

FIG. 1



FIG. 2



5,687,196

## 1

### RANGE AND BEARING TRACKING SYSTEM WITH MULTIPATH REJECTION

### BACKGROUND OF THE INVENTION

The present invention is related generally to systems and methods for determining the range and bearing of the source of radiofrequency ("RF") signal and, in particular, to systems and methods for determining the range and bearing of such signals in the face of multipath and similar noise sources.

Systems and method for determining the distance and bearing of an RF signal are well known. In some systems, a outbound signal having a known power is sent from a base station to a remote station at an unknown location. The remote station may "respond" to the signal from the base station by returning a signal upon receipt of the outbound signal. Such a system is presently produced by Cubic Defense Systems, Inc. as the AN/ARS-6(V) PLS system or by Rockwell International Inc as the Target Locating System (TLS). The distance between the base station and the remote station may be determined by any of the known methods. For example, the distance can be computed by timing the total transit time between the transmission of the outbound signal and the receipt of the response signal. By subtracting the estimated time of the delay in the remote station from the total transit time, the time to traverse twice the distance between the base and the remote stations can obtained and the distance readily computed. By way of another example of prior art systems, the distance between the base and the remote stations can be estimated by knowing the power of the signal transmitted from the remote and measuring the power of the signal received at the base station. Using the inverse square law of signal strength over increasing distances, an estimate of the distance can be obtained from the difference between the transmitted power and the received power.

Likewise, it is known in the prior art to determine the direction of the response signal by one of many techniques. For example, in one of the most simple methods, a loop antenna may be rotated and the strength of the response signal measured. The transmitting station is estimated to be along the line corresponding to the axis of the loop when the loop is position to maximize response signal power. In another example in the prior art, a base station may use plural antennas having a known geometric relationship to one another. The angle of arrival of the response signal may be determined by evaluating the phase of the response signal simultaneously at each of the antennas. The simultaneous phase relationships at the antennas, the geometric relationship of the antennas and the frequency of the response signal can be used to estimate the angle of arrival of the response signal with respect to the antennas.

All of the above-noted systems and methods for determining range and bearing in the prior art experience some difficulty in multipath and other noisy environments typical of where many such tracking and ranging systems are used. For example, with reference to FIG. 1, an RF signal source 10 may be located at location remote and unknown to a base station 12. Plural blocking and/or reflecting elements 14, such as buildings, towers, mountains may exist in the proximity of and in the direct path between the RF signal source 10 and the base station 12. The blocking and/or reflecting elements cause RF signals impinging upon such elements to be blocked, absorbed, reflected, and often a combination of all three. Generally, such elements cause RF signals to be diminished in strength and to change direction.

## 2

When a source of RF signals such as the remote source 10 radiates RF signals, such signals are blocked and/or reflected by the elements 14 such that instead of a single signal arriving at the base station 12, multiple versions of the same or slightly altered signal arrive at the base station 12. The different versions of the signals arrive at different times because they have travelled different paths of different distances than either the direct version or other indirect versions. The signals may also be altered from one another because each of the signals has experienced a different environment and may have been subject to different noise and interference sources along the different paths.

With continued reference to FIG. 1, in a multipath environment, the signal which arrives directly from the RF signal source 10 at the base station 12 may not be the strongest signal. For example, in the system of FIG. 1 three different paths 20, 22, and 24 between the RF signal source 10 and the base station 12 are shown. (It being understood that generally communications are conducted across an arc and not just at selected lines from the RF signal source.) The first signal path 20 proceeds directly from the RF signal source 10 to the base station 12. Because the first signal path intersects two of the elements, and each element tends to diminish the strength of the signal, the signal arriving at the base station 12 is lower in amplitude or power than a signal arriving without being partially absorbed. Note that when the signal on the first signal path impinged on the elements, it is likely that some portion of the signal was reflected and some portion was refracted and never reached the base station 12 but such reflection and refraction are not shown with respect to the first signal path 20 for simplicity of illustration.

The second signal path 22 in the illustration of FIG. 1 is reflected off two of the elements 14 before reaching the base station 12 (refraction and absorption not being shown). If the reflecting surfaces of these two elements are relatively efficient, a relatively strong signal will reach the base station 12 along the second signal path 22. Because the signal travelling the second signal path 22 travelled a longer distance than the signal travelling the first signal path 20, the signal on the second path will arrive at the base station 12 after the signal on the first signal path 20. Similarly, the third signal path 24 is reflected off an element 14 to reach the base station 12.

Note that in the system of FIG. 1, the various signals arrive at the base station from entirely different angles. In some systems in the prior art, the locating system will operate on the signal having the strongest signal power. As can be seen from the illustration in FIG. 1, such a procedure will lead to an erroneous result as the signal with the strongest power arrives along the second signal path 22, from almost the very opposite of the actual angle to the RF signal source. Note also that if ranging is done on the basis of the strongest signal, the ranging determination will be in error because the strongest (second signal path 22) travels more distance than the distance between the RF signal source 10 and the base station 12.

The influences of multipath signals on distance and angle location has been recognized in the prior art. Some prior art systems ignore the influence of multipath by utilizing a composite signal based on the strengths of the various multipath signals identified by the base station 12 The systems of FIG. 1 illustrate how the composite signal may be erroneous as signal which is the composite of the arriving signals may yield a signal which is misaligned such as the composite signal 26. As can be seen from the illustration, the direct signal path (first signal path 20) will yield the best

5,687,196

3

"direction" information but the "composite" signal 26 received by the base station is a combination of signals from different angles of arrival.

It is accordingly an object of the present invention to provide a novel system and method of tracking a remote RF transmitter that obviates these and other known problems in the prior art.

It is a further object of the present invention to provide a novel system and method of tracking a remote RF transmitter which has a reduced susceptibility to the effects of multipath.

It is another object of the present invention to provide a novel system and method of tracking a remote RF transmitter by determining the range and direction of an arriving signal with respect to the portion of the signal arriving directly from the RF transmitter.

These and many other objects and advantages of the present invention will be readily apparent to one skilled in the art to which the invention pertains from a perusal of the claims, the appended drawings, and the following detailed description of the preferred embodiments.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a pictorial representation of a typical environment in which RF tracking is accomplished, showing the various signal paths.

FIG. 2 is a signal power level graph showing the correlations of signal power in a typical multipath signal.

FIG. 3 is a simplified block diagram of a system in which the present invention may be used.

FIG. 4 is a simplified block diagram of another embodiment of a device in which the method of the present invention can be implemented.

DESCRIPTION OF PREFERRED
EMBODIMENTS

The principles of operation of the present invention can be described with reference to the correlated signal power level graph of FIG. 2. The graph of FIG. 2 depicts the correlated power level of the signal received plotted against time starting from the time of transmission of the signal. In a typical multipath environment, such as shown in the illustration of FIG. 1, the signal power level may have several peaks, each peak corresponding to the arrival of a signal which has taken a different route. For example, in FIG. 2, the first peak could correspond to the signal traveling along the first signal path 20 of FIG. 1, the second peak could correspond to the signal travelling along the second signal path 22 of FIG. 1, et cetera. Note that in the graph of FIG. 2, the "strongest" signal corresponds to the signal travelling on the second signal path 22 and that this is a multipath signal, not the signal arriving directly from the transmitter. Rather, the signal arriving directly from the transmitter is the first signal having a significant peak, the signal travelling along the first signal path 20. The first arriving signal in this example is weaker than the later arriving signal because the signal was attenuated by passing through the blocking elements 14 illustrated in FIG. 1. Because the "shortest distance between two points is a straight line" and the speed of transmission of the signal through various media is approximately equal, the signal travelling directly from the transmitter to the base station will always be the first signal to arrive (assuming that the signal is not wholly blocked.) The present invention takes advantage of the fact that the first arriving signal is the signal which has travelled the

4

shortest distance and is most likely the signal corresponding to the direct path to the transmitter by selecting this signal from which to determine the range to and angle of arrival from the remote transmitter.

With reference to FIG. 3, the present invention may be embodied in a tracking and locating system in which a base station 10 transmits a signal to a remote unit 12 which relays the signal back to the base station 10. The signal may be a spread spectrum signal, such as a chirp signal. By determining the round trip time and subtracting the known delay within the remote unit 12 and within the base station's detection system, the propagation time is determined and the distance may be calculated. In a preferred embodiment, the base station's receiver is a conventional correlation receiver in which the power level of the arriving signal is correlated in time and the signal arriving first in time is used to determine the total propagation time and angle of arrival.

With reference to FIG. 4, the present invention may be embodied in a direction finding unit having multiple channels 50, each channel being associated with a different antenna 52 (or element in a plural element antenna array). The geometric relationship of the plural antennas 52 is known to the DF unit. Each of the channels 50 may include a low noise amplifier 54 and a bandpass filter 56 which provides the received signal to a mixer 58 which mixes the received signal with a locally generated signal 60. The mixed signal may then be amplified by an intermediate frequency amplifier 62, further filtered by a bandpass filter 64 and adjusted by a gain control circuit 66. The mixed signal may then be applied to a quadrature downconverter which down converts the mixed signal to baseband. The baseband signal may be converted by an analog-to-digital ("A/D") converter 70 to a digital signal which is supplied to a digital signal processor ("DSP") 72. The DSP 72 may be under the control of a small logic device, such as a personal computer 74, which determines the angle and direction of the remote transmitter from the DSP and provides and appropriate display or announcement to a user (not shown).

In the preferred embodiment, it has been found advantageous for the remote transmitter to transmit a signal having two portions, the first portion being a preamble which alerts the base station that the signal is arriving and indicates to the receiver that it should begin receiving. The second portion of the transmitted signal may be a chirp waveform, i.e., a waveform in which the frequency is varied, usually at a linear rate, for a period of time. The transmitted signal may be generated remotely at the transmitter or may be a replay of a signal originally sent by the base station.

Use of a chirp waveform has several advantages in the present invention because of a useful property of mixed chirp signals. It is known that if two identical chirp signals, one time delayed from the other, are mixed, the resulting signal will be a sinusoidal signal with a frequency which is directly proportional to the amount of delay between the two signals.

In operation, when the transmitted signal is received at the base station, it is detected by the receiver which recognizes the preamble and starts a chirp generator 76 which modulates a quadrature modulator 78 to provide an RF chirp signal as the locally generated signal 60 on the mixer input. When the RF chirp signal is mixed with the chirp signals arriving from the remote transmitter (i.e., several time delayed versions of the transmitted chirp signal), a set of sinusoidal signals is generated whose frequencies are proportional to the time they arrived. Thus, after the mixing, the signals in each channel represent the multipath profile of the

5,687,196

| 5 | 6 |

received signal in the frequency domain. In the present invention, the mixing is accomplished at an intermediate frequency and then the frequency spectrum of signals is further downconverted by the quadrature downconverter 68 to baseband. The quadrature modulator 68 may be provided with a modulating/downconverting signal from the Timing and Frequency Synthesizer 40 via a line 42 in a conventional fashion. The signal may then be digitized by the A/D converter and the digitized form of the signal applied to a multichannel DSP 72 which may use conventional techniques (such as a fast Fourier Transform) to determine the spectrum of frequencies at which signal energy is significantly present so that a power level profile may be developed. The PC 74 may review the power level profiles developed by the DSP for all the channels 50 to determine which signal arrived first. Because the relative phase relationships among the signals have been preserved and the PC 74 has been provided with the geometric relationships between the various channels, the PC 74 may conventionally determine the angle of arrival of the first arriving signal.

The filtering and amplifying elements of the DF unit of FIG. 4 may be conventional. The DSP 72 may be a commercially available device such as the TMS 320 C 30 device sold by Texas Instruments.

While not critical to the invention, in one embodiment, an acceptable signal from the transmitter had a center frequency of 915 MHz with a chirp of +/–10 MHz for a duration of approximately 10 millisec. The locally generated (reference) RF chirp used to downconvert to an intermediate frequency may be a signal having a center frequency of 880 MHz.

In the foregoing description, for ease of understanding, the elements of the system have been referred to as "base" and "remote". However, there is nothing critical to the present invention that requires one of the stations be fixed and the other mobile. Additionally, the detailed description may suggest that certain components may be utilized to construct a system of the present invention. However, that suggestion is not to be taken as limiting as it is known that many other components could be utilized to accomplish the same results. For example, the FFT 74 could be replaced by a bank of bandpass filters and appropriate detectors, each measuring the power level of the signal at different frequency ranges. Similarly, while the above description utilizes plural channels 50, the invention could be readily implemented using a single channel which is appropriately multiplexed to the various antennas.

While preferred embodiments of the present invention have been described, it is to be understood that the embodiments described are illustrative only and the scope of the invention is to be defined solely by the appended claims when accorded a full range of equivalence, many variations and modifications naturally occurring to those of skill in the art from a perusal hereof.

What is claimed is:

1. A method for determining the direction with respect to a receiver of a source of a radiated radiofrequency (RF) signal, comprising the steps of:

(a) receiving a multipath signal which has been transmitted by a remote transmitter;

(b) correlating the received multipath signal into plural path signals;

(c) determining the time of arrival of each of the plural path signals;

(d) determining the direction of the remote transmitter from the path signal having the earliest determined time of arrival.

2. The method of claim 1 wherein said step of correlating comprises the step of determining the signal power level of each path signal.

3. The method of claim 1 wherein said step of receiving is accomplished by plural antennas.

4. The method of claim 3 wherein said step of receiving is accomplished by four antennas equally spaced along the corners of a square.

5. The method of claim 3 wherein said step of determining the direction comprises the step of comparing the phase relationship of the earliest arriving signal at each of the plural antennas for correspondence with predetermined angles of arrival.

6. The method of claim 1 wherein said radiated RF signal is a chirp signal.

7. The method of claim 1 wherein said radiated RF signal is derived from an RF signal received at the remote transmitter.

8. The method of claim 1 wherein said step of determining the time of arrival further comprises the steps of:

(c)(1) mixing the plural path signals with a predetermined mixing signal to produced plural mixed signals; and,

(c)(2) calculating the time of arrival of the plural mixed signals.

9. The method of claim 8 wherein said calculated time of arrival for each mixed signal is related to the frequency of each mixed signal.

