1  Daniel Rigmaiden
   Agency # 10966111
2  CCA-CADC
   PO Box 6300
3  Florence, AZ 85132
   Telephone: none
4  Email: none

5  Daniel David Rigmaiden
   Pro Se, Plaintiff
6

FILED ___ LODGED
RECEIVED ___ COPY

JAN 3 1 2014

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

7              UNITED STATES DISTRICT COURT

8                  DISTRICT OF ARIZONA

9

10  Daniel David Rigmaiden,              Civil Action No.:

11        Plaintiff,

12  v.                                   12-CV-01605-SRB-BSB

13
    Federal Bureau of Investigation, et al.
14
          Defendant.
15

16

17

18       PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS
         IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
19

20
              The Honorable Susan R. Bolton
21            United States District Judge

22

23

24

25

26

27
                THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
                TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
28              AND IS SUBJECT TO REJECTION BY THE COURT.

                REFERENCE: LRCivP. 5.4
                              (Rule Number/Section)

# Table of Contents

I.   Statement of Undisputed Material Facts.................................................................1

    A.   The government's (e.g., FBI) use of Harris WPG brand portable/transportable wireless device locators has been sufficiently and unequivocally identified for the public..............................................................................................................1

        1.   The Harris WPG LoggerHead...........................................................................1

        2.   The Harris WPG TriggerFish..........................................................................3

        3.   The Harris WPG StingRay...............................................................................4

    B.   Various FBI and EOUSA agents and employees have provided contradicting statements explaining the FBI's reasons for destroying data collected by portable/transportable wireless device locators.................................................8

    C.   Defendants FBI and EOUSA have the policy that it is not a Fourth Amendment search and seizure, and therefore requires no warrant, to use a portable/transportable wireless device locator to locate wireless devices....................................................10

    D.   Publicly available information relating to portable/transportable wireless device locators. .............................................................................................................11

        1.   Public information on precisely how portable/transportable wireless device locators operate.............................................................................................11

        2.   Public information on how the Harris WPG StingRay necessitates that users of connected cell phones dial 9-1-1 twice if seeking to make a 9-1-1 emergency phone call.........................................................................................................24

        3.   Public information on how to build cell site emulators using off-the-shelf hardware and free software..............................................................................25

    E.   Free tools capable of detecting and defeating law enforcement use of portable/transportable wireless device locators are publicly available.....................26

    F.   The government's use of portable/transportable wireless device locators is a matter of widespread and exceptional media interest.........................................................26

        1.   The media reported on the government's use of portable/transportable wireless device locators prior to any challenges made in United States v. Rigmaiden.........................................................................................................26

        2.   The media reported on the government's use of portable/transportable wireless device locators after challenges were made in United States v.

Rigmaiden.................................................................................27

G.   Plaintiff is an expert on portable/transportable wireless device locators and geolocation of wireless devices...........................................................29

H.   Plaintiff has the ability to disseminate FOIA responses to the public......................31

I.   Software is readily available that will allow Defendants FBI and EOUSA to redact FOIA response documents in their original native digital form with metadata intact.....................................................................................................33

J.   Plaintiff's submission of Federal Bureau of Investigation FOIA request RE: portable/ transportable wireless device locators.................................................................34

K.   Plaintiff's submission of Federal Bureau of Investigation FOIA request RE: Comments made to The Wall Street Journal by the Federal Bureau of Investigation as reported in a September 22, 2011 article...........................................................40

L.   Plaintiff's submission of Executive Office for United States Attorneys FOIA request RE: portable/transportable wireless device locators.................................................45

M.   Upon Defendant FBI's notice of 15,377 "pages" of records responsive to the October 10, 2011 FOIA request, it became evident to Plaintiff that the volume of records absolutely necessitates that they be provided in native digital form............48

N.   Upon Defendant FBI's notice of 15,377 "pages" of records responsive to the October 10, 2011 FOIA request, it became evident to Plaintiff that the volume of records absolutely necessitates that the FBI also provide metadata..........................54

O.   The FBI's arbitrary and capricious treatment of Plaintiff in comparison to other entities who have submitted similar FOIA requests RE: portable/transportable wireless device locators....................................................................................56

   1.   The FBI's arbitrary and capricious actions RE: duplication fee waiver.............56

   2.   The FBI's arbitrary and capricious actions RE: non-expedited processing.......57

   3.   The FBI's arbitrary and capricious actions RE: "first in-first out" multi-track FOIA request queue system.............................................................58

P.   Additional last minute issue RE: native form digital records...................................59

1  Daniel David Rigmaiden #10966111
   CCA-CADC
2  PO Box 6300
   Florence, AZ 85132
3  Telephone: none
   Email: none
4
5  Daniel David Rigmaiden,
   Pro Se, Plaintiff

6              UNITED STATES DISTRICT COURT
7                 DISTRICT OF ARIZONA

8  Daniel David Rigmaiden,            | Civil Action No.:

9        Plaintiff,                   | 12-CV-01605-SRB-BSB
   v.
                                      | PLAINTIFF'S STATEMENT OF
10 Federal Bureau of Investigation, et al. | UNDISPUTED MATERIAL FACTS IN
                                      | SUPPORT OF MOTION FOR PARTIAL
11       Defendant.                   | SUMMARY JUDGMENT

12

13        Plaintiff, Daniel David Rigmaiden, appearing *pro se*, respectfully submits the

14 following statement of undisputed material facts Pursuant to Fed. R. Civ. P. 56 and LRCiv

15 56.1(a).

16   I.      **Statement of Undisputed Material Facts**

17          **A.    The government's (*e.g.*, FBI) use of Harris WPG brand**
18                  **portable/transportable wireless device locators has been sufficiently**
                    **and unequivocally identified for the public.**
19
                    **1.   The Harris WPG LoggerHead.**
20

21        1.      Via an August 11, 2006 request for information under the Freedom of

22 Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, the Electronic Frontier Foundation

23 ("EFF") asked the Federal Bureau of Investigation ("FBI") to produce documents concerning

24 electronic surveillance systems known as DCS-3000 and Red Hook.  *See* Marcia Hofmann,

25 *EFF FOIA request to FBI* (Aug. 11, 2006), *available at*

26 http://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf (last accessed: Mar. 30,

27 2011);  *see also* Electronic Frontier Foundation v. Dep't of Justice, 517 F.Supp.2d 111 (D.D.C.

28 2007).

                                    - 1 -

1      2.      Between June 4, 2007 and February 11, 2008, the FBI disclosed to the public

2   5,278 pages of documents in response to the EFF FOIA request.  All of these documents are

3   available for download at http://www.eff.org/fn/directory/3673/228 (last accessed: Oct. 25,

4   2010).

5      3.      Via an FBI Response to EFF FOIA Request, Nos. 1056287-000 & 1056307-1

6   (Aug. 27, 2007), the FBI released an email indicating that FBI agents utilize the Harris

7   Wireless Product Group ("Harris WPG") "LoggerHead" portable/transportable wireless

8   device locator to locate wireless devices:

9          I was working with some agency guys yesterday.  They are putting together a
           system with a flat panel ant and a **loggerhead** and doing locations based on
10         registrations.  It works.  They have a later software version on their
           **loggerheads** (I think).  It will really help when we can use your software for
11         real time display of the **loggerhead** activity.  As it is, you have to make a pass
           in the area, move somewhere else, look at the log, etc.  Any word on when
12         **Harris** can make the change to the loggerhead?

13

14   FBI, *Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1*, Aug. 27, 2007,

15   *available at* http://www.eff.org/files/filenode/061708CKK/082707_dcs06.pdf [EFF PDF Set

16   6 of 6] (last accessed: Oct. 25, 2010), p. 142 of 148 (emphasis added).  Relevant pages of the

17   FOIA response containing the above quoted email are on the record at ATTACHMENT 01 of

18   *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's*

19   *Motion For Partial Summary Judgment.*

20      4.      According to the United States Patent and Trademark Office ("USPTO"), the

21   trademark name "loggerhead" is registered to Harris Corporation out of Melbourne, FL, USA.

22   *See* United States Patent and Trademark Office, *Trademark Reg. No. 2,555,909 [loggerhead]*

23   (registered Apr. 2, 2002), *all associated documents available via search at*

24   http://tmportal.uspto.gov/external/portal/tow (last accessed Mar. 11, 2011).  The full USPTO

25   document record for "loggerhead" is on the record at ATTACHMENT 02 of *Daniel*

26   *Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion*

27   *For Partial Summary Judgment.*

28      5.      According to the USPTO, Harris Intellectual Property Dept. attorney, Michael

- 2 -

1   S. Yatsko, signed a public declaration on July 9, 2001 stating that the "loggerhead" mark is

2   for "electronic surveillance transceivers for intercepting, monitoring and gathering

3   information concerning cellular network communications" and that it "was first used in

4   connection with the goods at least as early as August 25, 1999, was first used in interstate

5   commerce at least as early as August 25, 1999, and is now in use in such commerce." *Id.*

6                              **2.   The Harris WPG TriggerFish.**

7          6.     Via a November 29, 2007 request for information under the FOIA, 5 U.S.C. §

8   552 *et seq.*, the American Civil Liberties Union and the American Civil Liberties Union

9   Foundation ("ACLU") asked the Executive Office for United States Attorneys ("EOUSA") to

10  produce documents pertaining to the use of cell phone tracking and locating in criminal

11  investigations. *See* Catherine Crump, *ACLU FOIA request to EOUSA* (Nov. 29, 2007),

12  *available at* http://www.aclu.org/files/pdfs/freespeech/eousa_foia_20071129.pdf (last

13  accessed Mar. 30, 2011);  *see also* American Civil Liberties Union v. Department of Justice,

14  U.S. Dist. LEXIS 29040, No. 08-1157 (JR) (D.D.C., Mar. 26, 2010).

15         7.     Via an August 12, 2008 EOUSA response to the ACLU FOIA request, the

16  EOUSA made official public disclosures of various sections from its Electronic Surveillance

17  Manual. *See* EOUSA, *[M.D.La.] Response to ACLU FOIA Request No. 07-4130*, Aug. 12,

18  2008, *available at*

19  http://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf (last accessed:

20  Jan. 11, 2011).

21         8.     In the Electronic Surveillance Manual, under a heading labeled "Collection of

22  Cell Phone Location Information Directly by Law Enforcement," the EOUSA revealed

23  information on the government's use of portable/transportable wireless device locators:

24              Law enforcement possesses electronic devices that allow agents to
25       determine the location of certain cellular phones by the electronic signals that
         they broadcast.  This equipment includes an antenna, an electronic device that
26       processes the signals transmitted on cell phone frequencies, and a laptop
         computer that analyzes the signals and allows the agent to configure the
27       collection of information.  Working together, these devices allow the agent to
         identify the direction (on a 360 degree display) and signal strength of a
28       particular cellular phone while the user is making a call.  By shifting the
         location of the device, the operator can determine the phone's location more

precisely using triangulation.

EOUSA, *[M.D.La.] Response to ACLU FOIA Request No. 07-4130*, Aug. 12, 2008, *available at* http://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf (last accessed: Jan. 11, 2011), p. 9-10.  Relevant sections of the FOIA response containing the above quoted manual are on the record at <u>ATTACHMENT 03</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

9.     In the Electronic Surveillance Manual, the EOUSA also specifically identified the portable/transportable wireless device locator called the "triggerfish":

> A "triggerfish" can also be used to determine the cell site being used by a particular cellular telephone.  In addition, the cellular telephone company should be able to provide cell site information.  Once a cell site is determined, law enforcement agents can conduct surveillance in a more specific area in an effort to identify the user of the cellular telephone.

> *Id.*

10.     According to the USPTO, the trademark name "triggerfish" is registered to Harris Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office, *Trademark Reg. No. 2,534,253 [triggerfish]* (registered Jan. 29, 2002), *all associated documents available via search at* http://tmportal.uspto.gov/external/portal/tow (last accessed Mar. 11, 2011).  The full USPTO document record for "triggerfish" is on the record at <u>ATTACHMENT 04</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

11.     According to the USPTO, Harris Intellectual Property Dept. attorney, Michael S. Yatsko, signed a public declaration on July 9, 2001 stating that the "triggerfish" mark is for "electronic receivers for intercepting and monitoring cellular network communications" and that it "was first used in connection with the goods at least as early as November 26, 1997, was first used in interstate commerce at least as early as November 26, 1997, and is now in use in such commerce." *Id.*

### 3.   The Harris WPG StingRay.

12.     Agents in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, specifically noted

- 4 -

1    in a report of investigation and in handwritten notes that the "stingray" portable/transportable

2    wireless device locator was used to locate the aircard relevant to that case. *See* United States

3    v. Daniel Rigmaiden, CR08-814-PHX-DGC, EXHIBIT 26 of *1st Consolidated Exhibits,* Doc.

4    #587-2 (D.Ariz.); *id.*, EXHIBIT 109 of *2nd Consolidated Exhibits*, Doc. #821-6.

5        13.    At an open *Daubert* hearing in United States v. Allums, No. 2:08-CR-30 TS,

6    Doc. #128 [transcript] (D.Utah), FBI agent William Shute testified that **(1)** he has "particular

7    expertise in cell phone technology, plotting cell towers, tracking movements people are

8    making when they are making phone calls[,]" *id.*, p. 8, ln. 1-3, **(2)** he has "had training from

9    the Harris Corporation in Melbourne, Florida, which is a company that produces various

10   products for analyzing cellular telephones, measuring radio frequency[,]" *id.*, p. 9, ln. 2-5, **(3)**

11   "[o]ver the last nine years, but predominantly more so in the last three, [][he] personally []

12   used [][his training] over 300 times[,]" *id.*, p. 16, ln. 12-13, and **(4)** one type of

13   portable/transportable wireless device locator equipment FBI Agent Shute uses is "from the

14   Harris Corporation called the Sting Ray." *Id.*, p. 32, ln. 6-7.

15       14.    According to the USPTO, the trademark name "stingray" is registered to Harris

16   Corporation out of Melbourne, FL, USA. *See* United States Patent and Trademark Office,

17   *Trademark Reg. No. 2,762,468 [stingray]* (registered Sept. 9, 2003), *all associated*

18   *documents available via search at* http://tmportal.uspto.gov/external/portal/tow (last accessed

19   Mar. 11, 2011); *see also* United States Patent and Trademark Office, *Trademark Reg. No.*

20   *3,499,993 [StingRay II]* (registered Sep. 9, 2008), *all associated documents available via*

21   *search at* http://tmportal.uspto.gov/external/portal/tow (last accessed Mar. 11, 2011).  The full

22   USPTO document record for "stingray" is on the record at ATTACHMENT 05 of *Daniel*

23   *Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion*

24   *For Partial Summary Judgment.*

25       15.    According to the USPTO, Harris Intellectual Property Dept. attorney, Michael

26   S. Yatsko, signed a public declaration on August 14, 2001 stating that the "stingray" mark is

27   for "electronic surveillance transceivers for tracking, locating and gathering information from

28   cellular telephones," *see id.*, and in a later "Response To Official Action," attorney Donald S.

1  Showalter, on behalf of Harris, asked to amend the identification of goods to read "multi-

2  channel, software-defined, two-way electronic surveillance radios for interrogating, locating,

3  tracking and gathering information from cellular telephones." *Id.* In support of his request to

4  amend, Mr. Showalter included a Harris Corporation datasheet explaining the technical

5  features and operations of the StingRay. *See id.* The trademark documents indicate that the

6  mark was first used in connection with the goods on March 2, 2003 and was first used in

7  commerce on March 2, 2003. *Id.*

8         16.    As indicated by a September 29, 2010 "sole source vendor justification letter"

9  authored by Harris WPG and provided to the Durham, NC, City Council, as of September 29,

10  2010 Harris WPG was the sole source vendor of a certain class of portable/transportable

11  wireless device locators sold under the trade names StingRay II, StingRay, and KingFish:

>  The Harris RayFish product line includes the StingRay II, StingRay, and
>  KingFish systems, which are compatible with the CDMA2000, GSM, and
>  iDEN (Nextel) protocols. <u>The Harris StingRay and KingFish systems are the
>  only cooperative portable/man-portable standard +12VDC powered/battery
>  powered multiprotocol surveillance systems currently available.</u> When
>  interfaced with the optional Harris AmberJack DF antenna, supported mapping
>  software, laptop PC controller, and the Harris 25-Watt power amplifier kit, the
>  StingRay can perform vehicular-based operations. The transportability and
>  standard +12VDC vehicular power features of the Harris StingRay and
>  AmberJack, and the battery-powered features of the KingFish are unique for
>  tactical mission needs.

