**ATTACHMENT 08**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 08:   Federal Communications Commission, *FOIA Response to Christopher Soghoian, Center for Applied Cybersecurity Research, FOIA Request No. 2011-586*, Feb. 29, 2012;



Federal Communications Commission
Washington, D.C. 20554

February 29, 2012

Christopher Soghoian
Center for Applied Cybersecurity Research
Indiana University
P.O. Box 2366
Washington, D.C. 20013

By email to chris@soghoian.net

Re: FOIA Control No. 2011-586

Dear Mr. Soghoian:

This responds to your Freedom of Information Act (FOIA) request filed September 28, 2011, seeking "copies of all legal opinions, memoranda, briefs, training manuals, emails and as any other documents including communications with other federal and state agencies, including but not limited to the Department of Justice relating to the use of 'cell site simulators', 'IMSI catchers', 'digital analyzers', 'Triggerfish', 'StingRay', Amberjack or other similar mobile phone surveillance and tracking devices." You also specifically requested any documents that detail:

1. "Whether law enforcement and intelligence agencies have obtained permission from the FCC to use such technologies, and if so, what is required to gain such permission.
2. The legality of the use of these devices by law enforcement agencies, intelligence agencies, the military, as well as private individuals.
3. Whether these technologies interfere with the normal operation of wireless telephone networks."

You request all records created between January 1, 2005 and September 28, 2011.

Much of the information you seek is associated with equipment authorizations issued to the Harris Corporation ("Harris") and Digital Receiver Technology, Inc. ("DRT"). Harris and DRT requested confidential treatment for the documents you seek, and such treatment was afforded in the handling of those equipment authorization applications and grants by the FCC.

The publicly available information submitted with the DRT and Harris applications is available from the Commission's Equipment Authorization System (EAS) database at http://transition.fcc.gov/oet/ea/fccid/, using the FCC IDs XLM201B and XLM9955B1 for DRT and NK73092523, NK73100176, NK73186795 and NK73166210 for Harris grants. With respect to the Harris equipment authorization applications, we are providing four letters in support of one of the applications, variously dated August 21 and 22, 2007, attached to this email and named "Soghoian Document 1" through "Soghoian Document 4."

With respect to other documents related to the equipment applications by DRT and Harris, we are withholding several application components and exhibits and emails both to and from the FCC and the above parties and emails within the FCC under 47 C.F.R. § 0.457(d), as it relates to confidential commercial information and trade secrets; 0.457(e) which covers interagency and interagency communications; and 0.457(g)(5) as it relates to law enforcement investigative techniques and procedures.[1] See *e.g.*, *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) and *Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992) (establishing standards for determining whether information submitted to an agency is confidential under FOIA Exemption 4); *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 151 (1975) (Exemption 5 is intended to "prevent injury to the quality of agency decisions"); *Public Citizen v. Office of Management and Budget*, 569 F.3d 434 442-43 (D.C. Cir. 2009), *citing Judicial Watch v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (Exemption 5 applies to materials that are both predecisional and reflect the agency "give-and-take" of the consultative process); and *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002) (holding that Exemption 7(E) applies to internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations or procedures, such as internal IRS memorandums).

We have also discovered information associated with license applications, experimental license or special temporary authority applications by ShawnTech Communications, Inc., InlustroTech LLC, DRT, and Tecore, Inc., and other companies.  In some cases, those parties requested confidential treatment of some or all of the information they supplied in pursuit of those licenses.  In addition, we located memoranda, internal FCC emails, and interagency emails that are responsive to your request.

With respect to several applications for and grants of Special Temporary Authorization (STA) or experimental licenses by Shawntech Communications, Inc., for "managed access" systems, we are withholding certain application materials and emails to and from the FCC under Sections 0.457(d) as it relates to trade secrets.  You can access the publicly available material for these applications from the Commission's ELS database at https://apps.fcc.gov/oetcf/els/reports/CallsignSearch.cfm, using the call signs WE9XNZ, WE9XRO, WE9XNZ, and WD9XMZ and the File No. 034-EX-PL-2011.

With respect to an application for Special Temporary Authorization (STA) by Tecore, Inc. for a "managed access" system (subsequently dismissed at the request of applicant), we are withholding certain application materials and emails to and from the FCC under Sections 0.457(d) as it relates to trade secrets.  You can access the publicly available material for this application from the Commission's ELS database at https://apps.fcc.gov/oetcf/els/reports/CallsignSearch.cfm, using the File Number 0352-EX-PL-2010.

With respect to these applications for special temporary authority, certain internal emails are withheld as deliberative and predecisional pursuant to Section 0.457(e) of the FCC's rules.

---

[1] These sections correspond to FOIA Exemptions 4, 5, and 7(E), 5 U.S.C. §§ 552(b)(4), (b)(5), and (b)(7)(E)..

In addition, there are experimental applications for "managed access" systems that were ultimately withdrawn by the respective applicants, Inlustro Tech LLC and Digital Receiver Technology. The Inlustro Tech LLC application is available in full, and can be accessed at https://apps.fcc.gov/oetcf/els/reports/CallsignSearch.cfm, using the file number 0027-EX-ST-2010. Certain applications materials related to the DRT application are withheld under Section 0.457(s) as it relates to trade secrets   The publicly available information associated with the DRT application can be accessed at the same site using the File Number 0108-EX-PL-2010.

With respect to these applications for experimental licenses, certain internal emails are withheld as deliberative and predecisional pursuant to Section 0.457(e) of the FCC's rules.

In addition, we are withholding certain intra-agency and interagency emails and documents because they are classified or because taken together with other information they could endanger national and homeland security. These documents are withheld under FOIA Exemption 1, 5 U.S.C. § 552(b)(1), which protects classified information from disclosure, Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), which protects from disclosure information compiled for law enforcement purposes whose production could reasonably be expected to interfere with enforcement proceedings, and Exemption 7(E) which protects from disclosure information compiled for law enforcement purposes whose production would disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. See *National Security Studies v. DOJ*, 331 F.3d 918, 926-929 (D.C. Cir. 2003) (applying Exemption 7(A) in national and homeland security context where bits and pieces of data may aid in piecing together other bits of data); *Lewis-Bay v. DOJ*, 595 F.Supp.2d 120, 137 (D.D.C. 2009) (applying Exemption 7(E) to details of electronic surveillance techniques).

We also reviewed the records to determine if discretionary release is appropriate. *See Memorandum to Heads of Executive Departments and Agencies, Freedom of Information Act*, 74 FR 4683 (2009) (President Obama's memorandum concerning the FOIA); *The Freedom of Information Act (FOIA)*, available at <http:// www.usdoj.gov/ag/foia-memo-march2009.pdf> (Attorney General Holder's FOIA Memo). We have determined that the portions withheld here are not appropriate for discretionary release.

Because there are no fees assessed for processing your request, there is no need to rule on your request for a fee waiver. 47 C.F.R. § 0.470 (e)(5).

If you consider this to be a denial of your FOIA request, you may seek review by filing an application for review with the Office of General Counsel within 30 days of the date of this letter. *See* 47 C.F.R. § 461(j).

As you have requested we are providing our response and the responsive documents by email to the email address you provided.

Sincerely,

Julius P. Knapp
Chief,
Office of Engineering and Technology

cc: FOIA Officer

Aug. 22. 2007  9:21AM                                                          No. 0631   P. 1



**STATE OF WISCONSIN**
**DEPARTMENT OF JUSTICE**

---

**J.B. VAN HOLLEN**
**ATTORNEY GENERAL**

**Raymond P. Taffora**
**Deputy Attorney General**

17 West Main Street
P.O. Box 7857
Madison, WI 53707-7857

James R. Warren
Administrator
Division of Criminal Investigation

21 August 2007

Federal Communications Commission
445 12th Street S.W..
Washington, D.C.  20554

SUBJECT:    Equipment Application for Harris StingRay Product

Dear Chairman Martin:

I am writing to request that the Federal Communications Commission expeditiously grant the pending Harris Corporation equipment authorization application for the StingRay product.  Providing state and local law enforcement officials with access to this equipment is critical to ensuring that we meet our public safety mission.  Section 2.803(a)(1) of the Commission's rules prohibit persons from selling or offering for sale any radio frequency device unless the device is authorized by the Commission through its certification procedures.  Specifically the regulation states:

> No person shall sell or lease, or offer for sale or lease (including advertising for sale or lease), or import, ship or distribute for the purpose of selling or leasing or offering for sale or lease, any radio frequency device unless ... [i]n the case of a device subject to certification, such device has been authorized by the Commission in accordance with the rules in this chapter and is properly identified and labeled as required by § 2.925 and other relevant sections in this chapter. 47 C.F.R. § 2.803(a)(1).

Moreover, products, such as intentional radiators must be authorized in accordance with the FCC's certification procedures prior to the initiation of marketing in the U.S.

Granting Harris Corporation's equipment authorization application would enable state and local law enforcement officials to utilize the StingRay product to support detection, tracking and location missions, and search and rescue missions.  The use of this technology by local and state law enforcement officials would enable us to more efficiently and effectively protect and serve the public.

State and local law enforcement's use of such equipment is typically narrow in scope, isolated, and of relatively short duration.  Interference to users outside a predetermined target list is very limited and this device employs a "catch and release" technology that is localized and fixated on a particular signal of interest.

Moreover, the StingRay product provides for an automatic release for emergency calls. Also, we ask that the Commission keep in mind that state and local law enforcement agencies comply with all applicable laws including approved court orders for use of such equipment.

We respectfully request that the Commission grant the application and consider the benefits this equipment would provide to state/local law enforcement agencies. The Commission's time and attention to this matter is greatly appreciated. Please do not hesitate to contact the undersigned.

