Daniel Rigmaiden
Agency # 10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132
Telephone: none
Email: none

Daniel David Rigmaiden
Pro Se, Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

|  |  |
|---|---|
| Daniel David Rigmaiden, | Civil Action No.: |
| Plaintiff, |  |
| v. | 12-CV-01605-SRB-BSB |
| Federal Bureau of Investigation, et al. | DANIEL RIGMAIDEN'S SECOND DECLARATION UNDER PENALTY OF PERJURY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Defendant. |  |

Plaintiff, Daniel David Rigmaiden, being competent to make this declaration and having personal knowledge of the matters stated herein, declares pursuant to 28 U.S.C. § 1746:

**A.    RE: my ability to disseminate StingRay related FOIA responses to the public.**

1.    My contact at *The Wall Street Journal* is Jennifer Valentino-DeVries, a reporter who has written extensively on the government's use of portable/transportable wireless device locators in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC. *See, e.g.*, Valentino-DeVries, Jennifer (The Wall Street Journal), *'Stingray' Phone Tracker Fuels Constitutional Clash*, p. A1 (Sept. 22, 2011) (original article addressing CR08-814-PHX-DGC) *available at*

http://online.wsj.com/article/SB10001424053111904194604576583112723197574.html (last accessed: Sept. 22, 2011); Valentino-DeVries, Jennifer (The Wall Street Journal), *Feds Shift Tracking Defense: Prosecutors in Arizona Case Drop Position That 'Stingray' Use Didn't Require Warrant*, (Nov. 3, 2011) *available at* http://online.wsj.com/article/SB10001424052970204621904577014363024341028.html (last accessed: Nov. 15, 2011).

2.     Had the Federal Bureau of Investigation ("FBI") and Executive Office for United States Attorneys ("EOUSA") complied with my FOIA requests and provided the requested records within the required time frames, I would have forwarded FOIA response records on Harris WPG devices to Jennifer Valentino-DeVries—free of charge—prior to the publishing of her more recent articles and blogs (*i.e.*, 2012-2013) addressing cell phone tracking and locating.

3.     My contact at *Wired Digital* is Kim Zetter, a reporter who has written at least three articles on the government's use of portable/transportable wireless device locators in United States v. Rigmaiden, CR08-814-PHX-DGC. *See, e.g.*, Zetter, Kim (Wired Digital), *Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight* (Apr. 09, 2013), *available at* http://www.wired.com/threatlevel/2013/04/verizon-rigmaiden-aircard/all/ (last accessed: Apr. 10, 2013); Zetter, Kim (Wired Digital), *Judge Allows Evidence Gathered From FBI's Spoofed Cell Tower* (May 08, 2013), *available at* http://www.wired.com/threatlevel/2013/05/rigmaiden-cell-tower-evidence/ (last accessed: May 14, 2013).

4.     Prior to publishing her article titled "Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight" (Aug. 9, 2013), Kim Zetter of *Wired Digital* mailed me a letter (dated April 3, 2013) requesting to speak with me.  The above noted letter is attached to this declaration as ATTACHMENT 01 and is admissible under Fed. R. Evid. 901(a), and Fed. R. Evid. 901(b)(4).  I certify that ATTACHMENT 01 is a true and correct copy of the original Kim Zetter letter currently in my possession, other than for my redactions of Kim Zetter's email address and phone number via white boxes with black outlines.

5. Had the FBI and EOUSA complied with my FOIA requests and provided me the requested records within the required time frames, I would have forwarded FOIA response records on Harris WPG devices to Kim Zetter—free of charge—prior to the publishing of her August 9, 2013 article.

6. Prior to publishing his article titled "LAPD Spy Device Taps Your Cell Phone - StingRay is secretly used without warrants" (Sept. 13, 2012), Jon Campbell of *LA Weekly News* requested that I speak with him about portable/transportable wireless device locator technology in preparation for his article. Mr. Campbell made the request via email (dated July 26, 2012) through my court-appointed shadow counsel's assistant, Dan Colmerauer, who assists me in my criminal case, United States v. Rigmaiden, CR08-814-PHX-DGC. A print-out of the above noted email is attached to Dan Colmerauer's declaration, which is attached to this declaration as ATTACHMENT 02 and is admissible under Fed. R. Evid. 901(a), and/or Fed. R. Evid. 901(b)(4). I certify that ATTACHMENT 02 is a true and correct copy of the original declaration by Dan Colmerauer currently in my possession.

7. Had the FBI and EOUSA complied with my FOIA requests and provided me the requested records within the required time frames, I would have forwarded FOIA response records on Harris WPG devices to Jon Campbell—free of charge—prior to the publishing of his September 13, 2012 article.

8. During and after the litigation of my *Motion To Suppress* in United States v. Rigmaiden, CR08-814-PHX-DGC, I have been in contact with Hanni Fakhoury, a civil rights attorney working for the Electronic Frontier Foundation ("EFF"),[1] and Linda Lye, a civil rights attorney working for the America Civil Liberties Foundation ("ACLU").

9. Had the FBI and EOUSA complied with my FOIA requests and provided me the requested records within the required time frames, I would have forwarded FOIA response records on Harris WPG devices to Linda Lye and Hanni Fakhoury free of charge.

10. As soon as the FBI and EOUSA comply with my FOIA requests, I will forward FOIA response records on Harris WPG devices to, at the very least, Jennifer Valentino-

---

1. My old EFF contact, Kevin Bankston, no longer works at the EFF.

1  DeVries (The wall Street Journal), Kim Zetter (Wired Digital), Jon Campbell (LA Weekly

2  News), Lind Lye (ACLU), and Hanni Fakhoury (EFF)—all free of charge.

3       11.    As soon as the FBI and EOUSA finish complying with my FOIA requests, I will

4  have FOIA response records on Harris WPG devices uploaded to a website which will be

5  accessible to all members of the public free of charge. If I am still incarcerated when

6  receiving the records, I will accomplish the complete dissemination through either Dan

7  Colmerauer or through one of my contacts noted in ¶ No. 10 above.

8          **B.**    **RE: my communications with Defendant FBI relating to processing**

9              **of my October 10, 2011 FOIA request.**

10       12.    Via letter dated September 25, 2013 (received September 30, 2013), the FBI

11  provided me with additional information regarding my October 10, 2011 FOIA request, *i.e.*,

12  "FOIPA Request No.: 1212582" with "Subject: WIRELESS DEVICE LOCATORS

13  MANUFACTURED BY HARRIS WPG." Attached as <u>ATTACHMENT 03</u> is the FBI's

14  September 25, 2013 letter. The attached is admissible under Fed. R. Evid. 901(a), and Fed. R.

15  Evid. 901(b)(4). Pursuant to Fed. R. Evid. 901(a) and Fed. R. Civ. P. 56(e)(1), I certify that

16  the attachment is a true and correct copy of the original currently in my possession.

17       13.    In the September 25, 2013 letter, the FBI noted its previous May 1, 2013

18  position that "pursuant to FOIA exemption (b)(7)(E) [5 U.S.C. § 552 (b)(7)(E)], the FBI

19  could neither confirm nor deny the existence of records responsive to [][my] request." *Id.*

20  The FBI then stated in the letter that it "has since determined that **it can now confirm that**

21  **records responsive to this part of your request exist**; however, a substantial portion of

22  these records remain exempt under 5 U.S.C. § 552 (b)(7)(E)." *Id.* (emphasis in original).

23       14.    In the September 25, 2013 letter, the FBI also informed me that (**1**) my fee

24  waiver request is denied, (**2**) the FBI has identified 15,377 pages of records responsive to my

25  FOIA request, (**3**) I would need to pay the FBI $15.00 per CD to receive approximately 4,377

26  documents that are now ready to be sent (a total of $30.00 for two CDs), (**4**) the remaining

27  11,000 pages need to be searched for material related to "Harris Corporation," (**5**) the

28  disclosable portion of the 11,000 pages can be provided on CDs at $15.00 per CD, (**6**) my

1    expedited processing request is denied, and (**7**) there is no estimate on how long the 11,000

2    pages will take to process for release. *See id.*

3          15.     While no time estimate was provided in the September 25, 2013 letter, counsel

4    for Defendant FBI, Kimberly Herb, informed me via telephone on September 26, 2013 that

5    the FBI is only willing to process 500 pages per month, of non-native digital form records,

6    and provide me with interim releases via one CD per month.  Therefore, the FBI wants me to

7    wait 22 months to receive the disclosable portion of the estimated 11,000 records and pay

8    $330.00 for an estimated 22 CDs.  Added to the $30.00 for the first two CDs containing the

9    4,377 records already processed, minus the $10 credit for the equivalent of 100 free paper

10   record print-outs (*see* 5 U.S.C. § (a)(4)(A)(iv)(II)), the total amount of money the FBI wants

11   me to pay for the disclosable portion of the 15,377 records on 24 CDs is **$350.00**.

12         16.     During the September 26, 2013 phone call and during another phone call on

13   October 23, 2013, Ms. Herb informed me of the following: (**1**) the FBI voluntarily reversed

14   its legal position of neither confirming nor denying the existence of records responsive to my

15   October 10, 2011 FOIA request (*i.e.*, its prior *Glomar* response no longer applies), (**2**) native

16   form digital records will not be provided by Defendants, (**3**) metadata will not be provided by

17   Defendants, and (**4**) the FBI will not charge me search and review fees, but it will seek to

18   charge me duplication fees.[2]

19         17.     Via letter dated October 21, 2013, I responded to the FBI's September 25, 2013

20   letter.  The letter was mailed to the FBI on October 23, 2013, certified return receipt article

21   No. 7011 2970 0002 4750 2960.  Attached as <u>ATTACHMENT 04</u> is the October 21, 2011

---

22   2.    Ms. Herb informed me that the FBI agreed to not charge search and review fees based

23   on a *possible* application of 5 U.S.C. § 552(a)(4)(A)(viii) ("An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this

24   subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs

25   (6)(B) and (C), respectively) apply to the processing of the request.") and 5 U.S.C. § 552(a) (4)(A)(ii)(III) ("for any request not described in (I) or (II), fees shall be limited to reasonable

26   standard charges for document search and duplication [(but *not* review)].").), and because responsive records had already been searched for and located while processing similar FOIA

27   requests.  However, because the FBI believes that I am not the type of requester defined in clause (ii)(II) [5 U.S.C. § 552(a)(4)(A)(ii)(II)], the FBI will still seek to charge me duplication

28   fees, notwithstanding any *possible* violation of FOIA time limits and searches having already been completed.

1  response letter. The attached is admissible under Fed. R. Evid. 901(a), and Fed. R. Evid.

2  901(b)(4). Pursuant to Fed. R. Evid. 901(a) and Fed. R. Civ. P. 56(e)(1), I certify that the

3  attachment is a true and correct copy of the copy of the letter currently in my possession. I

4  mailed the original letter to the FBI and I believe it to be in the government's possession.

