**ATTACHMENT 16**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 16:  *Catcher Catcher - Wiki - Redmine*, http://opensource.srlabs.de/projects/
2/wiki/Wiki?version=18 (last accessed: Feb. 20, 2012);

« Previous - Version 18/25 (diff) - Next » - Current version
*luca, 01/12/2012 02:21 am*

## Tutorial

Currently, the IMSI Catcher detector is available only for the OsmocomBB platform.
If you like to test it, you can find all the needed information here:https://opensource.srlabs.de/projects/catcher/wiki/Tutorial
Please upload improvements as patches to this site or post to the    mailing list until a Git is set up.

## Software for other platforms

While Osmocom provides access to most detailed GSM data, other platforms could, too, provide useful information that can be used in detecting IMSI catcher attacks.

Folks with insights into phone programming APIs, please help fill out this list:

| Evidence | Available on | | | | |
|---|---|---|---|---|---|
|  | Blackberry | Android | | iOS | Symbian |
| Cipher indication |  | [1] *#32489# // OEM_SM_TYPE_SUB_CIPHERING_PROTECTION_ENTER | | | |
| LAC |  | [1a] getLac() | | | |
| Cell ID |  | [1a] getCid() | | | |
| Retransmission counters |  |  | | | |
| TMSI |  |  | | | |
| Send power |  | [1] LISTEN_SIGNAL_STRENGTHS ? | | | |
| Silent call |  | [1] | | | |
| Silent SMS |  | [1] | | [2] | |
| Remote install |  | [1c] // INSTALL_ASSET | | | |
| Network Roaming |  | [1b] getRoaming() | | | |

[1] TODO: Reference / API call needed
[1a]: android.telephony.gsm.GsmCellLocation
[1b]: android.telephony.ServiceState
[1c]: GTalkService

[2] TODO: Reference / API call needed

## IMSI catcher detection

For IMSI catchers to achieve their goals they will need to show behavior different from normal base stations. We distinguish between yellow, red, and black flags. Yellow flag are an indication that you might have been caught; red flags are a very strong indication; and black flags tell you: "You are being tracked down; throw away your phone and run."

| # | Flag | Evidence | Implementable in Osmocom |
|---|---|---|---|
| Setup: |  |  |  |
| S1 | R | No encryption after using encryption with the same operator before | done |
| S2 | Y | Cipher mode complete message is sent more than twice | wip |
| S3 | R | ... more than four times | wip |
| S4 | Y | IMEI not requested in Cipher Mode Complete message | done |
| Location updating (for information gathering, MITM): |  |  |  |
| L1 | Y | The LAC of a base station changes | done |
| L2 | R | The LAC changes more than once | done |
| L3 | Y | The LAC differs from all neighboring cells | wip |
| L4 | Y | The network queries the phones IMEI during location update | done |
| L5 | Y | The registration timer is set to a value < 10 minutes | wip |
| L6 | Y | The "IMSI attach procedure" flag is set | wip |
| (when locating a victim): |  |  |  |
| L7 | Y | Receive a silent text message | done |
| L8 | R | You are paged, but do not enter any transaction | done |

| L9 | R | Being assigned a traffic channel but not entering call control state/receiving a text message for 2 seconds | wip |
| L10 | B | ... 10 seconds | wip |
| L11 | Y | You do not receive a call setup message while already being on a traffic channel for 2 seconds | done |
| L12 | R | ... 10 seconds | done |
| L13 | Y | Your phone sends at the highest possible power | wip |

## ATTACHMENT 17

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 17:   Singel, Ryan (Wired Magazine), *FBI E-Mail Shows Rift Over
Warrantless Phone Record Grabs* (Dec. 20, 2007),
http://www.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell
(last accessed Sept. 22, 2010);

<< Back to Article

# FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs

By Ryan Singel     12.20.07

By now it's well known that FBI agents can't always be troubled to get a court order before going after a surveillance target's telephone and internet records. But newly released FBI documents show that aggressive surveillance tactics have even caused friction within the bureau.

"We deal mostly with the fugitive squad here, and, like in many other offices, these guys have a reputation for cutting corners," a surveillance specialist at the FBI's Minneapolis field office complained in an internal e-mail last year. "I'm not bashing them; it's the way they do business. Getting a court order is the absolute last step, if they have to.

"Before I had a blowup with a particular agent ... we were constantly asked to call our contacts at service providers to see if we could get various information without having to get a court order," the message continues. "This gets old, believe me. ... Doing this once or twice to help out turns into SOP (standard operating procedure) ... It's expected, and you're criticized as a tech agent if you refuse to do this later on."

The revelation is the second this year showing that FBI employees bypassed court order requirements for phone records. In July, the FBI and the Justice Department Inspector General revealed the existence of a joint investigation into an FBI counter-terrorism office, after an audit found that the Communications Analysis Unit sent more than 700 fake emergency letters to phone companies seeking call records. An Inspector General spokeswoman declined to provide the status of that investigation, citing agency policy.

The June 2006 e-mail (.pdf) was buried in more than 600-pages of FBI documents obtained by the Electronic Frontier Foundation, in a Freedom of Information Act lawsuit.

The message was sent to an employee in the FBI's Operational Technology Division by a technical surveillance specialist at the FBI's Minneapolis field office -- both names were redacted from the documents. The e-mail describes widespread attempts to bypass court order requirements for cellphone data in the Minneapolis office.

Remarkably, when the technical agent began refusing to cooperate, other agents began calling telephone carriers directly, posing as the technical agent to get customer cellphone records.

Federal law prohibits phone companies from revealing customer information unless given a court order, or in the case of an emergency involving physical danger.

The documents are the second batch released by the EFF after winning a Freedom of Information Act lawsuit last May. The first set of documents shed light on the breadth and sophistication of the FBI's national wiretapping system, which is wired into telecom switches around the United States under the terms of the 1994 Communications Assistance for Law Enforcement Act -- a law that was extended to broadband internet switches in May of this year.

The new documents detail how a little-known FBI telephone intercept unit has developed a powerful cellphone tracking technology that agents use to monitor the physical movements of surveillance targets, even on phones that are not GPS equipped.

Originally developed to capture and arrest computer hacker Kevin Mitnick in 1995, the system today relies on a mobile FBI van that has access to a wireless carrier's cell site tracking information in real time. A special surveillance unit called the Wireless Intercept and Tracking Team (WITT) operates the van, using the cell site location to get to the approximate location of the cellphone customer, then uses direction-finding gear to zero in on the target.

The technical agent complained in the e-mail that FBI agents looking for a suspect tend to skip gumshoe investigative techniques in favor of the slick tracking van. "These guys always want to take the WITT vehicle out and drive around half of town (sic) to find the guy," the agent wrote.

The tracking system is part of the FBI's Digital Collection System, or DCS, a suite of software packages used for criminal and intelligence phone taps, which relies on a massive interlinked fiber-optic network that connects surveillance terminals around the country.

In brief, the mobile tracking system works as follows:

FBI agents investigating a case prepare a court order saying a cellphone number is likely relevant to an ongoing investigation, and a judge signs off on it.

The court order is faxed to a mobile carrier, which then turns on surveillance in its switches, and begins delivering call data and cell site information to the FBI's DCS 3000 software.

That software keeps track of which cellphone towers a phone uses or pings. A central FBI database translates a mobile carrier's cell tower code to latitude and longitude coordinates.

The software sends the coordinates to the agents and technical personnel in the mobile unit who then drive to the general area. But since cell tower information is not precise, agents in the van use antenna array connected to tracking software to zero in on the cellphone.

The FBI's technology office trumpeted the tracking function of the DCS 3000 software in a letter to the FBI director, boasting that it was used after a December 2005 North Carolina kidnapping to help find the victim unharmed.

Justice Department spokesman Dean Boyd says the department's policy allows the FBI to get cell tower information using under the low legal standard that applies to monitoring the digits a phone customer dials. Under that "pen register" standard, the FBI need only assert that the surveillance is relevant to an investigation -- the target need not be suspected of a crime.

When GPS-level data is wanted, law enforcement agents still need to show probable cause to a judge, said Boyd, who deferred questions about the Minneapolis agent's e-mail to the FBI.

FBI spokesman Paul Bresson cautioned against drawing conclusions from redacted government documents, and claimed that the FBI follows the law.

"FBI agents are trained to enforce the law using all available legal tools," Bresson said. "Absent an emergency circumstance involving danger or death or serious physical injury, the FBI does not request, nor do service providers give, any records without a court order."

The FBI tech agent's critical e-mail is best understood in light of the bureau's ongoing courtroom attempts to get cellphone location information without having to show probable cause, according to EFF lawyer Marcia Hofmann.

"For years the government has made dubious legal claims to justify tracking people's locations with minimal oversight," Hofmann said. "These docs show that the government hasn't satisfied its own weak standards in some cases."

Other revelations in the document include:

National security wiretaps in a Florida investigation captured more than 1,800 phone conversations, and led to 50 international terrorism advisories. Though details are redacted from the document, that case appears to be the so-called Liberty City Seven. Prosecutors initially trumpeted that the seven men were plotting to blow up the Sears Tower, though a government official later admitted the group was "more aspirational than operational." Last week a Florida jury acquitted one man and failed to reach a verdict on the other six.

In 2006, DCS 5000, the FBI's national security wiretapping software, captured 27,728,675 communication sessions. The document does not define what a "session" consists of. That year the FBI reported winning 2,176 FISA, or Foreign Intelligence Surveillance Act, warrants from a secret court.

By 2003 one cellphone carrier, Richmond, Virginia-based Triton PCS, was handling some 1,800 subpoenas and court orders a year. With 800,000 customers, that represented one records demand for every 444 customers.

The FBI uses a Raytheon-developed tool known as the Digital Multimedia Watchdog to record and store phone calls and internet communications between informants and targets of an investigation. That tool can "collect, process and store large amounts of multimedia data, including voice, fax, data and video."

DCS 3000 -- the FBI's tool for recording the phone numbers a target calls, or is called from -- was set loose on 5,300 phones in 2005, at a cost of $320 per targeted number. Those costs did not include payments to telecoms for the intercepts. The software is maintained by Booz Allen Hamilton and contained more than 490,000 lines of code as of 2005.

The three software components of the FBI's phone surveillance system cost $38.7 million in 2003 and $39 million in 2004. Computers running these software packages at FBI offices and surveillance locations are connected through a Sprint-run closed fiber-optic network that allows surveillance to continue even when offices are destroyed, as happened during Sept. 11 and Hurricane Katrina.

# ATTACHMENT 18

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 18:   Myers, Rachel (ACLU), *With Technology Like This, Who Needs the Law? | American Civil Liberties Union* (Nov. 14, 2008), http://www.aclu.org/2008/11/14/with-technology-like-this-who-needs-the-law (last accessed Jul. 08, 2013);

SEARCH    GO

## BLOG CHANNELS

Blog of Rights
Free Future
Washington Markup

## LATEST POSTS

Obama's Pick to Lead FBI Approved Waterboarding Under Bush: Time to Speak Out

What Does Sheriff Arpaio Have To Do with Immigration Reform?

This Week in Civil Liberties (07/05/2013)

The Ten Most Disturbing Things You Should Know About the FBI Since 9/11

On This 4th of July: Liberty and Justice For All!

The Supreme Court Limits Our Employment Rights...Again

The Story of ACLU Action

Aaron Hernandez Is Now Locked Alone Inside a Room the Size of a Parking Spot

CBP Using Its Authorization for Border Use Of Drones as Wedge For Nationwide Use

Police Harassment of Photographers Remains a Problem

## TRENDING TOPICS

Government Surveillance
NSA
Government Secrecy
Patriot Act
Government Oversight
Cell Phones & Smartphones
Photographers' Rights
FBI

## ARTICLE     COMMENTS  13

11/14/2008

With Technology Like This, Who Needs the Law?

By Rachel Myers, ACLU at 12:55pm

*(Originally posted on Daily Kos.)*

The ACLU and Electronic Frontier Foundation have received several batches of Justice Department documents in response to our Freedom of Information Act (FOIA) request (and subsequent lawsuit) for records relating to the government's use of cell phones as tracking devices. What they tell us is that the government doesn't even need the help of a cell phone service provider to track us with our phones. The FBI now has what is called "triggerfish" technology — a cell site simulator that forces cell phones in the area to register its phone number, serial number and location — allowing it to track cell phones on its own. This raises the risk that they will do so without bothering to go to a court for permission first, since they no longer need to compel the provider to cooperate.

