1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

STUART F. DELERY
Assistant Attorney General
ELIZABETH J. SHAPIRO
Deputy Branch Director
BRAD P. ROSENBERG (D.C. Bar No. 467513)
Trial Attorney
KIMBERLY L. HERB (Illinois Bar No. 6296725)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone: (202) 514-3374
Facsimile: (202) 616-8460
E-mail: brad.rosenberg@usdoj.gov
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Daniel David Rigmaiden,

Plaintiff,

vs.

Federal Bureau of Investigation, et al.,

Defendants.

No. CV12-1605-SRB-BSB

**CROSS-MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

## CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants hereby cross-move for summary judgment in the above-captioned case.  In support thereof, below please find a memorandum of law in support of that motion, which is also used to oppose plaintiff's motion for partial summary judgment.  A response to plaintiff's statement of material facts, as well as defendants' statement of facts as to which there is no genuine issue, is attached hereto.  Oral argument is requested.

1

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

    I.    Plaintiff Is Not Entitled to a Fee Waiver. ................................................ 2

        A.    Plaintiff Is Not Entitled to a Public Interest Fee Waiver. .......................... 2

        B.    The FBI and EOUSA Have Not Waived the Right to Charge Fees. .......... 7

    II.    Plaintiff Is Not Entitled to Records in Native Digital Form with Metadata. .......... 9

    III.    The FBI Conducted A Search Reasonably Calculated to Uncover All Relevant Documents Regarding Plaintiff's WSJ/Brookings Request. ............................. 13

    IV.    The FBI Properly Withheld Records in Response to the WSJ Request That Are Exempt From Disclosure Under FOIA. ................................................................. 15

        A.    The FBI Properly Withheld Records Pursuant to Exemption 5................ 15

        B.    The FBI Properly Withheld Records Pursuant to Exemptions 6 and 7. ... 16

            1.    Exemptions 6 and 7(C) (Clearly Unwarranted and Unwarranted Invasion of Personal Privacy) ........................................................... 17

            2.    Exemption 7(E) (Investigative Techniques and Procedures)............ 19

    V.    The FBI Properly Withheld Records on the Harris/EPIC Request....................... 20

        A.    The FBI Properly Withheld Records Pursuant to Exemption 1................ 21

        B.    The FBI Properly Withheld Records Pursuant to Exemption 3................ 24

        C.    The FBI Properly Withheld Records Pursuant to Exemption 4................ 25

        D.    The FBI Properly Withheld Records Pursuant to Exemption 5................ 26

        E.    The FBI Properly Withheld Records Pursuant to Exemption 7(E)........... 27

    VI.    The FBI Has Produced All Reasonably Segregable Portions of Records. ........... 28

    VII.    EOUSA Has Conducted a Search Reasonably Calculated to Uncover Relevant Records in Response to Plaintiff's FOIA Request................................................ 29

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A.    EOUSA Has Conducted a Reasonable Search for Part 1 in Light of the Ambiguity of Plaintiff's Request and the Recordkeeping Systems It Has.30

B.    Parts 2 Through 4 Are Not Proper FOIA Requests. ................................. 32

VIII.   EOUSA Has Properly Withheld Records. ........................................................... 33

IX.   Because the Parties Agreed to Substitute the EPIC Request for Plaintiff's Harris Request, Expedited Processing Is Not at Issue. .................................................... 34

**INTRODUCTION**

This is a Freedom of Information Act ("FOIA") lawsuit brought by an incarcerated individual who is accused of having defrauded the federal government of millions of dollars by filing fraudulent tax returns in the name of deceased persons and third parties.[1] That individual – Daniel Rigmaiden – was apprehended in 2008 after the Federal Bureau of Investigation ("FBI") used a technology, colloquially referred-to as a "stingray," to locate his laptop.

In his Motion for Partial Summary Judgment and Supporting Memorandum,[2] Mr. Rigmaiden fashions himself as many things:  a member of the news media; an advocate for privacy interests; a technology expert; even someone who expresses concern for public safety.  In moments of candor, however, Mr. Rigmaiden has revealed his true motives for seeking records relating to the technology that was used to apprehend him: his "primary purpose . . . is to obtain evidence for [his] defense in United States v. Rigmaiden."[3]  That admission is fatal to plaintiff's argument that he is entitled to a public interest fee waiver, as he is seeking records for his own personal benefit.  Nor is plaintiff entitled to receive documents in native digital form with metadata intact, as he seeks. Metadata are not "records" as contemplated by FOIA, and the defendants' FOIA processing units do not have the capability to provide documents in native digital form in any event.  And even if they did, producing documents in native digital form would raise myriad processing and security concerns that cannot be resolved, as Mr. Rigmaiden suggests, by simply purchasing off-the-shelf software packages. These threshold issues – whether plaintiff is entitled to a waiver of fees and the production format of records, among others – should be resolved by this Court as a preliminary matter, as they will inform what additional processing (if any) must be undertaken by the defendants.

---

[1]     A detailed description of plaintiff's alleged fraudulent scheme can be found in Judge Campbell's decision denying his motion to suppress in his criminal proceeding. *See United States v. Rigmaiden*, ECF No. 1009, 08-CR-814-PHX-DGC (D. Ariz. May 8, 2013), *available at* 2013 WL 1932800.

[2]     ECF No. 84, 02/04/2014 ("Pl. Mem.").

[3]     *See* Declaration Under Penalty of Perjury, attached to Compl. as ECF No. 1-1 (07/26/2012), at 83 ¶ 2; *id.*, ECF No. 1-4, at 45 ¶ 2.

1

As a practical matter, however, there is little left to process:  Mr. Rigmaiden has already received (or will very soon receive) all of the records to which he is entitled.  Mr. Rigmaiden has filed three separate FOIA requests:  (1) a request to the FBI relating to comments made by FBI employees to a reporter for *The Wall Street Journal* regarding an article that discussed the details of plaintiff's criminal case, including his apprehension through the FBI's use of stingray technology, as well as comments made by FBI employees to a Brookings Institution panel regarding stingray technology ("WSJ Request"); (2) a request to the FBI regarding product manuals for and other details about stingray devices, including those manufactured by the Harris Corporation ("Harris/EPIC Request"); and (3) a request to EOUSA, including various U.S. Attorney's Offices, that is similar in some respects to the Harris Request in that it seeks information regarding stingray devices and how they are used ("EOUSA Request").  The FBI has completed processing the WSJ Request and has produced responsive records to plaintiff; accordingly, it is now moving for summary judgment on that request.  As for the Harris/EPIC Request, plaintiff has agreed that a similar, pre-processed request by the Electronic Privacy Information Center ("EPIC") can serve as a substitute for his request.  Again, the FBI has already produced responsive records to plaintiff and, accordingly, all that remains to be resolved are plaintiff's challenges to the FBI's claimed exemptions.  As for the EOUSA request, three parts of the four-part request are not proper FOIA requests at all, as they are argumentative and subjective in nature and fail to define adequately the type of records plaintiff seeks.  Regarding the fourth part, EOUSA has conducted a search for responsive records in its front offices (which is defended below), and the exemptions it has claimed are proper.

ARGUMENT

**I.     Plaintiff Is Not Entitled to a Fee Waiver.**

      **A.     Plaintiff Is Not Entitled to a Public Interest Fee Waiver.**

      Plaintiff seeks a public interest fee waiver pursuant to 5 U.S.C. §

2

552a(a)(4)(A)(iii).[4]  He is not entitled to one.  In order to obtain a fee waiver, plaintiff

must demonstrate that "[d]isclosure of the requested information is in the public interest."

28 C.F.R.  16.11(k)(1)(i).  That, in turn, requires an evaluation of four factors:  (1)

"whether the subject of the requested records concerns . . . identifiable operations or

activities of the federal government"; (2) whether "[t]he disclosable portions of the

requested records [are] meaningfully informative about government operations or

activities"; (3) whether disclosure would "contribute to the understanding of a reasonably

broad audience of persons interested in the subject, as opposed to the individual

understanding of the requester"; and (4) whether disclosure "is likely to contribute

'significantly' to [the] public understanding."  *Id.* § 16.11(k)(2); *see also Friends of the*

*Coast Fork v. U.S. Dep't of the Interior*, 110 F.3d 53, 55 (9th Cir. 1997).

      Plaintiff not only fails to satisfy these factors; the facts that he has attempted to put

into evidence *undercut* any public interest showing.[5]  For example, plaintiff asserts that

the requested records concern government operations, cites the fact that the FBI has

previously released certain records relating to Harris devices, and notes that his request

has an "*emphasis on user manuals for twelve (12) specifically identified Harris WPD*

*devices.*"  *See* Pl. Mem. at 2, 4-5 (emphasis added).  But the FBI has withdrawn the

Glomar response it had asserted in the early stages of this litigation,[6] and so the fact that

some FBI records are already in the public domain regarding Harris devices is, at best,

irrelevant.  *See* LRCiv. 56.1(a) (statement of facts "should include only those facts that

---

[4]     Though plaintiff seeks a fee waiver for all of his FOIA requests, as a practical matter this issue implicates only the FBI's Harris/EPIC request and the EOUSA request, as the FBI has already completed processing of the WSJ request and therefore has already provided all records responsive to that request to plaintiff.

