IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| DANIEL DAVID RIGMAIDEN<br>     Plaintiff, | ) ) ) ) | |
| v. | ) | Civil Action No. 12-CV-01605-SRB-BSB |
| U.S. DEPARTMENT OF JUSTICE, *et. al.*, | ) ) | |
| Defendants. | ) ) ) | |

### DECLARATION OF DAVID M. HARDY REGARDING
### WALL STREET JOURNAL AND THE BROOKINGS REQUEST

I, David M. Hardy, declare as follows:

(1)        I am currently the Section Chief of the Record/Information Dissemination

Section ("RIDS"), Records Management Division ("RMD"), in Winchester, Virginia.   I have

held this position since August 1, 2002.   Prior to my joining the FBI, from May 1, 2001 to July 31,

2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.   In that capacity, I

had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and

litigation for the Navy.   From October 1, 1980 to April 30, 2001, I served as a Navy Judge

Advocate at various commands and routinely worked FOIA matters.   I am an attorney and have

been licensed to practice law in the State of Texas since 1980.

(2)        In my official capacity as Section Chief of RIDS, I supervise approximately 249

employees who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ")

units and two (2) field operational service center units whose collective mission is to effectively

plan, develop, direct, and manage responses to requests for access to FBI records and information

pursuant to the FOIA; amended by the OPEN Government Act of 2007 and the OPEN FOIA Act

of 2009; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI

policies and procedures; judicial decisions; and other Presidential and Congressional directives.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.

Specifically, I am aware of the handling of the November 10, 2011, Freedom of Information Act

("FOIA") request.   The plaintiff's request seeks access to the following two categories of records

1) "All agency records concerning comments made by FBI agents and employees to *The Wall

Street Journal* (hereafter "WSJ") reported in or in relation to the September 22, 2011 WSJ article

titled "'Stingray' Phone Tracker Fuels Constitutional Clash," by Jennifer Valentino-DeVries.

and 2) "All agency records concerning comments made by FBI agents and employees at a panel at

the Brookings Institution in May of 2011 regarding portable/transportable wireless device locators

(e.g., cell site emulators) such as the Harris StingRay and KingFish."

(4)     The FBI has processed a total of 94 pages responsive to plaintiff's FBIHQ request.

Specifically, it has released to plaintiff a total of 94 pages responsive to the WSJ article request.

Of these pages released to plaintiff, 14 pages were released in full and 80 pages were released in

part.

(5)     In accordance with <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), this

declaration, which is being submitted in support of the FBI's motion for summary judgment to provide the Court and plaintiff with 1) an explanation of the procedures used to search for records responsive to plaintiff's WSJ request, and provide justifications for withholding of information from the located records pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E); and 2) an explanation of the procedures used to search for records responsive to plaintiff's request for comments made by FBI agents and employees at a panel at the Brookings Institution in May of 2011, resulting in no responsive records.

## PROCEDURAL HISTORY OF PLAINTIFF'S FOIA REQUESTS

(6)     By letter dated November 10, 2011, the plaintiff submitted a FOIA request to FBIHQ requesting 1.) All agency records concerning comments made by FBI agents and employees to The Wall Street Journal (hereafter "WSJ") reported in or in relation to the September 22, 2011 WSJ article titled "'Stingray' Phone Tracker Fuels Constitutional Clash," by JenniferValentino-DeVries.   I have identified the following subjects upon which FBI comments may have been made as quoted and/or paraphrased by the WSJ (these are direct quotes from the noted article):[1]   For the above quoted/paraphrased comments, I request all agency records relating to the FBI providing comments to the WSJ.   In addition, I also request all agency records regarding comments made to the WSJ relating to StingRay type gear that were not specifically quoted and/or paraphrased in the noted September 22, 2011 article.   2.) All agency records concerning comments made by FBI agents and employees at a panel at the Brookings Institution in May of 2011 regarding portable/transportable wireless device locators (e.g., cell site emulators) such as the Harris StingRay and KingFish.   The WSJ reported in the September 22, 2011 WSJ

---

[1]   Direct quotes 1-6 are not listed See Exhibit A.

article titled "'Stingray' Phone Tracker Fuels Constitutional Clash" that "Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel at the Brookings Institution in May that devices like these fall into a category of tools called 'pen registers,' which require a lesser order than a warrant."   (*See* **Exhibit A**.)

(7)     By letter dated January 23, 2012, the FBI acknowledged receipt of plaintiff's request to FBIHQ and assigned it FOIA Request Number 1180900-000, titling the subject of the request as "RECORDS CONCERNING WALL STREET JOURNAL ARTICLE STINGRAY PHONE TRACKER FUELS CONSTITUTIONAL CLASH."   RIDS advised plaintiff that a search of the automated indices of the FBI's Central Records System ("CRS") at FBIHQ would be conducted for information responsive to this request.   RIDS also advised that the request for a fee waiver is being considered and advised plaintiff of the decision at a later date.   (*See* **Exhibit B**.)

(8)     By letter dated January 31, 2012, the FBI advised plaintiff that its request for expedited processing has been denied.   (*See* **Exhibit C**.)

(9)     By letter date January 31, 2012, the FBI advised plaintiff that its request for a fee waiver has been denied.   (*See* **Exhibit D**.)

(10)     By letter dated April 6, 2012, OIP acknowledged receipt of plaintiff's appeal and assigned it Appeal Number AP-2012-01750.[2]   (*See* **Exhibit E**.)

(11)     By letter dated April 17, 2012, OIP advised plaintiff of its decision on the request for access to certain records was received in this Office on March 29, 2012.   You have appealed from the FBI's denial of your request for a fee waiver and expedited treatment of your request. The FBI properly denied your request for expedited treatment and fee waiver.   (*See* **Exhibit F**.)

---

[2] The FBI did not receive this FOIA request dated October 10, 2011 that plaintiff submitted with the Appeal letter dated February 15, 2011 (Plaintiff's letter should be dated February 15, 2012.)

(12)    On or about July 26, 2012, plaintiff filed the present lawsuit in the U.S. District

Court for the District of Arizona (Phoenix Division).  *See* Docket ("Dkt.") No. 1 ("Complaint").

(13)    Pursuant to the litigation filed on July 26, 2012, RIDS discovered the FOIA request

letter that plaintiff sent to OIP with appeal was never received by the FBI.[3]  The FBI opened this

new FOIA request on April 12, 2013 as FOIA request number 1212582-000 titling the subject of

the request as "WIRELESS DEVICE LOCATORS MANUFACTURED BY HARRIS

WIRELESS PRODUCTS GROUP."   Request number 1212582-000 will be addressed in a

separate declaration; therefore; no further discussion of the procedural history of that request is

contained herein.

(14)    By letter dated July 12, 2013, the FBI advised plaintiff that it had reviewed 94

pages and that it was releasing 94 pages.   This release was made under FOIPA Number 1180900.

Furthermore, the FBI advised that it was withholding information pursuant to FOIA Exemptions 5,

6, 7(C), and 7(E).   Plaintiff was also advised that it could administratively appeal the FBI's action

to DOJ/OIP within 60 days from the date of the letter.   (*See* **Exhibit G**.)

## EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(15)    The Central Records System ("CRS") enables the FBI to maintain information

which it has acquired in the course of fulfilling its mandated law enforcement responsibilities.

The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and

other files compiled for law enforcement purposes.   This system consists of a numerical sequence

of files, called FBI "classifications," which are broken down according to subject matter.   The

---

[3] The FBI only has record of receiving one FOIA request from plaintiff dated November 10, 2011
(RECORDS CONCERNING WALL STREET JOURNAL ARTICLE STINGRAY PHONE TRACKER FUELS
CONSTITUTIONAL CLASH) – FOIA 1180900

subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter (or program).   Certain records in the CRS are maintained at FBIHQ. Records that are pertinent to specific field offices of the FBI are maintained in those field offices. Although the CRS is primarily designed to serve as an investigative tool, the FBI typically searches the CRS for documents that are potentially responsive to FOIPA requests.   The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS").

(16)   The retrieval of data from the CRS is made possible through the ACS using the General Indices, which are arranged in alphabetical order.[4]   The General Indices consist of index cards on various subject matters that are searched either manually or through the automated indices.   The entries in the General Indices fall into two categories:

(a) A "main" entry -- A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.

(b) A "reference" entry -- A "reference" entry, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

(17)   Access to the CRS files in FBI Field Offices is also obtained through the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations. Searches made in the General Indices to locate records concerning a particular subject are made by searching the subject requested in the index.   FBI Field Offices have automated indexing functions.

---

[4] The General Indices, which became fully automated on September 24, 1987, also include Index cards which allow a manual search for records prior to that date.

(18)     On or about October 16, 1995, the ACS system was implemented for all Field

Offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that

were previously automated.   ACS can be described as an internal computerized subsystem of the

CRS.   Because the CRS cannot electronically query the case files for data, such as an individual's

name or social security number, the required information is duplicated and moved to the ACS so

that it can be searched.   Over 105 million records from the CRS were converted from automated

systems previously utilized by the FBI.   Automation did not change the CRS; instead, automation

has facilitated more economic and expeditious access to records maintained in the CRS.

(19)     The ACS consists of three integrated, yet separately functional, automated

applications that support case management functions for all FBI investigative and administrative

cases:

(a)     Investigative Case Management ("ICM") - ICM provides the ability to open,

assign, and close investigative and administrative cases as well as set, assign, and track leads.

The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a

case.   The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"),

formerly known as Auxiliary Offices.   When a case is opened, it is assigned a Universal Case File

Number ("UCFN"), which is used by all FBIHQ, as well as all FBI field offices and Legats that are

conducting or assisting in the investigation.   Using the file number "87-HQ-12345" as an

example, an explanation of the UCFN is as follows:   "87" indicates the classification for the

specific type of investigation, in this example is "Interstate Transportation of Stolen Property";

"HQ" is the abbreviated form used for the OO of the investigation, in this case is Headquarters;

and "12345" denotes the individual case file number for the particular investigation.

(b)   Electronic Case File ("ECF") - ECF serves as the central electronic repository for the FBI's official text-based documents.   ECF supports the universal serial concept in that only the creator of a document serializes it into a file.   This provides a single-source entry of serials into the computerized ECF system.   All <u>original</u> serials are maintained in the OO case file.

(c)   Universal Index ("UNI") - UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases.   Only the OO is required to index; however, the LOs may index additional information as needed.   UNI, an index of approximately 117.3 million records, functions to index names to cases, and to search names and cases for use in FBI investigations.   Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(20)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA"), and on occasion, support employees assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ.   The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval.   Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved.   The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes.   Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable

information, if any, the FBI may have in its CRS files on a particular subject matter or individual.

## SEARCH FOR RECORDS RESPONSIVE
## TO PLAINTIFF'S REQUEST

(21)    Given the purpose, design and organization of the information stored in the CRS system and in light of the subject of plaintiff's FOIA request (See ¶ 6, supra), the FBI performed an individualized search query (outside of the CRS system) of those FBI divisions and offices most likely to maintain potentially responsive records by issuing a search e-mail for records pertaining to the September 22, 2011 Wall Street Journal article titled "'Stingray' Phone Tracker fuels Constitutional Clash" and comments made by Federal Bureau of Investigation agents and employees at a panel at the Brookings Institution in May of 2011.

(22)    On January 24, 2012, the FBI prepared and circulated a search e-mail to the division most likely to possess records responsive to plaintiff's FOIA request.   The search e-mail requested that the personnel in this designated division conduct a thorough search for any and all documents in their possession responsive to plaintiff's request.   As a result, 94 responsive records for the WSJ article request were found and processed.   These pages were processed and released to the plaintiff on July 12, 2013.   The FBI released 94 pages to plaintiff.   Of these 94 pages, 14 pages were released in full and 80 pages were released in part.

(23)    In response to plaintiffs' FOIA request for comments made by Federal Bureau of Investigation agents and employees at a panel at the Brookings Institution in May of 2011 regarding portable/transportable wireless device locators, the FBI conducted a search of the CRS to identify all potentially responsive files indexed to "Valerie Caproni" during the relevant date range 04/01/2011 – 06/30/2011 and "Brookings Institution" during the relevant date range

01/01/2011 – 06/30/2011.   The search yielded no responsive records.

(24)   Regarding plaintiff's request seeking records about various portable/transportable wireless device locators used to locate cell phones, cell site emulators, etc. and related equipment manufactured and/or branded by the Harris Wireless Products Group (Harris Corporation) and other manufactures/companies.   The FBI will address this request in a separate declaration.

## EXPLANATION OF THE CODED FORMAT USED FOR THE JUSTIFICATION OF DELETED MATERIAL

(25)   The FBI has reviewed thoroughly all 94 pages under the FOIA in order to achieve maximum disclosure consistent with the access provisions of the FOIA.   RIDS has made every effort to provide plaintiff with all material in the public domain and with all reasonably segregable portions of releaseable material.   All material which the FBI has withheld is exempt from disclosure pursuant to a FOIA exemption.   Copies of the 94 pages released in full and in part are attached hereto as **Exhibit G.**   Each page of Exhibit G is consecutively Bates numbered "WSJCELL-1 through WSJCELL-94" in the lower right-hand corner.[5]

(26)   Copies of the documents contain, on their face, coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA.   The coded categories are provided to aid the Court and plaintiff in their review of the FBI's assertion of FOIA exemptions used to withhold the protected material on each page.

## MECHANICS OF USING THE CODED FORMAT WITH THE EXEMPTION CATEGORIES

---

[5] Documents previously released to plaintiff are also included in **Exhibit G**.

(27)   Each withholding of information at issue has a coded exemption next to it that details the nature of the information withheld pursuant to the provisions of the FOIA as well as a numerical designation which more specifically identifies the exact nature of the withheld information.   For example, on Bates page WSJCELL-1 of Exhibit G, Exemption (b)(7)(C)- 1 is cited to protect the names and/or identifying information of FBI Special Agents and Support Employees.   The "(b)(7)(C)" designation refers to Exemption 7(C) of the FOIA concerning an Unwarranted Invasion of Personal Privacy.   The numerical designation "1" following the (b)(7)(C) narrows the category of protected information from the main category to the more specific subcategory of "Special Agents and Support Employees."   These coded categories are used to assist the Court and plaintiff in their review of the FBI's withholding of information in these records.   The appropriate codes are also noted on the Descriptive Index below.   As the responsive records here can be categorized into a single category – email records regarding the same topic – a descriptive index is included within this declaration.

## SUMMARY OF JUSTIFICATION CATEGORIES

**EXEMPTION (b)(5)**     **PRIVILEGED INFORMATION**

(b)(5)-1                          Deliberative Process Privilege


**EXEMPTION (b)(6)**     **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY**

       **AND**

**EXEMPTION (b)(7)(C)**   **UNWARRANTED INVASION OF PERSONAL PRIVACY**

| (b)(6)-1 and (b)(7)(C)-1 | Name and/or Identifying Information of FBI Special Agents and Support Employees |
|---|---|
| (b)(6)-2 and (b)(7)(C)-2 | Name and/or Identifying Information of Third Parties Who Were Merely Mentioned |
| **EXEMPTION (b)(7)(E)** | **INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| (b)(7)(E)-1 | Investigative Techniques and Procedures |
| (b)(7)(E)-2 | Identity of FBI and/or Section |

### DESCRIPTIVE INDEX

(28)    WSJCELL-1-3 - Exemption (b)(5)-1 has been asserted at times in conjunction with (b)(7)(E)-1 to withhold internal FBI portions of an email dated September 9, 2011 to September 16, 2011 from WSJ to FBI employees to directly address the WSJ's legal question regarding stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(29)    WSJCELL-4-5 - Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 9, 2011 to Sepember 14, 2011 from WSJ to FBI employees in response to the WSJ inquiring about our stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(30)    WSJCELL-6-7 - Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 9, 2011 to September 12, 2011 from WSJ to FBI employees in response to the WSJ article inquiring about the stingray technology.   Additionally, Exemptions

(b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(31)    WSJCELL-8-10 - Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been asserted to withhold names within an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees for a WSJ fact check.   See detailed discussion below.

(32)    WSJCELL-11-14 - Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been asserted to withhold names within an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees for a WSJ fact check.   See detailed discussion below.

(33)    WSJCELL-15-17 - Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding the WSJ article on stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(34)    WSJCELL-18-20 - Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding the WSJ article on stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(35)    WSJCELL-21-23 - Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding the WSJ article on stingray technology.   Additionally, Exemptions (b)(6)-1,2 and

(b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(36)    WSJCELL-24-26 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding a WSJ article.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(37)    WSJCELL-27-29 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding a WSJ article.   Additionally, Exemptions (b)(6)-1,2, (b)(7)(C)-1,2, and (b)(7)(E)-2 have been applied to withhold information from this document; see detailed discussion below.

(38)    WSJCELL-30-33 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding a WSJ article.   Additionally, Exemptions (b)(6)-1,2, (b)(7)(C)-1,2, and (b)(7)(E)-2 have been applied to withhold information from this document; see detailed discussion below.

(39)    WSJCELL 34-36 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding the WSJ article on stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(40)    WSJCELL-37-39 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees

regarding a WSJ article.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(41)   WSJCELL-40-42 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding a WSJ article.   Additionally, Exemptions (b)(6)-1,2, (b)(7)(C)-1,2, and (b)(7)(E)-2 have been applied to withhold information from this document; see detailed discussion below.

(42)   WSJCELL-43-46 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding the WSJ article on stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(43)   WSJCELL-47-50 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding the WSJ article on stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(44)   WSJCELL-51-53 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding a WSJ article.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(45)     WSJCELL-54-57 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding a WSJ article.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(46)     WSJCELL-58-62 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 20, 2011 to September 21, 2011 from WSJ to FBI employees regarding the WSJ article on stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(47)     WSJCELL-63-69 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 9, 2011 to September 17, 2011 from WSJ to FBI employees to directly address the WSJ's legal question regarding stingray technology.   Additionally, Exemptions (b)(6)-1,2, (b)(7)(C)-1,2, and (b)(7)(E)-2 have been applied to withhold information from this document; see detailed discussion below.

(48)     WSJCELL-70-72 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 9, 2011 to September 16, 2011 from WSJ to FBI employees to directly address the WSJ's legal question regarding stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(49)     WSJCELL-73-74 Exemption (b)(6)-1,2 and (b)(7)(C)-1,2 has been asserted to withhold names within an email dated September 9, 2011 to September 16, 2011 from WSJ to FBI

employees to directly address the WSJ's legal question regarding stingray technology. See detailed discussion below.

(50)    WSJCELL-75 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 14, 2011 from WSJ to FBI employees to directly address the WSJ's legal question regarding stingray technology.   Additionally, Exemptions (b)(6)-1,2 and (b)(7)(C)-1,2 have been applied to withhold information from this document; see detailed discussion below.

(51)    WSJCELL-76-80 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 9, 2011 from WSJ to FBI employees to directly address the WSJ's legal question regarding stingray technology.   Additionally, Exemptions (b)(6)-1,2, (b)(7)(C)-1,2, and (b)(7)(E)-1, 2 have been applied to withhold information from this document; see detailed discussion below.

(52)    WSJCELL-81-85 Exemption (b)(5)-1 has been asserted to withhold internal FBI portions of an email dated September 9, 2011 to September 17, 2011 from WSJ to FBI employees to directly address the WSJ's legal question regarding stingray technology.   Additionally, Exemptions (b)(6)-1,2, (b)(7)(C)-1,2, and (b)(7)(E)-1, 2 have been applied to withhold information from this document; see detailed discussion below.

## INDEX OF PAGES RELEASED IN FULL ("RIF")

(53)    WSJCELL-86-87 have been RIF.   This is a two page question and answer sheet.

(54)    WSJCELL-88-94 have been RIF.   WSJ article dated 09/22/2011 titled 'Stingray' Phone Tracker Fuels Constitutional Clash.

## JUSTIFICATION FOR REDACTIONS

(55)    The FBI's rationale for withholding each particular category of information under the applicable exemption is explained below.

## EXEMPTION (b)(5)
## PRIVILEGED INFORMATION

(56)    5 U.S.C. § 552(b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."   This exemption has been construed to exempt those documents or information normally privileged in the civil discovery context, including, as is the case here, the deliberative process privilege.   The deliberative process privilege protects the internal deliberations of governement exempting material that contains opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations.

### (b)(5)-1   Deliberative Process Privilege

(57)    The deliberative process privilege protects certain internal deliberations of an agency by exempting from release recommendations, analyses, speculation and other non-factual information prepared in anticipation of agency decision-making.   The general purpose of the deliberative process privilege is to prevent injury to the quality of agency decisions.   Thus, material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or recommendations may properly be withheld.   Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction of an agency because it would chill the full and frank discussion between agency personnel regarding a decision.   If agency personnel knew

-18-

that their preliminary opinions, evaluations and comments would be released for public consumption, they might be more circumspect in what they put in writing, and thereby, impede a candid discussion of the issues surrounding a decision.   The FBI applied the deliberative process privilege to withhold information in full or in part on 53 pages as discussed in detail below.

### *Rationale for Withholding*

(58)     The information withheld from the material described above pursuant to Exemption (b)(5), the deliberative process privilege, reflects an internal, on-going dialogue among and between FBI personnel with regard to developing FBI policy on the legal status of "stingray" technology.[6]   This internal dialogue is reflected in many email deliberations and discussions among and between employees regarding these materials what FBI's policy should be, and how best to frame an agency response to the questions posed by the WSJ reporter.

(59)     This dialogue is both (a) "predecisional" - antecedent to the adoption of agency policy, and (b) "deliberative" - the numerous draft email trails and exchanges reflect a continuous set of deliberations, including the give and take of the consultative process with regard to the FBI's position on the legal status of the use of stingray technology.   All of the material withheld pursuant to Exemption (b)(5)-1 – whether withheld in full or in part – reflects a fluid, continuous and on-going deliberative set of discussions among employee contributing to FBI's policy on the legal status of so-called stingray technology and how best to frame an agency response to the questions posed by the WSJ reporter related to stingray technology.

(60)     The FBI has appropriately asserted Exemption (b)(5)-1, the deliberative process

---

[6] The use of the term "stingray" herein is a general reference to the existence of emerging cell phone tracking technology.

privilege, to protect these candid internal discussions concerning these evolving policies and procedures.   The release of the redacted information is likely to chill the full, frank, and open internal discussions between agency personnel – a chilling effect that is crucial to prevent given the important interest at stake – internal FBI deliberation over the legal status of using 'stingray' technology.   The FBI properly protected this information pursuant to FOIA Exemptions (b)(5)-1, which is cited on the following pages: WSJCELL-1-2, 4, 6, 15, 18, 21, 24-32, 34, 37-44, 47-48, 51-60, 63-67, 70-71, 75-79, and 81-84.

## **EXEMPTION (b)(7) THRESHOLD**

(61)     Exemption (b)(7) of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption. See 5 U.S.C. § 552 (b)(7).   In this case, the harm that could reasonably be expected to result from disclosure concerns invasion of personal privacy and revealing sensitive law enforcement techniques.

(62)     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.   Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.   The records responsive to plaintiff's request pertain to the WSJ article on 'Stingray' portable/transportable wireless device locators.   Pursuant to 28 USC §§ 533, 534, and Executive Order 12333 a implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM) and 28 CFR § 0.85, the FBI is the primary investigative

agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States.   Under this broad authority, the responsive email records herein were compiled for a law enforcement purpose as these records relate to FBI discussions and analysis of the policy, legal status, and use of emerging cell phone location technology as a tool or technique for use in FBI law enforcement efforts.   Thus, these documents squarely fall within the law enforcement duties of the FBI, and that the information readily meets the threshold requirement of Exemption (b)(7).   The remaining inquiries are whether its disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy and would reveal investigative techniques and procedures.

### EXEMPTION (b)(6) AND (b)(7)(C) CLEARLY UNWARRANTED AND UNWARRANTED INVASION OF PERSONAL PRIVACY

(63)     5 U.S.C. § 552 (b)(6) exempts from disclosure:

> personnel and medical files and similar files, when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.

(64)     5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.[7]

---

[7]   The practice of the FBI is to assert Exemption (b)(6) in conjunction with (b)(7)(C).   Although the balancing test for (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" and the test for (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.   The privacy interests are balanced against the public's interest in disclosure under the analysis of both

(65)     When withholding information pursuant to this exemption, the FBI is required to

balance the privacy interests of the individuals mentioned in these records against any public

interest in disclosure.   In asserting this exemption, each item of information was examined to

determine the nature and strength of the privacy interest of every individual whose name and/or

identifying information appears in the documents at issue.   In conducting this analysis, the public

interest in disclosure of this information is determined by assessing whether the information in

question would shed light on the FBI's performance of its mission to protect and defend the United

States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of

the United States, and to provide leadership and criminal justice services to federal, state,

municipal, and international agencies and partners.   In each instance where information was

withheld, it was determined that individual privacy rights outweighed the public interest.   The

only recognized public interest is that which sheds light on the operations and activities of the

federal government.   The FBI concluded that the information should be withheld under

Exemptions (b)(6) and (b)(7)(C), and determined that the individuals' privacy interests were not

outweighed by any public interest in disclosure.   Every effort has been made to release all

segregable information contained in these records without invading the privacy interests of these

individuals.

### (b)(6)-1 and (b)(7)(C)-1       Names and/or Identifying Information of FBI Special Agents and Support Employees

(66)     Exemptions (b)(6)-1 and (b)(7)(C)-1 have been asserted to protect the names and

_____

exemptions.

identifying information of FBI SAs and support employees who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in the documents responsive to plaintiff's request.   These responsibilities included reviewing and analyzing materials compiled as a result of, or in accordance with, investigations.   Assignments of SAs to any particular investigation are not by choice.   Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations.   The privacy consideration is also to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the course of an investigation, whether or not they are currently employed by the FBI.   FBI SAs conduct official inquiries into various criminal and national security violation cases.   They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives.   It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years.   These individuals may seek revenge on the agents and other federal employees involved in a particular investigation. The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent.   There is no public interest to be served by disclosing the identities of the SAs or support personnel to the public.   Thus, disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy.[8]

---

[8] For the convenience of the Court, rather than repeat the phrase "clearly unwarranted invasion of personal privacy" under the standard of Exemption 6 and "an unwarranted invasion of personal privacy" under the standard of Exemption 7C, every time we assert these two Privacy Exemptions are asserted, we will simply use the phrase "clearly unwarranted and unwarranted invasion of personal privacy" to refer to both standards.

