Daniel David Rigmaiden

Plaintiff,



v.

Federal Bureau of Investigation, et al

Defendant.

12-CV-01605-SRB-BSB

LODGED: Proposed

**"PLAINTIFF'S (1) RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND (2) REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT"**

Attached.

1 | Daniel David Rigmaiden
2 | 530 E McDowell Rd Ste 107-214
  | Phoenix, AZ 85004
  | Telephone: none
3 | Email: freedan@safe-mail.net

4 | Daniel David Rigmaiden,
5 | Pro Se, Plaintiff

6 | **UNITED STATES DISTRICT COURT**
  | **DISTRICT OF ARIZONA**
7 |

8 | Daniel David Rigmaiden,                 | Civil Action No.:

9 |          Plaintiff,                     | 12-CV-01605-SRB-BSB
  | v.
  |                                         | PLAINTIFF'S (1) RESPONSE TO
10 | Federal Bureau of Investigation, et al. | DEFENDANTS' CROSS-MOTION FOR
  |                                         | SUMMARY JUDGMENT AND (2) REPLY
11 |          Defendant.                     | TO DEFENDANTS' RESPONSE TO
  |                                         | PLAINTIFF'S MOTION FOR PARTIAL
12 |                                         | SUMMARY JUDGMENT

13      Plaintiff, Daniel David Rigmaiden, appearing *pro se*, respectfully submits *Plaintiff's*

14 *(1) Response to Defendants' Cross-Motion for Summary Judgment and (2) Reply to*

15 *Defendants' Response to Plaintiff's Motion for Partial Summary Judgment*. Plaintiff's

16 response and reply are set forth in the proceeding *Memorandum*. The facts in support of

17 Plaintiff's response and reply are contained in *Plaintiff's Controverting Statement of Facts,*

18 *Objection to the Admission of Evidence, and Statement of Additional Undisputed Material*

19 *Facts in Support* of *(1) Response to Defendant's Cross-Motion for Summary Judgment, and*

20 *(2) Reply to Defendants' Response to Plaintiff's Motion for Partial Summary Judgment*

21 (hereafter "PSAUMF, § III") and *Plaintiff's Statement Of Undisputed Material Facts In*

22 *Support Of Motion For Partial Summary Judgment* (Dkt. #085) (hereafter "PSUMF").

23               ***MEMORANDUM OF POINTS AND AUTHORITIES***

24      I.      **ARGUMENT**

25              A.     **Exemptions claimed by Defendant FBI relating to the Harris FOIA
                       request.**

26                     1.     **The issue of the FBI's *yet-to-be-applied* exemptions to *yet-to-be-
                              produced* records responsive to Plaintiff's October 10, 2011, FBI
27                            FOIA request RE: Harris devices <u>is not ripe for review</u>.**

28 Plaintiff and counsel for Defendant FBI verbally agreed to use a 500-page sample of

1   records responsive to Plaintiff's Harris FOIA request and an accompanying *Vaughn* index as a

2   means to argue the applicability of the FOIA exemptions the FBI *plans* to apply to all

3   responsive records in the future. *See* PSAUMF § III, ¶ 53. This agreement was never

4   formally placed on the record pursuant to LRCiv 83.7.   Plaintiff is exercising his right to

5   dispute the verbal agreement for the following reasons: (1) Defendant FBI violated the most

6   basic term of the verbal agreement, *i.e.*, a 500-page sample of responsive records **was never**

7   **provided**; instead, a 321-page sample was provided, *see* PSAUMF § III, ¶ 53, (2) out of the

8   23,000 "pages" located thus far, Defendant FBI failed to provide an adequate number of

9   sample records corresponding to each claimed FOIA exemption, *e.g.*, only one sample "page"

10  was provided corresponding to FOIA exemption (b)(1) and only nine sample "pages" were

11  provided corresponding to FOIA exemption (b)(4). *See id.* Plaintiff does not have a

12  sufficient sample to address the FBI's planned future withholdings to be applied across at

13  least 23,000 *yet-to-be-processed* "pages." *See id.* Because the agreement is in dispute (*see*

14  LRCiv 83.7), the Court cannot rely upon the 321-page sample and *Vaughn* index to decide

15  whether Defendant FBI's *yet-to-be-applied* withholdings and redactions are justified under

16  FOIA. The only claimed exemptions that are ripe for review are the specific exemptions

17  applied to the 321 "pages" provided to Plaintiff thus far, and to the some 200 "pages"

18  withheld in full noted in the *Vaughn* index. *See* PSAUMF § III, ¶ 54. The following

19  subsections address the inapplicability of those specific exemptions.

20            **a.   Defendant FBI failed to meet its burden to show that**
21            **Exemption (b)(4) applies to telecommunications companies,**
                **wireless products group, cell phone tracking devices, and**
22            **satellite systems that provide information to the FBI**

23            Defendant FBI relies upon exemption (b)(4) to withhold the names of

24  telecommunications companies, wireless products group, cell phone tracking devices, and

25  satellite systems that provide information to the FBI in the context of cell phone spying

26  equipment manufactured by Harris. *See* Dkt. #091-6 [Declaration by David M. Hardy,

27  Section Chief of the FBI Record/Information Dissemination Section], ¶ 40, pp. 19-20. From

28  the first set of fully processed records, the FBI fully withheld 103 "pages" on this basis, *see*

1    *id.*, ¶ 40, p. 19-20, fn. 15, and provided only nine "pages" in heavily redacted form.[1]  The

2    FBI claimed that "business would be substantially harmed if [][the companies'] customers

3    knew..." and the "stigma of working with the FBI would cause customers to cancel the

4    companies' services and file civil actions to prevent further disclosure of subscriber

5    information." *Id.*, ¶ 40, p. 19-20.  As explained below, the FBI is relying upon exemption (b)

6    (4) to hide violations of law and violations of FBI policy.  The FBI has provided no authority

7    supporting this novel application of a FOIA exemption.

8        FBI policy generally requires that agents obtain and serve court orders before

9    collecting geolocation data[2] or receiving assistance from telecommunications providers, etc.

10    on locating wireless devices.[3]  These court orders are obtained under the Stored

11    Communications Act ("SCA"), 18 U.S.C. § 2703, the Pen Register / Trap and Trace statutes,

12    18 U.S.C. §§ 3121-3127, or both.  Both the SCA and Pen/Trap statutes have immunity

13

14

15

---

16   1.     Four of those pages contain the headings "GPS/PING," "GEOLocation Data—E911," "Court order: 2703(d)," and "WITT"—an acronym for "Wireless Intercept and Tracking Team."  A fifth redacted page consists of an email hinting at a technical problem with one of Harris's devices.  The nine heavily redacted pages that claim FOIA exemption 5 U.S.C. § 552(b)(4) are at <u>ATTACHMENT 27</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

19   2.     *See* FBI Domestic Investigations and Operations Guide (DIOG) 2011 § 18.6.8.4.2.5.2, *available at* https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations %20Guide%20%28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2011- version/fbi-domestic-investigations-and-operations-guide-diog-october-15- 2011/at_download/file [PDF p. 119] (last accessed: May 14, 2014) ("[P]roduction of historical and prospective cell site and sector information [] must be combined with an application for pen register/trap and trace device...."); *id.*, § 18.6.9.11.1 [PDF p. 138] ("A standard PR/TT [[Pen Register/Trap and Trace]] order issued pursuant to 18 U.S.C. § 3127 is adequate to authorize the use of this technology to determine the location of a known targeted phone[.]"); <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, Doc. #0674-1 [Declaration by FBI Supervisory Agent Bradley S. Morrison], ¶ 2, p. 1 (D.Ariz., Oct. 27, 2011) (explaining the FBI's position that the StingRay and other equipment used to locate Rigmaiden's aircard "falls within the statutory definition of a pen register/trap and trace device.").

25   3.     In <u>United States v. Daniel Rigmaiden</u>, CR08-814-PHX-DGC, FBI agents obtained a court order requiring that Verizon Wireless assist them in using an unspecified "mobile tracking device" as they attempt to locate Rigmaiden's aircard. *See id.*, Doc. #0920-1, p. 10 (D.Ariz., Oct. 19, 2012) ("Verizon Wireless shall provide said agents immediately on request with all information, facilities, and technical assistance needed to ascertain the physical location of the Target Broadband Access Card/Cellular Telephone[.]").  The order cites the Stored Communications Act, 18 U.S.C. § 2703. *See id.*

1  provisions that protect telecommunications providers, etc. from civil lawsuits.[4][5][6]  In

2  light of these immunity statutes, the FBI's claim equates to one of two scenarios: (1) the FBI

3  is breaking the law by obtaining data from telecommunications providers, etc. without first

4  obtaining court orders, or (2) the court orders that are being issued do not legally authorize

5  collection of the type of data being sought.  If the FBI were obtaining the data with valid

6  court orders (as dictated by FBI policy), it would have no grounds to claim that customers

7  would "file civil actions to prevent further disclosure of subscriber information."  Dkt. #091-

8  6, ¶ 40, p. 20.[7]  The FBI's desire to conceal its illegal activity and to protect colluding

9  telecommunications providers, etc. from having current civil liability exposed is not a basis to

10  claim Exemption (b)(4).

---

11  4.    See 18 U.S.C. § 2703(e) ("No cause of action shall lie in any court against any

12  provider of wire or electronic communication service, its officers, employees, agents, or other specified persons for providing information, facilities, or assistance in accordance with the

13  terms of a court order, warrant, subpoena, statutory authorization, or certification under this chapter."); 18 U.S.C. § 3124(d) ("No cause of action shall lie in any court against any

14  provider of a wire or electronic communication service, its officers, employees, agents, or other specified persons for providing information, facilities, or assistance in accordance with

15  a court order under this chapter or request pursuant to section 3125 of this title.").