10. The method of claim 8 wherein said mixing signal is a chirp signal.

11. A system for determining the direction from which a received multipath signal was transmitted, comprising:

plural receiving channels, each channel comprising:

RF signal receiving means for receiving a RF signal and converting said RF signal to a received signal;

bandpass filtering means for filtering said received signal;

a chirp mixer to mix the filtered electrical signal with a chirp signal to produce an intermediate frequency ("IF") signal;

IF filtering means for filtering said IF signal;

a quadrature downconverter to downconvert said filtered IF signal to baseband quadrature signals; and,

an analog-to-digital converter to convert the baseband quadrature signals to digital signals;

digital signal processing means operatively connected to receive and determine the power spectrum of each of said digital signals from said plural receiving channels;

control means for determining the time of arrival of each of said digital signals and for determining the angle of arrival of the digital signal having the earliest time of arrival.

12. A method for determining the distance between a receiver of a radiated radiofrequency (RF) signal and a transmitter of said signal, comprising the steps of:

(a) receiving a multipath signal which has been transmitted by a remote transmitter;

(b) correlating the received multipath signal into plural path signals;

(c) determining the time of arrival of each of the plural path signals;

(d) determining the distance of the remote transmitter from the path signal having the earliest determined time of arrival.

13. The method of claim 12 wherein said step of correlating comprises the step of determining the signal power level of each path signal.

5,687,196

7

14. The method of claim 12 wherein said distance determining step comprises a measurement of the time period for the signal to travel from the transmitter to the receiver.

15. The method of claim 14 wherein said receiving step comprises the steps of:

(a) transmitting an outward signal to the remote transmitter; and,

(b) transmitting a signal to the receiver responsively to the receipt at the transmitter of the outward signal.

16. The method of claim 12 wherein said multipath signal is a spread spectrum signal.

17. A system for determining the direction to a remote transmitter from which a chirp signal was transmitted, comprising:

a receiver for receiving a first chirp signal and any multipath chirp signals related thereto;

a chirp generator for providing a locally generated chirp signal;

a mixer for combining the locally generated chirp signal with each of the received chirp signals to generate plural sinusoidal signals whose frequencies are related to the arrival times of the received chirp signals;

a signal processor operatively connected to receive the sinusoidal signals and for determining a power spectrum of the sinusoidal signals; and

a control means for determining from the power spectrum the relative times of arrival of the received chirp signals and for determining the angle of arrival of one of the received chirp signals having the earliest time of arrival.

18. The system of claim 17 further comprising a transmitter for transmitting an outgoing triggering signal to the remote transmitter causing the remote transmitter to transmit the first chirp signal.

19. The system of claim 18 wherein the outgoing triggering signal is a further chirp signal and the first chirp signal transmitted by the remote transmitter is a replay of the further chirp signal.

20. The system of claim 18 further comprising a timer for determining elapsed time between transmission of the triggering signal and reception of the earliest one of the received chirp signals.

21. A method of determining the direction to a remote transmitter of an RF chirp signal, comprising the steps of:

(a) receiving plural RF chirp signals resulting from a remotely transmitted RF chirp signal;

(b) generating a local RF chirp signal;

(c) mixing the local RF chirp signal with each of the received RF chirp signals to generate a set of sinusoidal signals whose frequencies are related to the arrival times of the received chirp signals;

8

(d) correlating the sinusoidal signals into plural path signals;

(e) determining which one of the plural path signals arrives first; and

(f) determining the direction to the remote transmitter using the earliest arriving one of the plural path signals.

22. The method of claim 21 wherein the step of correlating comprises the steps of determining a spectrum of frequencies with signal energy present, and developing a power level profile.

23. The method of claim 21 wherein the step of determining the earliest arriving one of the path signals comprises the step of comparing the frequencies of the sinusoidal signals.

24. The method of claim 21 wherein the transmitted RF chirp signal is transmitted in response to a trigger signal received at the remote transmitter.

25. The method of claim 24 wherein the trigger signal received at the remote transmitter is an RF chirp signal.

26. A method of determining the distance to a remote transmitter of an RF chirp signal, comprising the steps of:

(a) receiving a multipath RF chirp signal resulting from the remotely transmitted signal;

(b) correlating the multipath RF chirp signal into plural path signals;

(c) determining the time of arrival of the first arrived one of the path signals; and

(d) determining the distance of the remote transmitter using the first arrived one of the path signals.

27. The system of claim 11 further comprising a transmitter for transmitting a trigger signal to a remote transmitter to initiate transmission of the signal received at said plural receiving channels.

28. The system of claim 27 wherein said trigger signal is a chirp signal.

29. The system of claim 11 wherein the received RF signal comprises a preamble portion and a following chirp waveform portion, and wherein said RF signal receiving means is activated upon receipt of the preamble portion of the received RF signal.

30. The system of claim 17 wherein the received first chirp signal comprises a preamble portion for activating said receiver and a following chirp waveform portion.

31. The method of claim 21 wherein each of the received plural RF chirp signals comprises a preamble portion for activating a receiver and a following chirp waveform portion.

32. The method of claim 26 wherein the received RF chirp signal comprises a preamble portion for activating a receiver and a following chirp waveform portion.

*   *   *   *   *

## ATTACHMENT 14

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 14: Greenberg, Andy (Forbes Magazine), *Despite FCC
Scare Tactics, Researcher Demos AT&T
Eavesdropping – Forbes* (Jul. 31, 2010),
*available at*
http://www.forbes.com/sites/firewall/2010/07/31/
despite-fcc-scare-tactics-researcher-demos-att-
eavesdropping/ (last accessed: Dec. 14, 2011);

Business    Investing    Tech    Entrepreneurs    Op/Ed    Leadership    Lifestyle    Lists

# Forbes

Help | Login | SignUp

Search news, business leaders, and stock quotes

 Words To Strike From Your Resume
 How To Conquer Public Speaking
 7 Ways To Really Occupy Wall Street
 AdVoice: I'll Still Call 'Like-Minded' Friends

Free Issue >


Amazing things happen when business, community and Verizon come together. **LEARN MORE**
verizon



**The Firewall**
THE WORLD OF SECURITY
+ Follow

7/31/2010 @ 5:35PM | 1,350 views

# Despite FCC "Scare Tactics," Researcher Demos AT&T Eavesdropping

**Andy Greenberg, Forbes Staff**

+ Comment now

**Updated with a response from the GSM Association below.**

Researcher Chris Paget pulled off a stunt at the Defcon security conference Saturday that required as much legal maneuvering as technical wizardry: eavesdropping on the cell phone calls of AT&T subscribers in front of thousands of admiring hackers.

With about $1,500 worth of hardware and open source software, Paget turned two on-stage antennas into a setup capable of spoofing the base stations that connect the GSM cell phone signals used by AT&T and T-Mobile. Paget set his hardware to impersonate an AT&T signal, and dozens of phones in the room connected to his fake base station. "As far as your cell phones are concerned, I'm now indistinguishable from AT&T," he told the crowd.

Paget invited anyone with an AT&T phone to make a call, and using his GSM hijacking trick, routed their calls through a voice-over-Internet system that connected their calls even while recording the audio to a USB stick—which he promptly destroyed with a pair of scissors to make sure he hadn't violated any privacy laws. The hack, after all, was intended to show the fundamental insecurity of GSM cell signals—not spy on callers.

Even minutes before his demonstration, it wasn't clear whether Paget would go through with his cell-snooping act. He says he received a call from the Federal Communication Commission (FCC) on Friday morning, warning him about a long list of potential federal regulations that he might be violating with the demo.

"It wasn't a particularly productive conversation," he said in a meeting with reporters before his talk. "It seemed more like scare tactics to me."


RiA
Discover the difference with a Registered Investment Advisor.

Who challenges you, focuses you, inspires you?

The difference is independence.

What is a Registered Investment Advisor?

Learn More >

Compliments of Charles Schwab. Read important information.

## Most Popular

NEWS    People    Places    Companies

**Italy's Berlusconi Agrees To Resign After Passing Austerity Bill** +51,923 views

**The Worst and Best Advice I've Ever Gotten** +28,911 views

**4 Networking Mistakes You Don't Know You're Making** +23,330 views

**Final Cut: Words to Strike from Your Resume** +17,598 views

**How We Know You (Might Be) Lying** +16,460 views

+ show more

Requests for comment from the FCC and the GSM Association, which represents companies that use the GSM protocol, weren't immediately returned, though we'll update this post when we hear from them.

Paget's demo sidestepped the FCC's legal hurdles with a clever loophole. Creating your own GSM cell tower isn't generally legal. But Paget used a GSM radio spectrum that's reserved for HAM radio in the United States but GSM phones in Europe; Since Paget is licensed as a HAM radio operator, he's ostensibly protected from charges of running an unlicensed base station. "I'm operating as a licensed HAM radio transmitter, but your handset thinks I'm a European cell tower," he said.

Paget's fake base station trick is one that law enforcement and intelligence agencies have been using for years. But Paget says his $1,500 method is the least expensive and most accessible version of the hack ever performed. "This is a thousand times cheaper than anything that's done this before," he says.

Though Paget's hack can only intercept the 2G GSM protocol, his equipment first sends out a "jamming" signal of radio noise to block 3G connections, forcing phones to automatically search for a 2G signal and connecting with his hardware instead.

For now, his method can only intercept outgoing calls, and displays the wrong caller ID on the phone of the call's recipient. But neither of those problems applies to the more expensive versions of the interception technology, and could be fixed in his cheaper attack with more time, he says.

The highly-public hack is intended to show that GSM is a fundamentally insecure system, and should be dumped altogether in favor of 3G protocols. "GSM is broken," says Paget. "The primary solution is to turn it off altogether."

In practical terms, that would T-Mobile and AT&T phones shouldn't be set to search for 2G signals when a 3G connection isn't available. While BlackBerry phones have an option to only use 3G signals, iPhones and Android handsets don't, Paget says.

Paget says he's warned the GSM Association–the industry organization that oversees the standard–about his hack, but his concerns have been dismissed. "The GSMA says GSM is secure," he says. "The only defense I can put forth is to demonstrate that it isn't."

*Update: The GSM Association responded in a statement that lists the limitations to Paget's method: the eavesdropper would have difficulties identifying or targeting any specific user, the interception only works within a certain range, in some cases, the call's encryption could prevent eavesdropping, and GSM phones are designed to alert users when encryption is removed by a base station. (Paget said in his talk that no device he's tested–including iPhone and Android phones–has had this option enabled.)*

*In summary, the GSM Association spokeswoman writes, "The overall advice for GSM calls and fixed line calls is the same. Neither has ever offered a guarantee of secure communications. The great majority of users will make calls with no reason to fear that anyone might be listening. However users with especially high security requirements should consider adding extra, end to end security features over the top of both their fixed line calls and their mobile calls."*

**+ Comment now**



**The Firewall**
THE WORLD OF SECURITY
**+ Follow**

OUR WRITERS

     


MORE FROM THE FIREWALL

**The Firewall's News Stream**

 Show all activity (20)

New Post 6 months ago
Why Verizon Has Its Own HAZMAT Team

New Post 6 months ago
Debix: Ten Percent of Children Are Victims of Identity Theft

New Post 7 months ago
Security In DNS Left Out On Purpose, Says Creator

New Post 8 months ago
Why Cybersecurity Should Focus on Failure

· · · · ·

**Old Way or the New Way?**
You Now Have a Choice. The New Network Means Business.
www.juniper.net

**Galaxy Nexus Phone**
Calling All Dessert Lovers New! Android 4.0 Ice Cream Sandwich
google.com/nexus

**Stop The Harassing Calls**
Know your Rights- Stop the Calls Talk to an Atty today- free consult
www.tempebankruptcy.com

Email    Report Corrections

# More on Forbes Right Now



FEATURES



**Cars That Are Stolen The Most**



**Special Feature: Pastimes Of The Uber-Successful**

TODAY'S TOP STORIES

**Italy's Berlusconi Agrees To Resign After Passing Austerity Bill**
+51,923 views

**The Worst and Best Advice I've Ever Gotten**
+28,911 views

**4 Networking Mistakes You Don't Know You're Making**
+23,330 views

IBM
Smarter Computing    BAO    Cloud

Is Facebook Swallowing Up the Internet's Data?

This article appears in the August 8, 2011 issue of Forbes Magazine. See the accompanying graphic.

Big Data And The Innovator's Dilemma

**Forbes Data Driven**
IBM Smarter Computing Capabilities
Smarter Computing and Breakthrough IT Economics

Smarter Computing Primer: Setting Op-Ad. on ibm.com/smartercomputing

# Post Your Comment

**Log in to post a comment**

Username:

Password:

Lost your password?

☐ Remember me

Log In

**Don't have an account?**
**Join Forbes Now.**

# Comments

**CALLED-OUT**    Expand All Comments

+ expand 2 comments

# The Forbes 400

World's Billionaires    Celebrity 100    World's Leading Companies    more +

The Forbes 400 is the definitive list of wealth in America, profiling and ranking the country's richest citizens by their estimated net worths.

**View complete list »**



# Photo Galleries and More



*Gallery:* America's Best-Paying Sales Jobs



Lessons From America's Most Promising Companies



*Gallery:* What Makes People Powerful



Essential Gear For Smarter Travel



Companies That Give Back The Most

Home | Business | Investing | Tech | Entrepreneurs | Op/Ed | Leadership | Lifestyle | Lists | Forbes Conferences | Newsletters

Advertising Information | Self-Serve Advertising | Reprints/Permissions | Terms, Conditions and Notices | Privacy Statement | Contact Us | Sitemap | Help

2011 Forbes.com LLC™   All Rights Reserved

**MAGAZINES**

  

Free Trial Issue
Subscriber Services
Buy Back Issues

## **ATTACHMENT 15**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 15: *The OpenBTS Project*,
http://openbts.sourceforge.net (last accessed:
Feb. 10, 2012);

# OpenBTS®

## GSM. Simplified.

**Wiki** | **Blog** | **Download** | **Browse Code** | **List Archives** | **Bug Tickets** | **Online Store** | **Commercial**

OpenBTS is a Unix application that uses a software radio to present a GSM air interface to standard 2G GSM handset and uses a SIP softswitch or PBX to connect calls. (You might even say that OpenBTS is a simplified form of IMS that works with 2G feature-phone handsets.) The combination of the global-standard GSM air interface with low-cost VoIP backhaul forms the basis of a new type of cellular network that can be deployed and operated at substantially lower cost than existing technologies in many applications, including rural cellular deployments and private cellular networks in remote areas.