19  Durham, NC, USA, *City Council Agenda No. 7503 (Harris Sole Source Vendor Justification*

20  *letter)*, Sept. 29, 2010, p. 1, *available at*

21  http://www.durhamnc.gov/agendas/2010/cws20110103/251951_7503_342363.pdf (last

22  accessed: Mar. 9, 2011). The above quoted Harris WPG letter is on the record at

23  <u>ATTACHMENT 06</u> of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In*

24  *Support Of Plaintiff's Motion For Partial Summary Judgment.*

25         17.    The class of portable/transportable wireless device locators of which Harris

26  WPG was the sole source vendor were non-communication-intercept wireless device locators

27  capable of locating cdma2000 wireless devices via cell site emulation. *See* <u>United States v.</u>

28  <u>Daniel Rigmaiden</u>, CR08-814-PHX-DGC, Doc. #1047-1 (Plaintiff's Expert Report), p. 119-

1   124 & fn. No. 519 (D.Ariz.) ("[T]he Harris RayFish product line is entirely distinguished

2   from all other similar products considering it offers the only **cell site emulator capable** air

3   interface surveillance equipment supporting **cdma2000** based air interface standards."

4   (emphasis added)); *see also id.*, Doc. #824-1.  Plaintiff's expert report is also on the record in

5   the instant case at <u>ATTACHMENT 07</u> of *Daniel Rigmaiden's **First** Declaration Under*

6   *Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

7        18.    The UTStarcom PC5740 broadband access card (*i.e.*, "aircard") located by the

8   FBI using portable/transportable wireless device locators in <u>United States v. Rigmaiden</u> is a

9   cdma2000 1xEV-DO Rel. 0 wireless device.  *See* <u>United States v. Daniel Rigmaiden</u>, CR08-

10  814-PHX-DGC, Doc. #1047-1 (Plaintiff's Expert Report), p. 177-178 (D.Ariz.).

11       19.    The aircard in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, was located

12  by the FBI using portable/transportable wireless device locators with cell site emulation

13  capabilities while in cell site emulation mode.  *See* <u>United States v. Daniel Rigmaiden</u>, CR08-

14  814-PHX-DGC, Doc. #602, p. 3 (D.Ariz.) ("The equipment mimicked a Verizon Wireless cell

15  tower and sent and received signals directly to and from the aircard.").

16       20.    The portable/transportable wireless device locators used by the FBI to locate the

17  aircard in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, did not intercept

18  communications content.  *See* <u>United States v. Daniel Rigmaiden</u>, CR08-814-PHX-DGC,

19  "Affidavit Of Supervisory Special Agent Bradley S. Morrison," Doc. #674-1, p. 2-3, ¶ 4

20  (D.Ariz.) ("equipment used to locate the defendant's aircard did not capture, collect, decode,

21  view, or otherwise obtain any content transmitted from the aircard").

22       21.    Based on the undisputed facts in ¶¶ Nos. 16-20 above, the only class of

23  portable/transportable wireless device locator that could have been used by the FBI to locate

24  the aircard in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, were the non-

25  communication-intercept CDMA-capable locators (*i.e.*, the StingRay, StingRay II, and

26  KingFish) made by sole source vendor, Harris WPG.

27       22.    Via a September 28, 2011 request for information under the FOIA, 5 U.S.C. §

28  552 *et seq.*, Christopher Soghoian, Center for Applied Cybersecurity Research, asked the

Federal Communications Commission ("FCC") to produce documents pertaining to cell site simulators, IMSI catchers, digital analyzers, Triggerfish, StingRay, Amberjack and other similar mobile phone surveillance and tracking devices. The FCC's entire February 29, 2012 response to Mr. Soghoian's FOIA request (FOIA Control No. 2011-586) is on the record at ATTACHMENT 08 of *Daniel Rigmaiden's First Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*.

23.   In its FOIA response cover letter, the FCC stated that the devices listed by Mr. Soghoian are "associated with equipment authorizations issued to the Harris Corporation ('Harris') and Digital Receiver Technology, Inc. ('DRT')." *Id.*

**B.   Various FBI and EOUSA agents and employees have provided contradicting statements explaining the FBI's reasons for destroying data collected by portable/transportable wireless device locators.**

24.   In United States v. Rigmaiden, CR08-814-PHX-DGC, FBI supervisory agent Morrison stated that the FBI has a policy to destroy geolocation data and other data collected via portable/transportable wireless device locators because the agency seeks to protect the privacy of uninvolved third parties:

> FBI policy requires that at the conclusion of a location operation, FBI technical personnel are to purge all data stored in the [][portable/transportable wireless device locator] equipment. During a location operation, the electronic serial numbers (ESNs) (or their equivalent) from all wireless devices in the immediate area of the FBI device that subscribe to a particular provider may be incidentally recorded, including those of innocent, non-target devices. Purging is done by the FBI as an additional, internal procedural safeguard to ensure (1) that the privacy rights of those innocent third parties are maintained, (2) that the FBI does not store or maintain [][portable/transportable wireless device locator] data beyond the scope of its legal authorization, or (3) that the FBI does not collect information about individuals who are not subject of criminal or national security investigations.

United States v. Daniel Rigmaiden, CR08-814-PHX-DGC, "Affidavit Of Supervisory Special Agent Bradley S. Morrison," Doc. #674-1, p. 3, ¶ 5 (D.Ariz.).

25.   Contrary to FBI supervisory agent Morrison's declaration, the FBI policy provided to Plaintiff by AUSA Frederick A. Battista in United States v. Rigmaiden, CR08-814-PHX-DGC, provides no justification for the deletion of data collected by portable/transportable wireless device locators:

Extracted from HQ-1068430 serial 342, an EC dated 8/24/2004:

> Upon completion of a case all data related to that particular case must be removed from the cellular tracking equipment. Thus, prior to deploying equipment to effect a collection authorized pursuant to particular court order, TTAs should ensure that the equipment has been cleared of any prior case operational data.

United States v. Daniel Rigmaiden, CR08-814-PHX-DGC, EXHIBIT 071 of *2nd Consolidated Exhibits,* Doc. #821-4 (D.Ariz.) (December 2, 2011 letter from AUSA Battista to Plaintiff, p. 1).

    26.    Contrary to FBI supervisory agent Morrison's declaration, an FBI official told *The Wall Street Journal* in September of 2011 that deletion of data collected by portable/transportable wireless device locators was intended to prevent suspects from obtaining the data:

> In September, a Federal Bureau of Investigation representative told the Journal the policy of deletion "is intended to protect law enforcement capabilities so that subjects of law enforcement investigations do not learn how to evade or defeat lawfully authorized investigative activity."

Valentino-DeVries, Jennifer (The Wall Street Journal), *Feds Shift Tracking Defense: Prosecutors in Arizona Case Drop Position That 'Stingray' Use Didn't Require Warrant* (Nov. 3, 2011) *available at* http://online.wsj.com/article/SB10001424052970204621904577014363024341028.html (last accessed: Nov. 15, 2011). The above quoted news article is on the record at ATTACHMENT 09 of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

    27.    A statement made by Sherry Sabol, Chief of the Science & Technology Office for the FBI's Office of General Counsel, to *The Wall Street Journal* corroborates the statement quoted immediately above:

> Ms. Sabol says the FBI follows this ["destroy the evidence"] policy because its intent isn't to use the data as evidence in court, but rather to simply find the "general location of their subject" in order to start collecting other information that can be used to justify a physical search of the premises.

1   Valentino-DeVries, Jennifer (The Wall Street Journal), *'Stingray' Phone Tracker Fuels*

2   *Constitutional Clash*, p. A1 (Sept. 22, 2011) (original article addressing CR08-814-PHX-

3   DGC) *available at*

4   http://online.wsj.com/article/SB10001424053111904194604576583112723197574.html (last

5   accessed: Sept. 22, 2011).  The above quoted news article is on the record at <u>ATTACHMENT</u>

6   <u>10</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of*

7   *Plaintiff's Motion For Partial Summary Judgment.*

8        28.   In <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, the FBI deleted all

9   geolocation data and other data collected via the portable/transportable wireless device

10  locators used to locate the aircard; this was done **eighteen (18) days** after the aircard was

11  located, which was shortly after Plaintiff was arrested on the indictment in CR08-814-PHX-

12  DGC.  *See* <u>United States v. Daniel Rigmaiden</u>, CR08-814-PHX-DGC, Doc. #1047-1

13  (*Plaintiff's Expert Report*), p. 226-229 (D.Ariz.) (The aircard was located by the FBI's

14  portable/transportable wireless device locators on July 16-17, 2008); <u>United States v. Daniel</u>

15  <u>Rigmaiden</u>, CR08-814-PHX-DGC, Doc. #723 (January 4, 2012 Court Order), p. 14 (D.Ariz.)

16  (Noting the settled fact that "[a]ll data generated by the [][portable/transportable wireless

17  device locators] and received from Verizon as part of the locating mission was destroyed by

18  the government shortly after Defendant's arrest on August 3, 2008.").  The deleted data was

19  not just data relating to wireless devices owned by uninvolved third parties, but data relating

20  to the target aircard in CR08-814-PHX-DGC (*i.e.*, discoverable evidence was destroyed).  *See*

21  *id.*

> **C.   Defendants FBI and EOUSA have the policy that it is not a Fourth**
> **Amendment search and seizure, and therefore requires no warrant,**
> **to use a portable/transportable wireless device locator to locate**
> **wireless devices.**

25        29.   In <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, FBI supervisory agent

26  Morrison stated that the FBI has a policy that portable/transportable wireless device locators

27  "fall[] within the statutory definition of a pen register/trap and trace device."  <u>United States v.</u>

28  <u>Daniel Rigmaiden</u>, CR08-814-PHX-DGC, "Affidavit Of Supervisory Special Agent Bradley

1  S. Morrison," Doc. #674-1, p. 1, ¶ 2 (D.Ariz.).

2      30.    "Associate Deputy Attorney General James A. Baker and FBI General Counsel

3  Valerie E. Caproni both said at a panel at the Brookings Institution in May that devices like

4  these [(*i.e.*, portable/transportable wireless device locators)] fall into a category of tools called

5  'pen registers,' which require a lesser order than a warrant." Valentino-DeVries, Jennifer (The

6  Wall Street Journal), *'Stingray' Phone Tracker Fuels Constitutional Clash*, p. A1 (Sept. 22,

7  2011) (original article addressing CR08-814-PHX-DGC) *available at*

8  http://online.wsj.com/article/SB10001424053111904194604576583112723197574.html (last

9  accessed: Sept. 22, 2011). The above quoted news article is on the record at <u>ATTACHMENT</u>

10  <u>10</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of*

11  *Plaintiff's Motion For Partial Summary Judgment.*

12      31.    In <u>United States v. Rigmaiden,</u> CR08-814-PHX-DGC, although the government

13  conceded, arguendo, that a Fourth Amendment search and seizure occurred when the FBI

14  located the aircard, the EOUSA has the general policy that use of a portable/transportable

15  wireless device locator is not a search and/or seizure under the Fourth Amendment and that a

16  hybrid Pen/Trap + SCA (*i.e.*, Stored Communications Act) order is sufficient authority to

17  operate a portable/transportable wireless device locator. *See* <u>United States v. Daniel</u>

18  <u>Rigmaiden,</u> CR08-814-PHX-DGC, Doc. #674, p. 2, fn. No. 2 (D.Ariz.) ("the United States'

19  position is that the hybrid [Pen/Trap + SCA] order confers sufficient authority to use a cell

20  site simulator and that a tracking warrant is unnecessary.").

> **D.    Publicly available information relating to portable/transportable wireless device locators.**
>
> **1.    Public information on precisely how portable/transportable wireless device locators operate.**

24      32.    Publicly disclosed Miami, FL, City Commission Legislative Files contain

25  numerous documents revealing information on how various Harris WPG

26  portable/transportable wireless device locators operate:

27      <u>The KingFish system is the only man-portable battery powered CDMA & GSM</u>
   <u>Interrogation, Active Location, and Signal Information Collection system</u>

28      <u>currently available.</u> KingFish is compatible with CDMA commercial standards

IS-95A, IS-95-B, TSB74, and J-STD-008 in the U.S. 800 and 1900 MHz bands. A GSM S/W upgrade package (for the KingFish and its Pocket PC) is available for purchase that will allow operation against the GSM standard in the U.S. 800 and 1900 MHz bands (as well as the overseas 900 MHz E-GSM and DCS 1800 MHz bands). KingFish can also be powered via standard automotive + 12V DC or standard 110 VAC. The man-portability and battery power features of the Harris KingFish product are unique for tactical mission needs, allowing the user to perform passive collection, active interrogation and active location while on foot (i.e., inside a multi-story building, or outside in rough terrain).

Miami, FL, USA – Legislative Files, Harris Sole Source Vendor Letter, p. 1 (Nov. 29, 2006), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf (last accessed: Mar. 9, 2011).

The Police Department will be purchasing a Dual Band High Powered 30W Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband Direction Finder to upgrade the StingRay 4-CH and KingFish 1-CH, from Harris GCSD...

The upgrade is necessary to operate both the StingRay 4-CH and the KingFish 1-CH given the continuous change in technology. The amplifier will allow an increase in wattage that will greatly heighten the ability of tracking phones from an increased distance and reducing the time utilized; the converter is a high performance converter that enables the StingRay and the KingFish to operate in the 2100 MHz band, which is the new cellular phone technology being introduced to the Miami market and already being utilized around the country; the Amberjack Wideband will enable the StingRay to use its added capabilities with the current iDEN software to pinpoint push-to-talk cellular phones more effectively, a feature that the current equipment does not have. This will enable the investigators to carry out their duties and responsibilities in a more effective and efficient manner.

Miami, FL, USA, *Legislative Files, Inter-Office Memo RE: Harris Sole Source Vendor*, p. 1 (Nov. 13, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/47993.pdf (last accessed: Mar. 9, 2011).

The Harris StingRay and KingFish systems are compatible with the CDMA standard in the 800 MHz and 1900 MHz frequency bands, the GSM standard in the 800 MHz, 900 MHz, 1800 MHz, and 1900 MHz frequency bands, the iDEN (Nextel) standard in the 800 MHz and 850 MHz frequency bands, the UMTS standard in the 800 MHz and 1900 MHz frequency bands, and, with optional converter equipment, the UMTS standard in the 2100 MHz frequency band.

The Harris StingRay and KingFish vehicular-based systems are the only portable standard +12VDC powered CDMA, GSM, UMTS, and iDEN interrogation, tracking and location, and signal information collection system currently available. When interfaced with the optional Harris AmberJack direction-finding (DF) antenna(s) (or handheld DF antenna for iDEN and UMTS), Tarpon software, laptop PC controller, and Harpoon amplifier kits, the

StingRay can perform vehicular-based DF operations on the CDMA, GSM, UMTS, and iDEN cellular formats. The transportability and standard +12VDC vehicular power features of the Harris StingRay and KingFish products are unique for tactical mission needs.

The StingRay and KingFish are quoted with software and accessories that are required in order to perform missions on the CDMA, GSM, UMTS, and iDEN cellular formats. These include the cable assemblies, power supplies, antennas, laptop PC controller, power amplifiers, handheld DF antenna, AmberJack DF antenna, and cellular format software (CDMA, GSM, UMTS, and iDEN).

Harris also sells training on the use of the StingRay, KingFish and its accessories. Standard training sessions are 2 days per class with a maximum class size of 4 students....

Miami, FL, USA, *Legislative Files, Harris Sole Source Letter [Attachment B]*, p. 2 (Aug. 25, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48003.pdf (last accessed: Mar. 9, 2011).