Sincerely,

James R. Warren
Administrator
Wisconsin Department of Justice
Division of Criminal Investigation



# CITY OF HOUSTON

**Bill White, Mayor**

**Houston Police Department**
1200 Travis   Houston, Texas 77002-6000   713/247-1000

CITY COUNCIL MEMBERS:      Toni Lawrence  Jarvis Johnson  Anne Clutterbuck  Ada Edwards  Addie Wiseman  M.J. Khan, P.E.  Pam Holm  Adrian Garcia

Carol Alvarado      Peter Brown      Sue Lovell      Melissa Noriega      Ronald C. Green      Michael Berry      CITY CONTROLLER: Annise D. Parker

August 22nd, 2007

**Harold L. Hurtt**
**Chief of Police**



Federal Communications Commission
445 12th Street SW
Washington, D.C.  20554

SUBJECT:   Equipment Application for Harris StingRay Product

Dear Chairman Martin:

I am writing to request that the Federal Communications Commission expeditiously grant the pending Harris Corporation equipment authorization application for the StingRay product. Providing state and local law enforcement officials with access to this equipment is critical to ensuring that we meet our public safety mission. Section 2.803(a)(1) of the Commission's rules prohibit persons from selling or offering for sale any radio frequency device unless the device is authorized by the Commission through its certification procedures. Specifically, the regulation states:

> No person shall sell or lease, or offer for sale or lease (including advertising for sale or lease), or import, ship or distribute for the purpose of selling or leasing or offering for sale or lease, any radio frequency device unless … [i]n the case of a device subject to certification, such device has been authorized by the Commission in accordance with the rules in this chapter and is properly identified and labeled as required by § 2.925 and other relevant sections in this chapter. 47 C.F.R. § 2.803(a)(1).



Moreover, products, such as intentional radiators must be authorized in accordance with the FCC's certification procedures prior to the initiation of marketing in the U.S.

Granting Harris Corporation's equipment authorization application would enable state and local law enforcement officials to utilize the StingRay product to support detection, tracking and location missions, and search and rescue missions. The use of this technology by local and state law enforcement officials would enable us to more efficiently and effectively protect and serve the public.

State and local law enforcement's use of such equipment is typically narrow in scope, isolated, and of relatively short duration. Interference to users outside a predetermined target list is very limited and this device employs a "catch and release" technology that is localized and fixated on a particular signal of interest. Moreover, the StingRay product provides for an automatic release for emergency calls. Also, we ask that the Commission keep in mind that state and local law enforcement agencies comply with all applicable laws including approved court orders for the use of such equipment.

We respectfully request that the Commission grant the application and consider the benefits this equipment would provide to state/local law enforcement agencies. The Commission's time and attention to this matter is greatly appreciated.

Please do not hesitate to contact me if I may be of assistance, I may be reached at bcmcdaniel@houstonpd.us and at (713) 254-0574.

Sincerely,

Breck C. McDaniel, Sergeant
Homicide Division





*City of Alexandria, Virginia*
*Department of Police*
*2003 Mill Road*
*Alexandria, Virginia 22314*
*www.alexandriava.gov*

*David P. Baker*
*Chief of Police*



*Telephone 703.838.4700*
*Fax 703.838.6345*

22 August 2007

Federal Communications Commission
445 12th Street S.W..
Washington, D.C.  20554

SUBJECT:   Equipment Application for Harris StingRay Product

Dear Chairman Martin:

I am writing to request that the Federal Communications Commission expeditiously grant the pending Harris Corporation equipment authorization application for the StingRay product.  Providing state and local law enforcement officials with access to this equipment is critical to ensuring that we meet our public safety mission.   Section 2.803(a)(1) of the Commission's rules prohibit persons from selling or offering for sale any radio frequency device unless the device is authorized by the Commission through its certification procedures. Specifically the regulation states:

> No person shall sell or lease, or offer for sale or lease (including advertising for sale or lease), or import, ship or distribute for the purpose of selling or leasing or offering for sale or lease, any radio frequency device unless ... [i]n the case of a device subject to certification, such device has been authorized by the Commission in accordance with the rules in this chapter and is properly identified and labeled as required by § 2.925 and other relevant sections in this chapter. 47 C.F.R. § 2.803(a)(1).

Moreover, products, such as intentional radiators must be authorized in accordance with the FCC's certification procedures prior to the initiation of marketing in the U.S.

Granting Harris Corporation's equipment authorization application would enable state and local law enforcement officials to utilize the StingRay product to support detection, tracking and location missions, and search and rescue missions.  The use of this technology by local and state law enforcement officials would enable us to more efficiently and effectively protect and serve the public.

State and local law enforcement's use of such equipment is typically narrow in scope, isolated, and of relatively short duration.  Interference to users outside a predetermined target list is very limited and this device employs a "catch and release" technology that is localized and fixated on a particular signal of interest. Moreover, the StingRay product provides for an automatic release for emergency calls.  Also, we ask that the Commission keep in mind that state and local law enforcement agencies comply with all applicable laws including approved court orders for use of such equipment.

We respectfully request that the Commission grant the application and consider the benefits this equipment would provide to state/local law enforcement agencies.   The Commission's time and attention to this matter is greatly appreciated.  Please do not hesitate to contact the undersigned.

Sincerely,


Name:            Earl Cook
Title:             Executive Deputy Chief
Date:             22 August 2007
Organization: Alexandria Police Department

2

**Colonel James Teare, Sr.**
**Chief of Police**



**ANNE**
**ARUNDEL**
**COUNTY**
M   A   R   Y   L   A   N   D

Police Department
8495 Veterans Hwy.
Millersville, MD 21︎
(410) 222-8050

August 22, 2007

Federal Communications Commission
445 12th Street, S.W.
Washington, D. C. 20554

SUBJECT:     Equipment Application for Harris StingRay Product

Dear Chairman Martin:

I am writing to request that the Federal Communications Commission expeditiously grant the pending Harris Corporation equipment authorization application for the StingRay product. Providing state and local law enforcement officials with access to this equipment is critical to ensuring that we meet our public safety mission.  Section 2.803(a)(1) of the Commission's rules prohibit persons from selling or offering for sale any radio frequency device unless the device is authorized by the Commission through its certification procedures.  Specifically the regulation states:

> No person shall sell or lease, or offer for sale or lease (including advertising for sale or lease), or import, ship or distribute for the purpose of selling or leasing or offering for sale or lease, any radio frequency device unless ... [i]n the case of a device subject to certification, such device has been authorized by the Commission in accordance with the rules in this chapter and is properly identified and labeled as required by § 2.925 and other relevant sections in this chapter. 47 C.F.R. § 2.803(a)(1).

Moreover, products, such as intentional radiators must be authorized in accordance with the FCC's certification procedures prior to the initiation of marketing in the U.S.

Granting Harris Corporation's equipment authorization application would enable state and local law enforcement officials to utilize the StingRay product to support detection, tracking and location missions, and search and rescue missions.  The use of this technology by local and state law enforcement officials would enable us to more efficiently and effectively protect and serve the public.

State and local law enforcement's use of such equipment is typically narrow in scope, isolated, and of relatively short duration.  Interference to users outside a predetermined target list is very limited and this device employs a "catch and release" technology that is localized and fixated on a particular signal of interest.  Moreover, the StingRay product provides for an automatic release for emergency calls.  Also, we ask that the Commission keep in mind that state and local law enforcement agencies comply with all applicable laws including approved court orders for use of such equipment.

*Nationally Accredited Law Enforcement Agency*

We respectfully request that the Commission grant the application and consider the benefits this equipment would provide to state/local law enforcement agencies. The Commission's time and attention to this matter is greatly appreciated. Please do not hesitate to contact the undersigned.

Sincerely,

James Teare, Sr.
Chief of Police

JT/ksm

*Nationally Accredited Law Enforcement Agency*

**ATTACHMENT 09**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 09:   Valentino-DeVries, Jennifer, *Feds Shift Tracking Defense: Prosecutors
in Arizona Case Drop Position That 'Stingray' Use Didn't Require
Warrant*, The Wall Street Journal, (Nov. 3, 2011) *available at*
http://online.wsj.com/article/SB100014240529702046219045770143 63
024341028.html (last accessed: Nov. 15, 2011);



**Access your finances**
from just about anywhere.

You bank with Bank of America.
Now invest with Merrill Edge.

View your banking and investment accounts together
online, on your mobile device or at thousands of ATMs.

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your
colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.          Order a reprint of this article now

# THE WALL STREET JOURNAL.
WSJ.com

TECHNOLOGY   |   NOVEMBER 3, 2011

# Feds Shift Tracking Defense
*Prosecutors in Arizona Case Drop Position That 'Stingray' Use Didn't Require Warrant*

By JENNIFER VALENTINO-DEVRIES

The U.S. Department of Justice now says its use of a cellphone-tracking device in a controversial Arizona case could be considered a "search" under the Fourth Amendment, a tactical move legal experts say is designed to protect the secrecy of the gadgets known as "stingrays."

For more than a year, federal prosecutors have argued in U.S. District Court that the use of the stingray device—which can locate a mobile phone even when it's not being used to make a call—wasn't a search, in part because the user had no reasonable expectation of privacy while using Verizon Wireless cellphone service. Under that argument, authorities wouldn't need to obtain a search warrant before using one of the devices.



The defendant in the case, Daniel David Rigmaiden, is facing fraud charges. His quest to force the government to provide information about the device used to locate him was the subject of front-page article in The Wall Street Journal in September.

Legal experts say the government's move fits into its strategy of keeping information about the devices under wraps, and the government continues to maintain that, in general, search warrants aren't required.

The government said it is willing to make these concessions in this case alone in an attempt to "avoid unnecessary disclosure" of information about its stingray devices. The judge in the case, David G. Campbell, had indicated he might want to know more about the technical details of the devices before ruling on whether their use constituted a search.