5       18.    In the October 21, 2013 letter, I generally informed the FBI: (**1**) I initially

6  requested that all records be provided in native digital form rather than in paper print-out

7  form or in the typical *native-digital to paper-print to digital-scan to paper-print to digital-*

8  *scan to OCR PDF* form, (**2**) the FBI processing 3000 "pages" of records per month would be

9  fair attention paid to my FOIA request, and (**3**) I am not required to pay any search, review, or

10  duplication fees. *See id.*

11       19.    I also provided the FBI with an address of where to mail me the CDs containing

12  the responsive records. *See id.* I explained that, notwithstanding my FOIA request for native

13  form digital records and metadata, I am willing to accept the FBI's 15,377 pages of non-

14  native form records (*i.e.*, the *native-digital to paper-print to digital-scan to paper-print to*

15  *digital-scan to OCR PDF* records), "review those scans and identify specific records I need in

16  native digital form with metadata intact." *Id.* I explained to the FBI that "[t]his should act to

17  narrow my request in regards to the FBI's obligation to provide me with native form digital

18  documents and other digital records as requested." *Id.* However, I only expect to eliminate

19  pages that are exact duplicates of other pages. The FBI advised me in the September 25,

20  2013 letter that "some of the 4377 pages preprocessed may be included in the over 11,000

21  pages of material to be re-reviewed..." *See* <u>ATTACHMENT 03</u>. Based on a comparison of

22  black pixels and page coverage, I may be able to identify duplicate pages using automation

23  software. Such a process would be far more forgiving than OCR, which needs to identify

24  many small, independent pixel formations representing alphanumeric characters.

25       20.    In addition to mailing the October 21, 2013 letter to the FBI, I also had a CCA-

26  CADC staff member fax the letter to the FBI at (540) 868-4997. Attached as <u>ATTACHMENT</u>

27  <u>05</u> is my October 21, 2011 response letter [FAXED TO THE FBI BY CCA-CADC STAFF

28  MEMBER ON OCTOBER 23, 2013]. The attached is admissible under Fed. R. Evid. 901(a),

1   and Fed. R. Evid. 901(b)(4). Pursuant to Fed. R. Evid. 901(a) and Fed. R. Civ. P. 56(e)(1), I

2   certify that the attachment is a true and correct copy of the hard copy of the fax currently in

3   my possession. The electronic version of the fax was sent to the FBI at (540) 868-4997 and I

4   believe it to be in the government's possession.

5         21.     In addition to mailing the October 21, 2013 letter to the FBI, I also had Dan

6   Colmerauer fax the letter to the FBI at (540) 868-4997. Attached as <u>ATTACHMENT 06</u> is

7   my October 21, 2011 response letter [FAXED TO THE FBI BY DAN COLMERAUER ON

8   OCTOBER 24, 2013]. The attached is admissible under Fed. R. Evid. 901(a), and Fed. R.

9   Evid. 901(b)(4). Pursuant to Fed. R. Evid. 901(a) and Fed. R. Civ. P. 56(e)(1), I certify that

10   the attachment is a true and correct copy of the hard copy of the fax currently in my

11   possession. The electronic version of the fax was sent to the FBI at (540) 868-4997 and I

12   believe it to be in the government's possession.

13         **C.**     **RE: public need for native form digital records as opposed to paper**

14                   **print-outs scanned back into digital form.**

15         22.     This section of the declaration explains how **it is in the public interest** for

16   Defendants FBI and EOUSA to provide me with all records in native digital form, as required

17   by the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110

18   Stat. 3048, 3049 (codified as amended at 5 U.S.C. § 552(f)(2)), and as requested in all three

19   of my initial FOIA request letters. *See Complaint*, EXHIBIT 01, EXHIBIT 05, and EXHIBIT

20   11 (Dkt. #001-1). This section also explains how Defendant FBI and EOUSA can easily

21   locate, redact, and provide the requested records in native digital form.

22         23.     My three pending FOIA requests ask that "all digital documents be provided in

23   their original native form[.]" *See id.* Since making my requests, neither the FBI nor the

24   EOUSA have provided me with native form digital records and no indication has been made

25   by either defendant that native form digital records will be provided. However, since making

26   my requests, counsel for Defendants, Kimberly Herb, informed me via telephone that native

27   form digital records will not be provided by Defendants. After I became aware on September

28   30, 2013 that Defendant FBI would be processing at least 15,377 "pages" of records (4,377 of

1  those ready to be sent) as paper print-outs scanned back into PDF files, I then knew that the

2  sheer volume of records absolutely necessitates native digital form disclosure, else both

3  myself and other members of the public will be unable to organize and search the records in

4  an intelligible manner.  Below, I use the FBI's 94-page paper print-out response to my

5  November 10, 2011 FOIA request to show a real-world example of how non-native form

6  digital records hinder public understanding of FOIA content when thousands of pages are

7  produced.

8       24.     On July 12, 2013, when Defendant FBI responded to my November 10, 2011

9  FOIA request RE: comments made to *The Wall Street Journal* and the Brookings Institution,

10  it provided me with 94 pages of paper-form documents (*i.e.*, non-native digital form records).

11  *See Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's*

12  *Motion For Partial Summary Judgment*, ATTACHMENT 50.  The records were copies of

13  emails with attachments.

14       25.     The non-native digital form, paper print-out documents in Defendant FBI's July

15  12, 2013 FOIA response were created as follows: (**1**) native form digital email files were

16  opened in an email viewing program, (**2**) the emails were printed out to paper, (**3**) the paper

17  print-outs were scanned into PDF files so as to make secondary digital form files, (**4**) the PDF

18  files containing the paper scans were loaded into a PDF editing program, (**5**) digital

19  redactions were added by drawing white boxes with black borders over text, (**6**) once

20  redactions were complete, the redacted documents were again printed to paper, (**7**) these

21  paper print-outs were then scanned into PDF files (for archival) so as to make digital form

22  files now twice removed from their original native digital form, and (**8**) the 94-page archive

23  was then printed to paper and mailed to me as a FOIA response.

24       26.     After receiving the FBI's 94-page paper-form FOIA response, I had the

25  documents scanned into a PDF file and Optical Character Recognition ("OCR") was

26  performed on the file in order to convert the flat image text into vector based, keyword

27  searchable text.  The program used for OCR was Nitro PDF Professional 6.1.2.1 with OCR

28  conversion "Quality" set on "High."  By converting the flat image text to vector based text

- 8 -

1  via OCR, members of the public will be able to run keyword searches within the 94-page

2  FOIA response (as a PDF file) in order to more quickly locate information relevant to FBI

3  policies and practices vis-a-vis Harris devices.

4      27.    However, performing keyword searches on the OCR converted records is not an

5  adequate replacement for either (**1**) keyword searches conducted on the native form digital

6  email files (*e.g.*, *.eml files if using a program such as Microsoft Outlook or *.mht files if

7  using a web based email account) containing the original vector based text (*See* ¶ No. 41,

8  *infra*), or (**2**) keyword searches conducted on the digital-print-to-PDF versions of the native

9  form digital files (*i.e.*, *.eml or *.mht files digitally converted into PDF files using a free PDF

10  print driver such as PrimoPDF[3] or doPDF),[4] which preserves the original vector based text

11  without the need for printing to paper, scanning to PDF, and after-the-fact OCR conversion.

12  *See* ¶¶ Nos. 38-40, *infra.* (explaining the digital print-to-PDF and redaction method).

13      28.    Attached as ATTACHMENT 07 is page No.1 of 94 of the OCR converted PDF

14  file created from the 94 paper records provided to me by the FBI on July 12, 2013.  The

15  attached is admissible under Fed. R. Evid. 901(a), and Fed. R. Evid. 901(b)(4).  Pursuant to

16  Fed. R. Evid. 901(a) and Fed. R. Civ. P. 56(e)(1), I certify that the attachment is a true and

17  correct copy of the original currently in my possession.

18      29.    I previously opened the digital version of ATTACHMENT 07 using Nuance

19  PDF Reader 6.0, selected all of the OCR converted vector based text, and copied it to my

20  computer clipboard.  The copied text is pasted below:

21
22    · kRMD) (FBI)
  ·Fro~:,
23  I I
Sent: 'Friday. September 16. 20116:30 PM
24  To: Sabol. Sherry E.
Subject: RE: Wall Stree~ Journal request -legal s.tatus of ·stin~ray" technology
25  b5 -1
b6 -1
26  b7C -1
27
_____
28  3.  *See* http://www.nitrodf.com (last accessed: 2010).
4.  *See* http://www.dopdf.com (last accessed: 2010).

1  One addition from OPA as follows. L~t me know if you hear back from OID.
   Tha'nksl
2  From.: Sa~, Sherry E.
   Sen' '
3  To~ __ ~~~~~~~ _ ~~~~~~~~. ----------,
   Cc: Hess, Amy S.; Slyars, 0 Keith; talMlelt, elaine N.; Kortan, Michael P.
4  Subject: Re: Wan Street Journal request -le:gal status of
   -stfng,ray""tech':'~~----"""
5  OTO·1s this good to go?
6  b6 -1
   b7C -1
7  Fro-:n: sabo', S~,r:F:..... ----------- -.
   To: Sabol"Sherri E.j
8  Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine, N.; kOitanJ
   'Sent: Fit Sep 1~ 16:48:15 2Qll '-- ---1
9  Subject: RE: Wall Street Journa' request, -legal status o(~stfngray"" tech~, '
10 I inadvertently took OPA off the e,arlier'version -Iknow they have. a deadlin'e of
   C.08 today.
11 b6 -1
   b7C -1
12 From: Sabol"Sherry E.
   .sent:::=
13 1§ 2QU 4:12 PM
14 ~ H~~rs, lfKeith; Uirnmert; saine N.
   Subject: RE: Wall Street Joumal request -legal status of -stingray"" technology
15 .Importance: High .,
16 b5 -1
   b7E -1
17 W5JCELL-l
   _-'---'--_-=-:___.c.=..;.,;:___ _ , _
18

19     30.     Attached as <u>ATTACHMENT 08</u> is page No.1 of 85 of the Electronic Privacy

20 Information Center's ("EPIC") identical version of the FOIA response record at

21 <u>ATTACHMENT 07</u>, but provided directly to EPIC by the FBI in response to EPIC's own

22 FOIA request.  The attached is a printed Internet resource and is admissible under Fed. R.

23 Evid. 901(a), and Fed. R. Evid. 901(b)(4).  Pursuant to Fed. R. Evid. 901(a) and Fed. R. Civ.

24 P. 56(e)(1), I certify that the attachment is a true and correct copy of the printed Internet

25 resource provided to me by Dan Colmerauer.  Upon information provided to me by Mr.