The documents do indicate that at least currently, the FBI's standard procedure is to seek a court order before using "triggerfish" to track cell phones. However, when obtaining those court orders — for "pen register and trap and trace" surveillance — the government doesn't show probable cause that a crime has been or is being committed, or even demonstrate to the court that the person being spied on is relevant to an ongoing investigation. The government simply tells the court that it thinks the target is relevant and then the court issues the order, a process offering little protection against the abuse of this powerful surveillance technology. In fact, the Department of Justice documents themselves suggest some government folks might be apprehensive: "The use of a triggerfish to locate cellular telephones is an issue of some controversy." People with questions or concerns are instructed to contact Mark Eckenwiler, Senior Counsel at the DOJ Computer Crime and Intellectual Property Section.

An earlier EFF FOIA lawsuit turned up documents detailing how a little-known FBI telephone intercept unit had developed triggerfish technology that agents use to monitor the physical movements of surveillance targets. Back then it seemed the process required assistance from the provider. But the new documents plainly say that triggerfish surveillance can be done without provider assistance, as at the top of page 18 in this document (PDF): "This can be done without the user knowing about it, and without involving the cell phone provider."

The *Washington Post*'s Ellen Nakashima writes about the renewed call from magistrate judges for Congress to set a consistent legal standard for seeking cell phone tracking information today. All our related documents are here.

**CORRECTION:** An earlier version of this post mentioned the process of obtaining a pen-trap order from the FISA court. The documents uncovered by the ACLU/EFF FOIA are actually about pen-trap orders in the criminal context, and the second paragraph has been amended to reflect that.

Location Tracking
Prisoner Abuse

See All »

**BLOG ARCHIVE**

{select}

**AFFILIATE BLOGS**

{select}

11/14/2008

**RELATED**



1 of 10
Obama's Pick to
Lead FBI
Approved
Waterboarding
Under Bush: Time to Speak Out

2 of 10
What Does
Sheriff Arpaio
Have To Do with
Immigration
Reform?

**ARTICLE    COMMENTS  13**

---

**NEVER MISS AN ACTION THAT'S IMPORTANT TO YOU.**

Sign up for the **ACLU Action** newsletter.

E-mail address        **SIGN UP >**

**HELP GUARANTEE FREEDOM
FOR ALL.**

Chip in to help protect all of our rights and
liberties.

**DONATE
NOW »**

---

**CAPITAL PUNISHMENT**
Clemency »
Effective Counsel »
Execution Methods »
Innocence and the
Death Penalty »
Junk Science and
Capital Punishment »
Mental Illness and the
Death Penalty »
Race and the Death
Penalty »

**CRIMINAL LAW REFORM**
Drug Sentencing and
Penalties »
Drug Testing »
Health-Based
Solutions »
Marijuana Law
Reform »
Police Practices »
Race and Criminal
Justice »
Search and Seizure »
Juvenile Justice »

**FREE SPEECH**
Campaign Finance
Reform »
Censorship »
Flag Desecration »
Internet Censorship »
Right to Protest »
Student Speech »

**HIV / AIDS**
Criminal Justice and
HIV »
HIV/AIDS
Discrimination »
Prevention and
Education »
Testing and Privacy »

**HUMAN RIGHTS**
Children's Rights »
Death Penalty »
Immigrants' Rights »
National Security »
Racial Justice »
Women's Rights »

**IMMIGRANTS' RIGHTS**
State Anti-Immigrant
Laws »
Local Anti-Immigrant
Laws »
Immigration Detention »
Immigration
Enforcement »

**LGBT RIGHTS**
LGBT Basic Rights and
Liberties »
LGBT Parenting »
LGBT Relationships »
LGBT Youth &
Schools »
Discrimination Against
Transgender People »

**NATIONAL SECURITY**
Detention »
Discrimination »
Dissent »
Ideological Exclusion »
Secrecy »
Spy Files »
Surveillance & Privacy »
Targeted Killings »
Torture »

**PRISONERS' RIGHTS**
Immigration Detention »
Medical Care in
Prison »
Mental Health Care in
Prison »
Prison Conditions »
Private Prisons »
Restriction of Prisoners'
Rights »
Women in Prison »
Solitary Confinement »

**RACIAL JUSTICE**
Affirmative Action »
Criminal Justice »
Education »
Indigent Defense »
Juvenile Justice »
Racial Profiling »

**RELIGION & BELIEF**
Free Exercise of
Religion »
Government-Funded
Religion »
Religion and Schools »
The Public Square »

**REPRODUCTIVE
FREEDOM**
Abortion »
Birth Control »
Pregnancy »
Religion and
Reproductive Rights »
Sex Education »

**TECHNOLOGY AND
LIBERTY**
Biological
Technologies »
Consumer Privacy »
Internet Free Speech »
Internet Privacy »
Medical Privacy »
Students »
Workplace Privacy »

**VOTING RIGHTS**
Ballot Access »
Election Reform »
Redistricting »
Voter
Disfranchisement »
Voting Rights Act »

7/8/2013  7:55 AM

Voter Suppression »

**WOMEN'S RIGHTS**
Criminal Justice »
Education »
Employment »
Human Rights »
Violence Against
Women »

User Agreement    Privacy Statement    Contact Us

© ACLU, 125 Broad Street, 18th Floor, New York NY 10004
This is the website   of the American Civil Liberties Union and the ACLU Foundation.
Learn more about these two components of the ACLU.

The ACLU earns a 4-star rating
from Charity Navigator and
meets the highest standards of
the Better Business Bureau's
Wise Giving Alliance.

7/8/2013 7:55 AM

## ATTACHMENT 19

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 19:   McCullagh, Declan (CNET News), *Justice Dept. defends warrantless
cell phone tracking | Politics and Law - CNET News* (Feb. 13, 2010),
http://news.cnet.com/8301-13578_3-10453214-38.html (last accessed:
Jul. 08, 2010);

CNET News

# Justice Dept. defends warrantless cell phone tracking

In a novel privacy case, Obama administration tells an appeals court that police should be able to learn the locations of mobile devices without a search warrant.

by **Declan McCullagh** | February 13, 2010 9:25 AM PST

The FBI and other police agencies don't need to obtain a search warrant to learn the locations of Americans' cell phones, the U.S. Department of Justice told a federal appeals court in Philadelphia on Friday.

A Justice Department attorney told the Third Circuit Court of Appeals that there is no constitutional problem with obtaining records from cellular providers that can reveal the approximate locations of handheld and mobile devices. (See CNET's **previous article [http://www.cnet.com/8301-13578_3-10451518-38.html]** .)

There "is no constitutional bar" to acquiring "routine business records held by a communications service provider," said **Mark Eckenwiler [http://www.cybercrimeconference.org/bios/Eckenwiler.html]** , a senior attorney in the criminal division of the Justice Department. He added, "The government is not required to use a warrant when it uses a tracking device."

This is the first federal appeals court to address warrantless location tracking, which raises novel issues of government surveillance and whether Americans have a reasonable expectation of privacy in their--or at least their cell phones' --whereabouts.

Judge **Dolores Sloviter [http://en.wikipedia.org/wiki/Dolores_Sloviter]** sharply questioned Eckenwiler, saying that location data can reveal whether people "have been at a protest, or at a meeting, or at a political meeting" and that rogue governments could misuse that information. (See **transcript [#]** excerpts below.)

Just a few years ago, tracking phones was the stuff of thrillers like "Enemy of the State" or "Live Free or Die Hard." Now, even though police are tapping into the locations of mobile phones thousands of times a year, the legal ground rules remain unclear, and federal privacy laws written a generation ago are ambiguous at best.

"When the government acquires historical cell location information, it effectively commandeers our cell phones and turns them into electronic trackers that report, without our knowledge or consent, where we have been and how long we have spent there," **Susan Freiwald [http://www.usfca.edu/law_library/facultybib /Freiwald.html]** , a law professor at the University of San Francisco, told the court on Friday. "We should be able to use our cell phones without them creating a virtual map of our every movement and association."

Freiwald, the ACLU, the **Electronic Frontier Foundation [http://www.eff.org/]** , and the Center for Democracy and Technology filed briefs saying that the U.S. Constitution's Fourth Amendment provides Americans with at least some privacy protections that shield their whereabouts from police not armed with search **warrants [#]** . The civil liberties groups also said that current law gives judges the flexibility to require search warrants based on probable cause.

EFF attorney Jennifer Granick said one possibility is for the Third Circuit to order the

district judge to hold hearings to learn the more about the technology of cell tracking, including how accurately stored records can pinpoint the location of a phone. The judges "had a lot of factual questions about accuracy that haven't been answered," Granick said after the hearing.

Besides Sloviter, the other judges on the panel are **Atsushi Tashima [http://www.fjc.gov/servlet/tGetInfo?jid=2339]**, who is visiting from the Ninth Circuit, and **Jane Roth [http://en.wikipedia.org/wiki/Jane_Richards_Roth]**, who was not present on Friday but is expected to review the transcript.

The Bureau of Alcohol, Tobacco, Firearms and Explosives is asking the court for an order divulging historical (meaning stored, not future) phone location information because a set of suspects "use their wireless telephones to arrange meetings and transactions in furtherance of their drug trafficking activities." It's unclear how detailed this stored information is; there's some evidence that the FBI can use it to narrow down the location to a city block but perhaps not an individual house.

The Obama administration argues that no search warrant is necessary; it says what's needed is only a **2703(d) order [http://www.law.cornell.edu/uscode /18/usc_sec_18_00002703----000-.html]**, which requires law enforcement to show that the records are "relevant and material to an ongoing criminal investigation." Because that standard is easier to meet than that of a search warrant, it is less privacy-protective.

Cell phone tracking comes in two forms: police obtaining *retrospective* historical data kept by mobile providers for their own billing purposes that is typically not very detailed, or *prospective* tracking--which CNET was the first to report in a 2005 **article [http://www.cnet.com/Police-blotter-Cell-phone-tracking-rejected /2100-1030_3-5846037.html]** --that reveals the minute-by-minute location of a handset or mobile device.

Tracking cell phones can be useful for law enforcement. Agents from the Drug Enforcement Administration in Arizona tracked a tractor trailer with a drug shipment through a GPS-equipped Nextel phone owned by the suspect. Texas DEA agents have used cell site information in real time to locate a Chrysler 300M driving from Rio Grande City to a ranch about 50 miles away. Verizon Wireless and T-Mobile logs showing the location of mobile phones at the time calls were placed became evidence in a Los Angeles murder trial.

The civil liberties say they're not opposed to the government obtaining that information for legitimate purposes -- as long as the Fourth Amendment and federal privacy laws are being followed. This is, said Freiwald "a truly novel technology that can invade the privacy of all Americans who carry cell phones in their pockets or purses."

*Excerpts from Friday's oral arguments before the Third Circuit Court of Appeals*

**Justice Department's Eckenwiler:** That is what has come to be known in the vernacular as triangulation, where various measurements have been made from the towers in proximity to the phone to calculate a rough position to the phone?

**Judge Sloviter:** How close can you get ?

**Eckenwiler:** Well, what the regulations require is 50 meters of precision for a handset solution, essentially for all cases, 95 percent, it needs to be accurate within 150 meters... But that's a class of information that's separate and apart from what the government has requested here.

**Sloviter:** But can you get it? Does the statute permit it? Irrespective of what the government has asked for here, does the statute permit the government to request -- and according to the government to demand, if they make the requisite showing -- information that would let them know where the cell phone user is within 150 meters?

**Eckenwiler:** As to historical records, your honor.

**Sloviter:** Yes

**Eckenwiler:** The answer is if the carriers retain such information, yes, it would allow--

**Sloviter:** Suppose the information is last week?

**Eckenwiler:** The statute would allow the government to obtain that information.

**Sloviter:** There are governments in the world that would like to know where some of their people are, or have been. For example, have been at what may be happening today in Iran, have been at a protest, or at a meeting, or at a political meeting. Now, can the government assure us that -- one, it will never try to find out that information, and two, whether that information would not be covered by (d). [Ed. Note: Sloviter seems to be referring to a **2703(d) order [http://www.law.cornell.edu/uscode /18/usc_sec_18_00002703----000-.html]**.]