[5]     EOUSA has taken the position that plaintiff has failed to satisfy factors two, three, and four.  *See* Decl. of John W. Kornmeier ("Kornmeier Decl.") Ex. C.  The FBI more generally has found that plaintiff has failed to satisfy these factors, noting specifically that, "while disclosure contributes to your individual understanding and interest, it is not likely to contribute significantly to public understanding of government operations and activities."  Hardy Harris/EPIC Decl. Ex. E.

[6]     In initially responding to plaintiff's FOIA request, the FBI asserted a Glomar response, in which an agency neither confirms nor denies the existence of responsive records.  *See Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976).  The FBI has since withdrawn that response.

the Court needs to decide the motion").  As to the "emphasis on user manuals," those manuals would say nothing about "identifiable operations or activities of the federal government"; they would merely be informative about the (obscure) inner workings of certain devices that a private company allegedly sells to various law enforcement agencies.  And even if product manuals were somehow informative of government operations, they would not "contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester."  28 C.F.R. § 16.11(k)(2)(iii).

More to the point, to be in the public interest the disclosure of records must "contribute 'significantly' to [the] public understanding" such that "[t]he public's understanding of the subject in question, as compared to the level of public understanding existing prior to the disclosure, must be enhanced by the disclosure to a significant extent."  *Id.* §§ 16.11(k)(2)(ii), (iv).  Plaintiff has failed to show how disclosure of the records that he seeks will "contribute significantly" to the public's understanding; if anything, the disclosures plaintiff seeks from the FBI are virtually identical to those that have already been made by the FBI in the separate, but substantially overlapping, FOIA lawsuit brought by EPIC.  *See* Pl. Mem. at 7 (referring to both requests as addressing "the same subject" and noting that "[t]he only difference between the quoted part of EPIC's FOIA request and the comparable part of Plaintiff's FOIA request is that Plaintiff narrowed the subject matter. . . .").  The requests are so similar that the parties have agreed to use the FBI's search for records in response to the EPIC request as the search for plaintiff's Harris request.  *See* Nov. 18, 2013 E-Mail from Daniel Rigmaiden to Brad Rosenberg, attached hereto as Ex. A; Jan. 6, 2014 Letter from Brad Rosenberg to Daniel Rigmaiden (enclosing e-mail), attached hereto as Ex. B; January 27, 2014 Letter from Brad Rosenberg to Daniel Rigmaiden (enclosing e-mail), attached hereto as Ex. C. Fulfilling such duplicative requests is not in the public interest and, thus, does not entitle plaintiff to a fee waiver.  *See Judicial Watch v. DOJ*, 185 F. Supp. 2d 54, 62 (D.D.C. 2002) (finding that plaintiff failed to describe with specificity how disclosure of "these

4

particular documents will 'enhance' public understanding 'to a significant extent.'").[7]

And in any event, plaintiff's "facts" once again undercut any marginal value resulting from repeated and overlapping disclosures. *See* Pl. Mem. at 4 (arguing that "[t]here is additional extensive technical data available on the relevant devices" already in the public domain).[8]

Plaintiff's request fails to satisfy the fee-waiver requirement for yet another reason. Plaintiff – who is currently incarcerated – has not demonstrated that he is requesting information for the purpose of public disclosure. *See* 28 C.F.R. § 16.11(k)(2)(iii). To the contrary, in filing administrative appeals of both the FBI's Harris/EPIC request and the EOUSA request, Mr. Rigmaiden submitted declarations under penalty of perjury in which he stated "*[m]y primary purpose for seeking the records* requested in the [separate FBI and EOUSA FOIA requests] *is to obtain evidence for my defense* in United States v. Rigmaiden, CR08-814-PHX-DGC, pending in the District of Arizona." Those declarations were attached as exhibits to plaintiff's Complaint in this case. *See* Declaration Under Penalty of Perjury, ECF No. 1-1 (07/26/2012), at 83 ¶ 2 (emphasis added); *id.*, ECF No. 1-4, at 45 ¶ 2; *see also* ECF No. 1-1, at 83 ¶ 4 ("My primary interest is to obtain evidence for my self-represented defense . . . ."); Def. SOF ¶ 1. Whatever the merits of Mr. Rigmaiden's use of FOIA as a criminal discovery tool, his "primary purpose" is inconsistent with the fee waiver principles set forth in § 16.11(k)(2)(iii), which instruct DOJ to consider whether "a

---

[7] Plaintiff complains that his request was treated differently than EPIC's request. Aside from the fact that EPIC is a different entity that had different purposes in requesting records, the fact that plaintiff's request was processed after EPIC's request means that plaintiff's request is duplicative of EPIC's request and, therefore, is unlikely to add anything of value to the public's understanding. In any event, plaintiff fails to cite any authority for the novel proposition that an agency can act arbitrarily and capriciously by responding to separate FOIA requests by differently situated entities in different ways. *See* Pl. Mem. at 7; *see also id.* at 9.

[8] Plaintiff tries to argue that his "FOIA requests will clear up the FBI's contradicting public statements regarding its reasons for destroying . . . data." Pl. Mem. at 5. Aside from being irrelevant, the "facts" that plaintiff cites for these "contradicting statements" are not contradicting at all, as they are all context-specific and can be read in a complementary manner. *See* Pl. SOF Nos. 24-28. None purports to be an exhaustive set of justifications for the policy that plaintiff has challenged in his criminal proceeding.

reasonably broad audience of persons" – rather than an incarcerated requester – is the audience for the disclosure.  *See, e.g.*, *McQueen v. United States*, 264 F. Supp. 2d 502, 525 (S.D. Tex. 2003) (denying fee waiver where plaintiff alleged public purpose but primarily sought to "obtain[ ] information about [his] criminal case"); *Mells v. IRS*, No. 99-2030, 2002 WL 31934274, at *5-7 (D.D.C. Nov. 21, 2002) (noting that requester's reasons for fee waiver were "overwhelmingly personal in nature" where he claimed that disclosure "would yield exculpatory evidence pertaining to his criminal conviction").

Moreover, while plaintiff has indicated that he plans to release any records he obtains to the public via various third parties, *see* Pl. Mem. at 6, "intending to release information obtained pursuant to a FOIA request to the media is not sufficient to demonstrate that disclosure would contribute significantly to public understanding of the operations or activities of the government."  *Citizens Progressive Alliance v. U.S. Bureau of Indian Affairs*, 241 F. Supp. 2d 1342, 1367 (D.N.M. 2002); *see also Larson v. CIA*, 843 F.2d 1481, 1483 n.5 (D.C. Cir. 1988) (explaining that requests cannot become eligible for fee waivers simply upon intent to distribute information to journalists "because such a rule would enable requesters to avoid fees simply by asserting an intention to give the released documents to a newspaper").  Mr. Rigmaiden was perfectly candid in this regard when he submitted his administrative appeal regarding the Harris/EPIC request, stating that "[a]lthough I plan on providing the requested documents to various entities, *I am not requesting records on behalf of anyone other than myself.  I am not associated with any of the above entities*, and they are not aware of my specific FOIA request."  ECF No. 1-1, ¶ 4 (emphasis added); *see also* ECF No. 1-4, at 46 ¶ 4 (similar language regarding EOUSA request); Def. SOF ¶ 2.  Nor is it enough for a requester to simply assert that he plans to "disseminate the responsive material to the public at no cost"; the requester must demonstrate that he is able and ready to do so.  *See, e.g.*, *Brunsilius v. U.S. Dep't of Energy*, 514 F. Supp. 2d 30, 35-36 (D.D.C. 2007) ("Plaintiff's status as an inmate certainly inhibits his ability to disseminate information to the general public."), *aff'd*, No. 07-5362 (D.C. Cir. July 16, 2008); *McCain v. U.S. Dep't*

1    *of Justice*, 13 F.3d 220, 221 (7th Cir. 1993) (fee waiver must be assessed in light of

2    identity and objectives of requestor). [9]

3        **B.    The FBI and EOUSA Have Not Waived the Right to Charge Fees.**

4        Plaintiff alternatively argues that, even if he is not entitled to a public interest fee

5    waiver, the FBI and EOUSA have waived their right to charge fees because they did not

6    timely respond to plaintiff's FOIA requests regarding Harris devices.  *See* Pl. Mem. at 6-

7    7.  A waiver of search fees is appropriate if an agency fails to comply with certain time

8    limits to respond to a request, so long as no "unusual or exceptional circumstances"

9    apply.  5 U.S.C. § 552(a)(4)(A)(viii).  The waiver requirements for duplication fees is

10   even narrower; in addition to the above requirement, a waiver of the ability to charge

11   duplication fees is only appropriate if the requester is not seeking records for commercial

12   use and if the request is by an "educational or noncommercial scientific institution" or "a

13   representative of the news media."  5 U.S.C. § 552(a)(4)(A)(ii)(II).

14       It is clear that Mr. Rigmaiden is not entitled to a waiver of duplication fees,

15   regardless of whether the FBI and EOUSA responded to the FOIA requests in a timely

16   manner, because he does not fit into any of the categories to which the waiver of

17   duplication fees may apply.  Mr. Rigmaiden does not claim to be an educational or

18   noncommercial scientific institution; instead, he implies that he is entitled to a fee waiver

19   as "a representative of the news media."  See Pl. Mem. at 6.  That is nonsense.  A

20   "representative of the news media is a person or entity that (1) gathers information of

21   potential interest to a segment of the public; (2) uses its editorial skills to turn the raw

22   materials into a distinct work; and (3) distributes that work to an audience."  *Cause of*

23   *Action v. FTC* No. 12-850, ___ F. Supp. 2d ___, 2013 WL 4406875, at *11 (D.D.C. Aug.