(67)     The names of FBI support employees are also withheld pursuant to FOIA

Exemptions (b)(6)-1 and (b)(7)(C)-1.   These employees were assigned to handle tasks related to

stingray technology.   They were, and possibly are, in positions of access to information regarding

official law enforcement investigations, and therefore could become targets of harassing inquiries

for unauthorized access to investigations if their identities were released.   These individuals

maintain substantial privacy interests in not having their identities disclosed.   The FBI releases

the names of section chief and above and certain supervisory positions but withholds the names of

other employees including agents and support personnel.   There is no public interest to be served

by releasing the identities of these individuals.   Thus, disclosure of this information would

constitute a clearly unwarranted and unwarranted invasion of their personal privacy.   The FBI

properly protected this information pursuant to FOIA Exemptions (b)(6)-1 and (b)(7)C-1, which

are cited on the following pages: WSJCELL – 1-2, 4, 6, 8, 11-12, 15, 18, 21, 24, 27-31, 34, 37,

40-41, 43-44, 47-49, 51, 54-55, 58-60, 63-68, 70-73, and 75-85.

<u>**(b)(6)-2 and (b)(7)(C)-2**</u>          <u>**Names and/or Identifying Information**</u>
<u>**of Third Parties Merely Mentioned**</u>

(68)     Exemptions (b)(6)-2 and (b)(7)(C)-2 have been asserted to protect the names and

identifying information of third parties that were merely mentioned in the documents responsive to

plaintiff's request.   These individuals are not of investigative interest to the FBI.   Release of this

type of information about private citizens, without notarized authorizations permitting such a

release violates individuals legitimate privacy interests.   If the FBI disclosed their names and/or

other personal information, the disclosure would reveal that these third parties were at one time

connected with an FBI investigation in some way.   Disclosure of their identities could subject

-24-

these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.

(69)     The FBI also examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the third parties merely mentioned in the responsive records.   The FBI could not identify any discernible public interest. In particular, the FBI could not determine how the disclosure of the names, and/or identifying information of these individuals would shed any light on the operations and activities of the FBI. Thus, the FBI determined that these individuals' privacy interests outweighed any public interest in disclosure, and that disclosure of the names and/or identifying information of the third parties merely mentioned would constitute a clearly unwarranted and unwarranted invasion of privacy. The FBI properly protected this information pursuant to FOIA Exemptions (b)(6)-2 and (b)(7)C-2 and are cited on the following Bates pages: WSJCELL-2-8, 10-12, 14-18, 20-21, 23-24, 26-31, 33-37, 39-42, 44-46, 49-53, 55, 57, 60, 62, 68-69, 71-75, 79-80, and 84-85.

## EXEMPTION (b)(7)(E)
## INVESTIGATIVE TECHNIQUES AND PROCEDURES

(70)     5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

(71)     In order for this exemption to apply, the use of the technique or procedure at issue must not be well known to the public.

-25-

### (b)(7)(E)-1   Investigative Techniques and Procedures

(72)    Exemption (b)(7)(E)-1 has been asserted to protect from disclosure the FBI's application and use of emerging cell phone location technology as a law enforcement technique and the procedures associated with employment of this technique.   While the general existence and use of this technology as a law enforcement technique is publicly known, the specific internal application, functioning, and procedural details are not commonly known.   To release this type of information could enable criminals to educate themselves about the techniques employed for the location and apprehension of individuals and, therefore, allow these individuals to avoid detection or develop countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law.   The FBI properly withheld this information pursuant to FOIA Exemption (b)(7)(E)-1 and is cited on the following Bates pages: WSJCELL-1-2, 65, 76, and 81-82.[9]

### (b)(7)(E)-2   Identity of FBI and/or Section

(73)    Exemption (b)(7)(E)-2 has been asserted to protect methods or techniques involving the location and identity of FBI sections that were involved in the investigation(s) at issue in this case.   The sections are found in the signature block of internal FBI emails.   These signature blocks identify the section that originated or received the email.   Disclosure of the sections conducting the investigation would reveal the targets, the physical areas of interest of the investigation, and when taken together with the other locations if identified, could establish a pattern or "mosaic" that identification of a single location would not.   If the locations are clusters in a particular area, it would allow hostile analysts to avoid or circumvent those locations, especially if one or more location appeared with frequency or in a pattern.   This would disrupt the

---

[9] Exemption (b)(7)(E)-1 on Bates pages WSJCELL-66 and 77 that were released to plaintiff on July 12, 2013 has been removed.

method of the investigative process and deprive the FBI of valuable information.   The

withholding of the sections involved is justifiable as well under a similar rationale.   Once

identified, the section's areas of expertise become known and an individual would then be aware

of exactly what the law enforcement agency's interest is.   For example, knowing that a section

whose focus is on financial crimes is involved is quite different information than knowing that

section involved has a focus on crimes of violence.   This knowledge could allow a subject to

employ countermeasures targeted toward concealing particular types of behavior and/or to avoid

altogether activities in a particular location.   The revelation of the involvement that one or more

sections of differing focuses is critical information that can allow the adjustment of behaviors and

activities to avoid detection.   The FBI properly withheld this information pursuant to FOIA

Exemption (b)(7)(E)-2 and is cited on the following Bates pages: WSJCELL-27, 30, 40, 63-64, 77,

and 82.[10]

## CONCLUSION

(74)       The FBI has processed and released all reasonably segregable information from

the records responsive to plaintiff's FOIA request to the FBI for records pertaining to the

September 22, 2011 Wall Street Journal article titled "'Stingray' Phone Tracker fuels

Constitutional Clash."   The FBI has properly withheld information pursuant to FOIA Exemptions

5, 6, 7(C), and 7(E).   See 5 U.S.C. §§ 552 (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).   The FBI

carefully examined the responsive documents and determined that the information withheld from

plaintiff, if disclosed, was privileged deliberative process information, would cause a clearly

unwarranted and an unwarranted invasion of personal privacy interests if disclosed, and could

---

[10]   Updated coding on Bates pages WSJCELL-27, 30, 40, 63-64, 77, and 82 released to plaintiff on July 12, 2013 has been changed from (b)(7)(E)-1 to (b)(7)(E)-2.

reasonably be expected to reveal investigative techniques and procedures.   The FBI has

determined that there is no further information that can be reasonably segregated and released to

plaintiff.   As to the plaintiff's request for comments made by Federal Bureau of Investigation

agents and employees at a panel at the Brookings Institution in May of 2011 regarding

portable/transportable wireless device locators, the FBI searched its CRS and did not locate any

responsive records.

   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through G attached hereto are true and correct copies.

   Executed this ___12th___ day of March, 2014.


DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

DANIEL DAVID RIGMAIDEN
    Plaintiff,

       v.

U.S. DEPARTMENT OF JUSTICE, *et. al.*,

    Defendants.

)
)
)
)
)
)
)
)
)
)

Civil Action No. 12-CV-01605-SRB-BSB

# Exhibit A

<u>FREEDOM OF INFORMATION ACT REQUEST</u>

RE:  Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
      article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";

BY:  Daniel David Rigmaiden

TO:  Federal Bureau of Investigation

November 10, 2011
Page # 1 of 11

[<u>Certified Mail Return Receipt Article #</u>: 7010 1870 0003 0918 6393]

Daniel Rigmaiden
Agency #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

Chief of Record/Information Dissemination Section (FOIA Request)
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Ave., N.W.
Washington, DC 20525-001

Attention:

## I.    REQUEST FOR INFORMATION

        This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5
U.S.C. § 552 *et seq.* and the Department of Justice implementing regulations, 28 C.F.R. § 16.1
*et seq.* I am seeking the following two categories of records:

        1.    All agency records concerning comments made by FBI agents and employees to
*The Wall Street Journal* (hereafter "WSJ") <u>reported in *or* in relation to</u> the September 22, 2011
WSJ article titled "'Stingray' Phone Tracker Fuels Constitutional Clash,"[1] by Jennifer
Valentino-DeVries. I have identified the following subjects upon which FBI comments may
have been made as quoted and/or paraphrased by the WSJ (these are direct quotes from the
noted article):

    (1)    Stingrays are designed to locate a mobile phone even when it's not being used to
            make a call. The Federal Bureau of Investigation considers the devices to be so

---

1.      *See* Valentino-DeVries, Jennifer, *'Stingray' Phone Tracker Fuels Constitutional Clash*, The Wall Street Journal, p.
A1 (Sept. 22, 2011) *available at* http://online.wsj.com/article/SB10001424053111904194604576583112723197574.html
(last accessed: September 22, 2011). ("Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie
E. Caproni both said at a panel at the Brookings Institution in May that devices like these fall into a category of tools called
'pen registers,' which require a lesser order than a warrant.").

FREEDOM OF INFORMATION ACT REQUEST

RE:  Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
      article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";
BY:  Daniel David Rigmaiden
TO:  Federal Bureau of Investigation

November 10, 2011
Page # 2 of 11

critical that it has a policy of deleting the data gathered in their use, mainly to keep
suspects in the dark about their capabilities, an FBI official told The Wall Street
Journal in response to inquiries.

(2)   In a statement to the Journal, Sherry Sabol, Chief of the Science & Technology Office
      for the FBI's Office of General Counsel, says that information about stingrays and
      related technology is "considered Law Enforcement Sensitive, since its public release
      could harm law enforcement efforts by compromising future use of the equipment."

(3)   The FBI advises agents to work with federal prosecutors locally to meet the
      requirements of their particular district or judge, the FBI's Ms. Sabol says. She also
      says it is FBI policy to obtain a search warrant if the FBI believes the technology
      "may provide information on an individual while that person is in a location where he
      or she would have a reasonable expectation of privacy."

(4)   In a statement, the FBI told the Journal that "our policy since the 1990s has been to
      purge or 'expunge' all information obtained during a location operation" when using
      stingray-type gear.

(5)    As a general matter, Ms. Sabol says, court orders related to stingray technology "will
      include a directive to expunge information at the end of the location operation."

(6)   Ms. Sabol says the FBI follows this policy because its intent isn't to use the data as
      evidence in court, but rather to simply find the "general location of their subject" in
      order to start collecting other information that can be used to justify a physical search
      of the premises.

For the above quoted/paraphrased comments, I request all agency records relating to the FBI
providing comments to the WSJ. In addition, I also request all agency records regarding
comments made to the WSJ relating to StingRay type gear that were *not* specifically quoted
and/or paraphrased in the noted September 22, 2011 article.

        2.      All agency records concerning comments made by FBI agents and employees at a
panel at the Brookings Institution in May of 2011 regarding portable/transportable wireless
device locators (*e.g.*, cell site emulators) such as the Harris StingRay and KingFish. The WSJ

## FREEDOM OF INFORMATION ACT REQUEST

RE:  Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
     article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";

BY:  Daniel David Rigmaiden

TO:  Federal Bureau of Investigation

November 10, 2011
Page # 3 of 11

reported in the September 22, 2011 WSJ article titled "'Stingray' Phone Tracker Fuels
Constitutional Clash" that "Associate Deputy Attorney General James A. Baker and FBI
General Counsel Valerie E. Caproni both said at a panel at the Brookings Institution in May
that devices like these fall into a category of tools called 'pen registers,' which require a lesser
order than a warrant."[2]

        Government use of portable/transportable wireless device locators and destruction of
real-time geolocation data obtained via said devices is discussed in court documents filed under
United States v. Daniel David Rigmaiden, CR08-814-PHX-DGC, District of Arizona. *See* the
following documents filed under CR08-814-PHX-DGC: **(1)** *Response To Government's
Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In
Camera Hearing If Necessary* (Dkt. #536); **(2)** *Request For Judicial Notice Of Facts Relevant
To The Issue Of Governmental Privileges* (Dkt. #501); **(3)** *First Submission Of Redacted And
Summarized Documents For Requested In Camera Inspection;* (Dkt. #588); **(4)** *First
Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues* (Dkt.
#587); **(5)** *Motion For Disclosure Of All Relevant And Helpful Evidence Withheld By The
Government Based On A Claim Of Privilege* (Dkt. #592); **(6)** *Motion To Dismiss For
Destruction Of Evidence* (Dkt. #595); **(7)** *Government's Response To Defendant's Motion To
Dismiss For Destruction Of Evidence – Docket No. 595* (Dkt. #633); and **(8)** *Reply To
Government Response To Defendant's Motion To Dismiss For Destruction Of Evidence* (Dkt.
#639).

        I request that the applicable records include, but not be limited to, the following:

    (1)   electronically stored information
    (2)   emails
    (3)   email attachments
    (4)   letters
    (5)   correspondence
    (6)   memorandums
    (7)   documents
    (8)   reports
    (9)   statements
    (10)  audits

---

2.      *Id.*

<u>FREEDOM OF INFORMATION ACT REQUEST</u>

RE: Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
    article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";
BY: Daniel David Rigmaiden
TO: Federal Bureau of Investigation

November 10, 2011
Page # 4 of 11

---

    (11)  purchase receipts
    (12)  invoices
    (13)  word processing documents
    (14)  spreadsheets
    (15)  graphics and presentation documents
    (16)  images
    (17)  text files
    (18)  instant messages
    (19)  audio files
    (20)  video files
    (21)  voice mail
    (22)  internet data
    (23)  log files
    (24)  blogs
    (25)  calendar files
    (26)  text messages
    (27)  records of radio transmissions
    (28)  FBI corporate policy directives
    (29)  data dictionary files[3]
    (30)  metadata[4]
    (31)  system metadata[5]
    (32)  substantive metadata[6]
    (33)  embedded metadata[7]

---

3.    Data dictionaries are repositories of metadata, or information about data, such as its meaning, relationships to other data, origin, usage and format.

4.    <u>Nat'l Day Laborer Org. Network v. United States Immigration & Customs Enforcement Agency,</u> 2011 U.S. Dist. LEXIS 11655, 10 Civ. 3488 (SAS) (S.D.N.Y., Feb. 7, 2011) ("[M]etadata is 'readily reproducible' in the FOIA context.").

5.    System metadata is data automatically generated by a computer system when a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system. This data is not part of the native file and resides as part of the computer system with a reference to the native file.

6.    Substantive metadata is data generated by the application accessing the native file such as the data reflecting the date/time the file was created or modified and data reflecting changes made to the document by the user. This data is part of the native file and is viewable from the application used to create or modify the native file.

7.    Embedded metadata is text, numbers, content, data, or other information that is directly or indirectly inputted into a native file by a user and which is not typically visible to the user viewing the output display of the native file on screen or as a print-out. Examples of embedded metadata include, but are not limited to, spreadsheet formulas (which display as the

## FREEDOM OF INFORMATION ACT REQUEST

RE: Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";

BY: Daniel David Rigmaiden

TO: Federal Bureau of Investigation

November 10, 2011
Page # 5 of 11

I request that the storage devices/systems to be searched include, but not be limited to, the following:

(1)    workstation computers
(2)    server computers
(3)    backup systems
(4)    legacy systems
(5)    databases
(6)    hard drives
(7)    tape drives
(8)    zip disks and other disks
(9)    CDs, DVDs, Blu-ray discs, *etc.*
(10)   cartridges
(11)   magneto-optical disks
(12)   calendar systems
(13)   voice mail systems
(14)   text messaging systems
(15)   intranet systems
(16)   internet systems
(17)   personal digital assistants
(18)   cell phones and other cellular devices including Blackberry devices
(19)   Blackberry Enterprise Servers maintained by the FBI at its Clarksburg, West Virginia, facility and other facilities
(20)   FBI Enterprise Security Operations Center (ESOC) classified analytical network
(21)   home computers belonging to agents/personnel (**to the extent, if any, they are used for FBI business purposes**)

I request that the FBI conduct what is considered to be a typical "search" for an FBI FOIA request and electronic <u>keyword searches</u> at all FBI field offices, at the FBI's Office of General Counsel, at the FBI Engineering Research Facility, and at all other FBI offices and <u>data centers</u>. The FBI should conduct typical and keyword searches on the file types listed above

results of the formula operation), hidden columns, externally or internally linked files (*e.g.*, sound files in Powerpoint presentation), references to external files and content (*e.g.*, hyperlinks to HTML files or URLs), references and fields (*e.g.*, the field codes for an auto-numbered document), and certain database information if the data is part of a database (*e.g.*, a date field in a database will display as a formatted date, but its actual value is typically a long integer).

<u>FREEDOM OF INFORMATION ACT REQUEST</u>

RE:  Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
     article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";
BY:  Daniel David Rigmaiden
TO:  Federal Bureau of Investigation

November 10, 2011
Page # 6 of 11

including, but not limited to, archived emails and archived text messages.  Files belonging to
all FBI agents/employees and contractors should be searched including, but not limited to,
Technical Agents, Technically Trained Agents, Wireless Intercept and Tracking Team (or
similar) members, Law Enforcement Online members, and FBI Dedicated Contractor Support
Personnel.

## II.      FORM OF DOCUMENTS REQUESTED

     I request that all digital documents be provided in their original native form <u>with
metadata preserved</u>.  Additionally, if redactions are required, they should be done on the
original digital documents using a digital redaction process (*e.g.*, using Appligent Redax ™,
RapidRedact ™, Abobe Acrobat ™ X Pro, *etc.*) and provided in their native digitally redacted
form.  I request that the native form digital documents (*e.g.*, emails, *etc.*) that are redacted by a
computerized redaction process be provided "as is" and that they not be printed to hard copy
and then rescanned to create an artificial digital form of the documents.  I make the above
requests pursuant to 5 U.S.C. § 552(a)(3)(B) ("In making any record available to a person
under this paragraph, an agency shall provide the record in any form or format requested by the
person if the record is readily reproducible by the agency in that form or format.").

     I request that all responsive records be organized in an intelligible manner and
referenced or indexed so that they are capable of being read and understood by one possessing
average skills, intellect, and training.  If the responsive records are codified such that they
cannot be readily understood, I request that I be provided with all required decoding documents
necessary to provide a clear and intelligible understanding of the contents and meaning of the
responsive records.

## III.    REQUEST FOR WAIVER OF ALL COSTS OR REDUCED COSTS

     I am requesting a waiver of all costs pursuant to 5 U.S.C. 552(a)(4)(A)(iii) ("Documents
shall be furnished without any charge or at a charge reduced below the fees established under
clause (ii) if disclosure of the information is in the public interest because it is likely to
contribute significantly to public understanding of the operations or activities of the
government and is not primarily in the commercial interest of the requester.").  Disclosure of
the requested records will help members of the public understand (1) the privacy risks of
carrying cell phones and other wireless devices and (2) the FBI policy to destroy discoverable
*Brady* material (*i.e.*, real-time geolocation data) so that defendants and their attorneys will be

FREEDOM OF INFORMATION ACT REQUEST

RE: Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
    article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";

BY: Daniel David Rigmaiden

TO: Federal Bureau of Investigation

November 10, 2011
Page # 7 of 11

unable to use the information in a defense. The requested records concern the direct operations
and activities of the government with respect to surreptitiously locating cell phones and other
wireless devices using portable/transportable wireless device locators and related equipment.

    As noted above, on September 22, 2011, the WSJ published an article titled "'Stingray'
Phone Tracker Fuels Constitutional Clash"[8] wherein the government's use of
portable/transportable wireless device locators was clearly and sufficiently identified. The
identifiable government actions reported in the WSJ article and in the evidence I placed on the
record in CR08-814-PHX-DGC weigh in favor of granting me a fee waiver for this FOIA
request. *See* 28 C.F.R. § 16.11(k)(2)(i) (To determine whether the first fee waiver requirement
is met, "[t]he subject of the requested records must concern identifiable operations or activities
of the federal government, with a connection that is direct and clear, not remote or
attenuated."). There is additional support for granting a fee waiver considering I have the
ability and intention to effectively convey the responsive information to the public. *See* 28
C.F.R. § 16.11(k)(2)(iii) (When determining whether the requested records will contribute to an
understanding of the subject by the public, "[a] requester's expertise in the subject area and
ability and intention to effectively convey information to the public shall be considered."). The
information I obtain through this FOIA request will be placed on the public record in CR08-
814-PHX-DGC and I will also forward the information to Jennifer Valentino-DeVries, the
reporter who wrote the article about StingRay type devices for the WSJ. The noted WSJ article
specifically reported on my efforts to prove that the government violates the Fourth
Amendment when it uses portable/transportable wireless device locators to locate wireless
devices within home residences without a proper warrant. Finally, the records requested are
not sought for a commercial purpose[9] and I plan to disseminate the responsive material to the
public at no cost. *See* 28 C.F.R. § 16.11(k)(3)(i) and (ii) (To determine whether the fee waiver
requirement is met, the disclosure should not be primarily in the commercial interest of the
requester.).

## IV.    REQUEST FOR EXPEDITED PROCESSING

    I am requesting expedited processing of this FOIA request pursuant to 5 U.S.C. 552(a)

---

8.    *See* Valentino-DeVries, *'Stingray' Phone Tracker Fuels Constitutional Clash*, The Wall Street Journal, p. A1 (Sept.
22, 2011).

9.    *See* Judicial Watch, Inc., v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("We are also mindful that Congress
amended FOIA to ensure that it is liberally construed in favor of waivers for noncommercial requesters." (internal quotation
marks and citation omitted)).

<u>FREEDOM OF INFORMATION ACT REQUEST</u>

RE: Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
   article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";

BY: Daniel David Rigmaiden

TO: Federal Bureau of Investigation

November 10, 2011
Page # 8 of 11

(6)(E)(i)(I) (Expedited processing is merited "in cases in which the person requesting the
records demonstrates a compelling need;"). I have a compelling need for the requested records
considering the subject of my request is a matter of widespread and exceptional media interest
and the government's integrity is called into question when it tracks and locates wireless
devices without proper judicial authority (*i.e.*, a Rule 41 warrant founded on probable cause)
**and destroys the resulting evidence thereafter.** *See* 28 C.F.R. § 16.5(d)(1)(iv) (Expedited
processing is merited when the request involves "[a] matter of widespread and exceptional
media interest in which there exist possible questions about the government's integrity which
affect public confidence."). The media has repeatedly reported on warrantless government cell
phone tracking prior to this FOIA request. In 2007, the media reported that "a little-known FBI
telephone intercept unit has developed a powerful cellphone tracking technology that agents
use to monitor the physical movements of surveillance targets, even on phones that are not GPS
equipped."[10] In 2008, the media reported that the government can track cell phones on its own
using a TriggerFish and that it "raises the risk that they will do so without bothering to go to a
court for permission first, since they no longer need to compel the provider to cooperate."[11] In
2010, the media reported that a senior attorney in the criminal division of the Justice
Department claimed that "[t]he government is not required to use a warrant" when it uses
surveillance equipment to locate cell phones.[12] In 2011, the media reported on government
use of StingRay type devices, on me challenging use of those devices without proper judicial
authority, **and of the government destroying geolocation data at the conclusion of a
locating mission as a standard practice.** *See* fn. 1, *supra.* The above quoted/cited news
stories are all framed to call into question the government's integrity when it tracks and locates
cell phones and other wireless devices without proper warrants founded on probable cause.

Considering my request for information involves me losing substantial due process
rights, I am further entitled to expedited processing of this FOIA request. *See* 28 C.F.R. §
16.5(d)(1)(iii) (Expedited processing is merited when the request involves "[t]he loss of
substantial due process rights;"). I am currently losing substantial due process rights due to
recent activity in my criminal case in the District of Arizona, CR08-814-PHX-DGC. The

---

10.     Singel, Ryan (Wired), *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs* (Dec. 20, 2007), *available at*
http://www.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell (last accessed Sep. 22, 2010).

11.     Myers, Rachel (ACLU), *With Technology Like This, Who Needs the Law?* >> *Blog of Rights: Official Blog of the
American Civil Liberties Union* , "With Technology Like This, Who Needs The Law?" (Nov. 14, 2008),
http://www.aclu.org/2008/11/14/with-technology-like-this-who-needs-the-law (last accessed Aug. 16, 2011).

12.     McCullagh, Declan (CNET News), *Justice Dept. defends warrantless cell phone tracking* (Feb. 13, 2010),
*available at* http://news.cnet.com/8301-13578_3-10453214-38.html (last accessed Apr. 8, 2010).

FREEDOM OF INFORMATION ACT REQUEST

RE:  Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
      article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";

BY:  Daniel David Rigmaiden

TO:  Federal Bureau of Investigation

November 10, 2011
Page # 9 of 11

government recently filed a declaration under penalty of perjury by FBI Supervisory Special
Agent Bradley S. Morrison (docket No. 674-1) wherein Agent Morrison made the following
claim:

> FBI policy requires that at the conclusion of a location operation, FBI
> technical personnel are to purge all data stored in the pen register/trap and trace
> equipment[]... as an additional, internal procedural safeguard to ensure (1) that the
> privacy rights of those innocent third parties are maintained, (2) that the FBI does not
> store or maintain pen register/trap and trace data beyond the scope of its legal
> authorization, or (3) that the FBI does not collect information about individuals who
> are not the subject of criminal or national security investigations.

> *Government's Memorandum Re Motion For Discovery*, "Affidavit Of Supervisory
> Special Agent Bradley S. Morrison," par. 5 (p. 3), CR08-814-PHX-DGC, Dkt. #674-1,
> (Oct. 27, 2011, D.Ariz).

The above quoted claim contradicts claims made by other FBI employees as reported in the
WSJ article cited in fn. 1, *supra*.  These claims were made by Sherry Sabol, Chief of the
Science & Technology Office for the FBI's Office of General Counsel and by another
unidentified FBI official.  These claims are listed under paragraph No. 1 of this FOIA request
and also repeated below:

> Stingrays are designed to locate a mobile phone even when it's not being used to
> make a call. The Federal Bureau of Investigation considers the devices to be so
> critical that it has a policy of deleting the data gathered in their use, **mainly to keep
> suspects in the dark about their capabilities,** an FBI official told The Wall Street
> Journal in response to inquiries.

> - Valentino-DeVries, *'Stingray' Phone Tracker Fuels Constitutional Clash*, The Wall
> Street Journal, p. A1 (Sept. 22, 2011) (emphasis added).

> Ms. Sabol says the FBI follows this ["destroy the evidence"] policy because its intent
> isn't to use the data as evidence in court, but rather to simply find the "general
> location of their subject" in order to start collecting other information that can be
> used to justify a physical search of the premises.