16  5.    Similarly, there is no cause of action against a telecommunications provider who gives information to the government in response to an order issued under 50 U.S.C. Chapter 36 -

17  *Foreign Intelligence Surveillance*.  *See* 50 U.S.C. §§ 1805(h) (bar to legal action vis-a-vis electronic surveillance), 1842(f) (bar to legal action vis-a-vis pen registers and trap and trace

18  devices), and 1861(e) (bar to legal action vis-a-vis disclosure of business records).

18  6.    A relevant immunity statute saved Verizon from civil liability in the recent NSA

19  domestic spying scandal.  After Edward Snowden revealed that Verizon was providing the NSA with its customers' "telephony metadata" on an ongoing basis, Larry E. Klayman sued

20  Verizon and others.  *See* Klayman, et al. v. Obama, et al., 1:13−cv−00851−RJL (D.D.C.).  In response, Verizon claimed that even if it had been assisting the NSA in its domestic spying

21  operation, it is immune from civil liability under 50 U.S.C. § 1861(e), an immunity statute applicable to Foreign Intelligence Surveillance.  Verizon's attorney asserted that "a

22  telecommunications provider cannot be held liable for providing assistance to the government pursuant to a court order."  *See id.*, Doc. #055, pp. 11-12 (D.D.C., Dec. 16, 2013).  After

23  Verizon's attorney raised this argument, Klayman voluntarily dismissed his claim against the telecommunications provider.  *See id.*, Doc. #073, p. 1 (D.D.C., Jan. 23, 2014).

24  7.    In addition to preventing lawsuits brought against telecommunications providers, the FBI may also be seeking to prevent disciplinary action directed at the colluding agents.  *See*

25  18 U.S.C. § 2707(d) ("If a court or appropriate department or agency determines that the United States or any of its departments or agencies has violated any provision of this chapter,

26  and the court or appropriate department or agency finds that the circumstances surrounding the violation raise serious questions about whether or not an officer or employee of the United

27  States acted willfully or intentionally with respect to the violation, the department or agency shall, upon receipt of a true and correct copy of the decision and findings of the court or

28  appropriate department or agency promptly initiate a proceeding to determine whether disciplinary action against the officer or employee is warranted....").

      **b.   Defendant FBI failed to meet its burden to show that Exemption (b)(1) applies to information gathered either about or from a foreign country that could cause diplomatic or economic retaliation against the United States.**

Defendant FBI relies upon exemption (b)(1) and Executive Order 13526 § 1.4(d) (signed by President Barack Obama on December 29, 2009) to withhold records relating to "foreign activities" in the context of "Target Identification"[8] and other spy techniques conducted using Harris equipment. From the first set of fully processed records, the FBI fully withheld 36 "pages," *see* Dkt. #091-6, ¶ 19, p. 8, fn. 9, on this basis and provided only one "page" in heavily redacted form (relating to "Target Identification"). *See id.*, ¶ 29, p. 13 (discussing FBICELL-259, which as the heading "Target Identification"). The claimed exemption fails for two reasons: (1) the FBI is attempting to hide violations of international law, activity not protected by Executive Order 13526, and (2) David Hardy failed to establish his qualifications for making classifications as required by Executive Order 13526.

      **i.   The FBI is attempting to hide violations of international law.**

The section of the Executive Order cited by Hardy requires that he detail "identifiable or describable damage to the national security"[9] that will result if records are disclosed to the public. In an attempt to satisfy this requirement, the FBI claimed that "[t]he release of this information could cause serious harm, including **diplomatic or economic retaliation against the United States**." *See* Dkt. #091, p. 26. But diplomatic and economic retaliation are front-line sanctions for violations of international law,[10] not responses to run-of-the-mill espionage. Even after the National Security Agency was outed for spying on German

---

8.     One feature offered by Harris spy equipment is the ability to identify the Electronic Serial Number or similar numerical ID of a cell phone being carried or used by an unidentified surveillance target. *See* <u>ATTACHMENT 27</u> [FBICELL-290] of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment* (noting that the Wireless Intercept and Tracking Team ("WITT") uses "signaling information" to "Identify a target phone").

9.     Executive Order 13526 § 1.4 (Dec. 29, 2009).

10.    For example, the United States sanctioned Cuba for "restrict[ing] the Cuban people's exercise of freedom of speech, press, assembly, and other rights recognized by the Universal Declaration of Human Rights adopted by the General Assembly of the United Nations on December 10, 1948...." 22 U.S.C. § 6001. The sanctions against Cuba included "Prohibition on certain transactions between certain United States firms and Cuba," "Prohibitions on vessels," and "Restrictions on remittance to Cuba." 22 U.S.C. § 6005(a), (b) and (c).

1 | Chancellor Angela Merkel, the United States suffered no consequences for the NSA's spying

2 | —whether diplomatic, economic, or otherwise.  Dr. Stefan Talmon, Professor of Public Law,

3 | University of Bonn, described the NSA eavesdropping as simply a matter of "You spy, I spy,

4 | we all spy!"[11]  Because the claim of looming diplomatic or economic retaliation implicitly

5 | acknowledges spy activity that violates international law, the FBI's argument fails.  President

6 | Obama made clear that no agency may rely on Executive Order 13526 to withhold records to

7 | "conceal violations of law"[12] or to "prevent embarrassment to a person, organization, or

8 | agency[.]"[13]  The Court cannot rely upon the FBI's declaration to support an exemption

9 | considering the declaration itself is "evidence of [agency] bad faith."  Hunt v. CIA, 981 F.2d

10 | 1116, 1119 (9th Cir. 1992).

11 |        By releasing the specific FBI spy activities that violate international law, an open

12 | debate can begin that will allow the public to decide if the looming threat of diplomatic or

13 | economic retaliation is worth continuation of the FBI's illegal foreign spying.  If the FBI were

14 | required to release this information, but continue to keep secret the names of the foreign

15 | targets, an open public debate can begin while avoiding the due punishment noted by Hardy

16 | in his declaration.  Because the FBI has placed everyone in a position where they could suffer

17 | for the FBI's illegal activities, the public should be permitted to review the records and decide

18 | if the threat of diplomatic or economic retaliation is worth the risk.  At the very least, all

19 | responsive records should be provided to a special master, with international law expertise,

20 | for an in camera review.  Any foreign relations records documenting FBI spying done in

21 | violation of international law should be provided to Plaintiff so that he can disseminate to the

22 | public.

23 |

24 |

25 |

26 | 11.    Talmon, Stefan, Dr. [University of Bonn]. (Nov. 6, 2013). "Tapping the German Chancellor's Cell Phone and Public International Law." Cambridge Journal of International and Comparative Law, available at http://cjicl.org.uk/2013/11/06/tapping-german-chancellors-cell-phone-public-international-law/ (last accessed: May 14, 2014).

27 |

28 | 12.    Executive Order 13526 § 1.7(a)(1) (Dec. 29, 2009).

13.    Id., § 1.7(a)(2).

        **ii.   David Hardy failed to establish his qualifications for**
1              **making classifications.**

2       In his declaration, Hardy failed to establish that he received the proper classification

3  training.   Executive Order 13526 requires that "[a]ll original classification authorities must

4  receive training in proper classification (including the avoidance of over-classification) and

5  declassification as provided in this order and its implementing directives **at least once a**

6  **calendar year.**  Such training must include instruction on the proper safeguarding of

7  classified information and on the sanctions in section 5.5 of this order..." *Id.* § 1.3(d)

8  (emphasis added).  The FBI improperly asserts exemption (b)(1) and Executive Order 13526

9  considering Hardy's declaration fails to establish that he received training on classification

10 (including the avoidance of over-classification), etc. in either calendar year 2013, or 2014

11 before he conducted the classification review process.  Defendant FBI cannot submit new

12 evidence in a reply, therefore its summary judgment argument fails and Plaintiff is entitled to

13 the records.