In plain language, we are working on a new kind of cellular network that can be installed and operated at about 1/10 the cost of current technologies, but that will still be compatible with most of the handsets that are already in the market.



Typical OpenBTS development kit: USRP, laptop and handsets. This particular example has a range of just a few meters, but can connect inbound and outbound PSTN calls through a VoIP gateway.

## Project News (Last Updated 11 October 2011)

- There is a new public wiki.
- On 11 Oct 2011, we released P2.8 ("Opelousas") publicly, available from Sourceforge. Information on differences from the previous P2.6 ("Mamou") release is available here.
- We ran a multi-site test network at Burning Man 2011.
    - the blog post
    - general information
    - technical details

## OpenBTS in the News

- The Network World article that triggered and avalanche of interest in late 2010.
- Engineering for Change, a new magazine from the ASME, has one of the more substantial reports about the project.
- Make magazine finally found us.
- Technology Review covers our Niue hardware.
- CNet coverage of the Burning Man 2009 test network.
- EComm released the video of David Burgess' presentation at eCcomm America 2009, the first conference demo of OpenBTS, from March 2009.

## Show Us Your OpenBTS

Did you get OpenBTS up and running? Did you write it up on the web somewhere? We'd like to know!

- SAIT testing OpenBTS with Google Voice
- Prof. Dr.-Ing. Andreas Steil's group at Fachhochschule Kaiserslautern has built what looks like a very nice DCS 1800 system.
- Ali Gündüz blog post on the June 2010 OpenBTS workshop in Germany.
- Chris Paget running OpenBTS on a Droid.
- Alexander Chemeris' own OpenBTS adventures, mostly in Russian.
- Using a more accurate external clock to improve OpenBTS performance.
- OpenBTS on YouTube.
- Alberto Escudero-Pascual's test as reported on the village-telco-dev list.

Copyright 2011 Range Networks, Inc.
Copyright 2008, 2009, 2010 Kestrel Signal Processing, Inc.
Please note that "OpenBTS" is a registered trademark of Range Networks, Inc.
**Do not use the "OpenBTS" name in commercial activities without permission.**
Asterisk is a registered trademark of Digium, Inc.

## ATTACHMENT 16

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 16: *Catcher Catcher - Wiki - Redmine*,
http://opensource.srlabs.de/projects/2/wiki/Wiki
?version=18 (last accessed: Feb. 20, 2012);

« Previous - Version 18/25 (diff) - Next » - Current version
*luca, 01/12/2012 02:21 am*

# Tutorial

Currently, the IMSI Catcher detector is available only for the OsmocomBB platform.
If you like to test it, you can find all the needed information here:https://opensource.srlabs.de/projects/catcher/wiki/Tutorial
Please upload improvements as patches to this site or post to the   mailing list until a Git is set up.

## Software for other platforms

While Osmocom provides access to most detailed GSM data, other platforms could, too, provide useful information that can be used in detecting IMSI catcher attacks.

Folks with insights into phone programming APIs, please help fill out this list:

| | Available on | | | | |
|---|---|---|---|---|---|
| **Evidence** | Blackberry | Android | | iOS | Symbian |
| Cipher indication | | [1] *#32489# // OEM_SM_TYPE_SUB_CIPHERING_PROTECTION_ENTER | | | |
| LAC | | [1a] getLac() | | | |
| Cell ID | | [1a] getCid() | | | |
| Retransmission counters | | | | | |
| TMSI | | | | | |
| Send power | | [1] LISTEN_SIGNAL_STRENGTHS ? | | | |
| Silent call | | [1] | | | |
| Silent SMS | | [1] | | [2] | |
| Remote install | | [1c] // INSTALL_ASSET | | | |
| Network Roaming | | [1b] getRoaming() | | | |

[1] TODO: Reference / API call needed
[1a]: android.telephony.gsm.GsmCellLocation
[1b]: android.telephony.ServiceState
[1c]: GTalkService

[2] TODO: Reference / API call needed

## IMSI catcher detection

For IMSI catchers to achieve their goals they will need to show behavior different from normal base stations. We distinguish between yellow, red, and black flags. Yellow flag are an indication that you might have been caught; red flags are a very strong indication; and black flags tell you: "You are being tracked down; throw away your phone and run."

| # | | Flag | Evidence | Implementable in Osmocom |
|---|---|---|---|---|
| Setup: | | | | |
| S1 | | R | No encryption after using encryption with the same operator before | done |
| S2 | | Y | Cipher mode complete message is sent more than twice | wip |
| S3 | | R | ... more than four times | wip |
| S4 | | Y | IMEI not requested in Cipher Mode Complete message | done |
| Location updating (for information gathering, MITM): | | | | |
| L1 | | Y | The LAC of a base station changes | done |
| L2 | | R | The LAC changes more than once | done |
| L3 | | Y | The LAC differs from all neighboring cells | wip |
| L4 | | Y | The network queries the phones IMEI during location update | done |
| L5 | | Y | The registration timer is set to a value < 10 minutes | wip |
| L6 | | Y | The "IMSI attach procedure" flag is set | wip |
| (when locating a victim): | | | | |
| L7 | | Y | Receive a silent text message | done |
| L8 | | R | You are paged, but do not enter any transaction | done |

| L9 | R | Being assigned a traffic channel but not entering call control state/receiving a text message for 2 seconds | wip |
| L10 | B | ... 10 seconds | wip |
| L11 | Y | You do not receive a call setup message while already being on a traffic channel for 2 seconds | done |
| L12 | R | ... 10 seconds | done |
| L13 | Y | Your phone sends at the highest possible power | wip |

## **ATTACHMENT 17**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 17: Singel, Ryan (Wired Magazine), *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs* (Dec. 20, 2007), http://www.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell (last accessed Sept. 22, 2010);

<< Back to Article

# FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs

By Ryan Singel    12.20.07

By now it's well known that FBI agents can't always be troubled to get a court order before going after a surveillance target's telephone and internet records. But newly released FBI documents show that aggressive surveillance tactics have even caused friction within the bureau.

"We deal mostly with the fugitive squad here, and, like in many other offices, these guys have a reputation for cutting corners," a surveillance specialist at the FBI's Minneapolis field office complained in an internal e-mail last year. "I'm not bashing them; it's the way they do business. Getting a court order is the absolute last step, if they have to.

"Before I had a blowup with a particular agent ... we were constantly asked to call our contacts at service providers to see if we could get various information without having to get a court order," the message continues. "This gets old, believe me. ... Doing this once or twice to help out turns into SOP (standard operating procedure) ... It's expected, and you're criticized as a tech agent if you refuse to do this later on."

The revelation is the second this year showing that FBI employees bypassed court order requirements for phone records. In July, the FBI and the Justice Department Inspector General revealed the existence of a joint investigation into an FBI counter-terrorism office, after an audit found that the Communications Analysis Unit sent more than 700 fake emergency letters to phone companies seeking call records. An Inspector General spokeswoman declined to provide the status of that investigation, citing agency policy.

The June 2006 e-mail (.pdf) was buried in more than 600-pages of FBI documents obtained by the Electronic Frontier Foundation, in a Freedom of Information Act lawsuit.

The message was sent to an employee in the FBI's Operational Technology Division by a technical surveillance specialist at the FBI's Minneapolis field office -- both names were redacted from the documents. The e-mail describes widespread attempts to bypass court order requirements for cellphone data in the Minneapolis office.

Remarkably, when the technical agent began refusing to cooperate, other agents began calling telephone carriers directly, posing as the technical agent to get customer cellphone records.

Federal law prohibits phone companies from revealing customer information unless given a court order, or in the case of an emergency involving physical danger.

The documents are the second batch released by the EFF after winning a Freedom of Information Act lawsuit last May. The first set of documents shed light on the breadth and sophistication of the FBI's national wiretapping system, which is wired into telecom switches around the United States under the terms of the 1994 Communications Assistance for Law Enforcement Act -- a law that was extended to broadband internet switches in May of this year.

The new documents detail how a little-known FBI telephone intercept unit has developed a powerful cellphone tracking technology that agents use to monitor the physical movements of surveillance targets, even on phones that are not GPS equipped.

Originally developed to capture and arrest computer hacker Kevin Mitnick in 1995, the system today relies on a mobile FBI van that has access to a wireless carrier's cell site tracking information in real time. A special surveillance unit called the Wireless Intercept and Tracking Team (WITT) operates the van, using the cell site location to get to the approximate location of the cellphone customer, then uses direction-finding gear to zero in on the target.

The technical agent complained in the e-mail that FBI agents looking for a suspect tend to skip gumshoe investigative techniques in favor of the slick tracking van. "These guys always want to take the WITT vehicle out and drive around half of town (sic) to find the guy," the agent wrote.

The tracking system is part of the FBI's Digital Collection System, or DCS, a suite of software packages used for criminal and intelligence phone taps, which relies on a massive interlinked fiber-optic network that connects surveillance terminals around the country.

In brief, the mobile tracking system works as follows:

FBI agents investigating a case prepare a court order saying a cellphone number is likely relevant to an ongoing investigation, and a judge signs off on it.

The court order is faxed to a mobile carrier, which then turns on surveillance in its switches, and begins delivering call data and cell site information to the FBI's DCS 3000 software.

That software keeps track of which cellphone towers a phone uses or pings. A central FBI database translates a mobile carrier's cell tower code to latitude and longitude coordinates.

The software sends the coordinates to the agents and technical personnel in the mobile unit who then drive to the general area. But since cell tower information is not precise, agents in the van use antenna array connected to tracking software to zero in on the cellphone.

The FBI's technology office trumpeted the tracking function of the DCS 3000 software in a letter to the FBI director, boasting that it was used after a December 2005 North Carolina kidnapping to help find the victim unharmed.

Justice Department spokesman Dean Boyd says the department's policy allows the FBI to get cell tower information using under the low legal standard that applies to monitoring the digits a phone customer dials. Under that "pen register" standard, the FBI need only assert that the surveillance is relevant to an investigation -- the target need not be suspected of a crime.

When GPS-level data is wanted, law enforcement agents still need to show probable cause to a judge, said Boyd, who deferred questions about the Minneapolis agent's e-mail to the FBI.

FBI spokesman Paul Bresson cautioned against drawing conclusions from redacted government documents, and claimed that the FBI follows the law.

"FBI agents are trained to enforce the law using all available legal tools," Bresson said. "Absent an emergency circumstance involving danger or death or serious physical injury, the FBI does not request, nor do service providers give, any records without a court order."

The FBI tech agent's critical e-mail is best understood in light of the bureau's ongoing courtroom attempts to get cellphone location information without having to show probable cause, according to EFF lawyer Marcia Hofmann.

"For years the government has made dubious legal claims to justify tracking people's locations with minimal oversight," Hofmann said. "These docs show that the government hasn't satisfied its own weak standards in some cases."

Other revelations in the document include:

National security wiretaps in a Florida investigation captured more than 1,800 phone conversations, and led to 50 international terrorism advisories. Though details are redacted from the document, that case appears to be the so-called Liberty City Seven. Prosecutors initially trumpeted that the seven men were plotting to blow up the Sears Tower, though a government official later admitted the group was "more aspirational than operational." Last week a Florida jury acquitted one man and failed to reach a verdict on the other six.

In 2006, DCS 5000, the FBI's national security wiretapping software, captured 27,728,675 communication sessions. The document does not define what a "session" consists of. That year the FBI reported winning 2,176 FISA, or Foreign Intelligence Surveillance Act, warrants from a secret court.

By 2003 one cellphone carrier, Richmond, Virginia-based Triton PCS, was handling some 1,800 subpoenas and court orders a year. With 800,000 customers, that represented one records demand for every 444 customers.

The FBI uses a Raytheon-developed tool known as the Digital Multimedia Watchdog to record and store phone calls and internet communications between informants and targets of an investigation. That tool can "collect, process and store large amounts of multimedia data, including voice, fax, data and video."

DCS 3000 -- the FBI's tool for recording the phone numbers a target calls, or is called from -- was set loose on 5,300 phones in 2005, at a cost of $320 per targeted number. Those costs did not include payments to telecoms for the intercepts. The software is maintained by Booz Allen Hamilton and contained more than 490,000 lines of code as of 2005.

The three software components of the FBI's phone surveillance system cost $38.7 million in 2003 and $39 million in 2004. Computers running these software packages at FBI offices and surveillance locations are connected through a Sprint-run closed fiber-optic network that allows surveillance to continue even when offices are destroyed, as happened during Sept. 11 and Hurricane Katrina.

## ATTACHMENT 18

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 18: Myers, Rachel (ACLU), *With Technology Like This,
Who Needs the Law? | American Civil Liberties
Union* (Nov. 14, 2008),
http://www.aclu.org/2008/11/14/with-technology-
like-this-who-needs-the-law (last accessed Jul.
08, 2013);

SEARCH   `GO`

## BLOG CHANNELS

Blog of Rights

Free Future

Washington Markup

## LATEST POSTS

Obama's Pick to Lead FBI Approved Waterboarding Under Bush: Time to Speak Out

What Does Sheriff Arpaio Have To Do with Immigration Reform?

This Week in Civil Liberties (07/05 /2013)

The Ten Most Disturbing Things You Should Know About the FBI Since 9/11

On This 4th of July: Liberty and Justice For All!

The Supreme Court Limits Our Employment Rights...Again

The Story of ACLU Action

Aaron Hernandez Is Now Locked Alone Inside a Room the Size of a Parking Spot

CBP Using Its Authorization for Border Use Of Drones as Wedge For Nationwide Use

Police Harassment of Photographers Remains a Problem

## TRENDING TOPICS

Government Surveillance

NSA

Government Secrecy

Patriot Act

Government Oversight

Cell Phones & Smartphones

Photographers' Rights

FBI

---

| ARTICLE | COMMENTS  13 |
| --- | --- |

**11/14/2008**

### With Technology Like This, Who Needs the Law?

By Rachel Myers, ACLU at 12:55pm

*(Originally posted on Daily Kos.)*

The ACLU and Electronic Frontier Foundation have received several batches of Justice Department documents in response to our Freedom of Information Act (FOIA) request (and subsequent lawsuit) for records relating to the government's use of cell phones as tracking devices. What they tell us is that the government doesn't even need the help of a cell phone service provider to track us with our phones. The FBI now has what is called "triggerfish" technology — a cell site simulator that forces cell phones in the area to register its phone number, serial number and location — allowing it to track cell phones on its own. This raises the risk that they will do so without bothering to go to a court for permission first, since they no longer need to compel the provider to cooperate.