Relevant pages of the above quoted Miami, FL, City Commission Legislative Files are on the record at ATTACHMENT 11 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

33.     Publicly disclosed Miami, FL, City Commission Legislative Files also contain Harris WPG product datasheets revealing information on the features of the Harris WPG line of wireless device locators:

**StingRay** Transportable CDMA Interrogation, Tracking and Location, and Signal Information Collection System

*Product Description*

StingRay is Harris' latest offering in a long line of advanced wireless surveillance products. StingRay is a multichannel software defined radio that performs network base station surveys, Dialed Number and registration collection, mobile interrogation, and target tracking and location with Harris' AmberJack Direction-Finding Antenna. This low-power transportable surveillance system is designed with the future in mind—its reconfigurable architecture lends itself to upgrades of new capabilities and wireless standards, while preserving the initial investment in hardware.

*Features*

• Software Defined Radio (SDR) enables Simultaneous monitoring of up to eight CDMA Paging/Access channel pairs

- 13 -

- Active interrogation capability emulates base station to collect MINs and ESNs through forced registration; external PA output available for higher power requirements

- Interfaces with AmberJack antenna to form a complete target tracking and location solution using active direction-finding and ranging techniques (active approach does not require the target phone to be engaged in a call)

- Optional geolocation software overlays target tracks and tracking vehicle location on a digital map

- Wideband RF front-end provides simultaneous operation in the U.S. cellular 800 and PCS 1900 MHz bands and is preconfigured to support iDEN (low band), GSM 900, and DCS 1800 bands

- PC-based controller running Windows XP provides an Intuitive Graphical User Interface (GUI)

- Industry-standard USB interface enables plug-n-play networking of multiple StingRay surveillance systems if the user requires more channel capacity

- Supports targeting and real-time searching of mobile identification numbers (MIN), dialed numbers, and electronic serial numbers (ESN)

- Low-power system designed for vehicular operations

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: Mar. 9, 2011).


**AmberJack** Dual-Band Direction Finding System

***Product Description***

AmberJack is a phased array direction finding (DF) antenna system capable of tracking and locating mobile phone users. The DF antenna array is designed to operate with Harris' LoggerHead and StingRay products enabling tracking and location of AMPS, TDMA and CDMA phones. AmberJack operates in both the cellular and PCS bands.

AmberJack combines Harris' expertise in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction finding system. Beam forming technology offers a universal DF antenna for existing as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a targeted phone is engaged, information on the direction

to the target is dynamically updated for display on the PC.

### Features

- Determines direction of arrival and received signal strength of phone's transmission

- Provides real-time display of direction to the target

- Low power, small size

- User-friendly graphical user interface for the PC or Pocket PC (optional)

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: Mar. 9, 2011).

**AmberJack** Direction-Finding System

### Product Description

AmberJack is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations. The DF antenna array is designed to operate with Harris' Gossamer, KingFish, StingRay, and StingRay II products, enabling tracking and location of targeted mobile phones, as well as base stations. AmberJack-X operates in the U.S. cellular 850 and PCS 1900 bands, and AmberJack-G operates in the EGSM 900 and DCS 1800 bands. AmberJack-W operates in all the bands above as well as IDEN and UMTS bands I and IV.

AmberJack combines Harris' experience in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction-finding system. Phased array technology offers a universal DF antenna for existing, as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation on the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a target is engaged, information on the direction to the target is dynamically updated for display on the PC.

### Operations Supported

- Locating mobile phones and base stations

- Tracking mobile phones

### Features

- 15 -

- Determines direction of arrival and received signal strength of a targeted mobile phone's transmissions

- Determines direction of arrival and received signal strength of a targeted base station's transmission

- Provides real-time display of direction to the target

- Low power and portable

- User-friendly Graphical User Interface (GUI) for the PC

...

**External Control**

- Laptop PC (Windows XP Professional)

**Power Source**

- 12 Vdc at 0.5 A

**Physical Characteristics**

- Size: D = 17" H = 4.2"

- Weight: <14 lbs

**Required Accessories** *(sold separately)*

Gossamer with PC Controller, StingRay system, StingRay II, or KingFish with PC Controller

**Optional Accessories**

- Harpoon for DF range extension

...

Miami, FL, USA, *Legislative Files, Harris Sole Source Letter [Attachment B]*, p. 6-7 (Aug. 25, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48003.pdf (last accessed Mar. 9, 2011).

**Geolocation (Preliminary)** PC-Based Intelligent AMPS/TDMA and CDMA Tracking and Location

**Product Description**

Geolocation is a PC-based software application that allows the user to

- 16 -

intelligently track and locate targeted AMPS/TDMA or CDMA cellular phones... Geolocation consists of software and an external GPS receiver. Geolocation will be offered in two options: an AMPS/TDMA Option to be used in conjunction with the Harris LoggerHead Interrogator plus the PC Controller and the AmberJack DF Antenna; and a CDMA Option to be used in conjunction with the Harris StingRay system plus the AmberJack DF Antenna.

Geolocation provides a user-friendly, geospatially accurate mapping routine which shows on-screen the exact location of the tracking vehicle, plus Direction of Arrival (DOA) information and/or estimated range/location information on the targeted phone.

Providing a visual screen of an accurate local map, the exact location of the tracking vehicle, and the approximate location of the targeted phone, allows for a much more intelligent and expedient method for tracking and location.

***Features***

- User-friendly application running on Windows 98/2000/XP provides an intuitive Graphical User Interface (GUI)

- AMPS/TDMA: Interfaces with the LoggerHead Handheld Interrogator plus the PC Controller and the AmberJack Direction-Finding (DF) Antenna

- CDMA: Interfaces with the StrngRay plus the AmberJack Directicn-Finding (DF) Antenna

- Provided GPS receiver integrates with PC running the application

- Real-time viewing of tracking vehicle location

- Real-time viewing of approximate targeted cellular phone location

- Tracking missions can be stored for post-mission analysis

- Migration path to GSM and future cellular standards

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed: Mar. 9, 2011).

**KingFish (Preliminary)** Portable CDMA Interrogation, Direction-Finding, and Collection System

***Product Description***

KingFish provides investigators with a tool that extracts the telephone number (MIN) and Electronic Serial Number (ESN) from a CDMA mobile telephone. The Active Direction-Finding (DF) capability enables location of a powered-on

phone without depending on the suspect to be involved on a call. Additionally, KingFish provides passive Dialed Number Recorder (DNR) and Registration Collection capabilities. Passive operations identify calling patterns and provide information on the suspect's area of operation.

KingFish is based on a Software Defined Radio (SDR) architecture, which enables upgrades to future cellular standards, while preserving the initial investment in hardware. As initially offered, KingFish provides CDMA operation in both the Cellular and PCS bands.

***Features***

**Covert Packaging**

- Concealed radio, antennas, and battery power supply

- Wireless remote control from commercially available Pocket PC

**Intuitive Application Software**

- Windows interface

- Identifies active CDMA channels and catalogs base station parameters

- Provides real-time display of Interrogation and Passive Collection results

- Dynamically updates received signal strength to enable precise location of a target phone

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed: Mar. 9, 2011).

Relevant pages of the above quoted Miami, FL, City Commission Legislative Files are on the record at ATTACHMENT 11 of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

34. Publicly disclosed Miami, FL, City Commission Legislative Files also contain a Harris WPG GCSD Price List with numerous wireless device locators and accessories listed. *See* Miami, FL, USA, *Legislative Files, Harris GCSD Price List* (Sept. 2008), p. 1-8, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf (last accessed: Mar. 9, 2011). *See also* ATTACHMENT 11 of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

35.     "Lee [Lapin] has worked with several agencies, both public and private, helping to develop surveillance and tracking equipment and techniques.  His works ('letters on file') are employed as textbooks by many of the world's major intelligence agencies including the CIA, KGB and MOSSAD, the Justice Department, IRS, ATF, even the FBI.  In addition, Lee has appeared on several national talk shows and has been featured on the front page of the NY Times, in People Magazine, Associated Press, and in many other magazines and newspapers."  Coast to Coast AM, *Lee Lapin - Guests - Coast to Coast AM*, Lee Lapin Biography, http://www.coasttocoastam.com/guest/lapin-lee/6469 (last accessed: Mar. 11, 2011).  The above quoted news article is on the record at ATTACHMENT 12 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

36.     In his book, former government employee Lee Lapin explains the functionality of various portable/transportable wireless device locators manufactured by Harris WPG (*i.e.,* LoggerHead 4000, DF Antenna Array, SeaHorse, StarFish, and TriggerFish):

The LoggerHead 4000 is a handheld device that enables survey, intercept, and interrogation of analog and digital cellular networks.  This multipurpose tool provides investigators with a means of passively monitoring forward and reverse voice traffic, locating targeted cellular telephone users, actively intercepting calls, and interrogating cellular telephones for identifying information.  LoggerHead 4000 operates in the cellular and PCS bands.

**Base Station Survey**
●     Identifies analog and digital control channels with related received signal strength
●     Captures network information including System ID (SID) and service provider features
●     Time tags and stores survey results

**Passive Mobile Survey**
●     Intercepts forward and reverse audio using operator-defined mobile target parameters
●     Captures call related information including Mobile Identification Number (MIN), Electronic Serial Number (ESN), Dialed Number, Caller ID. and Received Signal Strength
●     Collects occurrences of mobile registrations with the network
●     Scans voice traffic channels for call activity

**Active Mobile Survey**

- 19 -

- Emulates Base Station Control Channel to "capture" mobile phones in close proximity
- Collects MINs and ESNs through forced registration
- Actively intercepts or denies calls originating from captured mobile phones

**Direction Finding**
- Interfaces with available direction-finding equipment

Lapin, Lee, *How To Get Anything On Anybody – Book 3*, Intelligence Here (Mt. Shasta, CA: Jan. 15, 2003),, p. 122.

SeaHorse is an Interrogation and Direction Finding (DF) system, which is capable of identifying, tracking, and locating an IS-95 (CDMA) mobile phone. SeaHorse may be deployed with a tracking vehicle or in a man-portable configuration. The interrogation function is used to extract the identity (IMSI and ESN) of a suspect's mobile phone, if this information is not already known to the investigator. The DF function is used to track and locate a targeted suspect.

SeaHorse is capable of operating in both the Cellular and PCS bands. User friendly software, developed for Windows operating systems, enables control of the SeaHorse system from a laptop or pocket PC.

The DF Antenna Array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle. Once a targeted phone is engaged, information on the directions to the target is dynamically updated for display on the PC. The DF Antenna Array is designed to operate with Harris' entire line of interrogators and intercept receivers, enabling tracking and location of AMPS, TDMA, GSM, as well as CDMA phones.

When detached from the laptop PC and Antenna Array, the interrogator unit can be easily concealed for tactical interrogation and location operations.

**Features**
Base Station Survey Capability
- Identifies active CDMA channels
- Measures and records pilot signal strengths
- Captures network information required for interrogation operation
- Time tags and stores survey results

**Interrogation**
- Emulates Base Station to "capture" IS-95 phones in close proximity
- Collects and stores phone identities (IMSI and ESN)

**Direction Finding**
- Engages targeted mobile phone
- Determines direction of arrival and received signal strength of phone's

- 20 -

transmissions
- Provides real-time display of direction to the target

*Id.*, p. 123.

StarFish integrates the Harris TriggerFish and LoggerHead surveillance products into a single pinpoint cellular location product. StarFish combines the multichannel monitoring capability of the TriggerFish with the mobility of the handheld LoggerHead to track a cellular user to an area the size of a hotel room. The StarFish system is comprised of a LoggerHead segment and a TriggerFish segment. The LoggerHead segment consists of a LoggerHead, directional antenna, a pocket PC (PPC) and communications equipment that is man-portable and concealed within a common backpack or shoulder bag. The TriggerFish segment consists of a TriggerFish and wireless communications equipment.

In StarFish mode, the LoggerHead receives its channel assignment remotely from the TriggerFish segment and graphically represents signal strength indications from the directional antenna to the PPC enabling the operator to locate the cellular target. The TriggerFish segment serves as the command and control element for StarFish. It monitors for a selected cellular target and sends channel assignments and short text messages to a maximum of six LoggerHead segments in the field.

Feedback to the TriggerFish operator of LoggerHead receiver signal strength and channel information allows an operator to direct and coordinate the search while somewhat removed from the hostile environment.

**Features**
- Ability to intercept and locate an AMPS/TDMA phone operating in the U.S. cellular or PCS bands
- Ability of the TriggerFish to remotely control and status up to six LoggerHeads at a range of up to 2,000 feet
- Remote control and status of LoggerHead mobile tracking functions via the PPC
- Concealment of the LoggerHead segment in an ordinary backpack or shoulder bag

*Id.*, p. 123-24.

Lee Lapin's book, quoted above, is available FREE to any member of the public who has access to the Internet. *See* Google Books, *How To Get Anything On Anybody – Book 3*, http://www.google.com/search?tbo=p&tbm=bks&q=isbn:1-880231-13-1&num=10 (last accessed: Feb. 22, 2011).

37. Harris Corporation has numerous publicly available published patents corresponding to portable/transportable wireless device locator technology of which the

1   government has made no effort to protect under the Invention Secrecy Act (ISA), 35 U.S.C.

2   §§ 181-88:

3
> [T]he wireless device locator may include at least one antenna and a transceiver
> connected thereto, and a controller for cooperating with the transceiver for
4   transmitting a plurality of location finding signals to a target wireless
> communications device from among the plurality thereof.  The target device
5   may transmit a respective reply signal for each of the location finding signals.

6
> Billhartz, Thomas J., *et al.*, Harris Corp., *Wireless Communications System
> Including A Wireless Device Locator And Related Methods*, U.S. Patent No.
7   7,321,777 (Melbourne, FL: Jan. 22, 2008), *available at*
> http://www.freepatentsonline.com/7321777.html (last accessed: Feb. 16, 2011),
8   p. 2, ln. 47-55.

9

10
> The location determining system may also include a location determining
> processor coupled to the receiver to collect, during movement relative to the
11   wireless transmitter, a series of range measurements [(using propagation
> delays)] and a corresponding series of received signal measurements, and to
12   estimate a location of the wireless transmitter based upon the range
> measurements weighted using the received signal measurements.

13

14
> McPherson, Rodney and Lanza, David J., Harris Corp., *Wireless Transmitter
> Location Determining System And Related Methods*, U.S. Patent No. 7,592,956
15   (Melbourne, FL: Sept. 22, 2009), *available at*
> http://www.freepatentsonline.com/7592956.html (last accessed: Feb. 22, 2011),
16   p. 2, ln. 16-22.

17

18
> In certain embodiments, the antenna may comprise a directional antenna.  In
> these embodiments, the location determining processor may cooperate with the
19   directional antenna to collect, during movement relative to the wireless
> transmitter, a corresponding series of angle of arrival measurements.  The
20   location determining processor may also estimate the location of the wireless
> transmitter further based upon the angle of arrival measurements.

21
> *Id.*, p. 2, ln. 40-47.

22

23
> Moreover, the location determining processor may cooperate with the receiver
> to collect, during movement relative to the wireless transmitter, a corresponding
24   series of received signal strength measurements.  The location determining
> processor may further estimate the location of the wireless transmitter further
25   based upon the received signal strength measurements weighted using the
> received signal measurements.

26
> *Id.*, p. 2, ln. 52-58.

27

28

- 22 -

*See also, e.g.*, Otto, James C., Harris Corp., *System And Method For Determining The Geolocation Of A Transmitter*, U.S. Patent No. 5,719,584 (Indian Harbor Beach, FL: Feb. 17, 1998), available at http://www.freepatentsonline.com/5719584.html (last accessed: Feb. 22, 2011); Proctor, James A, Jr. and Otto, James C., Harris Corp., *Range And Bearing Tracking System With Multipath Rejection*, U.S. Patent No. 5,687,196 (Indialantic, FL: Nov. 11, 1997), available at http://www.freepatentsonline.com/5687196.html (last accessed Feb. 16, 2011).