The government's move comes amid renewed questions about how the use of new technologies by law enforcement is challenging interpretations of the Fourth Amendment, which prohibits unreasonable searches and seizures.

The Supreme Court is set to hear oral arguments next week in a case in which federal agents used a GPS device to track a suspect's car for a month without a search warrant. The government argues that people driving on public roads don't have a reasonable expectation of privacy in their public movements.

In the Arizona case, Mr. Rigmaiden was found after federal agents used a stingray to track a mobile device to an apartment building. He has argued that using stingrays to locate devices in homes without a valid warrant "disregards the United States Constitution" and is illegal.



U.S. Patent and Trademark Office

Harris Corp. is the best-known maker of stingrays, like the one above.

In a memo filed with the court last week, the prosecution said it will agree that in this case, the "tracking operation was a Fourth Amendment search and seizure." It also will agree with some of the defendant's other assertions, including that the stingray caused a "disruption of service."

But the government's concessions don't represent a shift in policy. In the same memo, the government says its "position continues to be that, as a factual matter, the operation did not involve a search or seizure under the Fourth Amendment."

The latest filing means that in the Arizona case the government could stake its case on the argument that it did have a valid search warrant.

The defense has asserted the order wasn't, in fact, a proper search warrant, in part because it allowed investigators to delete all the tracking data collected, rather than reporting back to the judge.

The defense didn't immediately respond to a request for comment. The U.S. Attorney's Office declined to comment beyond what was in the memorandum.

**Earlier**

**Phone Tracker Fuels Constitutional Clash**
9/22/2011

**More on Internet Privacy**

Using Credit Cards to Target Web Ads

Secret Orders Target Email

Heading Off Privacy Problems

Latest in Web Tracking: Stealthy 'Supercookies'

Facebook Adds New Privacy Controls

In September, a Federal Bureau of Investigation representative told the Journal the policy of deletion "is intended to protect law enforcement capabilities so that subjects of law enforcement investigations do not learn how to evade or defeat lawfully authorized investigative activity."

Along with its memorandum, the government submitted an affidavit from an FBI special agent expanding on the agency's reasons for deleting data associated with stingray devices.

In the latest memo, the FBI says all data from stingrays are deleted because the devices may tend to pick up information on innocent people in addition to suspects. To ensure "that the privacy rights of those innocent third parties are maintained" after their data has been captured, all the information is deleted, including that pertaining to the subject. The defense indicated that it plans to file a response to the memorandum this week.

Copyright 2011 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

## ATTACHMENT 10

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 10:   Valentino-DeVries, Jennifer, *'Stingray' Phone Tracker Fuels
Constitutional Clash*, The Wall Street Journal, p. A1 (Sept. 22, 2011)
(original article addressing CR08-814-PHX-DGC) *available at*
http://online.wsj.com/article/SB10001424053111904194604576583112
723197574.html (last accessed: Sept. 22, 2011);



**1.00%** APY* | A HIGH-YIELD SAVINGS ACCOUNT FROM AMERICAN EXPRESS | LEARN MORE NOW | **PERSONAL SAVINGS** from American Express

Accounts offered by American Express Bank, FSB. MEMBER FDIC

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.     Order a reprint of this article now

# THE WALL STREET JOURNAL.
WSJ.com

TECHNOLOGY | SEPTEMBER 22, 2011

# 'Stingray' Phone Tracker Fuels Constitutional Clash

By JENNIFER VALENTINO-DEVRIES

For more than a year, federal authorities pursued a man they called simply "the Hacker." Only after using a little known cellphone-tracking device—a stingray—were they able to zero in on a California home and make the arrest.



U.S. Patent and Trademark Office

A Harris StingRay II, one of several devices dubbed 'stingrays.'

Stingrays are designed to locate a mobile phone even when it's not being used to make a call. The Federal Bureau of Investigation considers the devices to be so critical that it has a policy of deleting the data gathered in their use, mainly to keep suspects in the dark about their capabilities, an FBI official told The Wall Street Journal in response to inquiries.

A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says it obtains appropriate court approval to use the device.

Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a search warrant. These techniques are driving a constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

On Nov. 8, the Supreme Court will hear arguments over whether or not police need a warrant before secretly installing a GPS device on a suspect's car and tracking him for an extended period. In both the Senate and House, new bills would require a warrant before tracking a cellphone's location.

**More**

**Key Documents in 'Stingray' Case**

**Digits:** How 'Stingray' Devices Work

**Digits:** How Technology Is Testing the Fourth Amendment

And on Thursday in U.S. District Court of Arizona, Judge David G. Campbell is set to hear a request by Mr. Rigmaiden, who is facing fraud charges, to have information about the government's secret techniques disclosed to him so he can use it in his defense. Mr. Rigmaiden maintains his innocence and says that using stingrays to locate devices in homes without a valid warrant "disregards the United States Constitution" and is illegal.

His argument has caught the judge's attention. In a February hearing, according to a transcript, Judge Campbell asked the prosecutor, "Were there warrants obtained in connection with the use of this device?"

The prosecutor, Frederick A. Battista, said the government obtained a "court order that satisfied [the] language" in the federal law on warrants. The judge then asked how an order or warrant could have been obtained without telling the judge what technology was being used. Mr. Battista said: "It was a standard practice, your honor."

Judge Campbell responded that it "can be litigated whether those orders were appropriate."

On Thursday the government will argue it should be able to withhold details about the tool used to locate Mr. Rigmaiden, according to documents filed by the prosecution. In a statement to the Journal, Sherry Sabol, Chief of the Science & Technology Office for the FBI's Office of General Counsel, says that information about stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."



The prosecutor, Mr. Battista, told the judge that the government worries that disclosure would make the gear "subject to being defeated or avoided or detected."

A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It lets the stingray operator "ping," or send a signal to, a phone and locate it as long as it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

The government says "stingray" is a generic term. In Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

The best known stingray maker is Florida-based defense contractor Harris Corp. A spokesman for Harris declined to comment.

Harris holds trademarks registered between 2002 and 2008 on several devices, including the StingRay, StingRay II, AmberJack, KingFish, TriggerFish and LoggerHead. Similar devices are available from other manufacturers. According to a Harris document, its devices are sold only to law-enforcement and government agencies.

Some of the gadgets look surprisingly old-fashioned, with a smattering of switches and lights scattered across a panel roughly the size of a shoebox, according to photos of a Harris-made StingRay reviewed by the Journal. The devices can be carried by hand or mounted in cars, allowing investigators to move around quickly.

A rare public reference to this type of technology appeared this summer in the television crime drama "The Closer." In the episode, law-enforcement officers use a gadget they called a "catfish" to track cellphones without a court order.

The U.S. armed forces also use stingrays or similar devices, according to public contract notices. Local law enforcement in Minnesota, Arizona, Miami and Durham, N.C., also either possess the devices or have considered buying them, according to interviews and published requests for funding.

The sheriff's department in Maricopa County, Ariz., uses the equipment "about on a monthly basis," says Sgt. Jesse Spurgin. "This is for location only. We can't listen in on conversations," he says.

Sgt. Spurgin says officers often obtain court orders, but not necessarily search warrants, when using the device. To obtain a search warrant from a court, officers as a rule need to show "probable cause," which is generally defined as a reasonable belief, based on factual evidence, that a crime was committed. Lesser standards apply to other court orders.

A spokeswoman with the Bureau of Criminal Apprehension in Minnesota says officers don't need to seek search warrants in that state to use a mobile tracking device because it "does not intercept communication, so no wiretap laws would apply."

FBI and Department of Justice officials have also said that investigators don't need search warrants. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers," which require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

To get a pen-register order, investigators don't have to show probable cause. The Supreme Court has ruled that use of a pen register doesn't require a search warrant because it doesn't involve interception of conversations.

But with cellphones, data sent includes location information, making the situation more complicated because some judges have found that location information is more intrusive than details about phone numbers dialed. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

The prosecution in the Rigmaiden case says in court documents that the "decisions are made on a case-by-case basis" by magistrate and district judges. Court records in other cases indicate that decisions are mixed, and cases are only now moving through appellate courts.

The FBI advises agents to work with federal prosecutors locally to meet the requirements of their particular district or judge, the FBI's Ms. Sabol says. She also says it is FBI policy to obtain a search warrant if the FBI believes the technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

Experts say lawmakers and the courts haven't yet settled under what circumstances locating a person or device constitutes a search requiring a warrant. Tracking people when they are home is particularly sensitive because the Fourth Amendment specifies that people have a right to be secure against unreasonable searches in their "houses."

"The law is uncertain," says Orin Kerr, a professor at George Washington University Law School and former computer-crime attorney at the Department of Justice. Mr. Kerr, who has argued that warrants should be required for some, but not all, types of location data, says that the legality "should depend on the technology."

In the case of Mr. Rigmaiden, the government alleges that as early as 2005, he began filing fraudulent tax returns online. Overall, investigators say, Mr. Rigmaiden electronically filed more than 1,900 fraudulent tax returns as part of a $4 million plot.

Federal investigators say they pursued Mr. Rigmaiden "through a virtual labyrinth of twists and turns." Eventually, they say they linked Mr. Rigmaiden to use of a mobile-broadband card, a device that lets a computer connect to the Internet through a cellphone network.

Investigators obtained court orders to track the broadband card. Both orders remain sealed, but portions of them have been quoted by the defense and the prosecution.

These two documents are central to the clash in the Arizona courtroom. One authorizes a "pen register" and clearly isn't a search warrant. The other document is more complex. The prosecution says it is a type of search warrant and that a finding of probable cause was made.

But the defense argues that it can't be a proper search warrant, because among other things it allowed investigators to delete all the tracking data collected, rather than reporting back to the judge.