26 Colmerauer, the printed Internet resource was obtained by him from

27 http://epic.org/foia/fbi/stingray/FBI-FOIA-Release-07122013-s1-OCR.pdf (last accessed:

28 Oct. 1, 2013).

31.    I previously opened the digital version of <u>ATTACHMENT 08</u> using Nuance PDF Reader 6.0, selected all of the OCR converted vector based text, and copied it to my computer clipboard.  The copied text is pasted below:

> _____-----"~,:.;,;RM~D
> .. )...
> (F.;;:
> BI~)======:::;- _
> Sent:
> SUbJect:
> 1=riaaY.:seiPiennEeirTa: 2011 6:30 pM
> Journal request •• Iegal status of ·stingray" technology
> b:::' 1
> 1
> One addition from OPA as follows. let me know if you hear back from OTD.
> Tha-nksl
> Sent:Flida
> TO~---=----=~~~=__=_:___=_--_:___=~___=_:___="~~_:___=_=__rL..-----
> ___,
> Cc: Hess, Amy S.; Bryars, DKeith; Lammert, Elaine N.; Kortan, Michael P.
> Subject: Re: Wall Street Journal request --legal status of
> "stl~ray""" tEdlra<5gy-------I
> Fro':'1: sabol, S.herryJ= L,
> ~:~ :~:,~~7;EB~ars, 0 Keith; Lammert, ElalneN.;
> Kortan~ ~
> 'Sent: Fri 5ep 16 16:48:15 2011 '- - - - - - - - - -
> SubJec.t: RE: Wall Street Journal request --legal status of "stingray" tEdinology
> ,
> I inadvertently took OPAoff the
> ~arlierversion -I know they have a deadline of COB today.
> From: sabol, _Sherry E.
> '5e~rt§l2Q11'1:lZPM
> Tal
> Cc: Hess,
> ~y s;; Bryars, (iReith; ta'mmert, Elaine
> N~
> SubJec.t: RE: Wall Street Journal request -legal status of "stingray" tEdinology
> b7C -1
> b5 -1

32.    As the two blocks of OCR converted text show, the manner in which the FBI provides FOIA records significantly hinders one's ability to digitally search and organize responsive text.  For example, one line in my version of the FOIA record machine-reads, "Subject: RE: Wall Street Journa' request, -legal status o(~stfngray"" tech~,'." while it should

- 11 -

1   read, "RE: Wall Street Journal request -- legal status of 'stingray' technology." If searching

2   for the keyword "stingray" or "Wall Street Journal," the quoted line will not match. This is

3   because the OCR conversion turned the flat image form of "stingray" into "stfngray" and

4   "Journal" into " Journa." EPIC's version of the FOIA record suffers similar problems. For

5   example, two occurrences of the word "Subject" converted into "SubJec.t," which would

6   prevent automation software from mining the PDF file so as to create a database of email

7   subject lines for easy public viewing and retrieval. The above are only three of many

8   examples showing how running OCR conversion on the FBI's 94 pages of non-native form

9   FOIA response records failed to make up for a lack of native form digital records.

10       33.     Most people do not have the time to read 94 pages of government documents,

11   let alone the 15,377 pages[5] that still need to be provided to me by the FBI. Keyword

12   searches will be the primary method used to locate information of interest. In order for the

13   records to adequately aid public understanding via keyword searches, the text needs to be in

14   original vector based form—as provided by native form digital files (*See* ¶ No. 41, *infra*), or

15   in vector-to-vector conversion form as created by the PrimoPDF and doPDF print drivers.

16   *See* ¶¶ Nos. 38-40, *infra*. (explaining the digital print-to-PDF and redaction process). If given

17   the native form digital records or an equivalent, I will be able to load the vector based text

18   into an SQL database, using PostgreSQL,[6] which will allow for sophisticated, error free

19   keyword search functions to be performed by members of the public. I will make the SQL

20   database and search features freely accessible to the public via a website.

21       34.     In addition to the poor keyword conversions present in the FBI's non-native

22   digital form records, the dates for the emails also rarely converted properly. For example, one

23   OCR converted date line in my version of the FOIA record (ATTACHMENT 07) machine-

24   reads, "'Sent: Fit Sep 1~ 16:48:15 2Qll '-- ---1," while it should machine-read, "Sent: Fri Sep

25   _____

26   5.   *See* ATTACHMENT 03 (FBI FOIA letter explaining voluntary reversal of substantive position on initial *Glomar* claim applicable to 15,377 records).

27   6.   "PostgreSQL, often simply Postgres, is an object-relational database management system (ORDBMS) available for many platforms including Linux, FreeBSD, Solaris,

28   Microsoft Windows and Mac OS X."  *PostgreSQL - Wikipedia, the free encyclopedia*, http://en.wikipedia.org/wiki/Postgresql (last accessed: Aug. 20, 2013).

1 | 16 16:48:15 2011." In EPIC's version of the record (<u>ATTACHMENT 08</u>), one date (*i.e.*,

2 | Friday, September 16, 2011 6:11 PM) failed to convert at all and remains a flat image

3 | representation requiring a direct human-eye review. The above are only two of many

4 | examples showing how OCR conversion of date text within the FBI's 94 pages of non-native

5 | form FOIA response records failed to make up for a lack of native form digital records.

6 |      35.    In addition to an SQL database of keywords, it would also help public

7 | understanding to organize the FBI's 15,377 FOIA response records[7] (yet to be provided to

8 | me) into an SQL database according to date and time. Having a chronological order of emails

9 | and other documents will allow for showing the progression of FBI policies and use of Harris

10 | equipment over a period time. The public, including myself, would benefit from knowing

11 | *when*, not just *how*, the FBI engaged in certain tracking and locating activities. For example,

12 | by using the *when*, other illegal government surveillance activity—which may be identified in

13 | the news, in other FOIA responses, or in case law—can be compared, datewise, to the FOIA

14 | responses provided to me in order to determine how changes in FBI policy and practices were

15 | prompted by specific events. A chronologically ordered database will help identify what

16 | events or social factors caused FBI policies and practices to stray from Constitutional

17 | standards held by the general public.

18 |      36.    While it would be possible to manually type out all text and dates from the 94-

19 | page FOIA response provided to me by the FBI and enter that data into a chronologically

20 | ordered SQL database, it would likely take me a minimum of 10 minutes per page (*i.e.*, more

21 | than 15 hours) to complete. If the same task is applied to the remaining 15,377 pages of FBI

22 | records yet to be provided, it would take me nearly 1.25 years of 40-hour work weeks to

23 | complete. Aside from the time required, there would likely be many human error mistakes in

24 | a 15,377 page data entry job. All of these problems can be avoided if Defendants would

25 | simply provide the native form digital records, which is required by the 1996 FOIA

26 | amendments, requested in my initial FOIA request letters, and within the FBI's FOIA system

27 |

28 | 7.   *See* <u>ATTACHMENT 03</u> (FBI FOIA letter explaining voluntary reversal of substantive position on initial *Glomar* claim applicable to 15,377 records).

1  capabilities.

2      37.    By providing native form digital records, the dates, keywords, and all other text

3  will be preserved as vector based text—eliminating the need for manual data entry.  Records

4  in this form will allow for error free machine-reading, via automation software—including

5  artificial intelligence algorithms / machine learning and integrated human computation—for

6  the purpose of datamining and organizing the records in ways that would take a human

7  literally millions of hours to complete without the aid of software.  The datamining methods I

8  speak of are the same methods employed by the government, albeit less sophisticated, to

9  make sense of the massive amounts of personal and private information it gathers on U.S.

10  citizens.  The paper documents and *native-digital to paper-print to digital-scan to paper-print*

11  *to digital-scan to OCR PDF* records Defendants insist on providing will prevent me from

12  employing the complex database and search algorithms needed to display information in

13  ways that will advance public understanding of FBI policies and practices vis-a-vis Harris

14  WPG equipment.

15      38.    It would be a simple task for Defendants FBI and EOUSA to provide me with

16  native form digital documents or an equivalent.  For example, an email file in *.eml format or

17  in a format displayed within a web based email account can be digitally converted to a PDF

18  file using the PrimoPDF or doPDF print driver.  Assuming one of the PDF print drivers is

19  installed, this process involves (**1**) clicking the print button of the display program (*e.g.*,

20  Microsoft Outlook for *.eml files or Internet Explorer for *.html files, *etc.*) while the

21  document is open and displayed, (**2**) choosing the PrimoPDF or doPDF "virtual printer" from

22  the list of installed printers, (**3**) clicking the "print" button, (**4**) specifying where to save the

23  resulting PDF file, and (**5**) waiting a few seconds for the PDF file to be created and saved.[8]

24

25  8.    Even the Court requires that native form digital documents be converted directly to
PDF, rather than simply printed to paper and scanned, prior to uploading to PACER by ECF
26  account holders.  "Documents submitted for filing in the ECF system must be in a Portable
Document Format (.pdf).  Documents which exist only in paper form may be scanned into
27  .pdf for electronic filing.  All electronic documents must be converted to .pdf directly from a
word processing program (e.g., Microsoft Word® or Corel WordPerfect®) and **must be text**
28  **searchable**." ECF Proc. I(B)(4) (emphasis added).  While this process may be foreign to
Defendants and their counsel, it is a very common practice in in the District of Arizona.

- 14 -

39.     Once digitally converted to a PDF file, digital redactions of the vector based text can easily be performed by Defendants.  This process involves (**1**) opening the PDF file in Redax or Adobe Acrobat X Pro, (**2**) using the built-in redaction tools to draw white boxes with black borders over text that needs to be redacted, and (**3**) saving the redacted record to a new PDF file.  "Redax completely redacts (removes) text and graphics from the PDF page. Hacking the file cannot reveal properly redacted information." *Appligent Document Solutions – Redax*, http://www.appligent.com/redax (last accessed: Dec. 16, 2010); *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, ATTACHMENT 31 (web resource attached). *See also Adobe Acrobat X Pro Datasheet, available at* http://www.adobe.com/content/dam/Adobe/en/products/acrobat/pdfs/acrobatxpro_datasheet.pdf (last accessed: Dec. 13, 2010); *Daniel Rigmaiden's **First** Declaration Under Penalty Of Perjury In Support Of Plaintiff's Motion For Partial Summary Judgment*, ATTACHMENT 32 (web resource attached).

40.     The process explained in ¶¶ Nos. 38-39, *supra*, digitally converts the *true* native form digital file to a PDF file so that redactions can be performed.  This process is suitable for records that cannot easily be edited using a digital record's native viewing/editing software. For example, an email displayed in a web based email account via Internet Explorer (*i.e.*, the native viewing software) cannot easily be edited for redaction purposes.  Therefore, in cases such as this, the native form digital file is digitally converted into a PDF file using a PDF print driver (*see* ¶ No. 38 and fn. 8, *supra*)—which preserves the vector based text—so that digital redactions can be done using a PDF editor such as Adobe Acrobat X Pro.  Once digital redactions are complete, the PDF file is re-saved as a redacted version PDF, which can then be provided to me in digital form.  The PDF file is ***never*** converted to paper for any reason and paper never needs to be scanned.  While the PDF files resulting from this process are not *true* native form digital records, they should typically be suitable for my keyword search and organization endeavors (*see* ¶¶ Nos. 32-37, *supra*) considering the vector based text is preserved during the PDF print process and during the redaction process.

- 15 -

41.     For the records that can easily be edited, *e.g.*, Microsoft Word or Excel documents, Defendants FBI and EOUSA can provide me the documents in their *true* native digital form after using the relevant native viewing/editing software to perform redaction edits.  By using the native viewing/editing software to perform redactions (*e.g.*, replacing sensitive text with a series of bold X's), information such as embedded videos, spreadsheet equations, and macros will be preserved in the files and properly disclosed.  For any record that cannot be redacted using the relevant native viewing/editing software, Defendants can use, as a fall back, the digital-PDF-conversion method explained in ¶¶ Nos. 38-39 above and provide me with any embedded data (*e.g.*, spreadsheet equations, macros, and videos) separately.

42.     For the specifically requested video files and audio files, Defendants FBI and EOUSA can easily provide portions that can be disclosed.  Defendants providing video files and audio files as paper print-outs is a senseless proposal.  For example, a Harris StingRay or KingFish training video would need to be provided in its native digital form considering thousands of video frames and audio transcriptions printed to paper, then scanned to PDF and printed to paper again, will be too difficult to work with.  A video will aid public understanding more so than a flip book containing thousands of pages.

43.     For the specifically requested records of radio transmissions and other digital records produced as a result of prior tests performed using Harris equipment, those records would also need to be provided in native digital form.  For the public, I will analyze records of this nature using software capable of plotting geolocation data and antenna radiation patterns.  Therefore, the requested data is much less useful if provided in paper form or in any form other than native digital form.