**Eckenwiler:** Your honor, I can't speak to future hypotheticals in terms of what might happen.

**Sloviter:** But don't we have to be concerned about that? If the statute would permit the government -- not this government right now but a government -- to get information as to where... Wouldn't the government -- a government -- find it useful if it could get that information without showing probable cause?

**Eckenwiler:** Your honor, the information at issue in this case certainly is useful, that's why the government's applying for it here.

**Sloviter:** But without showing probable cause. Because it's relevant. Your papers admit that the showing that needs to be made for a subsection (d) order is less than the showing that needs to be made for a warrant.

**Eckenwiler:** That's correct, your honor.

**Sloviter:** So the question is, can (d) be used for that purpose?

**Eckenwiler:** Yes, your honor. It can be used constitutionally for that purpose. And the reason I understand your honor's concern about those future cases, those hypotheticals. But I think it is clear from the Supreme Court's caselaw that Fourth Amendment issues must be measured on the basis of the facts before the court.

**Sloviter:** The question is, really, what can the government get? [Refers to a log of cell phone tracking.] They can get, here's 4:33 on the same day, 4:39 pm on the same day, 4:40 on the same day. That's pretty close.

**Eckenwiler:** And your honor, the calling records, the numbers that are being called, from whom calls are being received by the same user, we can compel them with a subpoena.

**Sloviter:** That's right. And as I read this, you can compel a lot of information that it looks like you wanted with a warrant. I don't understand -- I've been on this court for 30 years, more than 30 years. The magistrate judges that I have seen are not very grudging about granting warrants. If you could have gotten a probable cause warrant, why do you want to make the point that you don't have to show probable cause?

**Eckenwiler:** Well, it's interesting, your honor, because the rationale that was adopted in this case by the lower court wouldn't limit the reviewing court, the court to whom the application was presented, to probable cause. Under the rationale that was articulated below, the court could demand proof by a preponderance of the evidence. Judge Lenihan's opinion said it's up to the court to decide, in effect, what showing could be made. It vests the trial court, the magistrate judge, with what's essentially unlimited

Case 2:12-cv-01605-DLR-BSB   Document 86-9   Filed 02/04/14   Page 16 of 66

discretion to decide what showing should be made. And the government submits, your honor, that that's an inappropriate exercise in judicial discretion.

**Sloviter:** You're concerned that the magistrates will give you the warrants even if they don't have enough basis? Is that really the government's concern? I mean, that's backwards.

**Eckenwiler:** Your honor, I'm saying the magistrate could demand an even showing higher than probable cause.

**Sloviter:** Then they'd go up on appeal and the district judge wouldn't accept that.

**Eckenwiler:** That's why we're here today. The magistrate demanded a higher showing than what's required under the statute.

**Sloviter:** But didn't require more than probable cause.

**Eckenwiler:** Your honor, that's true.

**Sloviter:** The five magistrates signed -- five! -- I've never seen that before. Did you ever see that before?

**Eckenwiler:** I have not, your honor.

**Sloviter:** Neither have I. Five magistrate judges signed on to this opinion affirmed by the district court. They didn't demand more than probable cause. They demanded just probable cause. A constitutional standard.

**[http://www.cnet.com/profile/declan00/]**

## About Declan McCullagh [http://www.cnet.com/profile/declan00/]

**Declan McCullagh [http://www.mccullagh.org/]** is the chief political correspondent for CNET. Declan previously was a reporter for Time and the Washington bureau chief for Wired and wrote the Taking Liberties section and Other People's Money column for CBS News' Web site.

- [http://plus.google.com/112961607570158342254/]
- 
-

**Don't Miss**

about these links

_⫠_

**Member Comments**

**0 Comments/**

1 person following  Log in []

**Commenting FAQs [http://www.cnet.com
/2706-1_1-1954.html] / Guidelines [http://www.cnet.com** Post to:
**/2706-1_1-1947.html]]**
Newest [] / Oldest [] / Top Comments []

+ Follow conversation Post Comment As...

@CBS Interactive. All rights reserved.
CNET

- 
- 
- 

close

**ATTACHMENT 20**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 20:   Slashdot.org, *Secret Stingray Warrantless Cellphone Tracking* (Oct. 27,
2012), http://yro.slashdot.org/story/12/10/27/144229/secret-stingray-
warrantless-cellphone-tracking (last accessed: Nov. 28, 2012);

Slashdot
Stories
Slash Boxes
Comments

**Search**

7 Full 30 Abbreviated 25 Hidden                    SlashTV  Channels ▼  Library  Newsletter  Submit  Login  Join
/Sea
Score:
5
Nickname:
4
3
Password: 6-20 characters long
2
1    ☐  Public Terminal
0
-1
**Log In**   Forgot your password?
More Login

http://

**Log in with OpenID**

Close   Nickname:

Password:
• Stories
☐ Public Terminal
• Recent
• Popular
• Blog   Forgot your password?

Slashdot

• Ask Slashdot
Close   • Book Reviews
Close   Games
• Idle
• YRO
•
• Cloud
• Hardware
• Linux
• Management
• Mobile
• Science
• Security
• Storage






## Secret Stingray Warrantless Cellphone Tracking 62

Posted by Soulskill on Saturday October 27, @10:34AM
from the your-phone-is-broadcasting-an-ip-address dept.

Penurious Penguin writes *"Last year a Slashdot story mentioned the case of Daniel David Rigmaiden, or 'the Hacker.' With the help of an IMSI-catcher device, law enforcement had been able to locate and arrest the elusive 'Hacker,' leading to U.S. v. Rigmaiden. But far more elusive than the 'Hacker,' is the IMSI-catcher device itself — particularly the legalities governing its use. The secrecy and unconstitutionality of these Man In The Middle devices, i.e. 'stingrays,' has caught some attention. The EFF and ACLU have submitted an amicus brief in the Rigmaiden case; and EPIC, after filing an FOIA request in February and receiving a grossly redacted 67 out of 25,000 (6,000 classified) pages on the "stingray" devices, has now requested a district judge expedite disclosure of all documents. Some Judges also seem wary of the 'stingray,' having expressed concerns that their use violates the Fourth Amendment; and additionally, that information explaining how the technology is used remains too obscure. Perhaps the most controversial aspect of ISMI-catchers is their several-kilometer range. When a "stingray" is used to spoof a cellphone tower, thousands of innocent users may be collaterally involved. And while the government claims to delete all gathered data unrelated to the target, it also means no one else can know what that data really was. The government claims that because only attributes of calls — but not their content — are captured in the attack, search warrants aren't necessary."* (More, below.)

Penurious Penguin continues, "The use of a pen-register (outgoing) and trap & trace (incoming) device, requires little more than a mewl of penal curiosity before a court, and no warrant or follow-up on the case is needed. The pen/trap seems unwieldy enough, as the EFF explains:

> "Most worrisome, we've heard some reports of the government using pen/trap taps to intercept content that should require a wiretap order: specifically, the content of SMS text messages, as well as "post-cut-through dialed digits" (digits you dial after your call is connected, like your banking PIN number, your prescription refill numbers, or your vote for American Idol). intercept information about your Internet communications as well."

Precisely what data these "stingrays" collect will hopefully be soon revealed through such efforts as those of EPIC. It should be noted that the Stingray is one of multiple devices with the same application. The Stingray and several others are trademarks of the Harris Corporation. Some are quite pricey ($75,000), and others are, as mentioned last year by a Slashdot reader, peculiarly affordable — and available. For a more comprehensive overview of the subject, see this Wall Street Journal article."

twitter facebook

aclu eff fbi

←

## Related Links

→

Supreme Court To Hear First Sale Doctrine Case

**ATTACHMENT 21**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 21:   Carroll, Rory (The Guardian), *ACLU challenges 'stingray surveillance'*
*that allows police to track cellphones | World news | guardian.co.uk*
(Mar. 28, 2013), *available at*
http://www.guardian.co.uk/world/2013/mar/28/aclu-stingray-
surveillance-police-cellphones (last accessed: Apr. 16, 2013);

This site uses cookies. By continuing to browse the site you are agreeing to our use of cookies. **Find out more here**

**the**guardian

ads not by thi

# ACLU challenges 'stingray surveillance' that allows police to track cellphones

## Civil liberties activists asking federal court to disallow evidence obtained by technology that mimics a genuine cellphone tower

**Rory Carroll** in Los Angeles
guardian.co.uk, Thursday 28 March 2013 10.03 EDT



A stingray sweeps up data from other people nearby, regardless of whether they are the focus of the investigation. Photograph: Peter Parks/AFP/Getty Images

A secretive technology which lets police locate and track people through their cellphones in alleged violation of the US constitution will be challenged in a potential landmark court case on Thursday.

The American Civil Liberties Union hopes to rein in the little known but widespread "stingray" surveillance devices which it claims violate the fourth amendment and the right to privacy.

The group will urge a federal court in Arizona to disregard evidence obtained by a stingray in what could be a test case for limiting the technology's use without a warrant.

The case revolves around Daniel Rigmaiden, a hacker accused of leading a gang of sophisticated identity thieves which allegedly stole millions of dollars by filing bogus tax returns.

"We hope that the court sends the clear message to the government that it cannot keep judges in the dark. Judges are not rubber stamps – they are constitutional safeguards of our privacy," Linda Lyle, the attorney leading the case, wrote in an ACLU blog post on Wednesday.

The Electronic Frontier Foundation, an advocacy group, submitted an amicus brief with the ACLU, calling stingrays "the biggest technological threat to cellphone privacy that you don't know about".

A stingray mimics a cellphone tower, prompting a phone to connect to it even if no call is made. This lets a stingray operator send a signal to the phone, locate it and in some cases intercept conversations. The device sweeps up data from other people nearby, regardless of whether they are the focus of the investigation.

Stingray is the generic name for the technology. Similar devices, typically the size of a shoebox, have different names such as Triggerhead and Kingfish.

The FBI and other law enforcement agencies have used the technology at least since 2008 but according to the ACLU they have routinely concealed or downplayed its role in surveillance requests to federal magistrate judges.

"By withholding information about this technology from courts in applications for electronic surveillance orders, the federal government is essentially seeking to write its own search warrants," said Lyle.

Through a Freedom of Information Act request the ACLU recently obtained what it called "troubling" emails dated May 2011 from Department of Justice officials in northern California who acknowledged not being explicit about stingrays in court applications for electronic surveillance.

"It shows that the government was engaged in a widespread practice of withholding important information for judges, and that it did so for years," said Lyle.

The EFF said in a statement that the technology's unrestricted use violated the fourth amendment's prohibition of unreasonable searches and seizures:

"If uninformed courts approve the unregulated use of stingrays, they are essentially allowing the government to enter into the home via a cellular signal at law enforcement's discretion and rummage at will without any supervision. The government can't simply use technology to upend centuries of constitutional law to conduct a search

they would be prevented from doing physically."

The FBI so values the technology it has a policy of deleting the data it gathers to keep suspects in the dark about its capabilities, the Wall Street Journal reported.

Privacy right advocates including the Electronic Privacy Information Center have rallied around the case of Rigmaiden, 32, who faces charges of conspiracy, wire fraud, mail fraud and aggravated identity theft in an alleged scam which netted $4m in multiple bank accounts.

Rigmaiden has pleaded innocence and wants US district judge David Campbell to throw out evidence obtained by stingrays on grounds it violated his constitutional rights.

Prosecutors have argued Rigmaiden did not have reasonable "privacy expectations" in the whereabouts of his Verizon mobile broadband card and thus agents were not obliged to obtain a warrant.