24   19, 2013) (citing *Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989)).

25   _____

26   [9]      Plaintiff also asserts that he does not intend to profit from the responsive records.
     *See* Pl. Mem. at 6.  As all of the public interest factors tilt heavily against a fee waiver,

27   the court need not address whether plaintiff has a commercial interest in the records (as
     that prong would only be relevant if the Court first found that disclosure was in the public

28   interest).  *See* 28 C.F.R. 16.11 (k)(i), (ii)(2) (describing any commercial interest as a
     counterbalance against the "first fee waiver requirement" of showing a public interest).

1    While Mr. Rigmaiden has stated that he intends to provide any information he receives to

2    *The Wall Street Journal,* other media outlets, and various civil rights organizations, he

3    has *repeatedly* made clear that he is "not requesting records on behalf of anyone other

4    than [him]self." ECF No. 1-1, ¶ 4; Def. SOF ¶ 2.  An intent to merely turn records over

5    to the news media, without any showing that he will use his skills to create a distinct

6    work that will be distributed, does not make a requester a representative of the news

7    media.  *See Nat'l Sec. Archive*, 880 F.2d at 1385-87; *see also Judicial Watch, Inc. v.*

8    *DOJ*, 122 F. Supp. 2d 13, 20 (D.D.C. 2000) ("Merely making information available to

9    the public does not transform a requester into a representative of the news media.").

10    Nor has EOUSA waived its ability to charge search fees.  Plaintiff's request

11    sought records from multiple U.S. Attorney's Offices scattered around the country.  *See*

12    Kornmeier Decl. ¶ 8 & Ex. A; Def. SOF ¶ 3.  Accordingly, the request to EOUSA

13    involves "unusual or exceptional circumstances" as defined by FOIA such that EOUSA's

14    failure to respond to plaintiff's request in a timely manner does not waive EOUSA's

15    ability to charge search fees.  *See* 5 U.S.C. § 552(a)(4)(A)(viii) (waiver of fees if agency

16    fails to comply with time limit "if no unusual or exceptional circumstances . . . apply to

17    the processing of the request"); *id.* § 552(a)(6)(B)(iii)(I) (defining "unusual

18    circumstances" to include "the need to search for and collect the requested records from

19    the field facilities or other establishments that are separate from the office processing the

20    request"); *see also id.* § 552(a)96)(B)(iii)(II) (unusual circumstance includes "the need to

21    search for, collect, and appropriately examine a voluminous amount of separate and

22    distinct records which are demanded in a single request").

23    Because EOUSA has not waived its ability to charge search and duplication fees,

24    and because the FBI has not waived its ability to charge duplication fees, these issues

25    should be resolved by this Court before it considers whether any further processing of

26    plaintiff's FOIA requests is either necessary or appropriate.[10]

---

27    [10]    The FBI has no record of having received the Harris/EPIC request, and only
learned of the request through the litigation.  Hardy Harris/EPIC Decl. ¶ 6.  Accordingly,

28    it first opened the FOIA request as a matter on April 12, 2013, and responded to that new

8

## II.  Plaintiff Is Not Entitled to Records in Native Digital Form with Metadata.

Plaintiff seeks to require the defendants to produce records in native digital form, with metadata intact.  Nothing in FOIA requires that result.

This Court's jurisdiction is limited to enjoining the defendants from withholding "agency record[s]."  5 U.S.C. § 552(a)(4)(B) (providing that district court "has jurisdiction to enjoin an agency from withholding agency records and to order the production of any agency records improperly withheld"); *see also Tax Analysts v. U.S. Dep't of Justice*, 913 F. Supp. 599, 601-02 (D.D.C. 1996).  Under FOIA, this Court "has jurisdiction only if the plaintiff establishes that an agency has (1) improperly (2) withheld (3) agency records."  *Id.*; *see also Kissinger v. Reporters Comm. For Freedom of Press*, 445 U.S. 136, 150 (1980).  "Unless all three of these criteria are met, a district court lacks jurisdiction to compel an agency to comply with FOIA."  *Tax Analysis*, 913 F. Supp. at 602.  Here, that test is not satisfied because metadata are not an "agency records."

Even as amended by the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat. 3048 (codified as amended at 5 U.S.C. § 552), FOIA does not reach metadata.  FOIA previously did not define "agency record," and the legislative history was considered "similarly unilluminating" by the D.C. Circuit.  *Tax Analysts v. United States Dept. of Justice*, 845 F.2d 1060, 1067 (D.C. Cir. 1988). Notwithstanding the fact that "record" is now defined in the Act, that definition is still unilluminating, as FOIA defines "record" as "(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format" and "(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management."  5 U.S.C. § 552(f).  That definition

---

request on May 1, 2013, which is within FOIA's statutory time limit.  Hardy Harris/EPIC Decl. ¶¶ 6, 7; 5 U.S.C. § 552(a)(6)(A).  Using that analysis, the FBI also has not waived its ability to charge search fees.  In light of the fact that plaintiff filed an administrative appeal with OIP, and the fact that OIP represented that it would forward plaintiff's request to the FBI, the government is not pressing that particular point in this litigation. Nonetheless, the FBI would still be entitled to charge search fees – if appropriate – due to the broad scope of plaintiff's Harris/EPIC request.  *See* 5 U.S.C. § 552(a)(6)(B)(iii)(II).

9

renders the meaning of "record" no clearer than it was before the amendment, and courts still must decide what information "would be an agency record." 5 U.S.C. § 552(f).

The legislative history of the 1996 amendments to FOIA make clear that the amendments were not intended to broaden the concept of "agency record" under FOIA. *See, e.g.*, H.R. Rep. 104-795, 104th Cong., 2d Sess. 16, 19, 20 (1996); S. Rep. 104-272, 104th Cong., 2d Sess. 19 (1996).  Rather, the amendments resolve that the "format" of a record is not relevant under FOIA and thus explicitly now provide that a "'record' under the FOIA includes electronically stored information."  H.R. Rep. 104-795 at 19-20 ("The format in which data is maintained is not relevant under the FOIA."); *see also* 5 U.S.C. § 552(f).  However, while Congress recognized that "the law needed to be updated to reflect the advancing use of information technology to maintain records," Congress contemplated that "access should be the same whether they are on a piece of paper or a computer hard drive."  H.R. Rep. 104-795 at 16.  In other words, a "matter not previously subject to FOIA when maintained in a non-electronic format [wa]s not made subject to FOIA by this bill."  H.R. Rep. 104-795 at 19 (emphasis added).  Only "information that passes the threshold test of being an agency record, remains a record" regardless of form.  H.R. Rep. 104-705 at 20.  Thus, not all electronically stored information is a "record."

If the law were otherwise, a record that in hard-copy would constitute a single record for FOIA purposes could be an untold quantity of "records" depending on how many different  agency personnel received and saved on their computers an unaltered electronic version of the document.  In this example, the agency clearly is not required to produce however many identical copies of the same responsive hard-copy document. *See, e.g.*, *Defenders of Wildlife v. United States Dept. of Interior*, 314 F. Supp. 2d 1, 10 (D.D.C. 2004) (observing that "it would be  illogical and wasteful to require an agency to produce multiple copies of the exact same document"); *see also Crooker v. U.S. State Dep't*, 628 F.2d 9, 10-11 (D.C. Cir. 1980).  Yet, in that same example, any electronic copy of that document saved on the computers of agency personnel would be a unique "record" for FOIA purposes because the metadata automatically assigned each copy

would be different as a result of differences in which recipients saved it, when they saved it, and what they named it.  This resulting exponential growth of non-identical, duplicate "records" clearly is at odds with Congress's intent that the 1996 amendments not subject to FOIA "matter[s] not previously subject  to FOIA when maintained in a non-electronic format." H.R. Rep. 104-795 at 19. Consistent with that purpose, metadata should be excluded from FOIA's reach.  *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) ("even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose rather than the literal words").

Moreover, it is impossible for the defendants' FOIA processing units to provide FOIA documents in native digital form with metadata intact.  As the Declaration of David M. Hardy regarding metadata makes clear, the "vast majority of the records responsive to FOIA/Privacy Act requests is still maintained by the FBI in original paper format as part of the FBI's official federal records system."  Hardy Metadata Decl. ¶ 10; Def. SOF ¶ 4.  For those records, there is simply no metadata to produce.  As for electronic records, the customized software product that the FBI uses to process FOIA requests, dubbed "FDPS," converts all electronic media into a flattened TIFF image.  *Id.* ¶ 12; Def. SOF ¶ 5.  FDPS, in turn, "is designed such that it is compatible only with TIFF images," and "[d]ocuments can be reviewed and redacted only if they are in TIFF format."  *Id.* ¶ 13; Def. SOF ¶¶ 6, 7.  Converting documents to flattened TIFFs "ensures protection of FBI and government agency equities, protection of national security information, and maintenance of classified information."  *Id.* ¶ 13; *see also id.* ¶ 10 (noting that "FDPS resides on the internal FBI network which is specifically designed to handle documents classified up to the 'SECRET' level"); Def. SOF ¶¶ 8, 9.  "In fact, the conversion of electronic documents to TIFF images is specifically designed to *affirmatively* strip metadata in order to ensure that no classified and/or law enforcement sensitive information is inadvertently released to the public."  *Id.* ¶ 13; Def. SOF ¶ 10. As Mr. Hardy notes in an example, "metadata associated with a document may contain