<u>FREEDOM OF INFORMATION ACT REQUEST</u>

RE:  Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
      article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";
BY:  Daniel David Rigmaiden
TO:  Federal Bureau of Investigation

November 10, 2011
Page # 10 of 11

---

    - *Id.*

      I qualify for expedited processing under 28 C.F.R. § 16.5(d)(1)(iii) because I have an
immediate need for the requested information relating to the comments made to the press about
the FBI's "destroy the evidence" policy. I need to use the responsive information to curtail
substantial loss of my due process rights by impeaching the testimony of FBI Agent Morrison.
In my criminal case (CR08-814-PHX-DGC), I will be moving to suppress secondary evidence
for the government's destruction of real-time geolocation data based on <u>United States v. Flyer</u>,
633 F.3d 911, 916 (9ᵗʰ Cir. 2011) ("If the government destroys evidence under circumstances
that do not violate a defendant's constitutional rights, the court may still impose sanctions
including suppression of secondary evidence."). I need to use the responsive FOIA material to
show that, contrary to FBI Agent Morrison's claim, the FBI **(1)** does in fact destroy evidence to
keep suspects in dark, and **(2)** does in fact destroy real-time geolocation data with an intention
to rely on information learned from the data to obtain other evidence to replace the destroyed
evidence, *i.e.*, the "hand off" procedure found unconstitutional in <u>Whitaker v. Garcetti</u>, 291
F.Supp.2d 1132, 1148 (C.D.Cal. 2003) (explaining the "hand off" procedure and finding it
unconstitutional), *affirmed in part, vacated in part, and reversed in part, all on other grounds*,
486 F.3d 572 (9ᵗʰ Cir. 2007).

* * * * *

      I expect a determination of this request for expedited processing within 10 calendar days
and a determination of this request for documents within 20 calendar days. *See* 28 CFR §
16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i). If this request is denied in whole or in part, I request
that all deletions be justified by reference to specific exemptions to FOIA. I request the release
of all segregable portions of otherwise exempt material. I reserve the right to appeal a decision
to withhold any information, to deny a waiver of fees, or to expedited processing.

      I certify as true and correct to the best of my knowledge and belief that I have a
compelling need for expedited processing and that the requested records are not for commercial
purposes. Thank-you for your prompt attention to this matter. Please furnish all responsive
records to the address below.

///

FREEDOM OF INFORMATION ACT REQUEST

RE:  Comments made to *The Wall Street Journal* by the FBI as reported in a Sept. 22, 2011
     article titled "'Stingray' Phone Tracker Fuels Constitutional Clash";

BY:  Daniel David Rigmaiden

TO:  Federal Bureau of Investigation

November 10, 2011
Page # 11 of 11

_____

                              Daniel David Rigmaiden


                              Daniel Rigmaiden
                              Agency #10966111
                              CCA-CADC
                              PO Box 6300
                              Florence, AZ 85132

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

DANIEL DAVID RIGMAIDEN            )
     Plaintiff,                )
                                  )
           v.          )  Civil Action No. 12-CV-01605-SRB-BSB
                                  )
U.S. DEPARTMENT OF JUSTICE, *et. al.*,  )
                                  )
     Defendants.                )
                                  )

# Exhibit B

U.S. Department of Justice

Federal Bureau of Investigation

Washington, D.C. 20535

January 23, 2012

MR. DANIEL DAVID RIGMAIDEN
**10966111
CCA-CADC
POST OFFICE BOX 6300
FLORENCE, AZ 85132

FOIPA Request No.:  1180900- 000
Subject: RECORDS CONCERNING WALL

Dear Mr. Rigmaiden:

This acknowledges receipt of your Freedom of Information/Privacy Acts (FOIPA) request to the FBI.

☒   This FOIPA request has been received at FBI Headquarters for processing.

☐   This FOIPA request has been received at the [_____ **Resident Agency /** _____ **Field Office]** and forwarded to FBI Headquarters for processing.

☒    We are searching the indices to our Central Records System for the information responsive to this request.   You will be informed of the results in future correspondence.

☒   Your request for a fee waiver is being considered and you will be advised of the decision at a later date.

☐   Please check for the status of your FOIPA request at www.fbi.gov/foia

The FOIPA Request number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.   Your patience is appreciated.

Very truly yours,

David M. Hardy
Section Chief,
Record/Information

Dissemination Section

Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DANIEL DAVID RIGMAIDEN<br>        Plaintiff,<br><br>                v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et. al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>) Civil Action No. 12-CV-01605-SRB-BSB<br>)<br>)<br>)<br>)<br>) |

# Exhibit C



U.S. Department of Justice

—————————————————
Federal Bureau of Investigation

Washington, D.C. 20535

January 31, 2012

MR. DANIEL DAVID RIGMAIDEN
**10966111
CCA-CADC
POST OFFICE BOX 6300
FLORENCE, AZ 85132

FOIPA Request No.  1180900- 000
Subject: RECORDS CONCERNING
WALL STREET JOURNAL ARTICLE
STINGRAY PHONE TRACKER FUELS CON

Dear Mr. Rigmaiden:

    This is in reference to your letter directed to the Federal Bureau of Investigation (FBI), in which you requested expedited processing for the above-referenced Freedom of Information /Privacy Acts (FOIPA) request. Pursuant to the Department of Justice (DOJ) standards permitting expedition, expedited processing can only be granted when it is determined that a FOIPA request involves one or more of the following:

    **28 C.F.R. §16.5 (d)(1)(i):** "Circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual."

    **28 C.F.R. §16.5 (d)(1)(ii):** "An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."

    **28 C.F.R. §16.5 (d)(1)(iii):** "The loss of substantial due process of rights."

    **28 C.F.R. §16.5 (d)(1)(iv):** "A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

    You have not provided enough information concerning the statutory requirements permitting expedition; therefore, your request is denied.

    You may appeal this denial by writing to the Office of Information Policy (OIP), United States Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C., 20530-0001.   Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely.   The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal."   Please cite the FOIPA number assigned to your request to facilitate its identification.

Sincerely yours,

avid M. Hardy

Section Chief

D

Record/Information
Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

DANIEL DAVID RIGMAIDEN        )
    Plaintiff,                )
                             )
        v.                    )   Civil Action No. 12-CV-01605-SRB-BSB
                             )
U.S. DEPARTMENT OF JUSTICE, *et. al.*,   )
                             )
    Defendants.               )
                             )

# Exhibit D

U.S. Department of Justice

**Federal Bureau of Investigation**

Washington, D.C. 20535

January 31, 2012

MR. DANIEL DAVID RIGMAIDEN
**10966111
CCA-CADC
POST OFFICE BOX 6300
FLORENCE, AZ 85132

FOIPA Request No.   1180900- 000
Subject: RECORDS CONCERNING WALL STREET
JOURNAL ARTICLE STINGRAY PHONE TRACKER FUELS
CONSTITUTIONAL CLASH

Dear Mr. Rigmaiden:

This is in response to your request for a fee waiver for the above referenced Freedom of Information-Privacy Acts (FOIPA) request.   Requests for fee waivers are determined on a case by case basis.  See 5 U.S.C.   § 552 (a)(4)(A)(iii).

In order to be granted a fee waiver or a reduction in fees, two requirements must be satisfied.   First, it must be established that "disclosure of the [requested] information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."   Second, it must be established that "disclosure of the information . . . is not primarily in the commercial interest of the requester."  See 5 U.S.C. § 552(a)(4)(A)(iii).   The burden is on the requester to show the statutory requirements for a fee waiver have been met.   Where one or both of these requirements has not been satisfied, a fee waiver is not warranted under the statute.

To determine whether the first requirement has been met, we consider the following four factors:   (1) whether the subject of the requested records concerns "the operations or activities of the government;" (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities; (3) whether disclosure of the requested information will contribute to "public understanding;" and (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities.  See 28 C.F.R. § 16.11(k)(2).

If the first requirement has been met, we are then required to determine whether disclosure of the requested information is primarily in the commercial interest of the requester.   To make this determination, we consider the following two factors:   (1) whether the requester has a commercial interest that would be furthered by the requested disclosure and (2) whether the magnitude of the identified commercial interest of the requester is sufficiently large, in comparison with the public interest in disclosure, that disclosure is "primarily in the commercial interest of the requester."  See 28 C.F.R. § 16.11(k)(3).   If the requester's commercial interest in disclosure is greater then the public interest to be served, then a fee waiver is not warranted.

We have reviewed the information that you provided in support of your request for a fee waiver and have found that you do not satisfy the second requirement because you have not adequately demonstrated that the information requested is not in your own commercial interest.

You may appeal this denial by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C., 20530-0001.   Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely.   The envelope and the letter should be clearly marked "Freedom of Information Appeal."   Please cite the FOIPA number assigned to your request to facilitate its identification.

Sincerely yours,

David M. Hardy

Section Chief,
Record/Information
  Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

DANIEL DAVID RIGMAIDEN
    Plaintiff,

        v.

U.S. DEPARTMENT OF JUSTICE, *et. al.*,

    Defendants.

)
)
)
)
)  Civil Action No. 12-CV-01605-SRB-BSB
)
)
)
)
)

# Exhibit E

**U.S. Department of Justice**

Office of Information Policy

Telephone: (202) 514-3642                    Washington, D.C.  20530

APR -6 2012

Mr. Daniel Rigmaiden
No. 10966111
CCA-CADC
Post Office Box 6300
Florence, AZ  85132

Re:  Your letter dated February 15, 2012

Dear Mr. Rigmaiden:

This is to advise you that your administrative appeal from the action of the Federal Bureau of Investigation was received by this Office on March 28, 2012.

The Office of Information Policy has the responsibility of adjudicating such appeals.  In an attempt to afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt.  Your appeal has been assigned number AP-2012-01750.  Please mention this number in any future correspondence to this Office regarding this matter.

We will notify you of the decision on your appeal as soon as we can.  If you have any questions about the status of your appeal you may contact me at the number above.

Sincerely,

Priscilla Jones
Supervisory Administrative Specialist

## FREEDOM OF INFORMATION ACT REQUEST APPEAL

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
    Products Group; APPEAL OF FOIA REQUEST sent via Certified Mail Return Receipt
    Article #: 7007 0710 0004 3772 8555 (FBI);

BY: Daniel David Rigmaiden

TO: Office of Information Policy (OIP)

February 15, 2011
Page # 1 of 2

[Certified Mail Return Receipt Article #: 7007 0710 0004 3772 8647]

Daniel Rigmaiden
Agency #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

**Attn:** Freedom of Information Appeal
Office of Information Policy (OIP)
United States Department of Justice
1425 New York Ave., NW, Suite 11050
Washington, DC 20530-001

RECEIVED

MAR 2 8 2012

Office of Inforu....   cy

Attention:

     This letter constitutes an appeal of a default denial of my request made under the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.* and the Department of Justice
implementing regulations, 28 C.F.R. § 16.1 *et seq.*

     Via a FOIA request dated October 10, 2011, I requested various records from the Federal
Bureau of Investigation (FBI) relating to portable/transportable wireless device locators
manufactured by Harris Wireless Products Group. *See* Attachment A (original FOIA request).
I sent the FOIA request using USPS certified return receipt delivery, article No. 7007 0710
0004 3772 8555. *See id.* The signature card for the FOIA request was signed "D.W. Jones /
OB" and then mailed back to me. *See* Attachment B (return receipt signature card). The
signature date is November 7, 2011. *See id.* I have not received any type of response to my
FOIA request as required by law. *See* 28 CFR § 16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i). I
consider the DOJ's actions to be arbitrary and capricious. I am appealing the following:

     1.   The FBI failing to acknowledge my FOIA request.
     2.   The FBI failing to grant me a fee waiver.
     3.   The FBI failing to grant me reduced fees.
     4.   The FBI failing to provide expedited processing.
     5.   The FBI failing to provide all requested records.

<u>FREEDOM OF INFORMATION ACT REQUEST APPEAL</u>

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
    Products Group; APPEAL OF FOIA REQUEST sent via Certified Mail Return Receipt
    Article #: 7007 0710 0004 3772 8555 (FBI);

BY: Daniel David Rigmaiden

TO: Office of Information Policy (OIP)

February 15, 2011
Page # 2 of 2

---

      In support of my request for a fee waiver, I have attached a supplementary declaration
under penalty of perjury establishing that I have no commercial interest in the requested
records. *See* <u>Attachment C</u> (Rigmaiden declaration).

      I expect a determination of this appeal within 20 business days. *See* 5 U.S.C. § 552(a)
(6)(A)(ii). Thank-you for your prompt attention to this matter. I can be contacted via mail at
the address below.

Daniel David Rigmaiden

Daniel Rigmaiden
Agency #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132



# ATTACHMENT A

FREEDOM OF INFORMATION ACT REQUEST

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
    Products Group;

BY: Daniel David Rigmaiden

TO: Federal Bureau of Investigation

October 10, 2011
Page # 1 of 8

[Certified Mail Return Receipt Article #: 7007 0710 0004 3772 8555]

Daniel Rigmaiden
Agency #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

Chief of Record/Information Dissemination Section (FOIA Request)
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Ave., N.W.
Washington, DC 20525-001

Attention:

## I.    REQUEST FOR INFORMATION

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5
U.S.C. § 552 *et seq.* and the Department of Justice implementing regulations, 28 C.F.R. § 16.1
*et seq.* I am seeking the following four categories of records:

1.    All agency records concerning the following portable/transportable wireless
device locators (*i.e.*, devices used to locate cell phones, *etc.*) and related equipment
manufactured and/or branded and/or sold by Harris Wireless Products Group (Harris
Corporation):

   (1)   StingRay
   (2)   StingRay II
   (3)   AmberJack
   (4)   KingFish
   (5)   TriggerFish
   (6)   LoggerHead
   (7)   Handheld Direction Finding Antenna
   (8)   StingRay CDMA Software

FREEDOM OF INFORMATION ACT REQUEST

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
    Products Group;

BY: Daniel David Rigmaiden

TO: Federal Bureau of Investigation

October 10, 2011
Page # 2 of 8

    (9)   KingFish CDMA Software
   (10)  Geolocation (software)
   (11)  Tarpon (software)
   (12)  RealSite (software)

     * *See* attached various Harris product pictures, datasheets, and price lists.

    2.    All agency records detailing the FBI's policies, practices, and procedures to
destroy real-time wireless device location data obtained by the Harris portable/transportable
wireless device locators and related equipment (listed in No. 1 above) or obtained by other
portable/transportable wireless device locators. The requested records should pertain to FBI
agents/personnel destroying real-time location data after the data has been used to further an
investigation or to facilitate an arrest.

    3.    All agency records detailing the FBI's policies, practices, and procedures to
conceal from defendants and their attorneys in criminal cases the fact that the FBI used the
Harris portable/transportable wireless device locators and related equipment (listed in No. 1
above), or other portable/transportable wireless device locators, to gather evidence during
related criminal investigations.

    4.    All agency records constituting user manuals, operations manuals, and training
manuals for the Harris portable/transportable wireless device locators and related equipment
(listed in No. 1 above).

    Government use of the devices listed in No. 1 above is discussed in court documents
filed under United States v. Daniel David Rigmaiden, CR08-814-PHX-DGC, District of
Arizona. *See* the following documents filed under CR08-814-PHX-DGC: **(1)** *Response To
Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex
Parte And In Camera Hearing If Necessary* (Dkt. #536); **(2)** *Request For Judicial Notice Of
Facts Relevant To The Issue Of Governmental Privileges* (Dkt. #501); **(3)** *First Submission Of
Redacted And Summarized Documents For Requested In Camera Inspection;* (Dkt. #588); **(4)**
*First Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues* (Dkt.
#587); and **(5)** *Motion For Disclosure Of All Relevant And Helpful Evidence Withheld By The
Government Based On A Claim Of Privilege* (Dkt. #592).

FREEDOM OF INFORMATION ACT REQUEST

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
    Products Group;
BY: Daniel David Rigmaiden
TO: Federal Bureau of Investigation

October 10, 2011
Page # 3 of 8

I request that the applicable records include, but not be limited to, the following:

(1)  electronically stored information
(2)  emails
(3)  email attachments
(4)  letters
(5)  correspondence
(6)  memorandums
(7)  documents
(8)  reports
(9)  statements
(10) audits
(11) purchase receipts
(12) invoices
(13) word processing documents
(14) spreadsheets
(15) graphics and presentation documents
(16) images
(17) text files
(18) instant messages
(19) audio files
(20) video files
(21) voice mail
(22) internet data
(23) log files
(24) blogs
(25) calendar files
(26) text messages
(27) records of radio transmissions
(28) FBI corporate policy directives
(29) data dictionary files[1]
(30) metadata[2]

---

1.    Data dictionaries are repositories of metadata, or information about data, such as its meaning, relationships to other
data, origin, usage and format.

2.    Nat'l Day Laborer Org. Network v. United States Immigration & Customs Enforcement Agency, 2011 U.S. Dist.

FREEDOM OF INFORMATION ACT REQUEST

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
    Products Group;
BY: Daniel David Rigmaiden
TO: Federal Bureau of Investigation

October 10, 2011
Page # 4 of 8

(31) system metadata[3]
(32) substantive metadata[4]
(33) embedded metadata[5]

I request that the storage devices/systems to be searched include, but not be limited to,
the following:

(1) workstation computers
(2) server computers
(3) backup systems
(4) legacy systems
(5) databases
(6) hard drives
(7) tape drives
(8) zip disks and other disks
(9) CDs, DVDs, Blu-ray discs, etc.
(10) cartridges
(11) magneto-optical disks
(12) calendar systems
(13) voice mail systems
(14) text messaging systems
(15) intranet systems
(16) internet systems

LEXIS 11655, 10 Civ. 3488 (SAS) (S.D.N.Y., Feb. 7, 2011) ("[M]etadata is 'readily reproducible' in the FOIA context.").

3.      System metadata is data automatically generated by a computer system when a native file is created, modified,
transmitted, deleted or otherwise manipulated by a user of such system. This data is not part of the native file and resides as
part of the computer system with a reference to the native file.

4.      Substantive metadata is data generated by the application accessing the native file such as the data reflecting the
date/time the file was created or modified and data reflecting changes made to the document by the user. This data is part of
the native file and is viewable from the application used to create or modify the native file.

5.      Embedded metadata is text, numbers, content, data, or other information that is directly or indirectly inputted into a
native file by a user and which is not typically visible to the user viewing the output display of the native file on screen or as
a print-out. Examples of embedded metadata include, but are not limited to, spreadsheet formulas (which display as the
results of the formula operation), hidden columns, externally or internally linked files (e.g., sound files in Powerpoint
presentation), references to external files and content (e.g., hyperlinks to HTML files or URLs), references and fields (e.g.,
the field codes for an auto-numbered document), and certain database information if the data is part of a database (e.g., a
date field in a database will display as a formatted date, but its actual value is typically a long integer).

FREEDOM OF INFORMATION ACT REQUEST

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
     Products Group;
BY: Daniel David Rigmaiden
TO: Federal Bureau of Investigation

October 10, 2011
Page # 5 of 8

    (17)   personal digital assistants
    (18)   cell phones and other cellular devices including Blackberry devices
    (19)   Blackberry Enterprise Servers maintained by the FBI at its Clarksburg, West Virginia,
          facility and other facilities
    (20)   FBI Enterprise Security Operations Center (ESOC) classified analytical network
    (21)   home computers belonging to agents/personnel (**to the extent, if any, they are used
          for FBI business purposes**)

    Electronic keyword searches should be conducted at all FBI field offices, at the FBI
Engineering Research Facility, and at all other FBI offices and data centers. The FBI should
conduct keyword searches on the file types listed above including, but not limited to, archived
emails and archived text messages. Files belonging to all FBI agents/employees and
contractors should be searched including, but not limited to, Technical Agents, Technically
Trained Agents, Wireless Intercept and Tracking Team (or similar) members, Law Enforcement
Online members, and FBI Dedicated Contractor Support Personnel. Considering the relevant
Harris products have uncommon "aquatic" names, keyword searches should include words that
are variations of the relevant Harris product names (*e.g.*, "sting ray," "amber jack," "logger
head," *etc.*) and a keyword search should be conducted on the word "Harris" standing alone so
that the results may be checked for responsive material.

**II.     FORM OF DOCUMENTS REQUESTED**

    I request that all digital documents be provided in their original native form with
metadata preserved. Additionally, if redactions are required, they should be done on the
original digital documents using a digital redaction process (*e.g.*, using Appligent Redax ™,
RapidRedact ™, Abobe Acrobat ™ X Pro, *etc.*) and provided in their native digitally redacted
form. I request that the native form digital documents (*e.g.*, emails, *etc.*) that are redacted by a
computerized redaction process be provided "as is" and that they not be printed to hard copy
and then rescanned to create an artificial digital form of the documents. I make the above
requests pursuant to 5 U.S.C. § 552(a)(3)(B) ("In making any record available to a person
under this paragraph, an agency shall provide the record in any form or format requested by the
person if the record is readily reproducible by the agency in that form or format.")

    I request that all responsive records be organized in an intelligible manner and
referenced or indexed so that they are capable of being read and understood by one possessing
average skills, intellect, and training. If the responsive records are codified such that they

FREEDOM OF INFORMATION ACT REQUEST

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
    Products Group;

BY: Daniel David Rigmaiden

TO: Federal Bureau of Investigation

October 10, 2011

Page # 6 of 8

cannot be readily understood, I request that I be provided with all required decoding documents necessary to provide a clear and intelligible understanding of the contents and meaning of the responsive records.

**III.     REQUEST FOR WAIVER OF ALL COSTS OR REDUCED COSTS**

    I am requesting a waiver of all costs pursuant to 5 U.S.C. 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."). Disclosure of the requested records will help members of the public understand the privacy risks of carrying cell phones and other wireless devices. The requested records concern the direct operations and activities of the government with respect to surreptitiously locating cell phones and other wireless devices using Harris brand portable/transportable wireless device locators and related equipment.

    On September 22, 2011, The Wall Street Journal published an article titled "'Stingray' Phone Tracker Fuels Constitutional Clash"[6] wherein the government's use of portable/transportable wireless device locators was clearly and sufficiently identified. The identifiable government actions reported in The Wall Street Journal article and in the evidence I placed on the record in CR08-814-PHX-DGC weigh in favor of granting me a fee waiver for this FOIA request. *See* 28 C.F.R. § 16.11(k)(2)(i) (To determine whether the first fee waiver requirement is met, "[t]he subject of the requested records must concern identifiable operations or activities of the federal government, with a connection that is direct and clear, not remote or attenuated."). There is additional support for granting a fee waiver considering I have the ability and intention to effectively convey the responsive information to the public. *See* 28 C.F.R. § 16.11(k)(2)(iii) (When determining whether the requested records will contribute to an understanding of the subject by the public, "[a] requester's expertise in the subject area and ability and intention to effectively convey information to the public shall be considered."). The information I obtain through this FOIA request will be placed on the public record in CR08-

---

6.     *See* Valentino-DeVries, Jennifer, *'Stingray' Phone Tracker Fuels Constitutional Clash*, The Wall Street Journal, p. A1 (Sept. 22, 2011) *available at* http://online.wsj.com/article/SB10001424053111904194604576583112723197574.html (last accessed: September 22, 2011) ("Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel at the Brookings Institution in May that devices like these fall into a category of tools called 'pen registers,' which require a lesser order than a warrant.").

FREEDOM OF INFORMATION ACT REQUEST

RE: Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
     Products Group;
BY: Daniel David Rigmaiden
TO: Federal Bureau of Investigation

October 10, 2011
Page # 7 of 8

814-PHX-DGC and I will also forward the information to Jennifer Valentino-DeVries, the
reporter who wrote the article about StingRay type devices for The Wall Street Journal. *See* fn.
6, *supra*. The noted Wall Street Journal article specifically reported on my efforts to prove that
the government violates the Fourth Amendment when it uses portable/transportable wireless
device locators to locate wireless devices within home residences without a proper warrant.
Finally, the records requested are not sought for a commercial purpose[7] and I plan to
disseminate the responsive material to the public at no cost. *See* 28 C.F.R. § 16.11(k)(3)(i) and
(ii) (To determine whether the fee waiver requirement is met, the disclosure should not be
primarily in the commercial interest of the requester.).

## IV.     REQUEST FOR EXPEDITED PROCESSING

I am requesting expedited processing of this FOIA request pursuant to 5 U.S.C. 552(a)
(6)(E)(i)(I) (Expedited processing is merited "in cases in which the person requesting the
records demonstrates a compelling need;"). I have a compelling need for the requested records
considering the subject of my request is a matter of widespread and exceptional media interest
and the government's integrity is called into question when it tracks and locates wireless
devices without proper judicial authority, *i.e.*, a Rule 41 warrant founded on probable cause.
*See* 28 C.F.R. § 16.5(d)(1)(iv) (Expedited processing is merited when the request involves "[a]
matter of widespread and exceptional media interest in which there exist possible questions
about the government's integrity which affect public confidence."). The media has repeatedly
reported on warrantless government cell phone tracking prior to this FOIA request. In 2007,
the media reported that "a little-known FBI telephone intercept unit has developed a powerful
cellphone tracking technology that agents use to monitor the physical movements of
surveillance targets, even on phones that are not GPS equipped."[8] In 2008, the media reported
that the government can track cell phones on its own using a TriggerFish and that it "raises the
risk that they will do so without bothering to go to a court for permission first, since they no
longer need to compel the provider to cooperate."[9] In 2010, the media reported that a senior

---

7.    *See* Judicial Watch, Inc., v. Rossotti, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("We are also mindful that Congress
amended FOIA to ensure that it is liberally construed in favor of waivers for noncommercial requesters." (internal quotation
marks and citation omitted)).

8.    Singel, Ryan (Wired), *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs* (Dec. 20, 2007), *available at*
http://www.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell (last accessed Sep. 22, 2010).

9.    Myers, Rachel (ACLU), *With Technology Like This, Who Needs the Law? >> Blog of Rights: Official Blog of the
American Civil Liberties Union*, "With Technology Like This, Who Needs The Law?" (Nov. 14, 2008),
http://www.aclu.org/2008/11/14/with-technology-like-this-who-needs-the-law (last accessed Aug. 16, 2011).