               **c.   Defendant FBI failed to meet its burden to show that**
14                  **Exemptions (b)(7)(E) and (b)(1) apply to the records relating**
15                  **to the technical operations of Harris devices.**

16      Defendant FBI relies upon exemption (b)(7)(E) and (b)(1) to withhold user manuals

17 and other technical information relating to cell phone spying equipment manufactured by

18 Harris. *See* Dkt. #091-6, ¶ 69, p. 27. From the first set of claimed fully processed records,

19 the FBI claims exemptions (b)(7)(E) and (b)(1) on the majority of the processed records. *See*

20 *id.*, ¶ 70, p. 27-28, fn. 18, 19, 20 and 21. As further explained below, the FBI has improperly

21 invoked exemptions 5 U.S.C. §§ 552(b)(7)(E) and (b)(1) considering (1) detailed technical

22 information regarding the operations of Harris WPG portable/transportable wireless device

23 locators is generally known to the public, and (2) much of the information requested by

24 Plaintiff and withheld by the FBI is already preserved in permanent public records.

               **i.   FOIA exemptions (b)(7)(E) and (b)(1) do not apply**
25                  **considering detailed technical information regarding the**
26                  **operations of Harris WPG devices is generally known to**
                   **the public**
27

28      In *Rosenfeld*, the Ninth Circuit found that "[i]t would not serve the purposes of FOIA

1   to allow the government to withhold information to keep secret a[n] investigative technique

2   that is routine and generally known." <u>Rosenfeld v. United States Dep't of justice</u>, 57 F.3d

3   803, 815 (9th Cir. 1995).[14]   The FBI has already admitted that "the existence of cell-site

4   technology as a general law enforcement technique is publically [sic] known..." Dkt. #091-6,

5   ¶ 73, p. 29.  Furthermore, widely available news articles and a book by a former government

6   surveillance contractor document the precise technical details of how Harris devices function

7   and how they are used by law enforcement.  *See* PSAUMF § III, ¶¶ Nos. 42-47.  For example,

8   a 2011 front page article in *The Wall Street Journal* explained in detail how law enforcement

9   uses the StingRay to locate wireless devices—complete with a picture of the StingRay II and

10  a diagram.[15]   A 2013 article by *Wired* explained even more precisely the technical

11  operations of the Harris devices.[16]   Furthermore, government entities including the FBI

12  (PSAUMF § III, ¶¶ Nos. 3, 12-15), EOUSA (PSAUMF § III, ¶ No. 9), United States Secret

13  Service (PSAUMF § III, ¶¶ No. 21), United States Army (PSAUMF § III, ¶ No. 26), United

14  States Navy (PSAUMF § III, ¶ No. 30), the FCC (PSAUMF § III, ¶¶ No. 22-25) and others

15  have released technical details regarding the use and operations of Harris devices.  For

16  example, FCC documents explain how a StingRay requires a cell phone user to dial 9-1-1

17  twice if his or her phone is accessing the StingRay's emulated cellular network during a law

18  enforcement surveillance operation.  *See id.*  Further information on this aspect of Harris

19  equipment is of great public interest considering the FBI's use of the equipment can cause

---

14.    This reasoning "is supported by holdings from district courts of the District of Columbia Circuit, that Exemption 7(E) only exempts investigative techniques not generally known to the public." *Id. See, e.g.,* <u>National Sec. Archive v. FBI</u>, 759 F.Supp. 872, 885 (D.D.C. 1991) ("Exemption 7(E) is properly invoked only for techniques not generally known to the public.").

15.    *See* Valentino-DeVries, Jennifer (The Wall Street Journal), *'Stingray' Phone Tracker Fuels Constitutional Clash*, p. A1 (Sept. 22, 2011) *available at* http://online.wsj.com/article/SB10001424053111904194604576583112723197574.html (last accessed: May 17, 2011); *see also* PSAUMF § III, ¶ No. 44; <u>ATTACHMENT 19</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

16.    *See* Zetter, Kim (Wired Digital), *Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight* (Apr. 09, 2013), *available at* http://www.wired.com/threatlevel/2013/04/verizon-rigmaiden-aircard/all/ (last accessed: May 17, 2014); *see also* PSAUMF § III, ¶ No. 45; <u>ATTACHMENT 20</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

1  loss of lives.  Before being physically attacked or falling unconscious from illness, people

2  may only have time, or the physical strength, to dial 9-1-1 once, not twice as required by

3  Harris equipment.  Furthermore, the FBI and counsels' insensitivity on this issue is very

4  disconcerting.  *See Comment by FBI's counsel, Brad Rosenberg*, Dkt. #091, p. 1 ("Rigmaiden

5  fashions himself as many things... even someone who expresses concern for public safety.").

6  Go pray, Brad.

7       Use of Harris type devices is so well known that there are free software tools available

8  on the Internet allowing any member of the public to defeat the government's use of the

9  devices via his/her cell phone.  *See* PSAUMF § III, ¶¶ Nos. 50-52.  However, the FBI again

10  attempts to mislead the court, but this time into believing that people are merely "trying" to

11  defeat the StingRay, rather than having already succeeded:

12         Internet bloggers are already outlining ways **to try** to circumvent the

13         governments [sic] cellular locating and identifying capabilities.  Releasing
       further details pertaining to this technique would thwart law enforcement

14         responsibilities.

15         Dkt. #091-6 [Declaration by David M. Hardy, Section Chief of the FBI Record/
       Information Dissemination Section], ¶ 73, p. 29 (emphasis added).

16

17  Contrary to Hardy's claim, anyone who visits the *SRLabs Open Source Projects* website will

18  see that "bloggers" have already succeeded in defeating the FBI's so-called "secret" spy

19  technology via the "Catcher Catcher" cell phone software that can be downloaded by any

20  member of the public for free.  *See* PSAUMF § III, ¶¶ Nos. 50-52.  Some of the detection

21  methods used by the software include: (1) "No encryption after using encryption with the

22  same operator before," (2) "IMEI not requested in Cipher Mode Complete message," (3)

23  "The LAC of a base station changes," (4) "The LAC changes more than once," (5) "The

24  network queries the phones IMEI during location update," (6) "Receive a silent text

25  message," (7) "You are paged, but do not enter any transaction," (8) "You do not receive a

26  call setup message while already being on a traffic channel for 2 seconds," and (9) "You do

27  not receive a call setup message while already being on a traffic channel for [10 seconds]."

28  *Id.*  For anyone willing to use the noted software, game over for the FBI.

1    To support an argument that user manuals and technical information should be kept

2   secret, the FBI claims that "information about [][the technology's] **application** and **use** is not

3   publically [sic] known." Dkt. #091-6, ¶ 73, p. 29 (emphasis added).  Setting aside for a

4   moment the fact that "application and use" are also generally known, records on how cell site

5   emulator technology is *applied* (*e.g.*, to track a cell phone, aircard, etc.) and *used* (*e.g.*, to

6   follow a suspect while staying at a distance) by FBI agents is separate from records relating to

7   the technical details of which the FBI has already conceded are public knowledge.  *Id.*, ¶ 73,

8   p. 29 ("the existence of cell-site technology as a general law enforcement technique is

9   publically [sic] known...").  While Plaintiff is also entitled to records detailing *application*

10   and *use* (those records contain known information as well), the Court must understand that

11   the FBI conceding that the *technology* is generally known is also a concession that (b)(7)(E)

12   and (b)(1) are inapplicable to the technical operations of Harris equipment—information the

13   FBI continues to withhold despite most of it being public knowledge and in the public

14   domain.  *See* PSAUMF § III ¶¶ Nos. 1-52 (detailing public knowledge and records).

15    Furthermore, the FBI cannot claim that (b)(7)(E) and (b)(1) apply simply because there

16   are specific technical details or techniques within the requested records that are yet to be

17   generally known.  "If we were to follow such reasoning, the government could withhold

18   information under Exemption 7(E) under any circumstances, no matter how obvious the

19   investigative practice at issue, simply by saying that the 'investigative technique' at issue is

20   not the practice but the application of the practice to the particular facts underlying the FOIA

21   request." Rosenfeld, 57 F.3d at 815.  In any event, by virtue of Harris' patents being publicly

22   available, *see* PSAUMF § III ¶¶ Nos. 36-37, it is evident that the government has made no

23   effort to conceal the technology from the public using the *Invention Secrecy Act*, 35 U.S.C. §§

24   181-88.  If the FBI was so concerned, it could have issued a secrecy order on the relevant

25   Harris patents under the Act.  Harris' patents explain the technology in precise enough detail

26   to allow for someone to duplicate the devices.  *See* United States v. Telectronics, Inc., 857

27   F.2d 778, 758 (Fed. Cir. 1988) (A patent application must pass the test of enablement, which

28   "is whether one reasonably skilled in the art could make or use the invention from the

1   disclosures in the patent coupled with information known in the art without undue

2   experimentation."). Devices similar to those made by Harris have already been built by

3   members of the public using online instructions, *see* PSAUMF § III ¶ No. 48, and

4   demonstrated to cell phone users in public forums. *See* PSAUMF § III ¶ No. 49.

5       Nevertheless, even if the Court were to reject full disclosure based on an application of

6   *Rosenfeld*, or debate precisely what details can be considered "routine and generally known,"

7   Plaintiff is still entitled to at least some records or portions thereof under the public domain

8   exception. As further argued below, Plaintiff is entitled to records containing information that

9   mirrors other information currently preserved in public records.

10              **d.   FOIA exemption (b)(7)(E), (b)(1) and all other exemptions,
                       do not apply to any information requested by Plaintiff that is
11                     already preserved in permanent public records.**

12      "Under the public domain doctrine, FOIA-exempt information may not be withheld if

13  it was previously disclosed and preserved in a permanent public record." Chesapeake Bay

14  Found., Inc. v. U.S. Army Corps of Eng'rs, 722 F.Supp.2d 66, 72 (D.D.C. 2010) (citation and

15  internal quotation marks omitted). "[I]f identical information is truly public, then

16  enforcement of an exemption cannot fulfill its purpose." Niagara Mohawk Power Corp. v.

17  United States DOE, 169 F.3d 16, 19 (D.C. Cir. 1999). However, the identified publicly

18  preserved document or record need not be the same document or record in the agency's

19  possession. Rather, the doctrine covers the same ***information***—even if the document or

20  record produced via a FOIA search is different from the publicly preserved document or

21  record:

22          While the excerpts of [public] trial testimony produced by North do not
            establish that the documents [][sought in his FOIA request] became part of the
23          public record, they are sufficient to demonstrate that **some information** within
            the requested documents may have been publicly disclosed.... Accordingly,
24          DEA has an obligation to search for and produce any responsive records that
            contain **information** identical that which has been publicly disclosed.
25
            North v. United States, 810 F. Supp. 2d 205, 208 (D.D.C. 2011) (emphasis added).
26

27  Therefore, Defendants FBI is required to produce all records, or portions thereof, containing

28  *information* which is the same as the *information* contained in publicly preserved documents.