The documents do indicate that at least currently, the FBI's standard procedure is to seek a court order before using "triggerfish" to track cell phones. However, when obtaining those court orders — for "pen register and trap and trace" surveillance — the government doesn't show probable cause that a crime has been or is being committed, or even demonstrate to the court that the person being spied on is relevant to an ongoing investigation. The government simply tells the court that it thinks the target is relevant and then the court issues the order, a process offering little protection against the abuse of this powerful surveillance technology. In fact, the Department of Justice documents themselves suggest some government folks might be apprehensive: "The use of a triggerfish to locate cellular telephones is an issue of some controversy." People with questions or concerns are instructed to contact Mark Eckenwiler, Senior Counsel at the DOJ Computer Crime and Intellectual Property Section.

An earlier EFF FOIA lawsuit turned up documents detailing how a little-known FBI telephone intercept unit had developed triggerfish technology that agents use to monitor the physical movements of surveillance targets. Back then it seemed the process required assistance from the provider. But the new documents plainly say that triggerfish surveillance can be done without provider assistance, as at the top of page 18 in this document (PDF): "This can be done without the user knowing about it, and without involving the cell phone provider."

The *Washington Post's* Ellen Nakashima writes about the renewed call from magistrate judges for Congress to set a consistent legal standard for seeking cell phone tracking information today. All our related documents are here.

**CORRECTION:** An earlier version of this post mentioned the process of obtaining a pen-trap order from the FISA court. The documents uncovered by the ACLU/EFF FOIA are actually about pen-trap orders in the criminal context, and the second paragraph has been amended to reflect that.

Location Tracking

Prisoner Abuse

**See All »**

11/14/2008

## RELATED

1 of 10
**Obama's Pick to Lead FBI Approved Waterboarding Under Bush: Time to Speak Out**

2 of 10
**What Does Sheriff Arpaio Have To Do with Immigration Reform?**

| ARTICLE | COMMENTS 13 |
|---------|-------------|

## BLOG ARCHIVE

(select)

## AFFILIATE BLOGS

(select)

## NEVER MISS AN ACTION THAT'S IMPORTANT TO YOU.

Sign up for the **ACLU Action** newsletter.

*E-mail address*     **SIGN UP >**

## HELP GUARANTEE FREEDOM FOR ALL.

Chip in to help protect all of our rights and liberties.

**DONATE NOW »**

**CAPITAL PUNISHMENT**
Clemency »
Effective Counsel »
Execution Methods »
Innocence and the Death Penalty »
Junk Science and Capital Punishment »
Mental Illness and the Death Penalty »
Race and the Death Penalty »

**CRIMINAL LAW REFORM**
Drug Sentencing and Penalties »
Drug Testing »
Health-Based Solutions »
Marijuana Law Reform »
Police Practices »
Race and Criminal Justice »
Search and Seizure »
Juvenile Justice »

**FREE SPEECH**
Campaign Finance Reform »
Censorship »
Flag Desecration »
Internet Censorship »
Right to Protest »
Student Speech »

**HIV / AIDS**
Criminal Justice and HIV »
HIV/AIDS Discrimination »
Prevention and Education »
Testing and Privacy »

**HUMAN RIGHTS**
Children's Rights »
Death Penalty »
Immigrants' Rights »
National Security »
Racial Justice »
Women's Rights »

**IMMIGRANTS' RIGHTS**
State Anti-Immigrant Laws »
Local Anti-Immigrant Laws »
Immigration Detention »
Immigration Enforcement »

**LGBT RIGHTS**
LGBT Basic Rights and Liberties »
LGBT Parenting »
LGBT Relationships »
LGBT Youth & Schools »
Discrimination Against Transgender People »

**NATIONAL SECURITY**
Detention »
Discrimination »
Dissent »
Ideological Exclusion »
Secrecy »
Spy Files »
Surveillance & Privacy »
Targeted Killings »
Torture »

**PRISONERS' RIGHTS**
Immigration Detention »
Medical Care in Prison »
Mental Health Care in Prison »
Prison Conditions »
Private Prisons »
Restriction of Prisoners' Rights »
Women in Prison »
Solitary Confinement »

**RACIAL JUSTICE**
Affirmative Action »
Criminal Justice »
Education »
Indigent Defense »
Juvenile Justice »
Racial Profiling »

**RELIGION & BELIEF**
Free Exercise of Religion »
Government-Funded Religion »
Religion and Schools »
The Public Square »

**REPRODUCTIVE FREEDOM**
Abortion »
Birth Control »
Pregnancy »
Religion and Reproductive Rights »
Sex Education »

**TECHNOLOGY AND LIBERTY**
Biological Technologies »
Consumer Privacy »
Internet Free Speech »
Internet Privacy »
Medical Privacy »
Students »
Workplace Privacy »

**VOTING RIGHTS**
Ballot Access »
Election Reform »
Redistricting »
Voter Disfranchisement »
Voting Rights Act »

Voter Suppression »

**WOMEN'S RIGHTS**
Criminal Justice »
Education »
Employment »
Human Rights »
Violence Against
Women »

User Agreement    Privacy Statement    Contact Us

© ACLU, 125 Broad Street, 18th Floor, New York NY 10004
This is the website    of the American Civil Liberties Union and the ACLU Foundation.
Learn more about these two components of the ACLU.

The ACLU earns a 4-star rating
from Charity Navigator and
meets the highest standards of
the Better Business Bureau's
Wise Giving Alliance.

## ATTACHMENT 19

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 19: McCullagh, Declan (CNET News), *Justice Dept.*
*defends warrantless cell phone tracking |*
*Politics and Law - CNET News* (Feb. 13, 2010),
http://news.cnet.com/8301-13578_3-10453214-
38.html (last accessed: Jul. 08, 2010);

CNET News

# Justice Dept. defends warrantless cell phone tracking

In a novel privacy case, Obama administration tells an appeals court that police should be able to learn the locations of mobile devices without a search warrant.

by **Declan McCullagh** | February 13, 2010 9:25 AM PST

○

The FBI and other police agencies don't need to obtain a search warrant to learn the locations of Americans' cell phones, the U.S. Department of Justice told a federal appeals court in Philadelphia on Friday.

A Justice Department attorney told the Third Circuit Court of Appeals that there is no constitutional problem with obtaining records from cellular providers that can reveal the approximate locations of handheld and mobile devices. (See CNET's **previous article [http://www.cnet.com/8301-13578_3-10451518-38.html]** .)

There "is no constitutional bar" to acquiring "routine business records held by a communications service provider," said **Mark Eckenwiler [http://www.cybercrimeconference.org/bios/Eckenwiler.html]** , a senior attorney in the criminal division of the Justice Department. He added, "The government is not required to use a warrant when it uses a tracking device."

This is the first federal appeals court to address warrantless location tracking, which raises novel issues of government surveillance and whether Americans have a reasonable expectation of privacy in their--or at least their cell phones' --whereabouts.

Judge **Dolores Sloviter [http://en.wikipedia.org/wiki/Dolores_Sloviter]** sharply questioned Eckenwiler, saying that location data can reveal whether people "have been at a protest, or at a meeting, or at a political meeting" and that rogue governments could misuse that information. (See **transcript [#]** excerpts below.)

Just a few years ago, tracking phones was the stuff of thrillers like "Enemy of the State" or "Live Free or Die Hard." Now, even though police are tapping into the locations of mobile phones thousands of times a year, the legal ground rules remain unclear, and federal privacy laws written a generation ago are ambiguous at best.

"When the government acquires historical cell location information, it effectively commandeers our cell phones and turns them into electronic trackers that report, without our knowledge or consent, where we have been and how long we have spent there," **Susan Freiwald [http://www.usfca.edu/law_library/facultybib /Freiwald.html]** , a law professor at the University of San Francisco, told the court on Friday. "We should be able to use our cell phones without them creating a virtual map of our every movement and association."

Freiwald, the ACLU, the **Electronic Frontier Foundation [http://www.eff.org/]** , and the Center for Democracy and Technology filed briefs saying that the U.S. Constitution's Fourth Amendment provides Americans with at least some privacy protections that shield their whereabouts from police not armed with search **warrants [#]** . The civil liberties groups also said that current law gives judges the flexibility to require search warrants based on probable cause.

EFF attorney Jennifer Granick said one possibility is for the Third Circuit to order the

district judge to hold hearings to learn the more about the technology of cell tracking, including how accurately stored records can pinpoint the location of a phone. The judges "had a lot of factual questions about accuracy that haven't been answered," Granick said after the hearing.

Besides Sloviter, the other judges on the panel are **Atsushi Tashima [http://www.fjc.gov/servlet/tGetInfo?jid=2339]**, who is visiting from the Ninth Circuit, and **Jane Roth [http://en.wikipedia.org/wiki/Jane_Richards_Roth]**, who was not present on Friday but is expected to review the transcript.

The Bureau of Alcohol, Tobacco, Firearms and Explosives is asking the court for an order divulging historical (meaning stored, not future) phone location information because a set of suspects "use their wireless telephones to arrange meetings and transactions in furtherance of their drug trafficking activities." It's unclear how detailed this stored information is; there's some evidence that the FBI can use it to narrow down the location to a city block but perhaps not an individual house.

The Obama administration argues that no search warrant is necessary; it says what's needed is only a **2703(d) order [http://www.law.cornell.edu/uscode /18/usc_sec_18_00002703----000-.html]**, which requires law enforcement to show that the records are "relevant and material to an ongoing criminal investigation." Because that standard is easier to meet than that of a search warrant, it is less privacy-protective.

Cell phone tracking comes in two forms: police obtaining *retrospective* historical data kept by mobile providers for their own billing purposes that is typically not very detailed, or *prospective* tracking--which CNET was the first to report in a 2005 **article [http://www.cnet.com/Police-blotter-Cell-phone-tracking-rejected /2100-1030_3-5846037.html]** --that reveals the minute-by-minute location of a handset or mobile device.

Tracking cell phones can be useful for law enforcement. Agents from the Drug Enforcement Administration in Arizona tracked a tractor trailer with a drug shipment through a GPS-equipped Nextel phone owned by the suspect. Texas DEA agents have used cell site information in real time to locate a Chrysler 300M driving from Rio Grande City to a ranch about 50 miles away. Verizon Wireless and T-Mobile logs showing the location of mobile phones at the time calls were placed became evidence in a Los Angeles murder trial.

The civil liberties say they're not opposed to the government obtaining that information for legitimate purposes -- as long as the Fourth Amendment and federal privacy laws are being followed. This is, said Freiwald "a truly novel technology that can invade the privacy of all Americans who carry cell phones in their pockets or purses."

*Excerpts from Friday's oral arguments before the Third Circuit Court of Appeals*

**Justice Department's Eckenwiler:** That is what has come to be known in the vernacular as triangulation, where various measurements have been made from the towers in proximity to the phone to calculate a rough position to the phone?

**Judge Sloviter:** How close can you get?

**Eckenwiler:** Well, what the regulations require is 50 meters of precision for a handset solution, essentially for all cases, 95 percent, it needs to be accurate within 150 meters... But that's a class of information that's separate and apart from what the government has requested here.

**Sloviter:** But can you get it? Does the statute permit it? Irrespective of what the government has asked for here, does the statute permit the government to request -- and according to the government to demand, if they make the requisite showing -- information that would let them know where the cell phone user is within 150 meters?

**Eckenwiler:** As to historical records, your honor.

**Sloviter:** Yes

**Eckenwiler:** The answer is if the carriers retain such information, yes, it would allow--

**Sloviter:** Suppose the information is last week?

**Eckenwiler:** The statute would allow the government to obtain that information.

**Sloviter:** There are governments in the world that would like to know where some of their people are, or have been. For example, have been at what may be happening today in Iran, have been at a protest, or at a meeting, or at a political meeting. Now, can the government assure us that -- one, it will never try to find out that information, and two, whether that information would not be covered by (d). [Ed. Note: Sloviter seems to be referring to a **2703(d) order [http://www.law.cornell.edu/uscode /18/usc_sec_18_00002703----000-.html]** .]

**Eckenwiler:** Your honor, I can't speak to future hypotheticals in terms of what might happen.

**Sloviter:** But don't we have to be concerned about that? If the statute would permit the government -- not this government right now but a government -- to get information as to where... Wouldn't the government -- a government -- find it useful if it could get that information without showing probable cause?

**Eckenwiler:** Your honor, the information at issue in this case certainly is useful, that's why the government's applying for it here.

**Sloviter:** But without showing probable cause. Because it's relevant. Your papers admit that the showing that needs to be made for a subsection (d) order is less than the showing that needs to be made for a warrant.

**Eckenwiler:** That's correct, your honor.

**Sloviter:** So the question is, can (d) be used for that purpose?

**Eckenwiler:** Yes, your honor. It can be used constitutionally for that purpose. And the reason I understand your honor's concern about those future cases, those hypotheticals. But I think it is clear from the Supreme Court's caselaw that Fourth Amendment issues must be measured on the basis of the facts before the court.

**Sloviter:** The question is, really, what can the government get? [Refers to a log of cell phone tracking.] They can get, here's 4:33 on the same day, 4:39 pm on the same day, 4:40 on the same day. That's pretty close.

**Eckenwiler:** And your honor, the calling records, the numbers that are being called, from whom calls are being received by the same user, we can compel them with a subpoena.

**Sloviter:** That's right. And as I read this, you can compel a lot of information that it looks like you wanted with a warrant. I don't understand -- I've been on this court for 30 years, more than 30 years. The magistrate judges that I have seen are not very grudging about granting warrants. If you could have gotten a probable cause warrant, why do you want to make the point that you don't have to show probable cause?

**Eckenwiler:** Well, it's interesting, your honor, because the rationale that was adopted in this case by the lower court wouldn't limit the reviewing court, the court to whom the application was presented to probable cause. Under the rationale that was articulated below, the court could demand proof by a preponderance of the evidence. Judge Lenihan's opinion said it's up to the court to decide, in effect, what showing could be made. It vests the trial court, the magistrate judge, with what's essentially unlimited

discretion to decide what showing should be made. And the government submits, your honor, that that's an inappropriate exercise in judicial discretion.

**Sloviter:** You're concerned that the magistrates will give you the warrants even if they don't have enough basis? Is that really the government's concern? I mean, that's backwards.