The above quoted/cited published patents are on the record at <u>ATTACHMENT 13</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

38.     At the 2010 Defcon security conference, researcher Chris Paget demonstrated her own cell site emulator similar to the technology built into Harris WPG portable/transportable wireless device locators. *See* Greenberg, Andy (Forbes Magazine), *Despite FCC Scare Tactics, Researcher Demos AT&T Eavesdropping - Forbes* (Jul. 31, 2010), *available at* http://www.forbes.com/sites/firewall/2010/07/31/despite-fcc-scare-tactics-researcher-demos-att-eavesdropping/ (last accessed: Dec. 14, 2011) ("With about $1,500 worth of hardware and open source software, Paget turned two on-stage antennas into a setup capable of spoofing the base stations that connect the GSM cell phone signals used by AT&T and T-Mobile. Paget set h[er] hardware to impersonate an AT&T signal, and dozens of phones in the room connected to h[er] fake base station."). The above quoted news article is on the record at <u>ATTACHMENT 14</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

39.     In <u>United states v. Rigmaiden</u>, CR08-814-PHX-DGC, Plaintiff submitted an expert report explaining the precise operations of portable/transportable wireless device locators as used to locate cdma2000 1xEV-DO Rel. 0 wireless devices. *See* <u>United States v. Daniel Rigmaiden</u>, CR08-814-PHX-DGC, Doc. #1047-1 (Plaintiff's Expert Report) (D.Ariz.); *see also id.*, Doc. #824-1. Plaintiff's expert report is also on the record in the instant case at <u>ATTACHMENT 07</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

**2.   Public information on how the Harris WPG StingRay necessitates that users of connected cell phones dial 9-1-1 twice if seeking to make a 9-1-1 emergency phone call.**

40.   As indicated by various Harris WPG cover letters attached to the FCC's response to Christopher Soghoian's FOIA request, the Harris WPG StingRay has an automatic "release" (*i.e.*, disconnect/hang-up/facilities release) for emergency 9-1-1 calls placed by users of cell phones connected to the StingRay:

> Interference to users outside a predetermined target list is very limited and this device employs a "catch and release" technology that is localized and fixated on a particular signal of interest.  Moreover, **the StingRay product provides for an automatic release for emergency calls.**

*See* ATTACHMENT 08 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment* (FCC's entire response to Mr. Soghoian's FOIA request [quoted letter is from City of Houston Police Department to FCC, Aug. 22, 2007 (emphasis added)]).  According to an FBI response to EPIC's February 10, 2012 FOIA request, "release" means "the **end of the call** for both incoming and outgoing calls[.]" FBI, *Response to EPIC FOIA Request No. 1182490-000*, Apr. 20, 2013, *available at* http://epic.org/foia/fbi/stingray/FBI-FOIA-Release-04302013-s3-OCR.pdf (last accessed: May 20, 2013), p. 6 of 53 (emphasis added).  According to the Telecommunications Industry Association, TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance* (Arlington, VA: May 31, 2000) technical standard, the "release" event for basic circuit calls indicates that "[t]he facilities for the entire call have been released[,]" *id.*, § 4.4.2, p. 20-21, and a definition section states that a call "**end[s]** with the final release of all facilities used." *Id.*, § 3, p. 5 (emphasis added).  FBI supervisory agent Morrison also stated in a declaration that the portable/transportable wireless device locator equipment used by the FBI during the locating missions is not configured to forward a cell phone's communications content to actual wireless carrier facilities.  *See* United States v. Daniel Rigmaiden, CR08-814-PHX-DGC, "Affidavit Of Supervisory Special Agent Bradley S. Morrison," Doc. #674-1, p. 2-3, ¶ 4 (D.Ariz.).

41.   As indicated by the information quoted in ¶ No. 40 above, if a user who's cell

1  phone is connected to a StingRay dials an emergency 9-1-1 call, the StingRay will (1)

2  "release" (*i.e.*, end) the 9-1-1 call, and (2) instruct the cell phone to "release" (*i.e.*, disconnect)

3  from the StingRay facilities so that it may connect to an actual wireless carrier cell site

4  capable of processing 9-1-1 calls.  *See id.*  However, because the first 9-1-1 call is "released"

5  by the StingRay, *see id.*, the cell phone user will be required to manually re-dial the 9-1-1 call

6  once a connection is established with the wireless carrier facilities--thus, causing delays

7  during an emergency.

### 3.   Public information on how to build cell site emulators using off-the-shelf hardware and free software.

10   42.   Through the OpenBTS project, information is publicly available allowing for

11  anyone to build his/her own 2G GSM cell site emulator for approximately $1500 USD.  *See*

12  *The OpenBTS Project*, http://openbts.sourceforge.net (last accessed: Feb. 10, 2012)

13  ("OpenBTS is a Unix application that uses a software radio to present a GSM air interface to

14  standard 2G GSM handset and uses a SIP softswitch or PBX to connect calls.");

15  ATTACHMENT 15 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

16  *Support Of Plaintiff's Motion For Partial Summary Judgment* (web resource attached).  *See*

17  *also* Greenberg, Andy (Forbes Magazine), *Despite FCC Scare Tactics, Researcher Demos*

18  *AT&T Eavesdropping - Forbes* (Jul. 31, 2010), *available at*

19  http://www.forbes.com/sites/firewall/2010/07/31/despite-fcc-scare-tactics-researcher-demos-

20  att-eavesdropping/ (last accessed: Dec. 14, 2011) ("With about $1,500 worth of hardware and

21  open source software, Paget turned two on-stage antennas into a setup capable of spoofing the

22  base stations..."); the above quoted news article is on the record at ATTACHMENT 14 of

23  *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's*

24  *Motion For Partial Summary Judgment.*

25   43.   Cell site emulator technology is a primary component of cell site emulator

26  capable portable/transportable wireless device locators.  *See* Plaintiff's expert report titled

27  *1xEV-DO Rel. 0, CELL SITE EMULATOR, & GEOLOCATION EXPERT REPORT RE: The*

28  *independent operations of the FBI's cell site emulators, etc. used to locate the UTStarcom*

1   *PC5740 1xEV-DO aircard in United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.)*

2   (May 29, 2013), p. 137-139 [PDF p. No. 143-145]. Plaintiff's expert report is on the record at

3   <u>ATTACHMENT 07</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

4   *Support Of Plaintiff's Motion For Partial Summary Judgment.* *See also* datasheets quoted in

5   ¶¶ Nos. 33 and 35-36, *supra* (noting cell site emulator capabilities of Harris WPG devices).

       **E.**    **Free tools capable of detecting and defeating law enforcement use of portable/transportable wireless device locators are publicly available.**

8       **44.**    Through the "Catcher Catcher" project, an open source software tool is publicly

9   available that can detect portable/transportable wireless device locators operating in cell site

10   emulator mode. *See* Catcher Catcher - Wiki - Redmine,

11   http://opensource.srlabs.de/projects/2/wiki/Wiki?version=18 (last accessed: Feb. 20, 2012);

12   <u>ATTACHMENT 16</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

13   *Support Of Plaintiff's Motion For Partial Summary Judgment* (web resource attached).

14       **45.**    Some of the detection methods used by the "Catcher Catcher" software include

15   "The LAC of a base station changes," "The LAC changes more than once," "The registration

16   timer is set to a value < 10 minutes,"Receive a silent text message," "You do not receive a

17   call setup message while already being on a traffic channel for 2 seconds," and "Your phone

18   sends at the highest possible power." *Id.*

       **F.**    **The government's use of portable/transportable wireless device locators is a matter of widespread and exceptional media interest.**

       **1.**    **The media reported on the government's use of portable/transportable wireless device locators prior to any challenges made in United States v. Rigmaiden.**

23       **46.**    In 2007, the media reported that "a little-known FBI telephone intercept unit

24   has developed a powerful cellphone tracking technology that agents use to monitor the

25   physical movements of surveillance targets, even on phones that are not GPS equipped."

26   Singel, Ryan (Wired Digital), *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs*

27   (Dec. 20, 2007), http://www.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell (last

28   accessed Sept. 22, 2010). The above quoted news article is on the record at <u>ATTACHMENT</u>

1 | 17 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of*

2 | *Plaintiff's Motion For Partial Summary Judgment.*

3 |      47.    In 2008, the media reported that the government can track cell phones on its

4 | own using a TriggerFish and that it "raises the risk that they will do so without bothering to

5 | go to a court for permission first, since they no longer need to compel the provider to

6 | cooperate." Myers, Rachel (ACLU), *With Technology Like This, Who Needs the Law? |*

7 | *American Civil Liberties Union* (Nov. 14, 2008), http://www.aclu.org/2008/11/14/with-

8 | technology-like-this-who-needs-the-law (last accessed Jul. 08, 2013). The above quoted

9 | news article is on the record at ATTACHMENT 18 of *Daniel Rigmaiden's **First** Declaration*

10 | *Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

11 |      48.    In 2010, the media reported that a senior attorney in the criminal division of the

12 | Justice Department claimed that "[t]he government is not required to use a warrant" when it

13 | uses surveillance equipment to locate cell phones. McCullagh, Declan (CNET News),

14 | *Justice Dept. defends warrantless cell phone tracking | Politics and Law - CNET News* (Feb.

15 | 13, 2010), http://news.cnet.com/8301-13578_3-10453214-38.html (last accessed: Jul. 08,

16 | 2010). The above quoted news article is on the record at ATTACHMENT 19 of *Daniel*

17 | *Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion*

18 | *For Partial Summary Judgment.*

19 |           **2.**  **The media reported on the government's use of**

20 |                  **portable/transportable wireless device locators after challenges**
                 **were made in United States v. Rigmaiden.**

21 |      49.    All of the below cited news articles are a small sampling that relate to the FBI's

22 | use of portable/transportable wireless device locators during the investigation leading to the

23 | indictment in United States v. Rigmaiden, CR08-814-PHX-DGC. Additional news article and

24 | reader comments can be located by searching the web on "stingray phone tracker" or similar

25 | phrases.

26 |      50.    Valentino-DeVries, Jennifer (The Wall Street Journal), *'Stingray' Phone Tracker*

27 | *Fuels Constitutional Clash*, p. A1 (Sept. 22, 2011) (original article addressing CR08-814-

28 | PHX-DGC) *available at*

1  http://online.wsj.com/article/SB10001424053111904194604576583112723197574.html (last

2  accessed: Sept. 22, 2011).  The above quoted news article is on the record at <u>ATTACHMENT</u>

3  <u>10</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of*

4  *Plaintiff's Motion For Partial Summary Judgment.*

5       51.    Valentino-DeVries, Jennifer (The Wall Street Journal), *Feds Shift Tracking*

6  *Defense: Prosecutors in Arizona Case Drop Position That 'Stingray' Use Didn't Require*

7  *Warrant*, (Nov. 3, 2011) *available at*

8  http://online.wsj.com/article/SB10001424052970204621904577014363024341028.html (last

9  accessed: Nov. 15, 2011).  The above quoted news article is on the record at <u>ATTACHMENT</u>

10  <u>09</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of*

11  *Plaintiff's Motion For Partial Summary Judgment.*

12       52.    Slashdot.org, *Secret Stingray Warrantless Cellphone Tracking* (Oct. 27, 2012),

13  http://yro.slashdot.org/story/12/10/27/144229/secret-stingray-warrantless-cellphone-tracking

14  (last accessed: Nov. 28, 2012). The above quoted news article is on the record at

15  <u>ATTACHMENT 20</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

16  *Support Of Plaintiff's Motion For Partial Summary Judgment.*

17       53.    Carroll, Rory (The Guardian), *ACLU challenges 'stingray surveillance' that*

18  *allows police to track cellphones | World news | guardian.co.uk* (Mar. 28, 2013), *available at*

19  http://www.guardian.co.uk/world/2013/mar/28/aclu-stingray-surveillance-police-cellphones

20  (last accessed: Apr. 16, 2013).  The above quoted news article is on the record at

21  <u>ATTACHMENT 21</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

22  *Support Of Plaintiff's Motion For Partial Summary Judgment.*

23       54.    Nakashima, Ellen (The Washington Post), *Little-known surveillance tool raises*

24  *concerns by judges, privacy activists*, The Washington Post (Mar. 27, 2013), *available at*

25  http://articles.washingtonpost.com/2013-03-27/world/38070419_1_magistrate-judge-federal-

26  agents-stingrays (last accessed: Apr. 9, 2013).  The above quoted news article is on the record

27  at <u>ATTACHMENT 22</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

28  *Support Of Plaintiff's Motion For Partial Summary Judgment.*

55.    Huffingtonpost.com, *Daniel David Rigmaiden Case Reveals Stingray Cell Phone Tracker's Covert Use* (Mar. 28, 2013), *available at* http://www.huffingtonpost.com/2013/03/28/daniel-david-rigmaiden-stingray_n_2973749.html (last accessed: Apr. 4, 2013).  The above quoted news article is on the record at <u>ATTACHMENT 23</u> of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

56.    Waterman, Shaun (The Washington Times), *Can you hear me now? Feds admit FBI warrantless cellphone tracking 'very common'* (Mar. 29, 2013), *available at* http://www.washingtontimes.com/news/2013/mar/29/feds-fbi-warrantless-cell-tracking-very-common/ (last accessed: Apr. 4, 2013).  The above quoted news article is on the record at <u>ATTACHMENT 24</u> of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

57.    Zetter, Kim (Wired Digital), *Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight* (Apr. 09, 2013), *available at* http://www.wired.com/threatlevel/2013/04/verizon-rigmaiden-aircard/all/ (last accessed: Apr. 10, 2013).  The above quoted news article is on the record at <u>ATTACHMENT 25</u> of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

58.    Zetter, Kim (Wired Digital), *Judge Allows Evidence Gathered From FBI's Spoofed Cell Tower* (May 08, 2013), *available at* http://www.wired.com/threatlevel/2013/05/rigmaiden-cell-tower-evidence/ (last accessed: May 14, 2013).  The above quoted news article is on the record at <u>ATTACHMENT 26</u> of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

### G.    Plaintiff is an expert on portable/transportable wireless device locators and geolocation of wireless devices.

59.    Plaintiff prepared an expert report titled *1xEV-DO Rel. 0, CELL SITE EMULATOR, & GEOLOCATION EXPERT REPORT RE: The independent operations of the*

1   *FBI's cell site emulators, etc. used to locate the UTStarcom PC5740 1xEV-DO aircard in*

2   *United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz.)* (May 29, 2013).  The technical

3   conclusions in Plaintiff's expert report are the same as contained in his *pro se Motion To*

4   *Suppress, i.e.*, United States v. Daniel Rigmaiden, CR08-814-PHX-DGC, Doc. #824-1

5   (D.Ariz., June 3, 2012).  Plaintiff's expert report is on the record at ATTACHMENT 07 of

6   *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's*

7   *Motion For Partial Summary Judgment.*

8       60.    Plaintiff's *Motion To Suppress* and expert report "explain[] the independent

9   operations of the FBI's cell site emulators, *etc.* used to intrude upon and locate the

10  UTStarcom PC5740 1xEV-DO aircard in United States v. Rigmaiden." *Id.* (expert report), p.

11  1 (PDF, p. 7).

12      61.    In order to prepare the technical information that went into his *Motion To*

13  *Suppress* and expert report, Plaintiff "spent approximately seven hundred (700) hours over

14  approximately seven (7) months (*i.e.*, November of 2011 through May of 2012) reviewing

15  more than 10,000 pages of Telecommunications Industry Association documents and other

16  resources in order to draft the content[s]." *Id.* (expert report), p. 226 [PDF p. No. 232].

17      62.    Kim Zetter, a reporter for *Wired Digital*, wrote an article (Apr. 9, 2013)

18  explaining cell site emulator technology based on Plaintiff's technical conclusions contained

19  in his *Motion To Suppress, i.e.*, United States v. Daniel Rigmaiden, CR08-814-PHX-DGC,

20  Doc. #824-1 (D.Ariz.).  Kim Zetter's article, "Secrets of FBI Smartphone Surveillance Tool

21  Revealed in Court Fight" (Aug. 9, 2013), is on the record at ATTACHMENT 25 of *Daniel*

22  *Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion*

23  *For Partial Summary Judgment.*  In Kim Zetter's article, Plaintiff's technical conclusions are

24  cited and quoted numerous times.  *See id.*

25      63.    In United States v. Rigmaiden, CR08-814-PHX-DGC, the court noted that

26  Plaintiff has an "extensive command of technical information[.]"  United States v. Rigmaiden,

27  CR08-814-PHX-DGC, Doc. #723, p. 29-30 (D.Ariz.).

28

H.      **Plaintiff has the ability to disseminate FOIA responses to the public.**

64.     Prior to publishing her article titled "Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight" (Aug. 9, 2013), Kim Zetter of *Wired Digital* mailed Plaintiff a letter (dated April 3, 2013) requesting to speak with Plaintiff.  The above noted letter is on the record at ATTACHMENT 27 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment* and at ATTACHMENT 01 *Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

65.     Had Defendants complied with Plaintiff's FOIA requests and provided Plaintiff the requested records within the required time frames, Plaintiff would have forwarded FOIA response records on Harris WPG devices to Kim Zetter prior to the publishing of her article. *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, p. 3, ¶ No. 4.