Legal experts who spoke with the Journal say it is difficult to evaluate the order, since it remains sealed. In general, for purposes of the Fourth Amendment, the finding of probable cause is most important in determining

whether a search is reasonable because that requirement is specified in the Constitution itself, rather than in legal statutes, says Mr. Kerr.

But it is "odd" for a search warrant to allow deletion of evidence before a case goes to trial, says Paul Ohm, a professor at the University of Colorado Law School and a former computer-crime attorney at the Department of Justice. The law governing search warrants specifies how the warrants are to be executed and generally requires information to be returned to the judge.

Even if the court finds the government's actions acceptable under the Fourth Amendment, deleting the data is "still something we might not want the FBI doing," Mr. Ohm says.

The government says the data from the use of the stingray has been deleted and isn't available to the defendant. In a statement, the FBI told the Journal that "our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation" when using stingray-type gear.

As a general matter, Ms. Sabol says, court orders related to stingray technology "will include a directive to expunge information at the end of the location operation."

Ms. Sabol says the FBI follows this policy because its intent isn't to use the data as evidence in court, but rather to simply find the "general location of their subject" in order to start collecting other information that can be used to justify a physical search of the premises.

In the Rigmaiden example, investigators used the stingray to narrow down the location of the broadband card. Then they went to the apartment complex's office and learned that one resident had used a false ID and a fake tax return on the renter's application, according to court documents.

Based on that evidence, they obtained a search warrant for the apartment. They found the broadband card connected to a computer.

Mr. Rigmaiden, who doesn't confirm or deny ownership of the broadband card, is arguing he should be given information about the device and about other aspects of the mission that located him.

In the February hearing, Judge Campbell said he might need to weigh the government's claim of privilege against the defendant's Fourth Amendment rights, and asked the prosecution, "How can we litigate in this case whether this technology that was used in this case violates the Fourth Amendment without knowing precisely what it can do?"

**Write to** Jennifer Valentino-DeVries at Jennifer.Valentino-DeVries@wsj.com

Copyright 2011 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

**ATTACHMENT 11**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 11:   **(1)** Miami, FL, USA, *Legislative Files, Harris Sole Source Vendor Letter*, p. 1 (Nov. 29, 2006), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf (last accessed: Mar. 9, 2011) [p. 1 of attachment]; **(2)** Miami, FL, USA, *Legislative Files, Inter-Office Memo RE: Harris Sole Source Vendor*, p. 1 (Nov. 13, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/47993.pdf (last accessed: Mar. 9, 2011) [p. No. 2 of attachment]; **(3)** Miami, FL, USA, *Legislative Files, Harris Sole Source Letter [Attachment B]*, p. 2 (Aug. 25, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48003.pdf (last accessed: Mar. 9, 2011) [p. No. 3-12 of attachment]; **(4)** Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 1-2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: Mar. 9, 2011) [p. No. 13-14 of attachment]; **(5)** Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 1-2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed: Mar. 9, 2011) [p. No. 15-16 of attachment]; **(6)** Miami, FL, USA, *Legislative Files, Harris GCSD Price List* (Sep. 2008), p. 1-8, available at http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf (last accessed: Mar. 9, 2011) [p. No. 17-24 of attachment];



**HARRIS CORPORATION**

Government Communications
Systems Division
Wireless Products Group
Post Office Box 9800
Melbourne, FL USA 32902-9800
phone 1-800-358-5297
fax 1-321-309-7437

www.harris.com

Date:   **29 November 2006**

To:     **City of Miami PD – Manuel Diaz**

From:   **Harris Wireless Products Group**

REF:    <u>**KingFish, KingFish GSM S/W, Pocket PC GSM S/W & Training Sole Source Justification**</u>

Harris Government Communications Systems Division, via its Wireless Products Group (WPG) in Melbourne, FL, offers a comprehensive line of cellular surveillance and tracking equipment for exclusive utilization by Government and Law Enforcement Agencies. Harris WPG developed and owns the design, but does sub-contract the electronic board assemblies, the functional testing of those assemblies, and the integration into the final equipment chassis. Harris WPG adds application specific S/W and conducts final testing on this chassis prior to shipping to the end-item customer.

<u>The KingFish system is the only man-portable battery powered CDMA & GSM Interrogation, Active Location, and Signal Information Collection system currently available.</u> KingFish is compatible with CDMA commercial standards IS-95A, IS-95-B, TSB74, and J-STD-008 in the U.S. 800 and 1900 MHz bands. A GSM S/W upgrade package (for the KingFish and its Pocket PC) is available for purchase that will allow operation against the GSM standard in the U.S. 800 and 1900 MHz bands (as well as the overseas 900 MHz E-GSM and DCS 1800 MHz bands). KingFish can also be powered via standard automotive +12V DC or standard 110VAC. The man-portability and battery power features of the Harris KingFish product are unique for tactical mission needs, allowing the user to perform passive collection, active interrogation and active location while on foot (i.e., inside a multi-story building, or outside in rough terrain).

The KingFish is delivered with all the accessories necessary to perform man-portable active location, interrogation and passive collection technical investigations on the CDMA & GSM cellular formats. Harris also sells training on the use of the KingFish. Training sessions are 2 days per class with a maximum class size of 4 students. One training class is required per product, and per cellular protocol.

<u>Harris WPG is your only source for the KingFish, KingFish GSM S/W, KingFish Pocket PC GSM S/W and associated training.</u>

One-year maintenance agreements are included with all Harris WPG Products. A Maintenance Agreement includes:
- Customer Telephone Support (8AM – 6PM EST) @ 1-800-358-5297
- Warranty on hardware
- Notification of and free access to S/W upgrades as they are released (applies to purchased protocols only)

Upon expiration of the first-year Maintenance Agreement, customers may extend their coverage another 12 months by purchasing an Extended Annual Maintenance Agreement at 15% of the original purchase price of their cellular product. These can then be renewed annually thereafter for the same 15% fee.

If you require any additional information, please feel free to contact our office at (800) 358-5297 or you can call my direct line at (321) 309-7430.

Sincerely,

Richard F. Roosa
Manager Advanced Programs
Harris Corporation
Wireless Products Group

CITY OF MIAMI, FLORIDA

**INTER-OFFICE MEMORANDUM**

TO :   Pedro G. Hernandez
       Chief Administrator/City Manager

FROM : Glenn Marcos, Director
       Chief Procurement Officer

DATE :   November 13, 2008          FILE :

SUBJECT :   Purchase of Upgrades for the
            StingRay and KingFish Cellular
            Tracking Surveillance Equipment

REFERENCES :

ENCLOSURES:

An investigation was conducted by staff to determine whether Harris Government Communications Systems Division (GCSD) Wireless Products Groups, located at P.O. Box 9800, Melbourne, Florida 32902, is the sole source provider to upgrade the current cellular tracking surveillance equipment known as the StingRay 4-CH and KingFish 1-CH, for the Department of Police.

The Police Department will be purchasing a Dual Band High Powered 30W Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband Direction Finder to upgrade the StingRay 4-CH and KingFish 1-CH, from Harris GCSD, which was purchased utilizing GSA IT 70 Schedule Contract #GS-35F-0283J, authorized pursuant to Resolution No. 06-0238. The electronic software (including training and a one-year maintenance agreement) to operate the cellular tracking devices was purchased as a sole source from Harris GCSD, as authorized by Resolution No. 07-0287.

The upgrade is necessary to operate both the StingRay 4-CH and the KingFish 1-CH given the continuous change in technology. The amplifier will allow an increase in wattage that will greatly heighten the ability of tracking phones from an increased distance and reducing the time utilized; the converter is a high performance converter that enables the StingRay and the KingFish to operate in the 2100 MHz band, which is the new cellular phone technology being introduced to the Miami market and already being utilized around the country; the Amberjack Wideband will enable the StingRay to use its added capabilities with the current iDEN software to pinpoint push-to-talk cellular phones more effectively, a feature that the current equipment does not have This will enable the investigators to carry out their duties and responsibilities in a more effective and efficient manner.

Harris Government Communications Systems Division, via its Wireless Products Group (WPG) offers a comprehensive line of cellular surveillance and tracking equipment, plus training and maintenance, for exclusive utilization by government and law enforcement agencies. Harris WPG developed and owns the equipment designs, but does sub-contract the electronic board assemblies, functional testing of those assemblies, and chassis integration. Harris WPG adds application specific, proprietary software, and conducts final testing on the chassis prior to shipment to the customer. Harris WPG is the only source and distributor of the StingRay vehicular-based and KingFish man-portable systems plus compatible accessories training and maintenance.

Accordingly, I am recommending that the requirements for competitive bidding be waived, and these findings be approved: Harris Government Communications Systems Division (GCSD) Wireless Products Groups, located at P.O. Box 9800, Melbourne, Florida 32902, is the sole source provider of the Dual Band High Powered 30W Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband Direction Finder to upgrade StingRay 4-CH and KingFish 1-CH cellular surveillance equipment, for the Department of Police, in an amount not to exceed $51,500. Funding is to be provided from the Law Enforcement Trust Fund, Award No. 1171, Project No. 19-690003, and Account Code No. 12500.191602.896000.0000.00000.