44.     If the FBI and EOUSA need additional help on how to redact digital records, so as to comply with the Electronic Freedom of Information Act Amendments of 1996, I am more than happy to provide both government sub-entities with further schooling – free of charge.  Just identify the record and I will teach Defendants' staff how to use its FOIA processing system to perform the redactions in a way that will not ruin the disclosable portions for machine-reading purposes.

- 16 -

45.     FBI divisions have already provided the FBI FOIA Work Process Unit ("WPU") with 15,377 records responsive to my request. *See* <u>ATTACHMENT 03</u>. If any of those records were not in native digital form, WPU can draft and send an electronic communication called a "search EC" requesting that the 15,377 responsive records, which were already scanned into the FBI's electronic FOIA/Privacy Act Document Processing System ("FDPS"), be provided now in native digital form. *See* <u>EPIC v. FBI</u>, 12-cv-00667-CKK (D.D.C.), Doc. #16-1 [declaration by David M. Hardy], p. 7-8 & fn. 5 ("At times, when a standard search of the general indices does not produce anticipated results, WPU drafts an electronic communication called a 'search EC' and directs it to those divisions most likely to house potentially responsive material."). Because of how the FBI's FOIA system operates, **complete with custom search ECs for non indexed records** (*see id.*), those divisions that provided the 15,377 records responsive to my request in the first instance can now provide them in native digital form in response to a WPU search EC without delay.

**D.   RE: public need for metadata corresponding to all provided records**

46.     This section of the declaration explains how **it is in the public interest** for Defendants FBI and EOUSA to provide me with all metadata corresponding to all digital records, as required by the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat. 3048, 3049 (codified as amended at 5 U.S.C. § 552(f)(2)), and as requested in all three of my initial FOIA request letters. *See Complaint*, EXHIBIT 01, EXHIBIT 05, and EXHIBIT 11 (Dkt. #001-1). This section also explains how Defendant FBI and EOUSA can easily locate, redact, and provide the requested metadata.

47.     My pending FOIA requests ask that I be provided with all metadata, system metadata,[9] substantive metadata,[10] and embedded metadata.[11] *See id.* I also requested

---

9.      System metadata is data automatically generated by a computer system when a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system. This data is not part of the native file and resides as part of the computer system with a reference to the native file.

10.     Substantive metadata is data generated by the application accessing the native file such as the data reflecting the date/time the file was created or modified and data reflecting changes made to the document by the user. This data is part of the native file and is viewable from the application used to create or modify the native file.

11.     Embedded metadata is text, numbers, content, data, or other information that is directly

1  that "all digital documents be provided in their original native form <u>with metadata preserved</u>."

2  *See id.* (emphasis in original).  Since making my requests, neither the FBI nor the EOUSA

3  have provided me with any metadata and no indication has been made by either defendant

4  that metadata will be provided.  However, counsel for Defendants, Kimberly Herb, informed

5  me via telephone that Defendants will not provide me with metadata.  After I became aware

6  on September 30, 2013 that Defendant FBI would be processing at least 15,377 "pages" of

7  records (4,377 of those ready to be sent) as paper print-outs scanned back into PDF files, I

8  then knew that the sheer volume of records absolutely necessitates that metadata be provided,

9  else both myself and other members of the public will be unable to organize and search the

10  records in an intelligible manner.  Below I use the FBI's 94-page paper print-out response to

11  my November 10, 2011 FOIA request to show a real-world example of how a lack of

12  metadata hinders public understanding of FOIA content when thousands of pages are

13  produced.

14      48.    On July 12, 2013, when Defendant FBI responded to my November 10, 2011

15  FOIA request RE: comments made to *The Wall Street Journal* and the Brookings Institution,

16  it provided me with 94 pages of paper-form documents (*i.e.*, non-native digital form records).

17  *See* <u>ATTACHMENT 03</u>.  The FOIA response contained no metadata.

18      49.    I need metadata for the 15,377 "pages" of records so that I can enter it into an

19  SQL database, using PostgreSQL,[12] which will allow for sophisticated keyword search

20  functions to be performed by members of the public.  I will make the SQL database and

21  search features freely accessible to the public via a website.  The metadata will compliment

22  or indirectly inputted into a native file by a user and which is not typically visible to the user

23  viewing the output display of the native file on screen or as a print-out.  Examples of
    embedded metadata include, but are not limited to, spreadsheet formulas (which display as
    the results of the formula operation), hidden columns, externally or internally linked files

24  (*e.g.*, sound files in Powerpoint presentation), references to external files and content (*e.g.*,
    hyperlinks to HTML files or URLs), references and fields (*e.g.*, the field codes for an auto-

25  numbered document), and certain database information if the data is part of a database (*e.g.*, a
    date field in a database will display as a formatted date, but its actual value is typically a long

26  integer).

27  12.   "PostgreSQL, often simply Postgres, is an object-relational database management
    system (ORDBMS) available for many platforms including Linux, FreeBSD, Solaris,

28  Microsoft Windows and Mac OS X."  *PostgreSQL - Wikipedia, the free encyclopedia*,
    http://en.wikipedia.org/wiki/Postgresql (last accessed: Aug. 20, 2013).

1    the vector based text entered into the database as explained in "Section C" of this declaration,

2    "Regarding public need for native form digital records as opposed to paper print-outs scanned

3    back into digital form."

4         50.    For example, system metadata and substantive metadata for digital records will

5    contain file creation date, access date, and modification date.  If the vector based text within

6    the body of a record does not contain a date, the metadata date can be used in place of the

7    missing visible date when entering the record into the SQL database chronology.  The purpose

8    of providing the public with a chronological database of records is explained in ¶ No. 35,

9    "Section C," of this declaration.

10        51.    All three requested forms of metadata corresponding to digital records may also

11   contain information on who authored a given record or what office or department within the

12   FBI or EOUSA authored or originated the record.  This information will help the public

13   understand which faction of a given Defendant is responsible for the policies or practices

14   discussed in the record.  For example, the noted metadata for a given record may indicate that

15   the FBI Engineering Research Facility was the originator.

16        52.    Other benefits may also come to light upon viewing the metadata for each

17   specific digital record.  For example, in my self-represented criminal case, United States v.

18   Rigmaiden, CR08-814-PHX-DGC (D.Ariz), I compared author and date substantive metadata

19   within two native digital form FBI Excel documents to support my request for suppression of

20   seized historical cell site location information:

21        [T]he metadata for the Excel documents provided to the government by Verizon
         Wireless indicates that the [two separate sets of cell site location] records [in the
22       Excel documents] were compiled by Verizon Wireless' Law Enforcement
         Resource Team on the same day the records were given to the FBI.  The Excel
23       documents were clearly created upon government instruction using records
         drawn from a set of raw technical data and are not themselves preexisting
24       Verizon Wireless business records.

25        See id., Motion To Suppress (Dkt. #824-1, p. 233 ).

26

27   The metadata allowed me to show that the two Excel documents were created on different

28   dates by two different Verizon Wireless employees who drew from the same set of non-

business-related technical data.  Using the comparisons, I was able to argue that Verizon

Wireless employees compiled historical cell site location information only upon law

enforcement request, which places the records outside the routine business records exception

established in United States v. Miller, 425 U.S. 435 (1976).  My argument was supported by

In The Matter Of The Application Of The United States Of America For An Order Directing

A Provider Of Electronic Communication Service To Disclose Records To The Government,

534 F.Supp.2d 585, 615 (W.D.Pa. 2008), vacated on other grounds, 620 F.3d 304 (3rd Cir.

2010) ("Lenihan (mj) 2008 Opinion") (Rejecting the third-party disclosure rule because

historical cell site location information is not used in the "ordinary course of the provision of

telephone communications services" and is instead "retained principally, if not exclusively, in

response to Government directive." (footnote omitted)).

53.    It would be a simple task for Defendants FBI and EOUSA to provide me with

metadata.  If Defendants are providing me with a *true* native form digital record, the

substantive metadata data and embedded metadata will be embedded in the file.  If providing

me with a record that was digitally converted into a PDF file (so as to preserve the original

vector based text),[13] the substantive metadata and embedded metadata can be extracted from

the *true* native form digital record, placed into a text file, and provided to me along with the

digitally created PDF file.  Under both scenarios, the separate system metadata can be

extracted from the operating system and/or the database storing the files and then be provided

to me in a text file corresponding to the record.

54.    If any of the requested metadata is not currently within the FBI's general

indices, the FBI FOIA Work Process Unit ("WPU") can draft an electronic communication

called a "search EC" and send it to those divisions who provided the 15,377 responsive

records that were already scanned into the FBI's electronic FOIA/Privacy Act Document

Processing System ("FDPS").  *See* EPIC v. FBI, 12-cv-00667-CKK (D.D.C.), Doc. #16-1

[declaration by David M. Hardy], p. 7-8 & fn. 5 ("At times, when a standard search of the

13.    This conversion method, which preserves the vector based text contained in the *true* native form digital record, is explained in ¶¶ Nos. 38-40, "Section C," of this declaration.

1   general indices does not produce anticipated results, WPU drafts an electronic

2   communication called a 'search EC' and directs it to those divisions most likely to house

3   potentially responsive material.").  Because of how the FBI's FOIA system operates,

4   **complete with custom search ECs for non indexed records** (*see id.*), those divisions that

5   provided the 15,377 records responsive to my request in the first instance can now provide

6   the metadata in response to a WPU search EC without delay.

7               **E.     Additional last minute issue RE: native form digital records.**

8          55.     Via FBI letter dated January 14, 2014, I was provided with a courtesy copy of

9   the FOIA responses provided to EPIC by the FBI in response to its cell site emulator FOIA

10  request.  I requested the copies to further test whether the FBI's process for recreating records

11  for FOIA responses results in high enough quality PDF files for a sufficient OCR machine

12  reading process.  I was able to determine that the FBI created the records using steps 1-8 in ¶

13  25 above, but added a 9th step that consisted of scanning the paper documents (created in step

14  No. 8 of ¶ 25 above) back into final PDF files. For disclosure.  The final scans were done by

15  J.C. Montgomery at the extremely low quality of **150dpi**[14] **(fast web view)**, (*see*

16  ATTACHMENT 09) which is insufficient for accurate OCR conversion.  Using a simple

17  scanner setting, the FBI could have very easily scanned at 600dpi, which would have allowed

18  for more words (but not *all* as would be the case with native form digital records) to properly

19  convert to vector based text for keyword searching.  The FBI is deliberately attempting to

20  hinder public understanding through deliberate low quality scans.

21         56.     Attached as ATTACHMENT 09 is a screenshot of the FBI's January 14, 2014

22  FOIA response PDF file ("Cell Site Simulator 2.pdf") openned in NitoPDF with an image

23  properties box showing 150 x 150dpi for the scans.  The attached is admissible under Fed. R.

24  Evid. 901(a), and Fed. R. Evid. 901(b)(4).  Pursuant to Fed. R. Evid. 901(a) and Fed. R. Civ.

25  P. 56(e)(1), I certify the attachment is a true/correct copy of the original in my possession.

26  ///

27

28  14.    DPI is an acronym for "dots per inch" and is a measure of quality for all non-vector
    based digital images including those that make up PDF files.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _January 10, 2014_____ in Florence, AZ, USA.