## More from the Guardian   What's this?

Handbag thieves admit manslaughter 10 Apr 2013

Why is Spartacus so overlooked? 15 Apr 2013

Boston doctors remove nails and pellets from blast survivors 16 Apr 2013

Boston Marathon hit by double explosion 15 Apr 2013

Congo: We did whatever we wanted, says soldier who raped 53 women 11 Apr 2013

Kidney grown in lab successfully transplanted into rat 14 Apr 2013

## More from around the web      What's this?

Atheists Are Becoming the Most Annoying Demographic on the Internet (vice)

Thinking About Early Retirement? A Few Things to Consider: (Allstate Blog)

The 12 Worst Supermarkets in America (The Fiscal Times)

7 Ways Your Looks Are Killing Your Career (Salary.com)

Plastic Surgery Disasters: Lil Kim, Meg Ryan & More (Hollyscoop)

Which Supreme Court Justice was Turned Down by 14 Law Firms? (Makers)

## Ads by Google

Stop Jan Brewer's Agenda

Stop Gov. Brewer and her partisan attacks. Sign the petition today!

www.democraticgovernors.org

Affiliate Tracking

Easy to use Affiliate Software Top Platform in the Industry!

www.LinkTrust.com

Private Detective Course

Become a Private Investigator Fast. 100% Online Study. Free Info Now.

top-schools-online.net

ads not by thi

© 2013 Guardian News and Media Limited or its affiliated companies. All rights reserved.

;

## ATTACHMENT 22

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 22:   Nakashima, Ellen (The Washington Post), *Little-known surveillance
tool raises concerns by judges, privacy activists* (Mar. 27, 2013),
*available at* http://articles.washingtonpost.com/2013-03-
27/world/38070419_1_magistrate-judge-federal-agents-stingrays (last
accessed: Apr. 9, 2013);

Jobs   Real Estate   Rentals   Cars   Print Subscription   Today's Paper   Discussions   Going Out Guide   Personal Post   Videos

Politics   Opinions   Local   Sports   National   World   Business   Tech   Lifestyle   Entertainment   Jobs   More

# National Security

Home > Collections

# Little-known surveillance tool raises concerns by judges, privacy activists

By Ellen Nakashima, March 27, 2013

Federal investigators in Northern California routinely used a sophisticated surveillance system to scoop up data from cellphones and other wireless devices in an effort to track criminal suspects — but failed to detail the practice to judges authorizing the probes.

The practice was disclosed Wednesday in documents obtained under the Freedom of Information Act by the American Civil Liberties Union of Northern California — in a glimpse into a technology that federal agents rarely discuss publicly.

The investigations used a device known as a StingRay, which simulates a cellphone tower and enables agents to collect the serial numbers of individual cellphones and then locate them. Although law enforcement officials can employ StingRays and similar devices to locate suspects, privacy groups and some judges have raised concerns that the technology is so invasive — in some cases effectively penetrating the walls of homes — that its use should require a warrant.

Ads by Google

## Cyber Security Programs

UMUC offers cyber security programs entirely online. Enroll today!

www.umuc.edu/cybersecurityprogram

AdChoices



The issues, judges and activists say, are twofold: whether federal agents are informing courts when seeking permission to monitor suspects, and whether they are providing enough evidence to justify the use of a tool that sweeps up data not only from a suspect's wireless device but also from those of bystanders in the vicinity.

In Northern California, according to the newly disclosed documents, judges expressed concerns about the invasive nature of the technology.

"It has recently come to my attention that many agents are still using [StingRay] technology in the field although the [surveillance] application does not make that explicit," Miranda Kane, then chief of the criminal division of the Northern California U.S. attorney's office, said in a May 2011 e-mail obtained by the ACLU.

As a result of that, she wrote, "effective immediately, all . . . applications and proposed orders must be reviewed by your line supervisor before they are submitted to a magistrate judge."

The Justice Department has generally maintained that a warrant based on probable cause is not needed to use a "cell-site simulator" because the government is not employing them to intercept conversations, former officials said. But some judges around the country have disagreed and have insisted investigators first obtain a warrant.

"It's unsettled territory," said one U.S. law enforcement official, who spoke on the condition of anonymity because he was not authorized to speak for the record.



In a statement, Christopher Allen, a spokesman for the FBI, said the bureau advises field offices to "work closely with the relevant U.S. Attorney's Office to adhere to the legal requirements" of their respective districts.

One of the problems is there is "scant law" addressing the issue of cell-site simulators, said Brian L. Owsley, a federal magistrate judge in the Southern District of Texas, who in June wrote a rare public ruling on the issue. He denied an application to use a StingRay, in large part because he felt the investigating agent failed to explain the technology or how it would be used to gather the target's cellphone number.

Moreover, the government did not explain what it would do with the numbers and other data "concerning seemingly innocent cell phone users" that were also picked up.

Ads by Google

**Search for Vital Records**
Births, deaths, marriages, and much more. Find vital records online
www.myheritage.com/Vital_Records

"Neither the special agent nor the assistant United States attorney appeared to understand the technology very well," Owsley wrote. "At a minimum, they seemed to have some discomfort in trying to explain it."

At a recent conference on cellphone tracking issues at Yale University, Owsley said he thought that "there are magistrate judges around the country that are getting these requests and not realizing what these requests are," in some cases perhaps because the agents are not clear about their intent to use the technology.

"By withholding information about this technology from courts in applications for electronic surveillance orders, the federal government is essentially seeking to write its own search warrants," said Linda Lye, a staff attorney for the ACLU of Northern California.

Judges "need the opportunity to require privacy safeguards, such as rules on how to handle the data of innocent people that may be captured by the devices as well," she said. Lye will be arguing the issue on Thursday in a federal case in Arizona, in support of a defendant charged with tax fraud and identity theft. Daniel Rigmaiden, known as "the Hacker" to acquaintances and federal agents, was tracked in part with the use of a StingRay. He has alleged that investigators did not seek a court's approval to use the technology.

"The main concern we have in Rigmaiden is the government was not being forthright with the magistrate when it was seeking to use this device," said Lye, whose organization is one of several that have filed an amicus brief in the case.

The newly disclosed documents suggest that "Rigmaiden was not an isolated case," she said.

The government said it obtained a warrant to track Rigmaiden, but the ACLU is arguing that the government did not present key information about the surveillance device to the magistrate, rendering the warrant invalid.

Chris Soghoian, the ACLU's principal technologist, said cell-site simulators are being used by local, state and federal authorities.

"No matter how the StingRay is used — to identify, locate or intercept — they always send signals through the walls of homes," which should trigger a warrant requirement, Soghoian said. "The signals always penetrate a space protected by the Fourth Amendment."

Ads by Google

**Don't File BK in AZ***
Visit Our Law Firm First & See How We Can Help! 100% Free Consultation
www.BkPhoenix.com



**Ever Been Arrested?**

... then your arrest record is online and ANYONE can view it. Want to see what's in yours?

**We Recommend**

Federal agents talk to ex-D.C. official who says he was...
*June 1, 2012*

Judges Urge Standard Cellphone-Tracking Policy
*November 14, 2008*

Carrier IQ: Which wireless carrier is the biggest user?
*December 16, 2011*

**FEATURED ARTICLES**

**MORE:**

Book review: 'The Great Deformation: The Corruption of Capitalism in America' by David Stockman

Pope Francis was often quiet on Argentine sex abuse cases as archbishop

For insurance exchanges, states need 'navigators' — and hiring them is a huge task

The best and worst small businesses to start in 2013

The Secret to Cleaning Grout in Tile Floors

Three days that saved the world financial system

186
**Comments**



postfan10 wrote:
3/27/2013 8:42 PM MST

If the police want to use this kind of tool, they should be getting a warrant.



kritiki wrote:
3/28/2013 2:25 AM MST

911 cried for better security. Instead we created a security monster. Our Legislature has undermined the Judiciary and given unprecedented powers to the Executive to act for security and ignore the rights of US Citizens on matters of privacy. Our system has become akin to the defunct KGB and in line with the present Iranian Secret Service, where politics rules supreme not the rights of the people of Iran.



**Navy_CTT responds:**
3/28/2013 2:39 AM MST

It wasn't just 9-11. Americans demand that the government keep them protected - from hunger, homelessness, illness, old age; in pregnancy and youth; from ignorance and on and on and on.

Government can't keep you in its womb 24/7/365, safe against anything and everything life can throw at you, without controlling you, no more than your parents did when you were 5. It's the same thing. That's why we use the Latin word for "father" - "pater" - as the root of the description for the kind of government we demand and have: "paternalistic".

---

## View all comments »

Add your comment | Reply to a comment | Recommend a comment | Report an offensive comment

---

### More from The Washington Post

- Aid groups push Obama administration to shift the way US helps feed starving people abroad
  The Washington Post - World News

- North Korea diplomatic channel loses its luster
  The Washington Post - World News

- Six Americans, including three civilians, killed in attacks in Afghanistan
  The Washington Post - World News

- Canada loses 54,500 jobs in March, unemployment rises to 7.2 percent
  Featured Articles From The Washington Post

- In his first season at Louisville, Luke Hancock has had a big impact on Cardinals
  Featured Articles From The Washington Post

### Sponsored Headlines
[What's this?]

- What Happens to a Bail Bond When Found Not Guilty?
  eHow

- Dead Guy goes to his own funeral
  Mevio

- The Secret to Answering: Where Do You See Yourself in Five Years?
  Big Interview Blog

- California Man Allegedly Poisoned Girlfriend with Visine
  GMA

- Supermodel Naomi Campbell Mugged, Injured on Paris Street
  First to Know

---

**washingtonpost.com**   © 2013 The Washington Post    Terms of Service    Privacy Policy    Submissions and Discussion Policy    Ad Choices    Index by Date    Index by Keyword

## ATTACHMENT 23

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 23:   Huffingtonpost.com, *Daniel David Rigmaiden Case Reveals Stingray Cell Phone Tracker's Covert Use* (Mar. 28, 2013), *available at* http://www.huffingtonpost.com/2013/03/28/daniel-david-rigmaiden-stingray_n_2973749.html (last accessed: Apr. 4, 2013);



## Mother Turns Skinny in 4 Weeks
Scottsdale: Mom cut 20 Lbs in thighs, face and arm using this 1 weird trick...

ads not by this site

April 4, 2013

**HUFF POST** POLITICS

---

# Daniel David Rigmaiden Case Reveals Stingray Cell Phone Tracker's Covert Use

Posted: 03/28/2013 5:10 pm EDT  |  Updated: 03/28/2013 6:21 pm EDT


(Jean-Sébastien Evrard/AFP/Getty Images)

When the 74-count indictment of Daniel David Rigmaiden on tax, mail and wire fraud charges was revealed in 2010, a local Arizona newspaper said Rigmaiden had fallen prey to one of "the oldest steps in the law-enforcement playbook: a confidential informant."

A snitch may have helped bring Rigmaiden down. But there was another informant in the case, an electronic one. And ever since Rigmaiden's indictment was unveiled, the U.S. Department of Justice has fought doggedly to keep the public in the dark about how exactly it was used.

In a U.S. District Court of Arizona hearing on Thursday, the government is finally being forced to defend its use of a secretive cell phone tracking device called a stingray. Days before the hearing, the government admitted a key error in its use of court orders for stingrays.

If civil liberties advocates had their pick of who would become a case study in the use of 21st century phone tracking technology, they would probably not choose Rigmaiden. The federal government alleges that under the alias "the hacker," he organized a complex, multi-state operation to defraud the Internal Revenue Service. His co-conspirators never knew him by name: He allegedly used a wireless aircard and anonymous Internet addresses to connect with them.

It was that card that led the feds to his front door. Federal law enforcement agents trawled the San Francisco Bay Area with a stingray, which simulates a legitimate cell tower and forces phones to reveal their location and unique ID numbers.

"When the government uses this stuff, they drive through a neighborhood. They send signals through the walls of every home in the neighborhood," said Christopher Soghoian, principal technologist at the American Civil Liberties Union's Speech Privacy and Technology Project.

Soghoian compared the technology to the robots in "Minority Report," the "little insect-type robots that crawl under people's doors and then force open people's eyelids and scan their eyes." But at least in that movie, he added, "they're only looking for a particular, known target."

**Sponsored Links**


**Truth About Annuities\***
Don't Buy Any Annuity Until You Watch This Special Video Report!
SeniorAnnuityAlert.com


**Legalize Gay Marriage?**
Should Gay Marriage Be Legal? Vote in Urgent Poll Now.
www.newsmax.com


**New Rule in Arizona**
(APR 2013): If you pay for car insurance you better read this...
www.ConsumerFinanceDaily.com

Buy a link here

Stingrays, Soghoian argued, violate Americans' Fourth Amendment right "to be secure in their ... houses" and its prohibition against general warrants not tailored to one person. The federal government has said it takes pains to delete information unrelated to the targets of its investigations.