11

the names of custodians, which may be exempt under FOIA exemptions (b)(6) and/or (b)(7)(C)." *Id.* ¶ 13 n.5.  Moreover, "[d]ocuments in their native electronic formats, . . . unlike TIFFs, are editable and could allow for the required redactions to be reverse-engineered, exposing the critical information that must be protected." *Id.* ¶ 14; Def. SOF ¶ 11.  In this regard, Mr. Rigmaiden's suggestion that the FBI "redact" sensitive information by substituting a series of "bold X's" [sic] would allow for exactly the type of reverse-engineering that Mr. Hardy describes.  *See* Pl. Mem. at 13**;** *see also* Hardy Metadata Decl. ¶ 14 & n.6 (describing examples of redactions that have been lifted). Finally, having the FBI produce documents in native digital form with metadata intact would present insurmountable processing problems with regard to the labeling of exemptions and the overlay of redactions.  *See* Hardy Metadata Decl. ¶ 15; Def. SOF ¶ 12.  As for plaintiff's suggestion that the FBI buy some sort of off-the-shelf software to process his FOIA request to his specifications, FDPS "is specifically intended **not** to be compatible with different versions of standard review platforms so as to maintain the integrity of the national security and law-enforcement sensitive documents processed within the parameters of the system."  Hardy Metadata Decl. ¶ 18; Def. SOF ¶ 13.[11]

None of the cases cited by plaintiff changes the result that defendants need not produce documents in native digital form with metadata.  Plaintiff cites *Sample v. B.O.P.* for the "clear statutory obligation to provide . . . records in electronic format," *see* Pl. Mem. at 11, but that case merely dealt with the production of records in paper versus an undefined electronic format.  The case does not specify what that format must be, much less stand for the proposition that they be provided in native digital form with metadata preserved.  *See Sample v. B.O.P.*, 466 F.3d 1086, 1087-89 (D.C. Cir. 2006).  Plaintiff cites *National Day Labor Org. Network v. U.S. Immigration & Customs Enforcement*, *see* Pl. Mem. at 14, but fails to advise the Court that the opinion in that case was withdrawn, *see* 2011 U.S. Dist. LEXIS 11655.  As for *Families for Freedom v. U.S. Customs &*

---

[11]     As set forth in Mr. Kornmeier's declaration, EOUSA's FOIA processing unit would face similar difficulties in providing documents in native digital form with metadata.  *See* Kornmeier Decl. ¶ 24; Def. SOF ¶¶ 14-15.

12

*Border Protection*, the Court was not presented with the question of whether metadata independently constitutes a "record" under FOIA such that it must be processed and disclosed.  The court offers no analysis on that issue. Instead, and in the context of a request that sought the dates of various "daily reports" summarizing law enforcement activities, the court merely observed that many of the reports did not appear to contain identifying dates and, on that basis, speculated that "the reports' metadata may have contained the date on which they were created; or perhaps they were archived according to date," and, accordingly, stated that "[d]efendants may not withhold this information if it exists." 837 F. Supp. 2d 287, 303-04 (S.D.N.Y. 2011).  The court certainly did not require that all metadata in the reports be produced; to the contrary, the court appeared to leave it to the defendant to ascertain how to provide any relevant date information.

## III.    The FBI Conducted A Search Reasonably Calculated to Uncover All Relevant Documents Regarding Plaintiff's WSJ/Brookings Request.

On summary judgment in a FOIA case, the agency must demonstrate "it has conducted a search reasonably calculated to uncover all relevant documents." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 986 (9th Cir. 2009) (quotation marks omitted). "This showing may be made by reasonably detailed, nonconclusory affidavits submitted in good faith." *Id.* (quotation marks omitted).  Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Lawyers' Comm. for Civil Rights of S.F. Bay Area v. U.S. Dep't of Treasury*, 534 F. Supp. 2d 1126, 1131 (N.D. Cal. 2008).  Indeed, the agency "need not set forth with meticulous documentation the details of an epic search for the requested records." *Id.* (quotation marks omitted). "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Citizens Comm'n on Human Rights v. FDA.*, 45 F.3d 1325, 1328 (9th Cir. 1995) (citation and quotation marks omitted).  In general, the sufficiency of a search is determined by the "appropriateness of the methods" used to carry it out, "not by the fruits

13

of the search." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).  Accordingly, the failure of an agency "to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records." *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004).

As explained in Mr. Hardy's Declaration regarding the WSJ Request, the FBI typically conducts searches in response to FOIA requests in its Central Records System ("CRS").  *See* Hardy WSJ Decl. ¶¶ 15-20 (describing organization and structure of CRS system); Def. SOF ¶ 16.  Due to the nature of plaintiff's WSJ request, as well as the purpose, design, and organization of information in the CRS as a law-enforcement tool, the FBI conducted a search query outside of the CRS, instead contacting those divisions and offices most likely to maintain potentially responsive records.  Hardy WSJ Declaration ¶ 21; Def. SOF ¶ 17.  Specifically, the FBI issued a search e-mail for responsive records relating to The Wall Street Journal article and comments made by FBI employees at the Brookings Institution panel at issue.  *Id.* ¶ 22; Def. SOF ¶¶ 18, 21.  As a result of the search inquiry, the FBI identified 94 responsive records relating to the WSJ portion of the request, all of which were processed.  *Id.*; Def. SOF ¶ 19.  On July 12, 2013, the FBI released those 94 pages to plaintiff, with 14 pages being released in full and 80 pages released in part.  *Id.*; Def. SOF ¶ 20.

As for the portion of plaintiff's request relating to the Brookings Institution, and in addition to the search inquiry described above, the FBI also conducted a search of the CRS.  *See* Hardy WSJ Declaration ¶ 23; Def. SOF ¶ 21.  Neither the search inquiry nor the search of the CRS yielded any records responsive to the Brookings Institution portion of plaintiff's request.  *See id.*; Def. SOF ¶ 22.

In sum, the FBI has more than satisfied FOIA's reasonable search requirement, and its declaration demonstrates that the standard is met.  The Court should grant summary judgment to the FBI on this issue.

14

**IV.    The FBI Properly Withheld Records in Response to the WSJ Request That Are Exempt From Disclosure Under FOIA.**

The public's interest in government information under FOIA is not absolute, as "Congress recognized . . . that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985).  FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quotation omitted).  Thus, FOIA is designed to achieve a "workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* (citation omitted).  To that end, FOIA incorporates "nine exemptions . . . which a government agency may invoke to protect certain documents from public disclosure." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996).  These statutory exemptions must be given "meaningful reach and application." *John Doe Agency*, 493 U.S. at 152.  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007); *see also Shannahan v. I.R.S.*, 672 F.3d 1142, 1148 (9th Cir. 2012) (courts should "accord substantial weight to an agency's declarations regarding the application of a FOIA exemption.").

**A.    The FBI Properly Withheld Records Pursuant to Exemption 5.**

FOIA exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5) ("Exemption 5").  In other words, Exemption 5 permits agencies to withhold privileged information, including attorney work product, deliberative materials, and confidential attorney-client communications. *See, e.g.*, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997).

With respect to the WSJ request, the FBI has withheld information pursuant to the

deliberative process privilege, the purpose of which is to "prevent injury to the quality of agency decisions" by protecting the "decision making processes of government agencies." *NLRB*, 421 U.S. at 150, 51; *see also* Hardy WSJ Decl. ¶ 57. "The deliberative process privilege protects materials that are both predecisional and deliberative." *Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). As set forth in the FBI's declaration, the withheld information – which "reflects an internal, on-going dialogue among and between FBI personnel with regard to developing FBI policy on the legal status of [cell phone tracking] technology" – meets both of these requirements. *See* Hardy WSJ Decl. ¶¶ 58, 59. The withheld material "reflects a fluid, continuous and on-going deliberative set of discussions among employees contributing to the FBI's policy on the legal status of so-called stingray technology and how best to frame an agency response to the questions posed by the WSJ reporter related to stingray technology." *Id.* ¶ 59. The failure to protect these "candid internal discussions concerning these evolving policies and procedures" would "chill the full, frank, and open discussions between agency personnel." *Id.* ¶ 60.

**B.     The FBI Properly Withheld Records Pursuant to Exemptions 6 and 7.**

FOIA protects from mandatory disclosure "records or information compiled for law enforcement purposes" when, among other issues, production of the documents "(C) could reasonably be expected to constitute an unwarranted invasion of personal privacy" (Exemption 7(C)), or "(E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law," (Exemption 7(E)). 5 U.S.C. § 552(b)(7). In addition to Exemption 7(C), there is a separate FOIA exemption for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 552(b)(6) (Exemption 6).

As a threshold issue when analyzing Exemption 7, the Court must determine whether the documents have a law enforcement purpose, which requires an examination

of whether the agency serves a "law enforcement function." *Church of Scientology Int'l v. I.R.S.*, 995 F.2d 916, 919 (9th Cir. 1993) (internal quotation marks and citation omitted). The FBI has such a law enforcement function, as it "has a clear law enforcement mandate." *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 808 (9th Cir. 1995); *see also* Hardy WSJ Decl. ¶ 62 (describing FBI's law enforcement function); Def. SOF ¶ 23. In order to satisfy Exemption 7's threshold requirement, a government agency with a clear law enforcement mandate—such as the FBI—"'need only establish a rational nexus between enforcement of a federal law and the document for which [a law enforcement] exemption is claimed.'" *Rosenfeld*, 57 F.3d at 808 (citation omitted).