<u>FREEDOM OF INFORMATION ACT REQUEST</u>

RE:  Portable/Transportable Wireless Device Locators Manufactured By Harris Wireless
      Products Group;
BY:  Daniel David Rigmaiden
TO:  Federal Bureau of Investigation

October 10, 2011
Page # 8 of 8

attorney in the criminal division of the Justice Department claimed that "[t]he government is
not required to use a warrant" when it uses surveillance equipment to locate cell phones.[10]  In
2011, the media reported on government use of StingRay type devices and on me challenging
use of those devices without proper judicial authority.  *See* fn. 6, *supra*.  The above quoted/cited
news stories are all framed to call into question the government's integrity when it tracks and
locates cell phones and other wireless devices without proper warrants founded on probable
cause.

* * * * *

I expect a determination of this request for expedited processing within 10 calendar days
and a determination of this request for documents within 20 calendar days.  *See* 28 CFR §
16.5(d)(4); 5 U.S.C. § 552(a)(6)(A)(i).  If this request is denied in whole or in part, I request
that all deletions be justified by reference to specific exemptions to FOIA.  I request the release
of all segregable portions of otherwise exempt material.  I reserve the right to appeal a decision
to withhold any information, to deny a waiver of fees, or to expedited processing.

I certify as true and correct to the best of my knowledge and belief that I have a
compelling need for expedited processing and that the requested records are not for commercial
purposes.  Thank-you for your prompt attention to this matter.  Please furnish all responsive
records to the address below.

Daniel David Rigmaiden

Daniel Rigmaiden
Agency #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

10.      McCullagh, Declan (CNET News), *Justice Dept. defends warrantless cell phone tracking* (Feb. 13, 2010),
*available at* http://news.cnet.com/8301-13578_3-10453214-38.html (last accessed Apr. 8, 2010).

**ATTACHMENT**









JUL-18-2002  11:31       H███AND and KNIGHT LLP                    P.27

### Standards Currently Supported

- ████████

### Future Standards Supported

- Software reconfigurable architecture will allow for future software upgrade to support other wireless standards and capabilities

### Operating Bands

### Transmit Capabilities

*(for Interrogation and Active Tracking and Location)*

- Up to ███ dBm output
- Interfaces with an ███████████

### Compatible Accessories

### Interfaces

- Power

### Physical Characteristics

- Housing: Standard aluminum case
- Wheeled transit case
  - Stows ████████
  - Conforms to airline carry-on weight and size limits

### PC Controller Characteristics

- ████████ operating system
- GUI is easily configured by user for mission scenarios
- Enables field upgrade of system firmware
- Integrated ██████████████ GUI with optional ████████

**DISTRIBUTION WARNING**

This brochure may be provided only to persons eligible under 18 USC 2512 (Government law enforcement agencies or communications service providers).

This brochure may only be given to U.S. citizens, permanent residents of the U.S. (green card holders), or Canadians eligible under 22 CFR 126.5.

**HARRIS**

*next level solutions*

Government Communications Systems Division | P.O. Box 37 | Melbourne, FL USA 32902-0037
1-800-358-6297 or wpg@harris.com | www.harris.com

Copyright © 2002 Harris Corporation
Printed in USA on Recyclable Paper

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

TOTAL P.27

# AmberJack®
## Direction-Finding System

**WIRELESS** products group

### Features

- Determines direction of arrival and received signal strength of a targeted mobile phone's transmission
- Determines direction of arrival and received signal strength of a targeted base station's transmission
- Provides real-time display of direction to the target
- Low power and portable
- User-friendly Graphical User Interface (GUI) for the PC

### Frequency Coverage

- Amberjack-X (U.S. Cellular/PCS 1900)
  - Cellular reverse: 824–849 MHz
  - Cellular forward: 869–894 MHz
  - PCS reverse: 1850–1910 MHz
  - PCS forward: 1930–1990 MHz
- Amberjack-G (EGSM 900/DCS 1800)
  - EGSM reverse: 880–915 MHz
  - EGSM forward: 925–960 MHz
  - DCS reverse: 1710–1785 MHz
  - DCS forward: 1805–1880 MHz

- Amberjack-W (Wideband)
  - iDEN reverse: 806–825 MHz
  - iDEN forward: 851–870 MHz
  - Cellular reverse: 824–849 MHz
  - Cellular forward: 869–894 MHz
  - PCS reverse: 1850–1910 MHz
  - PCS forward: 1930–1990 MHz
  - EGSM reverse: 880–915 MHz
  - EGSM forward: 925–960 MHz
  - DCS reverse: 1710–1785 MHz
  - DCS forward: 1805–1880 MHz
  - UMTS IV reverse: 1710–1755 MHz
  - UMTS IV forward: 2110–2155 MHz
  - UMTS I reverse: 1920–1980 MHz
  - UMTS I forward: 2110–2170 MHz

### External Control

- Laptop PC (Windows® XP Professional)

### Power source

- 12 Vdc at 0.5 A

### Physical Characteristics

- Size: D = 17", H = 4.2"
- Weight: <14 lbs

### Required Accessories (sold separately)

Gossamer with PC Controller, StingRay system, StingRay II, or KingFish with PC Controller

### Optional Accessories

Harpoon™ for DF range extension

### Catalog Part Number

- AJ-X (AmberJack-X)
- AJ-G (AmberJack-G)
- AJ-W (AmberJack-W)

### Authorized Federal Supply Service Information Technology Schedule

- SIN: 132-8 Purchase of Equipment
- SIN: 132-12 Maintenance, Repair Services and Repair Parts/Spare Parts
- GSA Contract Number: GS-35F-0293J

General Services Administration Federal Supply Service products and ordering information in this Authorized FSS Information Technology Schedule Pricelist are also available on the GSA Advantage! System. Agencies can browse GSA Advantage! by accessing the GSA's home page via the Internet at www.gsa.gov.



Specifications are subject to change without notice. Harris is a registered trademark of Harris Corporation. AmberJack, KingFish, Gossamer, StingRay, and StingRay II are registered trademarks of Harris Corporation. Harpoon is a trademark of Harris Corporation. Windows XP Professional is a registered trademark of Microsoft Corporation. iDEN is a trademark of Motorola, Inc.

This product is a restricted use item and can be sold only to authorized law enforcement and government agencies. Its use shall comply with all local, state, and federal laws and regulations. Harris Corporation assumes no liability for any misuse or improper use of the product and makes no warranty or representation whatsoever as to its suitability for any specific application.

### DISTRIBUTION WARNING

This brochure may be provided only to persons eligible under 18 USC 2512 (Government law enforcement agencies or communications service providers).



*assuredcommunications*®

Government Communications Systems | P.O. Box 9800 | Melbourne, FL USA 32902-9800
1-800-358-5297 or wpg@harris.com | www.wpg.harris.com | www.harris.com

Copyright © 2008 Harris Corporation 02/08 514176k VPB cid0105

# *Harpoon™*

## *Software-Controlled, High-Power Filtered Amplifier*

**WIRELESS** products group

### Standards Supported

- GSM
- CDMA2000®
- iDEN
- UMTS

### Frequency Coverage

- 850/1900: 869–894 MHz/1930–1990 MHz
- 900/1800: 925–960 MHz/1805–1880 MHz
- iDEN 800: 851–870 MHz
- 2100: 2110–2170 MHz

### Physical Characteristics

- Dual Band
  - Size: 10.5" x 14.75" x 5"
  - Weight: 24 lbs
- Single Band
  - Size: 10.5" x 10.5" x 5"
  - Weight: 15 lbs

### Power Specifications

- Input: 10–33 Vdc
- Power Consumption
  - Dual Band: 440 W max
  - Single Band: 280 W max

### Optional Accessories

- Diplexer for dual-band operation with StingRay and KingFish

### Catalog Part Number

- Harpoon 850/1900
- Harpoon 900/1800
- Harpoon i800
- Harpoon 2100



Specifications are subject to change without notice. Harris is a registered trademark of Harris Corporation. KingFish, StingRay, and StingRay II are registered trademarks of Harris Corporation. Harpoon is a trademark of Harris Corporation. CDMA2000 is a registered trademark of the Telecommunications Industry Association in the United States (TIA-USA). iDEN is a trademark of Motorola, Inc.

This product is a restricted use item and can be sold only to authorized law enforcement and government agencies. Its use shall comply with all local, state, and federal laws and regulations. Harris Corporation assumes no liability for any misuse or improper use of the product and makes no warranty or representation whatsoever as to its suitability for any specific application.

**DISTRIBUTION WARNING**

This brochure may be provided only to persons eligible under 18 USC 2512 (Government law enforcement agencies or communications service providers).



**HARRIS**
*assuredcommunications®*

Government Communications Systems | P.O. Box 9800 | Melbourne, FL USA 32902-9800
1-800-358-5297 or wpg@harris.com | www.wpg.harris.com | www.harris.com

Copyright © 2008 Harris Corporation 07/08 S14176m VF8 d0341



**HARRIS**

# UMTS IV Converter

## Overview

**UMTS IV Converter** is a high performance Frequency Converter that enables the StingRay® or KingFish® to operate in the CONUS UMTS IV (2100 MHz DL, 1700MHz UL) band. Its high stability and extremely low phase noise performance enables stand-alone-capability; which allows the StingRay/KingFish and Converter to operate with independent references. Its excellent channel-pair rejection enables operation with high-power PAs.

**UMTS IV Converter** enables the StingRay/KingFish to transmit on the UMTS IV downlink band and to receive on both the uplink and downlink bands. It automatically shuts down the downlink receive path during transmit mode, improving system isolation and reducing power consumption.

Active gain compensation guarantees constant gain over temperature, frequency, aging, and other environmental effects during transmit mode and guarantees constant gain over temperature during receive mode.

## Features

**Transmit**
- TX conversion from 1842.5 to 2140 MHz
- 60 MHz low ripple bandwidth
- Circuitry turns off during receive only mode
- Active gain compensation over temp and freq
- Active TX LED status indicator

**Receive**
- RX 1 conversion from 2140 to 1842.5 MHz
- RX 2 conversion bypass
- RX 1 circuitry turns off during transmit mode
- 11dB gain is temperature compensated
- Attenuators are activated from the front panel

**Local Oscillators**
- 0.5° Integrated Phase Noise (100Hz – 1MHz)
- 0.2ppb over temperature, ±25ppb/year aging
- LED status indicator

**Mechanical Housing**
- Rugged welded metal case
- Formed lid for convenient transceiver mounting
- Front panel connectors, controls, and indicators

**Accessories Included:**
- Transit Case
- AC/DC converter
- DC/DC converter for vehicular operation
- RF cables for StingRay/KingFish connections
- RF cable for PA connection
- Brackets for KingFish installation

**UMTS IV Converter**



**StingRay and UMTS IV Converter**



*assuredcommunications®*

**HARRIS PROPRIETARY INFORMATION**

This information is provided for your convenience. Always call your Account Manager for most current pricing and availability.

# WPG Product Pricing

**WIRELESS products group**

Version S&L 2010

Effective Date: 12/7/09
Update: 2/24/10

| | | Distributor Pricing | | | GSA Pricing | |
|---|---|---|---|---|---|---|
| | | 1 | 2-15 | 16+ | 1-15 | 16+ |
| Stingray | STINGRAY | | | | | 66,479 |
| StingRay GSM Software | SRAY-GSM-SW | | 20,000 | | 20,000 | |
| StingRay CDMA Software | SRAY-CDMA-SW | 22,000 | 20,000 | | 20,000 | |
| StingRay IDEN Software | SRAY-IDEN-SW | 22,000 | 20,000 | | | |
| StingRay 2100 MHz B1 Down Converter w/ By Pass (OCONUS) | CONV-2100/1900-WBP | 18,600 | 18,000 | | 18,054 | |
| StingRay 2100 MHz B4 Down Converter w/ By Pass (CONUS) | CONV-2100/1700-WBP | 18,600 | 18,000 | | 18,054 | |
| | | | | | | |
| StingRay Replacement Kit | SR-REPLACEMENT KIT | | | | | |
| Cable Assembly PC/USB - 6' Cable | 3092824-102 | | | | | |
| Cable Assembly PC/USB - 12' Cable | 3092824-103 | | | | | |
| Cable DC Power | 3092825-101 | | | | | |
| StingRay Carrying Case | RE1017HA | | | | | |
| 115V Power Cord | 17250 | | | | | |
| Laptop PC Controller (Dell Latitude) | 2009623-101 | | | | | |
| Panasonic Toughbook Computer | 2009526-101 | | | | | |
| Adapter, DC (Laptop) (non- Charging) | DE2035-803 | | | | | |
| Mouse, CMPTR (Micro Trac) | 2009623-003 | | | | | |
| Auto Power Adapter (B600 & D600) | 2009523-002 | | | | | |
| Mobile Mast 20' | OSMM-SA-20 | | | | | |
| 12' Extension Cable (TNC to N) | PE3866-144 | | | | | |
| 12' Extension Cable (TNC to TNC) | PE3414-144 | | | | | |
| N-F to TNC-F Adapter | PE9131 | | | | | |
| TNC-F to TNC-F Adapter | PE9088 | | | | | |
| N-M to TNC-F Adapter | PE9090 | | | | | |
| N-F to TNC-M Adapter | PE9089 | | | | | |
| Directional Antenna, Yagi (GSM) Pole Mount | Y2267A-86 | | | | | |
| SDR Radio Slice | 3092527-201 | | | | | |
| DC-DC Power Supply Module (SR & NF) | 3092577-101 | | | | | |
| Duplex Filter (AMPS/PCS) Stand Alone | WSA-00046 | | | | | |
| Duplex Filter (EGSM/DCS) Stand Alone | WSA-00100 | | | | | |
| Quad Band Mag Mount Antenex Antenna (TNC) | 3174173-101 | | | | | |
| 15' TNC-M to TNC-F Extension Cable | CA-400UF-TMTF-15 | | | | | |
| | | | | | | |
| StingRay II | STINGRAY II | 148,000 | 140,800 | | 134,962 | |
| StingRay II Upgrade | STINGRAY II-UP | 71,300 | 67,800 | | 65,014 | |
| StingRay II GSM Software | SRAY-II-GSM-SW | 22,000 | 20,000 | | | |
| StingRay II CDMA Software | SRAY-II-CDMA-SW | 22,000 | 20,000 | | | |
| StingRay II IDEN Software | SRAY-II-IDEN-SW | 22,000 | 20,000 | | | |
| | | | | | | |
| Cable Assembly PC/USB - 6' Cable | 3092824-102 | | | | | |
| Cable Assembly PC/USB - 12' Cable | 3092824-103 | | | | | |
| Laptop PC Controller (Dell Latitude) | 2009523-101 | | | | | |
| Adapter, DC (Laptop) (non- Charging) | DE2035-803 | | | | | |
| Panasonic Toughbook Computer | 2009525-101 | | | | | |
| Mouse, CMPTR (Micro Trac) | 2009623-003 | | | | | |
| Quad Band Mag Mount Antenex Antenna (TNC) | 3174173-101 | | | | | |
| 15' TNC-M to TNC-F Extension Cable | CA-400UF-TMTF-15 | | | | | |
| Quad Band Yagi (Wedge) including 6ft cable (PE 3076-72) | 3118894-201 | | | | | |
| Cable Assembly, RF (SMA-M to RTAN(GM-M) 6' | PE3076-72 | | | | | |
| Cable Assembly, RF (SMA-M to RTAN(GM-M) 12' | PE3076-144 | | | | | |
| GPS Antenna | ANT-GPS-SH-SMA | | | | | |
| AC/DC Converter | ACHA1224-1936 | | | | | |
| Volt Converter (Universal Plug Kit) | 3142767-101 | | | | | |
| StingRay II Case | RE041908HA | | | | | |
| SDR Radio Slice | 3092527-201 | | | | | |

This information is provided for your convenience. Always call your Account Manager for most current pricing and availability.

# WPG Product Pricing

**WIRELESS products group**

Effective Date: 12/7/09
Update: 2/24/10

Version S&L 2010

| Description | Part Number | | | |
|---|---|---|---|---|
| **Kingfish** | KINGFISH | 27,500 | 26,500 | 25,346 |
| KingFish N-Connector Upgrade | KF-N-UP | 2,400 | 1,700 | |
| KingFish GSM Software | KF-GSM-SW | 13,000 | 12,000 | |
| KingFish CDMA Software | KF-CDMA-SW | 18,100 | 17,200 | |
| KingFish IDEN Software | KF-IDEN-SW | 18,100 | 92,200 | |
| | | | | |
| Kingfish Replacement Kit | KF-REPLACEMENT KIT | | | |
| Tote Bag Assembly | 3100242-101 | | | |
| Carrying Case, KingFish | RE0613HA | | | |
| Cable Assembly, W102 (PC USB Type A) 6' cable | 3090524-102 | | | |
| Cable DC Power | 3082526-101 | | | |
| Battery Pack (11.1V) | 2014066-101 | | | |
| Lithium-ion Battery Charger | 2014066-102 | | | |
| Battery, Adapter, Lighter (24V, 1.5A) | VA2524 | | | |
| Power Supply (12V, 6A) | ACHA-12501 | | | |
| Quad Band Yagi (Wedge) Including 50 cable (PE 3076-72) | 3116694-201 | | | |
| Cable Assembly, RF (SMA-M to RTAN(GM-M) 6' | PE3076-72 | | | |
| Cable Assembly, RF (SMA-M to RTAN(GM-M) 12' | PE3076-144 | | | |
| Antenna Device, Wave, PCS/Cel (Green) | 2014520-001 | | | |
| Antenna Device, Wave, GSM (Orange) | 2014520-002 | | | |
| Antenna, ¼ Wave (2.4 GHZ) (Bluetooth) | 2014626-001 | | | |
| Backpack Carrying Case Custom (Blue) | 3100242-103 | | | |
| Backpack Carrying Case Custom (Army Digi-Camo) | 3100242-104 | | | |
| Quad Band Mag Mount Antenna Antenna (SMA) | 3174173-102 | | | |
| | | | | |
| **AmberJack G** | AJ-G | 24,300 | 23,100 | 22,156 |
| AmberJack X | AJ-X | 24,300 | 23,100 | 22,156 |
| AmberJack W | AJ-W | 38,400 | 36,500 | 35,016 |
| AmberJack Legacy to W Upgrade | AJL-W-UP | 19,750 | 18,000 | 18,000 |
| AmberJack X & G to W Upgrade | AJXG-W-UP | 21,850 | 20,800 | 19,741 |
| | | | | |
| Cable Assembly, DBDF Antenna, Loggerhead (12') | 3099505-101 | | | |
| Cable Assembly, DBDF Antenna, JHiobessemer (12') (To be used in place of the | 3120035-101 | | | |
| Carrying Case | RE0512HA-2 | | | |
| Cable Assembly, 3-Way Splitter | DC15A-3J1 | | | |
| Eyebolt, Swivel | 47821 | | | |
| Power Cable Internal | 3087877-101 | | | |
| Tool, Eyebolt | 47641/94982 | | | |
| Webbing Assembly, 12ft. | 86347836 | | | |
| Radome Assembly | 3087882-101 | | | |
| Cable Assembly, DBDF Antenna, Stingray (12')- (old P/N: 3099547-101) Three | KC8/H680 | | | |
| Cable Assembly, (36') | KC8/1672-1 | | | |
| Cable Assembly, DBDF Antenna, Stingray (25') | KC8/1672 | | | |
| Cable Assembly, DBDF Antenna, Stingray (5 meters or 16' 4") - (old P/N: | KC8/5684 | | | |
| Cable Assembly, DBDF Antenna, Stingray (50')- (old P/N: 3099547-102) | KC8/H686 | | | |
| CASE,CARRYING,AMBERJACK-W | RE022808HA | | | |
| | | | | |
| **Power Amp Kit** | PA-KIT | 3,675 | 3,500 | |
| | | | | |
| **Power Amp** | SM0520-36HH | | | |
| Carrying Case | RE0802HA | | | |
| Adapter Cable - SMA Male to SMA Male (12") | PE3377-12 | | | |
| 3 Way DC Splitter | DC15A-3J1 | | | |
| DC Power Cable | CBLID-00390 | | | |
| Right Angle SMA Coax Adapter | PE9088 | | | |
| Mounting Plate | 3102363-101 | | | |
| Adapter Cable - SMA Male to SMA Male (72") | PE3377-72 | | | |
| Quad Band Mag Mount Antenna Antenna (SMA) | 3174173-102 | | | |

**Harris Proprietary Information**
For Internal Company Use Only

This information is provided for your convenience. Always call your Account Manager for most current pricing and availability.

**WPG Product Pricing**

wireless
products group

Effective Date: 12/7/09
Update: 2/24/10

Version SAL 2010

| | | |
|---|---|---|
| Power Amp Kit - 10 Watt | PA-KIT-10W | |
| | | |
| Amplifier 10Watt | SM0822-3905 | |
| Carrying Case | RE0116HA | |
| Adapter Cable - SMA / TNC  (18") w/ Attenuator | 3147080-101 | |
| 3 Way DC Splitter | DC15A-3J1 | |
| Adapter Cable - SMA / TNC  (72") w/ Attenuator | 3147080-102 | |
| DC Power Cable for 10-Watt PA | 180-8045-66 | |
| AC to DC Power Supply for 10 Watt PA | ACHA1270-1465 | |
| AC to DC Power Supply for 10 Watt PA - 25 feet | CBLMS-F00416 | |
| Quad Band Mag Mount Antenna Antenna (TNC) | 3174173-101 | |
| 18" TNC-M to TNC-F Extension Cable | CA-400UF-TMTF-15 | |
| Attenuator, FXD, 5DB (SMA to SMA) | BW-85W2 | |
| | | |
| High Power Filtered 25W PA Kit - (800/850/1900/2100 B4) | PA-KIT-25W CONUS | 10,400 |
| High Power Filtered 25W PA Kit - (800/1800/2100 B1) | PA-KIT-25W OCONUS | 10,400 |
| | | |
| High Power antenna | VBC-822-M-1 | |
| DC Powr Cable (CLA) | 3092526-101 | |
| AC/DC Power Converter | ACHA1224-2551 | |
| DC / DC Power Cable | CBLIC-00640 | |
| RF Cable | 920-10027-012 | |
| Carry Case | RE05280GHA | |
| | | |
| High Power Filtered 30W PA Kit- Single Band IDEN 800 | PA-KIT-30W IDEN 800 | 54,954 |
| High Power Filtered 30W PA Kit- Single Band 2100 | PA-KIT-30W 2100 | 48,916 |
| High Power Filtered 30W PA Kit- Dual Band 1900/900 | PA-KIT-30W Dual-Band CONUS | 38,419 |
| High Power Filtered 30W PA Kit- Dual Band 800/1800 | PA-KIT-30W Dual-Band OCONUS | 38,419 |
| | | |
| Harpoon AC/DC Converter | ACHA2816-2597 | |
| USB Cable Assembly | 3092524-102 | |
| USB to AUX Cable Assembly (Beige) | 3161096-101 | |
| RF Cable Assembly (Blue) | 920-10027-012 | |
| Harpoon Mounting Tray Assembly | 3162503-101 | |
| Antenna; 806-2200 MHZ Magnetic Mount | VBC-822-M-1 | |
| Coax Adapter; SMA Male to TNC Female | PE9078 | |
| Aux to Primary (Harpoon to SR) Cable Assy | 3186799-101 | |
| Aux to Primary (Harpoon to SR II) Cable Assy | 3186800-101 | |
| | | |
| 1800Ghz Power Kit | OCTOPUS | 18,237 |
| | | |
| Directional Antenna, Quad Band w/whistle - *Requires P/N PE3377-72 &PE9070 | SWAN80183G1W3V3 | |
| Quad Band Mag Mount Antenna Antenna (TNC) | 3174173-101 | |
| 18" TNC-M to TNC-F Extension Cable | CA-400UF-TMTF-15 | |
| Quad Band Mag Mount Antenna Antenna (SMA) | 3174173-102 | |
| Antenna; 806-2200MHZ Magnetic Mount | VBC-822-M-1 | |
| Directional Antenna, Yagi (Cell) | 3084617-101 | |
| Directional Antenna, Yagi (DCS/PCS) | 3084618-101 | |
| Directional Antenna, Yagi (GSM) | 3084619-101 | |
| Directional Antenna, Quad Band w/whistle w/ Attenuator - Requires P/N PE3377- | 3120062-101 | |
| Directional Antenna, Yagi (DCS/PCS) - Pole Mount | Y421812 | |
| Directional Antenna, Yagi (GSM) Pole Mount | Y2287A-66 | |
| Quad Band Yagi (Wedge) 6ft Cable Included (PE3682-72) | 3116894-101 | |

This information is provided for your convenience. Always call your Account Manager for most current pricing and availability.