1   Plaintiff's requests that the Court require the FBI to use the documents attached to *Daniel*

2   *Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to*

3   *Defendants' Motion for Summary Judgment* as a **road map** to the specific information that is

4   preserved in public records.  The relevant attachments are Nos. 1-24.  Any information

5   referenced in those attachments must not be redacted or withheld in the records provided to

6   Plaintiff.  **This reasoning applies across all claimed FOIA Exemptions.**

7        The FBI claimed that "[r]eleasing **further details** pertaining to [][Harris devices]

8   would thwart law enforcement responsibilities."  Dkt. #091-6, ¶ 73, p. 29 (emphasis added).

9   With its use of the phrase "further details," the FBI admits that some information is already

10  publicly preserved.  Portions of documents in the FBI's possession (*i.e.*, user manuals,

11  training manuals, technical literature, *etc.*) containing the noted publicly preserved

12  information cannot be withheld under exemption (b)(7)(E) **or any other exemption**.  The

13  FBI simply revealing the terms "Harris," "StingRay," "LoggerHead," "TriggerFish" and

14  "WITT" is a good start, *see id.*, ¶ 16, p. 7, fn. 7, but falls short of the broad category of

15  publicly preserved information relating to Harris devices.  Even the official Harris price list

16  provided to the public by the United States General Services Administration lists 32 different

17  Harris products by name.  *See* <u>ATTACHMENT 13</u> of *Daniel Rigmaiden's Declaration Under*

18  *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

19  *Judgment* (including names such as KingFish, AmberJack, HailStorm, Harpoon, and

20  RayFish).

21              **e.   The FBI must disclose the names of the FBI sections within
                       the responsive records.**

22        Additionally, unlike in the WSJ FOIA request, the FBI failed to assert (b)(7)(E) to

23  protect the location and identity of FBI sections named in the records.  The FBI must disclose

24  this information as it was improperly redacted with no basis provided in Hardy's declaration.

25              **f.   Exemption (b)(3) does not broadly apply to the records
                       withheld by the FBI.**
26

27        The FBI asserts exemption (b)(3) as a "catch all" for all of its other claimed

28  exemptions.  David Hardy's declaration is wholly conclusory to the effect that it attempts to

1  justify withholding records based on exemption (b)(3). The FBI failed to explain how any

2  given document contains "intelligence sources and method information." *See* Dkt. #091-6, ¶¶

3  35-38, p. 16-18 (pure boilerplate wording requiring no further response). All of these records

4  must be disclosed.

2.  **Exemptions claimed by Defendant FBI relating to *The Wall***
       ***Street Journal* and Brookings Institute FOIA request.**

7       As for the FBI's claim of exemption (b)(7)(E), it fails for the same reasons applicable

8  to the FBI's attempt to apply this exemption to records responsive to Plaintiff's Harris FOIA

9  request. *See* §§ I(A)(1)(c), (c)(i) & (c)(ii), *supra*, hereby incorporated into this section by

10 reference. All of these records must be disclosed. Additionally, unlike in the Harris FOIA

11 request, the FBI also asserts (b)(7)(E) "to protect methods or techniques involving the

12 location and identity of FBI sections that were involved in the investigation(s) at issue in this

13 case. The sections are found in the signature block of internal FBI emails." Dkt. #091-8, ¶

14 73, p. 26. The FBI is frivolously attempting to hide the "FBI sections" mentioned throughout

15 the records. It is already common knowledge that the FBI will use whatever investigative

16 means it has available, including Harris devices, to investigate any given crime. For example,

17 the FBI already publicly advised potential violent offenders that the FBI Criminal

18 Investigative Division, Violent Crimes Unit, is in possession of a number of StingRays. *See*

19 ATTACHMENT 25 (page labeled "FBICELL-298") of *Daniel Rigmaiden's Declaration*

20 *Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for*

21 *Summary Judgment.* Because the FBI's supposed concern about tipping off criminals is a

22 paper tiger, Plaintiff requests that the Court order the FBI to disclose the records.

23      As for the FBI's claim of exemption (b)(5) (*i.e.*, the deliberative process privilege), the

24 FBI violates FOIA by applying the exemption to the withheld records that contain the FBI's

25 final decisions on how to deal with *The Wall Street Journal* and what comments will be made

26 to the reporter. While the FBI disclosed some emails that were sent from FBI personnel to

27 the reporter, it failed to disclose the FBI's **internal emails** that contain the FBI's final

28 decisions on what would be said, etc. Because these final decisions are not covered by

- 13 -

1   exemption (b)(5), Plaintiff requests that the Court order the FBI to disclose the records.

2   **3.   Exemptions claimed by Defendant EOUSA relating to the Harris FOIA request.**

3   **a.   EOUSA failed to meet its burden to show that FOIA**
4   **exemption (b)(7)(E) and (b)(5) apply to records responsive to**
    **Plaintiff's October 10, 2011, EOUSA FOIA request RE:**
5   **Harris devices.**

6        As an initial matter, most of the records Defendant EOUSA provided Plaintiff are not

7   even responsive to his FOIA request.  *See* PSAUMF § III, ¶¶ Nos. 55-56.  As explained in §

8   I(B)(3) later in this brief, EOUSA took a set of records responsive to another requester's **GPS**

9   **device tracking** related FOIA request and sent it to Plaintiff in an attempt to avoid having to

10  search for records relating to his FOIA request regarding Harris **cell phone tracking devices**.

11  However, for the 68 pages that appear to be slightly responsive to Plaintiff's request (by pure

12  happenstance), *see* PSAUMF § III, ¶ No. 55, EOUSA's claimed exemptions fail.  The 68

13  pages are labeled as (1) "Information about cellular provider retention periods" [asserting b5,

14  b6, b7C, and b7E] (Dkt. #091-9, p. 34), (2) "guidance for prosecutors for obtaining and using

15  cell phone evidence" [asserting b5, b6, b7E] (Dkt. #091-9, p. 37), and (3) "Using Cellular

16  Call Detail Records and Location Analysis Evidence in Criminal Trials" [asserting b5, b6]

17  (Dkt. #091-9, p. 38).  Note: the remainder of the "pages" are not at all responsive to Plaintiff's

18  Harris FOIA request.

19       As for EOUSA's claim of exemption (b)(7)(E), it fails for the same reasons applicable

20  to the FBI's attempt to apply this exemption.  *See* §§ I(A)(1)(c), (c)(i) & (c)(ii), *supra*, hereby

21  incorporated into this section by reference.  Furthermore, while the FBI at least attempted to

22  justify an application of exemption (b)(7)(E), EOUSA provides no basis whatsoever to

23  support its application.  Its reasoning is entirely conclusory as shown by its *Vaughn* index.

24  All of these records must be disclosed.

25       As for EOUSA's claim of exemption (b)(5), its reasoning is also entirely conclusory as

26  shown by its *Vaughn* index.  All of these records must be disclosed.

27

28

**4.   Plaintiff contests all other FOIA exemptions claimed by Defendants.**

Plaintiff also contests all other FOIA exemptions claimed by Defendants which are not otherwise specifically addressed in this brief.  Defendants failed to meet their burden to show the applicability of all claimed exemptions.

**B.   Searches performed by Defendant FBI relating to the Harris FOIA request.**

**1.   The FBI failed to conduct an adequate search for records while addressing *The Wall Street Journal* and Brookings Institute FOIA request.**

Defendant FBI failed to carry out appropriate methods to search for records responsive to the Brookings Institute section and *The Wall Street Journal* section of Plaintiff's FOIA request.  *See* Dkt. #091-8.  The FBI did not directly contact prior FBI General Counsel Valerie E. Caproni for records responsive to Plaintiff's request.  Considering Plaintiff's FOIA request relates precisely to comments she made, the most elementary method of search is to ask for responsive records from her directly.

For both the WSJ and Brookings sections, the FBI should have also searched its "Blackberry Enterprise Servers maintained by the FBI at its Clarksburg, West Virginia, facility and other facilities" for text messages regarding the issues.  Plaintiff specifically asked the FBI for text messages and specified the FBI's Blackberry Enterprise Servers.  *See* Dkt. #001, EXHIBIT 05 (Plaintiff's FOIA request letter).  In United States v. Rigmaiden, the FBI produced copies of text messages during the discovery process so this is absolutely within the FBI's capabilities.  *See id.*, CR08-814-PHX-DGC, Doc. #0898-1, p. 59  EXHIBIT 10 (D.Ariz., Oct. 15, 2012).  The FBI also failed to search its archive of all saved incoming and outgoing emails received/sent by FBI employees.  All of these emails are saved on a central network server similar to the text messages sent to/from FBI employee Blackberry devices.  Plaintiff specifically asked the FBI for emails and that it search its "server computers."  *Verified Complaint* Dkt. #001, EXHIBIT 05 (Plaintiff's FBI WSJ/Brookings FOIA request letter).  As is common knowledge, a simple 5-minute SQL search by a systems administrator (targeted at, for example, Valerie E. Caproni's emails of which the FBI never

1  deletes) will easily accomplish this task.  Plaintiff request that the Court order the FBI to

2  search for the type of records specified and in the locations specified.

3            **2.**   **The FBI failed to conduct an adequate search for records while**

4                   **addressing Plaintiff's Harris FOIA request.**

5        Defendant FBI failed to carry out appropriate methods to search for records responsive

6  to Plaintiff's Harris FOIA request.  *See* Dkt. #091-8.  For the Harris record search, the FBI

7  failed to search for text messages within its Blackberry Enterprise Servers and failed to search

8  for emails within its email servers similarly explained in § I(B)(1), *supra*.  *See* Dkt. #104-1.