**Eckenwiler:** Your honor, I'm saying the magistrate could demand an even showing higher than probable cause.

**Sloviter:** Then they'd go up on appeal and the district judge wouldn't accept that.

**Eckenwiler:** That's why we're here today. The magistrate demanded a higher showing than what's required under the statute.

**Sloviter:** But didn't require more than probable cause.

**Eckenwiler:** Your honor, that's true.

**Sloviter:** The five magistrates signed -- five! -- I've never seen that before. Did you ever see that before?

**Eckenwiler:** I have not, your honor.

**Sloviter:** Neither have I. Five magistrate judges signed on to this opinion affirmed by the district court. They didn't demand more than probable cause. They demanded just probable cause. A constitutional standard.

**[http://www.cnet.com/profile/declan00/]**

## About Declan McCullagh [http://www.cnet.com/profile/declan00/]

**Declan McCullagh [http://www.mccullagh.org/]** is the chief political correspondent for CNET. Declan previously was a reporter for Time and the Washington bureau chief for Wired and wrote the Taking Liberties section and Other People's Money column for CBS News' Web site.

o **[http://plus.google.com/112961607570158342254/]**

o

o

**Don't Miss**

about these links

_⊓_

Member Comments

**0 Comments/**

1 person following Log in []

**Commenting FAQs [http://www.cnet.com /2706-1 1-1954.html] / Guidelines [http://www.cnet.com** Post to: **/2706-1 1-1947.html]**

Newest [] / Oldest [] / Top Comments []

+ Follow conversation **Post Comment As...**

@CBS Interactive. All rights reserved.
CNET

- 
- 
- ▓▓

close

## **ATTACHMENT 20**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 20: Slashdot.org, *Secret Stingray Warrantless
Cellphone Tracking* (Oct. 27, 2012),
http://yro.slashdot.org/story/12/10/27/144229/se
cret-stingray-warrantless-cellphone-tracking
(last accessed: Nov. 28, 2012);

Slashdot
Stories
Slash Boxes
Comments

Search

7 Full 30 Abbreviated 25 Hidden          SlashTV   Channels ▼   Library   Newsletter   Submit   Login   Join
/Sea
Score:
5   Nickname:
4
3   Password: 6-20 characters long
2
1   ☐ Public Terminal
0
-1   Log In   Forgot your password?

More Login

http://

Log in with OpenID

Close
Nickname:

Password:
• Stories
• Recent
• Popular Terminal
• Blog
          Forgot your password?
Slashdot

• Ask Slashdot
Close • Book Reviews
Close • Games
• Idle
• YRO
•
• Cloud
• Hardware
• Linux
• Management
• Mobile
• Science
• Security
• Storage



# Secret Stingray Warrantless Cellphone Tracking 62

Posted by Soulskill on Saturday October 27, @10:34AM
from the your-phone-is-broadcasting-an-ip-address dept.

Penurious Penguin writes *"Last year a Slashdot story mentioned the case of Daniel David Rigmaiden, or 'the Hacker.' With the help of an IMSI-catcher device, law enforcement had been able to locate and arrest the elusive 'Hacker,' leading to U.S. v. Rigmaiden. But far more elusive than the 'Hacker,' is the IMSI-catcher device itself — particularly the legalities governing its use. The secrecy and unconstitutionality of these Man In The Middle devices, i.e. 'stringrays,' has caught some attention. The EFF and ACLU have submitted an amicus brief in the Rigmaiden case; and EPIC, after filing an FOIA request in February and receiving a grossly redacted 67 out of 25,000 (6,000 classified) pages on the "stingray" devices, has now requested a district judge expedite disclosure of all documents. Some Judges also seem wary of the 'stingray,' having expressed concerns that their use violates the Fourth Amendment; and additionally, that information explaining how the technology is used remains too obscure. Perhaps the most controversial aspect of ISMI-catchers is their several-kilometer range. When a "stingray" is used to spoof a cellphone tower, thousands of innocent users may be collaterally involved. And while the government claims to delete all gathered data unrelated to the target, it also means no one else can know what that data really was. The government claims that because only attributes of calls — but not their content — are captured in the attack, search warrants aren't necessary."* (More, below.)

Penurious Penguin continues, "The use of a pen-register (outgoing) and trap & trace (incoming) device, requires little more than a mewl of penal curiosity before a court, and no warrant or follow-up on the case is needed. The pen/trap seems unwieldy enough, as the EFF explains:

> "Most worrisome, we've heard some reports of the government using pen/trap taps to intercept content that should require a wiretap order: specifically, the content of SMS text messages, as well as "post-cut-through dialed digits" (digits you dial after your call is connected, like your banking PIN number, your prescription refill numbers, or your vote for American Idol). intercept information about your Internet communications as well."

Precisely what data these "stingrays" collect will hopefully be soon revealed through such efforts as those of EPIC. It should be noted that the Stingray is one of multiple devices with the same application. The Stingray and several others are trademarks of the Harris Corporation. Some are quite pricey ($75,000), and others are, as mentioned last year by a Slashdot reader, peculiarly affordable — and available. For a more comprehensive overview of the subject, see this Wall Street Journal article."

twitter facebook

    aclu eff fbi

⇐

# Related Links

⇒

Supreme Court To Hear First Sale Doctrine Case

## **ATTACHMENT 21**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 21: Carroll, Rory (The Guardian), *ACLU challenges
'stingray surveillance' that allows police to
track cellphones | World news | guardian.co.uk*
(Mar. 28, 2013), *available at*
http://www.guardian.co.uk/world/2013/mar/28/aclu
-stingray-surveillance-police-cellphones (last
accessed: Apr. 16, 2013);

**This site uses cookies. By continuing to browse the site you are agreeing to our use of cookies. Find out more here**

**theguardian**

ads not by thi

# ACLU challenges 'stingray surveillance' that allows police to track cellphones

## Civil liberties activists asking federal court to disallow evidence obtained by technology that mimics a genuine cellphone tower

**Rory Carroll** in Los Angeles
guardian.co.uk, Thursday 28 March 2013 10.03 EDT



A stingray sweeps up data from other people nearby, regardless of whether they are the focus of the investigation.
Photograph: Peter Parks/AFP/Getty Images

A secretive technology which lets police locate and track people through their cellphones in alleged violation of the US constitution will be challenged in a potential landmark court case on Thursday.

The American Civil Liberties Union hopes to rein in the little known but widespread "stingray" surveillance devices which it claims violate the fourth amendment and the right to privacy.

The group will urge a federal court in Arizona to disregard evidence obtained by a stingray in what could be a test case for limiting the technology's use without a warrant.

The case revolves around Daniel Rigmaiden, a hacker accused of leading a gang of sophisticated identity thieves which allegedly stole millions of dollars by filing bogus tax returns.

"We hope that the court sends the clear message to the government that it cannot keep judges in the dark. Judges are not rubber stamps – they are constitutional safeguards of our privacy," Linda Lyle, the attorney leading the case, wrote in an ACLU blog post on Wednesday.

The Electronic Frontier Foundation, an advocacy group, submitted an amicus brief with the ACLU, calling stingrays "the biggest technological threat to cellphone privacy that you don't know about".

A stingray mimics a cellphone tower, prompting a phone to connect to it even if no call is made. This lets a stingray operator send a signal to the phone, locate it and in some cases intercept conversations. The device sweeps up data from other people nearby, regardless of whether they are the focus of the investigation.

Stingray is the generic name for the technology. Similar devices, typically the size of a shoebox, have different names such as Triggerhead and Kingfish.

The FBI and other law enforcement agencies have used the technology at least since 2008 but according to the ACLU they have routinely concealed or downplayed its role in surveillance requests to federal magistrate judges.

"By withholding information about this technology from courts in applications for electronic surveillance orders, the federal government is essentially seeking to write its own search warrants," said Lyle.

Through a Freedom of Information Act request the ACLU recently obtained what it called "troubling" emails dated May 2011 from Department of Justice officials in northern California who acknowledged not being explicit about stingrays in court applications for electronic surveillance.

"It shows that the government was engaged in a widespread practice of withholding important information for judges, and that it did so for years," said Lyle.

The EFF said in a statement that the technology's unrestricted use violated the fourth amendment's prohibition of unreasonable searches and seizures:

"If uninformed courts approve the unregulated use of stingrays, they are essentially allowing the government to enter into the home via a cellular signal at law enforcement's discretion and rummage at will without any supervision. The government can't simply use technology to upend centuries of constitutional law to conduct a search

they would be prevented from doing physically."

The FBI so values the technology it has a policy of deleting the data it gathers to keep suspects in the dark about its capabilities, the Wall Street Journal reported.

Privacy right advocates including the Electronic Privacy Information Center have rallied around the case of Rigmaiden, 32, who faces charges of conspiracy, wire fraud, mail fraud and aggravated identity theft in an alleged scam which netted $4m in multiple bank accounts.

Rigmaiden has pleaded innocence and wants US district judge David Campbell to throw out evidence obtained by stingrays on grounds it violated his constitutional rights.

Prosecutors have argued Rigmaiden did not have reasonable "privacy expectations" in the whereabouts of his Verizon mobile broadband card and thus agents were not obliged to obtain a warrant.

## More from the Guardian   What's this?

Handbag thieves admit manslaughter 10 Apr 2013

Why is Spartacus so overlooked? 15 Apr 2013

Boston doctors remove nails and pellets from blast survivors 16 Apr 2013

Boston Marathon hit by double explosion 15 Apr 2013

Congo: We did whatever we wanted, says soldier who raped 53 women 11 Apr 2013

Kidney grown in lab successfully transplanted into rat 14 Apr 2013

## More from around the web   What's this?

Atheists Are Becoming the Most Annoying Demographic on the Internet (vice)

Thinking About Early Retirement? A Few Things to Consider: (Allstate Blog)

The 12 Worst Supermarkets in America (The Fiscal Times)

7 Ways Your Looks Are Killing Your Career (Salary.com)

Plastic Surgery Disasters: Lil Kim, Meg Ryan & More (Hollyscoop)

Which Supreme Court Justice was Turned Down by 14 Law Firms? (Makers)

# Ads by Google

Stop Jan Brewer's Agenda

Stop Gov. Brewer and her partisan attacks. Sign the petition today!

www.democraticgovernors.org

Affiliate Tracking

Easy to use Affiliate Software Top Platform in the Industry!

www.LinkTrust.com

Private Detective Course

Become a Private Investigator Fast. 100% Online Study. Free Info Now.

top-schools-online.net

ads not by thi

© 2013 Guardian News and Media Limited or its affiliated companies. All rights reserved.

;

## ATTACHMENT 22

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 22: Nakashima, Ellen (The Washington Post), *Little-known surveillance tool raises concerns by judges, privacy activists* (Mar. 27, 2013), *available at* http://articles.washingtonpost.com/2013-03-27/world/38070419_1_magistrate-judge-federal-agents-stingrays (last accessed: Apr. 9, 2013);

Jobs  Real Estate  Rentals  Cars  Print Subscription  Today's Paper  Discussions  Going Out Guide  Personal Post  Videos

**Politics**  **Opinions**  **Local**  **Sports**  **National**  **World**  **Business**  **Tech**  **Lifestyle**  **Entertainment**  **Jobs**  **More**

# National Security

Home > Collections

## Little-known surveillance tool raises concerns by judges, privacy activists

By Ellen Nakashima, March 27, 2013

Federal investigators in Northern California routinely used a sophisticated surveillance system to scoop up data from cellphones and other wireless devices in an effort to track criminal suspects — but failed to detail the practice to judges authorizing the probes.

The practice was disclosed Wednesday in documents obtained under the Freedom of Information Act by the American Civil Liberties Union of Northern California — in a glimpse into a technology that federal agents rarely discuss publicly.

The investigations used a device known as a StingRay, which simulates a cellphone tower and enables agents to collect the serial numbers of individual cellphones and then locate them. Although law enforcement officials can employ StingRays and similar devices to locate suspects, privacy groups and some judges have raised concerns that the technology is so invasive — in some cases effectively penetrating the walls of homes — that its use should require a warrant.

Ads by Google



1 Tip for
a tiny belly

### Cyber Security Programs

UMUC offers cyber security programs entirely online. Enroll today!

www.umuc.edu/cybersecurityprogram

AdChoices

The issues, judges and activists say, are twofold: whether federal agents are informing courts when seeking permission to monitor suspects, and whether they are providing enough evidence to justify the use of a tool that sweeps up data not only from a suspect's wireless device but also from those of bystanders in the vicinity.

In Northern California, according to the newly disclosed documents, judges expressed concerns about the invasive nature of the technology.

"It has recently come to my attention that many agents are still using [StingRay] technology in the field although the [surveillance] application does not make that explicit," Miranda Kane, then chief of the criminal division of the Northern California U.S. attorney's office, said in a May 2011 e-mail obtained by the ACLU.

As a result of that, she wrote, "effective immediately, all . . . applications and proposed orders must be reviewed by your line supervisor before they are submitted to a magistrate judge."

The Justice Department has generally maintained that a warrant based on probable cause is not needed to use a "cell-site simulator" because the government is not employing them to intercept conversations, former officials said. But some judges around the country have disagreed and have insisted investigators first obtain a warrant.

"It's unsettled territory," said one U.S. law enforcement official, who spoke on the condition of anonymity because he was not authorized to speak for the record.

Cut down a
bit of your
belly
everyday by
following thi
1 weird old
tip

Tip

ads not by this site



Keep Your
Home Through
Bankruptcy

SEE MORE



ads not by this site

LINCOLN
2 BOOKS FOR $5.95

PLUS A FREE BOOK

In a statement, Christopher Allen, a spokesman for the FBI, said the bureau advises field offices to "work closely with the relevant U.S. Attorney's Office to adhere to the legal requirements" of their respective districts.

One of the problems is there is "scant law" addressing the issue of cell-site simulators, said Brian L. Owsley, a federal magistrate judge in the Southern District of Texas, who in June wrote a rare public ruling on the issue. He denied an application to use a StingRay, in large part because he felt the investigating agent failed to explain the technology or how it would be used to gather the target's cellphone number.

Ads by Google

Moreover, the government did not explain what it would do with the numbers and other data "concerning seemingly innocent cell phone users" that were also picked up.

Ads by Google

**Search for Vital Records**
Births, deaths, marriages, and much more. Find vital records online
www.myheritage.com/Vital_Records

**Ever Been Arrested?**

... then your arrest record is online and ANYONE can view it. Want to see what's in yours?