66.     Prior to publishing his article titled "LAPD Spy Device Taps Your Cell Phone - StingRay is secretly used without warrants" (Sept. 13, 2012), Jon Campbell of *LA Weekly News* requested that Plaintiff speak with him about portable/transportable wireless device locator technology in preparation for his article.  Mr. Campbell made the request via email (dated July 26, 2012) through Plaintiff's court-appointed shadow counsel's assistant, Dan Colmerauer, who assists Plaintiff in his criminal case, United States v. Rigmaiden, CR08-814-PHX-DGC.  The above noted email is on the record as an attachment to Dan Colmerauer's declaration at ATTACHMENT 28 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment* and at ATTACHMENT 02 *Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

67.     Had Defendants complied with Plaintiff's FOIA requests and provided Plaintiff the requested records within the required time frames, Plaintiff would have forwarded FOIA response records on Harris WPG devices to Jon Campbell prior to the publishing of his article. *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of*

1 | *Plaintiff's Motion For Partial Summary Judgment*, p. 4, ¶ No. 7.

2 |     68.    Jennifer Valentino-DeVries, a reporter for *The Wall Street Journal*, has written

3 | numerous articles and blogs about the FBI's use of portable/transportable wireless device

4 | locators in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC. *See, e.g.*, <u>ATTACHMENT 09</u>

5 | and <u>ATTACHMENT 10</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury*

6 | *In Support Of Plaintiff's Motion For Partial Summary Judgment*.

7 |     69.    Had Defendants complied with Plaintiff's FOIA requests and provided Plaintiff

8 | the requested records within the required time frames, Plaintiff would have forwarded FOIA

9 | response records on Harris WPG devices to Jennifer Valentino-DeVries prior to the

10 | publishing of her more recent articles and blogs (*i.e.*, 2012-2013). *See Daniel Rigmaiden's*

11 | ***Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial*

12 | *Summary Judgment*, p. 2, ¶ No. 2.

13 |     70.    Civil rights attorneys from the ACLU and EFF have made appearances in

14 | <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, for the purpose of litigating the FBI's

15 | illegal use of portable/transportable wireless device locators. *See* <u>United States v. Rigmaiden</u>,

16 | CR08-814-PHX-DGC, Doc. #905, #906, #907, #912, and #913 (D.Ariz.).

17 |     71.    Two of the civil rights attorneys, *i.e.*, Linda Lye and Hanni Fakhoury, write

18 | articles for their respective civil rights organizations. *See* **(1)** Lye, Linda, *Court Ruling Gives*

19 | *FBI Too Much Leeway on Surveillance Technology | ACLU of Northern California* (May 28,

20 | 2013),

21 | https://www.aclunc.org/issues/technology/blog/court_ruling_gives_fbi_too_much_leeway_on

22 | _surveillance_technology.shtml (last accessed: Jul. 8, 2013); and **(2)** Fakhoury, Hanni,

23 | *Stingrays: The Biggest Technological Threat to Cell Phone Privacy You Don't Know About |*

24 | *Electronic Frontier Foundation* (Oct. 22, 2012),

25 | https://www.eff.org/deeplinks/2012/10/stingrays-biggest-unknown-technological-threat-cell-

26 | phone-privacy (last accessed: Jul. 8, 2013). The above quoted news articles are on the record

27 | at <u>ATTACHMENT 29</u> and <u>ATTACHMENT 30</u> of *Daniel Rigmaiden's **First** Declaration*

28 | *Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*.

72.     During and after the litigation of Plaintiff's *Motion To Suppress* in United States v. Rigmaiden, CR08-814-PHX-DGC, Plaintiff has been in contact with Hanni Fakhoury of the EFF and Linda Lye of the ACLU.  *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, p. 4, ¶ No. 8.

73.     Had defendants complied with Plaintiff's FOIA requests and provided Plaintiff the requested records within the required time frames, Plaintiff would have forwarded FOIA response records on Harris WPG devices to Linda Lye and Hanni Fakhoury.  *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, p. 4, ¶ No. 9.

74.     As soon as Defendants comply with Plaintiff's FOIA requests, Plaintiff will forward FOIA response records on Harris WPG devices to, at the very least, Jennifer Valentino-DeVries (The wall Street Journal), Kim Zetter (Wired Digital), Jon Campbell (LA Weekly News), Lind Lye (ACLU), and Hanni Fakhoury (EFF).  *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, p. 4, ¶ No. 10.

75.     As soon as Defendants finish complying with Plaintiff's FOIA requests, Plaintiff will have FOIA response records on Harris WPG devices uploaded to a website which will be accessible to all members of the public.  *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, p. 4-5, ¶ No. 11.

**I.     Software is readily available that will allow Defendants FBI and EOUSA to redact FOIA response documents in their original native digital form with metadata intact.**

76.     Software exists that allows for redacting Portable Document Format ("PDF") files while maintaining the original native digital form of the files.  For example, "Redax completely redacts (removes) text and graphics from the PDF page.  Hacking the file cannot reveal properly redacted information."  *Appligent Document Solutions – Redax*, http://www.appligent.com/redax (last accessed: Dec. 16, 2010); ATTACHMENT 31 of *Daniel*

- 33 -

*Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment* (web resource attached). Additionally, Adobe Acrobat X Pro allows for redacting "hidden metadata and other content" from PDF files as well as text and illustrations. *See Adobe Acrobat X Pro Datasheet, available at* http://www.adobe.com/content/dam/Adobe/en/products/acrobat/pdfs/acrobatxpro_datasheet.p df (last accessed: Dec. 13, 2010); ATTACHMENT 32 of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment* (web resource attached). Furthermore, the FBI commonly employs a digital redaction process as shown by the white box / black border "digital redaction graphics" on its August 27, 2007 response to an EFF FOIA request. *See FBI, Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1, Aug. 27, 2007, available at* http://www.eff.org/files/filenode/061708CKK/082707_dcs06.pdf [EFF PDF Set 6 of 6] (last accessed: Oct. 25, 2010), p. 142 of 148. One page of the FOIA response containing the digital redactions is on the record at ATTACHMENT 01 of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*.

**J.    Plaintiff's submission of Federal Bureau of Investigation FOIA request RE: portable/transportable wireless device locators.**

77.    On approximately October 10, 2011, Plaintiff mailed Defendant, the Federal Bureau of Investigation ("FBI"), a FOIA request seeking records on Harris WPG brand portable/transportable wireless device locators with an emphasis on user manuals for twelve (12) specifically identified Harris WPG devices. *See* ATTACHMENT 33 of *Daniel Rigmaiden's* **First** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*.

78.    The records requested in the FOIA request noted in ¶ No. 77 above relate to **(1)** the Harris WPG StingRay, StingRay II, AmberJack, KingFish, TriggerFish, LoggerHead, Handheld Direction Finding Antenna, StingRay CDMA Software, KingFish CDMA Software, Geolocation (software), Tarpon (software),  RealSite (software), and other related equipment,

1   **(2)** the FBI's policies, practices, and procedures to destroy real-time wireless device location

2   data obtained by Harris WPG devices or obtained by other portable/transportable wireless

3   device locators, **(3)** the FBI's policies, practices, and procedures to conceal from defendants

4   and their attorneys in criminal cases the fact that the FBI used Harris WPG devices (or other

5   portable/transportable wireless device locators) to gather evidence during related criminal

6   investigations, and **(4)** agency records constituting user manuals, operations manuals, and

7   training manuals for the Harris WPG portable/transportable wireless device locators and

8   related equipment. *See id.*

9       79.    Pursuant to 5 U.S.C. § 552(a)(3)(B), Plaintiff requested that the FBI provide all

10   digital records in their original native digital form with metadata preserved. *See id.*

11   Additionally, Plaintiff requested that any redactions be done on the original digital records

12   using a digital redaction process (*e.g.*, using Appligent Redax TM, RapidRedact TM, Adobe

13   Acrobat TM X Pro, *etc.*) and be provided in their native digitally redacted form. *See id.*

14   Plaintiff requested that the native form digital records (*e.g.*, emails, *etc.*) that are redacted by a

15   computerized redaction process be provided "as is" and that they not be printed to hard copy

16   and then rescanned to create an artificial digital form of the documents. *See id.*

17       80.    In his FOIA request letter, Plaintiff requested a waiver of all fees or reduced

18   fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), and 28 C.F.R. §§ 16.5(k)(2)(i) and (iii), 16.11(k)

19   (3)(i) and (ii), based on the reasoning that **(1)** disclosure of the information is likely to

20   contribute significantly to the public understanding of the operations or activities of the

21   government, **(2)** the requested information pertains to identified government activities, **(3)** the

22   requested information is not primarily in the commercial interest of Plaintiff, **(4)** the

23   requested information relates to a subject of which Plaintiff is an expert, and **(5)** Plaintiff is

24   willing and capable of effectively disseminating the requested information to the public. *See*

25   *id.*

26       81.    In his FOIA request letter, Plaintiff requested expedited processing pursuant to

27   5 U.S.C. § 552(a)(6)(E)(i)(I) and 28 C.F.R. § 16.5(d)(1)(iv) based on the reasoning that the

28   subject of the request is a matter of widespread and exceptional media interest and the

1   government's integrity is called into question when it tracks and locates wireless devices

2   without proper judicial authority in compliance with the United States Constitution. *See id.*

3         82.    Plaintiff mailed the FBI FOIA request letter via USPS Certified Return Receipt

4   delivery, article No. 7007 0710 0004 3772 8555.  The signature card for the FOIA request

5   was signed "D.W. Jones / OB" on November 7, 2011 and then mailed back to Plaintiff. *See*

6   ATTACHMENT 34 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

7   *Support Of Plaintiff's Motion For Partial Summary Judgment.*

8         83.    On approximately February 15, 2012, Plaintiff mailed a FOIA appeal letter to

9   Defendant Office of Information Policy ("OIP") considering no response was received by

10   Plaintiff from the FBI after having waited more than **three (3) months**. *See* ATTACHMENT

11   35 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of*

12   *Plaintiff's Motion For Partial Summary Judgment.*

13         84.    In the appeal letter, Plaintiff appealed **(1)** the FBI failing to acknowledge

14   Plaintiff's FOIA request, **(2)** the FBI failing to grant Plaintiff a fee waiver, **(3)** the FBI failing

15   to grant Plaintiff reduced fees, **(4)** the FBI failing to provide Plaintiff expedited processing,

16   and **(5)** the FBI failing to provide Plaintiff all requested records. *See id.*

17         85.    In the appeal letter, Plaintiff included a declaration explaining how he has no

18   commercial interest in the sought after records. *See id.*  Plaintiff's declaration is titled "Daniel

19   Rigmaiden has no commercial interest in the records requested via FBI FOIA request,

20   certified return receipt article No. 7007 0710 0004 3772 8555."  In his declaration, Plaintiff

21   explained that he has no commercial interest in the records considering he plans to **(1)** use the

22   responsive records as evidence in his pending criminal case (CR08-814-PHX-DGC in the

23   District of Arizona),[1] **(2)** freely disseminate the responsive records through the public

24   record in CR08-814-PHX-DGC, **(3)** freely disseminate the responsive records by providing

25   them to his contacts at the ACLU and EFF, and **(4)** freely disseminate the responsive records

26   by providing them to Jennifer Valentino-DeVries at *The Wall Street Journal.*

27     ———————————

28   1.    This claim was made to the extent that a given record holds evidentiary value in the
context of Plaintiff's suppression arguments.

86.    On approximately May 14, 2012, Plaintiff received a determination of his appeal letter via a letter from the OIP (dated May 10, 2012).  The OIP assigned Plaintiff Appeal No. AP-2012-01750.  *See* ATTACHMENT 36 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*.  Janice Galli McLeod, Associate Director of the OIP, and Anne D. Work, Senior Counsel, Administrative Appeals Staff, OIP, denied Plaintiff relief based on a determination that the FBI has no record of having received Plaintiff's request--despite the signed USPS Certified Return Receipt signature card provided to the OIP via Plaintiff's appeal letter.  *See id.*  The OIP closed Plaintiff's appeal.  *See id.*

87.    Due in part to the FBI ignoring Plaintiff's FOIA request, Plaintiff filed the instant civil action against the FBI on July 26, 2012.  *See Complaint* (Dkt. #01).

88.    On approximately May 6, 2013--after having waited nearly **nineteen (19) months** from the time of his original FOIA request and nearly **nine (9) months** from the time of filing the instant civil action--Plaintiff finally received a letter from the FBI (dated May 1, 2013) acknowledging Plaintiff's FOIA request.  *See* ATTACHMENT 37 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*.  The FBI assigned Plaintiff "FOIPA Request No.: 1212582" with "Subject: WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS WPG."  *Id.*  The FBI's response came nearly **eighteen (18) months** after receiving the original FOIA request.

89.    The FBI refused to search for and provide Plaintiff the requested records.  *See id.*  The FBI's FOIA response cited FOIA exemption 5 U.S.C. § 552(b)(7)(E) and stated that "it is the FBI's policy to neither confirm nor deny the existence of any records which--if such records exist--would tend to indicate, reveal, or acknowledge the identity of an individual, organization, company, or technology critical to the performance of the FBI's mission.  Acknowledging the FBI's interest, if any, invites the risk of circumvention of federal law enforcement efforts."  *Id.*

90.    Via letter dated September 25, 2013, the FBI noted its previous May 1, 2013

position that "pursuant to FOIA exemption (b)(7)(E) [5 U.S.C. § 552 (b)(7)(E)], the FBI

could neither confirm nor deny the existence of records responsive to [][Plaintiff's] request."

*See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of*

*Plaintiff's Motion For Partial Summary Judgment*, ATTACHMENT 03.  After reviewing

*Plaintiff's Motion For Partial Summary Judgment* (Dkt. #036) (original version) and related

documents, the FBI voluntarily reversed its position and "determined that **it can now**

**confirm that records responsive to this part of your request exist**[.]"  *Id.* (emphasis in

original).

91.     In the September 25, 2013 letter, the FBI also informed Plaintiff that (**1**) his fee

waiver request is denied, (**2**) the FBI has identified 15,377 pages of records responsive to his

FOIA request, (**3**) he will need to pay the FBI $15.00 per CD to receive approximately 4,377

documents that are now ready to be sent (a total of $30.00 for two CDs), (**4**) the remaining

11,000 pages need to be searched for material related to "Harris Corporation," (**5**) the

disclosable portion of the 11,000 pages can be provided on CDs at $15.00 per CD, (**6**) his

expedited processing request is denied, and (**7**) there is no estimate on how long the 11,000

pages will take to process for release.  *See id.*

92.     While no estimate was provided in the September 25, 2013 letter, counsel for

Defendant FBI, Kimberly Herb, informed Plaintiff via telephone that the FBI is only willing

to process 500 pages per month and provide Plaintiff with interim releases via one CD per

month.  *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support*

*Of Plaintiff's Motion For Partial Summary Judgment*, ¶ No. 15.  Therefore, the FBI wants

Plaintiff to wait 22 months to receive the disclosable portion of the estimated 11,000 records

and pay $330.00 for an estimated 22 CDs. Added to the $30.00 for the first two CDs

containing the 4,377 records already processed, minus the $10 credit for the equivalent of 100

free paper record print-outs (*see* 5 U.S.C. § (a)(4)(A)(iv)(II)), the total amount of money the

FBI wants Plaintiff to pay for the disclosable portion of the 15,377 records on 24 CDs is

**$350.00**.

93.     The FBI's September 25, 2013 letter contained no indication that it would be

- 38 -

1  providing native form digital records and metadata as requested in Plaintiff's initial FOIA

2  request letter. *See id.*, <u>ATTACHMENT 03</u>. Counsel for Defendant FBI, Ms. Herb, informed

3  Plaintiff via telephone that the FBI would not be providing records in native digital form or

4  metadata as requested by Plaintiff. *See id.*, ¶ No. 16.