APPROVED BY: _____          DATE: ___12/23/08___
             Pedro G. Hernandez
             Chief Administrator/City Manager



# Attachment B

# Law Enforcement Trust Fund
## *Sole Source Vendor Letter*



HARRIS CORPORATION

Government Communications
Systems Division
Wireless Products Group
P.O. Box 9800
Melbourne, FL USA 32902-9800
phone 1-321-309-7773

www.harris.com

August 25, 2008

To: Raul Perez, City of Miami PD

RE: StingRay and KingFish Sole Source Justification

Harris Government Communications Systems Division, via its Wireless Products Group (WPG) in Melbourne, FL, offers a comprehensive line of cellular surveillance and tracking equipment, plus training and maintenance, for exclusive utilization by Government and Law Enforcement Agencies. Harris WPG developed and owns the equipment designs, but does sub-contract the electronic board assemblies, functional testing of those assemblies, and chassis integration. Harris WPG adds application specific, proprietary software, and conducts final testing on the chassis prior to shipment to the customer. Harris WPG has also developed specialized training courses for the operation and use of the StingRay and KingFish equipment.

The Harris StingRay and KingFish systems are compatible with the CDMA standard in the 800 MHz and 1900 MHz frequency bands, the GSM standard in the 800 MHz, 900 MHz, 1800 MHz, and 1900MHz frequency bands, the iDEN (Nextel) standard in the 800 MHz and 850 MHz frequency bands, the UMTS standard in the 800 MHz and 1900 MHz frequency bands, and, with optional converter equipment, the UMTS standard in the 2100 MHz frequency band.

The Harris StingRay and KingFish vehicular-based systems are the only portable standard +12VDC powered CDMA, GSM, UMTS, and iDEN interrogation, tracking and location, and signal information collection system currently available. When interfaced with the optional Harris AmberJack direction-finding (DF) antenna(s) (or handheld DF antenna for iDEN and UMTS), Tarpon software, laptop PC controller, and Harpoon amplifier kits, the StingRay can perform vehicular-based DF operations on the CDMA, GSM, UMTS, and iDEN cellular formats. The transportability and standard +12VDC vehicular power features of the Harris StingRay and KingFish products are unique for tactical mission needs.

The StingRay and KingFish are quoted with software and accessories that are required in order to perform missions on the CDMA, GSM, UMTS, and iDEN cellular formats. These include the cable assemblies, power supplies, antennas, laptop PC controller, power amplifiers, handheld DF antenna, AmberJack DF antenna, and cellular format software (CDMA, GSM, UMTS, and iDEN).

Harris also sells training on the use of the StingRay, KingFish and its accessories. Standard training sessions are 2 days per class with a maximum class size of 4 students. One-year maintenance agreements are included with all Harris WPG Products. Maintenance agreements include the following:
- Customer telephone support (8AM – 6PM EST)
- Hardware warranty
- Notification and access to software upgrades as they are released

Harris WPG is your only source and distributor of the StingRay vehicular-based and KingFish man-portable systems plus compatible accessories, training and maintenance.

If you require any additional information, please feel free to my direct line at 321-309-7773 or my mobile at 321-258-2583.

Sincerely,

Lin Vinson    8/25/08

Lin Vinson
Major Account Manager, Wireless Products Group
Harris Corporation



| Quote | QTE6779-01751 |
|---|---|
| Date | 7/31/2008 |
| Page: | 1 |

# Quotation

**Bill To:**

City of Miami Police Department
Detective Raul Pérez
raul.perez@miami-police.org
305-321-7655

**Ship To:**

Detective Raul Perez
raul.perez@miami-police.org
305-321-7655

| Purchase Order No. | Customer ID | Salesperson ID | Shipping Method | Payment Terms | Req Ship Date | Master No. |
|---|---|---|---|---|---|---|
| | MDPD-MIAFL-001 | | BEST WAY | Net 30 | 0/0/0000 | 2,211 |

| Quantity | Item Number | Description | UOM | Discount | Unit Price | Ext. Price |
|---|---|---|---|---|---|---|
| 1 | PA-KIT-30W DUAL-BAND | PA-KIT-30W Dual-Band CONUS 850/1900 | EA | | $17,500.00 | $17,500.00 |
| 1 | UMTS-B4-CONV | UMTS 2100 MHz Converter | EA | | $16,000.00 | $16,000.00 |
| 1 | AJ-W-UG | AmberJack-X or G to AmberJack-W Upgrade (WideB | EA | | $18,000.00 | $18,000.00 |
| | NOTE | | * | | | $0.00 |
| | Delivery will be 120 days ARO unless otherwise | | | | | |
| | stated.  Please see attached Terms and Conditions. | | | | | |

HARRIS CORP - WIRELESS PRODUCTS GROUP
P.O. BOX 9800, M/S R5-11A
MELBOURNE, FL 32902-9800
PH: 800-358-5297, FAX: 321-309-7437,wpg@harris.com

Approved By:

_____

| | |
|---|---|
| Subtotal | $51,500.00 |
| Misc | $0.00 |
| Tax | $0.00 |
| Freight | $0.00 |
| Trade Discount | $0.00 |
| Purchase Price | $51,500.00 |



# Harpoon™
## Software-Controlled, High-Power Filtered Amplifier

### Product Description

Harpoon™ is a software-controlled, high-power filtered amplifier that maximizes the multichannel transmit capability of the StingRay II® and significantly improves the performance of the single-channel StingRay® and KingFish® systems by providing high-gain, wide dynamic range, and excellent linearity along with 30 watts of filtered output power. System status indication alerts the user during fault conditions including problems with the RF connections.

- Four Versions Available
  - Harpoon 850/1900 (Dual Band)
  - Harpoon 900/1800 (Dual Band)
  - Harpoon 2100 (Single Band)
  - Harpoon i800 (Single Band)

### Features

- Automatic Level Control
  - Maximizes total output power up to 30 W per band
  - Maintains constant output power
  - Improves power level accuracy
- Filtered Output
  - Improves transmit signal quality
  - Improves receiver sensitivity



#### Operations Supported

- **Maximizes the multichannel transmit capability of the StingRay II**
- **Significantly improves the performance of the single-channel StingRay and KingFish systems**



# Harpoon™
## Software-Controlled, High-Power Filtered Amplifier



### Standards Supported
- GSM
- CDMA2000®
- iDEN
- UMTS

### Frequency Coverage
- 850/1900: 869–894 MHz/1930–1990 MHz
- 900/1800: 925–960 MHz/1805–1880 MHz
- iDEN 800: 851–870 MHz
- 2100: 2110–2170 MHz

### Physical Characteristics
- Dual Band
  - Size: 10.5" x 14.75" x 5"
  - Weight: 24 lbs
- Single Band
  - Size: 10.5" x 10.5" x 5"
  - Weight: 15 lbs

### Power Specifications
- Input: 10–33 Vdc
- Power Consumption
  - Dual Band: 440 W max
  - Single Band: 280 W max

### Optional Accessories
- Diplexer for dual-band operation with StingRay and KingFish

### Catalog Part Number
- Harpoon 850/1900
- Harpoon 900/1800
- Harpoon i800
- Harpoon 2100



Improves Transmit Signal Quality and Receiver Sensitivity

Specifications are subject to change without notice. Harris is a registered trademark of Harris Corporation. KingFish, StingRay, and StingRay II are registered trademarks of Harris Corporation. Harpoon is a trademark of Harris Corporation. CDMA2000 is a registered trademark of the Telecommunications Industry Association in the United States (TIA-USA). iDEN is a trademark of Motorola, Inc.

This product is a restricted use item and can be sold only to authorized law enforcement and government agencies. Its use shall comply with all local, state, and federal laws and regulations. Harris Corporation assumes no liability for any misuse or improper use of the product and makes no warranty or representation whatsoever as to its suitability for any specific application.

**DISTRIBUTION WARNING**
This brochure may be provided only to persons eligible under 18 USC 2512 (Government law enforcement agencies or communications service providers).


*assuredcommunications®*

Government Communications Systems | P.O. Box 9800 | Melbourne, FL USA 32902-9800
1-800-358-5297 or wpg@harris.com | www.wpg.harris.com | **www.harris.com**

Copyright © 2008 Harris Corporation 07/08 514176m VPB d0341



# *AmberJack*®
## *Direction-Finding System*

### Product Description

AmberJack® is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations. The DF antenna array is designed to operate with Harris' Gossamer®, KingFish®, StingRay®, and StingRay II® products, enabling tracking and location of targeted mobile phones, as well as base stations. AmberJack-X operates in the U.S. cellular 850 and PCS 1900 bands, and AmberJack-G operates in the EGSM 900 and DCS 1800 bands. AmberJack-W operates in all the bands above as well as iDEN™ and UMTS bands I and IV.

AmberJack combines Harris' expertise in phased array antenna technology and

tracking and locating systems to offer a state-of-the-art direction-finding system. Phased array technology offers a universal DF antenna for existing, as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation on the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows® operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a target is engaged, information on the direction to the target is dynamically updated for display on the PC.