DANIEL DAVID RIGMAIDEN,
Pro Se Plaintiff:

_Daniel Rigmaiden_____
Daniel D. Rigmaiden
Agency # 10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132
Telephone: none

-22-

Respectfully Submitted: January 29, 2014   Daniel Rigmaiden

Daniel Rigmaiden
Plaintiff

**CERTIFICATE OF SERVICE**

I, Daniel David Rigmaiden, certify under penalty of perjury under the laws of the

United States of America that on ___January 31, 2014___ I caused the following

to be mailed first-class United States Postal Service delivery by _having it hand_

_delivered to the Court clerk,_ :

Original attached document addressed to:

Clerk of the Court
Attn: Civil Docketing Section
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street, Suite 130, SPC 1
Phoenix, AZ 85003-2118

Per court order at Dkt #056, the ECF system will effectuate service on:

~~One copy of the original document addressed to:~~

Brad P. Rosenberg, Trial Attorney
Kimberly L. Herb, Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
PO Box 883
Washington, D.C. 20044

By: _Daniel Rigmaiden_

-23-

**Daniel Rigmaiden's Second Declaration Under Penalty of Perjury In Support of Plaintiff's Motion For Partial Summary Judgment**

**ATTACHMENT INDEX**

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF
PERJURY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 01:   Letter from Kim Zetter (Wired Digital) to Daniel Rigmaiden, April 3, 2013; Re: requesting additional information; Note: email address and phone number redacted;

ATTACHMENT 02:   Email from Jon Campbell (LA Weekly News) to Dan Colmerauer, July 26, 2012; Re: requesting that Daniel Rigmaiden speak to Mr. Campbell about portable/transportable wireless device locator technology (supported by declaration from Dan Colmerauer);

ATTACHMENT 03:   FBI's September 25, 2013 letter to Daniel Rigmaiden RE: update to answer to October 10, 2011 FOIA request: "FOIPA Request No.: 1212582" with "Subject: WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS WPG."

ATTACHMENT 04:   Daniel Rigmaiden's October 21, 2011 response letter to the FBI's September 25, 2013 letter RE: update to answer to October 10, 2011 FOIA request: "FOIPA Request No.: 1212582" with "Subject: WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS WPG."

ATTACHMENT 05:   Daniel Rigmaiden's October 21, 2011 response letter [FAXED TO THE FBI BY CCA-CADC STAFF MEMBER ON OCTOBER 23, 2013] to the FBI's September 25, 2013 letter RE: update to answer to October 10, 2011 FOIA request: "FOIPA Request No.: 1212582" with "Subject: WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS WPG."

ATTACHMENT 06:   Daniel Rigmaiden's October 21, 2011 response letter [FAXED TO THE FBI BY DAN COLMERAUER ON OCTOBER 24, 2013] to the FBI's September 25, 2013 letter RE: update to answer to October 10, 2011 FOIA request: "FOIPA Request No.: 1212582" with "Subject: WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS WPG."

ATTACHMENT 07:   Excerpt of FBI FOIA response contained in July 12, 2013 FBI letter to Daniel Rigmaiden RE: FOIPA Request No. 1180900-000; Subject: Wall Street Journal Article On Cell Site Simulator Devices"; Note: includes paper print-out of page No. 1 of 94 from FOIA record PDF file after converting flat image text to vector based text using Optical Character Recognition (OCR);

ATTACHMENT 08:  Excerpt of FBI FOIA response contained in July 12, 2013 FBI release to Electronic Privacy Information Center (EPIC) RE: FOIPA Request No. 1182490-000; Subject: STINGRAY/CELL SITE SIMULATOR DEVICES, *available at* http://epic.org/foia/fbi/stingray/FBI-FOIA-Release-07122013-s1-OCR.pdf (last accessed: Oct. 1, 2013);  Note: includes paper print-out of page No. 1 of 85 from FOIA record PDF file after converting flat image text to vector based text using Optical Character Recognition (OCR);

ATTACHMENT 09:  Screenshot of the FBI's January 14, 2014 FOIA response PDF file ("Cell Site Simulator 2.pdf") opened in NitoPDF with an image properties box showing 150 x 150dpi for the scans;

- 2 -

## ATTACHMENT 01

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

<u>ATTACHMENT 01</u>:  Letter from Kim Zetter (Wired Digital) to Daniel Rigmaiden, April 3,
2013; Re: requesting additional information; Note: email address and
phone number redacted;

 **DIGITAL**

2 April 2013

Daniel David Rigmaiden
Inmate #: 10966111
Florence-AZ-Florence-CADC-6300
CENTRAL ARIZONA DETENTION CENTER
P.O. Box 6300
Florence, AZ 85132

Dear Daniel,

I'm a reporter for *Wired* in San Francisco who covers computer security and civil
liberties issues. I've written extensively on Fourth Amendment issues with regard to
GPS trackers and location data.

I've been following your case since 2010 and attended your hearing last week in
Phoenix regarding your motion to suppress, related to the government's use of a
stingray and searches of your apartment, storage space and hard drives. I've also
read through your 369-page motion to suppress.

I'd be interested in speaking with you about the case and perhaps even visiting you
to discuss the issues.

I'm not sure if you have access to Corrlinks, but I do have an account if you're able to
communicate that way.

I look forward to hearing from you.

Regards,

Kim Zetter
Senior Reporter
Wired
415

520 THIRD STREET, SUITE 305 SAN FRANCISCO, CA 94107 | V:415.276.5054  F:415.276.8490  E:info@wired.com

Threat Level
Privacy, Crime and Security Online
Crime
Surveillance
Hacks and Cracks

Like 409 5          34          Share  44

# Government Fights for Use of Spy Tool That Spoofs Cell Towers

By Kim Zetter
03.29.13
9:22 PM
Edit

Follow @KimZetter



The government is fighting a challenge to its use of a so-called stingray device that emulated a legitimate cellphone tower (such as the real tower above) in order to trick a suspect's Verizon Wireless device into connecting to it and revealing his location. *Photo: Alan Levine/Flickr*

PHOENIX, Arizona — The government's use of a secret spy tool was on trial on Thursday in a showdown

between an accused identity thief and more than a dozen federal lawyers and law enforcement agents who were fighting to ensure that evidence obtained via a location-tracking tool would be admissible in court.

At issue is whether law enforcement agents invaded Daniel David Rigmaiden's privacy in 2008 when they used a so-called stingray to track his location through a Verizon Wireless air card that he used to connect his computer to the internet. Also at issue is whether a warrant the government obtained from a judge covered the use of the stingray and whether the government made it sufficiently clear to the judge how the technology it planned to use worked.

Over the course of a three-hour hearing in the U.S. District Court in Arizona, Rigmaiden, 31, asserted that the warrant the government obtained only authorized Verizon Wireless to provide agents with data about the air card but did not authorize agents to use the invasive stingray device. He also asserted that Verizon Wireless "reprogrammed" his air card to make it interact with the FBI's stingray, something that he says was outside the bounds of the judge's order.

Rigmaiden and civil liberties groups who have filed amicus briefs in the case also maintain that the government failed its duty to disclose to the judge who issued the warrant that the device they planned to use not only collected data from the target of an investigation but from anyone else in the vicinity who was using an air card or other wireless communication device.

Linda Lye, staff attorney for the American Civil Liberties Union of Northern California, told the judge on Thursday that this was the equivalent of rummaging through ten or twelve apartments to find the correct one where the defendant resided, something that would never be allowed under a normal warranted search.

By withholding information about the stingray from the judge and providing only "scant information" about the data they planned to collect, the FBI had "failed to live up to its duty of candor.... The government should have been clear about what information it wanted to obtain and what information it was going to obtain in using the technology," she said.

The ACLU recently uncovered emails that show a pattern of agents routinely withholding information from judges about their use of stingrays in applying for warrants for electronic surveillance.

The Rigmaiden case is shining a spotlight on the secretive technology, generically known as a stingray or IMSI catcher, that allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices into connecting to the stingray instead of a phone carrier's tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location. To prevent detection by suspects, the stingray is supposed to send the data along to a real tower so that traffic continues to flow.

By gathering the wireless device's signal strength from various locations, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

Although there are stingray devices that can capture and record the content of phone calls and text messages, the U.S. government has insisted in court documents for the Rigmaiden case that the stingray used in this case could only capture the equivalent of header information — such as the phone or account number assigned to the aircard as well as dialing, routing and address information involved in the communication. As such, the government has maintained that the device is the equivalent of devices designed to capture routing and header data on e-mail and other internet communications, and therefore does not require a search warrant.

The device, however, doesn't just capture information related to a targeted phone. It captures data from "all wireless devices in the immediate area of the FBI device that subscribe to a particular provider" according to government documents —— including data of innocent people who are not the target of the investigation. FBI policy requires agents to then purge collateral data collected by the surveillance tool.

The StingRay II, made by the firm Harris. The stingray name is also a generic term for other cell tower

devices that operate similarly to this one. *Image: U.S. Patent and Trademark Office*

Rigmaiden was arrested in May 2008 on charges that he was the ringleader of an identify theft gang that stole more than $4 million in refunds from the IRS by filing fraudulent tax returns. Rigmaiden and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process.

Rigmaiden, along with Ransom Marion Carter, III, who is still at large, was charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud. Investigators used the stingray to trace an air card to the Domicilio Apartments complex in Santa Clara, California, that Rigmaiden was renting under an assumed identity. Court documents indicate that the surveillance tool led investigators "to the general proximity of defendant's usage of the aircard," allowing authorities to then narrow the air card's location to three or four apartments, and finally to unit 1122 in the complex.

Rigmaiden maintains that in order for the stingray to be able to collect location data from his air card, Verizon Wireless had to write data to the air card consisting of "identifying information for the FBI's emulated cell sites" as well as make configuration changes that would cause the air card to recognize the FBI's emulated cell tower as an authorized tower for providing service and cause the air card to attempt connections to the emulated tower prior to attempting connections with actual Verizon Wireless towers.

"The FBI technical agents needed Verizon Wireless to write data to the aircard in this manner because the aircard's properly configured Preferred Roaming List prevented it from accessing rogue, unauthorized cell sites... such as cell site emulators used by the FBI," Rigmaiden wrote in a court document.

For years, the U.S. government asserted that the use of stingray devices did not violate Fourth Amendment rights, and Americans didn't have a legitimate expectation of privacy for data sent from their wireless devices to a cell tower, even if another device secretly intercepted that communication to the tower.

But the government changed its stance in the Rigmaiden case in 2011 after the defendant argued that using the device to locate his wireless air card inside an apartment constituted a search under the Fourth Amendment and therefore required a valid search warrant, which Rigmaiden asserted authorities didn't have.

After U.S. District Judge David Campbell indicated he'd seek more information about the device and how it worked, prosecutors backed down — likely to avoid scrutiny of their technology — and conceded that in this case alone its use could be considered a search, but that in general the devices did not violate American's privacy.

Prosecutors then argued that the FBI's use of the stingray against Rigmaiden was indeed authorized by a court order and warrant. They pointed to a warrant that agents obtained to get near real-time tracking information from Verizon Wireless and said that was sufficient to cover the stingray as well. A separate tracking warrant, prosecutors said, wasn't necessary for the fake tower.

A U.S. attorney argued in court on Thursday that although the warrant used in the case didn't specify that it was for a tracking device, the affidavit seeking the warrant did, and this was sufficient. He acknowledged, however, that the affidavit didn't describe what device the FBI planned to use or how it worked.

The ACLU's Lye called the government's assertions a "post hoc re-characterization" of the warrant and said the government was simply "laboring" to find any document it could, in order to say it had obtained a warrant for the stingray.