The government's use of stingrays even in relatively low-level tax fraud cases might never have become known if Rigmaiden weren't a dogged jailhouse lawyer, someone who has churned through several court-appointed attorneys and now represents himself. Rigmaiden has been in jail since 2008, but it took until 2011 to force the government to admit that it had used a stingray against him.

The federal judge in Rigmaiden's case is considering whether to throw out the evidence collected by the phone tracking device -- and all the fruits of the searches thereafter. That could conceivably mean Rigmaiden walks.

One central issue is whether the court order used to hunt down Rigmaiden with a stingray counts as a proper warrant. The ACLU of Northern California, which has filed a friend-of-the-court brief in the case, argues that since the government did not specifically tell the judge that it was going to use a stingray, the subsequent search was invalid.

In a document released March 22, the government revealed what the ACLU had long suspected: that in similar cases, U.S. attorneys have often failed to disclose to front-line magistrate judges that they are using stingrays. Instead, they've made their applications read like standard requests for basic cell phone surveillance methods, called pen registers, that record only the numbers of incoming and

outgoing calls.

"It has recently come to my attention that many agents" were using stingrays, San Francisco federal prosecutor Miranda Kane wrote in the May 2011 email, "although the pen register application does not make that explicit."

"While we continue work on a long term fix for this problem it is important that we are consistent and forthright in our pen register requests," she added.

As Kane's email suggests, the federal government has been under increasing pressure from judges to obtain a warrant before it uses stingrays. In court filings related to the Rigmaiden stingray case, the government has essentially claimed that the court orders it obtained were nothing out of the ordinary.

U.S. District Judge David G. Campbell has told prosecutors that they should be prepared to support that assertion.

"There's a lot riding on this," said Linda Lye, the ACLU attorney making her group's argument as a third party in Thursday's hearing. The government has a legal "duty of candor" to be honest with judges when it does things like apply for search warrants or pen registers. The question in this case, Lye said, is "what does that 'duty of candor' mean when it comes to new technology?"

by Taboola




Britney Doesn't Need
Photoshop



Julia Roberts' Malibu
Mansion Is An
Architect's Dream
Lonny



Parents Outraged
Over Victoria's Secret
Underwear



Brian Kilmeade
Walks Off Set Over
'Belly Button'
Remarks

**ATTACHMENT 24**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 24:   Waterman, Shaun (The Washington Times), *Can you hear me now?
Feds admit FBI warrantless cellphone tracking 'very common'* (Mar.
29, 2013), *available at*
http://www.washingtontimes.com/news/2013/mar/29/feds-fbi-
warrantless-cell-tracking-very-common/ (last accessed: Apr. 4, 2013);

| NEWS | OPINION | VIDEO | SPORTS | LIFE | MEDIA | SPECIALS | COMMUNITIES |
|------|---------|-------|--------|------|-------|----------|-------------|

Search

EDITORS' PICKS:   China finds more cases of bird flu previously not seen in humans

CONNECT:

# Can you hear me now? Feds admit FBI warrantless cellphone tracking 'very common'

COMMENTS (99)     SIZE: + / -     PRINT

By Shaun Waterman - The Washington Times                    Friday, March 29, 2013

FBI(/topics/federal-bureau-of-investigation/) investigators for at least five years have routinely used a sophisticated cellphone tracking(#) tool that can pinpoint callers' locations and listen to their conversations — all without getting a warrant for it, a federal court was told this week.

The use of the "Stingray," as the tool is called, "is a very common practice" by federal investigators, Justice Department(/topics/department-of-justice/) attorneys told the U.S. District Court for Arizona(/topics /us-district-court-for-arizona/) Thursday, according to the American Civil Liberties Union(/topics/american-civil-liberties-union/) .

Installed in an unmarked van, Stingray mimics a cellphone tower, so it can pinpoint the precise location of any mobile device in range and intercept conversations and data, said Linda Lye(/topics/linda-lye/) , staff attorney at the ACLU(/topics/american-civil-liberties-union/) of Northern California in a blog post about the case.

In a rare public discussion of federal electronic surveillance capabilities and authorities, Justice Department(/topics/department-of-justice/) lawyers told the court(/topics/un-court/) hearing that, instead of a warrant, the FBI(/topics/federal-bureau-of-investigation/) operates Stingray and other cellphone-mimicking technology under the authority of "pen register" orders. These court orders, also known as "tap and trace" orders, are generally issued to allow investigators to collect only so-called "metadata" — like all phone numbers calling to or called from a particular number.

But Stingray collects much more than just phone numbers and also "sweep[s] up the data of innocent people who happen to be nearby," according to the ACLU(/topics/american-civil-liberties-union/) filing.

Given the broad nature of the information Stingray collects and its ability to eavesdrop on conversations, many federal judges insisted that they should be told when its use was envisaged under a tap and trace order, the ACLU(/topics/american-civil-liberties-union/) filing says.

Tap and trace orders are generally more easily granted than a warrant, which requires "probable cause" under the Fourth Amendment.

But Justice Department(/topics/department-of-justice/) emails that the group obtained under the federal Freedom of Information Act and filed with their brief show that government lawyers were concerned some FBI(/topics/federal-bureau-of-investigation/) agents were not properly disclosing their use of Stingray.

"It has recently come to my attention that many agents are still using [Stingray] technology in the field although the pen register(#) application does not make that explicit," reads one May 2011 email from a Justice Department(/topics/department-of-justice/) attorney.

"It is important that we are consistent and forthright in our pen register requests to the magistrates," the attorney concludes.

The ACLU(/topics/american-civil-liberties-union/) has filed an amicus brief in the case U.S. vs. Rigmaiden. An amicus brief is filed not by the defendant or anyone on his behalf, but by another interested party.

In the case, first brought in 2008, Mr. Rigmaiden, charged with identity theft(#) , is seeking to suppress evidence obtained by Stingray on the basis that using it constitutes a search and requires a probable cause warrant.

The Department of Justice(/topics/department-of-justice/) declined a request for comment, as neither they nor the FBI(/topics/federal-bureau-of-investigation/) generally speak about ongoing litigation.


Men: You won't need aphrodisiacs with this. Try this weird testosterone trick that works...


Stocks soar—but some wealthy citizens are preparing for the "End of America." Here's why...


Scottsdale - New rule allows many Arizona residents to get car insurance at half-price.


Famous TV doctor calls this new mens diet pill the "Holy Grail" of weight loss...

Advertisement

## ATTACHMENT 25

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 25:   Zetter, Kim (Wired Magazine), *Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight* (Apr. 09, 2013), *available at* http://www.wired.com/threatlevel/2013/04/verizon-rigmaiden-aircard/all/ (last accessed: Apr. 10, 2013);

Threat Level
Privacy, Crime and Security Online
· Surveillance

Like 3k 1,511      1.3k      Share   154

# Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight

· By Kim Zetter
· 04.09.13
· 6:30 AM

Follow @KimZetter



*Image: rmuser/Flickr*

A legal fight over the government's use of a secret surveillance tool has provided new insight into how the controversial tool works and the extent to which Verizon <u>Wireless</u> aided federal agents in using it to track a suspect.

Court documents in a case involving accused identity thief Daniel David Rigmaiden describe how the wireless provider reached out remotely to reprogram an <u>air card</u> the suspect was using in order to make it communicate with the government's surveillance tool so that he could be located.

Rigmaiden, who is accused of being the ringleader of a $4 million tax fraud operation, asserts in court documents that in July 2008 Verizon surreptitiously reprogrammed his air card to

make it respond to incoming voice calls from the FBI and also reconfigured it so that it would connect to a fake cell site, or stingray, that the FBI was using to track his location.

Air cards are devices that plug into a computer and use the wireless cellular networks of phone providers to connect the computer to the internet. The devices are not phones and therefore don't have the ability to receive incoming calls, but in this case Rigmaiden asserts that Verizon reconfigured his air card to respond to surreptitious voice calls from a landline controlled by the FBI.

The FBI calls, which contacted the air card silently in the background, operated as pings to force the air card into revealing its location.

In order to do this, Verizon reprogrammed the device so that when an incoming voice call arrived, the card would disconnect from any legitimate cell tower to which it was already connected, and send real-time cell-site location data to Verizon, which forwarded the data to the FBI. This allowed the FBI to position its stingray in the neighborhood where Rigmaiden resided. The stingray then "broadcast a very strong signal" to force the air card into connecting to it, instead of reconnecting to a legitimate cell tower, so that agents could then triangulate signals coming from the air card and zoom-in on Rigmaiden's location.

To make sure the air card connected to the FBI's simulator, Rigmaiden says that Verizon altered his air card's Preferred Roaming List so that it would accept the FBI's stingray as a legitimate cell site and not a rogue site, and also changed a data table on the air card designating the priority of cell sites so that the FBI's fake site was at the top of the list.

Rigmaiden makes the assertions in a 369-page document he filed in support of a motion to suppress evidence gathered through the stingray. Rigmaiden collected information about how the stingray worked from documents obtained from the government, as well as from records obtained through FOIA requests filed by civil liberties groups and from open-source literature.

During a hearing in a U.S. District Court in Arizona on March 28 to discuss the motion, the government did not dispute Rigmaiden's assertions about Verizon's activities.

The actions described by Rigmaiden are much more intrusive than previously known information about how the government uses stingrays, which are generally employed for tracking cell phones and are widely used in drug and other criminal investigations.

The government has long asserted that it doesn't need to obtain a probable-cause warrant to use the devices because they don't collect the content of phone calls and text messages and operate like pen-registers and trap-and-traces, collecting the equivalent of header information.

The government has conceded, however, that it needed a warrant in his case alone — because the stingray reached into his apartment remotely to locate the air card — and that the activities performed by Verizon and the FBI to locate Rigmaiden were all authorized by a court order signed by a magistrate.

The Electronic Frontier Foundation and the American Civil Liberties Union of Northern California, who have filed an amicus brief in support of Rigmaiden's motion, maintain that the order does not qualify as a warrant and that the government withheld crucial information from the magistrate — such as identifying that the tracking device they planned to use was a stingray and that its use involved intrusive measures — thus preventing the court from properly fulfilling its oversight function.

"It shows you just how crazy the technology is, and [supports] all the more the need to explain to the court what they are doing," says EFF Staff Attorney Hanni Fakhoury. "This is more than just [saying to Verizon] give us some records that you have sitting on your server. This is reconfiguring and changing the characteristics of the [suspect's] property, without informing the judge what's going on."

The secretive technology, generically known as a stingray or IMSI catcher, allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices like air cards into connecting to the stingray instead of a phone carrier's legitimate tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location.

By moving the stingray around and gathering the wireless device's signal strength from various locations in a neighborhood, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

Use of the spy technology goes back at least 20 years. In a 2009 Utah case, an FBI agent described using a cell site emulator more than 300 times over a decade and indicated that they were used on a daily basis by U.S, Marshals, the Secret Service and other federal agencies.

The FBI used a similar device to track former hacker Kevin Mitnick in 1994, though the version used in that case was much more primitive and passive.

A 1996 *Wired* story about the Mitnick case called the device a Triggerfish and described it as "a technician's device normally used for testing cell phones." According to the story, the Triggerfish was "a rectangular box of electronics about a half a meter high controlled by a PowerBook" that was essentially "a five-channel receiver, able to monitor both sides of a conversation simultaneously." The crude technology was hauled around in a station wagon and van. A black coaxial cable was strung out of the vehicle's window to connect the Triggerfish to a direction-finding antenna on the vehicle's roof, which had four antenna prongs that reached 30 centimeters into the sky.

The technology has become much sleeker and less obtrusive since then, but still operates under the same principles.

In Rigmaiden's case, agents apparently used two devices made by a Florida-based company called Harris. One was the company's StingRay system, which is designed to work from a vehicle driven around a neighborhood to narrow a suspect's location to a building. Once agents tracked the signals from Rigmaiden's air card to the Domicilio Apartments complex in Santa Clara, California, they apparently used another device made by Harris called the KingFish — a handheld system that allowed them to walk through the complex and zero-in on Rigmaiden's air card in apartment 1122.

Although a number of companies make stingrays, including Verint, View Systems, Altron, NeoSoft, MMI, Ability, and Meganet, the Harris line of cell site emulators are the only ones that are compatible with CDMA2000-based devices. Others can track GSM/UMTS-based communications, but the Harris emulators can track CDMA2000, GSM and iDEN devices, as well as UMTS. The Harris StingRay and KingFish devices can also support three different communication standards simultaneously, without having to be reconfigured.