The FBI easily satisfies the rational nexus requirement, as "the responsive email records herein were compiled for a law enforcement purpose as these records relate to FBI discussions and analysis of the policy, legal status, and use of emerging cell phone location technology as a tool or technique for use in FBI law enforcement efforts." Hardy WSJ Decl. ¶ 62.

       **1.**       **Exemptions 6 and 7(C) (Clearly Unwarranted and Unwarranted Invasion of Personal Privacy)**

As noted above, Exemption 6 provides that an agency may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Its more expansive law-enforcement counterpart, Exemption 7(C), permits withholding of "records or information compiled for law enforcement purposes" to the extent that "production of such law enforcement records . . . *could reasonably be expected* to constitute an *unwarranted* invasion of personal privacy." *Id.* § 552(b)(7)(C) (emphasis added); *see Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 693 n.7 (9th Cir. 2011) (describing Exemption 7(C)'s broader protections). Both exceptions are often considered together. *See Yonemoto*, 686 F.3d at 693 n.7; *see also* Hardy WSJ Decl. ¶ 64 n.7 (noting that "[t]he practice of the FBI is to assert Exemption (b)(6) in conjunction with (b)(7)(C)").

Here, Exemptions 6 and 7(C) have been asserted to protect the names and/or

17

identifying information of FBI Special Agents and support employees who were

responsible for investigative activities reported in the responsive documents, as publicity

regarding any particular investigation "may seriously prejudice their effectiveness in

conducting other investigations" and subject them to "unnecessary, unofficial questioning

as to the course of an investigation" because these individuals "come into contact with all

strata of society, conducting searches and making arrests, both of which result in

reasonable but nonetheless serious disturbances to people and their lives."  Hardy WSJ

Decl. ¶ 66.  "It is possible for an individual targeted by such law enforcement actions to

carry a grudge which may last for years."  *Id.*  The FBI also withheld the names of FBI

support employees who "were assigned to handle tasks related to stingray technology," as

they "could become targets of harassing inquiries for unauthorized access to

investigations if their duties were released."  *Id.* ¶ 67.  Finally, the FBI applied

Exemptions 6 and 7(C) to protect the names and/or identifying information of third

parties who were merely mentioned in records responsive to plaintiffs' request, as

releasing such information without notarized authorizations permitting the release would

violate their legitimate privacy interests.  *Id.* ¶ 68.

These records all reflect a cognizable privacy interest protected by both

Exemptions 6 and 7(C).  Such an interest "'encompass[es] the individual's control of

information concerning his or her person, but it is not limited to just that type of

information.'"  *Yonemoto*, 686 F.3d at 693 (quoting *Dep't of Justice v. Reporters Comm.

for Freedom of the Press*, 489 U.S. 749, 773 (1989)).  Once a non-trivial, non-speculative

privacy interest is present, then the exemptions shield the information from disclosure

unless "the public interests in disclosing the *particular* information requested outweigh

those privacy interests."  *Yonemoto*, 686 F.3d at 694.  This balances the privacy interest

against the asserted public interest.  Yet the "*only* relevant public interest in the FOIA

balancing analysis is the extent to which disclosure of the information sought would

she[d] light on an agency's performance of its statutory duties or otherwise let citizens

know what their government is up to."  *Id.* at 694 (quoting *Bibles v. Or. Natural Desert*

18

*Ass'n*, 519 U.S. 355, 355-56, 117 S. Ct. 795, 136 L. Ed. 2d 825 (1997)).  Here, there is no public interest served by revealing the information protected by Exemptions 6 and 7(C). *See* Hardy WSJ Decl. ¶¶ 65-67, 69.  Identifying particular FBI special agents and lower-level employees, or third parties, sheds no light on the FBI's activities and operations. *See Council on Am.-Islamic Relations, Cal. v. F.B.I.*, 749 F. Supp. 2d 1104, 1119-21 (S.D. Cal. 2010) (upholding application of Exemption 7(C) to FBI Special Agents and support personnel, local law enforcement employees, and third parties who provided information or who were merely mentioned).

### 2. Exemption 7(E) (Investigative Techniques and Procedures)

Exemption 7(E) protects from disclosure information compiled for law enforcement purposes where release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions," or where it would "disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E). Congress intended that Exemption 7(E) protect from disclosure techniques and procedures used to prevent and protect against crimes as well as techniques and procedures used to investigate crimes after they have been committed.  *See, e.g., PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 250-51 (D.C. Cir. 1993) (holding that portions of FBI manual describing patterns of violations, investigative techniques, and sources of information available to investigators were protected by Exemption 7(E)).

Here, Exemption 7(E) "has been asserted to protect from disclosure the FBI's application and use of emerging cell phone location technology as a law enforcement technique and the procedures associated with employment of this technique."  Hardy WSJ Decl. ¶ 72.  "While the general existence and use of this technology as a law enforcement technique is publicly known, the specific internal application, functioning, and procedural details are not commonly known."  *Id.*  Particularly relevant here, releasing this information "could enable criminals to educate themselves about the

techniques employed for the location and apprehension of individuals and, therefore, allow these individuals to avoid detection or develop countermeasures." *Id.*

The FBI is also asserting Exemption 7(E) "to protect methods or techniques involving the location and identity of FBI sections that were involved in the investigation(s) at issue in this case" and which "are found in the signature block of internal FBI emails." *Id.* ¶ 73. "Disclosure of the sections conducting the investigation would reveal the targets, the physical areas of interest of the investigation, and when taken together with the other locations if identified, could establish a pattern or 'mosaic' that identification of a single location would not." *Id.* Alternatively, disclosing a section's "areas of expertise" would allow individuals to ascertain "exactly what the law enforcement agency's interest is," thus allowing for the deployment of countermeasures and "the adjustment of behaviors and activities to avoid detection." *Id.*

**V.   The FBI Properly Withheld Records on the Harris/EPIC Request.**

In this case, the parties have agreed to litigate the FBI's withholdings on a request filed by EPIC that is similar to Plaintiff's Harris request. Upon withdrawing its Glomar response and determining that it could respond to plaintiff's FOIA request, the FBI notified plaintiff of the number of pages potentially responsive to his request, the time needed to process those documents, and the fees associated with the request. Hardy Harris/EPIC Decl. ¶ 8. Alternatively, the FBI noted that it had previously processed a similar FOIA request filed by EPIC, resulting in the FBI's release of 4,377 pages of materials (hereinafter referred to as the "EPIC documents"). *Id.* ¶ 9. EPIC's FOIA request sought "agency records concerning cell site simulator and other cell phone tracking technologies deployed by the FBI to covertly locate, target, and track targets of interest," and it was subject to litigation, *EPIC v. FBI*, No. 12-667 (D.D.C. Apr. 26, 2012). The FBI proposed that it could provide plaintiff with these already processed pages in order to ensure that Mr. Rigmaiden would quickly receive documents responsive to his request without having to incur additional search and production fees for a new, separate request. While Mr. Rigmaiden initially rejected this offer, *see* Ex. F, Rigmaiden

letter Oct. 21, 2013, he subsequently proposed that the FBI provide him with a copy of the EPIC documents and a *Vaughn* index detailing the basis for the FBI's withholdings on the basis of Exemptions 1, 3, 4, 5, 6, 7(C),[12] and 7(E) within that set of documents, *see* Ex. A.[13] Mr. Rigmaiden stated that this agreement would "allow the government to cross-move for summary judgment on the FOIA exemptions with a second Vaughn index" and further stated that "if the government wins on all issues then the case will likely be concluded in the district court." *Id.* Counsel for Defendants then confirmed via email with Mr. Rigmaiden that the proposal to provide a revised *Vaughn* index regarding the EPIC documents represented the parties' agreement with how to address Plaintiff's Harris request. Ex. B. Having received a response that defense counsel's email was correct, *see* Ex. C, the FBI agreed to provide a new, revised *Vaughn* index for the 500 pages comprising the EPIC documents. For the reasons discussed below, the FBI's withholdings in the EPIC documents are appropriate.

### A.    The FBI Properly Withheld Records Pursuant to Exemption 1.

FOIA Exemption 1 protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy, and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552 (b)(1). For information to be properly classified

---

[12]    Mr. Rigmaiden agreed not to challenge exemptions (b)(6) and (b)(7)(C) unless there are sections of a personnel file discussing an agent's training and experience in using portable/transportable wireless device locators and related equipment. *See* Ex. C. Because no such files were identified, the withholdings were not included in the revised draft *Vaughn* and are not further discussed in this brief.

[13]    In the EPIC case, FBI agreed to provide EPIC with a draft *Vaughn* index for a sample of 500 pages selected by EPIC; per an agreement between the parties, the FBI only needed to address its withholdings under exemptions (b)(3) and (b)(7)(E) in the index. EPIC provided its selection for the sample set on August 30, 2013, and the FBI conveyed its draft *Vaughn* index on October 1, 2013, as well as a revised set of the 500 pages that comprised this sample because the FBI's review of the documents revealed additional information that could be released. As a result of the FBI's provision of a draft *Vaughn*, EPIC agreed to withdraw its remaining substantive legal claims, with only issues relating to attorney fees remaining to be resolved. See *EPIC v. FBI*, No. 12-667, Joint Status Report ¶ 8 (D.D.C. Nov. 1, 2013). Mr. Rigmaiden requested that the FBI produce a "second *Vaughn* index" to supplement the *Vaughn* index provided to EPIC – while the EPIC *Vaughn* only addressed the FBI's withholdings pursuant to exemptions (b)(3) and (b)(7)(E), Mr. Rigmaiden requested that the FBI produce a second *Vaughn* that would address the FBI's withholdings under exemptions 1, 3, 4, 5, 6, 7(C) , and 7(E).