# WPG Product Pricing

**Effective Date:** 1/27/09
**Update:** 2/24/10

Version S&I, 2010

| Description | Part Number | | GSA |
|---|---|---|---|
| StingRay 2100 MHz B1 Down Converter w/ Bv Pass (OCONUS) | CONV-2100/1900-WBP | | 18,054 |
| StingRay 2100 MHz B4 Down Converter w/ Bv Pass (CONUS) | CONV-2100/1700-WBP | | 18,054 |

| | | | |
|---|---|---|---|
| HA1226-1937 | Adapter | 210 | |

| | | | |
|---|---|---|---|
| Laptop PC | 2009523 | | |
| Toughbook PC | 2009526 | | |
| Rugged Mini-PC | 2014088 | | |

| Description | Part Number | | |
|---|---|---|---|
| Directional Antenna, Quad Band w/saddle - *Requires P/N PE3377-72 &PE9070 | SWAN90185G1W3V3 | | |
| Quad Band Mag Mount Antenna, Antenna (TNC) | 3174173-101 | | |
| 15' TNC-M to TNC-F Extension Cable | CA-400UF-TMTF-15 | | |
| Quad Band Mag Mount Antenna, Antenna (SMA) | 3174173-102 | | |
| Antenna, 806-2200MHz Magnetic Mount | VBC-822-M-1 | | |
| Directional Antenna, Yagi (Cell) | 3084817-101 | | |
| Directional Antenna, Yagi (DCS/PCS) | 3084816-101 | | |
| Directional Antenna, Yagi (GSM) | 3084819-101 | | |
| Directional Antenna, Quad Band w/saddle w/ Attenuator - Requires P/N PE3377- | 3120082-101 | | |
| Directional Antenna, Yagi (DCS/PCS) / Pole Mount | Y431812 | | |
| Directional Antenna, Yagi (GSM) Pole Mount | YZ2387A-66 | | |
| Quad Band Yagi (Wedge) 6ft Cable Included (PE3682-72) | 3116894-101 | | |

| Description | | | |
|---|---|---|---|
| Repair for all WPG products not covered by warranty. Charges are $86.00/hr plus REPAIR | TBD | | |

| Description | Part Number | Description & sell | GSA |
|---|---|---|---|
| Maintenance 4W PA Kit | MT-4W | 800 | |
| Maintenance 10W PA Kit | MT-10W | 800 | |
| Maintenance 25W PA Kit CONUS | MT-25WC | 1,436 | 1,436 |
| Maintenance 25W PA Kit OCONUS | MT-25WO | 1,436 | 1,436 |
| Maintenance AmberJack X | MT-AJX | 2,872 | 2,872 |
| Maintenance AmberJack G | MT-AJG | 2,872 | 2,872 |
| Maintenance AmberJack W | MT-AJW | 4,786 | 4,786 |
| Maintenance Converter Band 1 OCONUS w/ BP | MT-CONV1O | 2,684 | 2,684 |
| Maintenance Converter Band 4 CONUS w/ BP | MT-CONV4C | 2,684 | 2,684 |
| Maintenance Harpoon 2100 | MT-HARP21 | 1,914 | 1,914 |
| Maintenance Harpoon CONUS | MT-HARPC | 1,914 | 1,914 |
| Maintenance Harpoon IDEN | MT-HARPI | 1,914 | 1,914 |
| Maintenance Harpoon OCONUS | MT-HARPO | 1,914 | 1,914 |
| Maintenance KingFish | MT-KF | 3,829 | 3,829 |
| Maintenance Octopus | MT-OCT | 2,684 | 2,684 |
| Maintenance StingRay | MT-SR | 10,529 | 10,529 |
| Maintenance StingRay I | MT-SRII | 21,058 | 21,058 |

| Description | Part Number | | |
|---|---|---|---|
| Training - Melbourne | TRAIN-MLB | | |
| Training - Melbourne 1-Day Course | TRAIN-MLB-1 | | |
| Training - Florida | TRAIN-FL | | |
| Training - East Coast | TRAIN-EC | | |
| Training - East Coast 1-Day Course | TRAIN-EC-1 | | |
| Training - West Coast | TRAIN-WC | | |
| Training - West Coast 1-Day Course | TRAIN-WC-1 | | |

*Harris Proprietary Information*
For Internal Company Use Only

This information is provided for your convenience.  Always call your Account Manager for most current pricing and availability.

# WPG Product Pricing

**WIRELESS**
products group

Version S&L 2010

Effective Date:  12/7/09
Update:   2/24/10

---

## WPG Contact Information:

**Michael Dillon**
Federal, State and Local Law Enforcement
(571) 246-7450
michael.dillon@harris.com

**Rich Roose**
DoD, SOCOM, International, Federal Intelligence
Ph: (321) 309-7430
Cell: (321) 223-8551
richard.roose@harris.com

**Lin Vinson**
ARMY, National Security, Federal Intelligence
(321) 259-2563
lin.vinson@harris.com

**Susan McCreery**
Sales/Support
321-309-7450 (Office)
321-258-9631 (9toBry)
321-409-9975 (fax)
www.wpg.harris.com
www.premier.harris.com/wpg
susan.mccreery@harris.com

**Harris Proprietary Information**
For Internal Company Use Only

# HARRIS

EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

# W♦RELESS
## products group

## HARRIS GCSD
## PRICE LIST
### Effective September 2008
### All price quotes are in USD ($)

***This price list supersedes all previous price lists. Prices and products are subject to change without notice. Products are subject to discontinuation without notice.***

HARRIS Wireless Products Group
PO Box 9800
Melbourne, Florida 32902
1-800-PLS-LAWS (1-800-358-5287) Fax 321-308-7437

**HARRIS**

EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

# HARRIS

EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

## AmberJack

| MODEL NUMBER | DESCRIPTION | PRICE 1 to 15 Units | 6+ Units |
|---|---|---|---|
| AJ-G | The AmberJack-G DF Antenna is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations Forward and Reverse in the GSM 900 and 1800 MHz Bands.* | $ 24,300 | $ 23,100 |
| AJ-X | The AmberJack-X DF Antenna is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations Forward and Reverse in the GSM 800 and 1900 MHz Bands.* | $ 24,300 | $ 23,100 |
| AJ-W | The AmberJack-W DF Antenna is a wideband phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base station Forward and Reverse in the frequency bands from 800MHz to 2100 MHz* | $ 38,400 | $ 36,500 |
| AJ-GUP | AmberJack-G DF Antenna Upgrade. Upgrades the legacy AJ-DF antenna to the AJ-G antenna. | $ 13,000 | $ 12,400 |
| AJ-XUP | AmberJack-X DF Antenna Upgrade. Upgrades the legacy AJ-DF antenna to the AJ-X antenna. | $ 9,000 | $ 8,600 |
| AJ-WUP | AmberJack-W DF Antenna Upgrade. Upgrades the legacy AJ-DF antenna to the AJ-W antenna. Includes 12AEP-800-2100 antenna cover kit. | $ 18,000 | $ 17,100 |

* Requires PC Controller Software for Gossamer Operations.

### AmberJack Accessories

| | | PRICE | |
|---|---|---|---|
| 3088596-101 | Cable Assembly, DBDF Antenna, Loggerhead (12') | $ 650 | |
| 3120038-101 | Cable Assembly, DBDF Antenna, LH/Gossamer (12') (To be used in place of the 3088596-101 for both LH and Gossamer) | $ 650 | |
| KCII/1660 | Cable Assembly, DBDF Antenna, StingRay (12') - (old PN: 3099547-101) | $ 800 | |
| RE0512HA-2 | Carrying Case | $ 890 | |
| DC15A-3J1 | Cable Assembly, 3-Way Splitter | $ 170 | |
| 47621 | Eyebolt, Swivel | $ 54 | |
| 3087877-101 | Power Cable Internal | $ 73 | |
| 47641/94882 | Tool, Eyebolt | $ 15 | |
| 8834T561 | Webbing Assembly, 12ft. | $ 39 | |
| 3087882-101 | Radome Assembly | $ 1,800 | |
| KCII/1672 | Cable Assembly, DBDF Antenna, StingRay (25') | $ 975 | |
| KCII/1684 | Cable Assembly, DBDF Antenna, StingRay (5 meters or 16'4") - (old PN: 3099547-103) | $ 825 | |
| KCII/1696 | Cable Assembly, DBDF Antenna, StingRay (50') - (old PN: 3099547-102) | $ 1,000 | |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

## StingRay

| MODEL NUMBER | DESCRIPTION | PRICE 1 to 15 Units | 16+ Units |
|---|---|---|---|
| STINGRAY | StingRay (4 module) – 1-CH Xmit Interrogation and Direction Finding Transportable Unit. | $ 75,100 | $ 71,300 |
| SRAY-GSM-SW | StingRay – GSM Software Package | $ 22,000 | $ 20,900 |
| SRAY-CDMA-SW | StingRay – CDMA Software Package | $ 22,000 | $ 20,900 |
| SRAY-IDEN-SW | StingRay – IDEN Software Package | $ 22,000 | $ 20,900 |
| SRAY-UMTS-SW | StingRay – UMTS Software Package | N/C | N/C |
| SRAY-GSM-SW-INTCP | StingRay – GSM Intercept Software Package without S/C | $ 27,400 | $ 26,000 |
| SRAY-GSM-SW-INTCP-SC | StingRay – GSM Intercept Software Package with S/C (Restricted Sales only Federal Customer) | $ 50,000 | $ 25,000 |
| UMTS-B1-CONV | StingRay 2100/1900MHz Down Converter | $ 16,000 | $ 15,200 |
| UMTS-B4-CONV | StingRay 2100/1700MHz Down Converter | $ 16,000 | $ 15,200 |
| AIRBRN-KIT-CONUS | Airborne DF Kit CONUS | $ 9,000 | $ 8,550 |

## StingRay II

| MODEL NUMBER | DESCRIPTION | PRICE 1 to 15 Units | 16+ Units |
|---|---|---|---|
| STINGRAY II | StingRay II – 4-CH Multi-Xmit Interrogation and Direction Finding Transportable Unit. | $ 148,000 | $ 140,600 |
| STINGRAY II-UP | StingRay II – StingRay to StingRay II Upgrade | $ 65,000 | $ 61,800 |
| SRAY II-GSM-SW | StingRay – GSM Software Package | $ 22,000 | $ 20,900 |
| SRAY II-CDMA-SW | StingRay – CDMA Software Package | $ 22,000 | $ 20,900 |
| SRAY II-IDEN-SW | StingRay – IDEN Software Package | $ 22,000 | $ 20,900 |
| SRAY II-GSM-SW-INTCP | StingRay – GSM Intercept Software Package | $ 27,400 | $ 26,000 |
| SRAY II-GSM-SW-INTCP-SC | StingRay – GSM Intercept Software Package with S/C (Restricted Sales only Federal Customer) | $ 50,000 | $ 25,000 |
| SRAY II-UMTS-SW | StingRay – UMTS Software Package | N/C | N/C |

### StingRay Accessories

| | | PRICE |
|---|---|---|
| 3092524-102 | Cable Assembly PC/USB - 6' Cable | $ 196 |
| 3092524-103 | Cable Assembly PC/USB - 12' Cable | $ 220 |
| 3092525-101 | Cable DC Power | $ 175 |
| RE1017HA | Carrying Case | $ 925 |
| 17250 | 115V Power Cord | $ 6 |
| 2009523-101 | Laptop PC Controller (Dell Latitude D630) | $ 3,500 |
| 2009525-101 | Panasonic Toughbook Computer | $ 6,500 |
| DE2035-903 | Adapter, DC (Laptop) (non- Charging) | $ 226 |
| 2009523-003 | Mouse, CMPTR (Micro Trac) | $ 50 |
| 2009523-002 | Auto Power Adapter (8500 & D600) | $ 128 |
| OSMM-SA-20 | Mobile Mast 20' | $ 2,990 |
| PE5665-144 | 12' Extension Cable (TNC to N) | $ 80 |
| PE3414-144 | 12' Extension Cable (TNC to TNC) | $ 85 |
| PE9131 | N-F to TNC-F Adapter | $ 48 |
| PE9099 | TNC-F to TNC-F Adapter | $ 28 |
| PE9090 | N-M to TNC-F Adapter | $ 30 |
| PE9089 | N-F to TNC-M Adapter | $ 28 |

**HARRIS**

EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| StingRay Accessories continued... | | PRICE | |
|---|---|---|---|
| Y2287A-661 | Directional Antenna, Yagi (GSM) Pole Mount | $ 700 | |
| FPPA-400 | Field Portable Power Adapter (Military Vehicles) | $ 2,900 | |
| FPPS-375 | Field Portable Power Source (Battery Pack) | $ 1,700 | |
| FPACPS | Field Portable AC Power Source | $ 900 | |
| 3092527-201 | SDR Radio Slice | $ 15,000 | |
| 3092577-101 | DC-DC Power Supply Module (SR & KF) | $ 1,400 | |
| WSA-00045 | Duplex Filter (AMPS/PCS) Stand Alone | $ 1,970 | |
| WSA-00100 | Duplex Filter (EGSM/DCS) Stand Alone | $ 2,310 | |
| 3174173-101 | Quad Band Mag Mount Antenex Antenna (TNC) | $ 125 | |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| MODEL NUMBER | DESCRIPTION | PRICE 1 to 15 Units | 16+ Units |
|---|---|---|---|
| KINGFISH | KingFish – Man Portable Interrogative and Direction Finding Unit for the CDMA waveform | $ 27,800 | $ 26,400 |
| KF-GSM-SW | KingFish – GSM Software Package | $ 18,100 | $ 17,200 |
| KF-CDMA-SW | KingFish – CDMA Software Package | $ 18,100 | $ 17,200 |
| KF-IDEN-SW | KingFish – IDEN Software Package | $ 18,100 | $ 17,200 |
| KF-UMTS-SW | KingFish – UMTS Software Package | N/C | N/C |
| *KingFish Accessories* | | PRICE | |
| 3100242-101 | Tote Bag Assembly | $ 570 | |
| RE0513HA | Carrying Case, KingFish | $ 950 | |
| 3092524-102 | Cable Assembly, W102 (PC USB Type A) 6' cable | $ 19 | |
| 3092525-101 | Cable DC Power | $ 17 | |
| 2014068-101 | Battery Pack (11.1V) | $ 256 | |
| 2014068-102 | Lithium-Ion Battery Charger | $ 426 | |
| VA2524 | Battery, Adapter, Lighter (24V, 1.5A) | $ 140 | |
| ACHA-12501 | Power Supply (12V, 5A) | $ 190 | |
| 3118694-201 | Quad Band Yagi (Wedge) including 6ft cable (PE 3076-72) | $ 1,300 | |
| PE3076-72 | Cable Assembly, RF (SMA-M to RTANGM-M) 6' | $ 104 | |
| PE3076-144 | Cable Assembly, RF (SMA-M to RTANGM-M) 12' | $ 104 | |
| 2014620-001 | Antenna Device, Wave, PCS/Cell (Green) | $ 22 | |
| 2014628-001 | Antenna, M Wave (2.4 GHZ) (Bluetooth) | $ 18 | |
| 2014629-002 | Antenna Device, Wave, GSM (Orange) | $ 22 | |
| 3100242-103 | Backpack Carrying Case Custom (Blue) | $ 660 | |
| 3100242-104 | Backpack Carrying Case Custom (Army Digi-Camo) | $ 660 | |
| 3174173-102 | Quad Band Mag Mount Antenna Antenna (SMA) | $ 125 | |

# HARRIS

EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| MODEL NUMBER | DESCRIPTION | PRICE |
|---|---|---|
| 2009523-101 | Laptop PC Controller (Dell Latitude D630) | $ 3,500 |
| 2015651-101 | Mini PC Controller (OQO) | $ 3,200 |
| 2014069-101 | Rugged Mini PC Controller (OD Go Book) | $ 4,900 |
| 3084625-101 | Laptop Computer, Lightweight, Low Power, 12" Screen | $ 3,000 |
| 2009525-101 | Panasonic Toughbook Computer | $ 6,500 |

### PC Controller Accessories

| MODEL NUMBER | DESCRIPTION | PRICE |
|---|---|---|
| 3058870-101 | Serial Cable | $ 40 |
| 2009523-003 | Mouse, CMPTR (Micro Trac) | $ 50 |
| 2009523-002 | Auto Power Adapter (E500 & D600) | $ 125 |

| MODEL NUMBER | DESCRIPTION | PRICE | |
|---|---|---|---|
| | | 1 to 15 Units | 16+ Units |
| PA-KIT-30W IDEN 800 | High Powered Filtered 30W PA Kit - Single Band iDEN 800 | $ 14,000 | $ 13,300 |
| PA-KIT-30W 2100 | High Powered Filtered 30W PA Kit - Single Band UMTS 2100 | $ 16,000 | $ 15,200 |
| PA-KIT-30W Dual-Band CONUS | High Powered Filtered 30W PA Kit - Dual Band 850/1900 | $ 17,500 | $ 16,600 |
| PA-KIT-30W Dual-Band OCONUS | High Powered Filtered 30W PA Kit - Dual Band 900/1800 | $ 17,500 | $ 16,600 |
| 3184472-101 | Harpoon Diplexer Kit (Use w/SR I) | $ 650 | $ 650 |
| | Need Mag Mount Antenna Specified | | |

| MODEL NUMBER | DESCRIPTION | PRICE | |
|---|---|---|---|
| | | 1 to 15 Units | 16+ Units |
| CONV-2100/AWS | UMTS Band IV -AWS Converter | $ 16,000 | $ 15,200 |
| CONV-2100/1900 | UMTS Band I Converter | $ 16,000 | $ 15,200 |

# ATTACHMENT B



U.S. Postal Service
CERTIFIED MAIL   RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ 208 | 500 |
| Certified Fee | 285 | |
| Return Receipt Fee (Endorsement Required) | 230 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ 7.23 | |

Sent To
Federal Bureau of Investigation
Street, Apt. No.; or PO Box No. 935 Pennsylvania Ave, N.W.
City, State, ZIP+4 Washington DC 20535

7007 0710 0004 3772 8555

**SENDER:** COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Chief of Record Section, FOIA Request
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Ave, N.W.
Washington, DC 20535-001

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
D.W. JONES/OD        1/17/2011

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☒ Yes

2. Article Number
(Transfer from service label)   7007 0710 0004 3772 8555

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

# ATTACHMENT C

## DECLARATION UNDER PENALTY OF PERJURY

RE: Daniel Rigmaiden has no commercial interest in the records requested via FBI FOIA request, certified return receipt article No. 7007 0710 0004 3772 8555;

BY: Daniel David Rigmaiden

---

I, Daniel David Rigmaiden, declare the following:

1.     This declaration establishes that my interests in the records requested via FBI FOIA request letter, certified return receipt article No. 7007 0710 0004 3772 8555, are not in my commercial interest. In my original FOIA request letter I stated that "the records requested are not sought for a commercial purpose and I plan to disseminate the responsive material to the public at no cost." *Id.*, p. 7. I also "certif[ied] as true and correct to the best of my knowledge and belief that I have a compelling need for expedited processing and that the requested records are not for commercial purposes." *Id.*, p. 8.

2.     My primary purpose for seeking the records requested in the FBI FOIA request is to obtain evidence for my defense in United States v. Rigmaiden, CR08-814-PHX-DGC, pending in the District of Arizona. I am representing myself in CR08-814-PHX-DGC and I need the requested records to use as evidence in support of a motion to suppress evidence currently due April 27, 2012. *See* D.Ariz., CR08-814-PHX-DGC, Dkt. #768 (Court order indicating that motion to suppress due on April 27, 2012). I have absolutely no plans to profit from the requested records and they will all be disseminated to the public via the public record in CR08-814-PHX-DGC.

3.     In order to advance public understanding, the requested documents will also be given to my contacts at (1) the American Civil Liberties Union of Northern California (Linda Lye, Staff Attorney) (2) the American Civil Liberties Union of Arizona (Daniel Pochoda, Staff Attorney) and (3) the Electronic Frontier Foundation (Kevin Bankston, Senior Staff Attorney) —all nonprofit entities who have a history of notifying the public about illegal government

<u>DECLARATION UNDER PENALTY OF PERJURY</u>

RE:  Daniel Rigmaiden has no commercial interest in the records requested via FBI FOIA
       request, certified return receipt article No. 7007 0710 0004 3772 8555;
BY:  Daniel David Rigmaiden

---

conduct at no cost.  I will also forward all records to Jennifer Valentino-DeVries at The Wall

Street Journal as they have taken an interest in notifying the public about the specific type of

illegal government conduct discussed in the FBI FOIA request.  Although The Wall Street

Journal is a for-profit newspaper, previous news articles published about CR08-814-PHX-DGC

and the government's use of the Harris StingRay were freely disseminated on the Internet by

The Wall Street Journal. *See* FBI FOIA request letter, certified return receipt article No. 7007

0710 0004 3772 8555.  I will not charge anyone for the documents I am requesting via the FBI

FOIA request.

        4.     Although I plan on providing the requested documents to various entities, I am

not requesting records on behalf of anyone other than myself.  I am not associated with any of

the above entities and they are not aware of my specific FOIA request.  My primary interest is

to obtain evidence for my self-represented defense in CR08-814-PHX-DGC.

        5.     I have neither the resources nor the means to profit from any records provided in

response to the FBI FOIA request.  I am currently incarcerated awaiting trial on CR08-814-

PHX-DGC and am not permitted to conduct commercial activities from within the facility

where I am housed: Corrections Corporation of America, Central Arizona Detention Center.

        6.     I declare, certify, verify, and state under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct to the best of my knowledge,

except as to those matters which are therein stated on information and belief, and, as to those

matters, I believe it to be true.  *See* 28 U.S.C. § 1746 ("Wherever... any matter is required or

permitted to be supported, evidenced, established, or proved by the sworn... affidavit, in writing

## DECLARATION UNDER PENALTY OF PERJURY

RE: Daniel Rigmaiden has no commercial interest in the records requested via FBI FOIA
request, certified return receipt article No. 7007 0710 0004 3772 8555;

BY: Daniel David Rigmaiden

---

of the person making the same [], such matter may, with like force and effect, be supported,

evidenced, established, or proved by the unsworn declaration..., in writing of such person

which is subscribed by him, as true under penalty of perjury, and dated..."); 18 U.S.C. § 1621

("Whoever... in any declaration... under penalty of perjury as permitted under section 1746 of

title 28, United States Code, willfully subscribes as true any material matter which he does not

believe to be true... is guilty of perjury and shall, except as otherwise expressly provided by

law, be fined under this title or imprisoned not more than five years, or both....").


Executed on ___February 22, 2012___ , in Florence, Arizona, United States of America.


Daniel David Rigmaiden


*Daniel Rigmaiden*

Daniel Rigmaiden
Agency # 10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132


- Page # 3 of 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

DANIEL DAVID RIGMAIDEN
    Plaintiff,

          v.

U.S. DEPARTMENT OF JUSTICE, *et. al.*,

    Defendants.

)
)
)
)
)
)
)
)
)
)

Civil Action No. 12-CV-01605-SRB-BSB

# Exhibit F



**U.S. Department of Justice**

Office of Information Policy
*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

APR 17 2012

Mr. Daniel Rigmaiden
Register No. 10966-111
CCA-CADC
Post Office Box 6300
Florence, AZ 85132

Re:    Appeal No. AP-2012-01751
        Request No. 1180900
        JGM:SKV

Dear Mr. Rigmaiden:

This is to advise you that your administrative appeal from the action of the Federal Bureau of Investigation on your request for access to certain records was received in this Office on March 29, 2012. You have appealed from the FBI's denial of your request for a fee waiver and expedited treatment of your request.

In your appeal letter, you assert your request is entitled to expedited treatment pursuant to the third and fourth standards enumerated in the Department of Justice's regulations. Under the third standard, you must show that the request involves "[t]he loss of substantial due process rights." 28 C.F.R. § 16.5(d)(1)(iii). Under the fourth standard, you must show that the subject matter of your request is a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). This Office makes determinations regarding the first three standards, while the Department's Director of Public Affairs makes determinations regarding the fourth standard. See 28 C.F.R. § 16.5(d)(2).

Regarding the third standard, courts have held that requests for expedited treatment for due process reasons generally should not be granted unless a requester shows that he is "facing grave punishment" in a pending criminal proceeding and that "there is a reason to believe that the information produced will aid in the individual's defense." Aguilera v. FBI, 941 F. Supp. 144, 150 (D.D.C. 1996). Based on the information that you have provided, I have determined that you do not meet this test because you have not demonstrated that the information sought will aid in any criminal defense, or that you are facing grave punishment. Without such a showing, expedited treatment pursuant to the third standard is not warranted. Accordingly, the FBI properly denied your request for expedited treatment under the third standard.

The Director of Public Affairs considered your request for expedited processing under the fourth standard and determined that your request should be denied. I agree with the determination of the Director of Public Affairs that expedited treatment of your request is not warranted under this standard because you have failed to sufficiently demonstrate that the subject of your request is "[a] matter of widespread and exceptional media interest in which there exist

**FBI**

possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(d)(1)(iv). Accordingly, the Director of Public Affairs properly determined that you failed to meet your burden under the fourth standard for expedited processing. With regard to your appeal of the FBI's denial of your request for a fee waiver,

Finally, with regard to your request for a fee waiver, I note that the FBI has not yet assessed any fees in this instance so it is currently unknown whether you will accrue fees above the Department's "threshold" of $14.00 -- the amount at or below which, by regulation, no fees are charged to a requester. Further, while I agree with the FBI's decision that your fee waiver request should be denied, I disagree with the basis listed by the FBI for its denial. I have reviewed the administrative record in this matter and find that you have clearly stated in your Declaration dated February 22, 2012, that the primary purpose for your waiver request is your need for the records to defend yourself in a criminal matter 08-cr-814-PHX-DGC. You also indicate that although you intend to give your records to others, you are not requesting records for anyone other than yourself. On the basis of your statements I have concluded that you are the primary beneficiary of any release of records that the FBI may ultimately provide to you, and thus the public interest requirement of the FOIA, also referred to as fee waiver factors one through four, has not been met. (See enclosure). Any benefit from a release must accrue to the general public in accordance with the statutory standard. Nor have you demonstrated that a significant contribution to the public's understanding of FBI's operations will occur as a result of a future releases to you, or demonstrated in any way that you have the capacity to disseminate any such records to the public. Accordingly, your fee waiver is denied on different grounds.

If you are dissatisfied with my action on your appeal for expedited treatment of your request, you may file a lawsuit in accordance with 5 U.S.C. § 552(a)(6)(E)(iii) and with regard to my decision on your fee waiver request, you may file a lawsuit pursuant to § 552(a)(4)(B).

Sincerely,

Janice Galli McLeod
Associate Director

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

DANIEL DAVID RIGMAIDEN       )
     Plaintiff,                )
                                                )
               v.                   )   Civil Action No. 12-CV-01605-SRB-BSB
                                        )
U.S. DEPARTMENT OF JUSTICE, *et. al.*,   )
                                        )
     Defendants.              )

# Exhibit G



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

July 12, 2013

MR. DANIEL DAVID RIGMAIDEN
**10966111
CCA-CADC
POST OFFICE BOX 6300
FLORENCE, AZ 85132

FOIPA Request No.   1180900- 000
Subject: WALL STREET JOURNAL ARTICLE ON
CELL SITE SIMULATOR DEVICES

Dear Mr. Rigmaiden:

The enclosed documents were reviewed under the Freedom of Information/Privacy Acts (FOIPA), Title 5, United States Code, Sections 552/552a.  Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision.  In addition, a deleted page information sheet was inserted in the file to indicate where pages were withheld entirely.  The exemptions used to withhold information are marked below and explained on the enclosed Explanation of Exemptions:

|  | **Section 552** |  |  | **Section 552a** |
|---|---|---|---|---|
| ☐ (b)(1) | ☐ (b)(7)(A) |  | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) |  | ☐ (j)(2) |
| ☐ (b)(3) | ☑ (b)(7)(C) |  | ☐ (k)(1) |
|  | ☐ (b)(7)(D) |  | ☐ (k)(2) |
| _____ | ☑ (b)(7)(E) |  | ☐ (k)(3) |
| _____ | ☐ (b)(7)(F) |  | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) |  | ☐ (k)(5) |
| ☑ (b)(5) | ☐ (b)(9) |  | ☐ (k)(6) |
| ☑ (b)(6) |  |  | ☐ (k)(7) |

**94 page(s)** were reviewed and **94 page(s)** are being released.

☐ Document(s) were located which originated with, or contained information concerning other Government agency(ies) [OGA].   This information has been:

    ☐ referred to the OGA for review and direct response to you.
    ☐ referred to the OGA for consultation.   The FBI will correspond with you regarding this information when the consultation is finished.