9  The above section is hereby incorporated into this section by reference.  Plaintiff requests that

10  the Court order the FBI to perform keyword searches of its text message and email archive

11  servers for terms such as "StingRay," "KingFish" and the other terms listed in the FOIA

12  request letter in order to locate the records.

13        Additionally, Plaintiff challenges the sufficiency of the FBI's Harris search on the basis

14  that it failed to search for any of the other record types specifically named by Plaintiff, and it

15  failed to search within any of the record systems specifically named by Plaintiff.  In his

16  original FOIA request letter, Plaintiff named: electronically stored information, emails, email

17  attachments, letters, correspondence, memorandums, documents, reports, statements, audits,

18  purchase receipts, invoices, word processing documents, spreadsheets, graphics and

19  presentation documents, images, text files, instant messages, audio files, video files, voice

20  mail, internet data, log files, blogs, calendar files,  text messages, records of radio

21  transmissions, FBI corporate policy directives, data dictionary files, metadata,  system

22  metadata, substantive metadata, and embedded metadata within workstation computers,

23  server computers, backup systems, legacy systems, databases, hard drives, tape drives, zip

24  disks and other disks, CDs, DVDs, Blu-ray discs, *etc.*, cartridges, magneto-optical disks,

25  calendar systems, voice mail systems, text messaging systems, intranet systems, internet

26  systems, personal digital assistants, cell phones and other cellular devices including

27  Blackberry devices, Blackberry Enterprise Servers maintained by the FBI at its Clarksburg,

28  West Virginia, facility and other facilities, FBI Enterprise Security Operations Center (ESOC)

classified analytical network, and home computers belonging to agents/personnel (**to the extent, if any, they are used for FBI business purposes**). *See Verified Complaint* Dkt. #001, EXHIBIT 01 (Plaintiff's FBI Harris FOIA request letter). Plaintiff requests that the Court order the FBI to search for the type of records specified and in the locations specified.

Additionally, Plaintiff challenges the sufficiency of the FBI's Harris search on the basis that it ignored two of the four categories in his FOIA request letter: (1) "All agency records detailing the FBI's policies, practices, and procedures to **d**estroy real-time wireless device location data obtained by the Harris portable/transportable wireless device locators...," and (2) "All agency records detailing the FBI's policies, practices, and procedures to conceal from defendants and their attorneys in criminal cases the fact that the FBI used the Harris portable/transportable wireless device locators..." *Verified Complaint* Dkt. #001, EXHIBIT 01 (Plaintiff's FBI Harris FOIA request letter). Rather than search for records under the noted categories, the FBI instead decided to "leverage and apply the search results of three other FBI search efforts for similarly requested material[.]" Dkt. #104-1, ¶ 5, p. 4. But this "leveraging" only hits on the first and fourth categories of information specified in Plaintiff's FOIA request (*i.e.*, information on the operations of Harris devices). The two categories of which the FBI failed to conduct new searches (*i.e.*, categories two and three of Plaintiff's FOIA request letter) do not fit within the FBI's prior searches of which it "leveraged." *See* Dkt. #104-1. Plaintiff requests that the Court order the FBI to conduct a FOIA search that complies with the two categories that the FBI ignored.

### 3.   The EOUSA failed to conduct an adequate search for records while addressing Plaintiff's Harris FOIA request.

Defendant EOUSA failed to carry out appropriate methods to search for records responsive to Plaintiff's Harris FOIA request. *See* Dkt. #091-9. The EOUSA failed to search for the types of records and in the places specified just the same as the FBI failed when conducting the FOIA searches addressed in § I(B)(1) and (2), *supra*. *See* Dkt. #104-1. The above sections are hereby incorporated into this section by reference, as Plaintiff specified the same types of records and records system in all three FOIA request letters. *See Verified*

1 | *Complaint*, Dkt. #001, EXHIBIT 11 (Plaintiff's EOUSA Harris FOIA request letter).

2 |      Additionally, Plaintiff challenges the sufficiency of the EOUSA's Harris search on the

3 | basis that it attempted to fulfill Plaintiff's FOIA request by sending him records responsive to

4 | another requester's FOIA request that relates to **GPS tracking devices**, rather than take the

5 | time to search for records relating to portable/transportable wireless device locators. *See*

6 | PSAUMF § III ¶ No. 56.  Nearly all of the records relate to the *Jones* GPS tracking case and

7 | are dated in 2012, which is years before EOUSA conducted its supposed search for Plaintiff.

8 | *See id.*  Plaintiff requests that the Court order EOUSA to conduct an actual search for records

9 | responsive to Plaintiff's FOIA request, rather than pull up records relating to a search

10 | conducted in 2012 relating to GPS tracking devices and providing those to Plaintiff in a

11 | pathetic attempt to avoid having to comply with FOIA laws.

12 |      Additionally, Plaintiff challenges the sufficiency of the EOUSA's Harris search on the

13 | basis that it ignored three of the four categories in his FOIA request letter: (1) "All

14 | department records detailing United States Attorneys Office ('USAO') policies, practices, and

15 | procedures to seek court orders to destroy real-time wireless device location data obtained by

16 | the Harris portable/transportable wireless device...," and (2) "All department records detailing

17 | USAO policies, practices, and procedures to have AUSAs and other attorneys seek one or

18 | more court orders authorizing use of pen registers, trap and trace devices, stored records

19 | under the Stored Communications Act, and/or mobile tracking devices—<u>while the true</u>

20 | <u>intention is to use Harris portable/transportable wireless device locators and related</u>

21 | <u>equipment (listed in No. 1 above) or other portable/transportable wireless device</u>

22 | <u>locators</u>[,]"and (3) "All department records detailing USAO policies, practices, and

23 | procedures to conceal from defendants and their attorneys in criminal cases the fact that the

24 | government used the Harris portable/transportable wireless device locators..." *Verified*

25 | *Complaint*, Dkt. #001, EXHIBIT 11 (Plaintiff's EOUSA Harris FOIA request letter).  The

26 | EOUSA claims that the ignored parts "fail to meet the standard of reasonably defining records

27 | sought[.]" Dkt. #091, p. 32. This is another frivolous argument.  While searching for records

28 | for the ACLU in response to a similar FOIA request, the EOUSA located and produced an

1  email that detailed "AUSAs... seek[ing] one or more court orders authorizing use of trap and

2  trace devices, [or] stored records under the Stored Communications Act...—while the true

3  intention is to use Harris portable/transportable wireless device locators and related

4  equipment [] or other portable/transportable wireless device locators..."—**precisely the type**

5  **of records Plaintiff seeks**.  The email located by the EOUSA for the ACLU was placed on

6  the record in United States v. Rigmaiden, CR08-814-PHX-DGC, Doc. #985-1 (D.Ariz. Mar.

7  26, 2013).  Considering the type of records Plaintiff seeks clearly exist within AUSA email

8  storage, Plaintiff requests that the Court order the EOUSA to process the remaining three

9  categories in his FOIA request letter.

10      Additionally, Plaintiff challenges the sufficiency of the EOUSA's Harris search on the

11  basis that it refused to search "the United States Attorneys Offices in the following locations

12  []: California, Arizona, and New York[] [including] all United States Attorneys Offices within

13  the state[s]."  *Verified Complaint*, Dkt. #001, EXHIBIT 11 (Plaintiff's EOUSA Harris FOIA

14  request letter).  Even if the Court is convinced that the EOUSA properly ignored three

15  categories of requested records, the EOUSA has no right to not search the offices Plaintiff

16  specified for the first category of records.  While the claimed searches were certainly phony,

17  *see* argument immediately above, the EOUSA claims to have already searched five other

18  offices specified in Plaintiff's FOIA request.  *See* Dkt. #091-9.  It cannot ignore the other

19  offices simply because it does not feel like searching.  The EOUSA searched similar offices

20  when it produced the FOIA response records for the ACLU in a FOIA request the EOUSA

21  says "generally overlaps" Plaintiff's.  *See* PSUMF ¶ No. 128.  The records that were

22  produced for the ACLU from a USAO are on the record in United States v. Rigmaiden,

23  CR08-814-PHX-DGC, Doc. #985-1 (D.Ariz. Mar. 26, 2013).  Plaintiff already explained to

24  EOUSA's counsel, Brad Rosenberg, that the AUSAs at each of the specified USAOs can

25  simply have their email accounts searched in the same way they were searched when the

26  EOUSA fulfilled the ACLU's overlapping FOIA request.  The EOUSA's arguments to the

27  contrary are in classic frivolous Rosenberg style.  Plaintiff requests that the Court order the

28  EOUSA to search the specified USAOs for the requested records.

**C.    Defendants' arguments do not undercut Plaintiff's claim that he is
entitled to search and duplication fee waivers on all three FOIA
requests.**

In his *Motion for Partial Summary Judgment* (Dkt. #084), Plaintiff explained why he is
entitled to fee waivers on all of his FOIA requests submitted to the FBI and EOUSA.  In
response, Defendants claim that Plaintiff is not entitled to a duplication fee waiver[17]
because user manuals and other technical information "would say nothing about 'identifiable
operations or activities of the federal government'; they would merely be informative about
the (obscure) inner workings of certain devices..." Dkt. #091, p. 4.  This is incorrect.  It was
by virtue of the so-called "obscure" inner workings that *The Wall Street Journal* and *Wired*
were able to explain to their readers the various Fourth Amendment intrusions the FBI
engages in when using Harris devices.  Relevant articles explain how the devices force cell
phones to connect to rogue cellular spy networks operated by the FBI, read and write data to
and from cell phones, and force transmissions at a higher power—draining user batteries.  If
the public were not interested, seasoned reporters would not be reporting on the so-called
"obscure" inner workings and readers would not be enraged over the FBI's use of those inner
workings to violate their Fourth Amendment rights.  Additionally, information on the so-
called "obscure inner workings" can help members of the public configure their phones to
avoid being denied access to 9-1-1 operators while a StingRay is operating in the area. *See*
PSAUMF § III ¶¶ Nos. 22-25 (explaining how the FBI's use of StingRays requires cell phone
users to dial 9-1-1 twice).