**We Recommend**

Federal agents talk to ex-D.C. official who says he was...
*June 1, 2012*

Judges Urge Standard Cellphone-Tracking Policy
*November 14, 2008*

Carrier IQ: Which wireless carrier is the biggest user?
*December 16, 2011*

"Neither the special agent nor the assistant United States attorney appeared to understand the technology very well," Owsley wrote. "At a minimum, they seemed to have some discomfort in trying to explain it."

At a recent conference on cellphone tracking issues at Yale University, Owsley said he thought that "there are magistrate judges around the country that are getting these requests and not realizing what these requests are," in some cases perhaps because the agents are not clear about their intent to use the technology.

"By withholding information about this technology from courts in applications for electronic surveillance orders, the federal government is essentially seeking to write its own search warrants," said Linda Lye, a staff attorney for the ACLU of Northern California.

Judges "need the opportunity to require privacy safeguards, such as rules on how to handle the data of innocent people that may be captured by the devices as well," she said. Lye will be arguing the issue on Thursday in a federal case in Arizona, in support of a defendant charged with tax fraud and identity theft. Daniel Rigmaiden, known as "the Hacker" to acquaintances and federal agents, was tracked in part with the use of a StingRay. He has alleged that investigators did not seek a court's approval to use the technology.

"The main concern we have in Rigmaiden is the government was not being forthright with the magistrate when it was seeking to use this device," said Lye, whose organization is one of several that have filed an amicus brief in the case.

The newly disclosed documents suggest that "Rigmaiden was not an isolated case," she said.

The government said it obtained a warrant to track Rigmaiden, but the ACLU is arguing that the government did not present key information about the surveillance device to the magistrate, rendering the warrant invalid.

Chris Soghoian, the ACLU's principal technologist, said cell-site simulators are being used by local, state and federal authorities.

"No matter how the StingRay is used — to identify, locate or intercept — they always send signals through the walls of homes," which should trigger a warrant requirement, Soghoian said. "The signals always penetrate a space protected by the Fourth Amendment."

Ads by Google

**Don't File BK in AZ***
Visit Our Law Firm First & See How We Can Help! 100% Free Consultation
www.BkPhoenix.com

**FEATURED ARTICLES**

**MORE:**

Book review: 'The Great Deformation: The Corruption of Capitalism in America' by David Stockman

Pope Francis was often quiet on Argentine sex abuse cases as archbishop

For insurance exchanges, states need 'navigators' — and hiring them is a huge task

The best and worst small businesses to start in 2013

The Secret to Cleaning Grout in Tile Floors

Three days that saved the world financial system

## 186
## Comments

 **postfan10** wrote:
3/27/2013 8:42 PM MST

If the police want to use this kind of tool, they should be getting a warrant.

 **kritik1** wrote:
3/28/2013 2:25 AM MST

911 cried for better security. Instead we created a security monster. Our Legislature has undermined the Judiciary and given unprecedented powers to the Executive to act for security and ignore the rights of US Citizens on matters of privacy. Our system has become akin to the defunct KGB and in line with the present Iranian Secret Service, where politics rules supreme not the rights of the people of Iran.



**Navy_CTT responds:**
3/28/2013 2:39 AM MST

It wasn't just 9-11. Americans demand that the government keep them protected - from hunger, homelessness, illness, old age; in pregnancy and youth, from ignorance and on and on and on.

Government can't keep you in its womb 24/7/365, safe against anything and everything life can throw at you, without controlling you, no more than your parents did when you were 5. It's the same thing. That's why we use the Latin word for "father" - "pater" - as the root of the description for the kind of government we demand and have: "paternalistic".

---

## View all comments »

Add your comment | Reply to a comment | Recommend a comment | Report an offensive comment

---

### More from The Washington Post

- Aid groups push Obama administration to shift the way US helps feed starving people abroad
  The Washington Post - World News
- North Korea diplomatic channel loses its luster
  The Washington Post - World News
- Six Americans, including three civilians, killed in attacks in Afghanistan
  The Washington Post - World News
- Canada loses 54,500 jobs in March, unemployment rises to 7.2 percent
  Featured Articles From The Washington Post
- In his first season at Louisville, Luke Hancock has had a big impact on Cardinals
  Featured Articles From The Washington Post

### Sponsored Headlines
[What's this?]

- What Happens to a Bail Bond When Found Not Guilty?
  eHow
- Dead Guy goes to his own funeral
  Mevio
- The Secret to Answering: Where Do You See Yourself in Five Years?
  Big Interview Blog
- California Man Allegedly Poisoned Girlfriend with Visine
  GMA
- Supermodel Naomi Campbell Mugged, Injured on Paris Street
  First to Know

---

**washingtonpost.com**     © 2013 The Washington Post     Terms of Service     Privacy Policy     Submissions and Discussion Policy     Ad Choices     Index by Date     Index by Keyword

**ATTACHMENT 23**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 23: Huffingtonpost.com, *Daniel David Rigmaiden Case
Reveals Stingray Cell Phone Tracker's Covert Use*
(Mar. 28, 2013), *available at*
http://www.huffingtonpost.com/2013/03/28/daniel-
david-rigmaiden-stingray_n_2973749.html (last
accessed: Apr. 4, 2013);



## Mother Turns Skinny in 4 Weeks
Scottsdale: Mom cut 20 Lbs in thighs, face and arm using this 1 weird trick...

ads not by this site

April 4, 2013



# POLITICS

## Daniel David Rigmaiden Case Reveals Stingray Cell Phone Tracker's Covert Use

Posted: 03/28/2013 5:10 pm EDT  |  Updated: 03/28/2013 6:21 pm EDT



(Jean-Sebastien Evrard/AFP/Getty Images)

When the 74-count indictment of Daniel David Rigmaiden on tax, mail and wire fraud charges was revealed in 2010, a local Arizona newspaper said Rigmaiden had fallen prey to one of "the oldest steps in the law-enforcement playbook: a confidential informant."

A snitch may have helped bring Rigmaiden down. But there was another informant in the case, an electronic one. And ever since Rigmaiden's indictment was unveiled, the U.S. Department of Justice has fought doggedly to keep the public in the dark about how exactly it was used.

In a U.S. District Court of Arizona hearing on Thursday, the government is finally being forced to defend its use of a secretive cell phone tracking device called a stingray. Days before the hearing, the government admitted a key error in its use of court orders for stingrays.

If civil liberties advocates had their pick of who would become a case study in the use of 21st century phone tracking technology, they would probably not choose Rigmaiden. The federal government alleges that under the alias "the hacker," he organized a complex, multi-state operation to defraud the Internal Revenue Service. His co-conspirators never knew him by name: He allegedly used a wireless aircard and anonymous Internet addresses to connect with them.

It was that card that led the feds to his front door. Federal law enforcement agents trawled the San Francisco Bay Area with a stingray, which simulates a legitimate cell tower and forces phones to reveal their location and unique ID numbers.

"When the government uses this stuff, they drive through a neighborhood. They send signals through the walls of every home in the neighborhood," said Christopher Soghoian, principal technologist at the American Civil Liberties Union's Speech Privacy and Technology Project.

Soghoian compared the technology to the robots in "Minority Report," the "little insect-type robots that crawl under people's doors and then force open people's eyelids and scan their eyes." But at least in that movie, he added, "they're only looking for a particular, known target."

Sponsored Links



**Truth About Annuities*
Don't Buy Any Annuity Until You Watch This Special Video Report!
SeniorAnnuityAlert.com



**Legalize Gay Marriage?**
Should Gay Marriage Be Legal? Vote in Urgent Poll Now.
www.newsmax.com



**New Rule in Arizona**
(APR 2013): If you pay for car insurance you better read this...
www.ConsumerFinanceDaily.com

Buy a link here

Stingrays, Soghoian argued, violate Americans' Fourth Amendment right "to be secure in their ... houses" and its prohibition against general warrants not tailored to one person. The federal government has said it takes pains to delete information unrelated to the targets of its investigations.

The government's use of stingrays even in relatively low-level tax fraud cases might never have become known if Rigmaiden weren't a dogged jailhouse lawyer, someone who has churned through several court-appointed attorneys and now represents himself. Rigmaiden has been in jail since 2008, but it took until 2011 to force the government to admit that it had used a stingray against him.

The federal judge in Rigmaiden's case is considering whether to throw out the evidence collected by the phone tracking device -- and all the fruits of the searches thereafter. That could conceivably mean Rigmaiden walks.

One central issue is whether the court order used to hunt down Rigmaiden with a stingray counts as a proper warrant. The ACLU of Northern California, which has filed a friend-of-the-court brief in the case, argues that since the government did not specifically tell the judge that it was going to use a stingray, the subsequent search was invalid.

In a document released March 22, the government revealed what the ACLU had long suspected: that in similar cases, U.S. attorneys have often failed to disclose to front-line magistrate judges that they are using stingrays. Instead, they've made their applications read like standard requests for basic cell phone surveillance methods, called pen registers, that record only the numbers of incoming and

outgoing calls.

"It has recently come to my attention that many agents" were using stingrays, San Francisco federal prosecutor Miranda Kane wrote in the May 2011 email, "although the pen register application does not make that explicit."

"While we continue work on a long term fix for this problem it is important that we are consistent and forthright in our pen register requests," she added.

As Kane's email suggests, the federal government has been under increasing pressure from judges to obtain a warrant before it uses stingrays. In court filings related to the Rigmaiden stingray case, the government has essentially claimed that the court orders it obtained were nothing out of the ordinary.

U.S. District Judge David G. Campbell has told prosecutors that they should be prepared to support that assertion.

"There's a lot riding on this," said Linda Lye, the ACLU attorney making her group's argument as a third party in Thursday's hearing. The government has a legal "duty of candor" to be honest with judges when it does things like apply for search warrants or pen registers. The question in this case, Lye said, is "what does that 'duty of candor' mean when it comes to new technology?"

by Taboola

   

Britney Doesn't Need Photoshop

Julia Roberts' Malibu Mansion Is An Architect's Dream
Lonny

Parents Outraged Over Victoria's Secret Underwear

Brian Kilmeade Walks Off Set Over 'Belly Button' Remarks

## ATTACHMENT 24

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 24: Waterman, Shaun (The Washington Times), *Can you hear me now? Feds admit FBI warrantless cellphone tracking 'very common'* (Mar. 29, 2013), *available at* http://www.washingtontimes.com/news/2013/mar/29/feds-fbi-warrantless-cell-tracking-very-common/ (last accessed: Apr. 4, 2013);

EDITORS' PICKS:   China finds more cases of bird flu previously not seen in humans

CONNECT:

# Can you hear me now? Feds admit FBI warrantless cellphone tracking 'very common'

COMMENTS (99)    SIZE: + / -     PRINT

By Shaun Waterman - The Washington Times                                    Friday, March 29, 2013

FBI (/topics/federal-bureau-of-investigation/) investigators for at least five years have routinely used a sophisticated cellphone tracking(#) tool that can pinpoint callers' locations and listen to their conversations — all without getting a warrant for it, a federal court was told this week.

The use of the "Stingray," as the tool is called, "is a very common practice" by federal investigators, Justice Department (/topics/department-of-justice/) attorneys told the U.S. District Court for Arizona (/topics /us-district-court-for-arizona/) Thursday, according to the American Civil Liberties Union (/topics/american-civil-liberties-union/) .

Installed in an unmarked van, Stingray mimics a cellphone tower, so it can pinpoint the precise location of any mobile device in range and intercept conversations and data, said Linda Lye (/topics/linda-lye/) , staff attorney at the ACLU (/topics/american-civil-liberties-union/) of Northern California in a blog post about the case.

In a rare public discussion of federal electronic surveillance capabilities and authorities, Justice Department (/topics/department-of-justice/) lawyers told the court (/topics/un-court/) hearing that, instead of a warrant, the FBI (/topics/federal-bureau-of-investigation/) operates Stingray and other cellphone-mimicking technology under the authority of "pen register" orders. These court orders, also known as "tap and trace" orders, are generally issued to allow investigators to collect only so-called "metadata" — like all phone numbers calling to or called from a particular number.

But Stingray collects much more than just phone numbers and also "sweep[s] up the data of innocent people who happen to be nearby," according to the ACLU (/topics/american-civil-liberties-union/) filing.

Given the broad nature of the information Stingray collects and its ability to eavesdrop on conversations, many federal judges insisted that they should be told when its use was envisaged under a tap and trace order, the ACLU (/topics/american-civil-liberties-union/) filing says.

Tap and trace orders are generally more easily granted than a warrant, which requires "probable cause" under the Fourth Amendment.

But Justice Department (/topics/department-of-justice/) emails that the group obtained under the federal Freedom of Information Act and filed with their brief show that government lawyers were concerned some FBI (/topics/federal-bureau-of-investigation/) agents were not properly disclosing their use of Stingray.

"It has recently come to my attention that many agents are still using [Stingray] technology in the field although the pen register(#) application does not make that explicit," reads one May 2011 email from a Justice Department (/topics/department-of-justice/) attorney.

"It is important that we are consistent and forthright in our pen register requests to the magistrates," the attorney concludes.

The ACLU (/topics/american-civil-liberties-union/) has filed an amicus brief in the case U.S. vs. Rigmaiden. An amicus brief is filed not by the defendant or anyone on his behalf, but by another interested party.

In the case, first brought in 2008, Mr. Rigmaiden, charged with identity theft(#) , is seeking to suppress evidence obtained by Stingray on the basis that using it constitutes a search and requires a probable cause warrant.

The Department of Justice (/topics/department-of-justice/) declined a request for comment, as neither they nor the FBI (/topics/federal-bureau-of-investigation/) generally speak about ongoing litigation.

 Men: You won't need aphrodisiacs with this. Try this weird testosterone trick that works...

 Stocks soar–but some wealthy citizens are preparing for the "End of America." Here's why...

 Scottsdale - New rule allows many Arizona residents to get car insurance at half-price.

 Famous TV doctor calls this new mens diet pill the "Holy Grail" of weight loss...