5        94.   Via letter dated October 21, 2013, Plaintiff responded to Defendant FBI's

6  September 25, 2013 letter. *See id.*, <u>ATTACHMENT 04</u>. Plaintiff mailed the letter to the FBI

7  on October 23, 2013, certified return receipt article No. 7011 2970 0002 4750 2960. *See id.*

8  Plaintiff also had both a CCA-CADC staff member and Dan Colmerauer fax the letter to the

9  FBI. *See id.*, <u>ATTACHMENT 05</u> (copy of fax from CCA-CADC staff member) and

10 <u>ATTACHMENT 06</u> (copy of fax from Dan Colmerauer).

11       95.   In his October 21, 2013 letter, Plaintiff generally informed the FBI: **(1)** he

12 initially requested that all records be provided in native digital form rather than in paper print-

13 out form or in the typical *native-digital to paper-print to digital-scan to paper-print to*

14 *digital-scan to OCR PDF* form, **(2)** the FBI processing 3000 "pages" of records per month

15 would be fair attention paid to his FOIA request, and **(3)** he is not required to pay any search,

16 review, or duplication fees. *See id.*, <u>ATTACHMENT 04</u>.

17       96.   Plaintiff also provided the FBI with an address of where to mail him the CDs

18 containing the responsive records. *See id.* Plaintiff explained that, notwithstanding his FOIA

19 request for native form digital records and metadata, he is willing to accept the FBI's 15,377

20 pages of non-native form records (*i.e.*, the *native-digital to paper-print to digital-scan to*

21 *paper-print to digital-scan to OCR PDF* records), "review those scans and identify specific

22 records [][he] need[s] in native digital form with metadata intact." *Id.* Plaintiff explained to

23 the FBI that "[t]his should act to narrow [][his] request in regards to the FBI's obligation to

24 provide [][him] with native form digital documents and other digital records as requested."

25 *Id.* However, Plaintiff only expects to eliminate pages that are exact duplicates of other

26 pages. *See id.*, ¶ No. 19. The FBI advised that "some of the 4377 pages preprocessed may be

27 included in the over 11,000 pages of material to be re-reviewed..." *Id.* Based on a comparison

28 of black pixels and page coverage, Plaintiff could likely identify duplicate pages using

1 automation software. *See id.* Such a process would be far more forgiving compared to OCR,

2 which needs to make sense of many small sets of pixels in alphanumeric character

3 formations. *See id.*

      **K.**    **Plaintiff's submission of Federal Bureau of Investigation FOIA request RE: Comments made to The Wall Street Journal by the Federal Bureau of Investigation as reported in a September 22, 2011 article.**

7     97.    On approximately November 10, 2011, Plaintiff mailed Defendant, the FBI, a

8 FOIA request seeking records on **(1)** comments made by FBI agents and employees to *The*

9 *Wall Street Journal* reported in or in relation to the September 22, 2011  article titled

10 "'Stingray' Phone Tracker Fuels Constitutional Clash," by Jennifer Valentino-DeVries, **(2)**

11 comments made by FBI agents and employees at a panel at the Brookings Institution in May

12 of 2011 regarding portable/transportable wireless device locators such as the Harris WPG

13 StingRay and KingFish. *See* <u>ATTACHMENT 38</u> of *Daniel Rigmaiden's* **First** *Declaration*

14 *Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

15     98.    The records requested in the FOIA request noted in ¶ No. 91 above pertain to

16 the FBI's comments made to *The Wall Street Journal* and the Brookings Institution about **(1)**

17 FBI policies and practices to delete/destroy real-time geolocation data collected/generated

18 using portable/transportable wireless device locators (*e.g.*, the Harris WPG StingRay) while

19 locating wireless devices such as cell phones, **(2)** FBI policies and practices to keep the noted

20 real-time geolocation data hidden from defendant's and their attorneys, **(3)** FBI policies and

21 practices to first obtain a warrant before locating/tracking wireless devices within private

22 residences, and **(4)** the FBI's position that portable/transportable wireless device locators fall

23 into the "pen register and trap and trace device" legal category which require no warrant

24 authorization. *See id.*

25     99.    Pursuant to 5 U.S.C. § 552(a)(3)(B), Plaintiff requested that the FBI provide all

26 digital records in their original native digital form with metadata preserved. *See id.*

27 Additionally, Plaintiff requested that any redactions be done on the original digital records

28 using a digital redaction process (*e.g.*, using Appligent Redax TM, RapidRedact TM, Adobe

1  Acrobat TM X Pro, *etc.*) and be provided in their native digitally redacted form.  Plaintiff

2  requested that the native form digital records (*e.g.*, emails, *etc.*) that are redacted by a

3  computerized redaction process be provided "as is" and that they not be printed to hard copy

4  and then rescanned to create an artificial digital form of the documents.  *See id.*

5      100.   In his FOIA request letter, Plaintiff requested a waiver of all fees or reduced

6  fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), and 28 C.F.R. §§ 16.5(k)(2)(i) and (iii), 16.11(k)

7  (3)(i) and (ii), based on the reasoning that **(1)** disclosure of the information is likely to

8  contribute significantly to the public understanding of the operations or activities of the

9  government, **(2)** the requested information pertains to identified government activities, **(3)** the

10  requested information is not primarily in the commercial interest of Plaintiff, **(4)** the

11  requested information relates to a subject of which Plaintiff is an expert, and **(5)** Plaintiff is

12  willing and capable of effectively disseminating the requested information to the public.  *See*

13  *id.*

14      101.   In his FOIA request letter, Plaintiff requested expedited processing pursuant to

15  5 U.S.C. § 552(a)(6)(E)(i)(I) and 28 C.F.R. § 16.5(d)(1)(iv) based on the reasoning that the

16  subject of the request is a matter of widespread and exceptional media interest and the

17  government's integrity is called into question when it **(1)** tracks and locates wireless devices

18  without proper judicial authority in compliance with the United States Constitution, and **(2)**

19  destroys evidence collected using portable/transportable wireless device locators at the

20  conclusion of locating missions.  *See id.*

21      102.   In his FOIA request letter, Plaintiff requested expedited processing pursuant to

22  28 C.F.R. § 16.5(d)(1)(iii) based on the reasoning that Plaintiff is losing substantial due

23  process rights in his pending criminal case, CR08-814-PHX-DGC.  *See id.*

24      103.   Plaintiff mailed the FBI FOIA request letter via USPS Certified Return Receipt

25  delivery, article No. 7010 1870 0003 0918 6393.  No signature card for the FOIA request was

26  returned to Plaintiff, however, the USPS website indicates that the FOIA request was received

27  by the FBI on January 3, 2012.  *See* <u>ATTACHMENT 39</u> of *Daniel Rigmaiden's **First***

28  ***Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary***

- 41 -

1 | *Judgment.*

2 | 104.   On approximately January 30, 2012, Plaintiff received a letter from the FBI

3 | (dated January 23, 2012) acknowledging Plaintiff's FOIA request. *See* <u>ATTACHMENT 40</u> of

4 | *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's*

5 | *Motion For Partial Summary Judgment.* The FBI assigned Plaintiff "FOIPA Request No.:

6 | 1180900-000" with "Subject: RECORDS CONCERNING WALL STREET JOURNAL

7 | ARTICLE STINGRAY PHONE TRACKER FUELS CONSTITUTIONAL CLASH." *See id.*

8 | In the letter, the FBI stated that it is "searching the indices to [][its] Central Records System

9 | for the information responsive to this request. You will be informed of the results in future

10 | correspondence." *Id.*

11 | 105.   On approximately February 3, 2012, Plaintiff received two letters from the FBI

12 | (dated January 31, 2012) denying Plaintiff's request for expedited processing and denying

13 | Plaintiff's request for a fee waiver. *See* <u>ATTACHMENT 41</u> of *Daniel Rigmaiden's **First***

14 | *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary*

15 | *Judgment.* In the first letter, the FBI stated that Plaintiff has "not provided enough

16 | information concerning the statutory requirements permitting expedition; therefore, []

17 | [Plaintiff's] request is denied." *Id.* In the second letter, the FBI stated that Plaintiff has not

18 | satisfied the requirements for a fee waiver because Plaintiff has "not adequately demonstrated

19 | that the information requested is not in [][Plaintiff's] own commercial interest." *Id.*

20 | 106.   On approximately February 15, 2012, Plaintiff mailed a FOIA appeal letter to

21 | the OIP appealing the FBI's denial of Plaintiff's request for expedited processing and a fee

22 | waiver. *See* <u>ATTACHMENT 42</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of*

23 | *Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.* In the appeal letter,

24 | Plaintiff appealed **(1)** the FBI failing to grant Plaintiff a fee waiver, **(2)** the FBI failing to

25 | grant Plaintiff reduced fees, and **(3)** the FBI failing to provide Plaintiff expedited processing.

26 | *See id.*

27 | 107.   In the appeal letter, Plaintiff included a declaration explaining how he has no

28 | commercial interest in the sought after records. *See id.* Plaintiff's declaration is titled "Daniel

Rigmaiden has no commercial interest in the records requested via FBI FOIA request No. 1180900-000." In his declaration, Plaintiff explained that he has no commercial interest in the records considering he plans to **(1)** use the responsive records as evidence in his pending criminal case (CR08-814-PHX-DGC in the District of Arizona),[2] **(2)** freely disseminate the responsive records through the public record in CR08-814-PHX-DGC, **(3)** freely disseminate the responsive records by providing them to his contacts at the ACLU and EFF, and **(4)** freely disseminate the responsive records by providing them to Jennifer Valentino-DeVries at *The Wall Street Journal*. *See id.*

108.    In the appeal letter, Plaintiff included a declaration explaining how he has a need for expedited processing of his FOIA request. *See id.* Plaintiff's declaration is titled "Daniel Rigmaiden has a need for expedited processing of FBI FOIA request No. 1180900-000." In his declaration, Plaintiff provided further information on his original claim that he has a need for expedited processing considering he is at a loss of substantial due process rights in his pending criminal case, <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC.

109.    On approximately April 20, 2012, Plaintiff received a determination of his appeal via a letter from the OIP (dated April 17, 2012). *See* <u>ATTACHMENT 43</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*. The OIP assigned Plaintiff Appeal No. AP-2012-01751. *See id.* Janice Galli McLeod, Associate Director of the OIP, denied Plaintiff relief for expedited processing and a fee waiver. *See id.*

110.    In her letter, Janice Galli McLeod stated that Plaintiff is not entitled to expedited processing based on her determination that **(1)** Plaintiff has "not demonstrated that the information sought will aid in any criminal defense, or that [][Plaintiff is] facing grave punishment[,]" *id.*, and **(2)** "expedited treatment of [][Plaintiff's] request is not warranted" because Plaintiff "failed to sufficiently demonstrate that the subject of [][his] request is a matter of widespread and exceptional media interest in which there exist possible questions

---

2.    This claim was made to the extent that a given record holds evidentiary value in the context of Plaintiff's suppression arguments.

1 about the government's integrity which affect public confidence." *Id.* (internal quotation

2 marks, brackets, and citation omitted).

3      111.   In her letter, Janice Galli McLeod stated that Plaintiff is not entitled to a fee

4 waiver based on her determination that **(1)** Plaintiff "[][is] the primary beneficiary of any

5 release of records that the FBI may ultimately provide... and thus the public interest

6 requirement of the FOIA, also referred to as fee waiver factors one through four, has not been

7 met[,]" and **(2)** Plaintiff "[][has not] demonstrated that a significant contribution to the

8 public's understanding of FBI's operations will occur as a result of a future release to []

9 [Plaintiff], or demonstrated in any way that [][Plaintiff has] the capacity to disseminate any

10 such records to the public." *Id.*

11      112.   Via letter dated July 12, 2013, Defendant FBI responded to Plaintiff's FOIA

12 request dated November 10, 2011, RE: comments made to *The Wall Street Journal* and the

13 Brookings Institution.  Plaintiff received this letter from CCA-CADC staff on July 18, 2013.

14 *See* <u>ATTACHMENT 50</u> of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury*

15 *In Support Of Plaintiff's Motion For Partial Summary Judgment.*

16      113.   The July 12, 2013 FBI letter included a 94 page paper-form (*i.e.*, non-native

17 digital form records) attachment responsive to FBI comments made to *The Wall Street*

18 *Journal* vis-a-vis the StingRay. *See id.*  However, the documents contained heavy redactions

19 with cites to exemptions 5 U.S.C. §§ 552(b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).  *See id.*

20 Official and final justifications for the claimed exemptions in support of the redactions have

21 not been provided by the FBI.

22      114.   The July 12, 2013 FBI letter did not include any documents relating to FBI

23 comments made at the May, 2011 Brookings Institution panel. *See id.*  Rather, the letter

24 stated that the FBI "conducted a search of [][their] records and were unable to identify

25 records responsive to [that section of] the FOIA [request]." *See id.*  The FBI has not

26 explained what records were searched, how searches were conducted, or how its searches

27 were adequate. *See id.*

28

- 44 -

**L.   Plaintiff's submission of Executive Office for United States Attorneys FOIA request RE: portable/transportable wireless device locators.**

115.   On approximately October 10, 2011, Plaintiff mailed Defendant, the Executive Office for United States Attorneys ("EOUSA"), a FOIA request seeking records on Harris WPG brand portable/transportable wireless device locators with an emphasis on user manuals for twelve (12) specifically identified Harris WPG devices. *See* ATTACHMENT 44 of *Daniel Rigmaiden's First Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.*

116.   The records requested in the FOIA request noted in ¶ No. 107 above relate to **(1)** the Harris WPG StingRay, StingRay II, AmberJack, KingFish, TriggerFish, LoggerHead, Handheld Direction Finding Antenna, StingRay CDMA Software, KingFish CDMA Software, Geolocation (software), Tarpon (software),  RealSite (software), and other related equipment, **(2)** the EOUSA's policies, practices, and procedures to seek court orders to destroy real-time wireless device location data obtained by the Harris WPG devices or obtained by other portable/transportable wireless device locators, **(3)** the EOUSA's policies, practices, and procedures to have Assistant United States Attorneys and other attorneys seek one or more court orders authorizing use of pen registers, trap and trace devices, stored records under the Stored Communications Act, and/or mobile tracking devices--while the true intention is to use Harris WPG devices or other portable/transportable wireless device locators, and **(4)** the EOUSA's policies, practices, and procedures to conceal from defendants and their attorneys in criminal cases the fact that the government used Harris WPG devices or other portable/transportable wireless device locators to gather evidence during related criminal investigations. *See id.*

117.   Plaintiff narrowed his FOIA request to apply only to the following EOUSA staffs: **(1)** Office of the Director, **(2)** Counsel to the Director, **(3)** Attorney General Advisory Committee, **(4)** Legal Programs, **(5)** General Counsel, **(6)** Office of Enforcement Operations, and **(7)** the Computer Crime and Intellectual Property Section. *See id.*  In addition, Plaintiff requested that the United States Attorneys Offices in the following locations be searched: California, Arizona, and New York. *See id.*  Plaintiff requested that all United States

- 45 -

1   Attorneys Offices within the above states be searched. *See id.*

2   118.   Pursuant to 5 U.S.C. § 552(a)(3)(B), Plaintiff requested that the EOUSA

3   provide all digital records in their original native digital form with metadata preserved. See

4   id. Additionally, Plaintiff requested that any redactions be done on the original digital records

5   using a digital redaction process (e.g., using Appligent Redax TM, RapidRedact TM, Adobe

6   Acrobat TM X Pro, etc.) and be provided in their native digitally redacted form. See id.

7   Plaintiff requested that the native form digital records (e.g., emails, etc.) that are redacted by a

8   computerized redaction process be provided "as is" and that they not be printed to hard copy

9   and then rescanned to create an artificial digital form of the documents. See id.