### Operations Supported

■ Locating mobile phones and base stations

■ Tracking mobile phones



# *AmberJack®*
## *Direction-Finding System*

**WIRELESS products group**

### Features

- Determines direction of arrival and received signal strength of a targeted mobile phone's transmission
- Determines direction of arrival and received signal strength of a targeted base station's transmission
- Provides real-time display of direction to the target
- Low power and portable
- User-friendly Graphical User Interface (GUI) for the PC

### Frequency Coverage

- AmberJack-X (U.S. Cellular/PCS 1900)
  - Cellular reverse: 824–849 MHz
  - Cellular forward: 869–894 MHz
  - PCS reverse: 1850–1910 MHz
  - PCS forward: 1930–1990 MHz
- AmberJack-G (EGSM 900/DCS 1800)
  - EGSM reverse: 880–915 MHz
  - EGSM forward: 925–960 MHz
  - DCS reverse: 1710–1785 MHz
  - DCS forward: 1805–1880 MHz

- AmberJack-W (Wideband)
  - iDEN reverse: 806–825 MHz
  - iDEN forward: 851–870 MHz
  - Cellular reverse: 824–849 MHz
  - Cellular forward: 869–894 MHz
  - PCS reverse: 1850–1910 MHz
  - PCS forward: 1930–1990 MHz
  - EGSM reverse: 880–915 MHz
  - EGSM forward: 925–960 MHz
  - DCS reverse: 1710–1785 MHz
  - DCS forward: 1805–1880 MHz
  - UMTS IV reverse: 1710–1755 MHz
  - UMTS IV forward: 2110–2155 MHz
  - UMTS I reverse: 1920–1980 MHz
  - UMTS I forward: 2110–2170 MHz

### External Control

- Laptop PC (Windows® XP Professional)

### Power source

- 12 Vdc at 0.5 A

### Physical Characteristics

- Size: D = 17˝, H = 4.2˝
- Weight: <14 lbs

### Required Accessories (sold separately)

Gossamer with PC Controller, StingRay system, StingRay II, or KingFish with PC Controller

### Optional Accessories

Harpoon™ for DF range extension

### Catalog Part Number

- AJ-X (AmberJack-X)
- AJ-G (AmberJack-G)
- AJ-W (AmberJack-W)

### Authorized Federal Supply Service Information Technology Schedule

- SIN: 132-8 Purchase of Equipment
- SIN: 132-12 Maintenance, Repair Services and Repair Parts/Spare Parts

GSA Contract Number: GS-35F-0293J

General Services Administration Federal Supply Service products and ordering information in this Authorized FSS Information Technology Schedule Pricelist are also available on the GSA *Advantage!* System. Agencies can browse GSA *Advantage!* by accessing the GSA's home page via the Internet at *www.gsa.gov.*



Specifications are subject to change without notice. Harris is a registered trademark of Harris Corporation. AmberJack, KingFish, Gossamer, StingRay, and StingRay II are registered trademarks of Harris Corporation. Harpoon is a trademark of Harris Corporation. Windows XP Professional is a registered trademark of Microsoft Corporation. iDEN is a trademark of Motorola, Inc.

This product is a restricted use item and can be sold only to authorized law enforcement and government agencies. Its use shall comply with all local, state, and federal laws and regulations. Harris Corporation assumes no liability for any misuse or improper use of the product and makes no warranty or representation whatsoever as to its suitability for any specific application.

**DISTRIBUTION WARNING**

This brochure may be provided only to persons eligible under 18 USC 2512 (Government law enforcement agencies or communications service providers).



*assuredcommunications®*

Government Communications Systems | P.O. Box 9800 | Melbourne, FL USA 32902-9800
1-800-358-5297 or wpg@harris.com | www.wpg.harris.com | **www.harris.com**

Copyright © 2008 Harris Corporation 07/08 514176k VP8 d0105





# UMTS IV Converter

## Overview

**UMTS IV Converter** is a high performance Frequency Converter that enables the StingRay® or KingFish® to operate in the CONUS UMTS IV (2100 MHz DL, 1700MHz UL) band. Its high stability and extremely low phase noise performance enables stand-alone-capability; which allows the StingRay/KingFish and Converter to operate with independent references. Its excellent channel-pair rejection enables operation with high-power PAs.

**UMTS IV Converter** enables the StingRay/KingFish to transmit on the UMTS IV downlink band and to receive on both the uplink and downlink bands. It automatically shuts down the downlink receive path during transmit mode, improving system isolation and reducing power consumption.

Active gain compensation guarantees constant gain over temperature, frequency, aging, and other environmental effects during transmit mode and guarantees constant gain over temperature during receive mode.

## Features

**Transmit**
- TX conversion from 1842.5 to 2140 MHz
- 60 MHz low ripple bandwidth
- Circuitry turns off during receive only mode
- Active gain compensation over temp and freq
- Active TX LED status indicator

**Receive**
- RX 1 conversion from 2140 to 1842.5 MHz
- RX 2 conversion bypass
- RX 1 circuitry turns off during transmit mode
- 11dB gain is temperature compensated
- Attenuators are activated from the front panel

**Local Oscillators**
- 0.5° Integrated Phase Noise (100Hz – 1MHz)
- 0.2ppb over temperature, ±25ppb/year aging
- LED status indicator

**Mechanical Housing**
- Rugged welded metal case
- Formed lid for convenient transceiver mounting
- Front panel connectors, controls, and indicators

**UMTS IV Converter**



**StingRay and UMTS IV Converter**



**Accessories included:**
- Transit Case
- AC/DC converter
- DC/DC converter for vehicular operation
- RF cables for StingRay/KingFish connections
- RF cable for PA connection
- Brackets for KingFish installation

*assuredcommunications®*

**HARRIS PROPRIETARY INFORMATION**

**Perez, Raul**

| | |
|---|---|
| **From:** | Vinson, Lin [wvinson@harris.com] |
| **Sent:** | Thursday, July 31, 2008 10:51 AM |
| **To:** | Perez, Raul |
| **Subject:** | t-mobile 2100 network rollout |

Raul,

Here is the info we received on T-Mobile's UMTS (2100 AWS) rollout plans.  Also I have attached copies of
our UMTS converter and AmberJack data sheets for your reference.

Thanks,
Lin

From: Engadget
URL: http://www.engadget.com/2008/07/30/t-mobile-3g-service-coming-october-1-to-27-markets/
Sent from: adam harder (aharder@harris.com)
Sent to: aharder@harris.com
Comments:

# T-Mobile 3G service coming October 1 to 27 markets

**07-30-2008**



We were already <u>pretty sure</u> this would be happening, but it's looking real now, if 8.5 x 11-inch pieces
of paper taped to a window is any indication: T-Mobile is rolling out its 3G service on October 1 to 27
select cities. The above poster was spotted by TmoNews "outside a meeting" and, as you can see, it says,

"10.1.08 3G is Coming." As far as those launch cities, we have a handy little list for you after the break. By the way, it's entirely possible T-Mobile 3G is already live in your market, though, so don't let this confuse you too much. It could just mean you're next, or, at least by October 1.

- New York City
- Austin
- NJ and Long Island
- Las Vagas
- Minneapolis
- Miami
- Dallas
- Chicago
- Houston
- Philadelphia
- Denver
- Detroit
- Orlando
- Kansas city
- Atlanta
- Los Angeles
- New England (whatever that means)
- Portland
- Sacramento
- San Diego
- Seattle
- Washington DC
- San Francisco
- Birmingham
- Memphis
- Tampa
- Phoenix





# StingRay™

## Transportable CDMA Interrogation, Tracking and Location, and Signal Information Collection System

### Product Description

StingRay™ is Harris' latest offering in a long line of advanced wireless surveillance products. StingRay is a multichannel software defined radio that performs network base station surveys, Dialed Number and registration collection, mobile interrogation, and target tracking and location with Harris' Amber-Jack™ Direction-Finding Antenna. This low-power transportable surveillance system is designed with the future in mind—its reconfigurable architecture lends itself to upgrades of new capabilities and wireless standards, while preserving the initial investment in hardware.

### Features

- Software Defined Radio (SDR) enables simultaneous monitoring of up to eight CDMA Paging/Access channel pairs
- Active interrogation capability emulates base station to collect MINs and ESNs through forced registration; external PA output available for higher power requirements
- Interfaces with AmberJack antenna to form a complete target tracking and location solution using active direction-finding and ranging techniques (active approach does not require the target phone to be engaged in a call)

- Optional geolocation software overlays target tracks and tracking vehicle location on a digital map
- Wideband RF front-end provides simultaneous operation in the U.S. cellular 800 and PCS 1900 MHz bands and is preconfigured to support iDEN (low band), GSM 900, and DCS 1800 bands
- PC-based controller running Windows® XP provides an intuitive Graphical User Interface (GUI)
- Industry-standard USB interface enables plug-n-play networking of multiple StingRay surveillance systems if the user requires more channel capacity
- Supports targeting and real-time searching of mobile identification numbers (MIN), dialed numbers, and electronic serial numbers (ESN)
- Low-power system designed for vehicular operations



*HARRIS*

*AmberJack™*

**Dual-Band Direction Finding System**

**WIRELESS products group**

### Product Description

AmberJack™ is a phased array direction finding (DF) antenna system capable of tracking and locating mobile phone users. The DF antenna array is designed to operate with Harris' Loggerhead™ and StingRay™ products enabling tracking and location of AMPS, TDMA and CDMA phones. AmberJack operates in both the cellular and PCS bands.

AmberJack combines Harris' expertise in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction finding system. Beam forming technology offers a universal DF antenna for existing as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows® operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a targeted phone is engaged, information on the direction to the target is dynamically updated for display on the PC.

### Features

- Determines direction of arrival and received signal strength of phone's transmission
- Provides real-time display of direction to the target
- Low power, small size
- User-friendly graphical user interface for the PC or Pocket PC (optional)



*next level solutions*



## Geolocation (Preliminary)

**PC-Based Intelligent AMPS/TDMA and CDMA Tracking and Location**

### Product Description

Geolocation is a PC-based software appli-
cation that allows the user to intelligently
track and locate targeted AMPS/TDMA or
CDMA cellular phones in the 800 and
900 MHz bands. Geolocation consists
of software and an external GPS receiver.
Geolocation will be offered in two options:
an AMPS/TDMA Option to be used in
conjunction with the Harris LoggerHead™
Interrogator plus the PC Controller™ and
the AmberJack™ DF Antenna; and a CDMA
Option to be used in conjunction with the
Harris StingRay™ system plus the Amber-
Jack™ DF Antenna.

Geolocation provides a user-friendly,
geospatially accurate mapping routine
which shows on-screen the exact location
of the tracking vehicle, plus Direction of
Arrival (DOA) information and/or estimated
range/location information on the targeted
phone.

Providing a visual screen of an accurate
local map, the exact location of the track-
ing vehicle, and the approximate location
of the targeted phone, allows for a much
more intelligent and expedient method for
tracking and location.