When asked by Judge Campbell if it was important for the judge who issued the warrant to know that the location-tracking tool they planned to use was designed to collect data from other nearby devices, Assistant U.S. Attorney Fred Battista said that "the use of these devices is a very common practice," implying that the technology should be not be new to judges. Battista also said that the stingray collected only a "small amount of data" from other devices in the area. The data had been destroyed afterward and there was no evidence that any third party suffered harm as a result of the collection, he said.

He also asserted that in all the cases in which stingray's had been used, there was no indication that a judge had ever disallowed the use of the tool because it could pick up data from other devices not belonging to a suspect.

Lye disputed this, however, and cited two cases where judges brought up concerns about the fact that the devices vacuum up any data in their path. The matter of issuing the warrants in those cases, however, was ultimately overtaken by other matters, making the data collection a moot point.

Rigmaiden is seeking to have evidence obtained through the stingray thrown out on grounds that what he has characterized as "warrantless surveillance" violated his privacy.

Government prosecutors adopted a circular argument on Thursday to counter this by saying that even though the use of the stingray in this case constituted a search under the Fourth Amendment and required a warrant — thereby carrying an expectation of privacy — Rigmaiden himself didn't have any expectation of privacy since he had rented the apartment under false pretenses by using a stolen identity to obtain the lease and had also obtained his Verizon Wireless account using another stolen identity.

"This is a very unique case," Battista told the judge. He urged the court not to be so swayed by Rigmaiden's eloquent assertions of his privacy rights that it forgot to take into account the fact that he cared little about the privacy rights of the victims he allegedly exploited when he stole their identities.

"A person who acts as the defendant has acted should not have any expectation of privacy," Battista said.

The government is fighting so hard for its use of the stingray in this case, because if Rigmaiden succeeds in his motion to suppress evidence obtained through the stingray, it would significantly weaken the government's case against him, since it could also force the government to throw out evidence obtained in a search of his apartment and a separate storage space where investigators seized computer hard drives. Information obtained through the stingray and the air car was at least used as part of the basis for obtaining warrants for those other searches.

"They did get a separate search warrant to search the apartment, but the question is did they have independent probable cause in that search warrant application separate from the stingray search?" Lye says.

Lye notes that this case is much different from other location tracking cases — such as the GPS tracking case the Supreme Court decided last year. Other cases have focused on whether or not the government should obtain a warrant to use a location-tracking device or to obtain location data from a third-party provider. In Rigmaiden's case, however, the government has already conceded it needed a warrant.

"The question here is whether this odd order the government obtained was a warrant, and that gets to the question about the government duty to be candid with the courts about the technology," she says.

Lye urged the judge to suppress evidence obtained through the use of the stingray in Rigmaiden's case "to ensure that the government [will be forthcoming] with judges in the future."

Judge Campbell is expected to rule on the motion to suppress within a few weeks.

Rigmaiden's trial is scheduled to begin in May.

**Pages:** 1 2 View All

Related

You Might Like

Related Links by Contextly





Spoofs Cell Phone Tower to Intercept Calls

Case 2:12-cv-01605-DLR-BSB   Document 82-1   Filed 01/31/14   Page 32 of 66
Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight | Threat Level | Wired.com
4/15/13 4:45 PM

Threat Level
Privacy, Crime and Security Online
Surveillance

Like 4.4k  71      1.4k      Share   210

# Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight

By Kim Zetter
04.09.13
6:30 AM
Edit

Follow @KimZetter



*Image: rmuser/Flickr*

A legal fight over the government's use of a secret surveillance tool has provided new insight into how the controversial tool works and the extent to which Verizon Wireless aided federal agents in using it to track a suspect.

Court documents in a case involving accused identity thief Daniel David Rigmaiden describe how the wireless provider reached out remotely to reprogram an air card the suspect was using in order to make it communicate

Secrets of FBI Smartphone Surveillance Tool Revealed In Court Fight | Threat Level | Wired.com

with the government's surveillance tool so that he could be located.

Rigmaiden, who is accused of being the ringleader of a $4 million tax fraud operation, asserts in court documents that in July 2008 Verizon surreptitiously reprogrammed his air card to make it respond to incoming voice calls from the FBI and also reconfigured it so that it would connect to a fake cell site, or stingray, that the FBI was using to track his location.

Air cards are devices that plug into a computer and use the wireless cellular networks of phone providers to connect the computer to the internet. The devices are not phones and therefore don't have the ability to receive incoming calls, but in this case Rigmaiden asserts that Verizon reconfigured his air card to respond to surreptitious voice calls from a landline controlled by the FBI.

The FBI calls, which contacted the air card silently in the background, operated as pings to force the air card into revealing its location.

In order to do this, Verizon reprogrammed the device so that when an incoming voice call arrived, the card would disconnect from any legitimate cell tower to which it was already connected, and send real-time cell-site location data to Verizon, which forwarded the data to the FBI. This allowed the FBI to position its stingray in the neighborhood where Rigmaiden resided. The stingray then "broadcast a very strong signal" to force the air card into connecting to it, instead of reconnecting to a legitimate cell tower, so that agents could then triangulate signals coming from the air card and zoom-in on Rigmaiden's location.

To make sure the air card connected to the FBI's simulator, Rigmaiden says that Verizon altered his air card's Preferred Roaming List so that it would accept the FBI's stingray as a legitimate cell site and not a rogue site, and also changed a data table on the air card designating the priority of cell sites so that the FBI's fake site was at the top of the list.

Rigmaiden makes the assertions in a 369-page document he filed in support of a motion to suppress evidence gathered through the stingray. Rigmaiden collected information about how the stingray worked from documents obtained from the government, as well as from records obtained through FOIA requests filed by civil liberties groups and from open-source literature.

During a hearing in a U.S. District Court in Arizona on March 28 to discuss the motion, the government did not dispute Rigmaiden's assertions about Verizon's activities.

The actions described by Rigmaiden are much more intrusive than previously known information about how the government uses stingrays, which are generally employed for tracking cell phones and are widely used in drug and other criminal investigations.

The government has long asserted that it doesn't need to obtain a probable-cause warrant to use the devices because they don't collect the content of phone calls and text messages and operate like pen-registers and trap-and-traces, collecting the equivalent of header information.

The government has conceded, however, that it needed a warrant in his case alone — because the stingray reached into his apartment remotely to locate the air card — and that the activities performed by Verizon and the FBI to locate Rigmaiden were all authorized by a court order signed by a magistrate.

The Electronic Frontier Foundation and the American Civil Liberties Union of Northern California, who have filed an amicus brief in support of Rigmaiden's motion, maintain that the order does not qualify as a warrant and that the government withheld crucial information from the magistrate — such as identifying that the tracking device they planned to use was a stingray and that its use involved intrusive measures — thus preventing the court from properly fulfilling its oversight function.

"It shows you just how crazy the technology is, and [supports] all the more the need to explain to the court what they are doing," says EFF Staff Attorney Hanni Fakhoury. "This is more than just [saying to Verizon] give us some records that you have sitting on your server. This is reconfiguring and changing the characteristics of the [suspect's] property, without informing the judge what's going on."

The secretive technology, generically known as a stingray or IMSI catcher, allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices

like air cards into connecting to the stingray instead of a phone carrier's legitimate tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location.

By moving the stingray around and gathering the wireless device's signal strength from various locations in a neighborhood, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

Use of the spy technology goes back at least 20 years. In a 2009 Utah case, an FBI agent described using a cell site emulator more than 300 times over a decade and indicated that they were used on a daily basis by U.S, Marshals, the Secret Service and other federal agencies.

The FBI used a similar device to track former hacker Kevin Mitnick in 1994, though the version used in that case was much more primitive and passive.

A 1996 *Wired* story about the Mitnick case called the device a Triggerfish and described it as "a technician's device normally used for testing cell phones." According to the story, the Triggerfish was "a rectangular box of electronics about a half a meter high controlled by a PowerBook" that was essentially "a five-channel receiver, able to monitor both sides of a conversation simultaneously." The crude technology was hauled around in a station wagon and van. A black coaxial cable was strung out of the vehicle's window to connect the Triggerfish to a direction-finding antenna on the vehicle's roof, which had four antenna prongs that reached 30 centimeters into the sky.

The technology has become much sleeker and less obtrusive since then, but still operates under the same principles.

In Rigmaiden's case, agents apparently used two devices made by a Florida-based company called Harris. One was the company's StingRay system, which is designed to work from a vehicle driven around a neighborhood to narrow a suspect's location to a building. Once agents tracked the signals from Rigmaiden's air card to the Domicilio Apartments complex in Santa Clara, California, they apparently used another device made by Harris called the KingFish — a handheld system that allowed them to walk through the complex and zero-in on Rigmaiden's air card in apartment 1122.

Although a number of companies make stingrays, including Verint, View Systems, Altron, NeoSoft, MMI, Ability, and Meganet, the Harris line of cell site emulators are the only ones that are compatible with CDMA2000-based devices. Others can track GSM/UMTS-based communications, but the Harris emulators can track CDMA2000, GSM and iDEN devices, as well as UMTS. The Harris StingRay and KingFish devices can also support three different communication standards simultaneously, without having to be reconfigured.

Rigmaiden was arrested in 2008 on charges that he was the mastermind behind an operation that involved stealing more than $4 million in refunds from the IRS by filing fraudulent tax returns. He and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process. Rigmaiden has been charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud.

# ATTACHMENT 02

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 02:   Email from Jon Campbell (LA Weekly News) to Dan Colmerauer, July
26, 2012; Re: requesting that Daniel Rigmaiden speak to Mr. Campbell
about portable/transportable wireless device locator technology
(supported by declaration from Dan Colmerauer);

DECLARATION OF DANIEL M. COLMERAUER

I, Daniel M. Colmerauer, hereby declare under penalty of perjury as follows:

1.      That I am fully competent to testify in the matters contained herein;

2.      Attached is an email from Jon Campbell of the L.A. Weekly that I received on July 26, 2012, to my email address of: screenwriter2@earthlink.net. I certify that the attached email is a true and correct copy of the original currently in my possession.

3.      When Mr. Campbell refers to "Mr. Rigmaiden" he is referring to Daniel David Rigmaiden.

I declare under penalty of perjury that foregoing is true and correct.

EXECUTED on the 8th day of July, 2013.

Daniel M. Colmerauer

**Dan Colmerauer**

| | |
|---|---|
| From: | "Jon Campbell" <2joncampbell@gmail.com> |
| Date: | Thursday, July 26, 2012 3:21 PM |
| To: | <screenwriter2@earthlink.net> |
| Subject: | Rigmaiden Case and Stingray |

Hi Dan,

Here's my contact info. I'd love to talk to Mr. Rigmaiden about the technology. It appears a major city police department here in CA is also using this device, they are stonewalling my FOI requests (as well as out and out lying, it appears) and I'm hoping to learn more about the technology and how it works. We can talk off the record if necessary, I'm just hoping to shed light on an unusually powerful and potentially worrisome technology.

Thanks.


Best,
Jon Campbell
t. 619-995-4332
e. 2joncampbell@gmail.com

# ATTACHMENT 03

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

<u>ATTACHMENT 03</u>:   FBI's September 25, 2013 letter to Daniel Rigmaiden RE: update to
answer to October 10, 2011 FOIA request: "FOIPA Request No.:
1212582" with "Subject: WIRELESS DEVICE LOCATORS
MANUFACTURED BY HARRIS WPG."