Rigmaiden was arrested in 2008 on charges that he was the mastermind behind an operation that involved stealing more than $4 million in refunds from the IRS by filing fraudulent tax returns. He and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process. Rigmaiden has been charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud.



A PC5740 Air Card.

The surveillance of Rigmaiden began in June 2008 when agents served Verizon with a grand jury subpoena asking for data on three IP addresses that were allegedly used to electronically file some of the fraudulent tax returns. Verizon reported back that the three IP addresses were linked to an air card account registered in the name of Travis Rupard — an identity that Rigmaiden allegedly stole. The air card was identified as a UTStarcom PC5740 device that was assigned a San Francisco Bay Area phone number.

A court order was then submitted to Verizon Wireless requiring the company to provide historical cell site data on the account for the previous 30 days to determine what cell towers the air card had contacted and determine its general location. Verizon responded by supplying the government with information that included the latitude and longitude coordinates for five cell sites in San Jose and Santa Clara cities, in the heart of Silicon Valley. In July, the government served Verizon Wireless with another court order directing the company to assist the FBI in the use and monitoring of a mobile tracking device to locate an unidentified suspect. The order directed Verizon Wireless to provide the FBI with any "technical assistance needed to ascertain the physical location of the [air card]...."

The government has fought hard to suppress information about how it uses stingrays, but in his motion to suppress, Rigmaiden lays out in great detail how the surveillance occurred and the nature of the technical assistance Verizon provided the FBI.

On the morning of July 14, 2008, FBI Agent Killigrew created a cell tower range chart/map consisting of a street map, plotted Verizon Wireless cell site sectors belonging to cell site Nos. 268, 139, and 279, and a triangulated aircard location signature estimate represented by a shaded area. On the chart/map, the total land area collectively covered by cell site Nos. 268, 139, and 279 is approximately 105,789,264 ft$^2$. FBI Agent Killigrew used triangulation techniques and location signature techniques to eliminate 93.9% of that 105,789,264 ft$^2$ area resulting in the location estimate being reduced to 6,412,224 ft$^2$ represented by the shaded area. The shaded area on the cell tower range chart covers the location of apartment No. 1122 at the Domicilio apartment complex.

On July 15, agents with the FBI, IRS and US Postal Service flew to San Jose to triangulate Rigmaiden's location using the stingray. They worked with technical agents from the San Francisco FBI's Wireless Intercept and Tracking Team to conduct the real-time tracking.

According to Rigmaiden, the agents drove around the cell site areas gathering information about signal range and radio frequencies for each cell site sector. "The radio frequency information was needed so that the FBI technical agents could properly configure their StingRay and KingFish for use in cell site emulator mode," Rigmaiden writes. "By referencing a list of all the radio frequencies already in use, the FBI was able to choose an unused frequency for use by its emulated cellular network that would not interfere with the various FCC licensed cellular networks already operating in the noted area."

The next day, Verizon Wireless surreptitiously reprogrammed Rigmaiden's air card so that it would recognize the FBI's stingray as a legitimate cell site and connect to it "prior to attempting connections with actual Verizon Wireless cell sites." The FBI needed Verizon to reprogram the device because it otherwise was configured to reject rogue, unauthorized cell sites, Rigmaiden notes.

On July 16, the FBI placed 32 voice calls to the air card between 11am and 5pm. Each time the air card was notified that a call was coming in, it dropped its data connection and went into idle mode. At the same time, it sent real-time cell site location information to Verizon, which forwarded the information to the FBI's DCS-3000 servers, part of the elaborate digital collection system the FBI operates for wiretapping and pen-registers and trap-and-traces. From the FBI's servers, the location data was transmitted wirelessly through a VPN to the FBI's technical agents "lurking in the streets of Santa Clara" with the StingRay.



A stingray, made by Harris Corp. *Image: U.S. Patent and Trademark Office*

At this point, the StingRay took over and began to broadcast its signal to force the air card — and any other wireless devices in the area — to connect to it, so that agents could zoom-in on Rigmaiden's location.

"Because the defendant attempted to keep his aircard continuously connected to the Internet, the FBI only had a very short window of time to force the aircard to handoff its signal to the StingRay after each surreptitious voice call [and] the FBI needed to repeatedly call the aircard in order to repeatedly boot it offline over the six hours of surreptitious phone calls," Rigmaiden writes. "Each few minute window of time that followed each denial-of-service attack (i.e., surreptitious phone call) was used by the FBI to move its StingRay, while in cell

site emulator mode, to various positions until it was close enough to the aircard to force an Idle State Route Update (i.e., handoff)."

Rigmaiden maintains that once the connection was made, the StingRay wrote data to the air card to extend the connection and also began to "interrogate" the air card to get it to broadcast its location. The FBI used the Harris AmberJack antenna to deliver highly-directional precision signals to the device, and moved the StingRay around to various locations in order to triangulate the precise location of the air card inside the Domicilio Apartments complex.

According to Rigmaiden, agents also transmitted Reverse Power Control bits to his air card to get it to transmit its signals at "a higher power than it would have normally transmitted if it were accessing cellular service through an actual Verizon Wireless cell site."

Once agents had tracked the device to the Domicilio Apartments complex, they switched out the StingRay for the handheld KingFish device to locate Rigmaiden's apartment within the complex.

Around 1am on July 17, an FBI agent sent a text message to another FBI agent stating, "[w]e are down to an apt complex...." By 2:42 am, one of the FBI technical agents sent a text message to someone stating that they had "[f]ound the card" and that agents were "working on a plan for arrest."

Agents still didn't know who was in the apartment — since Rigmaiden had used an assumed identity to lease the unit — but they were able to stake out the apartment complex and engage in more traditional investigative techniques to gather more intelligence about who lived in unit 1122. On August 3, while the apartment was still under surveillance, Rigmaiden left the unit. Agents followed him a short distance until Rigmaiden caught on that he was being followed. After a brief foot chase, he was arrested.

Rigmaiden and the American Civil Liberties Union and Electronic Frontier Foundation have argued that the government did not obtain a legitimate warrant to conduct the intrusive surveillance through the stingray. They say it's indicative of how the government has used stingrays in other cases without proper disclosure to judges about how they work, and have asked the court to suppress evidence gathered through the use of the device.

U.S. District Court Judge David Campbell is expected to rule on the motion to suppress within a few weeks.

**Pages:** 1 2 View All
See Also:
Related

Inside DCSNet, the FBI's Nationwide Eavesdropping Network



Government Fights for Use of Spy Tool That Spoofs Cell Towers



Feds' Use of Fake Cell Tower: Did it Constitute a Search?



Identity Thieves Filed for $4 Million in Tax Refunds Using Names of Living and Dead



You Might Like

*Bloodline*: The New *Evil Dead* Doesn't Care About Your Nostalgia



Wide Body: Kickstarter Darling Pebble Sparks Its First Crowdfunded Accessory



Sticky-Fingered Plant May Hold the Secret to Snaring Bed Bugs



Everything I Know About *Mad Men*, I Learned From the Season 6 Premiere





Kim Zetter is a senior reporter at Wired covering cybercrime, privacy, security and civil liberties.
Read more by Kim Zetter
Follow @KimZetter and @ThreatLevel on Twitter.
Post Comment | 128 Comments and 1499 Reactions |  Permalink
Back to top

Like 3k Tweet 1,511    1.3k

Reddit  Digg Stumble Upon Email

**128 comments** · 1499 reactions                       5

 Leave a message...

**ATTACHMENT 26**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 26:   Zetter, Kim (Wired Magazine), *Judge Allows Evidence Gathered From
FBI's Spoofed Cell Tower* (May. 08, 2013), *available at*
http://www.wired.com/threatlevel/2013/05/rigmaiden-cell-tower-
evidence/ (last accessed: May 14, 2013);

Threat Level
Privacy, Crime and Security Online
› Surveillance
Share on Facebook
215 shares

Tweet  254       39       Share   17

# Judge Allows Evidence Gathered From FBI's Spoofed Cell Tower

› By Kim Zetter
› 05.08.13
› 5:40 PM

Follow @KimZetter



*Photo: Alan Levine/Flickr*

An Arizona judge has denied a motion to suppress evidence collected through a spoofed cell tower that the FBI used to track the location of an accused identity thief.

The ruling means that the government may use not only evidence gathered through its fake cell tower to locate an air card that Daniel David Rigmaiden was using to access the internet, but also evidence gathered from the apartment to which they tracked him through the air card and evidence collected from a storage space and computer hard drives found in the apartment and storage locker.

In his ruling, U.S. District Judge David Campbell based his decision on whether Rigmaiden had a reasonable expectation of privacy in the use of the air card inside his apartment, as well as in the

apartment itself and the storage unit that was discovered through the search of the apartment. Judge Campbell concluded that Rigmaiden did not have a reasonable expectation of privacy in any of these because he had obtained the air card and rented the apartment and storage space through fraudulent means — that is, using identifications that he had stolen from other people.

Campbell wrote that even if Rigmaiden had a subjective expectation of privacy in these items, "the Court cannot conclude that his expectation is one society should be prepared to recognize as objectively reasonable."

Prosecutors assert that Rigmaiden purchased the air card in May of 2006 using the stolen identity of Travis Rupard, and maintained a Verizon wireless account used with the air card under the same name. He also allegedly obtained a Visa card in the name of Andrew Johnson, a deceased individual, to purchase the laptop computer he used with the air card. He allegedly rented the apartment under the name of Steven Travis Brawner, a deceased individual.

According to authorities, Rigmaiden then used the air card and the laptop computer to file hundreds of false tax returns using the names of hundreds of deceased individuals.

"One who so thoroughly immerses himself in layers of false identities should not later be heard to argue that society must recognize as legitimate his expectation of privacy in the location and implements of his fraud," Campbell wrote in his ruling, citing a number of precedent-setting cases to support his decision, including a Ninth Circuit decision that a defendant can have no expectation of privacy in a computer that is obtained through fraud. "Having utterly disregarded the privacy rights of Travis Rupard, Steven Brawner, and Andrew Johnson, not to mention the many other names used in his scheme, Defendant cannot now credibly argue that he had a legitimate expectation of privacy in the devices and apartment he acquired through the fraudulent use of their identities."

The ruling is a huge win for the government, which would have been hard-pressed to preserve its case against Rigmaiden without evidence gathered from the apartment and seized hard drives.

But the American Civil Liberties Union, which filed an amicus brief in support of Rigmaiden's motion to suppress, says the judge missed the mark on a number of issues in the case. According to Linda Lye, a staff attorney for the ACLU's Northern California office, past rulings have asserted that a defendant doesn't have the expectation of privacy when it comes to someone else's property. But in Rigmaiden's case, there is no dispute that the air card was his and that the aliases he used to obtain the air card and rent the apartment were being used by him.

"If you can't connect that the other name [you are using] is you, then there's no expectation of privacy," she told Wired. "But there's no dispute that the aliases that Rigmaiden used were his aliases. Also, the government talks a lot of about fraud, but fraud has a very legal definition. There has to be a material misrepresentation that caused harm, but there's no showing that the apartment complex or Verizon felt that Rigmaiden's use of another name was material to the transaction or that they suffered any harm. They were all paid."

Rigmaiden was arrested in 2008 on charges that he was the mastermind behind an operation that involved stealing more than $4 million in refunds from the IRS by filing fraudulent tax returns. He and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process. Rigmaiden has been charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud.

In court documents, Rigmaiden asserted that in July 2008 Verizon surreptitiously reprogrammed his air card so that it would connect to a fake cell site, or stingray device, that the FBI was using to track his location.

Air cards are devices that plug into a computer and use the wireless cellular networks of phone providers to connect the computer to the internet. The devices are not phones and therefore don't have the ability to receive incoming calls, but in this case Rigmaiden asserts that Verizon

reconfigured his air card to respond to surreptitious voice calls from a landline controlled by the FBI.

The FBI calls, which contacted the air card silently in the background, operated as pings to force the air card into revealing its location so they could use the stingray to track him.

The secretive technology, generically known as an IMSI catcher, allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices like air cards into connecting to the stingray instead of a phone carrier's legitimate tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location.