21

pursuant to Exemption 1, it must meet the requirements of E.O. 13,526, "Classified National Security Information." *See* 75 Fed. Reg. 707 (Dec. 29, 2009). The E.O. lists three classification levels: Top Secret, Secret, and Confidential. *Id.* § 1.2, 75 Fed. Reg. at 707-08. The declarant for the FBI, David M. Hardy, is an original classification authority. *See* Hardy Harris/EPIC Decl. ¶ 2.

"The function of determining whether secrecy is required in the national interest is expressly assigned to the executive." *Epstein v. Ressor*, 421 F.2d 930, 933 (9th Cir. 1970). Thus, and for exemptions related to national security, "the district court [is] required to accord 'substantial weight' to [the agency's] affidavits" as long as they are not "controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992); *Salisbury v. United States*, 690 F.2d 966, 970 (D.C. Cir. 1982) ("'[T]he Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [effects] might occur as a result of public disclosure of a particular classified record.'") (quoting S. Rep. No. 1200, 93rd Cong., 2d Sess. 12 (1974)).

Here, the FBI withheld classified information relating to: intelligence activities, sources, and methods; foreign relations or foreign activities; and vulnerabilities or capabilities of systems relating to national security. The Hardy declaration and *Vaughn* index submitted herewith fully support application of Exemption 1, as they describe "the justifications for nondisclosure with reasonably specific detail," *Hunt*, 981 F.2d at 1119, and demonstrate "that the information withheld logically falls within the claimed exemption[]." *Id.*; *see also Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007) (same). *See* Hardy EPIC Decl. ¶¶ 18-34. All of the information being withheld pursuant to Exemption 1 has been marked at the "Secret" level, as the unauthorized disclosure of that information reasonably could be expected to cause serious damage to national security. *Id.* ¶ 22; E.O. 13526 § 1.2(a)(2). Moreover, all of the procedural requirements associated with E.O. 13526 were followed with respect to these materials. *Id.* ¶ 22.

First, the FBI withheld information relating to intelligence activities, sources, and

methods.  The FBI withheld a number of pages that contained detailed intelligence activities gathered or compiled by the FBI on specific individuals of national security interest.  *Id*. ¶ 28.  The disclosure of this information could cause serious damage to the national security because it would reveal the actual intelligence activity or method the FBI uses against a specific target and disclose the intelligence-gathering capabilities of the method.  *Id.*  Additionally, the release of the information would provide an assessment of the FBI source's penetration of the target during an identified time period. *Id.*  Moreover, the FBI has withheld information on FBICELL-259 that identifies the character and/or title of the case for a specific type of intelligence activity directed at a specific target of national security interest.  *Id.*¶ 29.  If revealed, this information would cause serious damage to national security by a revealing a particular intelligence investigation, the nature of that investigation, and the manner in which the information was acquired.  *Id.*  These documents are properly classified as "Secret" and withheld pursuant to Exemption 1.  *Id.* ¶¶ 28, 29.

Second, the FBI withheld information on FBICELL-392 relating to foreign relations or foreign activities.   This page contains sensitive intelligence gathered by the United States either about or from a foreign country.  *Id.* ¶ 30.  The release of this information could cause serious harm, including diplomatic or economic retaliation against the United States.  *Id.* ¶ 31.  Additionally, the release would identify the target, scope, or time frame of U.S. intelligence activities in a foreign country, which in turn could result in the cessation of these activities, the development of countermeasures to counteract them, and jeopardize the safety and continued viability of sources.  *Id.*  This document is properly classified as Secret and withheld pursuant to Exemption 1.  *Id.*

Third, the FBI withheld a number of pages relating to the vulnerabilities or capabilities of systems relating to national security.  *Id.* ¶ 32.  These documents all pertain to systems employed, or under development, by the FBI to assist in its national security missions.  Among other things, this information includes detailed descriptions of stingray capabilities, planned enhancements to the FBI system, key technology areas

1    exploitation, and FBI vulnerabilities with respect to specific technological capabilities

2    and deficiencies of technology.  *Id.* ¶ 32.  The information withheld may be described

3    only generally, as any further explanation could reveal the information the FBI seeks to

4    protect.  *Id.*  It is properly classified as Secret and withheld pursuant to Exemption 1.

5              **B.      The FBI Properly Withheld Records Pursuant to Exemption 3.**

6              Exemption 3 of the FOIA permits agencies to withhold from disclosure records

7    that are: "specifically exempted from disclosure by statute . . . provided that such statute

8    (A)(i) requires that the matters be withheld from the public in such a manner as to leave

9    no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to

10   particular types of matters to be withheld."  5 U.S.C. § 552(b)(3) as amended.  In

11   analyzing the propriety of a withholding taken pursuant to Exemption 3, the Court need

12   not examine "the detailed factual contents of specific documents" in which withholdings

13   have been taken.  *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007).  Rather, "'the

14   sole issue for decision is the existence of a relevant statute and the inclusion of withheld

15   material within the statute's coverage.'  It is particularly important to protect intelligence

16   sources and methods from public disclosure."  *Id.* (quoting *Ass'n of Retired R.R. Workers*

17   *v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C.Cir.1987)).

18            Here, the FBI invokes Section 102A(i)(1) of the National Security Act of 1947, as

19   amended, 50 U.S.C. § 403-1(i)(1), which requires that the Director of National

20   Intelligence  ("DNI") "shall protect intelligence sources and methods from unauthorized

21   disclosure."  It is well-established that Section 102A qualifies as a withholding statute for

22   the purposes of Exemption 3.  *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007); *see*

23   *also ACLU v. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011).  Indeed, the

24   Supreme Court has recognized the "wide-ranging authority" provided by the National

25   Security Act to protect intelligence sources and methods, noting that, rather than limit the

26   scope of the Act, "Congress simply and pointedly protected all sources of intelligence

27   that provide, or are engaged to provide, information the [CIA] needs" to gather and

28

                                              24

1  analyze intelligence.  *CIA v. Sims*, 471 U.S. 159, 169-70, 177 (1985). In his declaration,

2  Mr. Hardy establishes that the information withheld by the FBI is covered by the statute.

3  The Office of the DNI reviewed the information and confirmed that it contains

4  intelligence sources and methods.  Hardy Harris/EPIC Decl. ¶ 37.  As a result, the FBI

5  properly withheld this information.

6    **C.    The FBI Properly Withheld Records Pursuant to Exemption 4.**

7      FOIA exempts from disclosure "trade secrets and commercial or financial

8  information obtained from a person and privileged or confidential."  5 U.S.C. § 552b(4)

9  ("Exemption 4").  To withhold information under Exemption 4, the government agency

10 must demonstrate that it is "(1) commercial and financial information, (2) obtained from

11 a person or by the government, (3) that is privileged or confidential." *GC Micro Corp. v.*

12 *Def. Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir.1994).  "[C]ommercial or financial

13 matter is 'confidential' for purposes of the exemption if disclosure of the information is

14 likely to have either of the following effects: (1) to impair the Government's ability to

15 obtain necessary information in the future; or (2) to cause substantial harm to the

16 competitive position of the person from whom the information was obtained."  *Id.*

17     The FBI withheld commercial information in documents FBICELL 15-45, 63-65,

18 82-93 on the basis of Exemption 4.  Specifically, the FBI withheld the identities of

19 telecommunications companies, wireless products group, cell phone tracking devices, and

20 satellite systems that had provided information to the FBI as part of its national security

21 and criminal investigations.  Hardy Harris/EPIC Decl. ¶ 40.  The disclosure of this

22 information would impair the FBI's ability to obtain information to support future

23 investigative needs, as the companies may reconsider their cooperation with the FBI if

24 such information is likely to be revealed.  *Id.*  Additionally, the businesses themselves

25 would be substantially harmed if their customers knew they were providing information

26 to the FBI, potentially resulting in the loss of customers and civil lawsuits.  *Id.*  The

27 Hardy declaration therefore establishes that the release of this information was properly

28 protected under Exemption 4.