In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) [5 U.S.C. § 552 (b)(7)(E)], this response neither confirms nor denies the existence of your subject's name on any watch lists.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.   See 5 U.S.C. § 552(c) (2006 & Supp. IV (2010).   This response is limited to those records that are subject to the requirements of the FOIA.   This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You have the right to appeal any denials in this release.   Appeals should be directed in writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice,1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's eFOIA portal at http://www.justice.gov/oip/efoia-portal.html. Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely. The envelope and the letter should be clearly marked "Freedom of Information Appeal."   Please cite the FOIPA Request Number assigned to your request so that it may be easily identified.

The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation.   Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s).   Our experience has shown when ident, references usually contain information similar to the information processed in the main file(s).   Because of our significant backlog, we have given priority to processing only the main investigative file(s).   If you want the references, you must submit a separate request for them in writing, and they will be reviewed at a later date, as time and resources permit.

Additionally, In response to your Freedom of Information Act (FOIA) request seeking documents related to FBI general counsel Valerie Caproni's appearance on a May, 2011 Brookings Institution panel, we conducted a search of our records and were unable to identify records responsive to the FOIA.   If you have additional information pertaining to the subject that you believe was of investigative interest to the Bureau, please provide us the details and we will conduct an additional search.

Sincerely,

David M. Hardy
Section Chief
Record/Information Dissemination Section
Records Management Division

Enclosure(s): Bates pages WSJCELL-1 through WSJCELL-94

## EXPLANATION OF EXEMPTIONS

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552**

(b)(1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute(A)   requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal  privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could be reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could be reasonably expected to constitute an unwarranted invasion of personal  privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a**

(d)(5)   information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control,   or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual  pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government  service he release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | |
| **Sent:** | Friday, September 16, 2011 6:30 PM |
| **To:** | Sabol, Sherry E. |
| **Subject:** | RE: Wall Street Journal request -- legal status of "stingray" technology |

b5 -1
b6 -1
b7C -1

One addition from OPA as follows. Let me know if you hear back from OTD. Thanks!

---

**From:** Sabol, Sherry E.
**Sent:** Friday, September 16, 2011 6:11 PM
**To:**
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.;
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

OTD-is this good to go?

---

**From:** Sabol, Sherry E.
**To:** Sabol, Sherry E.;
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan,
**Sent:** Fri Sep 16 16:48:15 2011
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

I inadvertently took OPA off the earlier version -- I know they have a deadline of COB today.

---

**From:** Sabol, Sherry E.
**Sent:** Friday, September 16, 2011 4:12 PM
**To:**
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology
**Importance:** High

b5 -1
b7E -1

b5 -1
b7E -1

**From:**
**Sent:** Friday, September 16, 2011 1:49 PM
**To**                          Sabol, Sherry E.
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.
**Subject:** FW: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

See update below. We will need a response by COB today if we are going to contribute to the article.

**From**
**Sent:** Friday, September 16, 2011 1:44 PM
**To**
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

Another update: It looks as though my editors might want to run it out for Monday's paper, which would put my deadline for comment to Sunday at midday. (And today would really be best.)

Thanks!

b6 -1, -2
b7C -1, -2

**From:**
**To**                    (DO)(FBI)
**Sent:** Fri Sep 09 11:22:54 2011
**Subject:** Wall Street Journal request -- legal status of "stingray" technology

Hi.

b6 -1, -2
b7C -1, -2

Thanks so much for helping me out.

I'm                              and am writing about the use of "stingray" type devices, which are used generally to locate or otherwise get data on cellular devices. As an example of the use of this technology, I'm writing about a case in U.S. District Court in the District of Arizona in which the FBI used one of these devices. (It's unclear whether what was used was a stingray, a triggerfish, or something else. The prosecution explains that "stingray" is the generic term used.)

Currently, the judge in the case is set to hear the defendant's motion for disclosure of more information on the device and techniques used; the prosecution says that these matters are law enforcement sensitive.

2

I understand this technology is very sensitive for the FBI; however, I would very much like to get the FBI's views on this technology. I do not want to only quote the ACLU in this matter and would appreciate your help.

Here's what I'm looking for:

**LEGAL INFORMATION**
(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy? Do the instructions vary by region? Things like that.

(2) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

**USAGE INFORMATION**
I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

I'm not on a daily deadline for this story, but I am on a deadline. The story needs to be sent to my editors in the next few days, so I would hope to talk with someone as soon as possible.

Thank you.

Best Regards,

b6 -2
b7C -2

WSJCELL-3

3

**(RMD) (FBI)**

**From:**
**Sent:** Wednesday, September 14, 2011 5:38 PM
**To:** Sabol, Sherry E.
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

Sherry

We have a meeting tomorrow morning here at OTD to draft a response

Associate General Counsel
Unit Chief, Science and Technology Law Unit
Office of the General Counsel
Federal Bureau of Investigation

---

**From:** Sabol, Sherry E.
**To**
**Cc** ; Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.
**Sent:** Wed Sep 14 14:32:31 2011
**Subject:** FW: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

All,

Please see the below request from the Wall Street Journal. A reporter is inquiring about our tracking technology based on the ongoing case in the District of Arizona.

b5 -1

Thanks, Sherry

---

**From**
**To** (DO)(FBI)
**Sent:** Fri Sep 09 11:22:54 2011
**Subject:** Wall Street Journal request -- legal status of "stingray" technology

b6 -1, -2
b7C -1, -2

Hi.

Thanks so much for helping me out.

I'm and am writing about the use of "stingray" type devices, which are used generally to locate or otherwise get data on cellular devices. As an example of the use of this technology, I'm writing about a case in U.S. District Court in the District of Arizona in which the FBI used one of these devices. (It's unclear whether what was used was a stingray, a triggerfish, or something else. The prosecution explains that "stingray" is the generic term used.)

Currently, the judge in the case is set to hear the defendant's motion for disclosure of more information on the device and techniques used; the prosecution says that these matters are law enforcement sensitive.

I understand this technology is very sensitive for the FBI; however, I would very much like to get the FBI's views on this technology. I do not want to only quote the ACLU in this matter and would appreciate your help.

Here's what I'm looking for:

**LEGAL INFORMATION**
(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy? Do the instructions vary by region? Things like that.

(2) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

**USAGE INFORMATION**
I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

I'm not on a daily deadline for this story, but I am on a deadline. The story needs to be sent to my editors in the next few days, so I would hope to talk with someone as soon as possible.

Thank you.

Best Regards,

b6 -2
b7C -2

WSJCELL-5

2

**(RMD) (FBI)**

| | |
|---|---|
| From: | |
| Sent: | Monday, September 12, 2011 11:09 AM |
| To: | Lammert, Elaine N.; Sabol, Sherry E. |
| Cc: | Caproni, Valerie E. |
| Subject: | RE: Wall Street Journal request -- legal status of "stingray" technology |

b5 -1
b6 -1
b7C -1

Good morning SC Sabol and DGC Lammert. Per GC Caproni's email below, I wonder if you might have thoughts on the following

Thanks,

*FBI Office of Public Affairs*

---

From: Caproni, Valerie E.
Sent: Monday, September 12, 2011 9:31 AM
To:
Cc: Lammert, Elaine N.; Sabol, Sherry E.
Subject: RE: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1

I think Sherry or Elaine can help.

VC

---

From:
Sent: Monday, September 12, 2011 9:12 AM
To: Caproni, Valerie E.
Subject: FW: Wall Street Journal request -- legal status of "stingray" technology

Good morning Ms. Caproni. I wonder if you may be able to look at one more media inquiry? For old times' sake perhaps? Or else maybe point me in the right direction? Specific questions are listed below.

Many thanks,

b6 -1
b7C -1

---

From                   (DO)(FBI)
Sent: Friday, September 09, 2011 11:55 AM
To:
Subject: Fw: Wall Street Journal request -- legal status of "stingray" technology

Do you want to handle this? Looks like a legal issue.

WSJCELL-6

---

From:
To:                  (DO)(FBI)

b6 -2
b7C -2

1

**Sent:** Fri Sep 09 11:22:54 2011
**Subject:** Wall Street Journal request -- legal status of "stingray" technology

HI.

Thanks so much for helping me out.

b6 -2
b7C -2

I'm _____ and am writing about the use of "stingray" type devices, which are used generally to locate or otherwise get data on cellular devices. As an example of the use of this technology, I'm writing about a case in U.S. District Court in the District of Arizona in which the FBI used one of these devices. (It's unclear whether what was used was a stingray, a triggerfish, or something else. The prosecution explains that "stingray" is the generic term used.)

Currently, the judge in the case is set to hear the defendant's motion for disclosure of more information on the device and techniques used; the prosecution says that these matters are law enforcement sensitive.

I understand this technology is very sensitive for the FBI; however, I would very much like to get the FBI's views on this technology. I do not want to only quote the ACLU in this matter and would appreciate your help.

Here's what I'm looking for:

**LEGAL INFORMATION**
(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy? Do the instructions vary by region? Things like that.

(2) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

**USAGE INFORMATION**
I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

I'm not on a daily deadline for this story, but I am on a deadline. The story needs to be sent to my editors in the next few days, so I would hope to talk with someone as soon as possible.

Thank you.

Best Regards,

b6 -2
b7C -2

WSJCELL-7

2

**(RMD) (FBI)**

From:
Sent:          Wednesday, September 21, 2011 3:43 PM
To:
Cc:            Sabol, Sherry E.
Subject:       RE: WSJ fact check

Got it. Thank you. Fowarding to my editors now.                    b6 -1,-2
                                                                   b7C -1, -2

From:
Sent: Wednesday, September 21, 2011 3:39 PM
To:                                                                b6 -1, -2
Cc: Sabol, Sherry E.                                               b7C -1, -2
Subject: RE: WSJ fact check

        Thanks for all your patience. Please see our comments in red below, and advise of any additional questions. Also, as we discussed, you may consider using a named source rather than "FBI official."

General Comment: Please note FBI will not comment on the capabilities or functionality of equipment or on ongoing litigation.

From
Sent: Tuesday, September 20, 2011 11:57 PM
To: Sabol, Sherry E.;
Subject: WSJ fact check
Importance: High

Hi Chris and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.                                        b6 -1, -2
                                                                   b7C -1, -2

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

Best,

                                      WSJCELL-8


                                        1

* Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

FBI is concerned the first sentence (bullet above) is misleading. While the equipment may be used without a warrant, it is used only pursuant to lawful authority – court order issued pursuant to the Pen Register Statute and section 2703(d) of the Stored Communications Act.

* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

The FBI believes the second sentence is misleading. The FBI uses this equipment pursuant to lawful authority – whether it be a search warrant or a court order issued pursuant to the Pen Register Statute and Stored Communications Act.

* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

The FBI disagrees with the characterization of the technology being "so secret" – as noted previously, the FBI considers the equipment Law Enforcement Sensitive and our policy is intended to protect law enforcement capabilities so that subjects of law enforcement investigations do not learn how to evade or defeat lawfully authorized investigative activity.

* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding ... this equipment is disclosed, it can be subject to being defeated or avoided or detected."

* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

\* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

Where the hybrid order is required, the standard cited is accurate for the Pen Register.  Section 2703(d), however, requires that the information sought is "relevant and material" to an ongoing investigation. Also, from legal perspective, a pen register may be used because the subject does not have a "reasonable expectation of privacy" in the information sought. Pen register information is provided by the subject to a third party in order for the equipment to work, ie, the phone company.

\* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

\* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

\* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

\* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

\* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

\* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably, so)."

b6 -2
b7C -2

WSJCELL-10

3

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | |
| **Sent:** | Wednesday, September 21, 2011 5:12 PM |
| **To:** | |
| **Cc:** | Sabol, Sherry E. |
| **Subject:** | final |

b6 -1, -2
b7C -1, -2

OK, here's what we worked out. I think it addresses your concerns, albeit not in legal language.

We have a "no surprises" policy toward subjects in our articles, so I'm mainly sending this to make sure we are all on the same page in terms of what is going to be in the paper tomorrow.

Thank you for being so incredibly helpful. I think your comments have really made the article more balanced.

Best Regards,

**\* The Federal Bureau of Investigation considers the devices to be so critical that it has a policy of deleting the data gathered in their use, mainly to keep suspects in the dark about their capabilities, an FBI official told The Wall Street Journal in response to inquiries.**

**\* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says it obtains appropriate court approval to use the device.**
**\* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a search warrant. (Those two paragraphs come one right after the other, so we are not going to repeat the same phrase.)**

**\* To get a pen-register order, investigators don't have to show probable cause. The Supreme Court has ruled that use of a pen register doesn't require a search warrant because it doesn't involve interception of conversations. (Just took out all the technical legal requirements because it was going to get so confusing for our readers with the 2703(d) stuff and so forth.)**

b6 -2
b7C -2

WSJCELL-11

1

b6 -1, -2,
b7C -1, -2

**From:**
**Sent:** Wednesday, September 21, 2011 3:39 PM
**To:**
**Cc:** Sabol, Sherry E.
**Subject:** RE: WSJ fact check

b6 -1, -2
b7C -1, -2

Thanks for all your patience. Please see our comments in red below, and advise of any additional questions. Also, as we discussed, you may consider using a named source rather than "FBI official."

General Comment: Please note FBI will not comment on the capabilities or functionality of equipment or on ongoing litigation.

**From:**
**Sent:** Tuesday, September 20, 2011 11:57 PM
**To:** Sabol, Sherry E.;
**Subject:** WSJ fact check
**Importance:** High

H          and Sherry,

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

b6 -2
b7C -2

Best,

* Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

WSJCELL-12

FBI is concerned the first sentence (bullet above) is misleading. While the equipment may be used without a warrant, it is used only pursuant to lawful authority – court order issued pursuant to the Pen Register Statute and section 2703(d) of the Stored Communications Act.

* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

The FBI believes the second sentence is misleading. The FBI uses this equipment pursuant to lawful authority – whether it be a search warrant or a court order issued pursuant to the Pen Register Statute and Stored Communications Act.

* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

The FBI disagrees with the characterization of the technology being "so secret" – as noted previously, the FBI considers the equipment Law Enforcement Sensitive and our policy is intended to protect law enforcement capabilities so that subjects of law enforcement investigations do not learn how to evade or defeat lawfully authorized investigative activity.

* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding … this equipment is disclosed, it can be subject to being defeated or avoided or detected."

* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

Where the hybrid order is required, the standard cited is accurate for the Pen Register. Section 2703(d), however, requires that the information sought is "relevant and material" to an ongoing investigation. Also, from legal perspective, a pen register may be used because the subject does not have a "reasonable expectation of privacy" in the information sought. Pen register information is provided by the subject to a third party in order for the equipment to work, ie, the phone company.

WSJCELL-13

* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a

3

phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably so)."

b6 -2
b7C -2

WSJCELL-14

**RMD) (FBI)**

From:
Sent:                    Wednesday, September 21, 2011 3:22 PM
To:                      Sabol, Sherry E.
Subject:                 Fw: WSJ fact check

```
b5 -1
b6 -1, -2
b7C -1, -2
```

Sent from my BlackBerry Wireless Handheld

From:
To:
Sent: Wed Sep 21 15:17:34 2011
Subject: RE: WSJ fact check

Yes. Thank you.

Also! We have changed at least one of the sentences that I know of to try to make it clearer that it's law enforcement techniques you are trying to protect, not the specific device.

   Stingrays are designed to locate a mobile phone even when it's not being used to make a call. The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather, out of a desire to keep its tactics under wraps, an FBI official told The Wall Street Journal in response to inquiries.

```
b6 -1, -2
b7C -1, -2
```

From:
Sent: Wednesday, September 21, 2011 3:08 PM
To:
Subject: Re: WSJ fact check

[        ] I should have your response within 30 minutes. Is that okay?

Sent from my BlackBerry Wireless Handheld

From:
To: Sabol, Sherry E.;
Sent: Tue Sep 20 23:56:57 2011
Subject: WSJ fact check

```
b6 -1, -2
b7C -1, -2
```

H[    ]and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday, although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

Best,

b6 -2
b7C -2

* Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding … this equipment is disclosed, it can be subject to being defeated or avoided or detected."

* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

WSJCELL-16

* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at

a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably so)."

b6 -2
b7C -2

WSJCELL-17

3

(RMD) (FBI)

| | | |
|---|---|---|
| **From:** | | |
| **Sent:** | Wednesday, September 21, 2011 8:13 AM | b5 -1 |
| **To:** | Sabol, Sherry E. | b6 -1, -2 |
| **Subject:** | RE: WSJ fact check | b7C -1, -2 |

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 7:39 AM
**To:** Hess, Amy S.; Bryars, D Keith
**Cc:**
**Subject:** Fw: WSJ fact check
**Importance:** High

WSJ asked us to fact check certain statements.

b5 -1
b6 -1, -2
b7C -1, -2

III look at rest again in office.

They need an answer by mid-day.

**From:**
**To:** Sabol, Sherry E.; Allen
**Sent:** Tue Sep 20 23:56:57 2011
**Subject:** WSJ fact check

H[    ]and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll **need a response for my editors by midday** although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

b5 -1
b6 -1, -2
b7C -1, -2

Best,

WSJCELL-18

• Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding … this equipment is disclosed, it can be subject to being defeated or avoided or detected."

* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

WSJCELL-19

2

* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably so)."

b6 -2
b7C -2

WSJCELL-20

3

_____ (RMD) (FBI)

| | |
|---|---|
| **From:** | Hess, Amy S. |
| **Sent:** | Wednesday, September 21, 2011 10:55 AM |
| **To:** | Sabol, Sherry E.; Bryars, D Keith _____ |
| **Subject:** | Re: WSJ fact check |

b5 -1
b6 -1, -2
b7C -1, -2

**From:** Sabol, Sherry E.
**To:** Hess, Amy S.; Bryars, D Keith
**Cc:**
**Sent:** Wed Sep 21 07:38:43 2011
**Subject:** Fw: WSJ fact check

b5 -1
b6 -1, -2
b7C -1, -2

WSJ asked us to fact check certain statements.

Ill look at rest again in office.

They need an answer by mid-day.

**From** _____
**To:** Sabol, Sherry E.
**Sent:** Tue Sep 20 23:56:57 2011
**Subject:** WSJ fact check

H_____ and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll **need a response for my editors by midday**, although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

b6 -1, -2
b7C -1, -2

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

Best,

_____

* Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

WSJCELL-21

1

\* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

\* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

\* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

\* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

\* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

\* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

\* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding … this equipment is disclosed, it can be subject to being defeated or avoided or detected."

\* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

\* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

\* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

\* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

\* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

\* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

WSJCELL-22

2

\* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

\* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

\* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

\* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

\* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably so)."

b6 -2
b7C -2

WSJCELL-23

3

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | Sabol, Sherry E. |
| **Sent:** | Wednesday, September 21, 2011 11:12 AM |
| **To:** | Sabol, Sherry E.; Bryars, D Keith; DiClemente, Anthony P. |
| **Cc:** | Hess, Amy S. |
| **Subject:** | RE: WSJ fact check |

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 11:10 AM
**To:** Bryars, D Keith; DiClemente, Anthony P.;
**Cc:** Hess, Amy S.
**Subject:** RE: WSJ fact check

b5 -1
b6 -1, -2
b7C -1, -2

Thanks!

**From:**
**Sent:** Tuesday, September 20, 2011 11:57 PM
**To:** Sabol, Sherry E.;
**Subject:** WSJ fact check
**Importance:** High

b6 -1, -2
b7C -1, -2

H        and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a **response for my editors by midday** although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

Best,

b6 -2
b7C -2

b5 -1

WSJCELL-24

1

WSJCELL-25

b5 -1

b6 -2
b7C -2

WSJCELL-26

3

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | DiClemente, Anthony P. |
| **Sent:** | Wednesday, September 21, 2011 11:17 AM |
| **To:** | Sabol, Sherry E.; Bryars, D Keith; |
| **Cc:** | Hess, Amy S. |
| **Subject:** | Re: WSJ fact check |

b6 -1,-2
b7C -1,-2
b5 -1

Anthony DiClemente

Chief                            Section
Operational Technology Division
Federal Bureau of Investigation

b7E -1

**From:** Sabol, Sherry E.
**To:** Bryars, D Keith; DiClemente, Anthony P.;
**Cc:** Hess, Amy S.
**Sent:** Wed Sep 21 11:09:37 2011
**Subject:** RE: WSJ fact check

b5 -1
b6 -1, -2
b7C -1, -2

Thanks!

**From:**
**Sent:** Tuesday, September 20, 2011 11:57 PM
**To:** Sabol, Sherry E.;
**Subject:** WSJ fact check
**Importance:** High

b6 -1,-2
b7C -1,-2

H        and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

WSJCELL-27

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

1

I would appreciate it if you could tell me that you received this email.

Best,

```
b5 -1
b6 -1,-2
b7C -1,-2
```

WSJCELL-28

b5 -1

WSJCELL-29

b6 -1,-2
b7C -1,-2

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | DiClemente, Anthony P. |
| **Sent:** | Wednesday, September 21, 2011 11:22 AM |
| **To:** | Sabol, Sherry E.; Bryars, D Keith; |
| **Cc:** | Hess, Amy S. |
| **Subject:** | Re: WSJ fact check |

b5 -1
b6 -1,-2
b7C -1,-2

Anthony DiClemente
Chief             Section
Operational Technology Division
Federal Bureau of Investigation
            Office
            Mobile

b7E -1

**From:** Sabol, Sherry E.
**To:** Sabol, Sherry E.; Bryars, D Keith; DiClemente, Anthony P.
**Cc:** Hess, Amy S.
**Sent:** Wed Sep 21 11:12:07 2011
**Subject:** RE: WSJ fact check

b5 -1
b6 -1, -2
b7C -1, -2

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 11:10 AM
**To:** Bryars, D Keith; DiClemente, Anthony P.
**Cc:** Hess, Amy S.
**Subject:** RE: WSJ fact check

Thanks!

b6 -1, -2
b7C -1, -2
b5 -1

**From:**
**Sent:** Tuesday, September 20, 2011 11:57 PM
**To:** Sabol, Sherry E.;
**Subject:** WSJ fact check
**Importance:** High

H        and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

1

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

Best,

b5 −1
b6 −1, −2
b7C −1, −2

WSJCELL-31

2

b5 -1

WSJCELL-32

b6  -2
b7C -2

WSJCELL-33

4

**(RMD) (FBI)**

| | | |
|---|---|---|
| **From:** | | |
| **Sent:** | Wednesday, September 21, 2011 11:23 AM | b5 -1 |
| **To:** | Hess, Amy S.; Sabol, Sherry E.; Bryars, D Keith | b6 -1 |
| **Subject:** | Re: WSJ fact check | b7C -1 |

Sent from my BlackBerry Wireless Handheld

---

**From:** Hess, Amy S.
**To:** Sabol, Sherry E.; Bryars, D Keith;
**Sent:** Wed Sep 21 10:55:09 2011
**Subject:** Re: WSJ fact check

---

**From:** Sabol, Sherry E.                                                   b5 -1
**To:** Hess, Amy S.; Bryars, D Keith                                        b6 -1
**Cc:**                                                                       b7C -1
**Sent:** Wed Sep 21 07:38:43 2011
**Subject:** Fw: WSJ fact check

WSJ asked us to fact check certain statements.

Ill look at rest again in office.                                           b6 -1, -2
                                                                             b7C -1, -2
They need an answer by mid-day.                                             b5 -1

---

**From**
**To:** Sabol, Sherry E.;
**Sent:** Tue Sep 20 23:56:57 2011
**Subject:** WSJ fact check

Hi          and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you. I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

1

Best,

b6 -2
b7C -2

* Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding … this equipment is disclosed, it can be subject to being defeated or avoided or detected."

* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

WSJCELL-35

* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably so)."

b6 -2
b7C -2

**(RMD) (FBI)**

**From:**
**Sent:** Wednesday, September 21, 2011 11:51 AM
**To:** Sabol, Sherry E.
**Subject:** Re: WSJ fact check

Thx!
Blackberry Message

```
b5 -1
b6 -1
b7C -1
```

**From:** Sabol, Sherry E.
**To:** DiClemente, Anthony P
**Sent:** Wed Sep 21 11:49:50 2011
**Subject:** FW: WSJ fact check

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 11:49 AM
**To**
**Cc:** Hess, Amy S.; Bryars, D Keith
**Subject:** RE: WSJ fact check

```
b5 -1
b6 -1, -2
b7C -1, -2
```

**From**
**Sent:** Tuesday, September 20, 2011 11:57 PM
**To:** Sabol, Sherry E.;
**Subject:** WSJ fact check
**Importance:** High

H[    ]and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a **response for my editors by midday** although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

```
b6 -2
b7C -2
```

I would appreciate it if you could tell me that you received this email.

Best,

WSJCELL-37

1

b5 -1

WSJCELL-38

b5 -1

b6 -2
b7C -2

WSJCELL-39

3

b6 -1
b7C -1

[        ] (RMD) (FBI)

**From:** DiClemente, Anthony P.
**Sent:** Wednesday, September 21, 2011 11:57 AM
**To:** Sabol, Sherry E.
**Subject:** Re: WSJ fact check

Thanks Sherry.

Anthony DiClemente
Chief [        ] Section
Operational Technology Division
Federal Bureau of Investigation
[        ] Office
[        ] Mobile

b7E -1

---

**From:** Sabol, Sherry E.
**To:** DiClemente, Anthony P.; Struyk, James L.; Mazel, Joseph W.; King, John E.
**Sent:** Wed Sep 21 11:49:50 2011
**Subject:** FW: WSJ fact check

---

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 11:49 AM
**To** [        ]
**Cc:** Hess, Amy S.; Bryars, D Keith
**Subject:** RE: WSJ fact check

b5 -1
b6 -1, -2
b7C -1, -2

Sherry.