Defendants claim that "Plaintiff has failed to show how disclosure of the records that
he seeks will 'contribute significantly' to the public's understanding[] [because]... the
disclosures... are virtually identical to those that have already been made by the FBI in the
separate... FOIA lawsuit brought by EPIC." Dkt. #091, p. 4.  This is simply not true.  First,
the FBI still has further searching to do for Plaintiff as the specific types of records requested
in Plaintiff's FOIA request differ from those requested in EPIC's request.[18]  Second, unlike

---

17.    Defendant FBI has already conceded that Plaintiff is entitled to a search and processing
fee waiver. *See* Dkt. #091, p. 9, fn. No. 3.
18.    *See* § I(B)(2), *supra* (explaining how the FBI failed to conduct an adequate search).

1   Plaintiff's *yet-to-be-processed* disclosures, the EPIC disclosures had all Harris terms redacted.

2   The FBI admits that "there are estimated to be 'over 11,000 pages' within the 22,982 pages

3   [provided to EPIC] that could undergo re-review and processing in light of FBI's admission

4   that certain terms [] within these records are sufficiently within the public realm..." Dkt.

5   #104-1, ¶ 11, p. 8. The FBI also admits that there could be further records located for release

6   considering "the review process is expected to pull in additional pages for re-review as... the

7   identified pages would have to be evaluated within the context of the documents where the

8   terms appear." *Id.*, ¶ 11, p. 9. This is precisely what happened when the FBI did its limited

9   re-review of 500 pages for EPIC, *i.e.*, it "ascertain[ed] if more information could be

10   segregated for release to address concerns that certain cell-site simulator technology

11   information and/or terms may be publically [sic] known." Dkt. #091-6, ¶ 16, p. 7 (footnote

12   omitted). Third, the FBI is improperly applying FOIA exemptions; once the Court orders the

13   FBI to properly disclose responsive information, it will further advance public understanding.

14       Defendants claim that Plaintiff is not entitled to a fee waiver because he "is currently

15   incarcerated [][and] has not demonstrated that he is requesting information for the purpose of

16   public disclosure." Dkt. #091, p. 5. Defendants note that in the year 2011, when Defendants

17   first began ignoring Plaintiff, he had a primary (but not sole) purpose of requesting records

18   for use in preparing his *Motion to Suppress* in <u>United States v. Rigmaiden</u>. *See id.* However,

19   because Defendants FBI and EOUSA ignored Plaintiff's FOIA requests, no records were

20   produced in time for the suppression motion filing deadline, or even before the date the court

21   ruled on all suppression issues, *i.e.*, May 8, 2013. *See id.*, Doc. #1009 (suppression motion

22   ruling). Given current events resulting from Defendants' initial delay tactics, Plaintiff no

23   longer needs the FOIA responses for use in his defense in CR08-814-PHX-DGC.

24   Suppression litigation is now concluded (*see id.*, Doc. #1009 (suppression motion ruling)),

25   Plaintiff has accepted a plea agreement (*see id.*, Doc. #1137), was sentenced to time-served

26   (*see id.*, Doc. #1136), and is **now living in free society**.

27       While Plaintiff certainly *had* a primary purpose to use the records in his criminal case,

28   he also had, and continues to have, additional purposes for requesting the records that cannot

1   not be ignored by the government or the Court: (1) to provide those records to his contacts in

2   the media and at civil rights organizations (*see Rigmaiden's 1st Declaration*, ATTACHMENT

3   42 ¶ 3 (Dkt. #086)), (2) to make the records freely available to the public on the web (*see*

4   *Rigmaiden's 2nd Declaration*, ¶ 11 (Dkt. #087)),[19] and (3) to use the records in conjunction

5   with his well established and accepted expertise to further explain to the public the

6   government's unconstitutional conduct in using cell site emulator technology to illegally track

7   and locate people.  At the time of making his FOIA requests, Plaintiff was disseminating

8   information to the public by virtue of the motions he was filing in United States v.

9   Rigmaiden.  After filing motions with attached government documents (which was done to

10   support his arguments), members of the press would read the documents and write or

11   televise[20] mainstream news stories.  For example, Jen Valentino-DeVries wrote a front page

12   article in *The Wall Street Journal* (*see* PSAUMF § III ¶ No. 44) after reading Plaintiff's

13   *Motion For Discovery* and attached exhibits (CR08-814-PHX-DGC, Dkt. #0592-1) and Kim

14   Zetter wrote an article for *Wired* (*see* PSAUMF § III ¶ No. 45) after reading *Plaintiff's Motion*

15   *To Suppress* and attached exhibits (CR08-814-PHX-DGC, Dkt. #0824-1).  Contrary to

16   Defendants claims, during the time he made his FOIA requests, had Plaintiff been provided

17   with FOIA records that could have been used to support a defense argument, using the

18   records in that manner would have had the collateral consequence of sufficiently

19   disseminating them to the public.  History proves this point.  Now, Plaintiff uses his website,

20   http://www.freedomdujour.com, to disseminate information—not as a collateral consequence,

21   but as a direct intent.  *See id.*  For example, currently the FBI's Harris FOIA response records

22   and Hardy's crazy declaration are being disseminated to the public by Plaintiff along with one

23   original work.  *See Rigmaiden, Daniel (May 21, 2014). FBI Says U.S. Could Suffer*

24   *Diplomatic / Economic Retaliation, and Customers Will Sue Telecom Companies if Details of*

25   *FBI's Foreign and Domestic Cell Phone Spying Are Revealed to Public*, Freedom Du Jour

26

27   19.   This is already happening. *See* http://www.freedomdujour.com (last accessed: May 24, 2014) (Plaintiff's information dissemination website).

28   20.   *See* https://www.youtube.com/user/DanielDavidRigmaiden/ (last accessed: May 24, 2014).

1   [website], *available at* http://www.freedomdujour.com/news/14_05-21-

2   2014_1_diplomatic_economic_retaliation_lawsuits_if_fbi_reveals_cell_phone_spying.html

3   (last accessed: May 24, 2014).  A link to Plaintiff's article has been retweeted at least 52 times

4   (and counting) to a combined set of over 100,000 twitter users.  *See, e.g.,*

5   https://twitter.com/yustein/statuses/469671111563964417 (sent out to 8,931 twitter users) and

6   https://twitter.com/csoghoian/statuses/469570597211897856 (sent out to 33,000 twitter users

7   and retweeted by 25 other people to an additional 81,038 twitter users).  Plaintiff has

8   established his ability to disseminate information to the public, both past and present.

9       Defendants rely upon <u>McQueen v. United States</u>, 264 F. Supp. 2D 502, 525 (S.D.Tex.

10  2003) to make their argument that, at the time Plaintiff made his request, he had no intention

11  or ability to disseminate information to the public.  If the Court is to decide the issue based on

12  the past, *McQueen* does not help Defendants' position considering McQueen's "***sole need*** for

13  [] information [][was] to see that justice is done in the case[.]"  *Id.* at 525 (emphasis added).

14  As noted above, this was not Plaintiff's ***sole need***, and is now not even a need at all.

15  Furthermore, *McQueen* relies upon <u>Rizzo v. Tyler</u>, 438 F. Supp. 895, 897 (S.D.N.Y. 1997), but

16  *Rizzo* found that "the claimed public interest **appears to be manufactured** for the purpose of

17  taking advantage of the waiver provision."  *Id.* at 900 (emphasis added).  In comparison, the

18  great public interest in the government's warrantless cell phone tracking is not manufactured

19  in this case.  Because *Rizzo* does not apply to the instant case, neither does *McQueen*.

20      Defendants also rely upon <u>Larson v. CIA</u>, 843 F.2d 1481, 1483 (D.C. Cir. 1988) to

21  argue that Plaintiff's plan to disseminate to journalists is not grounds for a fee waiver.  *See*

22  Dkt. #091, p. 6.  However, Larson is nothing like Rigmaiden:

23      Larson's allegation, as presented in the administrative record, **failed to identify
        the newspaper company** to which he intended to release the requested
24      information, his purpose for seeking the requested material, **or his professional
        or personal contacts with any major newspaper companies**.  The absence of
25      this information demonstrates an inability to disseminate the information to the
        public.  *Id.* at 1483 (emphasis added).
26

27  Unlike in *Larson*, the administrative record in the present case shows how Plaintiff identified

28  *The Wall Street Journal* reporter Jen Valentino-DeVries and provided copies of her then-

1  recent front-page articles that mention Plaintiff and draw upon StingRay related information

2  Plaintiff placed on the record in United States v. Rigmaiden.  *See* EXHIBIT 01 of *Verified*

3  *Complaint* (Dkt. #001) (Plaintiff's Harris FOIA request letter sent to the FBI).  Therefore,

4  *Larson* does not support Defendants' position.  Additionally, during the 2.5 years since

5  Plaintiff made his FOIA requests, he has gained additional news media contacts including

6  Kim Zetter at *Wired*.  *See* PSUMF, ¶ No. 64.  These additional reporters also wrote articles

7  based on information and original works (in the form of motions) placed on the record in

8  United States v. Rigmaiden.  *See, e.g.*, PSAUMF § III ¶ No. 45.  What's more, a reporter from

9  *Politico*, Shaun Waterman, tweeted a link to Plaintiff's *Freedom Du Jour* news article (an

10  original work discussing Hardy's crazy declaration) to his Twitter follows.  *See*

11  https://twitter.com/WatermanReports/status/470563471525171200.  This goes to show that

12  Plaintiff is *still* capable of getting vital information to the mainstream news media for

13  dissemination to the public.