Advertisement

**ATTACHMENT 25**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 25: Zetter, Kim (Wired Magazine), *Secrets of FBI
Smartphone Surveillance Tool Revealed in Court
Fight* (Apr. 09, 2013), *available at*
http://www.wired.com/threatlevel/2013/04/verizon
-rigmaiden-aircard/all/ (last accessed: Apr. 10,
2013);

Threat Level
Privacy, Crime and Security Online
Surveillance

Like 3k  Tweet 1,511     1.3k     Share     154

# Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight

By Kim Zetter
04.09.13
6:30 AM

Follow @KimZetter



*Image: rmuser/Flickr*

A legal fight over the government's use of a secret surveillance tool has provided new insight into how the controversial tool works and the extent to which Verizon Wireless aided federal agents in using it to track a suspect.

Court documents in a case involving accused identity thief Daniel David Rigmaiden describe how the wireless provider reached out remotely to reprogram an air card the suspect was using in order to make it communicate with the government's surveillance tool so that he could be located.

Rigmaiden, who is accused of being the ringleader of a $4 million tax fraud operation, asserts in court documents that in July 2008 Verizon surreptitiously reprogrammed his air card to

make it respond to incoming voice calls from the FBI and also reconfigured it so that it would connect to a fake cell site, or stingray, that the FBI was using to track his location.

Air cards are devices that plug into a computer and use the wireless cellular networks of phone providers to connect the computer to the internet. The devices are not phones and therefore don't have the ability to receive incoming calls, but in this case Rigmaiden asserts that Verizon reconfigured his air card to respond to surreptitious voice calls from a landline controlled by the FBI.

The FBI calls, which contacted the air card silently in the background, operated as pings to force the air card into revealing its location.

In order to do this, Verizon reprogrammed the device so that when an incoming voice call arrived, the card would disconnect from any legitimate cell tower to which it was already connected, and send real-time cell-site location data to Verizon, which forwarded the data to the FBI. This allowed the FBI to position its stingray in the neighborhood where Rigmaiden resided. The stingray then "broadcast a very strong signal" to force the air card into connecting to it, instead of reconnecting to a legitimate cell tower, so that agents could then triangulate signals coming from the air card and zoom-in on Rigmaiden's location.

To make sure the air card connected to the FBI's simulator, Rigmaiden says that Verizon altered his air card's Preferred Roaming List so that it would accept the FBI's stingray as a legitimate cell site and not a rogue site, and also changed a data table on the air card designating the priority of cell sites so that the FBI's fake site was at the top of the list.

Rigmaiden makes the assertions in a 369-page document he filed in support of a motion to suppress evidence gathered through the stingray. Rigmaiden collected information about how the stingray worked from documents obtained from the government, as well as from records obtained through FOIA requests filed by civil liberties groups and from open-source literature.

During a hearing in a U.S. District Court in Arizona on March 28 to discuss the motion, the government did not dispute Rigmaiden's assertions about Verizon's activities.

The actions described by Rigmaiden are much more intrusive than previously known information about how the government uses stingrays, which are generally employed for tracking cell phones and are widely used in drug and other criminal investigations.

The government has long asserted that it doesn't need to obtain a probable-cause warrant to use the devices because they don't collect the content of phone calls and text messages and operate like pen-registers and trap-and-traces, collecting the equivalent of header information.

The government has conceded, however, that it needed a warrant in his case alone — because the stingray reached into his apartment remotely to locate the air card — and that the activities performed by Verizon and the FBI to locate Rigmaiden were all authorized by a court order signed by a magistrate.

The Electronic Frontier Foundation and the American Civil Liberties Union of Northern California, who have filed an amicus brief in support of Rigmaiden's motion, maintain that the order does not qualify as a warrant and that the government withheld crucial information from the magistrate — such as identifying that the tracking device they planned to use was a stingray and that its use involved intrusive measures — thus preventing the court from properly fulfilling its oversight function.

"It shows you just how crazy the technology is, and [supports] all the more the need to explain to the court what they are doing," says EFF Staff Attorney Hanni Fakhoury. "This is more than just [saying to Verizon] give us some records that you have sitting on your server. This is reconfiguring and changing the characteristics of the [suspect's] property, without informing the judge what's going on."

The secretive technology, generically known as a stingray or IMSI catcher, allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices like air cards into connecting to the stingray instead of a phone carrier's legitimate tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location.

By moving the stingray around and gathering the wireless device's signal strength from various locations in a neighborhood, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

Use of the spy technology goes back at least 20 years. In a 2009 Utah case, an FBI agent described using a cell site emulator more than 300 times over a decade and indicated that they were used on a daily basis by U.S, Marshals, the Secret Service and other federal agencies.

The FBI used a similar device to track former hacker Kevin Mitnick in 1994, though the version used in that case was much more primitive and passive.

A 1996 *Wired* story about the Mitnick case called the device a Triggerfish and described it as "a technician's device normally used for testing cell phones." According to the story, the Triggerfish was "a rectangular box of electronics about a half a meter high controlled by a PowerBook" that was essentially "a five-channel receiver, able to monitor both sides of a conversation simultaneously." The crude technology was hauled around in a station wagon and van. A black coaxial cable was strung out of the vehicle's window to connect the Triggerfish to a direction-finding antenna on the vehicle's roof, which had four antenna prongs that reached 30 centimeters into the sky.

The technology has become much sleeker and less obtrusive since then, but still operates under the same principles.

In Rigmaiden's case, agents apparently used two devices made by a Florida-based company called Harris. One was the company's StingRay system, which is designed to work from a vehicle driven around a neighborhood to narrow a suspect's location to a building. Once agents tracked the signals from Rigmaiden's air card to the Domicilio Apartments complex in Santa Clara, California, they apparently used another device made by Harris called the KingFish — a handheld system that allowed them to walk through the complex and zero-in on Rigmaiden's air card in apartment 1122.

Although a number of companies make stingrays, including Verint, View Systems, Altron, NeoSoft, MMI, Ability, and Meganet, the Harris line of cell site emulators are the only ones that are compatible with CDMA2000-based devices. Others can track GSM/UMTS-based communications, but the Harris emulators can track CDMA2000, GSM and iDEN devices, as well as UMTS. The Harris StingRay and KingFish devices can also support three different communication standards simultaneously, without having to be reconfigured.

Rigmaiden was arrested in 2008 on charges that he was the mastermind behind an operation that involved stealing more than $4 million in refunds from the IRS by filing fraudulent tax returns. He and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process. Rigmaiden has been charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud.



A PC5740 Air Card.

The surveillance of Rigmaiden began in June 2008 when agents served Verizon with a grand jury subpoena asking for data on three IP addresses that were allegedly used to electronically file some of the fraudulent tax returns. Verizon reported back that the three IP addresses were linked to an air card account registered in the name of Travis Rupard — an identity that Rigmaiden allegedly stole. The air card was identified as a UTStarcom PC5740 device that was assigned a San Francisco Bay Area phone number.

A court order was then submitted to Verizon Wireless requiring the company to provide historical cell site data on the account for the previous 30 days to determine what cell towers the air card had contacted and determine its general location. Verizon responded by supplying the government with information that included the latitude and longitude coordinates for five cell sites in San Jose and Santa Clara cities, in the heart of Silicon Valley. In July, the government served Verizon Wireless with another court order directing the company to assist the FBI in the use and monitoring of a mobile tracking device to locate an unidentified suspect. The order directed Verizon Wireless to provide the FBI with any "technical assistance needed to ascertain the physical location of the [air card]...."

The government has fought hard to suppress information about how it uses stingrays, but in his motion to suppress, Rigmaiden lays out in great detail how the surveillance occurred and the nature of the technical assistance Verizon provided the FBI.

On the morning of July 14, 2008, FBI Agent Killigrew created a cell tower range chart/map consisting of a street map, plotted Verizon Wireless cell site sectors belonging to cell site Nos. 268, 139, and 279, and a triangulated aircard location signature estimate represented by a shaded area. On the chart/map, the total land area collectively covered by cell site Nos. 268, 139, and 279 is approximately 105,789,264 ft². FBI Agent Killigrew used triangulation techniques and location signature techniques to eliminate 93.9% of that 105,789,264 ft² area resulting in the location estimate being reduced to 6,412,224 ft² represented by the shaded area. The shaded area on the cell tower range chart covers the location of apartment No. 1122 at the Domicilio apartment complex.

On July 15, agents with the FBI, IRS and US Postal Service flew to San Jose to triangulate Rigmaiden's location using the stingray. They worked with technical agents from the San Francisco FBI's Wireless Intercept and Tracking Team to conduct the real-time tracking.

According to Rigmaiden, the agents drove around the cell site areas gathering information about signal range and radio frequencies for each cell site sector. "The radio frequency information was needed so that the FBI technical agents could properly configure their StingRay and KingFish for use in cell site emulator mode," Rigmaiden writes. "By referencing a list of all the radio frequencies already in use, the FBI was able to choose an unused frequency for use by its emulated cellular network that would not interfere with the various FCC licensed cellular networks already operating in the noted area."

The next day, Verizon Wireless surreptitiously reprogrammed Rigmaiden's air card so that it would recognize the FBI's stingray as a legitimate cell site and connect to it "prior to attempting connections with actual Verizon Wireless cell sites." The FBI needed Verizon to reprogram the device because it otherwise was configured to reject rogue, unauthorized cell sites, Rigmaiden notes.

On July 16, the FBI placed 32 voice calls to the air card between 11am and 5pm. Each time the air card was notified that a call was coming in, it dropped its data connection and went into idle mode. At the same time, it sent real-time cell site location information to Verizon, which forwarded the information to the FBI's DCS-3000 servers, part of the elaborate digital collection system the FBI operates for wiretapping and pen-registers and trap-and-traces. From the FBI's servers, the location data was transmitted wirelessly through a VPN to the FBI's technical agents "lurking in the streets of Santa Clara" with the StingRay.



A stingray, made by Harris Corp. *Image: U.S. Patent and Trademark Office*

At this point, the StingRay took over and began to broadcast its signal to force the air card — and any other wireless devices in the area — to connect to it, so that agents could zoom-in on Rigmaiden's location.

"Because the defendant attempted to keep his aircard continuously connected to the Internet, the FBI only had a very short window of time to force the aircard to handoff its signal to the StingRay after each surreptitious voice call [and] the FBI needed to repeatedly call the aircard in order to repeatedly boot it offline over the six hours of surreptitious phone calls," Rigmaiden writes. "Each few minute window of time that followed each denial-of-service attack (i.e., surreptitious phone call) was used by the FBI to move its StingRay, while in cell

site emulator mode, to various positions until it was close enough to the aircard to force an Idle State Route Update (i.e., handoff)."

Rigmaiden maintains that once the connection was made, the StingRay wrote data to the air card to extend the connection and also began to "interrogate" the air card to get it to broadcast its location. The FBI used the Harris AmberJack antenna to deliver highly-directional precision signals to the device, and moved the StingRay around to various locations in order to triangulate the precise location of the air card inside the Domicilio Apartments complex.

According to Rigmaiden, agents also transmitted Reverse Power Control bits to his air card to get it to transmit its signals at "a higher power than it would have normally transmitted if it were accessing cellular service through an actual Verizon Wireless cell site."

Once agents had tracked the device to the Domicilio Apartments complex, they switched out the StingRay for the handheld KingFish device to locate Rigmaiden's apartment within the complex.

Around 1am on July 17, an FBI agent sent a text message to another FBI agent stating, "[w]e are down to an apt complex...." By 2:42 am, one of the FBI technical agents sent a text message to someone stating that they had "[f]ound the card" and that agents were "working on a plan for arrest."

Agents still didn't know who was in the apartment — since Rigmaiden had used an assumed identity to lease the unit — but they were able to stake out the apartment complex and engage in more traditional investigative techniques to gather more intelligence about who lived in unit 1122. On August 3, while the apartment was still under surveillance, Rigmaiden left the unit. Agents followed him a short distance until Rigmaiden caught on that he was being followed. After a brief foot chase, he was arrested.

Rigmaiden and the American Civil Liberties Union and Electronic Frontier Foundation have argued that the government did not obtain a legitimate warrant to conduct the intrusive surveillance through the stingray. They say it's indicative of how the government has used stingrays in other cases without proper disclosure to judges about how they work, and have asked the court to suppress evidence gathered through the use of the device.

U.S. District Court Judge David Campbell is expected to rule on the motion to suppress within a few weeks.

**Pages:** 1 2 View All
See Also:
Related

Inside DCSNet, the FBI's Nationwide Eavesdropping Network



Government Fights for Use of Spy Tool That Spoofs Cell Towers



Feds' Use of Fake Cell Tower: Did it Constitute a Search?



Identity Thieves Filed for $4 Million in Tax Refunds Using Names of Living and Dead



You Might Like

*Bloodline*: The New *Evil Dead* Doesn't Care About Your Nostalgia



Wide Body: Kickstarter Darling Pebble Sparks Its First Crowdfunded Accessory



Sticky-Fingered Plant May Hold the Secret to Snaring Bed Bugs



Everything I Know About *Mad Men*, I Learned From the Season 6 Premiere





Kim Zetter is a senior reporter at Wired covering cybercrime, privacy, security and civil liberties.

Read more by Kim Zetter

Follow @KimZetter and @ThreatLevel on Twitter.

Post Comment | 128 Comments and 1499 Reactions |  Permalink

Back to top

Like  Tweet  1.3k  1,511        1.3k

Reddit  Digg Stumble Upon Email

**128 comments** · 1499 reactions                                5

 Leave a message…

**ATTACHMENT 26**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 26: Zetter, Kim (Wired Magazine), *Judge Allows
Evidence Gathered From FBI's Spoofed Cell Tower*
(May. 08, 2013), *available at*
http://www.wired.com/threatlevel/2013/05/rigmaid
en-cell-tower-evidence/ (last accessed: May 14,
2013);

Threat Level
Privacy, Crime and Security Online
› Surveillance
Share on Facebook
215 shares

| Tweet ‹ 254 | | 39 | | Share | 17 |

# Judge Allows Evidence Gathered From FBI's Spoofed Cell Tower

› By Kim Zetter
› 05.08.13
› 5:40 PM

Follow @KimZetter



*Photo: Alan Levine/Flickr*

An Arizona judge has denied a motion to suppress evidence collected through a spoofed cell tower that the FBI used to track the location of an accused identity thief.