10   119.   In his FOIA request letter, Plaintiff requested a waiver of all fees or reduced

11   fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), and 28 C.F.R. §§ 16.5(k)(2)(i) and (iii), 16.11(k)

12   (3)(i) and (ii), based on the reasoning that **(1)** disclosure of the information is likely to

13   contribute significantly to the public understanding of the operations or activities of the

14   government, **(2)** the requested information pertains to identified government activities, **(3)** the

15   requested information is not primarily in the commercial interest of Plaintiff, **(4)** the

16   requested information relates to a subject of which Plaintiff is an expert, and **(5)** Plaintiff is

17   willing and capable of effectively disseminating the requested information to the public. *See*

18   *id.*

19   120.   In his FOIA request letter, Plaintiff requested expedited processing pursuant to

20   5 U.S.C. § 552(a)(6)(E)(i)(I) and 28 C.F.R. § 16.5(d)(1)(iv) based on the reasoning that the

21   subject of the request is a matter of widespread and exceptional media interest and the

22   government's integrity is called into question when it tracks and locates wireless devices

23   without proper judicial authority in compliance with the United States Constitution. *See id.*

24   121.   Plaintiff mailed the EOUSA FOIA request letter via USPS Certified Return

25   Receipt delivery, article No. 7009 2250 0003 8907 7508. The signature card for the FOIA

26   request was mailed back to Plaintiff but it contained no signature or date. *See*

27   ATTACHMENT 45 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

28   *Support Of Plaintiff's Motion For Partial Summary Judgment.* However, the USPS website

- 46 -

1  indicates that the FOIA request was received by the EOUSA on November 7, 2011. *See*

2  ATTACHMENT 46 of *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In*

3  *Support Of Plaintiff's Motion For Partial Summary Judgment.*

4       122.   On approximately February 15, 2012, Plaintiff mailed a FOIA appeal letter to

5  the OIP considering no response was received by Plaintiff from the EOUSA after having

6  waited more than **four (4) months**. *See* ATTACHMENT 47 of *Daniel Rigmaiden's **First***

7  *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary*

8  *Judgment.*

9       123.   In the appeal letter, Plaintiff appealed **(1)** the EOUSA failing to acknowledge

10  Plaintiff's FOIA request, **(2)** the EOUSA failing to grant Plaintiff a fee waiver, **(3)** the EOUSA

11  failing to grant Plaintiff reduced fees, **(4)** the EOUSA failing to provide Plaintiff expedited

12  processing, and **(5)** the EOUSA failing to provide Plaintiff all requested records. *See id.*

13       124.   In the appeal letter, Plaintiff included a declaration explaining how he has no

14  commercial interest in the sought after records. *See id.* Plaintiff's declaration is titled "Daniel

15  Rigmaiden has no commercial interest in the records requested via EOUSA FOIA request,

16  certified return receipt article No. 7009 2250 0003 8907 7508." In his declaration, Plaintiff

17  explained that he has no commercial interest in the records considering he plans to **(1)** use the

18  responsive records as evidence in his pending criminal case (CR08-814-PHX-DGC in the

19  District of Arizona), **(2)** freely disseminate the responsive records through the public record in

20  CR08-814-PHX-DGC,[3] **(3)** freely disseminate the responsive records by providing them to

21  his contacts at the ACLU and EFF, and **(4)** freely disseminate the responsive records by

22  providing them to Jennifer Valentino-DeVries at *The Wall Street Journal*. *See id.*

23       125.   On approximately May 14, 2012, Plaintiff received a determination of his

24  appeal via a letter from the OIP (dated May 10, 2012). The OIP assigned Plaintiff Appeal No.

25  AP-2012-01749. *See* ATTACHMENT 48 of *Daniel Rigmaiden's **First** Declaration Under*

26  *Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment.* Janice

27  ———————————

28  3.    This claim was made to the extent that a given record holds evidentiary value in the context of Plaintiff's suppression arguments.

1  Galli McLeod, Associate Director of the OIP, denied Plaintiff relief based on a determination

2  that "no adverse determination has yet been made by EOUSA, there is no action for this

3  Office to consider on appeal." *See id.*

4       126.   Due in part to the EOUSA ignoring Plaintiff's FOIA request, Plaintiff filed the

5  instant civil action against the EOUSA on July 26, 2012. *See Complaint* (Dkt. #01).

6       127.   On approximately May 6, 2013--after having waited nearly **nineteen (19)**

7  **months** from the time of his original FOIA request and nearly **nine (9) months** from the time

8  of filing the instant civil action--Plaintiff finally received a letter from the EOUSA (dated

9  May 3, 2013) acknowledging Plaintiff's FOIA request. *See* ATTACHMENT 49 of *Daniel*

10 *Rigmaiden's First Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion*

11 *For Partial Summary Judgment.* The EOUSA assigned Plaintiff "Request No.: 11-4585" with

12 "Subject of Request: Location Tracking Devices." *Id.* The EOUSA's response came nearly

13 **eighteen (18) months** after receiving the original FOIA request.

14      128.   The EOUSA refused to search for and provide Plaintiff the requested records.

15 *See id.* The EOUSA claimed that it "do[es] not maintain records in a manner which would

16 enable us to reasonably search for this information." *Id.* The EOUSA provided no

17 explanation as to why it cannot search for the requested information. *See id.* Instead, the

18 EOUSA noted that it conducted FOIA searches for the ACLU on a request that "generally

19 overlaps" Plaintiff's. *See id.* While it offered the results of the ACLU FOIA searches in place

20 of fulfilling Plaintiff's FOIA request, the EOUSA did not identify which ACLU FOIA request

21 it was referencing; the EOUSA did not provide information on how the ACLU FOIA request

22 "generally overlaps" Plaintiff's; and the EOUSA did not provide an explanation as to why it

23 fulfilled the ACLU's request but refuses to even conduct searches on Plaintiff's request. *See*

24 *id.*

25      **M.**   **Upon Defendant FBI's notice of 15,377 "pages" of records**
          **responsive to the October 10, 2011 FOIA request, it became evident**

26           **to Plaintiff that the volume of records absolutely necessitates that**
          **they be provided in native digital form.**

27

28      129.   On September 26, 2013, counsel for Defendant FBI, Ms. Herb, informed

Plaintiff via phone that Defendant FBI had voluntarily reversed its *Glomar* position and had a set of records to provide. *See Daniel Rigmaiden's* **Second** *Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, ¶ 16. However, Ms. Herb also informed Plaintiff that the records would not be provided in native digital form and also that no metadata would be provided. *See id.* By FBI letter dated September 25, 2013 (received September 30, 2013), Plaintiff learned that the FBI had approximately 15,377 responsive "pages" of records and that 4,377 were ready to be provided. *See id.* ¶ 15. It was then that it became evident to Plaintiff that the **volume** of responsive records absolutely necessitates that they be provided in native digital form else both Plaintiff and other members of the public will be unable to organize and search the records in an intelligible manner. *See id.*, ¶¶ Nos. 22-37 and 46-53.

130.    Currently, the FBI plans to print its 15,377 "pages" of native digital form records to hard copy paper, then scan all of the paper into PDF files, then provide those non-native form records to Plaintiff. *See id.*, ¶¶ Nos. 23-25. Due to the large number of pages, native form digital records are needed so that the original, unaltered vector based text can be databased and searched using a computer without the need for Optical Character Recognition ("OCR")—which is an unrefined process limiting accurate keyword searches. *See id.*, ¶¶ Nos. 29-32. For example, an OCR text extraction performed on one of the FBI's typical FOIA response PDFs provided to Plaintiff resulted in one line incorrectly machine-reading as, "Subject: RE: Wall Street Journa' request, -legal status o(~stfngray"" tech~,'" while it should have read, "RE: Wall Street Journal request -- legal status of 'stingray' technology." *See id.* If searching for the keyword "stingray" or "Wall Street Journal" in this typical FBI record format, the quoted line will not match. *See id.*, ¶ No. 32. This is because the OCR conversion turned the flat image form of "stingray" into "stfngray" and "Journal" into " Journa." *See id.* This shows that the format of records the FBI intends to provide Plaintiff are inadequate for computerized keyword searches. *See id.*

131.    Most people do not have the time to read a 15,377 page FOIA response from start to finish. *See id.* ¶ No. 33. Keyword searches will be the primary method used to locate

information of interest.  *See id.*  In order for the records to adequately aid public

understanding via keyword searches, the text needs to be in original vector based form—as

provided by native form digital files, or in vector-to-vector conversion form as created by, for

example, the PrimoPDF and doPDF print drivers.  *See id.*, ¶¶ Nos. 33 and 38-40.  If given the

native form digital records or an equivalent, Plaintiff will be able to load the vector based text

into an SQL database, using PostgreSQL,[4] which will allow for sophisticated, error free

keyword search functions to be performed by members of the public.  *See id.,* ¶ No. 33.

Plaintiff will make the SQL database and search features freely accessible to the public via a

website.  *See id.*

132.   In addition to an SQL database of keywords, it would also help public

understanding to organize the FBI's 15,377 FOIA response records into an SQL database

according to date and time.  *See id.,* ¶ No. 35.  Having a chronological order of emails and

other documents will allow for showing the progression of FBI policies and use of Harris

equipment over a period time.  *See id.*  The public, including Plaintiff, would benefit from

knowing *when*, not just *how*, the FBI engaged in certain tracking and locating activities.  *See

id.*  For example, by using the *when*, other illegal government surveillance activity—which

may be identified in the news, in other FOIA responses, or in case law—can be compared,

datewise, to the FOIA responses provided to Plaintiff in order to determine how changes in

FBI policy and practices were prompted by specific events.  A chronologically ordered

database will help identify what events or social factors caused FBI policies and practices to

stray from Constitutional standards held by the general public.  *See id.*  Because the dates

within the body of FBI's OCR converted non-native digital form records rarely convert

properly (*e.g.*, "'Sent: Fit Sep 1~ 16:48:15 2Qll '-- ---1," while it should machine-read, "Sent:

Fri Sep 16 16:48:15 2011.", *id.* ¶ No. 34), Plaintiff needs the native form digital records so

that the original vector based text can be machine-read without error.  *See id.,* ¶ No. 35.

---

4.   "PostgreSQL, often simply Postgres, is an object-relational database management
system (ORDBMS) available for many platforms including Linux, FreeBSD, Solaris,
Microsoft Windows and Mac OS X." *PostgreSQL - Wikipedia, the free encyclopedia*,
http://en.wikipedia.org/wiki/Postgresql (last accessed: Aug. 20, 2013).

133.   By providing native form digital records, the dates, keywords, and all other text will be preserved as vector based text. *See id.,* ¶ No. 37.  Records in this form will allow for error free machine-reading, via automation software—including artificial intelligence algorithms / machine learning and integrated human computation—for the purpose of datamining and organizing the records in ways that would take a human literally millions of hours to complete without the aid of software. *See id.,* ¶¶ Nos. 36-37.  The paper documents and *native-digital to paper-print to digital-scan to paper-print to digital-scan to OCR PDF* records Defendants insist on providing will prevent Plaintiff from employing the complex database and search algorithms needed to display information in ways that will advance public understanding of FBI policies and practices vis-a-vis Harris WPG equipment. *See id.*

134.   It would be a simple task for Defendants FBI and EOUSA to provide Plaintiff with native form digital records or an equivalent that preserves vector based, keyword searchable text. *See id.,* ¶ No. 38.  For example, an email file in *.eml format or in a format displayed within a web based email account can be digitally converted to a PDF file using the PrimoPDF or doPDF print driver. *See id.* Assuming one of the PDF print drivers is installed, this process involves (**1**) clicking the print button of the display program (*e.g.*, Microsoft Outlook for *.eml files or Internet Explorer for *.html files, *etc.*) while the document is open and displayed, (**2**) choosing the PrimoPDF or doPDF "virtual printer" from the list of installed printers, (**3**) clicking the "print" button, (**4**) specifying where to save the resulting PDF file, and (**5**) waiting a few seconds for the PDF file to be created and saved.[5] *See id.*

135.   Once digitally converted to a PDF file, digital redactions of the vector based text can easily be performed by Defendants.  This process involves (**1**) opening the PDF file in Redax or Adobe Acrobat X Pro, (**2**) using the built-in redaction tools to draw white boxes

---

5.   Even the Court requires that native form digital documents be converted directly to PDF, rather than simply printed to paper and scanned, prior to uploading to PACER by ECF account holders.  "Documents submitted for filing in the ECF system must be in a Portable Document Format (.pdf).  Documents which exist only in paper form may be scanned into .pdf for electronic filing.  All electronic documents must be converted to .pdf directly from a word processing program (e.g., Microsoft Word® or Corel WordPerfect®) and **must be text searchable.**"  ECF Proc. I(B)(4) (emphasis added).  While this process may be foreign to Defendants and their counsel, it is a very common practice in in the District of Arizona.

1  with black borders over text that needs to be redacted, and **(3)** saving the redacted record to a

2  new PDF file. "Redax completely redacts (removes) text and graphics from the PDF page.

3  Hacking the file cannot reveal properly redacted information." *Appligent Document Solutions*

4  *– Redax*, http://www.appligent.com/redax (last accessed: Dec. 16, 2010); *Daniel Rigmaiden's*

5  *First Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial*

6  *Summary Judgment*, ATTACHMENT 31 (web resource attached). *See also Adobe Acrobat X*

7  *Pro Datasheet, available at*

8  http://www.adobe.com/content/dam/Adobe/en/products/acrobat/pdfs/acrobatxpro_datasheet.p

9  df (last accessed: Dec. 13, 2010); *Daniel Rigmaiden's **First** Declaration Under Penalty Of*

10  *Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, ATTACHMENT 32

11  (web resource attached).

12         136.   The process explained in ¶¶ Nos. 134-135, *supra*, digitally converts the *true*

13  native form digital file to a PDF file so that redactions can be performed. This process is

14  suitable for records that cannot easily be edited using a digital record's native viewing/editing

15  software. *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support*

16  *Of Plaintiff's Motion For Partial Summary Judgment*, ¶ No. 40. For example, an email

17  displayed in a web based email account via Internet Explorer (*i.e.*, the native viewing

18  software) cannot easily be edited for redaction purposes. *See id*. Therefore, in cases such as

19  this, the native form digital file is digitally converted into a PDF file using a PDF print driver

20  (*see id.*)—which preserves the vector based text—so that digital redactions can be done using

21  a PDF editor such as Adobe Acrobat X Pro. *See id*. Once digital redactions are complete, the

22  PDF file is re-saved as a redacted version PDF, which can then be provided to Plaintiff in

23  digital form. *See id*. The PDF file is **never** converted to paper for any reason and paper never

24  needs to be scanned. *See id*. While the PDF files resulting from this process are not *true*

25  native form digital records, they should typically be suitable for Plaintiff's keyword search

26  and organization endeavors (*see id.*) considering the vector based text is preserved during the

27  PDF print process and during the redaction process.

28         137.   For the records that can easily be edited, *e.g.*, Microsoft Word or Excel

1  documents, Defendants FBI and EOUSA can provide Plaintiff the documents in their *true*

2  native digital form after using the relevant native viewing/editing software to perform

3  redaction edits. *See id.*, ¶ No. 41. By using the native viewing/editing software to perform

4  redactions (*e.g.*, replacing sensitive text with a series of bold X's), information such as

5  embedded videos, spreadsheet equations, and macros will be preserved in the files and

6  properly disclosed. *See id.* For any record that cannot be redacted using the relevant native

7  viewing/editing software, Defendants can use, as a fall back, the digital-PDF-conversion

8  method explained in ¶¶ Nos. 134-135 above and provide Plaintiff with any embedded data

9  (*e.g.*, spreadsheet equations, macros, and videos) separately. *See id.*

10       138.   For the specifically requested video files and audio files, Defendants FBI and

11  EOUSA can easily provide portions that can be disclosed. *See id.*, ¶ No. 42. Defendants

12  providing video files and audio files as paper print-outs is a senseless proposal. *See id.* For

13  example, a Harris StingRay or KingFish training video would need to be provided in its

14  native digital form considering thousands of video frames and audio transcriptions printed to

15  paper, then scanned to PDF and printed to paper again, will be too difficult to work with. *See*

16  *id.* A video will aid public understanding more so than a flip book containing thousands of