### Features

- User-friendly application running on
  Windows® 98/2000/XP provides an
  intuitive Graphical User Interface (GUI)

- AMPS/TDMA: Interfaces with the
  LoggerHead™ Handheld Interrogator
  plus the PC Controller™ and the
  AmberJack™ Direction-Finding (DF)
  Antenna

- CDMA: Interfaces with the StingRay™
  plus the AmberJack™ Direction-Finding
  (DF) Antenna

- Provided GPS receiver integrates with
  PC running the application

- Real-time viewing of tracking vehicle
  location

- Real-time viewing of approximate
  targeted cellular phone location

- Tracking missions can be stored for
  post-mission analysis

- Migration path to GSM and future
  cellular standards





# WIRELESS
## products group

## *KingFish™ (Preliminary)*

### Portable CDMA Interrogation, Direction-Finding, and Collection System

## Product Description

KingFish™ provides investigators with a tool that extracts the telephone number (MIN) and Electronic Serial Number (ESN) from a CDMA mobile telephone. The Active Direction-Finding (DF) capability enables location of a powered-on phone without depending on the suspect to be involved on a call. Additionally, KingFish provides passive Dialed Number Recorder (DNR) and Registration Collection capabilities. Passive operations identify calling patterns and provide information on the suspect's area of operation.

KingFish is based on a Software Defined Radio (SDR) architecture, which enables upgrades to future cellular standards, while preserving the initial investment in hardware. As initially offered, KingFish provides CDMA operation in both the Cellular and PCS bands.

## Features

### Covert Packaging
- Concealed radio, antennas, and battery power supply
- Wireless remote control from commercially available Pocket PC

### Intuitive Application Software
- Windows® interface
- Identifies active CDMA channels and catalogs base station parameters
- Provides real-time display of Interrogation and Passive Collection results
- Dynamically updates received signal strength to enable precise location of a target phone



*next level solutions*



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE



## HARRIS GCSD
## PRICE LIST
### Effective September 2008
### All price quotes are in USD ($)

*\*\*\*This price list supersedes all previous price lists. Prices and products are subject to change without notice. Products are subject to discontinuation without notice.\*\*\**



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| | AmberJack® | | |
|---|---|---|---|
| **MODEL NUMBER** | **DESCRIPTION** | **PRICE** | |
| | | 1 to 15 Units | 16+ Units |
| AJ-G | The AmberJack-G DF Antenna is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations Forward and Reverse in the GSM 900 and 1800 MHz Bands.* | $ 24,300 | $ 23,100 |
| AJ-X | The AmberJack-X DF Antenna is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations Forward and Reverse in the GSM 800 and 1900 MHz Bands.* | $ 24,300 | $ 23,100 |
| AJ-W | The AmberJack-W DF Antenna is a wideband phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations Forward and Reverse in the frequency bands from 800MHz to 2100 MHz* | $ 38,400 | $ 36,500 |
| AJ-GUP | AmberJack-G DF Antenna Upgrade.  Upgrades the legacy AJ-DF antenna to the AJ-G antenna. | $ 13,000 | $ 12,400 |
| AJ-XUP | AmberJack-X DF Antenna Upgrade. Upgrades the legacy AJ-DF antenna to the AJ-X antenna. | $ 9,000 | $ 8,600 |
| AJ-WUG | AmberJack-W DF Antenna Upgrade. Upgrades the legacy AJ-DF antenna, AJ-X or AJ-G antenna to the AJ-W antenna. | $ 18,000 | $ 17,100 |
| | *Requires PC Controller Software for Gossamer Operations.* | | |
| ***AmberJack Accessories*** | | **PRICE** | |
| 3088596-101 | Cable Assembly, DBDF Antenna, Loggerhead (12') | $ 650 | |
| 3120038-101 | Cable Assembly, DBDF Antenna, LH/Gossamer (12') (To be used in place of the 3088596-101 for both LH and Gossamer) | $ 650 | |
| KCII/1660 | Cable Assembly, DBDF Antenna, StingRay (12')- (old PN: 3099547-101) | $ 800 | |
| RE0512HA-2 | Carrying Case | $ 890 | |
| DC15A-3J1 | Cable Assembly, 3-Way Splitter | $ 170 | |
| 47621 | Eyebolt, Swivel | $ 54 | |
| 3087877-101 | Power Cable Internal | $ 73 | |
| 47641/94882 | Tool, Eyebolt | $ 15 | |
| 8834T561 | Webbing Assembly, 12ft. | $ 35 | |
| 3087882-101 | Radome Assembly | $ 1,800 | |
| KCII/1672 | Cable Assembly, DBDF Antenna, StingRay (25') | $ 975 | |
| KCII/1684 | Cable Assembly, DBDF Antenna, StingRay (5 meters or 16' 4") - (old PN: 3099547-103) | $ 825 | |
| KCII/1696 | Cable Assembly, DBDF Antenna, StingRay (50') - (old PN: 3099547-102) | $ 1,000 | |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| MODEL NUMBER | DESCRIPTION | PRICE | |
|---|---|---|---|
| **StingRay®** | | 1 to 15 Units | 16+ Units |
| STINGRAY | StingRay (4 module) – 1-CH Xmit Interrogation and Direction Finding Transportable Unit. | $ 75,100 | $ 71,300 |
| SRAY-GSM-SW | **StingRay – GSM Software Package** | $ 22,000 | $ 20,900 |
| SRAY-CDMA-SW | **StingRay – CDMA Software Package** | $ 22,000 | $ 20,900 |
| SRAY-IDEN-SW | **StingRay – iDEN Software Package** | $ 22,000 | $ 20,900 |
| SRAY-UMTS-SW | **StingRay – UMTS Software Package** | N/C | N/C |
| SRAY-GSM-SW-INTCP | **StingRay -- GSM Intercept Software Package without S/C** | $ 27,400 | $ 26,000 |
| SRAY-GSM-SW-INTCP-SC | **StingRay -- GSM Intercept Software Package with S/C** (Restricted Sales only Federal Customer) | $ 50,000 | $ 25,000 |
| UMTS-B1-CONV | **StingRay 2100/1900MHz Down Converter** | $ 16,000 | $ 15,200 |
| UMTS-B4-CONV | **StingRay 2100/1700MHz Down Converter** | $ 16,000 | $ 15,200 |
| AIRBRN-KIT-CONUS | **Airborne DF Kit CONUS** | $ 9,000 | $ 8,550 |
| **StingRay II®** | | | |
| STINGRAY II | StingRay II – 4-CH Multi-Xmit Interrogattion and Direction Finding Transportable Unit. | $ 148,000 | $ 140,600 |
| STINGRAY II-UP | **StingRay II – StingRay to StingRay II Upgrade** | $ 65,000 | $ 61,800 |
| SRAY II-GSM-SW | **StingRay – GSM Software Package** | $ 22,000 | $ 20,900 |
| SRAY II-CDMA-SW | **StingRay – CDMA Software Package** | $ 22,000 | $ 20,900 |
| SRAY II-IDEN-SW | **StingRay – iDEN Software Package** | $ 22,000 | $ 20,900 |
| SRAY II-GSM-SW-INTCP | **StingRay -- GSM Intercept Software Package** | $ 27,400 | $ 26,000 |
| SRAY II-GSM-SW-INTCP-SC | **StingRay -- GSM Intercept Software Package with S/C** (Restricted Sales only Federal Customer) | $ 50,000 | $ 25,000 |
| SRAY II-UMTS-SW | **StingRay – UMTS Software Package** | N/C | N/C |

| _StingRay Accessories_ | | PRICE |
|---|---|---|
| 3092524-102 | Cable Assembly PC/USB - 6' Cable | $ 196 |
| 3092524-103 | Cable Assembly PC/USB - 12' Cable | $ 220 |
| 3092525-101 | Cable DC Power | $ 171 |
| RE1017HA | Carrying Case | $ 925 |
| 17250 | 115V Power Cord | $ 8 |
| 2009523-101 | Laptop PC Controller (Dell Latitude D630) | $ 3,500 |
| 2009525-101 | Panasonic Toughbook Computer | $ 6,500 |
| DE2035-803 | Adapter, DC (Laptop) (non- Charging) | $ 226 |
| 2009523-003 | Mouse, CMPTR (Micro Trac) | $ 50 |
| 2009523-002 | Auto Power Adapter (8500 & D600) | $ 128 |
| OSMM-SA-20 | Mobile Mast 20' | $ 2,990 |
| PE3665-144 | 12' Extension Cable (TNC to N) | $ 80 |
| PE3414-144 | 12' Extension Cable (TNC to TNC) | $ 85 |
| PE9131 | N-F to TNC-F Adapter | $ 48 |
| PE9099 | TNC-F to TNC-F Adapter | $ 28 |
| PE9090 | N-M to TNC-F Adapter | $ 30 |
| PE9089 | N-F to TNC-M Adapter | $ 28 |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| StingRay Accessories continued... | | PRICE | |
|---|---|---|---|
| Y2287A-66 | Directional Antenna, Yagi (GSM) Pole Mount | $ | 100 |
| FPPA-400 | Field Portable Power Adapter (Military Vehicles) | $ | 2,900 |
| FPPS-375 | Field Portable Power Source (Battery Pack) | $ | 1,700 |
| FPACPS | Field Portable AC Power Source | $ | 900 |
| 3092527-201 | SDR Radio Slice | $ | 15,000 |
| 3092577-101 | DC-DC Power Supply Module (SR & KF) | $ | 1,400 |
| WSA-00045 | Duplex Filter (AMPS/PCS) Stand Alone | $ | 1,970 |
| WSA-00100 | Duplex Filter (EGSM/DCS) Stand Alone | $ | 2,310 |
| 3174173-101 | Quad Band Mag Mount Antenex Antenna (TNC) | $ | 125 |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| KingFish® | | | |
|---|---|---|---|
| **MODEL NUMBER** | **DESCRIPTION** | **PRICE** | |
| | | 1 to 15 Units | 16+ Units |
| KINGFISH | **KingFish** – Man Portable Interrogation and Direction Finding Unit for the CDMA waveform | $ 27,800 | $ 26,400 |
| KF-GSM-SW | **KingFish** – GSM Software Package | $ 18,100 | $ 17,200 |
| KF-CDMA-SW | **KingFish** – CDMA Software Package | $ 18,100 | $ 17,200 |
| KF-IDEN-SW | **KingFish** – iDEN Software Package | $ 18,100 | $ 17,200 |
| KF-UMTS-SW | **KingFish** – UMTS Software Package | N/C | N/C |