U.S. Department of Justice

Federal Bureau of Investigation
*Washington, D.C. 20535*

September 25, 2013

Mr. Daniel Rigmaiden
**10966111
CCA-CADC
PO Box 6300
Florence, AZ  85132

FOIPA Request No.: 1212582-000
Subject: WIRELESS DEVICE LOCATORS
MANUFACTURED BY HARRIS WPG

Dear Mr. Rigmaiden:

This is in reference to your Freedom of Information (FOIA) request that is currently in litigation.

Your FOIA request dated October 10, 2011[1] seeks "all agency records concerning the following portable/transportable wireless device locators and related equipment manufactured and/or branded and/or sold by Harris Wireless Products Group (Harris Corporation)."  By letter dated May 1, 2013, the FBI advised you that pursuant to FOIA exemption (b)(7)(E) [5 U.S.C. § 552 (b)(7)(E)], the FBI could neither confirm nor deny the existence of records responsive to your request.   The FBI has since determined that **it can now confirm that records responsive to this part of your request exist**; however, a substantial portion of these records remain exempt under 5 U.S.C. § 552 (b)(7)(E).

To the extent you have requested a fee waiver and expedited processing of this material, your requests are denied.   *See* enclosed letters dated September 25, 2013.

The FBI has identified approximately 23,000 pages of responsive material that has also been processed pursuant to a FOIA request for the same subject matter.   Within this body of approximately 23,000 pages, we have determined there are 4,377 pages of material responsive to your request that may be released in part to you as that material has been preprocessed for the similar FOIA request.   If you elect to receive this material, you will owe $427.70 in duplication fees to receive a paper copy or an estimated $20.00[2] to receive the release on CDs.   As a prisoner, you cannot receive CD's directly.   If you elect to pay for CD processing, you must provide an alternative address for receipt.

In addition, there are over 11,000 pages within the body of 23,000 pages that require additional review and processing in light of the FBI's admission that records related to this request exist.   This review would determine if there is additional material related to "Harris Corporation" within these 11,000 plus pages that may be segregated for release.   Please note that, some of the 4377 pages preprocessed may be included in the over 11,000 pages of material to be re-reviewed and this could result in more material released from those 4,377 pages and/or more material released from some of 18,600 pages previously withheld in full.   As such, you are responsible for applicable duplication fees for any additional material determined to be releasable.

You have the following options:

**Preprocessed material**– If you elect to receive this preprocessed material, you will owe $427.70 in duplication fees to receive a paper copy or $20.00 for the estimated 2 CD's.   If you choose paper, an advance payment of the full amount of $427.70 is required per 28 C.F.R. § 16.8(i)(2).   As noted above, since you are a prisoner, you must **provide an alternative address** and agree to pay the estimated fee of $20.00 in order to receive your release in CD format.

---

[1] The FBI did not receive this FOIA request dated October 10, 2011.   The FBI addressed this FOIA request as soon as it was notified of the request.
[2] CDs cost $15 each, but there is a $10 credit for the first CD and the remaining $5 is carried forward to the second CD, so the total amount due for 2 CDs is $20.   This estimate is also contingent on the actual file size of these records. If the records can fit onto a single CD, there will be no charge, but if 3 CDs are required, the amount due would be $35.

**Additional material of 11,000 pages**—Given the significant volume of this re-review and reprocessing project, FBI estimates that duplication costs will exceed $25.00.   Accordingly, per § 16.11(e), if you elect to receive this material, work will not commence until you agree to pay this fee.   Once work commences, you will be invoiced for each release on a monthly basis per the following.

There is a duplication fee of ten cents per page if you receive a paper copy (*See* 28 C.F.R. § 16.11 and 16.49).   Releases are also available on CD upon request.   Each CD contains approximately 500 <u>reviewed</u> pages per release.   The 500 page estimate is based on our business practice of processing cases in which the page count exceeds 501 pages.   The first 100 pages, or the cost equivalent ($10.00) for releases on CD, will be provided to you at no charge.   Again, you must provide an alternative address if you elect to receive these releases on CD and must remit payment for each CD.[3]

You also have the option to reduce the scope of your request; this will accelerate the process and could potentially place your request in a smaller processing queue.   This may also reduce search and duplication costs and allow for a more timely receipt of your information.   The FBI uses a three-queue processing system to fairly assign and process new requests.   Requests track into one of the three queues depending on the number of responsive pages - 500 pages or less (small queue), 501 pages to 2500 pages (medium queue), or more than 2500 pages (large queue).   Small queue cases usually require the least time to process.   Please advise in writing, if you would like to discuss reducing the scope of your request, and your willingness to pay the estimated search and duplication costs indicated above.   Mail your response to: Work Process Unit; Record Information/Dissemination Section; Records Management Division; Federal Bureau of Investigation; 170 Marcel Drive; Winchester, VA 22602.   You may also fax your response to: 540-868-4997, Attention: Work Process Unit.

Please remember this is only an estimate, and some of the information may be withheld in full pursuant to FOIA/Privacy Act exemption(s).   Also, some information may not be responsive to your subject.   Thus, the actual charges could be less.   **However, you must notify us in writing within thirty (30) days from the date of this letter of your options above and format decision (paper or CD) and your remittance or commitment to pay the estimated fees as required.**

If we do not receive your format decision and/or commitment to pay within thirty (30) days of the date of this notification, your request will be closed.   Include the FOIPA Request Number listed above in any communication regarding this matter.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
Dissemination Section
Records Management Division

---

3 See footnote 2, above.



**U.S. Department of Justice**

**Federal Bureau of Investigation**

Washington, D.C. 20535

September 25, 2013

Mr. Daniel Rigmaiden
**10966111
CCA-CADC
PO Box 6300
Florence, AZ  85132

FOIPA Request No.: 1212582-000
Subject: WIRELESS DEVICE LOCATORS
MANUFACTURED BY HARRIS WPG

Dear Mr. Rigmaiden:

This is in response to your request for a fee waiver for the above referenced Freedom of Information/Privacy Acts (FOIPA) request.  Fee waivers are determined on a case by case basis.  See 5 U.S.C. § 552 (a)(4)(A)(iii).

To be granted a fee waiver or a reduction in fees, two requirements must be satisfied.  First, you must demonstrate that "disclosure of the [requested] information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  Second, you must establish that "disclosure of the information . . . is not primarily in the commercial interest of the requester."  See 5 U.S.C. § 552(a)(4)(A)(iii).  The burden is on the requester to show the statutory requirements for a fee waiver have been met.  If these requirements are not satisfied, a fee waiver is unavailable under the statute.

To determine whether disclosure is in the public interest, we consider these factors:  (1) whether the subject of the requested records concerns "the operations or activities of the government;" (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities; and (3) whether disclosure of the requested information will contribute "significantly" to "public understanding."  See 28 C.F.R. §16.11(k)(2).

If the first requirement has been met, we must then determine whether disclosure of the requested information is primarily in the commercial interest of the requester.  To make this determination, we consider these factors:  (1) whether the requester has a commercial interest that would be furthered by the requested disclosure and (2) whether the magnitude of the identified commercial interest of the requester is sufficiently large, [compared to] the public interest in disclosure, that disclosure is "primarily in the commercial interest of the requester."  See 28 C.F.R. § 16.11(k)(3).  If the requester's commercial interest in disclosure is greater than the public interest to be served, then a fee waiver is not warranted.

We have reviewed the information you provided in support of your request for a fee waiver and have found that you do not satisfy either requirement.  Quoting or paraphrasing the statute, without also providing factual detail or support specific to your request, is not sufficient under the law.  Moreover, while disclosure contributes to your individual understanding and interest, it is not likely to contribute significantly to public understanding of government operations and activities.  Consequently, your request is denied.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's eFOIA portal at http://www.justice.gov/oip/efoia-portal.html.   Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely.   The envelope and the letter should be clearly marked "Freedom of Information Appeal."   Please cite the FOIPA Request Number in any correspondence to us for proper identification of your request.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

September 25, 2013

Mr. Daniel Rigmaiden
**10966111
CCA-CADC
PO Box 6300
Florence, AZ  85132

FOIPA Request No.: 1212582-000
Subject: WIRELESS DEVICE LOCATORS
MANUFACTURED BY HARRIS WPG

Dear Mr. Rigmaiden:

This is in reference to your letter to the FBI, in which you requested expedited processing for the above-referenced Freedom of Information /Privacy Acts (FOIPA) request.   Under Department of Justice (DOJ) standards for expedited processing, it can only be granted in the following situations:

**28 C.F.R. §16.5 (d)(1)(i):** "Circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual."

**28 C.F.R. §16.5 (d)(1)(ii):** "An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."

**28 C.F.R. §16.5 (d)(1)(iii):** "The loss of substantial due process of rights."

**28 C.F.R. §16.5 (d)(1)(iv):** "A matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affects public confidence."

You have not provided enough information concerning the statutory requirements permitting expedition; therefore, your request is denied.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's eFOIA portal at http://www.justice.gov/oip/efoia-portal.html.   Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely.   The envelope and the letter should be clearly marked "Freedom of Information Appeal."   Please cite the FOIPA Request Number in any correspondence to us for proper identification of your request.

Sincerely,

David M. Hardy
Section Chief
Record/Information
      Dissemination Section
Records Management Division

U.S. Department of Justice
Federal Bureau of Investigation

*170 Marcel Drive*
*Winchester, VA 22602-4843*

Official Business
Penalty for Private Use $300

SEP 3 0 2013



U.S. OFFICIAL MAIL
PENALTY FOR
PRIVATE USE $300.
UNITED STATES POSTAGE
PITNEY BOWES
$ 00.46°
02 1R
0000001 2580    SEP 26  2013
MAILED FROM ZIP CODE 22602

8513263θθθθ

**ATTACHMENT 04**

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 04:   Daniel Rigmaiden's October 21, 2011 response letter to the FBI's
September 25, 2013 letter RE: update to answer to October 10, 2011
FOIA request: "FOIPA Request No.: 1212582" with "Subject:
WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS
WPG."

Certified Return Receipt Article #:

October 21, 2013                 7011 2970 0002 4750 2960

RE: FOIPA Request # 1212582-000


Daniel Rigmaiden #1096611l

CCA-CADC

PO Box 6300

Florence, AZ 85132


David M. Hardy, Records Management Division

Federal Bureau of Investigation

170 Marcel Drive

Winchester, VA 22602


Chief Hardy:


    This is in response to your September 25, 2013 letter
regarding FOIPA Request # 1212582-000. Your terms are
unacceptable. However, you'll notice in my initial FOIA request
letter that I already asked for all records to be in only
digital form. This means native form digital records with
metadata intact. These records could be *.eml files, word
processor document files, spreadsheet document files, etc. Your
typical scans of paper print-outs are unacceptable, i.e., the
"paper scan to PDF" records that you provide people who do
not specifically request native form digital records as I did.

1

With that being said, if the FBI wishes to send me CDs of PDF files that were created from paper print-outs of native form digital records then I would be willing to review those scans and identify specific records I need in native digital form with metadata intact. This should act to narrow my request in regards to the FBI's obligation to provide me with native form digital documents and other digital records as requested. The FBI should immediately mail me CDs containing the 15,377 pages of paper print-out scans to:

Daniel Rigmaiden
c/o Philip Seplow
2000 North 7th St.
Phoenix, AZ 85006
(602) 254-8817

I will not pay any fees as I am entitled to a full fee waiver. This is explained in my Motion For Partial Summary Judgment. The slowest processing time I will agree to is 3000 (three thousand) pages per month at no cost.