By moving the stingray around and gathering the wireless device's signal strength from various locations in a neighborhood, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

In order to use the stingray with Rigmaiden's air card, the defendant asserts in court documents that Verizon reprogrammed his air card so that when an incoming voice call arrived, the card would disconnect from any legitimate cell tower to which it was already connected, and send real-time cell-site location data to Verizon, which forwarded the data to the FBI. This allowed the FBI to position its stingray in the neighborhood where Rigmaiden resided. The stingray then "broadcast a very strong signal" to force the air card into connecting to it, instead of reconnecting to a legitimate cell tower, so that agents could then triangulate signals coming from the air card and zoom-in on Rigmaiden's location.

To make sure the air card connected to the FBI's simulator, Rigmaiden says that Verizon altered his air card's Preferred Roaming List so that it would accept the FBI's stingray as a legitimate cell site and not a rogue site, and also changed a data table on the air card designating the priority of cell sites so that the FBI's fake site was at the top of the list.d

The government has never disputed Rigmaiden's assertions about Verizon's activities or that it relied on the stingray to locate Rigmaiden in his apartment.

But the actions described by Rigmaiden are much more intrusive than previously known information about how the government uses stingrays, which are generally employed for tracking cell phones and are widely used in drug and other criminal investigations.

Rigmaiden sought to suppress evidence obtained through the use of the stingray on grounds that it involved a search of his apartment and that the government did not obtain a probable-cause warrant to use the stingray.

The government has long asserted that it doesn't need to obtain a probable-cause warrant to use stingrays because they don't collect the content of phone calls and text messages and operate like pen-registers and trap-and-traces, collecting the equivalent of header information.

The government has conceded, however, that it needed a warrant in Rigmaiden's case alone — because the stingray reached into his apartment remotely to locate the air card — and that the activities performed by Verizon and the FBI to locate Rigmaiden were all authorized by a court order signed by a magistrate.

But the ACLU and the Electronic Frontier Foundation argued in their amicus brief that the order the government obtained did not qualify as a warrant and that the government withheld crucial information from the magistrate who issued the order to use the device — such as identifying that the tracking device they planned to use was a stingray and that its use involved intrusive measures — thus preventing the court from properly fulfilling its oversight function. The government did not tell the magistrate that all phones and devices in the vicinity of a stingray will connect to it when it is turned on, not just those of a target being tracked.

Judge Campbell disagreed with the civil liberties groups on all counts.

"The intrusion that allowed agents to locate the aircard – using a mobile tracking device to send signals to and receive signals from the aircard – was not a 'severe intrusion,'" he wrote in his ruling.

"The evidence in this case suggests that Defendant used the aircard and laptop computer to perpetrate an extensive scheme of fraud through electronic communications. The Court cannot conclude that the government's corresponding use of electronic communications to find the aircard violated any legitimate expectation of privacy."

The judge also ruled that the government was not in the wrong for failing to disclose to a magistrate judge that it planned to use a stingray to track the defendant, or to explain to the judge how the tracking device it intended to use worked. He characterized this information as a "detail of execution which need not be specified."

Lye says the government has a duty of candor when seeking court approval for the use of surveillance technology, and the judge's ruling has strong implications for any new surveillance technology used by federal agencies.

"When the government is seeking a warrant to use new technology, it has the duty to explain to the court what that technology is and how it works," she said. "Stingrays are a very potent example of why that is so, because it scoops up innocent information of third parties who are not under probable cause surveillance."

Rigmaiden's case is expected to go to trial later this month.

› Related
› You Might Like
› Related Links by Contextly


›
›  of FBI Smartphone Surveillance Tool Revealed in Court Fight
›
›  of FBI Smartphone Surveillance Tool Revealed in Court Fight
›
›  nent Fights for Use of Spy Tool That Spoofs Cell Towers
›
› ...e of Fake Cell Tower: Did it Constitute a Search? | Threat ...


› Identity Thieves Filed for $4 Million in Tax Refunds Using Names of ...


› ...edible Machine Is Back, Spiritually
›



nder Chris Hadfield Bids Farewell to the ISS With Bowie Cover



Administration Secretly Obtains Phone Records of AP Journalists



Pulled Off a Federal Sting That Cost Google $500 Million

Kim Zetter is a senior reporter at Wired covering cybercrime, privacy, security and civil liberties.
Read more by Kim Zetter
Follow @KimZetter and @ThreatLevel on Twitter.
Post Comment | 43 Comments | Permalink
Back to top

Share on Facebook
215 shares
Tweet 254        39
Reddit  Digg Stumble Upon Email

## 44 comments

 0



Leave a message...

**Best**    **Community**                                    Share     ⚙

**Michael Moon** · 6 days ago
And yet when a corporation does much the same, by putting all the liabilities in one corporation
and all the profit in another, and then bankrupts or closes the one created as a vehicle to hold all
the bad paper created - well that is legal.
7    1    Reply   Share ›

> **Chuckiechan** → Michael Moon · 5 days ago
> What does that have with Rigmaiden defrauding the government using fraudulent ID's to
> get tax refunds that were not due to him?
>
> I fail to see the connection...
> 2    1    Reply   Share ›

**syrik** · 6 days ago
The judges reasoning for disallowing an expectation of privacy is spot on. You shouldn't be
granted rights to privacy in order to commit crimes. Rather, once you begin criminal activity, you
should expect to be caught.
18    7    Reply   Share ›

> **crunchy2k** → syrik · 6 days ago
> That is not what I read the judge is saying here. He is saying if you use a known stolen
> identity to pay for a Verizon cell device or any storage facilities, then you shouldn't expect
> any degree of privacy under the law. If Rigmaiden had used his real name to order the cell
> device and rent the buildings, then he should have been granted the safeguards a private
> citizen enjoys. As Rigmaiden is innocent until proven guilty.
> 14    1    Reply   Share ›

> > **syrik** → crunchy2k · 6 days ago
> > If he used his real name he wouldn't have committed a crime, at least as far as the
> > fraudulent account that he was caught using.
> > 3    3    Reply   Share ›

> > **Chuckiechan** → crunchy2k · 5 days ago
> > The judge did not rule on "what if he used his real name"...
> >
> > The guy is a crook.
> > 1    1    Reply   Share ›

**ATTACHMENT 27**

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 27:   Letter from Kim Zetter (Wired Digital) to Daniel Rigmaiden, April 3,
2013; Re: requesting additional information; Note: Kim Zetter's email
address and phone number redacted;

# WIRED DIGITAL

2 April 2013

Daniel David Rigmaiden
Inmate #: 10966111
Florence-AZ-Florence-CADC-6300
CENTRAL ARIZONA DETENTION CENTER
P.O. Box 6300
Florence, AZ 85132

Dear Daniel,

I'm a reporter for *Wired* in San Francisco who covers computer security and civil liberties issues. I've written extensively on Fourth Amendment issues with regard to GPS trackers and location data.

I've been following your case since 2010 and attended your hearing last week in Phoenix regarding your motion to suppress, related to the government's use of a stingray and searches of your apartment, storage space and hard drives. I've also read through your 369-page motion to suppress.

I'd be interested in speaking with you about the case and perhaps even visiting you to discuss the issues.

I'm not sure if you have access to Corrlinks, but I do have an account if you're able to communicate that way.

I look forward to hearing from you.

Regards,

Kim Zetter
Senior Reporter
Wired
415

@

520 THIRD STREET, SUITE 305  SAN FRANCISCO, CA 94107 | V:415.276.5054  F:415.276.8490  E:info@wired.com

Threat Level
Privacy, Crime and Security Online
Crime
Surveillance
Hacks and Cracks

Like 409 5      34      Share    44

# Government Fights for Use of Spy Tool That Spoofs Cell Towers

By Kim Zetter
03.29.13
9:22 PM
Edit

Follow @KimZetter



The government is fighting a challenge to its use of a so-called stingray device that emulated a legitimate cellphone tower (such as the real tower above) in order to trick a suspect's Verizon Wireless device into connecting to it and revealing his location. *Photo: Alan Levine/Flickr*

PHOENIX, Arizona — The government's use of a secret spy tool was on trial on Thursday in a showdown

between an accused identity thief and more than a dozen federal lawyers and law enforcement agents who were fighting to ensure that evidence obtained via a location-tracking tool would be admissible in court.

At issue is whether law enforcement agents invaded Daniel David Rigmaiden's privacy in 2008 when they used a so-called stingray to track his location through a Verizon Wireless air card that he used to connect his computer to the internet. Also at issue is whether a warrant the government obtained from a judge covered the use of the stingray and whether the government made it sufficiently clear to the judge how the technology it planned to use worked.

Over the course of a three-hour hearing in the U.S. District Court in Arizona, Rigmaiden, 31, asserted that the warrant the government obtained only authorized Verizon Wireless to provide agents with data about the air card but did not authorize agents to use the invasive stingray device. He also asserted that Verizon Wireless "reprogrammed" his air card to make it interact with the FBI's stingray, something that he says was outside the bounds of the judge's order.

Rigmaiden and civil liberties groups who have filed amicus briefs in the case also maintain that the government failed its duty to disclose to the judge who issued the warrant that the device they planned to use not only collected data from the target of an investigation but from anyone else in the vicinity who was using an air card or other wireless communication device.

Linda Lye, staff attorney for the American Civil Liberties Union of Northern California, told the judge on Thursday that this was the equivalent of rummaging through ten or twelve apartments to find the correct one where the defendant resided, something that would never be allowed under a normal warranted search.

By withholding information about the stingray from the judge and providing only "scant information" about the data they planned to collect, the FBI had "failed to live up to its duty of candor.... The government should have been clear about what information it wanted to obtain and what information it was going to obtain in using the technology," she said.

The ACLU recently uncovered emails that show a pattern of agents routinely withholding information from judges about their use of stingrays in applying for warrants for electronic surveillance.

The Rigmaiden case is shining a spotlight on the secretive technology, generically known as a stingray or IMSI catcher, that allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices into connecting to the stingray instead of a phone carrier's tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location. To prevent detection by suspects, the stingray is supposed to send the data along to a real tower so that traffic continues to flow.

By gathering the wireless device's signal strength from various locations, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

Although there are stingray devices that can capture and record the content of phone calls and text messages, the U.S. government has insisted in court documents for the Rigmaiden case that the stingray used in this case could only capture the equivalent of header information — such as the phone or account number assigned to the aircard as well as dialing, routing and address information involved in the communication. As such, the government has maintained that the device is the equivalent of devices designed to capture routing and header data on e-mail and other internet communications, and therefore does not require a search warrant.

The device, however, doesn't just capture information related to a targeted phone. It captures data from "all wireless devices in the immediate area of the FBI device that subscribe to a particular provider" according to government documents — including data of innocent people who are not the target of the investigation. FBI policy requires agents to then purge collateral data collected by the surveillance tool.

The StingRay II, made by the firm Harris. The stingray name is also a generic term for other cell tower

devices that operate similarly to this one. *Image: U.S. Patent and Trademark Office*

Rigmaiden was arrested in May 2008 on charges that he was the ringleader of an identify theft gang that stole more than $4 million in refunds from the IRS by filing fraudulent tax returns. Rigmaiden and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process.

Rigmaiden, along with Ransom Marion Carter, III, who is still at large, was charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud. Investigators used the stingray to trace an air card to the Domicilio Apartments complex in Santa Clara, California, that Rigmaiden was renting under an assumed identity. Court documents indicate that the surveillance tool led investigators "to the general proximity of defendant's usage of the aircard," allowing authorities to then narrow the air card's location to three or four apartments, and finally to unit 1122 in the complex.

Rigmaiden maintains that in order for the stingray to be able to collect location data from his air card, Verizon Wireless had to write data to the air card consisting of "identifying information for the FBI's emulated cell sites" as well as make configuration changes that would cause the air card to recognize the FBI's emulated cell tower as an authorized tower for providing service and cause the air card to attempt connections to the emulated tower prior to attempting connections with actual Verizon Wireless towers.

"The FBI technical agents needed Verizon Wireless to write data to the aircard in this manner because the aircard's properly configured Preferred Roaming List prevented it from accessing rogue, unauthorized cell sites… such as cell site emulators used by the FBI," Rigmaiden wrote in a court document.