**D.      The FBI Properly Withheld Records Pursuant to Exemption 5.**

As discussed above, FOIA exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5) ("Exemption 5").  In response to this FOIA request, the FBI is asserting Exemption 5 for both the attorney-client privilege and the deliberative process privilege.  The standard for the deliberative process privilege is discussed in Part IV.A**,** *supra.*  As for the attorney-client privilege, it "'protects a client's confidences to her attorney so that the client may have uninhibited confidence in the inviolability of her relationship with her attorney.'"  *Nat'l Res. Def. Council v. U.S. Dept. of Def.*, 388 F. Supp. 2d 1086, 1099 (C.D. Cal. 2005) (quoting *Judicial Watch v. U.S. Postal Serv.*, 297 F. Supp. 2d 255, 267 (D.D.C. 2004)).  To withhold a document under Exemption 5 pursuant to the attorney-client privilege, "'an agency must demonstrate that the document it seeks to withhold (1) involves confidential communications between an attorney and his client and (2) relates to a legal matter for which the client has sought professional advice.'" *Id.*

The FBI has withheld information pursuant to the attorney client privilege as protected by Exemption 5 on six sets of documents.  The first set relates to a June 2008 legal briefing that discussed, among other issues: the best practices of the Wireless Intercept and Tracking Team ("WITT"); WITT's disruption of service, purge data, data retention, emergency provision, and alternative authority; Fourth Amendment privacy interest; Court orders; and the investigative use of technique, cellular tracking as evidence, and protecting sensitive techniques.  Hardy Harris/EPIC Decl. ¶¶ 43-47.  The second set of documents relates to a legal briefing on July 29, 2010 discussing the legal authority for Pen Register Trap and Trace, the legal authority to deploy WITT, procedures for the requesting agency, and procedures for field office approval for technical assistance.  *Id.* ¶ 48.  The third set relates to a March 7-8, 2007 email chain between and among FBI employees regarding WITT missions.  *Id.* ¶ 49.  The fourth set involves a legal briefing on a WITT project.  *Id.*¶ 50.  The fifth set is a portion of a legal

26

briefing by the Tracking Technology Unit to an FBI Assistant General Counsel.  *Id.* ¶ 51.
The final set relates to preparations for Court testimony from a FBI briefing.  *Id.* ¶ 52.
These documents are communications between and among FBI counsel and the FBI's
clients and employees seeking and containing legal advice on the FBI's use of cell-site
simulator technology.  *Id.* ¶ 51.  The communications were made in confidence, using
secured computer systems.  *Id.*  If such information were revealed, it would impede FBI's
clients and employees from fully disclosing information to FBI attorneys in the future
regarding their reasons for seeking legal advice.  *Id.*

The FBI also has withheld nine sets of documents on the basis of the deliberative
process privilege.  The first document is pre-decisional and deliberative because it
reflects the FBI's WITT teams comments on a two-page cost proposal review.  *Id.* ¶ 55.
The second document set is a set of emails regarding a trip report.  *Id.* ¶ 56.  The face of
the document clearly relates its pre-decisional and deliberative nature, as it states that the
email chain was intended "to solicit feedback if the reported items are incomplete or
inaccurate" and further that the feedback will then be used to produce a white paper.  Ex.
D, attached hereto (EPICCELL-294).  The third set of documents relates to a meeting
agenda regarding a research project review.  Hardy Harris/EPIC Decl. ¶ 57.  The fourth
set also clearly reflects pre-decisional deliberative information, as it contains FBI
employee's thoughts on proposed legislation.  *Id.* ¶ 58; Ex. D (EPICCELL-393).  The
fifth through ninth sets of documents are finance memoranda regarding the FBI's WITT
team, and they are pre-decisional and deliberative because they reflect *requests* for
funding.  *Id.* ¶¶ 59-63; Ex. D (FBICELL-454-455, 457, 459-460, 461, 515).  Accordingly,
the FBI properly withheld this information pursuant to Exemption 5.

**E.    The FBI Properly Withheld Records Pursuant to Exemption 7(E).**

Here, the FBI asserts Exemption 7(E) to protect procedures and techniques used
by FBI agents relating to cell-site simulator technology and secure FBI email addresses,
faxes, telephone numbers and office locations.  First, the FBI withheld information
related to the application of cell-site simulator technology as a law enforcement technique

27

and its procedures, including *inter alia* the development of the technology, the facts and circumstances of its employment, technical specifications, specific products used, and sensitive terms and definitions specific to the FBI relating to the application of these devices in collecting data for pending and future investigations.  Hardy Harris/EPIC Decl. ¶ 73.  While the existence of cell-site technology is generally known, detailed information about its application and use is not.  The release of this detailed information significantly risks circumvention of the law and would trigger immeasurable harm to law enforcement and national security operations.  *Id.*  As the Hardy declaration notes, bloggers have already sought to outline ways to circumvent the use of cellular location and identifying capabilities.  *Id.*  Further disclosure – even of seemingly small details – would enable individuals to, in mosaic fashion, combine what is generally known about the technique with new specific details to get a bigger picture of how the technique is employed.  *Id.*  Second, the FBI also withheld information relating to FBI email addresses, faxes, telephone numbers and office locations pursuant to Exemption 7(E).  *Id.* ¶ 74.  This information relates to the internal practices of the FBI in that they are utilized by FBI personnel during the performance of their jobs.  Disclosure of this information could subject these individuals to unauthorized users, could disrupt official business including investigations by Special Agents, and could compromise the effectiveness of the FBI's computer system.  *Id.*  This information is routinely withheld, as there is no public benefit or genuine public interest.  *Id.*  Accordingly, the FBI has properly withheld both categories of information pursuant to Exemption 7(E).

**VI.    The FBI Has Produced All Reasonably Segregable Portions of Records.**

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  This provision does not require disclosure of records in which the non-exempt information that remains is meaningless.  *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005) (concluding that no reasonably segregable information exists because "the non-exempt

28

information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words."). The FBI has reviewed the withheld material and has disclosed all non-exempt information that reasonably could be disclosed.  *See* Hardy WSJ Decl. ¶¶ 25, 74; Hardy Harris/EPIC Decl. ¶¶ 16-17, 75-76; Def. SOF ¶ 27. Accordingly, the FBI has produced all "reasonably segregable portion[s]" of the responsive records.

## VII.  EOUSA Has Conducted a Search Reasonably Calculated to Uncover Relevant Records in Response to Plaintiff's FOIA Request.

Plaintiff has served a four-part FOIA request on EOUSA.  *See* Declaration of John W. Kornmeier Ex. A.  Specifically, Mr. Rigmaiden sought four categories of records:

> 1.     All department records concerning the following portable/transportable wireless device locators (*i.e.*, devices used to locate cell phones, etc.) and related equipment manufactured and/or branded and/or sold by Harris Wireless Products Group (Harris Corporation) . . . .

> [2].    All departmental records detailing [USAO] policies, practices, and procedures to seek court orders to destroy real-time wireless device location data. . . .  The requested records should pertain to Assistant United States Attorneys ("AUSA") and other attorneys applying for court orders to destroy real-time location data used to further an investigation or to facilitate an arrest.

> [3].    All department records detailing USAO policies, practices, and procedures to have AUSAs and other attorneys seek one or more court orders authorizing use of pen registers, trap and trace devices, stored records under the Stored Communications Act, and/or mobile tracking devices—<u>while the true intention is to use Harris portable/transportable wireless device locators and related equipment (listed in No. 1 above) or other portable/transportable wireless device locators.</u> . . .

> [4].    All departmental records detailing USAO policies, practices, and procedures to conceal from defendants and their attorneys in criminal cases the fact that the government used the Harris portable/transportable wireless device locators (listed in No. 1, above), or other portable/transportable wireless device locators, to gather evidence during related criminal investigations.

Kornmeier Decl. Ex. A (emphasis in original).

EOUSA initially responded to the FOIA request by indicating that it did not

1   maintain records in a manner that would enable it to reasonably search for the

2   information and, on that basis, denied the request.  Kornmeier Decl. ¶ 5.[14]  Plaintiff

3   subsequently clarified the scope of this request through undersigned litigation counsel to

4   indicate that, when he refers to the "Department," he is referring to EOUSA and the

5   specific offices listed at the bottom of his request; when he is referring to "other devices,"

6   he means devices not manufactured by Harris; but when he says "related equipment"

7   following Harris devices, he is referring to related Harris equipment.  Kornmeier Decl. ¶

8   6; Def. SOF ¶ 28

9          Based upon that "clarification," EOUSA re-evaluated its denial of Mr.

10  Rigmaiden's FOIA request and has now processed Part 1 of plaintiff's FOIA request.  As

11  for Parts 2 through 4, they remain fatally flawed as discussed in more detail below.

12          A.      **EOUSA Has Conducted a Reasonable Search for Part 1 in Light of the
                    Ambiguity of Plaintiff's Request and the Recordkeeping Systems It
13                  Has.**

14          FOIA requires federal agencies to make records available only upon a request that

15  "reasonably describes" the records sought.  5 U.S.C. § 552(a)(3)(A).  As the Ninth

16  Circuit has explained, a request "reasonably describes" a record "if it enable[s] a

17  professional employee of the agency who [i]s familiar with the subject area of the request

18  to locate the record with a reasonable amount of effort."  *Marks v. United States*, 578

19  F.2d 261, 263 (9th Cir. 1978) (citing H.R. Rep. No. 93-876, at 6 (1974), *reprinted in*

20  1974 U.S.C.C.A.N. 6267, 6271).  "The rationale for this rule is that FOIA was not

21  intended to reduce government agencies to full-time investigators on behalf of

22  requesters," *Assassination Archives & Research Ctr. v. CIA* (*AARC*), 720 F. Supp. 217,

23  219 (D.D.C. 1989), nor to allow requesters to conduct "fishing expeditions" through

24  agency files, *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002).  Accordingly, it is

25  appropriate for an agency to deny a "broad, sweeping request[]" if the request is

26  insufficiently particular to allow an employee to locate responsive records within a

27  _____

28  [14]     EOUSA also offered to provide records that had been processed in another FOIA
        request to Mr. Rigmaiden.  Kornmeier Decl. ¶ 5.

reasonable period of time.  *Marks*, 578 F.2d at 263.