---

**From:** [        ]
**Sent:** Tuesday, September 20, 2011 11:57 PM
**To:** Sabol, Sherry E. [        ]
**Subject:** WSJ fact check
**Importance:** High

H [        ] and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

WSJCELL-40

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

1

I would appreciate it if you could tell me that you received this email.

Best,

b5 -1
b6 -1, -2
b7C -1, -2

WSJCELL-41

2

b5 -1

WSJCELL-42

b6 -2
b7C -2

3

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | |
| **Sent:** | Wednesday, September 21, 2011 12:03 PM |
| **To:** | Sabol, Sherry E.; DiClemente, Anthony P. |
| **Cc:** | |
| **Subject:** | RE: WSJ fact check |

b6 -1
b7C -1

Sherry-

Here's my thoughts:

WSJCELL-43

b5 -1
b6 -1
b7C -1

1

Assistant General Counsel
Science & Technology Law Unit
Federal Bureau of Investigation
Offi
BB:
E-Mail

b6 -1
b7C -1

**THIS COMMUNICATION MAY CONTAIN PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT AND ATTORNEY WORK PRODUCT MATERIAL.
DO NOT DISCLOSE WITHOUT PRIOR PERMISSION FROM FBI OGC.**

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 10:16 AM
**To:** DiClemente, Anthony P.
**Cc:**
**Subject:** Fw: WSJ fact check

Please take a look at this and get me your thoughts/comments asap.

**From:** Hess, Amy S.
**To:** Sabol, Sherry E.; Bryars, D Keith
**Cc:**
**Sent:** Wed Sep 21 10:11:25 2011
**Subject:** Re: WSJ fact check

**From:** Sabol, Sherry E.
**To:** Hess, Amy S.; Bryars, D Keith
**Cc:**
**Sent:** Wed Sep 21 07:58:43 2011
**Subject:** Fw: WSJ fact check

b5 -1
b6 -1
b7C -1

WSJ asked us to fact check certain statements.

Ill look at rest again in office.

They need an answer by mid-day.

**From:**
**To:** Sabol, Sherry E.
**Sent:** Tue Sep 20 23:56:57 2011
**Subject:** WSJ fact check

b6 -1, -2
b7C -1, -2

H    and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

2

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything; when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

Best,

b6 -2
b7C -2

* Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding … this equipment is disclosed, it can be subject to being defeated or avoided or detected."

* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

3

* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably so)."

b6 -2
b7C -2

WSJCELL-46

(RMD) (FBI)

**From:**
**Sent:** Wednesday, September 21, 2011 12:14 PM
**To:** Sabol, Sherry E.; DiClemente, Anthony P.;      b5 -1
**Cc:**      b6 -1
**Subject:** Re: WSJ fact check      b7C -1

Associate General Counsel
Unit Chief, Science and Technology Law Unit
Office of the General Counsel
Federal Bureau of Investigation

**From:**
**To:** Sabol, Sherry E.; DiClemente, Anthony P.;
**Cc:**
**Sent:** Wed Sep 21 12:02:57 2011
**Subject:** RE: WSJ fact check

Sherry-      b5 -1
     b6 -1
Here's my thoughts:      b7C -1

WSJCELL-47

1

b5 -1
b6 -1
b7C -1

Assistant General Counsel
Science & Technology Law Unit
Federal Bureau of Investigation
Offic
BB:
E-M

**THIS COMMUNICATION MAY CONTAIN PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT AND ATTORNEY WORK PRODUCT MATERIAL. DO NOT DISCLOSE WITHOUT PRIOR PERMISSION FROM FBI OGC.**

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 10:16 AM
**To:** DiClemente, Anthony P.;
**Cc**
**Subject:** Fw: WSJ fact check

b5 -1
b6 -1
b7C -1

Please take a look at this and get me your thoughts/comments asap.

**From:** Hess, Amy S.
**To:** Sabol, Sherry E.; Bryars, D Keith
**Cc**
**Sent:** Wed Sep 21 10:11:25 2011
**Subject:** Re: WSJ fact check

**From:** Sabol, Sherry E.
**To:** Hess, Amy S.; Bryars, D Keith
**Cc**
**Sent:** Wed Sep 21 07:38:43 2011
**Subject:** Fw: WSJ fact check

b5 -1
b6 -1
b7C -1

WSJ asked us to fact check certain statements.

WSJCELL-48

Ill look at rest again in office.

They need an answer by mid-day.

**From:**
**To:** Sabol, Sherry E.;
**Sent:** Tue Sep 20 23:56:57 2011
**Subject:** WSJ fact check

b6 -1, 2
b7C -1, 2

and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a **response for my editors by midday** although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included merely to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

Best,

b6 -2
b7C -2

* Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding ... this equipment is disclosed, it can be subject to being defeated or avoided or detected."

WSJCELL-49

3

* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably so)."

b6 -2
b7C -2

**(RMD) (FBI)**

**From:**
**Sent:** Wednesday, September 21, 2011 12:17 PM
**To:** Sabol, Sherry E.
**Cc:** Hess, Amy S.; Bryars, D Keith
**Subject:** Re: WSJ fact check

b5 −1
b6 −1
b7C −1

Sent from my BlackBerry Wireless Handheld

From: Sabol, Sherry E.
To:
Cc: Hess, Amy S.; Bryars, D Keith;
Sent: Wed Sep 21 11:56:59 2011
Subject: Re: WSJ fact check

From: Sabol, Sherry E.
To:
Cc: Hess, Amy S.; Bryars, D Keith
Sent: Wed Sep 21 11:48:47 2011
Subject: RE: WSJ fact check

b5 −1
b6 −1
b7C −1

Sherry.

From:
Sent: Tuesday, September 20, 2011 11:57 PM
To: Sabol, Sherry E.
Subject: WSJ fact check
Importance: High

b6 −1, −2
b7C −1, −2

Hi          and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

1

Best,

b6 -2
b7C -2

b5 -1

WSJCELL-52

b5 -1

b6 -2
b7C -2

WSJCELL-53

3

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | Sabol, Sherry E. |
| **Sent:** | Wednesday, September 21, 2011 2:10 PM |
| **To:** | Sabol, Sherry E. |
| **Cc:** | |
| **Subject:** | RE: WSJ fact check |

b5 -1
b6 -1
b7C -1

Thanks,

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 2:00 PM
**To:**
**Cc:**
**Subject:** RE: WSJ fact check

b5 -1
b6 -1
b7C -1

**From:**
**Sent:** Wednesday, September 21, 2011 12:03 PM
**To:** Sabol, Sherry E.
**Cc:**
**Subject:** FW: WSJ fact check

Sherry-

Assistant General Counsel
Science & Technology Law Unit
Federal Bureau of Investigation
Offic
BB:
E-Ma

b5 -1
b6 -1
b7C -1

**THIS COMMUNICATION MAY CONTAIN PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT AND ATTORNEY WORK PRODUCT MATERIAL. DO NOT DISCLOSE WITHOUT PRIOR PERMISSION FROM FBI OGC.**

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 11:49 AM
**To:** DiClemente, Anthony P.;
**Subject:** FW: WSJ fact check

WSJCELL-54

1

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 11:49 AM
**To:**
**Cc:** Hess, Amy S.; Bryars, D Keith
**Subject:** RE: WSJ fact check

Sherry.

b5 -1
b6 -1, -2
b7C -1, -2

**From:**
**Sent:** Tuesday, September 20, 2011 11:57 PM
**To:** Sabol, Sherry E.;
**Subject:** WSJ fact check
**Importance:** High

H          and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a **response for my editors by midday** although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

Best,

b5 -1
b6 -2
b7C -2

WSJCELL-55

2

b5 -1

WSJCELL-56

3

b5 -1

b6 -2
b7C -2

WSJCELL-57

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | |
| **Sent:** | Wednesday, September 21, 2011 3:04 PM |
| **To:** | Sabol, Sherry E. |
| **Subject:** | Re: WSJ fact check |

b5 -1
b6 -1
b7C -1

Sent from my BlackBerry Wireless Handheld

**From:** Sabol, Sherry E.
**To**
**Sent:** Wed Sep 21 14:01:41 2011
**Subject:** Re: WSJ fact check

**From**
**To:** Sabol, Sherry E.
**Sent:** Wed Sep 21 13:17:36 2011
**Subject:** FW: WSJ fact check

b5 -1
b6 -1
b7C -1

**From**
**Sent:** Wednesday, September 21, 2011 12:14 PM
**To**          Sabol, Sherry E.; DiClemente, Anthony P.;
**Cc**
**Subject:** Re: WSJ fact check

Associate General Counsel
Unit Chief, Science and Technology Law Unit
Office of the General Counsel
Federal Bureau of Investigation

**From**
**To:** Sabol, Sherry E.; DiClemente, Anthony P.
**Cc**
**Sent:** Wed Sep 21 12:02:57 2011
**Subject:** RE: WSJ fact check

b5 -1
b6 -1
b7C -1

Sherry-

Here's my thoughts:

WSJCELL-58

1

b5 -1

Assistant General Counsel
Science & Technology Law Unit
Federal Bureau of Investigation
Office
BB: (
E-Mai

b6 -1
b7C -1

**THIS COMMUNICATION MAY CONTAIN PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT AND ATTORNEY WORK PRODUCT MATERIAL. DO NOT DISCLOSE WITHOUT PRIOR PERMISSION FROM FBI OGC.**

WSJCELL-59

**From:** Sabol, Sherry E.
**Sent:** Wednesday, September 21, 2011 10:16 AM

2

**To:** DiClemente, Anthony P.;
**Cc**
**Subject:** FW: WSJ fact check

Please take a look at this and get me your thoughts/comments asap.

b5 -1
b6 -1
b7C -1

**From:** Hess, Amy S.
**To:** Sabol, Sherry E.; Bryars, D Keith
**Cc:**
**Sent:** Wed Sep 21 10:11:25 2011
**Subject:** Re: WSJ fact check

**From:** Sabol, Sherry E.
**To:** Hess, Amy S.; Bryars, D Keith
**Cc**
**Sent:** Wed Sep 21 07:38:43 2011
**Subject:** Fw: WSJ fact check

WSJ asked us to fact check certain statements.

b5 -1
b6 -1, -2
b7C -1, -2

I'll look at rest again in office.

They need an answer by mid-day.

**From**
**To:** Sabol, Sherry E.
**Sent:** Tue Sep 20 23:56:57 2011
**Subject:** WSJ fact check

Hi          and Sherry.

Below are sentences and paragraphs from the story, which is set to run in Thursday's paper. Please let me know if you are aware of any factual errors in any of them. I'll need a response for my editors by midday although we will have a bit of time after that to go back and forth. Sometimes the best thing to do is let me know early on which statements have problems so we can work it out, but it's up to you.

(Some items you may not have adequate information on, like very general statements, or statements about the specifics of the Arizona case. These are included mainly to provide you with context. We don't like subjects of stories to be surprised by anything when the story runs. If you feel you don't have enough information to evaluate a statement, just say so. Not a problem.)

Thanks so much for your help, again. I realize this is very sensitive and an important tool for you; I also feel like people have a lot of questions about this general topic and I want to make sure I present everything as accurately as possible.

I would appreciate it if you could tell me that you received this email.

b6 -2
b7C -2

Best,

WSJCELL-60

3

* Stingrays are designed to locate a mobile phone even when it's not being used to make a call.

* A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It allows the stingray operator to ping a phone and find it if it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

* Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a warrant. The technologies are driving a broad Constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

* A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says no warrant is required and that standards vary depending on the state and district.

* The devices are so secret that the Federal Bureau of Investigation has a policy of deleting the data they gather out of a desire to keep the technology under wraps, an FBI official told The Wall Street Journal in response to inquiries about the device.

* In Thursday's hearing, the government will argue that it should be able to withhold information on precisely what tool was used to locate Mr. Rigmaiden, according to documents filed by the prosecution.

* The FBI says information on stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."

* The prosecutor, Mr. Battista, told the judge that the government's concern is that "if the actual information regarding ... this equipment is disclosed, it can be subject to being defeated or avoided or detected."

* In the case of the alleged hacker, Mr. Rigmaiden, the government faces the task of prosecuting him without disclosing details about the device it used to locate him.

* The government says "stingray" is a generic term, and in Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

* "Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels," an FBI official told the Journal.

* FBI and Department of Justice officials have said that investigators don't need to get search warrants to use stingray devices. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel discussion at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers" that require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

* To get a pen-register order, investigators must show only that the information likely to be obtained is "relevant to an ongoing criminal investigation." The Supreme Court has ruled that use of a pen register doesn't require a search warrant, because it doesn't involve interception of conversations.

* But with cellphones, data sent in real time includes location information, making the situation more complicated, because some judges have found that location information is more intrusive than data on the numbers dialed by a phone. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

WSJCELL-61

* The FBI advises agents to work with the local federal prosecutors to conform to the legal requirements of their particular district, an FBI official said. He added that it is FBI policy to obtain a search warrant if the FBI believes

technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

* Experts say lawmakers and the courts haven't yet settled whether locating a person or device in a home constitutes a "search" that requires a warrant.

* The FBI told the Journal that "with regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation."

* The FBI allows this policy because information gathered in these operations "is intended to be used only as lead information to assist investigators in identifying the general location of their subject and is not intended to be used as substantive evidence in a case," the official said.

* In the Rigmaiden case, the investigators used the stingray to narrow down the location of the broadband card. One of the Phoenix federal agents then said in a July 2008 email that the team needed "to develop independent probable cause" and that the "FBI does not want to disclose the [redacted] (understandably so)."

b6 -2
b7C -2

WSJCELL-62

5

**(RMD) (FBI)**

| | |
|---|---|
| From: | DiClemente, Anthony P. |
| Sent: | Saturday, September 17, 2011 4:26 PM |
| To: | Sabol, Sherry E. |
| Subject: | Fw: Wall Street Journal request -- legal status of "stingray" technology. |

FYI - I'll call you.

Anthony DiClemente
Chief, [          ] Section
Operational Technology Division
Federal Bureau of Investigation

b6 -1
b7C -1
b7E -1

---

**From:** Bryars, D Keith
**To:** DiClemente, Anthony P.; Hess, Amy S.
**Sent:** Sat Sep 17 16:16:37 2011
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

Thanks Tony.



D. Keith Bryars
A/Deputy Assistant Director
Operational Technology Division
Innovation*Technology*Collaboration

---

**From:** DiClemente, Anthony P.
**To:** Hess, Amy S.; Bryars, D Keith
**Sent:** Sat Sep 17 15:44:16 2011
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

Amy/Keith,

Regards,

b5 -1
b6 -1
b7C -1
b7E -1

Anthony DiClemente
Chief, [          ] Section
Operational Technology Division
Federal Bureau of Investigation

---

**From:** DiClemente, Anthony P.
**To:** Hess, Amy S.; Bryars, D Keith
**Sent:** Sat Sep 17 14:36:27 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

WSJCELL-63

1

Anthony DiClemente
Chief [          ] Section
Operational Technology Division
Federal Bureau of Investigation

b5 -1
b6 -1
b7C -1
b7E -1

**From:** Sabol, Sherry E.
**To:** DiClemente, Anthony P.
**Sent:** Sat Sep 17 14:23:18 2011
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

**From:** DiClemente, Anthony P.
**To:** DiClemente, Anthony P.; Sabol, Sherry E.; Hess, Amy S. [          ]; Bryars, D Keith
**Sent:** Sat Sep 17 14:19:03 2011
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

WSJCELL-64

b7E -1

Anthony DiClemente
Chief [          ] Section
Operational Technology Division

Federal Bureau of Investigation

**From:** DiClemente, Anthony P.
**Sent:** Saturday, September 17, 2011 1:16 PM
**To:** Sabol, Sherry E.; Hess, Amy S. [ ] Bryars, D Keith
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1
b7E -1

Anthony DiClemente
Chief [ ] Section
Operational Technology Division
Federal Bureau of Investigation

**From:** Hess, Amy S.
**Sent:** Saturday, September 17, 2011 9:53 AM
**To:** [ ] DiClemente, Anthony P.
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1
b7E -1

WSJCELL-65

3

**From:** Bryars, D Keith
**To:** Hess, Amy S.
**Sent:** Sat Sep 17 06:16:30 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

Amy,

Thanks, Keith

b5 -1
b7E -1

D. Keith Bryars
A/Deputy Assistant Director
Operational Technology Division
Innovation*Technology*Collaboration

---

**From:** Sabol, Sherry E.
**To:** Bryars, D Keith
**Sent:** Fri Sep 16 23:49:17 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

---

**From:**
**To:** DiClemente, Anthony P.
**Cc:** Kortan, Michael P.; Sabol, Sherry E.
**Sent:** Fri Sep 16 21:03:31 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

Sent from my BlackBerry Wireless Handheld

---

**From: Sabol, Sherry E.**
**To**
**Sent:** Fri Sep 16 18:49:49 2011
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

---

**From**
**To:** Sabol, Sherry E.
**Sent:** Fri Sep 16 18:30:28 2011
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

WSJCELL-66

4

**From: Sabol, Sherry E.**
**Sent: Friday, September 16, 2011 6:11 PM**
**To**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.**
**Subject: Re: Wall Street Journal request -- legal status of "stingray" technology**

b5 -1
b6 -1
b7C -1

**From: Sabol, Sherry E.**
**To: Sabol, Sherry E.**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.**
**Sent: Fri Sep 16 16:48:15 2011**
**Subject: RE: Wall Street Journal request -- legal status of "stingray" technology**

**From: Sabol, Sherry E.**
**Sent: Friday, September 16, 2011 4:12 PM**
**To**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.**
**Subject: RE: Wall Street Journal request -- legal status of "stingray" technology**
**Importance: High**

++++++++++++++++++++++

b5 -1
b6 -1
b7C -1

WSJCELL-67

5

**From:**
**Sent:** Friday, September 16, 2011 1:49 PM
**To:** _____ Sabol, Sherry E.
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.
**Subject:** FW: Wall Street Journal request -- legal status of "stingray" technology

See update below. We will need a response by COB today if we are going to contribute to the article.

**From:**
**Sent:** Friday, September 16, 2011 1:44 PM
**To:**
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b6 -1, -2
b7C -1, -2

Another update: It looks as though my editors might want to run it out for Monday's paper, which would put my deadline for comment to Sunday at midday. (And today would really be best.)

Thanks!

**From:**
**To:** _____ (DO)(FBI)
**Sent:** Fri Sep 09 11:22:54 2011
**Subject:** Wall Street Journal request -- legal status of "stingray" technology

b6 -1, -2
b7C -1, -2

Hi.

Thanks so much for helping me out.

I'm _____ and am writing about the use of "stingray" type devices, which are used generally to locate or otherwise get data on cellular devices. As an example of the use of this technology, I'm writing about a case in U.S. District Court in the District of Arizona in which the FBI used one of these devices. (It's unclear whether what was used was a stingray, a triggerfish, or something else. The prosecution explains that "stingray" is the generic term used.)

Currently, the judge in the case is set to hear the defendant's motion for disclosure of more information on the device and techniques used; the prosecution says that these matters are law enforcement sensitive.

I understand this technology is very sensitive for the FBI; however, I would very much like to get the FBI's views on this technology. I do not want to only quote the ACLU in this matter and would appreciate your help.

Here's what I'm looking for:

**LEGAL INFORMATION**
(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy? Do the instructions vary by region? Things like that.

WSJCELL-68

6

(2) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

**USAGE INFORMATION**
I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

I'm not on a daily deadline for this story, but I am on a deadline. The story needs to be sent to my editors in the next few days, so I would hope to talk with someone as soon as possible.

Thank you.

Best Regards,

b6 -2
b7C -2

WSJCELL-69

7

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | |
| **Sent:** | Friday, September 16, 2011 9:04 PM |
| **To:** | DiClemente, Anthony P. |
| **Cc:** | Kortan, Michael P.; Sabol, Sherry E. |
| **Subject:** | Fw: Wall Street Journal request -- legal status of "stingray" technology |

b5 -1
b6 -1
b7C -1

--------------------------
Sent from my BlackBerry Wireless Handheld

**From: Sabol, Sherry E.**
**To:**
**Sent:** Fri Sep 16 18:49:49 2011
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

b6 -1
b7C -1
b5 -1

**From: Allen, Christopher M.**
**To:** Sabol, Sherry E.
**Sent:** Fri Sep 16 18:30:28 2011
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

**From: Sabol, Sherry E.**
**Sent:** Friday, September 16, 2011 6:11 PM
**To:**
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.;
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

**From: Sabol, Sherry E.**
**To:** Sabol, Sherry E.;
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.;
**Sent:** Fri Sep 16 16:48:15 2011
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

**From: Sabol, Sherry E.**
**Sent:** Friday, September 16, 2011 4:12 PM
**To:**
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.

WSJCELL-70

1

**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology
**Importance:** High

b5 -1

**From:**
**Sent:** Friday, September 16, 2011 1:49 PM
**To:** Sabol, Sherry E.;
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.
**Subject:** FW: Wall Street Journal request -- legal status of "stingray" technology

See update below. We will need a response by COB today if we are going to contribute to the article.

b6 -1, -2
b7C -1, -2

**From:**
**Sent:** Friday, September 16, 2011 1:44 PM
**To:**
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

Another update: It looks as though my editors might want to run it out for Monday's paper, which would put my deadline for comment to Sunday at midday. (And today would really be best.)

Thanks!

WSJCELL-71

b6 -1, -2
b7C -1, -2

**From**
**To** _____ (DO)(FBI)
**Sent:** Fri Sep 09 11:22:54 2011
**Subject:** Wall Street Journal request -- legal status of "stingray" technology

Hi,

Thanks so much for helping me out.

I'm _____ and am writing about the use of "stingray" type devices, which are used generally to locate or otherwise get data on cellular devices. As an example of the use of this technology, I'm writing about a case in U.S. District Court in the District of Arizona in which the FBI used one of these devices. (It's unclear whether what was used was a stingray, a triggerfish, or something else. The prosecution explains that "stingray" is the generic term used.)

Currently, the judge in the case is set to hear the defendant's motion for disclosure of more information on the device and techniques used; the prosecution says that these matters are law enforcement sensitive.

I understand this technology is very sensitive for the FBI; however, I would very much like to get the FBI's views on this technology. I do not want to only quote the ACLU in this matter and would appreciate your help.

Here's what I'm looking for:

**LEGAL INFORMATION**
(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy? Do the instructions vary by region? Things like that.

(2) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

**USAGE INFORMATION**
I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

I'm not on a daily deadline for this story, but I am on a deadline. The story needs to be sent to my editors in the next few days, so I would hope to talk with someone as soon as possible.

Thank you,

Best Regards,

b6 -2
b7C -2

WSJCELL-72

3

**(RMD) (FBI)**

| | |
|---|---|
| **From:** | |
| **Sent:** | Friday, September 16, 2011 1:49 PM |
| **To:** | Sabol, Sherry E. |
| **Cc:** | Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P. |
| **Subject:** | FW: Wall Street Journal request -- legal status of "stingray" technology |

b6 -1, -2
b7C -1, -2

See update below. We will need a response by COB today if we are going to contribute to the article.

**From**
**Sent:** Friday, September 16, 2011 1:44 PM
**To**
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

Another update: It looks as though my editors might want to run it out for Monday's paper, which would put my deadline for comment to Sunday at midday. (And today would really be best.)

Thanks!

b6 -1, -2
b7C -1, -2

**From**
**T(                   DO)(FBI)**
**Sent:** Fri Sep 09 11:22:54 2011
**Subject:** Wall Street Journal request -- legal status of "stingray" technology

Hi.

Thanks so much for helping me out.

I'm                                        and am writing about the use of "stingray" type devices, which are used generally to locate or otherwise get data on cellular devices. As an example of the use of this technology, I'm writing about a case in U.S. District Court in the District of Arizona in which the FBI used one of these devices. (It's unclear whether what was used was a stingray, a triggerfish, or something else. The prosecution explains that "stingray" is the generic term used.)

Currently, the judge in the case is set to hear the defendant's motion for disclosure of more information on the device and techniques used; the prosecution says that these matters are law enforcement sensitive.

I understand this technology is very sensitive for the FBI; however, I would very much like to get the FBI's views on this technology. I do not want to only quote the ACLU in this matter and would appreciate your help.

Here's what I'm looking for:

**LEGAL INFORMATION**
(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy? Do the instructions vary by region? Things like that.

1

(2) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

**USAGE INFORMATION**
I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

I'm not on a daily deadline for this story, but I am on a deadline. The story needs to be sent to my editors in the next few days, so I would hope to talk with someone as soon as possible.

Thank you.

Best Regards,

b6 -2
b7C -2

WSJCELL-74

2

(RMD) (FBI)

**From:**
**Sent:** Wednesday, September 14, 2011 3:54 PM
**To:** Sabol, Sherry E.;
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.
**Subject:** FW: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1, -2
b7C -1, -2

**From**
**Sent:** Wednesday, September 14, 2011 3:43 PM
**To:**
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

Thanks for keeping me up to date.

I do have some information so far on the legal theories and policies involved here, from the documents that already exist in the example case and from some online research. I'll lay them out for you here just so you have them, in case it is helpful.

(1) General Counsel Valerie E. Caproni and Associate Deputy Attorney General James A. Baker, at a Brookings panel in May, said they thought these types of devices are pen registers and that somebody would need a pen register order to use them.

(2) The prosecution in the example case I'm looking at says the device is a pen register device, because it's not getting content like a wiretap would.

(3) The prosecution also says "U.S. magistrate judges and district judges across the country have debated whether cell phone tracking requires a hybrid order, a tracking warrant, or both." They say "these decisions are made on a case-by-case basis when the application is presented."

(4) I have not seen a full explanation in terms of policy for the deletion of the data from the device, except that the application for the order that involved deleting data has been described by the prosecution as "standard procedure" and "not a unique scenario." Additionally, investigators involved say in documents filed in the case that they developed "independent probable cause" after using the device because the "FBI does not want to disclose the [tracking device]" -- indicating the extreme sensitivity of the device and data from it.

I hope this is helpful in expediting the request. I know the topic is extremely sensitive, but it does seem like my questions have been broached before in a number of places. I would prefer to get a more comprehensive answer, but I can use the other info if I need to.