14         When Plaintiff said, "I am not requesting records on behalf of anyone other than

15  myself[,]" he was merely clarifying that he was not working for any news companies such as

16  *The Wall Street Journal*: "I am not associated with any of the above entities..." Dkt. #091, p.

17  6.  Defendants again attempt to mislead the Court by misconstruing Plaintiff's declarations as

18  meaning he had/has no intention to disseminate to journalists, civil rights activists at the

19  ACLU and EFF, and to the public directly (specifically what the declarations state in other

20  paragraphs).  Plaintiff's FOIA requests, appeal letters, and declarations (which are all on the

21  record) make clear the full scope of Plaintiff's intentions—intentions that have now become a

22  reality.  *See, e.g.*, http://www.freedomdujour.com (Plaintiff's FOIA record dissemination

23  website where FOIA records and filings in this case are available for public download).

### 1.   EOUSA remains legally barred from charging search and duplication fees.

26         Plaintiff already explained how EOUSA's failure to adhere to FOIA time guidelines

27  merits Plaintiff a full fee waiver.  *See* Dkt. #084, p. 3-7.  In response, the EOUSA claimed

28  that it can charge Plaintiff search fees because "unusual or exceptional circumstances" was

1   the reason for its failure to acknowledge Plaintiff's FOIA request for 18 months. *See* Dkt.

2   #091, p. 8. EOUSA's counsel cites 5 U.S.C. § 552(a)(4)(A)(viii) in support of their client's

3   claim:

4   > Waiver of fees if agency fails to comply with time limit "if no unusual or
5   > exceptional circumstances... apply to the processing of the request."
> Dkt. #091, p. 8 (ellipsis/omission in EOUSA's counsels' brief).

6

7   However, in a recurring theme dishonesty, EOUSA's counsel used an ellipsis (…) to hide the

8   portion of the statute that renders his client's claim frivolous:

9   > Waiver of fees if agency fails to comply with time limit "if no unusual or
10  > exceptional circumstances **(as those terms are defined for purposes of
> paragraphs (6)(B) and (C), respectively)** apply to the processing of the
11  > request."

12      5 U.S.C. § 552(a)(4)(A)(viii) (emphasis added).

13  Section (6)(B) cited in (a)(4)(A)(viii) requires that time limits "be extended by written notice

14  to the person making such request setting forth the unusual circumstances for such extension

15  and the date on which a determination is expected..." *Id.* EOUSA admits that it ignored

16  Plaintiff for 18 months. *See* Dkt. #091-9, ¶¶ 3-4, p. 2 ("By letter dated October 10, 2011, Mr.

17  Rigmaiden submitted a FOIA request for four categories of records.... By letter dated May 3,

18  2013, EOUSA responded to Mr. Rigmaiden..."). No written notice was ever provided to

19  Plaintiff as required by (6)(B). EOUSA also failed to comply with other requirements of (6)

20  (B) and (6)(C). Because it failed to comply, (a)(4)(A)(viii) does not allow it to assess search

21  fees.

22      EOUSA also relies upon an "invented confusion" over Plaintiff's FOIA request as a

23  means to justify why it first ignored Plaintiff and then refused to even search for records. *See*

24  Dkt. #091-9, ¶ No. 7, p. 3 ("Having received Mr. Rigmaiden's interpretation of what he

25  actually meant, EOUSA decided to determine if a search for responsive records could be

26  done."). However, Plaintiff's FOIA request letter was written clearly and any of EOUSA's

27  counsels' later questions Plaintiff answered regarding the letter do not affect EOUSA's failure

28  to properly address the request. There was no "what he actually meant," as claimed by

- 25 -

1   EOUSA.  Plaintiff always meant precisely what he meant from the start (as written in his

2   FOIA request letter).  It is now clear that EOUSA's counsel asked Plaintiff very dumb

3   questions regarding the FOIA letter, such as "what do you mean by 'department'," as a means

4   to provide his client an opportunity to mentally justify claims such as, "Having received Mr.

5   Rigmaiden's interpretation of what he actually meant, EOUSA decided to determine if a

6   search for responsive records could be done." (ah, social dissidence at its best).  This is

7   another example of Brad Rosenberg's general dishonesty towards the Court.  EOUSA cannot

8   erase the fact that the specific offices Plaintiff wanted searched were listed in his original

9   FOIA request letter from the start.  *See* EXHIBIT 11 of *Verified Complaint* (Dkt. #001)

10  (EOUSA Harris FOIA request letter).  Even if two of the listed offices are not within the

11  EOUSA (as claimed by EOUSA), it does not give EOUSA a right to ignore the entire request

12  rather than respond within 20 days.  *See id.*  EOUSA's failure to respond in time means

13  Plaintiff is entitled to a full fee waiver.

14              **2.   FBI has waived search fees; the only dispute is Plaintiff's right to**
                **a duplication fee waiver.**
15

16          The FBI has already waived all **search** fees for Plaintiff.  As noted by Defendant FBI,

17  "In light of the fact that plaintiff filed an administrative appeal with OIP, and the fact that OIP

18  represented that it would forward plaintiff's request to the FBI, the government is not pressing

19  that particular point in this litigation."  Dkt. #091, p. 9, fn. No. 3.  Therefore, the parties

20  agree that as the FBI continues to reprocess the 23,000 "pages" of records to remove Harris

21  product redactions, and as it continues to reveal further previously redacted information and

22  conduct future searches for records (if ordered by the Court), it cannot charge Plaintiff.  The

23  only issue before the Court is whether the FBI can charge Plaintiff **duplication** fees.

24          **D.    Defendant FBI and EOUSA have waived challenges to Plaintiff's**
                **claim of being entitled to expedited processing.**
25

26          In his *Motion for Partial Summary Judgment* (Dkt. #084), Plaintiff explained why he

27  is entitled to expedited processing on all of his FOIA requests submitted to the FBI and

28  EOUSA.  In their response brief, Defendants failed to address the issue of expedited

1 | processing and have therefore waived the issue.

2 |       No counter-argument was raised by EOUSA. *See* Dkt. #091. As the EOUSA

3 | continues to search for and process additional records if ordered by the Court, Plaintiff is

4 | entitled to expedited processing. Plaintiff requests that the Court order the EOUSA to process

5 | at least 3,000 "pages" of records per month while it continues to address Plaintiff's FOIA

6 | request in an expedited fashion.

7 |       As for Defendant FBI, it originally claimed, "Because the Parties Agreed to Substitute

8 | the EPIC Request for Plaintiff's Harris Request, Expedited Processing Is Not at Issue." Dkt.

9 | #091, p. 34. However, Defendant FBI then filed a motion requesting leave to withdraw the

10 | part of its argument claiming that the parties agreed to substitute the EPIC disclosure. *See*

11 | Dkt. #096. The Court then noted, "The government also states that its

12 | previous filings mistakenly stated that Plaintiff had agreed that the EPIC search could

13 | serve as a substitute for his Harris request. [] The government withdraws

14 | that statement[.]" Dkt. #103, p. 1. The Court then allowed the FBI to file a supplemental

15 | response memorandum in light of the mistake. *See id.*, p. 2-3. However, in the supplemental

16 | response memorandum, the FBI only addressed the issue of its search for records and not the

17 | issue of expedited processing. *See* Dkt. #104. Therefore, with Dkt. #091 and #104,

18 | Defendant FBI has already filed its response to Plaintiff's motion at Dkt. #084 and the matter

19 | is now fully briefed. The instant memorandum is Plaintiff's reply and concludes briefing on

20 | the issue of expedited processing. **The FBI has lost its chance to contest the issue and the**

21 | **Court must rule in Plaintiff's favor**. As the FBI continues to reprocess at least 11,000

22 | "pages" of documents (and probably the full 23,000) to remove redactions of Harris product

23 | names, and as the FBI continues to search for and process additional records if ordered by the

24 | Court, Plaintiff is entitled to expedited processing. Plaintiff requests that the Court order the

25 | FBI to process at least 3,000 "pages" of records per month while it continues to address

26 | Plaintiff's FOIA request in an expedited fashion.

27 |

28 |

**E.     Defendants' arguments do not undercut Plaintiff's claim that he is entitled to records in native digital form, or converted directly into PDFs (rather than printed and rescanned) so as to preserve searchable text.  Nevertheless, the issue is in factual dispute and must proceed to trial.**

As an initial matter, the issue of native form digital record production is entirely separate from the issue of metadata production.  Defendants filings make clear that it is attempting to prey upon what it sees as "technical illiteracy" on the part of the Court.  *See* Dkt. #091, p. 9-13 (attempting to apply metadata facts and arguments to Plaintiff's request for native digital form records).  Plaintiff, however, does not believe the Court to be oblivious to the differences, both technical and legal, between (1) FOIA production of native form digital records, and (2) FOIA production of metadata.  Nor does he expect the Court to fall for Defendants' dishonest attempt to confuse and intermingle the legal issues.