The ruling means that the government may use not only evidence gathered through its fake cell tower to locate an air card that Daniel David Rigmaiden was using to access the internet, but also evidence gathered from the apartment to which they tracked him through the air card and evidence collected from a storage space and computer hard drives found in the apartment and storage locker. In his ruling, U.S. District Judge David Campbell based his decision on whether Rigmaiden had a reasonable expectation of privacy in the use of the air card inside his apartment, as well as in the

apartment itself and the storage unit that was discovered through the search of the apartment. Judge Campbell concluded that Rigmaiden did not have a reasonable expectation of privacy in any of these because he had obtained the air card and rented the apartment and storage space through fraudulent means — that is, using identifications that he had stolen from other people.

Campbell wrote that even if Rigmaiden had a subjective expectation of privacy in these items, "the Court cannot conclude that his expectation is one society should be prepared to recognize as objectively reasonable."

Prosecutors assert that Rigmaiden purchased the air card in May of 2006 using the stolen identity of Travis Rupard, and maintained a Verizon wireless account used with the air card under the same name. He also allegedly obtained a Visa card in the name of Andrew Johnson, a deceased individual, to purchase the laptop computer he used with the air card. He allegedly rented the apartment under the name of Steven Travis Brawner, a deceased individual.

According to authorities, Rigmaiden then used the air card and the laptop computer to file hundreds of false tax returns using the names of hundreds of deceased individuals.

"One who so thoroughly immerses himself in layers of false identities should not later be heard to argue that society must recognize as legitimate his expectation of privacy in the location and implements of his fraud," Campbell wrote in his ruling, citing a number of precedent-setting cases to support his decision, including a Ninth Circuit decision that a defendant can have no expectation of privacy in a computer that is obtained through fraud. "Having utterly disregarded the privacy rights of Travis Rupard, Steven Brawner, and Andrew Johnson, not to mention the many other names used in his scheme, Defendant cannot now credibly argue that he had a legitimate expectation of privacy in the devices and apartment he acquired through the fraudulent use of their identities."

The ruling is a huge win for the government, which would have been hard-pressed to preserve its case against Rigmaiden without evidence gathered from the apartment and seized hard drives. But the American Civil Liberties Union, which filed an amicus brief in support of Rigmaiden's motion to suppress, says the judge missed the mark on a number of issues in the case. According to Linda Lye, a staff attorney for the ACLU's Northern California office, past rulings have asserted that a defendant doesn't have the expectation of privacy when it comes to someone else's property. But in Rigmaiden's case, there is no dispute that the air card was his and that the aliases he used to obtain the air card and rent the apartment were being used by him.

"If you can't connect that the other name [you are using] is you, then there's no expectation of privacy," she told Wired. "But there's no dispute that the aliases that Rigmaiden used were his aliases. Also, the government talks a lot of about fraud, but fraud has a very legal definition. There has to be a material misrepresentation that caused harm, but there's no showing that the apartment complex or Verizon felt that Rigmaiden's use of another name was material to the transaction or that they suffered any harm. They were all paid."

Rigmaiden was arrested in 2008 on charges that he was the mastermind behind an operation that involved stealing more than $4 million in refunds from the IRS by filing fraudulent tax returns. He and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process. Rigmaiden has been charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud.

In court documents, Rigmaiden asserted that in July 2008 Verizon surreptitiously reprogrammed his air card so that it would connect to a fake cell site, or stingray device, that the FBI was using to track his location.

Air cards are devices that plug into a computer and use the wireless cellular networks of phone providers to connect the computer to the internet. The devices are not phones and therefore don't have the ability to receive incoming calls, but in this case Rigmaiden asserts that Verizon

reconfigured his air card to respond to surreptitious voice calls from a landline controlled by the FBI.

The FBI calls, which contacted the air card silently in the background, operated as pings to force the air card into revealing its location so they could use the stingray to track him.

The secretive technology, generically known as an IMSI catcher, allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices like air cards into connecting to the stingray instead of a phone carrier's legitimate tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location.

By moving the stingray around and gathering the wireless device's signal strength from various locations in a neighborhood, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

In order to use the stingray with Rigmaiden's air card, the defendant asserts in court documents that Verizon reprogrammed his air card so that when an incoming voice call arrived, the card would disconnect from any legitimate cell tower to which it was already connected, and send real-time cell-site location data to Verizon, which forwarded the data to the FBI. This allowed the FBI to position its stingray in the neighborhood where Rigmaiden resided. The stingray then "broadcast a very strong signal" to force the air card into connecting to it, instead of reconnecting to a legitimate cell tower, so that agents could then triangulate signals coming from the air card and zoom-in on Rigmaiden's location.

To make sure the air card connected to the FBI's simulator, Rigmaiden says that Verizon altered his air card's Preferred Roaming List so that it would accept the FBI's stingray as a legitimate cell site and not a rogue site, and also changed a data table on the air card designating the priority of cell sites so that the FBI's fake site was at the top of the list.d

The government has never disputed Rigmaiden's assertions about Verizon's activities or that it relied on the stingray to locate Rigmaiden in his apartment.

But the actions described by Rigmaiden are much more intrusive than previously known information about how the government uses stingrays, which are generally employed for tracking cell phones and are widely used in drug and other criminal investigations.

Rigmaiden sought to suppress evidence obtained through the use of the stingray on grounds that it involved a search of his apartment and that the government did not obtain a probable-cause warrant to use the stingray.

The government has long asserted that it doesn't need to obtain a probable-cause warrant to use stingrays because they don't collect the content of phone calls and text messages and operate like pen-registers and trap-and-traces, collecting the equivalent of header information.

The government has conceded, however, that it needed a warrant in Rigmaiden's case alone — because the stingray reached into his apartment remotely to locate the air card — and that the activities performed by Verizon and the FBI to locate Rigmaiden were all authorized by a court order signed by a magistrate.

But the ACLU and the Electronic Frontier Foundation argued in their amicus brief that the order the government obtained did not qualify as a warrant and that the government withheld crucial information from the magistrate who issued the order to use the device — such as identifying that the tracking device they planned to use was a stingray and that its use involved intrusive measures — thus preventing the court from properly fulfilling its oversight function. The government did not tell the magistrate that all phones and devices in the vicinity of a stingray will connect to it when it is turned on, not just those of a target being tracked.

Judge Campbell disagreed with the civil liberties groups on all counts.

"The intrusion that allowed agents to locate the aircard – using a mobile tracking device to send signals to and receive signals from the aircard – was not a 'severe intrusion,'" he wrote in his ruling. "The evidence in this case suggests that Defendant used the aircard and laptop computer to perpetrate an extensive scheme of fraud through electronic communications. The Court cannot conclude that the government's corresponding use of electronic communications to find the aircard violated any legitimate expectation of privacy."

The judge also ruled that the government was not in the wrong for failing to disclose to a magistrate judge that it planned to use a stingray to track the defendant, or to explain to the judge how the tracking device it intended to use worked. He characterized this information as a "detail of execution which need not be specified."

Lye says the government has a duty of candor when seeking court approval for the use of surveillance technology, and the judge's ruling has strong implications for any new surveillance technology used by federal agencies.

"When the government is seeking a warrant to use new technology, it has the duty to explain to the court what that technology is and how it works," she said. "Stingrays are a very potent example of why that is so, because it scoops up innocent information of third parties who are not under probable cause surveillance."

Rigmaiden's case is expected to go to trial later this month.

› Related
› You Might Like
› Related Links by Contexty



›
› of FBI Smartphone Surveillance Tool Revealed in Court Fight



›
› of FBI Smartphone Surveillance Tool Revealed in Court Fight



›
› nent Fights for Use of Spy Tool That Spoofs Cell Towers



›
› se of Fake Cell Tower: Did it Constitute a Search? | Threat …



›
› Security Thieves Filed for $4 Million in Tax Refunds Using Names of …



›
› edible Machine Is Back, Spiritually



›

 nder Chris Hadfield Bids Farewell to the ISS With Bowie Cover

Administration Secretly Obtains Phone Records of AP Journalists

 Pulled Off a Federal Sting That Cost Google $500 Million

Kim Zetter is a senior reporter at Wired covering cybercrime, privacy, security and civil liberties.
Read more by Kim Zetter
Follow @KimZetter and @ThreatLevel on Twitter.
Post Comment | 43 Comments |  Permalink
Back to top

Share on Facebook
215 shares
Tweet 254          39

Reddit  Digg Stumble Upon Email

**44 comments**

 0

 Leave a message...

Best      Community                                                    Share  ⚙

**Michael Moon** · 6 days ago

And yet when a corporation does much the same, by putting all the liabilities in one corporation and all the profit in another, and then bankrupts or closes the one created as a vehicle to hold all the bad paper created - well that is legal.

7    | 1      Reply   Share ⋮

> **Chuckiechan** → Michael Moon · 5 days ago
>
> What does that have with Rigmaiden defrauding the government using fraudulent ID's to get tax refunds that were not due to him?
>
> I fail to see the connection...
>
> 2    | 1      Reply   Share ⋮

**syrik** · 6 days ago

The judges reasoning for disallowing an expectation of privacy is spot on. You shouldn't be granted rights to privacy in order to commit crimes. Rather, once you begin criminal activity, you should expect to be caught.

18    | 7      Reply   Share ⋮

> **crunchy2k** → syrik · 6 days ago
>
> That is not what I read the judge is saying here. He is saying if you use a known stolen identity to pay for a Verizon cell device or any storage facilities, then you shouldn't expect any degree of privacy under the law. If Rigmaiden had used his real name to order the cell device and rent the buildings, then he should have been granted the safeguards a private citizen enjoys. As Rigmaiden is innocent until proven guilty.
>
> 14    | 1      Reply   Share ⋮
>
> > **syrik** → crunchy2k · 6 days ago
> >
> > If he used his real name he wouldn't have committed a crime, at least as far as the fraudulent account that he was caught using.
> >
> > 3    | 3      Reply   Share ⋮
> >
> > **Chuckiechan** → crunchy2k · 5 days ago
> >
> > The judge did not rule on "what if he used his real name"...
> >
> > The guy is a crook.
> >
> > 1    | 1      Reply   Share ⋮

## ATTACHMENT 27

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 27: Letter from Kim Zetter (Wired Digital) to Daniel
Rigmaiden, April 3, 2013; Re: requesting
additional information; Note: Kim Zetter's email
address and phone number redacted;

# WIRED DIGITAL

2 April 2013

Daniel David Rigmaiden
Inmate #: 10966111
Florence-AZ-Florence-CADC-6300
CENTRAL ARIZONA DETENTION CENTER
P.O. Box 6300
Florence, AZ 85132

Dear Daniel,

I'm a reporter for *Wired* in San Francisco who covers computer security and civil liberties issues. I've written extensively on Fourth Amendment issues with regard to GPS trackers and location data.

I've been following your case since 2010 and attended your hearing last week in Phoenix regarding your motion to suppress, related to the government's use of a stingray and searches of your apartment, storage space and hard drives. I've also read through your 369-page motion to suppress.

I'd be interested in speaking with you about the case and perhaps even visiting you to discuss the issues.

I'm not sure if you have access to Corrlinks, but I do have an account if you're able to communicate that way.

I look forward to hearing from you.

Regards,

Kim Zetter
Senior Reporter
Wired
415

@

Threat Level
Privacy, Crime and Security Online
Crime
Surveillance
Hacks and Cracks

Like e 409 85        34        Share   44

# Government Fights for Use of Spy Tool That Spoofs Cell Towers

By Kim Zetter
03.29.13
9:22 PM
Edit

Follow @KimZetter



The government is fighting a challenge to its use of a so-called stingray device that emulated a legitimate cellphone tower (such as the real tower above) in order to trick a suspect's Verizon Wireless device into connecting to it and revealing his location. *Photo: Alan Levine/Flickr*

PHOENIX, Arizona — The government's use of a secret spy tool was on trial on Thursday in a showdown

between an accused identity thief and more than a dozen federal lawyers and law enforcement agents who were fighting to ensure that evidence obtained via a location-tracking tool would be admissible in court.

At issue is whether law enforcement agents invaded Daniel David Rigmaiden's privacy in 2008 when they used a so-called stingray to track his location through a Verizon Wireless air card that he used to connect his computer to the internet. Also at issue is whether a warrant the government obtained from a judge covered the use of the stingray and whether the government made it sufficiently clear to the judge how the technology it planned to use worked.

Over the course of a three-hour hearing in the U.S. District Court in Arizona, Rigmaiden, 31, asserted that the warrant the government obtained only authorized Verizon Wireless to provide agents with data about the air card but did not authorize agents to use the invasive stingray device. He also asserted that Verizon Wireless "reprogrammed" his air card to make it interact with the FBI's stingray, something that he says was outside the bounds of the judge's order.

Rigmaiden and civil liberties groups who have filed amicus briefs in the case also maintain that the government failed its duty to disclose to the judge who issued the warrant that the device they planned to use not only collected data from the target of an investigation but from anyone else in the vicinity who was using an air card or other wireless communication device.

Linda Lye, staff attorney for the American Civil Liberties Union of Northern California, told the judge on Thursday that this was the equivalent of rummaging through ten or twelve apartments to find the correct one where the defendant resided, something that would never be allowed under a normal warranted search.

By withholding information about the stingray from the judge and providing only "scant information" about the data they planned to collect, the FBI had "failed to live up to its duty of candor…. The government should have been clear about what information it wanted to obtain and what information it was going to obtain in using the technology," she said.

The ACLU recently uncovered emails that show a pattern of agents routinely withholding information from judges about their use of stingrays in applying for warrants for electronic surveillance.

The Rigmaiden case is shining a spotlight on the secretive technology, generically known as a stingray or IMSI catcher, that allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices into connecting to the stingray instead of a phone carrier's tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location. To prevent detection by suspects, the stingray is supposed to send the data along to a real tower so that traffic continues to flow.

By gathering the wireless device's signal strength from various locations, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

Although there are stingray devices that can capture and record the content of phone calls and text messages, the U.S. government has insisted in court documents for the Rigmaiden case that the stingray used in this case could only capture the equivalent of header information — such as the phone or account number assigned to the aircard as well as dialing, routing and address information involved in the communication. As such, the government has maintained that the device is the equivalent of devices designed to capture routing and header data on e-mail and other internet communications, and therefore does not require a search warrant.

The device, however, doesn't just capture information related to a targeted phone. It captures data from "all wireless devices in the immediate area of the FBI device that subscribe to a particular provider" according to government documents -— including data of innocent people who are not the target of the investigation. FBI policy requires agents to then purge collateral data collected by the surveillance tool.

The StingRay II, made by the firm Harris. The stingray name is also a generic term for other cell tower