17  pages. *See id.*

18       139.   For the specifically requested records of radio transmissions and other digital

19  records produced as a result of prior tests performed using Harris equipment, those records

20  would also need to be provided in native digital form. *See id.*, ¶ No. 43. For the public, I will

21  analyze records of this nature using software capable of plotting geolocation data and antenna

22  radiation patterns. *See id.* Therefore, the requested data is much less useful if provided in

23  paper form or in any form other than native digital form. *See id.*

24       140.   FBI divisions have already provided the FBI FOIA Work Process Unit

25  ("WPU") with 15,377 records responsive to Plaintiff's request. *See id.*, ¶ No. 45. If any of

26  those records were not in native digital form, WPU can draft and send an electronic

27  communication called a "search EC" requesting that the 15,377 responsive records, which

28  were already scanned into the FBI's electronic FOIA/Privacy Act Document Processing

1    System ("FDPS"), be provided now in native digital form. *See* EPIC v. FBI, 12-cv-00667-

2    CKK (D.D.C.), Doc. #16-1 [declaration by David M. Hardy], p. 7-8 & fn. 5 ("At times, when

3    a standard search of the general indices does not produce anticipated results, WPU drafts an

4    electronic communication called a 'search EC' and directs it to those divisions most likely to

5    house potentially responsive material."). Because of how the FBI's FOIA system operates,

6    **complete with custom search ECs for non indexed records** (*see id.*), those divisions that

7    provided the 15,377 records responsive to Plaintiff's request in the first instance can now

8    provide them in native digital form in response to a WPU search EC without delay. *See id.*

9            **N.    Upon Defendant FBI's notice of 15,377 "pages" of records**
10                   **responsive to the October 10, 2011 FOIA request, it became evident**
                     **to Plaintiff that the volume of records absolutely necessitates that the**
11                   **FBI also provide metadata.**

12           141.    Plaintiff needs metadata corresponding to the 15,377 "pages" of records so that

13   he can enter it into an SQL database, using PostgreSQL, which will allow for sophisticated

14   keyword search functions to be performed by members of the public. *See Daniel*

15   *Rigmaiden's **Second** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion*

16   *For Partial Summary Judgment*, ¶ No. 49. Plaintiff will make the SQL database and search

17   features freely accessible to the public via a website. *See id.* The metadata will compliment

18   the vector based text entered into the database as explained above. *See id.* For example,

19   system metadata and substantive metadata for digital records will contain file creation date,

20   access date, and modification date. *See id.*, ¶ No. 50. If the vector based text within the body

21   of a record does not contain a date, the metadata date can be used in place of the missing

22   visible date when entering the record into the SQL database chronology. *See id.*

23           142.    Additionally, metadata corresponding to digital records may also contain

24   information on who authored a given record or what office or department within the FBI or

25   EOUSA authored or originated the record. *See id.*, ¶ No. 51. This information will help the

26   public understand which faction of a given Defendant is responsible for the policies or

27   practices discussed in the record. *See id.* For example, the noted metadata for a given record

28   may indicate that the FBI Engineering Research Facility was the originator. *See id.*

143.   Other benefits may also come to light upon viewing the metadata for each specific digital record.  For example, in Plaintiff's self-represented criminal case, United States v. Rigmaiden, CR08-814-PHX-DGC (D.Ariz), he compared author and date substantive metadata within two native digital form FBI Excel documents to support his request for suppression of seized historical cell site location information.  *See id.*, ¶ No. 52.

144.   It would be a simple task for Defendants FBI and EOUSA to provide Plaintiff with metadata.  *See id.*, ¶ No. 53. If Defendants are providing Plaintiff with a *true* native form digital record, the substantive metadata data and embedded metadata will be embedded in the file.  *See id.*  If providing Plaintiff with a record that was digitally converted into a PDF file (so as to preserve the original vector based text), the substantive metadata and embedded metadata can be extracted from the *true* native form digital record, placed into a text file, and provided to Plaintiff along with the digitally created PDF file.  See id.  Under both scenarios, the separate system metadata can be extracted from the operating system and/or the database storing the files and then be provided to Plaintiff in a text file corresponding to the record.  *See id.*

145.   If any of the requested metadata is not currently within the FBI's general indices, the FBI FOIA Work Process Unit ("WPU") can draft an electronic communication called a "search EC" and send it to those divisions who provided the 15,377 responsive records that were already scanned into the FBI's electronic FOIA/Privacy Act Document Processing System ("FDPS").  *See* EPIC v. FBI, 12-cv-00667-CKK (D.D.C.), Doc. #16-1 [declaration by David M. Hardy], p. 7-8 & fn. 5 ("At times, when a standard search of the general indices does not produce anticipated results, WPU drafts an electronic communication called a 'search EC' and directs it to those divisions most likely to house potentially responsive material.").  Because of how the FBI's FOIA system operates, **complete with custom search ECs for non indexed records** (*see id.*), those divisions that provided the 15,377 records responsive to Plaintiff's request in the first instance can now provide the metadata in response to a WPU search EC without delay.  *See id.*, ¶ No. 54.

O.   **The FBI's arbitrary and capricious treatment of Plaintiff in comparison to other entities who have submitted similar FOIA requests RE: portable/transportable wireless device locators.**

1.   **The FBI's arbitrary and capricious actions RE: duplication fee waiver.**

146.   The FBI's September 25, 2013 letter did not ask Plaintiff to pay search and review fees, but it did ask him to pay duplication fees. *See Daniel Rigmaiden's **Second Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, ATTACHMENT 03. Additionally, counsel for Defendant FBI, Ms. Herb, informed Plaintiff via telephone that the FBI is not charging search and review fees, but it will seek to charge Plaintiff duplication fees. *See id.*, ¶ No. 16.

147.   Ms. Herb informed Plaintiff that the FBI agreed to not charge search and review fees based on a possible application of 5 U.S.C. § 552(a)(4)(A)(viii) and 5 U.S.C. § 552(a)(4)(A)(ii)(III), and because responsive records had already been searched for and located while processing similar FOIA requests. *See id.*, ¶ No. 16 & fn. 2. However, because the FBI believes that Plaintiff is not the type of requester defined in (ii)(II) [5 U.S.C. § 552(a)(4)(A)(ii)(II)], the FBI still seeks to charge him duplication fees. *See id.* Therefore, what remains is the issue of whether Plaintiff is required to pay **duplication fees** in the approximate amount of **$350.00**. *See id.*, ¶ No. 15.

148.   In another case, EPIC v. FBI, 12-cv-00667-CKK (D.D.C.), the FBI, through its counsel, Ms. Herb (who is also the FBI's counsel in the present case), stated that "Plaintiff requested waiver of duplication fees with its FOIA request and Defendant [FBI] agreed, in this instance, that Plaintiff's FOIA request will **contribute to public understanding of the operations and activities of Government.**" *Id.*, Doc. #11 [Defendant FBI's Answer], p. 3-4, ¶ No. 23 (emphasis added). The FBI agreed that the records requested by EPIC were a type covered by 5 U.S.C. § 552(a)(4)(A)(iii).

149.   The subject matter of the FOIA request submitted by the Electronic Information Privacy Center's (EPIC) "concern[s] technical specifications of the StingRay device or other cell-site simulator technologies." *Id.*, Doc. #19, p. 2. The only difference between the quoted part of EPIC's FOIA request and the comparable part of Plaintiff's FOIA request is that

1 Plaintiff narrowed the subject matter to apply only to specifically named cell site emulator

2 products manufactured and/or sold by Harris WPG Corporation. *See Complaint*, EXHIBIT

3 01 (Plaintiff's FOIA request letter) (Dkt. #001-1).

4        150.    In his initial FOIA request letter, Plaintiff asked for a fee waiver based on the

5 same FOIA provision used by EPIC to support its request for a waiver:

> I am requesting a waiver of all costs pursuant to 5 U.S.C. 552(a)(4)(A)(iii)
> ("Documents shall be furnished without any charge or at a charge reduced
> below the fees established under clause (ii) if disclosure of the information is in
> the public interest because it is likely to contribute significantly to public
> understanding of the operations or activities of the government and is not
> primarily in the commercial interest of the requester."). Disclosure of the
> requested records will help members of the public understand the privacy risks
> of carrying cell phones and other wireless devices. The requested records
> concern the direct operations and activities of the government with respect to
> surreptitiously locating cell phones and other wireless devices using Harris
> brand portable/transportable wireless device locators and related equipment.

*Complaint*, EXHIBIT 01 (Plaintiff's FOIA request letter to FBI) (Dkt. #001-1).

14      151.    Despite there being identical reasoning in support of a duplication fee waiver,

15 Defendant FBI refused to waive duplication fees for Plaintiff in the way it previously waived

16 duplication fees for EPIC. In its September 25, 2013 letter to Plaintiff, Defendant FBI

17 justified its refusal of Plaintiff's request for a duplication fee waiver by stating that "you do

18 not satisfy [][the] requirement[,]" which states, "disclosure of the [requested] information is

19 in the public interest because it is likely to contribute significantly to public understanding of

20 the operations or activities of the government." *See Daniel Rigmaiden's **Second** Declaration

21 *Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*,

22 ATTACHMENT 03. Defendant FBI is acting arbitrarily and capriciously in denying

23 Plaintiff's request for a duplication fee waiver while granting EPIC's request based on the

24 same asserted FOIA provision, *i.e.*, 5 U.S.C. § 552(a)(4)(A)(iii).

### 2.   The FBI's arbitrary and capricious actions RE: non-expedited processing.

27      152.    The FBI denied Plaintiff's request for expedited processing. *See* ¶ Nos 139-144,

28 *supra*. The FBI also denied EPIC's request for expedited processing of the FOIA request at

1  issue in EPIC v. FBI, 12-cv-00667-CKK (D.D.C.). However, even while the FBI denied

2  EPIC's request for expedited processing, it still offered "to process the responsive records at a

3  rate of 1,000 per month and provide interim releases." *See id.*, Doc. #15-1, p. 4-5; Doc. #14-

4  1, p. 20. In comparison, the FBI is only willing to process 500 pages per month of Plaintiff's

5  pending FOIA request. *See Daniel Rigmaiden's **Second** Declaration Under Penalty Of*

6  *Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, ¶ No. 15. The

7  amount of pages identified for review in response to EPIC's request was 25,000 (see EPIC v.

8  FBI, 12-cv-00667-CKK (D.D.C.), Doc. #15-1, p. 4-5) while the number of pages identified

9  for review in response to Plaintiff's request is currently at 11,000. *See id.*, ¶ No. 14.

10  Defendant FBI is acting arbitrarily and capriciously in offering to process for Plaintiff only

11  500 page per month while offering to process for EPIC 1,000 pages per month.

**3.   The FBI's arbitrary and capricious actions RE: "first in-first out" multi-track FOIA request queue system.**

14      153.   Via a declaration by David M. Hardy in <u>EPIC v. FBI</u>, 12-cv-00667-CKK

15  (D.D.C.), Defendant FBI stated that "RIDS [(the FBI's Record/Information Dissemination

16  Section)] has a well orchestrated process to faithfully administer the FOIA program in

17  accordance with applicable statutes and regulations, and to **treat all requesters fairly and**

18  **equitable**, giving none an undue advantage over others. RIDS's adherence to the '**first in-**

19  **first out**' multi-track queue system ensures all requesters are treated similarly and fairly." *Id.*,

20  Doc. #16-1, p. 10 (emphasis added). Rather than respond to Plaintiff's October 10, 2011

21  FOIA request using its fair, equitable, and well orchestrated process, the FBI chose to ignore

22  Plaintiff's request—not once, but twice—and process other, later FOIA requests ahead of

23  Plaintiff's.

24      154.   Defendant FBI signed for Plaintiff's certified letter containing his October 10,

25  2011 FOIA request on November 7, 2011. *See Daniel Rigmaiden's **First** Declaration Under*

26  *Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*,

27  <u>ATTACHMENT 34</u>. The signature card for the FOIA request was signed "D.W. Jones / OB"

28  and then mailed back to Plaintiff. *See id.* Despite clear evidence of receiving the request,

- 58 -

1 │ Defendant OIP informed Plaintiff via letter dated May 10, 2012 that "[t]he FBI has no record

2 │ of having received a FOIA request from you." *Id.*, <u>ATTACHMENT 36</u>. Defendant OIP then

3 │ assured Plaintiff that "I have forwarded a copy of your request to the FBI, which will be

4 │ opened as a new request." *Id.*

5 │      155.   After waiting an additional two months (*i.e.*, until July 19, 2012) with no word

6 │ from the FBI regarding Plaintiff's October 10, 2011 FOIA request letter—which was

7 │ forwarded to the FBI by Defendant OIP—Plaintiff filed the instant suit. Only after being

8 │ served with Plaintiff's Complaint did the FBI finally respond to Plaintiff's October 10, 2012

9 │ FOIA request. The FBI responded via letter dated May 1, 2013. *See id.*, <u>ATTACHMENT 37</u>.

10 │ Later, in its September 25, 2013 letter to Plaintiff, the FBI claimed that it "did not receive this

11 │ FOIA request dated October 10, 2011." *See Daniel Rigmaiden's* **Second** *Declaration Under*

12 │ *Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*,

13 │ <u>ATTACHMENT 03</u>.

14 │      156.   Had the FBI responded within 20 business days following its initial receipt on

15 │ November 7, 2011, it could have begun processing the 11,000 pages responsive to Plaintiff's

16 │ request, at a rate of 479 pages per month, and been done by November 5, 2013. Given that the

17 │ FBI's FOIA system "ensures all requesters are treated similarly and fairly[,]" Defendant FBI

18 │ is acting arbitrarily and capriciously in falsely claiming that it did not receive Plaintiff's

19 │ October 10, 2011 FOIA request, even after Defendant OIP personally forwarded a copy of the

20 │ request to the FBI on or about May 10, 2012.

21 │      **P.**    **Additional last minute issue RE: native form digital records.**

22 │      157.   Via FBI letter dated January 14, 2014, Plaintiff was provided with a courtesy

23 │ copy of the FOIA responses provided to EPIC by the FBI in response to its cell site emulator

24 │ FOIA request. *See id.*, ¶¶ Nos. 55-56. Plaintiff requested the copies to further test whether

25 │ the FBI's process for recreating records for FOIA responses results in high enough quality

26 │ PDF files for a sufficient OCR machine reading process. *See id.* Plaintiff was able to

27 │ determine that the FBI created the records using steps 1-8 in ¶ 25 of *id.*, but added a 9th step

28 │ that consisted of scanning the paper documents (created in step No. 8 in ¶ 25 of *id.*) into final

1  PDF files for disclosure. *See id.* The final scans were done by J.C. Montgomery at the

2  extremely low quality of **150dpi**[6] **(fast web view)**, (*see id.*) which is insufficient for

3  accurate OCR conversion. *See id.* Using a simple scanner setting, the FBI could have very

4  easily scanned at 600dpi, which would have allowed for more words (but not *all* as would be

5  the case with native form digital records) to properly convert to vector based text for keyword

6  searching. *See id.* The FBI is deliberately attempting to hinder public understanding through

7  deliberate low quality scans. *See id.*

8  ///

9  ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  _____

28  6.     DPI is an acronym for "dots per inch" and is a measure of quality for all non-vector based digital images including those that make up PDF files.

Respectfully Submitted: January 29, 2014    Daniel Rigmaiden

**CERTIFICATE OF SERVICE**    Daniel Rigmaiden
Plaintiff

I, Daniel David Rigmaiden, certify under penalty of perjury under the laws of the

United States of America that on _JANUARY 31, 2014_____ I caused the following

to be mailed first-class United States Postal Service delivery by _having it hand_

_delivered to the court clerk._____:

Original attached document addressed to:

Clerk of the Court
Attn: Civil Docketing Section
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street, Suite 130, SPC 1
Phoenix, AZ 85003-2118

Per Court order at Dkt. #056, the ECF system will effectuate service on;
~~One copy of the original document addressed to:~~

Brad P. Rosenberg, Trial Attorney
Kimberly L. Herb, Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
PO Box 883
Washington, D.C. 20044

By: _Daniel Rigmaiden_____

-61-



Plaintiff's Statement of Undisputed Material Facts
In Support of Motion for Partial Summary Judgment