| *KingFish Accessories* | | **PRICE** |
|---|---|---|
| 3100242-101 | Tote Bag Assembly | $ 570 |
| RE0513HA | Carrying Case, KingFish | $ 950 |
| 3092524-102 | Cable Assembly, W102 (PC USB Type A) 6' cable | $ 196 |
| 3092525-101 | Cable DC Power | $ 171 |
| 2014068-101 | Battery Pack (11.1V) | $ 256 |
| 2014068-102 | Lithium-Ion Battery Charger | $ 426 |
| VA2524 | Battery, Adapter, Lighter (24V, 1.5A) | $ 140 |
| ACHA-12501 | Power Supply (12V, 5A) | $ 190 |
| 3118694-201 | Quad Band Yagi (Wedge) including 6ft cable (PE 3076-72) | $ 1,300 |
| PE3076-72 | Cable Assembly, RF (SMA-M to RTANGM-M) 6' | $ 104 |
| PE3076-144 | Cable Assembly, RF (SMA-M to RTANGM-M) 12' | $ 108 |
| 2014620-001 | Antenna Device, Wave, PCS/Cell (Green) | $ 22 |
| 2014628-001 | Antenna, ¼ Wave (2.4 GHZ) (Bluetooth) | $ 18 |
| 2014629-002 | Antenna Device, Wave, GSM (Orange) | $ 22 |
| 3100242-103 | Backpack Carrying Case Custom (Blue) | $ 660 |
| 3100242-104 | Backpack Carrying Case Custom (Army Digi-Camo) | $ 660 |
| 3174173-102 | Quad Band Mag Mount Antenex Antenna (SMA) | $ 125 |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| PC Controllers | | |
|---|---|---|
| **MODEL NUMBER** | **DESCRIPTION** | **PRICE** |
| 2009523-101 | Laptop PC Controller (Dell Latitude D630) | $ 3,500 |
| 2015651-101 | Mini PC Controller (OQO) | $ 3,200 |
| 2014069-101 | Rugged Mini PC Controller (GD Go Book) | $ 4,900 |
| 3084625-101 | Laptop Computer, Lightweight, Low Power, 12" Screen | $ 3,000 |
| 2009525-101 | Panasonic Toughbook Computer | $ 6,500 |
| *PC Controller Accessories* | | **PRICE** |
| 3058870-101 | Serial Cable | $ 40 |
| 2009523-003 | Mouse, CMPTR (Micro Trac) | $ 50 |
| 2009523-002 | Auto Power Adapter (8500 & D600) | $ 128 |

| Harpoon High Powered Amp 30 Watt Filtered | | | |
|---|---|---|---|
| **MODEL NUMBER** | **DESCRIPTION** | **PRICE** | |
| | | **1 to 15 Units** | **16+ Units** |
| PA-KIT-30W iDEN 800 | High Powered Filtered 30W PA Kit - Single Band iDEN 800 | $ 14,000 | $ 13,300 |
| PA-KIT-30W 2100 | High Powered Filtered 30W PA Kit - Single Band UMTS 2100 | $ 16,000 | $ 15,200 |
| PA-KIT-30W Dual-Band CONUS | High Powered Filtered 30W PA Kit - Dual Band 850/1900 | $ 17,500 | $ 16,600 |
| PA-KIT-30W Dual-Band OCONUS | High Powered Filtered 30W PA Kit - Dual Band 900/1800 | $ 17,500 | $ 16,600 |
| 3184472-101 | Harpoon Diplexer Kit (Use w/SR I) | $ 650 | $ 650 |
| | Need Mag Mount Antenna Specified | | |

| UMTS Band Converters | | | |
|---|---|---|---|
| **MODEL NUMBER** | **DESCRIPTION** | **PRICE** | |
| | | **1 to 15 Units** | **16+ Units** |
| CONV-2100/1700 | UMTS Band IV - AWS Converter | $ 16,000 | $ 15,200 |
| CONV-2100/1900 | UMTS Band I Converter | $ 16,000 | $ 15,200 |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

HARRIS Wireless Products Group
PO Box 9800
Melbourne, Florida 32902
1-800-FL8-LAWS (1-800-358-5297) Fax: 321-309-7437

## ATTACHMENT 12

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 12:   Coast to Coast AM, *Lee Lapin - Guests - Coast to Coast AM, Lee Lapin
Biography*, http://www.coasttocoastam.com/guest/lapin-lee/6469 (last
accessed: Mar. 11, 2011);

About | Contact | Site Map | FAQs | Submissions | Site Feedback



Designer jewelry to enhance your own natural beauty.



**Coast to Coast AM - Live Nightly 1am-5am EST / 10pm-2am PST**

HOME    SHOWS    GUESTS    ARTICLES    MEDIA    HOSTS    STATIONS    STORE

LEARCAPITAL          Interest Rates Are Rising - :          click here to    FREE Special Report

Home > Guests > Lee Lapin

[ Like ]

# Lee Lapin

## Biography:

Lee Lapin works as a private detective, certified voice stress analyst, and is licensed as a surveillance consultant. He has written 23 books, that include six or seven on the fields of electronic surveillance, black bag entry techniques, physical surveillance, and personal intelligence gathering. He has produced a number of videos on these same subjects and has the capability to write, consult or demonstrate most of the latest techniques and equipment in both government and private arenas.

Lee has worked with several agencies, both public and private, helping to develop surveillance and tracking equipment and techniques. His works ("letters on file") are employed as textbooks by many of the world's major intelligence agencies including the CIA, KGB and MOSSAD, the Justice Department, IRS, ATF, even the FBI. In addition, Lee has appeared on several national talk shows and has been featured on the front page of the NY Times, in People Magazine, Associated Press, and in many other magazines and newspapers.

## Past Shows:

### Surveillance & Privacy Invasion

*Tuesday March 1, 2005*
Private investigator and electronic engineer Lee Lapin (intelligencehere) shared the latest tricks and techniques of surveillance used by the world's best agents and trackers. Optical surveillance, which is often legal, has had significant advancements in recent years. For instance, he cited how the DEA might set up a camera placed inside a plastic street cone to view through a person's window. Some cameras, he continued, have been reduced to the size of a dime and can go under doors or through a keyhole. In terms of audio surveillance, many new bugs are cell phone-based, said Lapin. If a person wanted to know if their phone was bugged, he suggested buying a second phone of the same model and taking both apart to see if there was anything extra in the suspected phone. He also talked about how private details about people are often culled through "pretexting," a now illegal method, where personal information is gained by someone under false pretenses. Lapin said he is cu ... More
**Host:** George Noory

**Websites:**
- intelligencehere.com

**Books:**
- How to Get Anything on Anybody: Book 3
- How to Get Anything on Anybody: Book II
- Spygame: Winning Through Super Technology
- The Extreme Covert Catalogue
- Whole Spy Catalogue

- Geopolitical Disclosures - Shows
- Will the end of the world take place on May 21, 2011 as some groups believe? - Polls
- Enochian Magic & Crystal Skulls - Shows
- Electronic Harassment / Paranormal Techniques - Shows
- Serial Killers - Shows





Designer jewelry to enhance your own natural beauty.

Check out our calendar for George Noory's public appearances in 2011.

## George's
### Child of the Day

**coasttocoastam**

*about 7 hours ago*
Fish suffocate, die in Redondo Beach marina: Millions of fish were found dead in a Redondo Beach marina early ...
http://bit.ly/dXBMM8

*about 13 hours ago*
News segment guest: Gerald Celente
http://www.trendsresearch.com

*about 18 hours ago*
George Noory: Hey Coast Insiders, our first video chat tonight:
http://tinyurl.com/C2CxChat 8pm PT; also my 1st hour guest is Alex Jones.

*5:40 PM yesterday*
UFO Mystery in Australia: Strange glowing

balls of light show up four nights in a row.
http://bit.ly/g11BUb

*6:13 AM yesterday*
News segment guests: Dr. Sherri Tenpenny
http://drtenpenny.com / Jerome Corsi

All Tweets



CoasttoCoastAM.com - © 2011 Premiere Radio Networks Inc.

**Shows**
- Recent Shows
- Show Archives
- Classic Shows
- Somewhere in Time with Art Bell
- Upcoming Shows

**Guests**
- Recent Guests
- Guest Archives

**Articles**
- Recent Articles
- Article Archives
- In the News

**Photos**
- Photos
- Albums
- Photo Archives
- Submit Your Photo

**General Navigation**
- Full Site Map
- Home
- George's Calendar
- Radio Stations
- About
- Contact
- User Submissions
- Emerging Artists

**Subscription & Merchandise**
- Coast Insider
- New Member Signup
- iPhone App
- Store
- E-Newsletter
- RSS

**Help & Customer Support**
- Customer Service
- FAQs
- iTunes Podcast Help (PDF)
- MP3 Downloads Help

**Legal**
- Copyright & Trademark
- Privacy Policy
- Terms of Use
- Contest Rules