Finally, the FBI's self-serving deadlines are of no interest to me. As the FBI failed to comply with FOIA

2

time guidelines — even after the OIP forwarded the FBI a second copy of my original FOIA request — all matters are now under the full jurisdiction of United States District Court Judge Susan R. Bolton. Unless merely providing the records that are long over due, the FBI should only contact me through its attorney.

Sincerely,

Daniel Rigmaiden

Daniel Rigmaiden

CC: FAX: (540-868-4997); Brad Rosenberg, USDOJ Civil Div.

3

## <u>ATTACHMENT 05</u>

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

<u>ATTACHMENT 05</u>:   Daniel Rigmaiden's October 21, 2011 response letter [FAXED TO THE
FBI BY CCA-CADC STAFF MEMBER ON OCTOBER 23, 2013] to
the FBI's September 25, 2013 letter RE: update to answer to October
10, 2011 FOIA request: "FOIPA Request No.: 1212582" with "Subject:
WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS
WPG."



**CORRECTIONS CORPORATION OF AMERICA**

**Central Arizona Detention Center**
1155 North Pinal Parkway
PO Box 1048
Florence, Arizona   85232
Phone: 520-868-3668
FAX: 520-868-3667

# Facsimile Message

**To:** David M. Hardy (FBI)   (540) 868-4997

**From:** Daniel Rigmaiden

**Pages (Including Cover):** 4

**Date:** 10/23/12

---

❏  Hard copy to follow in mail.
❏  Hard copy to follow Federal Express.
❏  No hard copy to follow.

---

Please use the space below for additional messages.

TRANSMISSION VERIFICATION REPORT

```
                            TIME  : 10/23/2013 09:01
                            NAME  : CADC ADMIN
                            FAX   : 5208687199
                            TEL   : 5208687199
                            SER.# : BROA3J439572
```

```
DATE,TIME                   10/23  09:00
FAX NO./NAME                915408684997-18240
DURATION                    00:00:25
PAGE(S)                     04
RESULT                      OK
MODE                        STANDARD
                            ECM
```

Certified Return Receipt Article #:

October 21, 2013          7011 2970 0002 4750 2960

RE: FOIPA Request # 1212582-000

Daniel Rigmaiden #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

David M. Hardy, Records Management Division
Federal Bureau of Investigation
170 Marcel Drive
Winchester, VA 22602

Chief Hardy:

This is in response to your September 25, 2013 letter regarding FOIPA Request # 1212582-000. Your terms are unacceptable. However, you'll notice in my initial FOIA request letter that I already asked for all records to be in only digital form. This means native form digital records with metadata intact. These records could be *.eml files, word processor document files, spreadsheet document files, etc. Your typical scans of paper print-outs are unacceptable, i.e., the "paper scan to PDF" records that you provide people who do not specifically request native form digital records as I did.

1

With that being said, if the FBI wishes to send me CDs of PDF files that were created from paper print-outs of native form digital records then I would be willing to review those scans and identify specific records I need in native digital form with metadata intact. This should act to narrow my request in regards to the FBI's obligation to provide me with native form digital documents and other digital records as requested. The FBI should immediately mail me CDs containing the 15,377 pages of paper print-out scans to:

Daniel Rigmaiden
c/o Philip Seplow
2000 North 7th St.
Phoenix, AZ 85006
(602) 254-8817

I will not pay any fees as I am entitled to a full fee waiver. This is explained in my Motion For Partial Summary Judgment. The slowest processing time I will agree to is 3000 (three thousand) pages per month at no cost.

Finally, the FBI's self-serving deadlines are of no interest to me. As the FBI failed to comply with FOIA

2

time guidelines — even after the OIP forwarded the FBI a second copy of my original FOIA request — all matters are now under the full jurisdiction of United States District Court Judge Susan R. Bolton. Unless merely providing the records that are long over due, the FBI should only contact me through its attorney.

Sincerely,

Daniel Rigmaiden

Daniel Rigmaiden

CC: FAX: (540-868-4997); Brad Rosenberg, USDOJ Civil Div.

3

## ATTACHMENT 06

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

<u>ATTACHMENT 06</u>:  Daniel Rigmaiden's October 21, 2011 response letter [FAXED TO THE
FBI BY DAN COLMERAUER ON OCTOBER 24, 2013] to the FBI's
September 25, 2013 letter RE: update to answer to October 10, 2011
FOIA request: "FOIPA Request No.: 1212582" with "Subject:
WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS
WPG."

# PHILIP A. SEPLOW
## ATTORNEY AT LAW

2000 NORTH 7TH STREET
PHOENIX, ARIZONA 85006

(602)  254-8817
FAX (602)  254-0271

MEMBER ARIZONA & CALIFORNIA BARS

## FACSIMILE TRANSMISSION COVER SHEET

### FAX TO:    540-868-4997

DATE:        October 24, 2013

TO:          Federal Bureau of Investigation

ATTN:        **David M. Hardy - Records Management Division**

NUMBER OF PAGES BEING TRANSMITTED  **4**
  (Including Cover Sheet)

Please contact DAN at (602) 254-8817 if you have any problems or questions regarding this
transmission.

**FAX NUMBER** (602) 254-0271

# PLEASE NOTE:    The following is being FAXed to you on behalf of Daniel David Rigmaiden.

P. 1

* * * Communication Result Report ( Oct. 24. 2013  2:29PM ) * * *

P.  1
2

Date/Time: Oct. 24.  2013   2:28PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|----------|------|-------------|-------|--------|---------------|
| 2335 | Memory TX | 15408684997 | P.  4 | OK | |

-----------------------------------------------------------------------
Reason for error
     E. 1) Hang up or line fail          E. 2) Busy
     E. 3) No answer                     E. 4) No facsimile connection
     E. 5) Exceeded max. E-mail size

PHILIP A. SEPLOW
ATTORNEY AT LAW

2000 NORTH 7TH STREET                         (602) 254-8817
PHOENIX, ARIZONA 85006                    FAX (602) 254-0271

                          MEMBER ARIZONA & CALIFORNIA BARS

FACSIMILE TRANSMISSION COVER SHEET

FAX TO:    540-868-4997

DATE:      October 24, 2013

TO:        Federal Bureau of Investigation

ATTN:      David M. Hardy - Records Management Division

NUMBER OF PAGES BEING TRANSMITTED  4
  (including Cover Sheet)

Please contact DAN at (602) 254-8817 if you have any problems or questions regarding this transmission.

FAX NUMBER (602) 254-0271

PLEASE NOTE:    The following is being FAXed to you on
                behalf of Daniel David Rigmaiden.

Certified Return Receipt Article #:

October 21, 2013          7011 2970 0002 4750 2960

RE: FOIPA Request # 1212582-000

Daniel Rigmaiden #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

David M. Hardy, Records Management Division
Federal Bureau of Investigation
170 Marcel Drive
Winchester, VA 22602

Chief Hardy:

   This is in response to your September 25, 2013 letter regarding FOIPA Request # 1212582-000. Your terms are unacceptable. However, you'll notice in my initial FOIA request letter that I already asked for all records to be in only digital form. This means native form digital records with metadata intact. These records could be *.eml files, word processor document files, spreadsheet document files, etc. Your typical scans of paper print-outs are unacceptable, i.e., the "paper scan to PDF" records that you provide people who do not specifically request native form digital records as I did.

1

With that being said, if the FBI wishes to send me CDs of PDF files that were created from paper print-outs of native form digital records then I would be willing to review those scans and identify specific records I need in native digital form with metadata intact. This should act to narrow my request in regards to the FBI's obligation to provide me with native form digital documents and other digital records as requested. The FBI should immediately mail me CDs containing the 15,377 pages of paper print-out scans to:

Daniel Rigmaiden
C/O Philip Seplow
2000 North 7th St.
Phoenix, AZ 85006
(602) 254-8817

I will not pay any fees as I am entitled to a full fee waiver. This is explained in my Motion For Partial Summary Judgment. The slowest processing time I will agree to is 3000 (three thousand) pages per month at no cost.

Finally, the FBI's self-serving deadlines are of no interest to me. As the FBI failed to comply with FOIA

2

time guidelines — even after the OIP forwarded the FBI a second copy of my original FOIA request — all matters are now under the full jurisdiction of United States District Court Judge Susan R. Bolton. Unless merely providing the records that are long over due, the FBI should only contact me through its attorney.

Sincerely,

Daniel Rigmaiden

Daniel Rigmaiden

CC: FAX: (540-868-4997); Brad Rosenberg, USDOJ Civil Div.

3

## ATTACHMENT 07

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 07:   Excerpt of FBI FOIA response contained in July 12, 2013 FBI letter to
Daniel Rigmaiden RE: FOIPA Request No. 1180900-000; Subject: Wall
Street Journal Article On Cell Site Simulator Devices"; Note: includes
paper print-out of page No. 1 of 94 from FOIA record PDF file after
converting flat image text to vector based text using Optical Character
Recognition (OCR);

_____ (RMD) (FBI)

**From:** _____
**Sent:** Friday, September 16, 2011 6:30 PM
**To:** Sabol, Sherry E.
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

One addition from OPA as follows. Let me know if you hear back from OTD. Thanks!

_____

**From:** Sabol, Sherry E.
**Sent:** Friday, September 16, 2011 6:11 PM
**To:** _____
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.;
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

OTD-is this good to go?

_____

**From:** Sabol, Sherry E.
**To:** Sabol, Sherry E.
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan,
**Sent:** Fri Sep 16 16:48:15 2011
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

I inadvertently took OPA off the earlier version -- I know they have a deadline of COB today.

_____

**From:** Sabol, Sherry E.
**Sent:** Friday, September 16, 2011 4:12 PM
**To:** _____
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology
**Importance:** High

b5 -1
b7E -1

WSJCELL-1          1

**ATTACHMENT 08**

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 08:   Excerpt of FBI FOIA response contained in July 12, 2013 FBI release to
Electronic Privacy Information Center (EPIC) RE: FOIPA Request No.
1182490-000; Subject: STINGRAY/CELL SITE SIMULATOR
DEVICES, *available at* http://epic.org/foia/fbi/stingray/FBI-FOIA-
Release-07122013-s1-OCR.pdf (last accessed: Oct. 1, 2013);  Note:
includes paper print-out of page No. 1 of 85 from FOIA record PDF file
after converting flat image text to vector based text using Optical
Character Recognition (OCR);

**(RMD) (FBI)**

**From:**
**Sent:** Friday, September 16, 2011 6:30 PM
**To:** Sabol, Sherry E.
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

One addition from OPA as follows. Let me know if you hear back from OTD. Thanks!

**From:** Sabol, Sherry E.
**Sent:** Friday, September 16, 2011 6:11 PM
**To:**
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.;
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

OTD-Is this good to go?

**From:** Sabol, Sherry E.
**To:** Sabol, Sherry E.;
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan,
**Sent:** Fri Sep 16 16:48:15 2011
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

I inadvertently took OPA off the earlier version – I know they have a deadline of COB today.

**From:** Sabol, Sherry E.
**Sent:** Friday, September 16, 2011 4:12 PM
**To**
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology
**Importance:** High

b5 -1
b7E -1

1

## ATTACHMENT 09

DANIEL RIGMAIDEN'S **SECOND** DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 09:   Screenshot of the FBI's January 14, 2014 FOIA response PDF file
("Cell Site Simulator 2.pdf") opened in NitoPDF with an image
properties box showing 150 x 150dpi for the scans;