For years, the U.S. government asserted that the use of stingray devices did not violate Fourth Amendment rights, and Americans didn't have a legitimate expectation of privacy for data sent from their wireless devices to a cell tower, even if another device secretly intercepted that communication to the tower.

But the government changed its stance in the Rigmaiden case in 2011 after the defendant argued that using the device to locate his wireless air card inside an apartment constituted a search under the Fourth Amendment and therefore required a valid search warrant, which Rigmaiden asserted authorities didn't have.

After U.S. District Judge David Campbell indicated he'd seek more information about the device and how it worked, prosecutors backed down — likely to avoid scrutiny of their technology — and conceded that in this case alone its use could be considered a search, but that in general the devices did not violate American's privacy.

Prosecutors then argued that the FBI's use of the stingray against Rigmaiden was indeed authorized by a court order and warrant. They pointed to a warrant that agents obtained to get near real-time tracking information from Verizon Wireless and said that was sufficient to cover the stingray as well. A separate tracking warrant, prosecutors said, wasn't necessary for the fake tower.

A U.S. attorney argued in court on Thursday that although the warrant used in the case didn't specify that it was for a tracking device, the affidavit seeking the warrant did, and this was sufficient. He acknowledged, however, that the affidavit didn't describe what device the FBI planned to use or how it worked.

The ACLU's Lye called the government's assertions a "post hoc re-characterization" of the warrant and said the government was simply "laboring" to find any document it could, in order to say it had obtained a warrant for the stingray.

When asked by Judge Campbell if it was important for the judge who issued the warrant to know that the location-tracking tool they planned to use was designed to collect data from other nearby devices, Assistant U.S. Attorney Fred Battista said that "the use of these devices is a very common practice," implying that the technology should not be new to judges. Battista also said that the stingray collected only a "small amount of data" from other devices in the area. The data had been destroyed afterward and there was no evidence that any third party suffered harm as a result of the collection, he said.

He also asserted that in all the cases in which stingray's had been used, there was no indication that a judge had ever disallowed the use of the tool because it could pick up data from other devices not belonging to a suspect.

Lye disputed this, however, and cited two cases where judges brought up concerns about the fact that the devices vacuum up any data in their path. The matter of issuing the warrants in those cases, however, was ultimately overtaken by other matters, making the data collection a moot point.

Rigmaiden is seeking to have evidence obtained through the stingray thrown out on grounds that what he has characterized as "warrantless surveillance" violated his privacy.

Government prosecutors adopted a circular argument on Thursday to counter this by saying that even though the use of the stingray in this case constituted a search under the Fourth Amendment and required a warrant — thereby carrying an expectation of privacy — Rigmaiden himself didn't have any expectation of privacy since he had rented the apartment under false pretenses by using a stolen identity to obtain the lease and had also obtained his Verizon Wireless account using another stolen identity.

"This is a very unique case," Battista told the judge. He urged the court not to be so swayed by Rigmaiden's eloquent assertions of his privacy rights that it forgot to take into account the fact that he cared little about the privacy rights of the victims he allegedly exploited when he stole their identities.

"A person who acts as the defendant has acted should not have any expectation of privacy," Battista said.

The government is fighting so hard for its use of the stingray in this case, because if Rigmaiden succeeds in his motion to suppress evidence obtained through the stingray, it would significantly weaken the government's case against him, since it could also force the government to throw out evidence obtained in a search of his apartment and a separate storage space where investigators seized computer hard drives. Information obtained through the stingray and the air card was at least used as part of the basis for obtaining warrants for those other searches.

"They did get a separate search warrant to search the apartment, but the question is did they have independent probable cause in that search warrant application separate from the stingray search?" Lye says.

Lye notes that this case is much different from other location tracking cases — such as the GPS tracking case the Supreme Court decided last year. Other cases have focused on whether or not the government should obtain a warrant to use a location-tracking device or to obtain location data from a third-party provider. In Rigmaiden's case, however, the government has already conceded it needed a warrant.

"The question here is whether this odd order the government obtained was a warrant, and that gets to the question about the government duty to be candid with the courts about the technology," she says.

Lye urged the judge to suppress evidence obtained through the use of the stingray in Rigmaiden's case "to ensure that the government [will be forthcoming] with judges in the future."

Judge Campbell is expected to rule on the motion to suppress within a few weeks.

Rigmaiden's trial is scheduled to begin in May.

**Pages:** 1 2 View All

Related

You Might Like

Related Links by Contextly





Spoofs Cell Phone Tower to Intercept Calls

Threat Level
Privacy, Crime and Security Online
Surveillance

Like 4.4k 71     1.4k     Share   210

# Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight

By Kim Zetter
04.09.13
6:30 AM
Edit

Follow @KimZetter



*Image: rmuser/Flickr*

A legal fight over the government's use of a secret surveillance tool has provided new insight into how the controversial tool works and the extent to which Verizon Wireless aided federal agents in using it to track a suspect.

Court documents in a case involving accused identity thief Daniel David Rigmaiden describe how the wireless provider reached out remotely to reprogram an air card the suspect was using in order to make it communicate

Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight | Threat Level | Wired.com                                                    4/15/13 4:45 PM

with the government's surveillance tool so that he could be located.

Rigmaiden, who is accused of being the ringleader of a $4 million tax fraud operation, asserts in court documents that in July 2008 Verizon surreptitiously reprogrammed his air card to make it respond to incoming voice calls from the FBI and also reconfigured it so that it would connect to a fake cell site, or stingray, that the FBI was using to track his location.

Air cards are devices that plug into a computer and use the wireless cellular networks of phone providers to connect the computer to the internet. The devices are not phones and therefore don't have the ability to receive incoming calls, but in this case Rigmaiden asserts that Verizon reconfigured his air card to respond to surreptitious voice calls from a landline controlled by the FBI.

The FBI calls, which contacted the air card silently in the background, operated as pings to force the air card into revealing its location.

In order to do this, Verizon reprogrammed the device so that when an incoming voice call arrived, the card would disconnect from any legitimate cell tower to which it was already connected, and send real-time cell-site location data to Verizon, which forwarded the data to the FBI. This allowed the FBI to position its stingray in the neighborhood where Rigmaiden resided. The stingray then "broadcast a very strong signal" to force the air card into connecting to it, instead of reconnecting to a legitimate cell tower, so that agents could then triangulate signals coming from the air card and zoom-in on Rigmaiden's location.

To make sure the air card connected to the FBI's simulator, Rigmaiden says that Verizon altered his air card's Preferred Roaming List so that it would accept the FBI's stingray as a legitimate cell site and not a rogue site, and also changed a data table on the air card designating the priority of cell sites so that the FBI's fake site was at the top of the list.

Rigmaiden makes the assertions in a 369-page document he filed in support of a motion to suppress evidence gathered through the stingray. Rigmaiden collected information about how the stingray worked from documents obtained from the government, as well as from records obtained through FOIA requests filed by civil liberties groups and from open-source literature.

During a hearing in a U.S. District Court in Arizona on March 28 to discuss the motion, the government did not dispute Rigmaiden's assertions about Verizon's activities.

The actions described by Rigmaiden are much more intrusive than previously known information about how the government uses stingrays, which are generally employed for tracking cell phones and are widely used in drug and other criminal investigations.

The government has long asserted that it doesn't need to obtain a probable-cause warrant to use the devices because they don't collect the content of phone calls and text messages and operate like pen-registers and trap-and-traces, collecting the equivalent of header information.

The government has conceded, however, that it needed a warrant in his case alone — because the stingray reached into his apartment remotely to locate the air card — and that the activities performed by Verizon and the FBI to locate Rigmaiden were all authorized by a court order signed by a magistrate.

The Electronic Frontier Foundation and the American Civil Liberties Union of Northern California, who have filed an amicus brief in support of Rigmaiden's motion, maintain that the order does not qualify as a warrant and that the government withheld crucial information from the magistrate — such as identifying that the tracking device they planned to use was a stingray and that its use involved intrusive measures — thus preventing the court from properly fulfilling its oversight function.

"It shows you just how crazy the technology is, and [supports] all the more the need to explain to the court what they are doing," says EFF Staff Attorney Hanni Fakhoury. "This is more than just [saying to Verizon] give us some records that you have sitting on your server. This is reconfiguring and changing the characteristics of the [suspect's] property, without informing the judge what's going on."

The secretive technology, generically known as a stingray or IMSI catcher, allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices

like air cards into connecting to the stingray instead of a phone carrier's legitimate tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location.

By moving the stingray around and gathering the wireless device's signal strength from various locations in a neighborhood, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

Use of the spy technology goes back at least 20 years. In a 2009 Utah case, an FBI agent described using a cell site emulator more than 300 times over a decade and indicated that they were used on a daily basis by U.S, Marshals, the Secret Service and other federal agencies.

The FBI used a similar device to track former hacker Kevin Mitnick in 1994, though the version used in that case was much more primitive and passive.

A 1996 *Wired* story about the Mitnick case called the device a Triggerfish and described it as "a technician's device normally used for testing cell phones." According to the story, the Triggerfish was "a rectangular box of electronics about a half a meter high controlled by a PowerBook" that was essentially "a five-channel receiver, able to monitor both sides of a conversation simultaneously." The crude technology was hauled around in a station wagon and van. A black coaxial cable was strung out of the vehicle's window to connect the Triggerfish to a direction-finding antenna on the vehicle's roof, which had four antenna prongs that reached 30 centimeters into the sky.

The technology has become much sleeker and less obtrusive since then, but still operates under the same principles.

In Rigmaiden's case, agents apparently used two devices made by a Florida-based company called Harris. One was the company's StingRay system, which is designed to work from a vehicle driven around a neighborhood to narrow a suspect's location to a building. Once agents tracked the signals from Rigmaiden's air card to the Domicilio Apartments complex in Santa Clara, California, they apparently used another device made by Harris called the KingFish — a handheld system that allowed them to walk through the complex and zero-in on Rigmaiden's air card in apartment 1122.

Although a number of companies make stingrays, including Verint, View Systems, Altron, NeoSoft, MMI, Ability, and Meganet, the Harris line of cell site emulators are the only ones that are compatible with CDMA2000-based devices. Others can track GSM/UMTS-based communications, but the Harris emulators can track CDMA2000, GSM and iDEN devices, as well as UMTS. The Harris StingRay and KingFish devices can also support three different communication standards simultaneously, without having to be reconfigured.

Rigmaiden was arrested in 2008 on charges that he was the mastermind behind an operation that involved stealing more than $4 million in refunds from the IRS by filing fraudulent tax returns. He and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process. Rigmaiden has been charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud.

## ATTACHMENT 28

DANIEL RIGMAIDEN'S FIRST DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 28:   Email from Jon Campbell (LA Weekly News) to Dan Colmerauer, July
26, 2012; Re: requesting that Daniel Rigmaiden speak to Mr. Campbell
about portable/transportable wireless device locator technology
(supported by declaration from Dan Colmerauer);

DECLARATION OF DANIEL M. COLMERAUER

I, Daniel M. Colmerauer, hereby declare under penalty of perjury as follows:

1.      That I am fully competent to testify in the matters contained herein;

2.      Attached is an email from Jon Campbell of the L.A. Weekly that I received on July 26, 2012, to my email address of: screenwriter2@earthlink.net. I certify that the attached email is a true and correct copy of the original currently in my possession.

3.      When Mr. Campbell refers to "Mr. Rigmaiden" he is referring to Daniel David Rigmaiden.

I declare under penalty of perjury that foregoing is true and correct.

EXECUTED on the 8th day of July, 2013.

Daniel M. Colmerauer

**Dan Colmerauer**

| | |
|---|---|
| **From:** | "Jon Campbell" <2joncampbell@gmail.com> |
| **Date:** | Thursday, July 26, 2012 3:21 PM |
| **To:** | <screenwriter2@earthlink.net> |
| **Subject:** | Rigmaiden Case and Stingray |

Hi Dan,

Here's my contact info. I'd love to talk to Mr. Rigmaiden about the technology. It appears a major city police department here in CA is also using this device, they are stonewalling my FOI requests (as well as out and out lying, it appears) and I'm hoping to learn more about the technology and how it works. We can talk off the record if necessary, I'm just hoping to shed light on an unusually powerful and potentially worrisome technology.

Thanks.


Best,
Jon Campbell
t. 619-995-4332
e. 2joncampbell@gmail.com

7/8/2013