As courts have recognized, whether an agency employee could locate a record with a reasonable amount of effort depends both on the nature of the request and the type of records system an agency has.  *See, e.g.*, *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 276 (D.D.C. 2012) ("[A]n agency is presumably unable to 'determine precisely what records are being requested' when it cannot perform a reasonable search for the requested records within the limitations of how its records systems are configured."); *Freedom Watch, Inc. v. CIA*, 895 F. Supp. 2d 221, 228-29 (D.D.C. 2012) (request improper where it imposes an unreasonable burden on agency); *AARC*, 720 F. Supp. at 219 ("[A]gencies are not required to maintain their records or perform searches which are not compatible with their own document retrieval systems.") (quoting *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982)).  In that regard, courts have taken a "'practical approach' . . . in interpreting the Act," *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1039 (7th Cir. 1998) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. at 157), allowing agencies to prioritize their resources, notwithstanding the obligations to provide access to records under FOIA.  *See, e.g.*, *Int'l Counsel Bureau v. U.S. Dep't of Defense*, 723 F. Supp. 2d 54, 59-60 (D.D.C. 2010).

In his request (as subsequently modified), Mr. Rigmaiden asks EOUSA to search for records in EOUSA's front offices, in other DOJ offices that are not part of EOUSA, and in U.S. Attorney's Offices in California, Arizona, and New York.  *See* Kornmeier Decl. ¶¶ 8-9 & Ex. A.  EOUSA determined that it could search in five of the seven offices that Mr. Rigmaiden identified, as they are part of EOUSA.  *See* Kornmeier Decl. ¶¶ 8-9; Def. SOF ¶ 29.  Because EOUSA's recordkeeping systems are not designed to retrieve the type of information that Mr. Rigmaiden sought, EOUSA obtained responsive records by asking representatives of the respective offices if they have responsive records.  *See* Kornmeier Decl. ¶ 10; *see also id.* ¶¶ 11-14 (describing specific steps undertaken by EOUSA); Def. SOF ¶ 30.

EOUSA did not, however, search for records in two offices – the Office of

31

Enforcement Information and the Computer Crimes and Intellectual Property Section –
because they are not part of EOUSA, but are part of the DOJ's Criminal Division.  *See*
Kornmeier Decl. ¶ 8; 28 C.F.R. § 16.4(a) ("the component that first receives a request for
a record and has possession of that record is the component responsible for responding to
the request"); Def. SOF ¶ 31.  As for the U.S. Attorney's Offices, EOUSA did not
conduct a search because those offices' records management system does not track the
information that Mr. Rigmaiden seeks, but instead tracks case-related information.  *See*
Kornmeier Decl. ¶ 16; Def. SOF ¶ 32.  Moreover, EOUSA determined that any attempt to
search multiple USAOs for records "concerning" specific and non-specific devices was
unreasonable in light of the vague nature of the request, the lack of a time limitation, and
the number of USAOs involved.  *See* Kornmeier Decl. ¶ 16; *Marks*, 578 F.2d at 263.[15]

### B.     Parts 2 Through 4 Are Not Proper FOIA Requests.

The remaining parts of plaintiff's EOUSA FOIA request fail to meet the standard
of reasonably defining records sought, as each of the parts requires that EOUSA conduct
some sort of sweeping internal investigation in order to identify responsive records.  For
example, plaintiff would like for EOUSA to identify policies regarding location-tracking
information by attempting to ascertain "the true intention" of the authors of the records at
issue, regardless of what the face of the record reveals.  Plaintiff similarly expects
EOUSA to be able identify alleged policies regarding concealment – which by definition
is the intended act of covering something up.  That is not a reasonably described request
under FOIA.  As for plaintiff's request for records to destroy information, it requires
EOUSA to identify those specific records that reflect circumstances in which information
was "used to further an investigation or facilitate an arrest," which in turn would require
EOUSA to research how data reflected in individual records were – or were not – used as
part of a larger criminal investigation or case.  Short of interviewing individual AUSAs to

---

[15]     Even if this Court disagrees and concludes that EOUSA must conduct some sort of
search of individual U.S. Attorney's Offices, it will still need to resolve the question of
whether Mr. Rigmaiden is entitled to a fee waiver.  If he has not, and if Mr. Rigmaiden
refuses to pay appropriate search fees, then no further searching would be appropriate.

ascertain how the data were used, EOUSA cannot make that determination.

In short, Parts 2 through 4 are not proper FOIA requests; they involve subjective notions that "are merely argumentative with no objective standard on which to base a search."  Kornmeier Decl. ¶ 18.

**VIII.   EOUSA Has Properly Withheld Records.**

In processing plaintiff's FOIA request, EOUSA withheld records pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E); Def. SOF ¶ 34.

**FOIA Exemption 5.**  EOUSA has withheld records pursuant to Exemption 5 based on application of the deliberative process privilege and the work-product doctrine.  *See* Kornmeier Decl. ¶ 27 & Ex. D.  The contours of the deliberative process privilege are discussed in Part IV.A, *supra*.  As for the work-product doctrine, it protects materials prepared by an attorney or others in anticipation of litigation, including materials of government attorneys generated in litigation and pre-litigation counseling.  *See* Fed. R. Civ. P. 26(b)(3); *Sears, Roebuck & Co.*, 421 U.S. at 154; *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2003).  The phrase "in anticipation of litigation" extends beyond an attorney's preparation for a case in existing litigation, and includes "documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated."  *Feshback Secs. v. Securities and Exch. Comm'n*, 5 F. Supp. 2d 774, 782 (N.D. Cal. 1997) (citing *Schiller v. NLRB.*, 964 F.2d 1205, 1208 (D.C. Cir. 1992), *abrogated on other grounds by Milner v. Dep't of Navy*, 131 S. Ct 1259 (2011)); *see also Delaney, Migdail & Young v. IRS*, 826 F.2d 124, 127 (D.C. Cir. 1987) (work product protection for memos that "advise the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome"); *Heggestad v. Dep't of Justice*, 182 F. Supp. 2d 1, 8 (D.D.C. 2000) (work product doctrine applies "even without a case already docketed or where the agency is unable to identify the specific claim to which the document relates").

As set forth in Mr. Kornmeier's declaration and attached *Vaughn* index, EOUSA

33

has properly invoked Exemption 5 for both the deliberative process privilege and the work product doctrine.  *See* Kornmeier Decl. ¶ 27 & Ex. E.  These materials, which largely consist of e-mails, draft memoranda, and comments on draft memoranda, are DOJ documents that reflect internal, pre-decisional deliberations or are prepared in anticipation of litigation – or both.  Many regard the ramifications of the Supreme Court decision, *United States v. Jones*, 132 S. Ct. 945 (2012), while a handful of others discuss a handful of topics including, for example, the use of cell-phone related evidence.  *See* Kornmeier Ex. E.

> **FOIA Exemptions 6, 7(C), and 7(E).**  EOUSA has asserted Exemptions 6 and 7(C) to protect the names and other personal information of individuals identified in EOUSA's records.  *See id.* ¶¶ 28, 29.  The scope of these exemptions is described in Part IV.B.1, *supra*, and the application of the exemptions is described in EOUSA's *Vaughn* index.  *See id.* Ex. E.[16]

> **FOIA Exemption 7(E).** EOUSA has asserted Exemption 7(E) to protect techniques and procedures for law enforcement investigations or procedures of which disclosure could reasonably be expected to risk circumvention of the law.  *See id.* ¶ 30. The scope of this exemption is described in Part IV.B.2, *supra*, and the application of the exemption is described in EOUSA's *Vaughn* index.  *See id.* Ex. E.

## IX.  Because the Parties Agreed to Substitute the EPIC Request for Plaintiff's Harris Request, Expedited Processing Is Not at Issue.

> While plaintiff's brief addresses his claim for expedited processing in relation to his Harris request to the FBI, as discussed above, the parties agreed to substitute the EPIC request for plaintiff's Harris request.  Plaintiff acknowledged that if the FBI successfully upheld its withholdings on the EPIC release, the litigation effectively would be over. Accordingly, the issue of expedited processing is not properly before the Court.

*          *          *

---

[16]     For purposes of Exemption 7, EOUSA has a clear law-enforcement function and a rational nexus exists.  *See* Kornmeier Decl. ¶ 26; Def. SOF ¶ 35.

34

1    DATED:  March 14, 2014                  Respectfully submitted,

2                                            STUART F. DELERY
                                             Assistant Attorney General
3
                                             ELIZABETH J. SHAPIRO
4                                            Deputy Branch Director

5                                            /s/ *Brad P. Rosenberg*
                                             BRAD P. ROSENBERG
6                                            D.C. Bar No. 467513
                                             KIMBERLY L. HERB
7                                            Illinois Bar No. 6296725
                                             Trial Attorneys
8                                            U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
9                                            P.O. Box 883
                                             Washington, D.C.  20044
10                                           Telephone:  (202) 514-3374
                                             Facsimile:  (202) 616-8460
11                                           E-mail:  brad.rosenberg@usdoj.gov

12                                           *Attorneys for Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2014, I served the foregoing document (including exhibits and other filings attached thereto) by first-class mail, postage pre-paid, on the following, who is not a registered participant of the CM/ECF system:

Daniel D. Rigmaiden
Agency # 10966111
CCA-CADC
PO Box 6300
Florence, AZ  85132

/s/ *Brad P. Rosenberg*
BRAD P. ROSENBERG
D.C. Bar No. 467513
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone:  (202) 514-3374
Facsimile:  (202) 616-8460
E-mail:  brad.rosenberg@usdoj.gov

*Attorney for Defendants*