The gist of my story as it stands currently (subject to change by editors, as always) is that this is a very hotly debated area of the law right now, and it shows how tough it is to use cutting-edge technology without disclosing it in a way that will help offenders, all while trying to use laws that just don't keep up with this kind of innovation.

Do you have any sense of how long the process might take on your end? I'd just like to know what to tell my editors.

b6 -2
b7C -2

WSJCELL-75

1

**(RMD) (FBI)**

**From:**
**Sent:** Saturday, September 17, 2011 1:41 PM
**To:** Bryars, D Keith; DiClemente, Anthony P.; Sabol, Sherry E.; Hess, Amy S.
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

y.                        b5 -1
                          b6 -1
                          b7C -1

From: Bryars, D Keith
To: DiClemente, Anthony P.; Sabol, Sherry E.; Hess, Amy S.;
Sent: Sat Sep 17 13:30:32 2011
Subject: Re: Wall Street Journal request -- legal status of "stingray" technology

**D. Keith Bryars**
A/Deputy Assistant Director
Operational Technology Division
"Innovation*Technology*Collaboration

                                        b5 -1
                                        b6 -1
From: DiClemente, Anthony P.                b7C -1
To: Sabol, Sherry E.; Hess, Amy S.        Bryars, D Keith    b7E -1
Sent: Sat Sep 17 13:16:36 2011
Subject: RE: Wall Street Journal request -- legal status of "stingray" technology

WSJCELL-76

1

b5 -1
b7E -1

Anthony DiClemente
Chief[          ]Section
Operational Technology Division
Federal Bureau of Investigation

---

**From:** Hess, Amy S.
**Sent:** Saturday, September 17, 2011 9:53 AM
**To**[          ]DiClemente, Anthony P.
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

---

**From:** Bryars, D Keith
**To:** Hess, Amy S.
**Sent:** Sat Sep 17 06:16:30 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1
b7E -1

D. Keith Bryars
A/Deputy Assistant Director
Operational Technology Division
Innovation*Technology*Collaboration

---

**From:** Sabol, Sherry E.
**To:** Bryars, D Keith
**Sent:** Fri Sep 16 23:49:17 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

---

**From:**[          ]
**To:** DiClemente, Anthony P.
**Cc:** Kortan, Michael P.; Sabol, Sherry E.
**Sent:** Fri Sep 16 21:03:31 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

WSJCELL-77

2

---------------------------------

Sent from my BlackBerry Wireless Handheld

b5 -1<br>
b6 -1<br>
b7C -1

**From: Sabol, Sherry E.**
**To**
**Sent: Fri Sep 16 18:49:49 2011**
**Subject: Re: Wall Street Journal request -- legal status of "stingray" technology**

**From**
**To: Sabol, Sherry E.**
**Sent: Fri Sep 16 18:30:28 2011**
**Subject: RE: Wall Street Journal request -- legal status of "stingray" technology**

**From: Sabol, Sherry E.**
**Sent: Friday, September 16, 2011 6:11 PM**
**To:**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.**
**Subject: Re: Wall Street Journal request -- legal status of "stingray" technology**

b5 -1<br>
b6 -1<br>
b7C -1

**From: Sabol, Sherry E.**
**To: Sabol, Sherry E.**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.**
**Sent: Fri Sep 16 16:48:15 2011**
**Subject: RE: Wall Street Journal request -- legal status of "stingray" technology**

**From: Sabol, Sherry E.**
**Sent: Friday, September 16, 2011 4:12 PM**
**To:**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.**
**Subject: RE: Wall Street Journal request -- legal status of "stingray" technology**
**Importance: High**

b5 -1<br>
b6 -1<br>
b7C -1

WSJCELL-78

+++++++++++++++++++++

b5 -1

**From**
**Sent:** Friday, September 16, 2011 1:49 PM
**To** Sabol, Sherry E.
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.
**Subject:** FW: Wall Street Journal request -- legal status of "stingray" technology

See update below. We will need a response by COB today if we are going to contribute to the article.

b6 -1, -2
b7C -1, -2

**From**
**Sent:** Friday, September 16, 2011 1:44 PM
**To:**
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

Another update: It looks as though my editors might want to run it out for Monday's paper, which would put my deadline for comment to Sunday at midday. (And today would really be best.)

Thanks!

WSJCELL-79

4

**From:**
**To:** _____ DO)(FBI)
**Sent:** Fri Sep 09 11:22:54 2011
**Subject:** Wall Street Journal request -- legal status of "stingray" technology

b6 -1, -2
b7C -1, -2

Hi,

Thanks so much for helping me out.

I'm _____ and am writing about the use of "stingray" type devices, which are used generally to locate or otherwise get data on cellular devices. As an example of the use of this technology, I'm writing about a case in U.S. District Court in the District of Arizona in which the FBI used one of these devices. (It's unclear whether what was used was a stingray, a triggerfish, or something else. The prosecution explains that "stingray" is the generic term used.)

Currently, the judge in the case is set to hear the defendant's motion for disclosure of more information on the device and techniques used; the prosecution says that these matters are law enforcement sensitive.

I understand this technology is very sensitive for the FBI; however, I would very much like to get the FBI's views on this technology. I do not want to only quote the ACLU in this matter and would appreciate your help.

Here's what I'm looking for:

**LEGAL INFORMATION**
(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy? Do the instructions vary by region? Things like that.

(2) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

**USAGE INFORMATION**
I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

I'm not on a daily deadline for this story, but I am on a deadline. The story needs to be sent to my editors in the next few days, so I would hope to talk with someone as soon as possible.

Thank you.

Best Regards,

b6 -2
b7C -2

WSJCELL-80

**(RMD) (FBI)**

**From:**
**Sent:** Saturday, September 17, 2011 1:41 PM
**To:** Bryars, D Keith; DiClemente, Anthony P.; Sabol, Sherry E.; Hess, Amy S.
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

```
b5 -1
b6 -1
b7C -1
```

**From:** Bryars, D Keith.
**To:** DiClemente, Anthony P.; Sabol, Sherry E.; Hess, Amy S.
**Sent:** Sat Sep 17 13:30:32 2011
**Subject:** Re: Wall Street Journal request -- legal status of "stingray" technology

D. Keith Bryars
A/Deputy Assistant Director
Operational Technology Division
Innovation*Technology*Collaboration

**From:** DiClemente, Anthony P.
**To:** Sabol, Sherry E.; Hess, Amy S.; Bryars, D Keith
**Sent:** Sat Sep 17 13:16:36 2011
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

```
b6 -1
b7C -1
b5 -1
b7E -1
```

WSJCELL-81

1

b5 -1
b7E -1

Anthony DiClemente
Chief,                        Section
Operational Technology Division
Federal Bureau of Investigation

---

**From:** Hess, Amy S.
**Sent:** Saturday, September 17, 2011 9:53 AM
**To**            ; DiClemente, Anthony P.
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

---

**From:** Bryars, D Keith
**To:** Hess, Amy S.
**Sent:** Sat Sep 17 06:16:30 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1
b7E -1

D. Keith Bryars
A/Deputy Assistant Director
Operational Technology Division
Innovation*Technology*Collaboration

---

**From:** Sabol, Sherry E.
**To:** Bryars, D Keith
**Sent:** Fri Sep 16 23:49:17 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

b5 -1
b6 -1
b7C -1

**From:**
**To:** DiClemente, Anthony P.
**Cc:** Kortan, Michael P.; Sabol, Sherry E.                    WSJCELL-82
**Sent:** Fri Sep 16 21:03:31 2011
**Subject:** Fw: Wall Street Journal request -- legal status of "stingray" technology

2

Sent from my BlackBerry Wireless Handheld

**From: Sabol, Sherry E.**
**To**
**Sent: Fri Sep 16 18:49:49 2011**
**Subject: Re: Wall Street Journal request — legal status of "stingray" technology**

b5 −1
b6 −1
b7C −1

**From**
**To: Sabol, Sherry E.**
**Sent: Fri Sep 16 18:30:28 2011**
**Subject: RE: Wall Street Journal request — legal status of "stingray" technology**

**From: Sabol, Sherry E.**
**Sent: Friday, September 16, 2011 6:11 PM**
**To**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.;**
**Subject: Re: Wall Street Journal request — legal status of "stingray" technology**

b5 −1
b6 −1
b7C −1

**From: Sabol, Sherry E.**
**To: Sabol, Sherry E.**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.;**
**Sent: Fri Sep 16 16:48:15 2011**
**Subject: RE: Wall Street Journal request — legal status of "stingray" technology**

**From: Sabol, Sherry E.**
**Sent: Friday, September 16, 2011 4:12 PM**
**To**
**Cc: Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.**
**Subject: RE: Wall Street Journal request — legal status of "stingray" technology**
**Importance: High**

b5 −1
b6 −1
b7C −1

WSJCELL-83

++++++++++++++++++++

3

b5 −1

**From:**
**Sent:** Friday, September 16, 2011 1:49 PM
**To:** Sabol, Sherry E.;
**Cc:** Hess, Amy S.; Bryars, D Keith; Lammert, Elaine N.; Kortan, Michael P.
**Subject:** FW: Wall Street Journal request -- legal status of "stingray" technology

See update below. We will need a response by COB today if we are going to contribute to the article.

**From:**
**Sent:** Friday, September 16, 2011 1:44 PM
**To:**
**Subject:** RE: Wall Street Journal request -- legal status of "stingray" technology

b6 −1, −2
b7C −1, −2

Another update: It looks as though my editors might want to run it out for Monday's paper, which would put my deadline for comment to Sunday at midday. (And today would really be best.)

Thanks!

--------

WSJCELL-84

4

From:
To [          ] D.(DO)(FBI)
Sent: Fri Sep 09 11:22:54 2011'
Subject: Wall Street Journal request — legal status of "stingray" technology

b6 -1
b7C -1

Hi:

Thanks so much for helping me out.

I'm [                                    ] and am writing about the use of "stingray" type devices, which are used generally to locate or otherwise get data on cellular devices. As an example of the use of this technology, I'm writing about a case in U.S. District Court in the District of Arizona in which the FBI used one of these devices. (It's unclear whether what was used was a stingray, a triggerfish, or something else. The prosecution explains that "stingray" is the generic term used.)

Currently, the judge in the case is set to hear the defendant's motion for disclosure of more information on the device and techniques used; the prosecution says that these matters are law enforcement sensitive.

I understand this technology is very sensitive for the FBI; however, I would very much like to get the FBI's views on this technology. I do not want to only quote the ACLU in this matter and would appreciate your help.

Here's what I'm looking for:

**LEGAL INFORMATION**
(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy? Do the instructions vary by region? Things like that.

(2) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

**USAGE INFORMATION**
I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

I'm not on a daily deadline for this story, but I am on a deadline. The story needs to be sent to my editors in the next few days, so I would hope to talk with someone as soon as possible.

Thank you.

Best Regards;

b6 -2
b7C -2

WSJCELL-85

5

(1) I would like to know what the FBI's guidelines are regarding what orders are required for the use of a stingray, particularly as it pertains to location information. Do they require a search warrant or a different type of order? Are agents instructed to try to get a warrant if possible but a lesser order if not? What is the legal analysis that supports this policy?

The specific equipment used by law enforcement agencies to obtain location information and the capabilities of that equipment are considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment. As a general matter, the type of information obtained with location identifying techniques is dialing, routing, addressing or signaling information that has historically been obtained pursuant to the Pen Register Statute (18 USC section 2131 et seq). That being said, Federal Courts are split on what legal authority is required to obtain location information on a prospective basis. Because of a prohibition against obtaining this information solely pursuant to a Pen Register/Trap and Trace order set forth in the Communications Assistance to Law Enforcement Act (CALEA, see 47 USC 1002), some District Courts require what has come to be known as a "hybrid" approach whereby a court order issued pursuant to the Pen Register Statute (18 USC section 3121 et seq) is combined with what is known as a "2703(d) order" (reference to 18 USC 2703(d), part of the Stored Communications Act). Other District Courts have held a search warrant based upon probable cause is necessary to obtain location information on a prospective basis.

In utilizing this equipment and data, the FBI conducts all investigations in accordance with the Attorney General Guidelines and the FBI's Domestic Investigations and Operations Guide.

(2) Do the instructions vary by region?

Generally speaking, the FBI advises our field offices to work closely with the relevant U.S. Attorney's Office to adhere to the legal requirements of their respective District as set forth in case law or court decisions/precedent. If the FBI believes the use of any technology or technique may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy, it is FBI policy to obtain a search warrant.

(3) I would like to know what the FBI policy is regarding data from stingrays being expunged. In the case I'm covering, the Agent, in the application for the use of device, requested that data obtained by the court order be expunged at the end of the mission to locate the cellular device. This request was granted, and that data was expunged.

With regard to the expungement of location information obtained through use of this type of equipment by the FBI, our policy since the 1990's has been to purge or "expunge" all information obtained during a location operation.

(4) USAGE INFORMATION – I would like any information that the FBI might be able to provide on how helpful these "stingray" type devices are, how frequently they are used and whether their use has increased or decreased in the past couple of years.

WSJCELL-86

Location information continues to be a vital component in law enforcement investigations at the federal, state and local levels.   All levels of law enforcement need to maintain the ability to utilize location information pursuant to lawful authority.

WSJCELL-87

FBI's 'Stingray' Cellphone Tracker Stirs a Fight Over Search Warrants, Fourth Amendme...   Page 1 of 7

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 11-01-2012 BY 65179 DMH/EJS

Thursday, September 22, 2011 As of 12:00 AM   New York   81°|69°

GET
F
SUBSC

## TECHNOLOGY

U.S. Edition Home    Today's Paper    Video    Blogs    Journal Community

World    U.S.    New York    Business    Markets    Tech    Personal Finance    Life & Culture    Opini

Digits    Personal Technology    What They Know    All Things Digita

TOP STORIES IN
### Technology



1 of 12
Groupon Unsure
on IPO Timing



2 of 12
H-P's PC Chief
Awaits Clarity

Ri
Beco

TECHNOLOGY   |   SEPTEMBER 22, 2011

# 'Stingray' Phone Tracker Fuels Constitutional Clash

Article    Comments (244)

Email    Print : Save              75              973

## SUBSCRIBER CONTENT PREVIEW

FOR FULL ACCESS   LOG IN   OR   SUBSCRIBE NOW - GET 2 WEEKS FREE

By JENNIFER VALENTINO-DEVRIES

For more than a year, federal authorities pursued a man they called simply "the Hacker." Only after using a little known cellphone-tracking device—a stingray—were they able to zero in on a California home and make the arrest.



U.S. Patent and Trademark Office
A Harris StingRay II, one of several devices dubbed 'stingrays.'

Stingrays are designed to locate a mobile phone even when it's not being used to make a call. The Federal Bureau of Investigation considers the devices to be so critical that it has a policy of deleting the data gathered in their use, mainly to keep suspects in the dark about their capabilities, an FBI official told The Wall Street Journal in response to inquiries.

A stingray's role in nabbing the alleged "Hacker"—Daniel David Rigmaiden—is shaping up as a possible test of the legal standards for using these devices in

investigations. The FBI says it obtains appropriate court approval to use the device.

WSJCELL-88

Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a search warrant. These techniques are driving a constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

On Nov. 8, the Supreme Court will hear arguments over whether or not police need a warrant before secretly installing a GPS device on a suspect's car and tracking him for an extended period. In both the Senate and House, new bills would require a warrant before tracking a cellphone's location.

**More**

Key Documents in 'Stingray' Case

Digits: How 'Stingray' Devices Work

Digits: How Technology is Testing the Fourth Amendment



connection with the use of this device?"

EXPERIENCE WSJ PROFESSIONAL

**Editors' Deep Dive: Techs Balance Innovation, Litigation**

NEW YORK POST
Critics Calling Out Deal by Microsoft & Nokia Over Antitrust Alarms

CHINA DAILY
Apple Bites Back with 40 Patents Granted in China

DOW JONES NEWS SERVICE
Tech Giants Seek to Clamp Down on Multi-Tentacled Patent Suits

Access thousands of business sources not available on the free web. Learn More

And on Thursday in U.S. District Court of Arizona, Judge David G. Campbell is set to hear a request by Mr. Rigmaiden, who is facing fraud charges, to have information about the government's secret techniques disclosed to him so he can use it in his defense. Mr. Rigmaiden maintains his innocence and says that using stingrays to locate devices in homes without a valid warrant "disregards the United States Constitution" and is illegal.

His argument has caught the judge's attention. In a February hearing, according to a transcript, Judge Campbell asked the prosecutor, "Were there warrants obtained in

The prosecutor, Frederick A. Battista, said the government obtained a "court order that satisfied [the] language" in the federal law on warrants. The judge then asked how an order or warrant could have been obtained without telling the judge what technology was being used. Mr. Battista said: "It was a standard practice, your honor."

Judge Campbell responded that it "can be litigated whether those orders were appropriate."

On Thursday the government will argue it should be able to withhold details about the tool used to locate Mr. Rigmaiden, according to documents filed by the prosecution. In a statement to the Journal, Sherry Sabol, Chief of the Science & Technology Office for the FBI's Office of General Counsel, says that information about stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."



Available

Investo
Faith in

WSJCELL-89



The prosecutor, Mr. Battista, told the judge that the government worries that disclosure would make the gear "subject to being defeated or avoided or detected."

A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It lets the stingray operator "ping," or send a signal to, a phone and locate it as long as it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

The government says "stingray" is a generic term. In Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

The best known stingray maker is Florida-based defense contractor Harris Corp. A spokesman for Harris declined to comment.

Harris holds trademarks registered between 2002 and 2008 on several devices, including the StingRay, StingRay II, AmberJack, KingFish, TriggerFish and LoggerHead. Similar devices are available from other manufacturers. According to a Harris document, its devices are sold only to law-enforcement and government agencies.

Some of the gadgets look surprisingly old-fashioned, with a smattering of switches and lights scattered across a panel roughly the size of a shoebox, according to photos of a Harris-made StingRay reviewed by the Journal. The devices can be carried by hand or mounted in cars, allowing investigators to move around quickly.

A rare public reference to this type of technology appeared this summer in the television crime drama "The Closer." In the episode, law-enforcement officers use a gadget they called a "catfish" to track cellphones without a court order.

The U.S. armed forces also use stingrays or similar devices, according to public contract notices. Local law enforcement in Minnesota, Arizona, Miami and Durham, N.C., also either possess the devices or have considered buying them, according to interviews and published requests for funding.

The sheriff's department in Maricopa County, Ariz., uses the equipment "about on a monthly basis," says Sgt. Jesse Spurgin. "This is for location only. We can't listen in on conversations," he says.

Sgt. Spurgin says officers often obtain court orders, but not necessarily search warrants, when using the device. To obtain a search warrant from a court, officers as a rule need to show "probable cause," which is generally defined as a reasonable belief, based on factual evidence, that a crime was committed. Lesser standards apply to other court orders.

A spokeswoman with the Bureau of Criminal Apprehension in Minnesota says officers don't need to seek search warrants in that state to use a mobile tracking device because it "does not intercept communication, so no wiretap laws would apply."

WSJCELL-90

FBI and Department of Justice officials have also said that investigators don't need search warrants. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers," which require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

To get a pen-register order, investigators don't have to show probable cause. The Supreme Court has ruled that use of a pen register doesn't require a search warrant because it doesn't involve interception of conversations.

But with cellphones, data sent includes location information, making the situation more complicated because some judges have found that location information is more intrusive than details about phone numbers dialed. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

The prosecution in the Rigmaiden case says in court documents that the "decisions are made on a case-by-case basis" by magistrate and district judges. Court records in other cases indicate that decisions are mixed, and cases are only now moving through appellate courts.

The FBI advises agents to work with federal prosecutors locally to meet the requirements of their particular district or judge, the FBI's Ms. Sabol says. She also says it is FBI policy to obtain a search warrant if the FBI believes the technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

Experts say lawmakers and the courts haven't yet settled under what circumstances locating a person or device constitutes a search requiring a warrant. Tracking people when they are home is particularly sensitive because the Fourth Amendment specifies that people have a right to be secure against unreasonable searches in their "houses."

"The law is uncertain," says Orin Kerr, a professor at George Washington University Law School and former computer-crime attorney at the Department of Justice. Mr. Kerr, who has argued that warrants should be required for some, but not all, types of location data, says that the legality "should depend on the technology."

In the case of Mr. Rigmaiden, the government alleges that as early as 2005, he began filing fraudulent tax returns online. Overall, investigators say, Mr. Rigmaiden electronically filed more than 1,900 fraudulent tax returns as part of a $4 million plot.

Federal investigators say they pursued Mr. Rigmaiden "through a virtual labyrinth of twists and turns." Eventually, they say they linked Mr. Rigmaiden to use of a mobile-broadband card, a device that lets a computer connect to the Internet through a cellphone network.

Investigators obtained court orders to track the broadband card. Both orders remain sealed, but portions of them have been quoted by the defense and the prosecution.

These two documents are central to the clash in the Arizona courtroom. One authorizes a "pen register" and clearly isn't a search warrant. The other document is more complex. The prosecution says it is a type of search warrant and that a finding of probable cause was made.

Most Po

Technok

Manager,
Java Deve
Informatio
-Mart Stor
TCG is lo
Group

keyword

MORE JOBS
Finance Job

FINS for En

More in 1
Groupon U:
H-P's PC C
Rival Ad-T
Facebook '
Full Tilt's C

Most Po

Read    En

1.    C
      Ne

2.    Sau

3.    E

4.    C

5.    Coll

Most Rea

WSJCELL-91

But the defense argues that it can't be a proper search warrant, because among other things it allowed investigators to delete all the tracking data collected, rather than reporting back to the judge.

Legal experts who spoke with the Journal say it is difficult to evaluate the order, since it remains sealed. In general, for purposes of the Fourth Amendment, the finding of probable cause is most important in determining whether a search is reasonable because that requirement is specified in the Constitution itself, rather than in legal statutes, says Mr. Kerr.

But it is "odd" for a search warrant to allow deletion of evidence before a case goes to trial, says Paul Ohm, a professor at the University of Colorado Law School and a former computer-crime attorney at the Department of Justice. The law governing search warrants specifies how the warrants are to be executed and generally requires information to be returned to the judge.

Even if the court finds the government's actions acceptable under the Fourth Amendment, deleting the data is "still something we might not want the FBI doing," Mr. Ohm says.

The government says the data from the use of the stingray has been deleted and isn't available to the defendant. In a statement, the FBI told the Journal that "our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation" when using stingray-type gear.

As a general matter, Ms. Sabol says, court orders related to stingray technology "will include a directive to expunge information at the end of the location operation."

Ms. Sabol says the FBI follows this policy because its intent isn't to use the data as evidence in court, but rather to simply find the "general location of their subject" in order to start collecting other information that can be used to justify a physical search of the premises.

In the Rigmaiden example, investigators used the stingray to narrow down the location of the broadband card. Then they went to the apartment complex's office and learned that one resident had used a false ID and a fake tax return on the renter's application, according to court documents.

Based on that evidence, they obtained a search warrant for the apartment. They found the broadband card connected to a computer.

Mr. Rigmaiden, who doesn't confirm or deny ownership of the broadband card, is arguing he should be given information about the device and about other aspects of the mission that located him.

In the February hearing, Judge Campbell said he might need to weigh the government's claim of privilege against the defendant's Fourth Amendment rights, and asked the prosecution, "How can we litigate in this case whether this technology that was used in this case violates the Fourth Amendment without knowing precisely what it can do?"

Write to Jennifer Valentino-DeVries at Jennifer.Valentino-DeVries@wsj.com

JOIN THE DISCUSSION

MORE IN
Tech »

WSJCELL-92

## 244 Comments, add yours

x  FBI_Logo

| 973 | Share | 11 | 75 | | Email | Print | Order Reprints |

**Hottest Penny Stock EMBA**
Pass on this stock & you will never forgive yourself. Read more today!
www.GreenGainers.com/EMBA

**Hot Stock Pick - OMVS**
Newest Solar Technology. Investment, Stocks, Trade, News.
www.OMVSsolar.com

**Don't Be Shy. Try Forex.**
Risk Free Practice Account. GFT.
GFTforex.com

**3-in-1 Credit Scores - $0**
View your Credit Report & Scores from All 3 Bureaus in 60 seconds.
FreeScoreOnline.com

---

## Add a Comment

JOURNAL COMMUNITY

We welcome your thoughtful comments. Please comply with our Community
rules. All comments will display your real name.

**Want to participate in the discussion?**

REGISTER FOR FREE

Or log in or become a subscriber now for complete Journal access.

☐ Track replies to my comment

Go to Comments tab

CLEAR      POST      Share articles and post your comments     **Login with Facebook**
                     on Facebook | What's this?

WSJCELL-93

Subscribe Now for Full Access to WSJ.com and Get

# 2 WEEKS FREE



**WSJ Subscriber's content provides:**
- Personalized tracking of industries
- Heard on the Street: up-to-the-minute news and analysis that affects the markets and industries
- Core business news: "What's News" and new "Management" section

## Editors' Picks

   

**The Cal Ripken of Mascots Plays On for the Giants, No Matter What**

**Drillers Face Methane Concern**

**Palestinian Moves Reshape Attitudes**

**Detours**

**WSJ.com Account:**
My Account
Subscriber Billing Info

**Create an Account:**
Register for Free
Subscribe to WSJ.com
Sign up for WSJ Professional

**Help & Information Center:**
Help
Customer Service
Contact Us
Global Support
New on WSJ.com
Take a Tour
Print Subscriber Services

**About:**
News Licensing
Reprints
Advertising
Classifieds
Advertise Locally
Conferences
About Dow Jones
Privacy Policy - Updated
Subscriber Agreement & Terms of Use - Updated
Copyright Policy
Jobs at WSJ.com

**WSJ.com:**
Site Map
Home
World
U.S.
New York
Business
Markets
Market Data
Tech
Personal Finance
Life & Culture
Opinion
Autos
Careers
Real Estate
Small Business
Student Journal
Corrections
SafeHouse - Send Us Information

**Tools & Forms**
Today's Pape
Video Center
Graphics
Columns
Blogs
Topics
Guides
Alerts
Newsletters
Mobile
Tablet Edition
Podcasts
RSS Feed
Journal Com
WSJ on T
WSJ on F
WSJ on F
My Journal
Portfolio
WSJ Digital

Copyright ©2011 Dow Jones & Company, Inc. All Rights Reserved

WSJCELL-94