Defendants try to frame the issue of native form digital record production as "what is a record" rather than as "Plaintiff's right to a record in a particular form or format."  Contrary to Defendants' contention, Plaintiff is not asking for any information that he is not otherwise entitled to under FOIA.  He simply requires that the information be provided in a particular **form or format** of record.  This is Plaintiff's right under FOIA.  Government agencies are required to "make reasonable efforts to search for the records in electronic form or format," 5 U.S.C. § 552(a)(3)(C),[21] and "shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B).  "There is a clear statutory obligation to provide the records in electronic format when that format is requested." Sample v. B.O.P., 466 F.3d 1086, 1088 (D.C. Cir. 2006).  Defendants taking native form digital records, printing them out, and rescanning them back into flat image files is not an electronic format as contemplated by FOIA.  Doing so undermines the purpose of having an electronic record.  Under Defendants' theory, it could take a digital photograph of an audio tape and provide that to a FOIA requester as a "digital record" of the the tape recording.  Plaintiff already explained how the

---

21.    Electronic (*i.e.*, digital) record production is required by the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat. 3048, 3049 (codified as amended at 5 U.S.C. § 552(f)(2)).

FBI's failure to produce digital records makes accurate keyword searching within the records impossible—similar to a photograph of a cassette tape. *See Daniel Rigmaiden's Second Declaration Under Penalty of Perjury in Support of Plaintiff's Motion for Partial Summary Judgment*, p. 7-17, ¶¶ Nos. 22-45. Plaintiff also explained how both Defendants are capable of providing the records in either native digital form, or as searchable, vector-based PDF files via a digital conversion process. *See id.*

In his declaration, Plaintiff explained how Defendants could convert the native digital form records to vector-based, keyword searchable PDF files and then perform digital redactions within the PDF files using Appligent Redax. *See id.* Since that time, EOUSA provided records to Plaintiff. *See PSAUMF § III ¶ No. 55.* Contrary to defense councils' frivolous argument that records are not "readily reproducible by the agency" in the form requested by Plaintiff, the EOUSA provided its records in the form **precisely requested by Plaintiff**, *i.e.*, it provided copies of emails that had been digitally converted to PDF (with preserved vector-based text) and then redacted using the very software identified by Plaintiff, *i.e.*, Appligent Redax. A screenshot of the metadata for the last PDF file provided by EOUSA shows that it used Appligent Redax to assemble and redact the records provided in vector-based, keyword searchable form. *See PSAUMF § III ¶ No. 56.* Again the government raises frivolous arguments that do nothing but waste the Court's time and taxpayer money.

As should now be clear, and contrary to the Court's previous mistake of grouping in "native form digital record production" with "metadata production,"[22] the issue of native form production is factual, not legal. Defendants are required to provide records in the form or format requested by Plaintiff "if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B). Because Plaintiff is not asking for any information he is not otherwise entitled to, this is a factual question, not legal. EOUSA, has already

---

22.    When addressing Plaintiff's request for discovery on Defendants' capabilities to produce native form digital records, the Court fell for Defendants' dishonest attempt to group two issues together: "The Court agrees that whether metadata is subject to FOIA is a legal issue." *See* Dkt. #108, p. 9. What happened to "native form digital records," Judge? Do you not understand that they are two different issues? Nevertheless, if Plaintiff's evidence is not good enough then the issue of Defendants' capabilities regarding form of production is in factual dispute and must proceed to trial.

1   shown that it can provide the records as vector based, keyword searchable PDF files which

2   satisfies Plaintiff's request for native form digital production.  As for the FBI, even if the

3   Court is convinced that the FBI is not capable of providing the records as vector based PDF

4   files, it is still capable of scanning its paper documents into its HighView system as 600 dot

5   per inch flat tiff images, as opposed to the 150 dot per inch,[23] and performing its redactions

6   on those higher quality scans, then providing the 600dpi tiffs to Plaintiff (allowing for an

7   adequate OCR conversion).  *See Daniel Rigmaiden's Second Declaration Under Penalty Of*

8   *Perjury In Support Of Plaintiff's Motion For Partial Summary* Judgment, ¶ 55.  The FBI said

9   it basically has to reprocess all 23,000 "pages" anyway,[24] so doing a rescan is not only the

10   FBI's legal obligation, *see* 5 U.S.C. § 552(a)(3)(B), it will also not be a burden.  Plaintiff

11   should not have to suffer from poor keyword searching when the FBI can easily resolve the

12   issue and is required to do so by law.  *See* 5 U.S.C. § 552(a)(3)(B).

13         If the Court is not convinced by Plaintiff's factual claims, as this is a factual issue, not

14   legal, then he requests that his previous request for discovery be granted[25] and that this

15   factual issue proceed to trial.

16               **F.**     **Defendants' arguments do not undercut Plaintiff's claim that he is**

17                       **entitled to metadata.**

18         The issue of metadata is a bit more complex as it is not a request for information in a

19   particular form or format, but a request for information itself (see the difference, now,

20   Judge?).  Most of Defendants' arguments raised in response to Plaintiff's requests for (1)

21   native form digital records, and (2) metadata, were in relation solely to the request for

22   metadata.  However, Defendants' arguments when applied to metadata are also incorrect.

23   Defendants' cite to H.R. Rep. 104-795 at 16 to argue that metadata can never be a record

24   under FOIA because a "'matter not previously subject to FOIA when maintained in a non-

---

25   23.     *See* Dkt. #091-7, ¶ No. 11, p. 5 ("This is accomplished through an interface within the

26   FDPS application and scanner attached directly to the client workstations.").

      24.     *See* Dkt. #104-1, ¶ No. 11-12, p. 8-9.

27   25.     *See* Dkt. #108, p. 4 ("[][Plaintiff] asserts that he needs this discovery to counter

28   Defendants' arguments about their document production capabilities, specifically whether

      they can produce documents in native format...").

1 | electronic format [wa]s not made subject to FOIA by this bill.'" Dkt. 091, p. 10. This does
2 | not help Defendants' position. Before the 1996 amendments to FOIA, information such as the
3 | dates paper documents were created, their authors, and what offices or departments they
4 | originated from were records under FOIA. Today, digital metadata contains this type of
5 | information—equivalent to the pre-1996 paper-form information. It is incorrect to claim that
6 | metadata can never be a record under FOIA based on a reading of H.R. Rep. 104-795, as
7 | claimed by Defendants. Any particular piece of metadata needs to be evaluated for disclosure
8 | under FOIA just like any other responsive information. *See* <u>Families for Freedom v. United</u>
9 | <u>States Customs & Border Prot.,</u> 837 F. Supp. 2d 287, 303-04 (S.D.N.Y. 2011) (Although
10 | "Defendants do not have the obligation to create new information in response to FOIA
11 | requests[,]... the reports' metadata may have contained the date on which they were created;
12 | or perhaps they were archived according by date. **Defendants may not withhold this**
13 | **information** if it exists." (emphasis added)). The FBI noted that "metadata associated with a
14 | document may contain the names of custodians, which may be exempt under FOIA[.]" Dkt.
15 | #091-7, ¶ 13, p. 7 fn. 5. Information that "may" be exempt has never justified ignoring the
16 | information entirely while fulfilling a FOIA request. This is why there are FOIA exemptions
17 | that an agency can assert in regards to specific pieces of information.
18 |      As for the FBI, it has already shown that the HighView system is capable of providing
19 | metadata to Plaintiff. Defendant FBI stated that "[a]t most, the process is able to produce a
20 | 'TIFF' image of an e-mail which may be immediately followed by a 'TIFF' image of a
21 | document embedded in that e-mail (<u>e.g.</u>, Excel, Word, .pdf, etc.)." Dkt. #091-6, ¶ 13, p. 6-7.
22 | An email attachment embedded in an email is one type of metadata. The HighView system
23 | can easily extract out and flatten into a tiff other metadata such as dates, FBI sections,
24 | authors, subject lines, etc. If not, it is time for the FBI to update its system to comply with the
25 | Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat.
26 | 3048, 3049 (codified as amended at 5 U.S.C. § 552(f)(2)), as was done by the EOUSA via its
27 | use of Appligent Redax. *See* PSAUMF § III ¶ No. 56.
28 | ///

1   Respectfully Submitted: *May 27, 2014*

2

3                                          DANIEL DAVID RIGMAIDEN,
                                           Pro Se Plaintiff:
4

5

6                                          *Daniel Rigmaiden*
                                           Daniel D. Rigmaiden
7

8                          **CERTIFICATE OF SERVICE**

9        I, Daniel David Rigmaiden, certify under penalty of perjury under the laws of the

10  United States of America that on *May 27, 2014*          I caused the following

11  to be hand delivered as follows:

12

13  Original attached document and one copy addressed to:

14  Clerk of the Court
    Attn: Civil Docketing Section
15  Sandra Day O'Connor U.S. Courthouse
    401 West Washington Street, Suite 130, SPC 1
16  Phoenix, AZ 85003-2118

17

18  Per Court order at Dkt. #056, the ECF system will effectuate service by providing copies to:

19  Brad P. Rosenberg, Trial Attorney
    Kimberly L. Herb, Trial Attorney
20  U.S. Department of Justice
    Civil Division, Federal Programs Branch
21  PO Box 883
    Washington, D.C. 20044
22

23

24

25

26

27

28  By: *Daniel Rigmaiden*

                              - 32 -