Daniel David Rigmaiden
530 E McDowell Rd Ste 107-214
Phoenix, AZ 85004
Telephone: none
Email: freedan@safe-mail.net

Daniel David Rigmaiden,
Pro Se, Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

Daniel David Rigmaiden,

     Plaintiff,

v.

Federal Bureau of Investigation, et al.

     Defendant.

Civil Action No.:

12-CV-01605-SRB-BSB

**PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS, OBJECTION TO THE ADMISSION OF EVIDENCE, AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS IN SUPPORT OF (1) RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND (2) REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Honorable Susan R. Bolton
United States District Judge

## Table of Contents

I.  Controverting Statement of Facts..................................................................................1

    A.  RE: Defendants' Objections and Responses to Plaintiff's Statement of Material Facts and Statement of Facts as to Which There is No Genuine Issue (Dkt. #91-1)............1

    B.  RE: Defendants' Supplemental Statement of Facts as to Which There is No Genuine Issue (Dkt. #104, p. 6-7)......................................................................................10

II.  Objections to the Admission of Evidence......................................................................12

III.  Statement of Additional Undisputed Material Facts in Support of Response to Defendants' Motion for Summary Judgment..................................................................13

    A.  Information preserved in official federal government public records detailing the technical operations of Harris devices (rebutting Defendants' claims of Exemption (b)(7)(E), etc.)..............................................................................................13

        1.  The Harris Loggerhead..............................................................................13

        2.  The Harris Triggerfish..............................................................................14

        3.  The Harris StingRay and StingRay II.........................................................16

            a.  The Harris StingRay necessitates that users of connected cell phones dial 9-1-1 twice if seeking to make a 9-1-1 emergency phone call.................20

        4.  The Harris KingFish..................................................................................21

        5.  The Harris AmberJack.............................................................................23

        6.  Publicly preserved federal government records relating to all Harris equipment used to locate wireless devices...............................................24

    B.  Information preserved in official state government public records detailing the technical operations of Harris devices (rebutting Defendants' claims of Exemption (b)(7)(E), etc.)..............................................................................................27

        1.  Publicly preserved state government records relating to all Harris equipment used to locate wireless devices...............................................27

    C.  Evidence of public knowledge regarding (1) the technical operations of Harris devices, (2) how to make Harris-like devices, and (3) how to easily defeat Harris devices used by law enforcement.........................................................................34

        1.  Evidence of public knowledge regarding the technical operations of Harris devices..............................................................................................34

2.   Evidence of public knowledge regarding how to make Harris devices.............38

3.   Evidence of public knowledge regarding how to easily defeat Harris
devices.................................................................................................39

D.   Defendant FBI failed to comply with the agreement that Plaintiff would be provided
with a 500-page sample of processed FOIA records and a Vaughn index in order to
litigate all future, yet-to-be-made redactions/withholdings....................................40

E.   Relevant facts RE: the EOUSA failed to conduct an adequate search for records
responsive to Plaintiff's Harris FOIA request.........................................................41

Daniel David Rigmaiden
530 E McDowell Rd Ste 107-214
Phoenix, AZ 85004
Telephone: none
Email: freedan@safe-mail.net

Daniel David Rigmaiden,
Pro Se, Plaintiff

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

Daniel David Rigmaiden,

   Plaintiff,

v.

Federal Bureau of Investigation, et al.

   Defendant.

Civil Action No.:

12-CV-01605-SRB-BSB

PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS, OBJECTION TO THE ADMISSION OF EVIDENCE, AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS IN SUPPORT OF (1) RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND (2) REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. Controverting Statement of Facts

  Plaintiff, Daniel David Rigmaiden, appearing *pro se*, respectfully submits the following controverting statement of facts Pursuant to Fed. R. Civ. P. 56 and LRCiv 56.1(b). The below numbered paragraphs correspond to Defendants' numbered paragraphs at Dkt. #091-1 and Dkt. #104, p. 6-7.

  **A. RE: Defendants' Objections and Responses to Plaintiff's Statement of Material Facts and Statement of Facts as to Which There is No Genuine Issue (Dkt. #91-1).**

  1. Plaintiff controverts this fact on the basis of (1) it is (now) inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**: Along with other clearly stated purposes, Plaintiff originally had a primary purpose of requesting records to support his *Motion To Suppress* in CR08-814-PHX-DGC. *See Rigmaiden's 2nd Declaration*, ATTACHMENT 42 ¶ 2-3 (Dkt.

- 1 -

#086).  Plaintiff submitted his FOIA requests in October and November of 2011.  Thereafter, the filing deadline for Plaintiff's *Motion To Suppress* was set to to April 27, 2012, and later extended to June 1, 2012.  *See* <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, Doc. #810 (D.Ariz. Apr. 23, 2012).  However, because Defendants FBI and EOUSA ignored Plaintiff's FOIA requests, no records were produced in time for the suppression motion filing deadline, or even before the date the court ruled on all suppression issues, *i.e.*, May 8, 2013.  *See id.*, Doc. #1009 (suppression motion ruling).  Given current events resulting from Defendants' initial delay tactics, Plaintiff no longer needs the FOIA responses for use in his defense in CR08-814-PHX-DGC.  Suppression litigation is now concluded (*see id.*, Doc. #1009 (suppression motion ruling)), Plaintiff has accepted a plea agreement (*see id.*, Doc. #1137), was sentenced to time-served (*see id.*, Doc. #1136), and is now living in free society. Furthermore, while Plaintiff certainly *had* a primary purpose to use the records in his criminal case, he also had, and continues to have, additional purposes for requesting the records: (1) to provide those records to his contacts in the media and at civil rights organizations (*see Rigmaiden's 1ˢᵗ Declaration*, <u>ATTACHMENT 42</u> ¶ 3 (Dkt. #086)), (2) to make the records freely available to the public on the web (*see Rigmaiden's 2ⁿᵈ Declaration*, ¶ 11 (Dkt. #087)), and (3) to use the records in conjunction with his well established and accepted expertise to further explain to the public the government's unconstitutional conduct in using cell site emulator technology to illegally track and locate people.  At the time of making his FOIA requests, Plaintiff was disseminating information to the public by virtue of the motions he was filing in <u>United States v. Rigmaiden</u>.  After filing motions with attached government documents (which was done to support his arguments), members of the press would read the documents and write or televise[1] mainstream news stories.  For example, Jen Valentino-DeVries wrote a front page article in *The Wall Street Journal* (*see* § III, ¶ No. 44, *infra*) after reading Plaintiff's *Motion For Discovery* and attached exhibits (CR08-814-PHX-DGC, Dkt. #0592-1) and Kim Zetter wrote an article for *Wired* (*see* § III, ¶ No. 45, *infra*) after reading

---

1.     *See* https://www.youtube.com/user/DanielDavidRigmaiden/ (last accessed: May 24, 2014).

1  *Plaintiff's Motion To Suppress* and attached exhibits (CR08-814-PHX-DGC, Dkt. #0824-1).

2  **IMMATERIAL FACT EXPLAINED**: Plaintiff's original primary purpose for requesting the

3  records is immaterial for four reasons: (1) Plaintiff no longer needs the records for his defense

4  in his criminal case (*see* reason above), (2) after Plaintiff's primary purpose became moot,

5  Plaintiff continued, and continues, to seek the records for the three other purposes noted in his

6  original FOIA request letters (*see also Plaintiff's Motion For Partial Summary Judgment*

7  (Dkt. #084) wherein he continues to seek records for the noted three purposes), (3)

8  Defendants point to no evidence (*see* Dkt. #091-1, ¶ 1, p. 20) showing that the existence of a

9  once relevant primary purpose necessarily negates Plaintiff's other purposes that have been

10  well articulated by Plaintiff in his FOIA requests and filings, and (4) in any event, if accepting

11  Defendants' "then-for-now" theory and finding it legally relevant, Plaintiff requesting records

12  for use in his *Motion To Suppress* would have also effectuated disclosure to the public as the

13  documents would have been placed on the public record during the course of litigation,

14  downloaded by the press, then reported to the public by the press.  As for reason No. 4 above,

15  what Plaintiff explains is precisely what occurred in CR08-814-DGC-PHX regarding a FOIA

16  response provided to the ACLU by Defendant EOUSA in a separate FOIA lawsuit.  ACLU

17  attorney Linda Lye placed an EOUSA FOIA disclosure on the record in CR08-814-PHX-

18  DGC in support of Plaintiff's *Motion To Suppress*. *See* United States v. Rigmaiden, CR08-

19  814-PHX-DGC, Doc. #985-1 (D.Ariz. Mar. 26, 2013).  After placing this FOIA response

20  document on the record, reporters obtained the document and then wrote about it in the

21  context of Plaintiff's *Motion To Suppress*. *See, e.g.*, Farivar, Cyrus. (Mar 27 2013). *New e-*

22  *mails reveal Feds not "forthright" about fake cell tower devices: E-mails could have*

23  *implications for accused tax fraudster caught via "stingray."* Ars Technica, *available at*

24  http://arstechnica.com/tech-policy/2013/03/new-e-mails-reveal-feds-not-forthright-about-

25  fake-cell-tower-devices/ (last accessed: Apr. 4, 2013).  To this effect, had Defendants

26  complied with FOIA laws rather than treat Plaintiff arbitrarily and capriciously compared to

27  overlapping FOIA requesters ACLU and EPIC, Plaintiff's original primary purpose—in

28  addition to helping his defense—would have *also* complemented his *other* purposes that still

1  remain relevant to this day.

2      2.      Plaintiff controverts this fact on the basis of (1) it is not a material fact.

3  **IMMATERIAL FACT EXPLAINED**:  Plaintiff requesting records on behalf of himself

4  rather than on behalf of the reporters and civil rights advocates he plans to disseminate

5  records to is immaterial.  It is well established that reporters contact Plaintiff for information

6  on cell site emulator technology and that his technical conclusions regarding the technology

7  are reported to the public. *See Rigmaiden's 1st Declaration*, <u>ATTACHMENT 25</u> (Dkt. #086)

8  (Zetter, Kim (Wired Magazine), *Secrets of FBI Smartphone Surveillance Tool Revealed in*

9  *Court Fight* (Apr. 09, 2013) [Reporting Plaintiff's cell site emulator technical conclusions to

10  the public].).  Numerous news articles placed on the record by Plaintiff show that he has the

11  ability to get information out to the public through his contacts. *See Rigmaiden's 1st*

12  *Declaration*, <u>ATTACHMENTS</u> 9,10, 20-26, 29, & 30 (Dkt. #086).  Additionally, Plaintiff will

13  upload (in fact, already has: http://www.freedomdujour.com) all relevant FOIA disclosures to

14  a website for public download. *See Rigmaiden's 2nd Declaration*, ¶ 11 (Dkt. #087).  Other

15  than for showing no commercial interest, Plaintiff requesting records on his own initiative

16  does not affect whether he is entitled to expedited processing and fee waiver.

17      3.      Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

18  supported by material evidence, and (2) it is not a material fact.

19  **INACCURATE FACT EXPLAINED**: The use of the word "numerous" is vague and up for

20  interpretation.

21  **IMMATERIAL FACT EXPLAINED**:  Whether Plaintiff requested records from a

22  "numerous" or "non-numerous" number of offices is immaterial to the underlying issues of

23  whether EOUSA was justified in completely ignoring Plaintiff's FOIA request for 18 months,

24  whether EOUSA is required to conduct the requested search for records, and whether EOUSA

25  is barred from charging fees after violating 5 U.S.C. § 552(a)(4)(A)(viii). *See Kornmeier's*

26  *Declaration*, ¶ 4-5 (Dkt. #091-9, p. 2) ("By letter dated October 10, 2011, Mr. Rigmaiden

27  submitted a FOIA request for four categories of records.... By letter dated May 3, 2013,

28  EOUSA responded to Mr. Rigmaiden..." (well over 20 days)).

- 4 -

1   4.   Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

2   supported by material evidence. **INACCURATE FACT EXPLAINED**: All of the FOIA

3   response documents placed on the record by Defendant FBI are all computer generated

4   documents such as emails and email attachments that originated in digital form. *See Hardy*

5   *3rd Declaration*, EXHIBIT G (Dkt. #091-8, p. 92-189) (showing emails and email

6   attachments).  In any event, the use of the phrase "vast majority" is vague and up for

7   interpretation.

8   5.   Plaintiff lacks knowledge or information sufficient to form a belief about

9   whether the FBI uses poorly designed software.

10   6.   Plaintiff lacks knowledge or information sufficient to form a belief about

11   whether the FBI uses poorly designed software.

12   7.   Plaintiff lacks knowledge or information sufficient to form a belief about the

13   truth of this assertion.

14   8.   Plaintiff has no means to confirm this assertion, but otherwise disputes as

15   inaccurate that tiff files are required to protect classified files.

16   9.   Plaintiff has no means to confirm this assertion.

17   10.   Plaintiff lacks knowledge or information sufficient to form a belief about

18   whether the FBI uses poorly designed software.  However, Plaintiff asserts in his Statement of

19   Additional Undisputed Facts that the FBI's FDPS system can easily be updated to "flatten"

20   metadata into a separate text document (that can then be subjected to redactions) in the same

21   way that the FDPS system flattens email attachments into separate documents.

22   11.   Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

23   supported by material evidence.

24   **INACCURATE FACT EXPLAINED**: The software cited by Plaintiff is specifically

25   designed, using patented technology, to do secure, non-reversable redactions on PDF files,

26   including PDF files that are created from emails and other documents. *See Rigmaiden's 1st*

27   *Declaration*, ATTACHMENTS 31 & 32 (Dkt. #086).

28   12.   Plaintiff has no means to confirm whether the FBI uses poorly designed

1 | software.

2 |      13.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

3 | supported by material evidence.

4 | **INACCURATE FACT EXPLAINED**: The tiff files claimed to be used by the FBI FDPS

5 | software are compatible with all "standard review platforms" used to review and edit image

6 | files, *i.e.*, Microsoft Paint, Abode Photoshop, Windows Picture and Fax Viewer, *etc*. The

7 | court can search its computer for *.tif (or search Google for "free tiff clipart"), click one of

8 | the resulting files, and see that it opens using a "standard review platform." Go ahead, try it!

9 |      14.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

10 | supported by material evidence.

11 | **INACCURATE FACT EXPLAINED**: Defendant EOUSA submitted a declaration claiming

12 | that all of the documents it located in response to Plaintiff's FOIA request were in digital form

13 | and that it can/did convert those documents to PDF: "The Staff will either receive paper

14 | documents and scan them into the e-FOIA system or receive electronic documents and

15 | convert them to TIFFs or PDFs. In Mr. Rigmaiden's case, it was the latter, as **all of the**

16 | **records identified through EOUSA's searches were electronic**." *See Kornmeier's*

17 | *Declaration*, ¶ 24 (Dkt. #091-9, p. 6 (emphasis added). Using one of the software packages

18 | identified by Plaintiff (*i.e.*, Redax by Appligent), the EOUSA redacted the responsive records

19 | in native digital form while preserving the disclosable vector based text. *See Rigmaiden's 1*ˢᵗ

20 | *Declaration* (Dkt. #086), ATTACHMENTS 31 & 32 (identifying Redax as software for

21 | Defendants to use); *see also* ATTACHMENT 29 of *Daniel Rigmaiden's Declaration Under*

22 | *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

23 | *Judgment*. (screenshot of PDF metadata showing that the EOUSA used the redaction software

24 | "Redax" to build the PDF documents disclosed to Plaintiff).

25 |      15.    Plaintiff lacks knowledge or information sufficient to form a belief about the

26 | truth of this assertion.

27 |      16.    Plaintiff lacks knowledge or information sufficient to form a belief about the

28 | truth of this assertion.

1       17.    Plaintiff lacks knowledge or information sufficient to form a belief about the

2  truth of this assertion.

3       18.    Plaintiff lacks knowledge or information sufficient to form a belief about the

4  truth of this assertion.

5       19.    Confirmed.

6       20.    Confirmed.

7       21.    Plaintiff lacks knowledge or information sufficient to form a belief about the

8  truth of this assertion.

9       22.    Plaintiff lacks knowledge or information sufficient to form a belief about the

10  truth of this assertion.

11       23.    Confirmed.

12       24.    Confirmed.

13       25.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

14  supported by material evidence, and (2) it is not a material fact.

15  **INACCURATE FACT EXPLAINED**: Defendants provide no material evidence showing

16  the redactions on FOIA documents released to EPIC.

17  **IMMATERIAL FACT EXPLAINED**:  The EPIC documents are not at issue in this lawsuit.

18  Plaintiff's FOIA request seeks documents relating to Harris products while EPIC's was a

19  general request on cell site emulators by all manufacturers.  **None of EPIC's documents**

20  **contain Harris-product-related words**, as the FBI said it would reveal in documents

21  provided to Plaintiff.  Additionally, the FBI located approximately 23,000 "pages" of

22  documents in relation to Plaintiff's request and is yet to process those documents.  Despite

23  Defendants' counsels' attempt to manipulate the proceedings, Plaintiff never agreed to

24  abandon his FBI Harris FOIA request and accept the same documents provided to EPIC.  *See*

25  *Defendants' Motion For Leave to File Supplemental Memorandum and Declaration or, in the*

26  *Alternative, to Withdraw a Portion of Their Argument* (Dkt. #096, p. 2) ("The government's

27  brief indicated that Mr. Rigmaiden had agreed that the EPIC search could serve as a substitute

28  search for his request.  That characterization was made by mistake, and the government

1   hereby withdraws it."). Additionally, the FBI failed to conducted searches for records within

2   categories two and three of Plaintiff's FOIA request. *Compare Verified Complaint*, Dkt. #001,

3   EXHIBIT 01 (Plaintiff's FBI Harris FOIA request letter naming four categories) *to* Dkt. #104-

4   1 (FBI's declaration failing to state it searched for records from categories two and three).

5       26.     Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

6   supported by material evidence, and (2) it is not a material fact.

7   **INACCURATE FACT EXPLAINED**: Defendants provide no material evidence showing

8   the redactions on FOIA documents released to EPIC.

9   **IMMATERIAL FACT EXPLAINED**:  The EPIC documents are not at issue in this lawsuit.

10  Plaintiff's FOIA request seeks documents relating to Harris products while EPIC's was a

11  general request on cell site emulators by all manufacturers. **None of EPIC's documents**

12  **contain Harris-product-related words**, as the FBI said it would reveal in documents

13  provided to Plaintiff.  Additionally, the FBI located approximately 23,000 "pages" of

14  documents in relation to Plaintiff's request and is yet to process those documents.  Despite

15  Defendants' counsels' attempt to manipulate the proceedings, Plaintiff never agreed to

16  abandon his FBI Harris FOIA request and accept the same documents provided to EPIC. *See*

17  *Defendants' Motion For Leave to File Supplemental Memorandum and Declaration or, in the*

18  *Alternative, to Withdraw a Portion of Their Argument* (Dkt. #096, p. 2) ("The government's

19  brief indicated that Mr. Rigmaiden had agreed that the EPIC search could serve as a substitute

20  search for his request.  That characterization was made by mistake, and the government

21  hereby withdraws it.").  Additionally, the FBI failed to conducted searches for records within

22  categories two and three of Plaintiff's FOIA request. *Compare Verified Complaint*, Dkt. #001,

23  EXHIBIT 01 (Plaintiff's FBI Harris FOIA request letter naming four categories) *to* Dkt. #104-

24  1 (FBI's declaration failing to state it searched for records from categories two and three).

25      27.     Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

26  supported by material evidence.

27  **INACCURATE FACT EXPLAINED**: This is not a fact and not supported by material

28  evidence nonetheless.  David Hardy and counsel for Defendants are merely stating their

- 8 -

1  opinion.

2      28.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

3  supported by material evidence.

4  **INACCURATE FACT EXPLAINED**: Plaintiff did not use the proper noun form of

5  "Department" in his FOIA request, he used the **pronoun** "department" (*See* Dkt. #086,

6  <u>ATTACHMENT 33</u> (October 10, 2011, EOUSA FOIA request)) to refer to the specific offices

7  and records he wanted searched, which were listed in his FOIA request letter as:

8         While complying with this FOIA request, I ask that the following
          **EOUSA staffs** be searched for both paper and electronic records: (1) Office of
9         the Director, (2) Counsel to the Director, (3) Attorney General Advisory
          Committee, (4) Legal Programs, (5) General Counsel, (6) Office of
10        Enforcement Operations, and (7) the Computer Crime and Intellectual Property
          Section. In addition, I request that the United States Attorneys Offices in the
11        following locations be searched: California, Arizona, and New York. For each
          state listed above, please search all United States Attorneys Offices within the
12        state.

13        *Id.* [p. 4 of letter] (emphasis added).

14

15  Plaintiff did not use a proper noun form of "Department," as in "Department of Justice," as

16  deceitfully claimed by Defendant EOUSA and its counsel. *See id*. The specific offices

17  Plaintiff wanted searched have been in plain English within his original FOIA request letter

18  since October 10, 2011. *See id*. After the semicolon in sentence No. 1 of ¶ No. 28, counsel's

19  explanation of the clear and concise grammar contained in Plaintiff's FOIA request is correct.

20      29.    Plaintiff lacks knowledge or information sufficient to form a belief about the

21  truth of this assertion.

22      30.    Plaintiff lacks knowledge or information sufficient to form a belief about the

23  truth of this assertion.

24      31.    Plaintiff lacks knowledge or information sufficient to form a belief about the

25  truth of this assertion. However, after being advised by counsel for Defendants', Brad

26  Rosenberg, that the Office of Enforcement Operations and Computer Crimes and Intellectual

27  Property Sections were not part of EOUSA, Plaintiff indicated that he would not require that

28  EOUSA search those two offices.

1  32.    Plaintiff lacks knowledge or information sufficient to form a belief about the
2  truth of this assertion.

3  33.    Plaintiff lacks knowledge or information sufficient to form a belief about the
4  truth of this assertion.

5  34.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not
6  supported by material evidence.

7  **INACCURATE FACT EXPLAINED**: Plaintiff did not receive any FOIA response
8  documents from Defendant EOUSA that are actually responsive to his FOIA request, he
9  instead received a phony response that was, in fact, from a different FOIA request unrelated
10  to portable/transportable wireless device locators.  *See* § III, ¶ Nos. 55-56, *infra*

11  **B.    RE: Defendants' Supplemental Statement of Facts as to Which**
       **There is No Genuine Issue (Dkt. #104, p. 6-7).**
12

13  1.    Plaintiff lacks knowledge or information sufficient to form a belief about the
14  truth of this assertion.

15  2.    Plaintiff lacks knowledge or information sufficient to form a belief about the
16  truth of this assertion (*i.e.*, regarding the FBI's thoughts).  However, Plaintiff contests
17  Defendant FBI's claim that the search was adequate under FOIA.  *See* ¶ No. 4 immediately
18  below.

19  3.    Plaintiff lacks knowledge or information sufficient to form a belief about the
20  truth of this assertion.  However, Plaintiff contests Defendant FBI's claim that the search was
21  adequate under FOIA.  *See* ¶ No. 4 immediately below.

22  4.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not
23  supported by material evidence.

24  **NACCURATE FACT EXPLAINED**: Plaintiff contests Defendant FBI's claim that its
25  "searches for records used to respond to plaintiff's Harris request meet the substance of
26  plaintiff's request."  First, none of Defendant FBI's declarations state that it conducted
27  searches within the specific systems identified by Plaintiff in his original FOIA request letter,
28  *i.e.*, (1) workstation computers, (2) server computers, (3) backup systems, (4) legacy systems,

1   (5) databases, (6) hard drives, (7) tape drives, (8) zip disks and other disks, (9) CDs, DVDs,

2   Blu-ray discs, etc., (10) cartridges, (11) magneto-optical disks, (12) calendar systems, (13)

3   voice mail systems, (14) text messaging systems, (15) intranet systems, (16) internet systems,

4   (17) personal digital assistants, (18) cell phones and other cellular devices including

5   Blackberry devices, (19) Blackberry Enterprise Servers maintained by the FBI at its

6   Clarksburg, West Virginia, facility and other facilities, (20) FBI Enterprise Security

7   Operations Center (ESOC) classified analytical network, and (21) home computers belonging

8   to agents/personnel (to the extent, if any, they are used for FBI business purposes).  *See*

9   *Rigmaiden's 1ˢᵗ Declaration*, <u>ATTACHMENT 33</u> (Dkt. #086) (October 10, 2011, EOUSA

10  FOIA request).  Second, none of Defendant FBI's declarations state that it conducted searches

11  for the types of records requested by Plaintiff in his original FOIA request letter, *i.e.*, (1)

12  electronically stored information, (2) emails, (3) email attachments, (4) letters, (5)

13  correspondence, (6) memorandums, (7) documents, (8) reports, (9) statements, (10) audits,

14  (11) purchase receipts, (12) invoices, (13) word processing documents, (14) spreadsheets,

15  (15) graphics and presentation documents, (16) images, (17) text files, (18) instant messages,

16  (19) audio files, (20) video files, (21) voice mail, (22) internet data, (23) log files, (24) blogs,

17  (25) calendar files, (26) text messages, (27) records of radio transmissions, (28) FBI corporate

18  policy directives, (29) data dictionary files, (30) metadata, (31) system metadata, (32)

19  substantive metadata, and (33) embedded metadata.  *See id.*

20         5.      Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

21  supported by material evidence.

22  **INACCURATE FACT EXPLAINED**: Plaintiff contests Defendant FBI's claim that the full

23  amount of responsive records located thus far do not require further processing and that only

24  11,000 "pages" require further processing.  The 23,000 "pages" of records referenced by the

25  FBI were in response to EPIC's FOIA request which was not specific to Harris products.  The

26  FBI still needs to (1) reprocess the full 23,000 pages to remove prior redactions that cover

27  Harris product names, and (2) reprocess the full 23,000 pages to remove prior redactions that

28  cover information relating to how the Harris products operate as this information is already in

- 11 -

1  the public domain and/or relates to subject matter that is generally known.

2  **II.    Objections to the Admission of Evidence**

3      Plaintiff, Daniel David Rigmaiden, appearing *pro se*, respectfully submits the

4  following objections to the admission of evidence Pursuant to Fed. R. Civ. P. 56 and LRCiv

5  56.1(b), and LRCiv 7.2(m)(2) ("An objection to the admission of evidence offered in support

6  of... a motion must be presented in the objecting party's responsive or reply memorandum (or,

7  if the underlying motion is a **motion for summary judgment**, in the party's response to

8  another party's separate statement of material facts)[.]" (emphasis added)).

9      1.    Plaintiff objects to the admission of Defendants' free-floating exhibits:

10  EXHIBIT A,  EXHIBIT B,  EXHIBIT C, and EXHIBIT D at Dkt. #091-2, as they were

11  neither authenticated under Fed. R. Evid. 901 nor are they self-authenticating under Fed. R.

12  Evid. 902.  Although these emails exist, they are being quoted by Defendant FBI out of

13  context and the FBI has since then claimed, "The government's brief indicated that Mr.

14  Rigmaiden had agreed that the EPIC search could serve as a substitute search for his request.

15  **That characterization was made by mistake**, and the government hereby withdraws it."

16  Dkt. #096, p. 2.

17      2.    Likewise, Plaintiff objects to the portions of David Hardy's declarations that

18  claim (1) EPIC disclosure satisfies Plaintiff's FOIA request, (2) Plaintiff agreed to accept

19  the EPIC disclosure in place of having the FBI fulfill his FOIA request, and (3) the FBI

20  provided Plaintiff with a 500-page sample of records responsive to the Harris FOIA request.

21  These are all lies.  Fib Nos. 1-2 were confirmed by Defendant FBI at Dkt. #096 and #104.  As

22  for fib No. 3, *see* § III, ¶¶ Nos. 53-54, *infra*.

23      3.    Plaintiff also objects to any and all sections of government Defendants'

24  declarations and attachments that are not specifically relied upon by Plaintiff to make his

25  arguments.  The non-relied upon sections and attachments are also more than likely further

26  lies of which Plaintiff does not have time to address specifically in this section.

27  ///

28  ///

- 12 -

### III.   Statement of Additional Undisputed Material Facts in Support of Response to Defendants' Motion for Summary Judgment.

Plaintiff respectfully submits the following statement of additional undisputed material facts (in support of Response to Defendants' Motion for Summary Judgment) Pursuant to Fed. R. Civ. P. 56 and LRCiv and 56.1(b) ("Any party opposing a motion for summary judgment must file a statement, separate from that party's memorandum of law, setting forth:... additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party.").

### A.   Information preserved in official <u>federal government</u> public records detailing the technical operations of Harris devices (rebutting Defendants' claims of Exemption (b)(7)(E), etc.).

### 1.   The Harris Loggerhead.

1.      Via an August 11, 2006 request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, the Electronic Frontier Foundation ("EFF") asked the Federal Bureau of Investigation ("FBI") to produce documents concerning electronic surveillance systems known as DCS-3000 and Red Hook. *See* Marcia Hofmann, *EFF FOIA request to FBI* (Aug. 11, 2006), *available at* https://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf (last accessed: Mar. 30, 2011); *see also* <u>Electronic Frontier Foundation v. Dep't of Justice</u>, 517 F.Supp.2d 111 (D.D.C. 2007).

2.      Between June 4, 2007 and February 11, 2008, the FBI disclosed to the public 5,278 pages of documents in response to the EFF FOIA request.  All of these documents are available for download at https://www.eff.org/issues/foia/061708CKK (last accessed: May 15, 2014).

3.      Via an FBI Response to EFF FOIA Request, Nos. 1056287-000 & 1056307-1 (Aug. 27, 2007), the FBI released an email indicating that FBI agents utilize the Harris Wireless Product Group ("Harris") Loggerhead portable/transportable wireless device locator to locate wireless devices:

I was working with some agency guys yesterday.  They are putting together a

- 13 -

1   system with a flat panel ant and a **loggerhead** and doing locations based on
    registrations.  It works.  They have a later software version on their
2   **loggerheads** (I think).  It will really help when we can use your software for
    real time display of the **loggerhead** activity.  As it is, you have to make a pass
3   in the area, move somewhere else, look at the log, etc.  Any word on when
    **Harris** can make the change to the loggerhead?

4

5   FBI, *Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1*, Aug. 27, 2007,

6   *available at* https://www.eff.org/files/filenode/061708CKK/082707_dcs06.pdf [EFF PDF Set

7   6 of 6] (last accessed: Oct. 25, 2010), p. 142 of 148 (emphasis added).  Relevant pages of the

8   FOIA response containing the above quoted email are on the record at <u>ATTACHMENT 01</u> of

9   *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response*

10  *to Defendants' Motion for Summary Judgment.*

11      4.      According to the United States Patent and Trademark Office ("USPTO"), the

12  trademark name Loggerhead is registered to Harris Corporation out of Melbourne, FL, USA.

13  *See* United States Patent and Trademark Office, *Trademark Reg. No. 2,555,909 [Loggerhead]*

14  (registered Apr. 2, 2002), *all associated documents available via search at*

15  http://tsdr.uspto.gov/#caseNumber=2,555,909&caseType=US_REGISTRATION_NO&search

16  Type=documentSearch (last accessed: May 15, 2014).  The full USPTO document record for

17  Loggerhead is on the record at <u>ATTACHMENT 02</u> of *Daniel Rigmaiden's Declaration Under*

18  *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

19  *Judgment.*

20      5.      According to the USPTO, Harris Intellectual Property Dept. attorney, Michael

21  S. Yatsko, signed a public declaration on July 9, 2001, stating that the Loggerhead mark is for

22  "electronic surveillance transceivers for intercepting, monitoring and gathering information

23  concerning cellular network communications" and that it "was first used in connection with

24  the goods at least as early as August 25, 1999, was first used in interstate commerce at least as

25  early as August 25, 1999, and is now in use in such commerce."  *Id.*

26                          **2.  The Harris Triggerfish.**

27      6.      Via a November 29, 2007, request for information under the FOIA, 5 U.S.C. §

28  552 *et seq.*, the American Civil Liberties Union and the American Civil Liberties Union

- 14 -

1  Foundation ("ACLU") asked the Executive Office for United States Attorneys ("EOUSA") to

2  produce documents pertaining to the use of cell phone tracking and locating in criminal

3  investigations. *See* Catherine Crump, *ACLU FOIA request to EOUSA* (Nov. 29, 2007),

4  *available at* https://www.aclu.org/files/pdfs/freespeech/eousa_foia_20071129.pdf (last

5  accessed: May 15, 2014);  *see also* <u>American Civil Liberties Union v. Department of Justice</u>,

6  U.S. Dist. LEXIS 29040, No. 08-1157 (JR) (D.D.C., Mar. 26, 2010).

7          7.      Via an August 12, 2008 EOUSA response to the ACLU FOIA request, the

8  EOUSA made official public disclosures of various sections from its Electronic Surveillance

9  Manual.  *See* EOUSA, *[M.D.La.] Response to ACLU FOIA Request No. 07-4130*, Aug. 12,

10  2008, *available at*

11  https://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf (last accessed:

12  May 15, 2014).

13          8.      In the Electronic Surveillance Manual, under a heading labeled "Collection of

14  Cell Phone Location Information Directly by Law Enforcement," the EOUSA revealed

15  information on the government's use of portable/transportable wireless device locators:

16          Law enforcement possesses electronic devices that allow agents to
17  determine the location of certain cellular phones by the electronic signals that
    they broadcast. This equipment includes an antenna, an electronic device that
18  processes the signals transmitted on cell phone frequencies, and a laptop
    computer that analyzes the signals and allows the agent to configure the
19  collection of information. Working together, these devices allow the agent to
    identify the direction (on a 360 degree display) and signal strength of a
20  particular cellular phone while the user is making a call. By shifting the
    location of the device, the operator can determine the phone's location more
21  precisely using triangulation.

22  EOUSA, *[M.D.La.] Response to ACLU FOIA Request No. 07-4130*, Aug. 12, 2008, *available*

23  *at* https://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf (last

24  accessed: May 15, 2014), p. 9-10.  Relevant sections of the FOIA response containing the

25  above quoted manual are on the record at <u>ATTACHMENT 03</u> of *Daniel Rigmaiden's*

26  *Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants'*

27  *Motion for Summary Judgment.*

28          9.      In the Electronic Surveillance Manual, the EOUSA also specifically identified

1  the portable/transportable wireless device locator called the "triggerfish":

> A "triggerfish" can also be used to determine the cell site being used by a particular cellular telephone. In addition, the cellular telephone company should be able to provide cell site information. Once a cell site is determined, law enforcement agents can conduct surveillance in a more specific area in an effort to identify the user of the cellular telephone.

*Id.*

10.    According to the USPTO, the trademark name Triggerfish is registered to Harris Corporation out of Melbourne, FL, USA. *See* United States Patent and Trademark Office, *Trademark Reg. No. 2,534,253 [Triggerfish]* (registered Jan. 29, 2002), *all associated documents available via search at* http://tsdr.uspto.gov/#caseNumber=2,534,253&caseType=US_REGISTRATION_NO&searchType=documentSearch (last accessed: May 15, 2014). The full USPTO document record for Triggerfish is on the record at <u>ATTACHMENT 04</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

11.    According to the USPTO, Harris Intellectual Property Dept. attorney, Michael S. Yatsko, signed a public declaration on July 9, 2001, stating that the Triggerfish mark is for "electronic receivers for intercepting and monitoring cellular network communications" and that it "was first used in connection with the goods at least as early as November 26, 1997, was first used in interstate commerce at least as early as November 26, 1997, and is now in use in such commerce." *Id.*

### 3.   The Harris StingRay and StingRay II.

12.    Agents in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, specifically noted in a report of investigation and in handwritten notes that the StingRay portable/transportable wireless device locator was used to locate the aircard relevant to that case. *See* <u>United States v. Daniel Rigmaiden</u>, CR08-814-PHX-DGC, EXHIBIT 26 of *1ˢᵗ Consolidated Exhibits,* Doc. #587-2 (D.Ariz.); *id.*, EXHIBIT 109 of *2ⁿᵈ Consolidated Exhibits*, Doc. #821-6.

13.    The aircard in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, was located

by the FBI using the StingRay and a second handheld, portable wireless device locator with each operating in cell site emulation mode. *See* United States v. Daniel Rigmaiden, CR08-814-PHX-DGC, Doc. #602, p. 3 (D.Ariz.) ("The equipment mimicked a Verizon Wireless cell tower and sent and received signals directly to and from the aircard.").

14.     In United States v. Rigmaiden, CR08-814-PHX-DGC, FBI supervisory agent Morrison stated that when agents use stingrays, "the electronic serial numbers (ESNs) (or their equivalent) from all wireless devices in the immediate area of the FBI device that subscribe to a particular provider may be incidentally recorded, including those of innocent, non-target devices." United States v. Daniel Rigmaiden, CR08-814-PHX-DGC, "Affidavit Of Supervisory Special Agent Bradley S. Morrison," Doc. #674-1, p. 3, ¶ 5 (D.Ariz.).

15.     At an open *Daubert* hearing in United States v. Allums, No. 2:08-CR-30 TS, Doc. #128 [transcript] (D.Utah), FBI agent William Shute testified that **(1)** he has "particular expertise in cell phone technology, plotting cell towers, tracking movements people are making when they are making phone calls[,]" *id.*, p. 8, ln. 1-3, **(2)** he has "had training from the Harris Corporation in Melbourne, Florida, which is a company that produces various products for analyzing cellular telephones, measuring radio frequency[,]" *id.*, p. 9, ln. 2-5, **(3)** "[o]ver the last nine years, but predominantly more so in the last three, [][he] personally [] used [][his training] over 300 times[,]" *id.*, p. 16, ln. 12-13, and **(4)** one type of portable/transportable wireless device locator equipment FBI Agent Shute uses is "from the Harris Corporation called the Sting Ray." *Id.*, p. 32, ln. 6-7.

16.     According to the USPTO, the trademark name StingRay is registered to Harris Corporation out of Melbourne, FL, USA. *See* United States Patent and Trademark Office, *Trademark Reg. No. 2,762,468 [StingRay]* (registered Sept. 9, 2003), *all associated documents available via search at* http://tsdr.uspto.gov/#caseNumber=2,762,468&caseType=US_REGISTRATION_NO&searchType=documentSearch (last accessed: May 15, 2014). The full USPTO document record for StingRay is on the record at ATTACHMENT 05 of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

- 17 -

1 | *Judgment.*

2 | 17. According to the USPTO, Harris Intellectual Property Dept. attorney, Michael

3 | S. Yatsko, signed a public declaration on August 14, 2001 stating that the StingRay mark is

4 | for "electronic surveillance transceivers for tracking, locating and gathering information from

5 | cellular telephones," *see id.*, and in a later "Response To Official Action," attorney Donald S.

6 | Showalter, on behalf of Harris, asked to amend the identification of goods to read "multi-

7 | channel, software-defined, two-way electronic surveillance radios for interrogating, locating,

8 | tracking and gathering information from cellular telephones." *Id.* In support of his request to

9 | amend, Mr. Showalter included a Harris Corporation datasheet explaining the technical

10 | features and operations of the StingRay. *See id.* The trademark documents indicate that the

11 | mark was first used in connection with the goods on March 2, 2003, and was first used in

12 | commerce on March 2, 2003. *Id.*

13 | 18. According to the USPTO, the trademark name StingRay II is registered to

14 | Harris Corporation out of Melbourne, FL, USA. *See* United States Patent and Trademark

15 | Office, *Trademark Reg. No. 3,499,993 [StingRay II]* (registered Sep. 9, 2008), *all associated*

16 | *documents available via search at*

17 | http://tsdr.uspto.gov/#caseNumber=3,499,993&caseType=US_REGISTRATION_NO&search

18 | Type=documentSearch (last accessed: May 15, 2014). The full USPTO document record for

19 | StingRay II is on the record at <u>ATTACHMENT 06</u> of *Daniel Rigmaiden's Declaration Under*

20 | *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

21 | *Judgment.*

22 | 19. According to the USPTO, Harris Intellectual Property Dept. attorney, Ronald S.

23 | Blum II, signed a public declaration on July 18, 2008, stating that the mark is for "[m]ulti-

24 | channel, software-defined, two-way electronic surve[i]llance radios for authorized law

25 | enforcement and government agencies for interrogating, locating, tracking and gathering

26 | information from cellular phones" and that it "was first used... at least as early as 7/17/2008,

27 | and first used in commerce at least as early as 7/17/2008, and is now in use in such

28 | commerce." *Id.*

20.     Within the trademark documents is a picture of the StingRay II mark attached to goods as used in interstate commerce. *See id.*  In the picture, the StingRay II shows the following labeled connection ports: (1) TX1 [(Transmission Antenna No. 1)]; (2) TX2 [(Transmission Antenna No. 2)]; (3) TX3 [(Transmission Antenna No. 3)]; (4) TX4 [(Transmission Antenna No. 4)]; (5) ANT 1 [(Direction Finding Antenna No. 1)]; (6) ANT 2 [(Direction Finding Antenna No. 2)]; (7) CNTRL 1; (8) CNTRL 2; (9) GPS ANTENNA; (10) 10 MHZ REF OUT; (11) PC INPUT; (12) AUX1; (13) AUX2; (14) RX1 [(Receive Antenna No. 1)]; (15) RX2 [(Receive Antenna No. 2)]; (16) RX3 [(Receive Antenna No. 3)]; (17) RS232; (18) 10/100 [(Ethernet)]; (19) USB [(x2)] ; and (20) DC INPUT 12VDC. *See id.*

21.     As indicated by a June 29, 2010, sole source purchase notice authored by the United States Secret Service, Harris is the sole source vendor of a certain class of portable/transportable wireless device locators sold under the trade names StingRay II, StingRay, AmberJack, and SideWinder:

> 25 Watt PA Kit, Amberjack W (components of StingRay II), PA Kit 30W 2100 (components of StingRay II), PA Kit 30W Dual Band 850/1900 (components of StingRay II), PA Kit 30W iDEN 800 (components of StingRay II), SideWinder (CDMA, GSM, 2100) components of StingRay II), SR II Upgrade: SRII CDMA, SRII GSM, SRII iDEN, StingRay II, Tactical Power Kit.

Department of Homeland Security, United States Secret Service (USSS). (Jun. 29, 2010). Harris equipment (Solicitation Number: 225717), *available at* https://www.fbo.gov/? s=opportunity&mode=form&id=52b671c48d68c6518b78939677952282&tab=core&_cview= 0 (last accessed: May 15, 2014).  The above quoted notice is on the record at <u>ATTACHMENT 07</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*  The fbo.gov website states that it is a "U.S. Federal government computer system[.]" *See* https://www.fbo.gov/? s=privacy&mode=list&tab=list (last accessed: May 15, 2014).

///
///
///

**a.  The Harris StingRay necessitates that users of connected cell phones dial 9-1-1 twice if seeking to make a 9-1-1 emergency phone call.**

22.     Via a September 28, 2011 request for information under the FOIA, 5 U.S.C. § 552 *et seq.*, Christopher Soghoian, Center for Applied Cybersecurity Research, asked the Federal Communications Commission ("FCC") to produce documents pertaining to cell site simulators, IMSI catchers, digital analyzers, Triggerfish, StingRay, Amberjack and other similar mobile phone surveillance and tracking devices.  The FCC's entire February 29, 2012 response to Mr. Soghoian's FOIA request (FOIA Control No. 2011-586) is *available at* http://files.cloudprivacy.net/FOIA/FCC/fcc-stingray-reply.pdf (last accessed: May 15, 2014) and on the record at <u>ATTACHMENT 08</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

23.     In its FOIA response cover letter, the FCC stated that the devices listed by Mr. Soghoian are "associated with equipment authorizations issued to the Harris Corporation ('Harris') and Digital Receiver Technology, Inc. ('DRT')."  *Id.*

24.     As indicated by various Harris cover letters attached to the FCC's response to Mr. Soghoian's FOIA request, the Harris StingRay has an automatic "release" (*i.e.*, disconnect/hang-up/facilities release) for emergency 9-1-1 calls placed by users of cell phones connected to the StingRay:

> Interference to users outside a predetermined target list is very limited and this device employs a "catch and release" technology that is localized and fixated on a particular signal of interest.  Moreover, **the StingRay product provides for an automatic release for emergency calls.**

*See* <u>ATTACHMENT 08</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment* (FCC's entire response to Mr. Soghoian's FOIA request [quoted letter is from City of Houston Police Department to FCC, Aug. 22, 2007 (emphasis added)]).  According to an FBI response to EPIC's February 10, 2012, FOIA request, "release" means "the **end of the call** for both incoming and outgoing calls[.]"  FBI, *Response to EPIC FOIA Request No. 1182490-000*, Apr. 20, 2013, *available at* http://epic.org/foia/fbi/stingray/FBI-FOIA-Release-04302013-s3-

OCR.pdf (last accessed: May 20, 2013), p. 6 of 53 (emphasis added).  According to the Telecommunications Industry Association, TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance* (Arlington, VA: May 31, 2000) technical standard, the "release" event for basic circuit calls indicates that "[t]he facilities for the entire call have been released[,]" *id.*, § 4.4.2, p. 20-21, and a definition section states that a call "**end[s]** with the final release of all facilities used." *Id.*, § 3, p. 5 (emphasis added).  FBI supervisory agent Morrison also stated in a declaration that the portable/transportable wireless device locator equipment used by the FBI during the locating missions is not configured to forward a cell phone's communications content to actual wireless carrier facilities.  *See* United States v. Daniel Rigmaiden, CR08-814-PHX-DGC, "Affidavit Of Supervisory Special Agent Bradley S. Morrison," Doc. #674-1, p. 2-3, ¶ 4 (D.Ariz.).

25.     As indicated by the information quoted in ¶ No. 40 above, if a user who's cell phone is connected to a StingRay dials an emergency 9-1-1 call, the StingRay will (1) "release" (*i.e.*, end) the 9-1-1 call, and (2) instruct the cell phone to "release" (*i.e.*, disconnect) from the StingRay facilities so that it may connect to an actual wireless carrier cell site capable of processing 9-1-1 calls.  *See id.*  However, because the first 9-1-1 call is "released" by the StingRay, *see id.*, the cell phone user will be required to manually re-dial the 9-1-1 call once a connection is established with the wireless carrier facilities--thus, causing delays during an emergency.

### 4.   The Harris KingFish.

26.     As indicated by a January 12, 2009 "NOTICE OF INTENT TO AWARD A SOLE SOURCE CONTRACT" authored by the United States Army, Harris is the sole source vendor of a certain class of portable/transportable wireless device locators sold under the trade name KingFish:

> *Harris KingFish, 1-Channel, Dual Mode Package systems that can be operated in two separate modes; Man-Portable and Vehicular Mounted. The Man-Portable system mode is battery powered CDMA, GSM and iDEN Interrogation Tracking and Location, and Signal Information Collection System. The Vehicular Mounted system mode is portable, 12VDC powered CDMA, GSM, iDEN Interrogation, Tracking and Location, and Signal Information Collection System.

1  Department of the Army, Office: U.S. Army Intelligence and Security Command. (Jan. 12,

2  2009). NOTICE OF INTENT TO AWARD A SOLE SOURCE CONTRACT-HARRIS:

3  KINGFISH DUAL MODE SYSTEM (Solicitation Number: W911W4-09-T-0017), *available*

4  *at* https://www.fbo.gov/index?

5  s=opportunity&mode=form&id=fd03ebae781f3a3fdb7633699bc1e351&tab=core&tabmode=

6  list&= (last accessed: May 15, 2014).  The above quoted notice is on the record at

7  <u>ATTACHMENT 09</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support*

8  *of Plaintiff's Response to Defendants' Motion for Summary Judgment*.  The fbo.gov website

9  states that it is a "U.S. Federal government computer system[.]"  *See* https://www.fbo.gov/?

10  s=privacy&mode=list&tab=list (last accessed: May 15, 2014).

11      27.    According to the USPTO, the trademark name KingFish is registered to Harris

12  Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office,

13  *Trademark Reg. No. 2,867,227 [KingFish]* (registered Jul. 27, 2004), *all associated*

14  *documents available via search at*

15  http://tsdr.uspto.gov/#caseNumber=2867227&caseType=US_REGISTRATION_NO&searchT

16  ype=documentSearch (last accessed: May 15, 2014).  The full USPTO document record for

17  KingFish is on the record at <u>ATTACHMENT 10</u> of *Daniel Rigmaiden's Declaration Under*

18  *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

19  *Judgment*.

20      28.    According to the USPTO, Harris Intellectual Property Dept. attorney, Michael

21  S. Yatsko, signed a public declaration on August 16, 2001, stating that the KingFish mark is

22  for "electronic surveillance transceivers for tracking, locating and gathering information from

23  cellular telephones."  *Id.*  The trademark documents indicate that the mark was first used in

24  connection with the goods on December 10, 2003, and was first used in commerce on

25  December 10, 2003. *Id.*

26      29.    Within the trademark documents is a picture of the KingFish mark attached to

27  goods as used in interstate commerce.  *See id.*  In the picture, the KingFish shows the

28  following labeled connection ports: (1) REMOTE ANTENNA, (2) USB, (3) DF [(Direction

1  Finding)] ANTENNA, (4) EXT PA, (5) DC INPUT, and (6) MAIN ANTENNA.  *See id.*

2                    **5.    The Harris AmberJack.**

3         30.    As indicated by a June 10, 2004, "Sole Source Harris Corporation AmberJack G

4  antennas and antenna accessory kits" notice authored by the United States Navy, Harris is the

5  sole source vendor of phased array antennas used with portable/transportable wireless device

6  locators sold by Harris, *i.e.*, "AmberJack G magnetic mount vehicular direction find

7  antennas... direction find accessory kits."  Space and Naval Warfare Systems Center

8  (SPAWARSYSCEN). (Jun. 10, 2004).  *Sole Source Harris Corporation AmberJack G*

9  *antennas and antenna accessory kits* (Solicitation Number: N65236-04-R-0096), *available at*

10  https://www.fbo.gov/index?

11  s=opportunity&mode=form&tab=core&id=f23e7d8968011a8d5fa7ccb38a0cb96c (last

12  accessed: May 16, 2014).  The above quoted notice is on the record at <u>ATTACHMENT 11</u> of

13  *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response*

14  *to Defendants' Motion for Summary Judgment.*  The fbo.gov website states that it is a "U.S.

15  Federal government computer system[.]"  *See* https://www.fbo.gov/?

16  s=privacy&mode=list&tab=list (last accessed: May 15, 2014).

17         31.    According to the USPTO, the trademark name AmberJack is registered to

18  Harris Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark

19  Office, *Trademark Reg. No. 2,710,009 [AmberJack]* (registered Aug. 22, 2003), *all*

20  *associated documents available via search at*

21  http://tsdr.uspto.gov/#caseNumber=2710009&caseType=US_REGISTRATION_NO&searchT

22  ype=statusSearch (last accessed: May 16, 2014).  The full USPTO document record for

23  AmberJack is on the record at <u>ATTACHMENT 12</u> of *Daniel Rigmaiden's Declaration Under*

24  *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

25  *Judgment.*

26         32.    According to the USPTO, Harris Intellectual Property Dept. attorney, Michael

27  S. Yatsko, signed a public declaration on August 14, 2001, stating that the AmberJack mark is

28  for "direction finding antennas for use in locating and tracking mobile telephones."  *Id.*  The

1  trademark documents indicate that the mark was first used in connection with the goods on

2  October 28, 2002, and was first used in commerce on October 28, 2002. *Id.*

3      33.    Within the trademark documents is a picture of the AmberJack mark attached to

4  goods as used in interstate commerce. *See id.* In the picture, a label on the AmberJack

5  indicates that the device is mounted to a road vehicle and used while driving: "Direction

6  Finding System has been designed to mount magnetically... [and] to [be us]able at normal

7  highway speeds[.]" *Id.*

8              **6.   Publicly preserved federal government records relating to all
                       Harris equipment used to locate wireless devices.**
9

10     34.    Public records at the United States General Services Administration reveal

11  numerous portable/transportable wireless device locators and accessories being sold by Harris

12  to the federal government and the price for each product. *See* United States General Services

13  Administration. (Mar. 11, 2014).  FEDERAL SUPPLY SERVICE, INFORMATION

14  TECHNOLOGY SCHEDULE PRICELIST, GENERAL PURPOSE COMMERCIAL

15  INFORMATION TECHNOLOGY EQUIPMENT, SOFTWARE AND SERVICES (Harris),

16  *available at* https://www.gsaadvantage.gov/ref_text/GS35F0283J/0ML8KB.2S6VTT_GS-

17  35F-0283J_HARRISMOD162.PDF (last accessed: May 16, 2014). The full GSA record of

18  Harris products is on the record at <u>ATTACHMENT 13</u> of *Daniel Rigmaiden's Declaration*

19  *Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for*

20  *Summary Judgment.*

21     35.    According to the U.S. GSA record, the portable/transportable wireless device

22  locators and accessories being sold by Harris include, but are not limited to **(1)** Gossamer

23  5100, $19,696; **(2)** KingFish, $25,349; **(3)** StingRay, $68,479; **(4)** Converter Band 4 CONUS

24  w/ By Pass, $18,054; **(5)** StingRay II, $134,952; **(6)** StingRay I to StingRay II Upgrade,

25  $65,014; **(7)** AmberJack W, $35,015; **(8)** AmberJack Legacy to W Upgrade, $18,009; **(9)**

26  AmberJack W Upgrade, $19,741; **(10)** OCTOPUS, $14,589; **(11)** 25W PA (CONUS),

27  $10,486; **(12)** 25W PA Kit (OCONUS), $10,486; **(13)** 25W PA Kit W/AD – RayFish Only

28  (CONUS), $10,486; **(14)** 25W PA Kit W/AD – RayFish Only (OCONUS), $10,486; **(15)**

- 24 -

1  Harpoon 2100, $16,915; **(16)** Harpoon (CONUS), $18,419; **(17)** Harpoon (OCONUS),

2  $18,419; **(18)** Harpoon iDen, $14,954; **(19)** Moray II, $24,984; **(20)** KingFish X1 to

3  HailStorm Upgrade, $154,557; **(21)** KingFish X2 to HailStorm Upgrade, $139,511; **(22)**

4  KingFish X3 to HailStorm Upgrade, $124,466; **(23)** KingFish X1 to HailStorm Upgrade,

5  $119,907; **(24)** KingFish X2 to HailStorm Upgrade, $104,861; **(25)** KingFish X3 to

6  HailStorm Upgrade, $89,816; **(26)** KingFish X1 to HailStorm Upgrade, $74,771; **(27)**

7  HailStorm, $169,602; **(28)** StingRay I to HailStorm Upgrade, $109,421; **(29)** StingRay II to

8  HailStorm Upgrade, $65,652; **(30)** KingFish X4 to HailStorm Upgrade, $109,421; **(31)**

9  Harpoon PA Kit Dual Band 700/800, $18,419; and **(32)** Harpoon PA Kit Dual Band 700/800

10  Upgrade, $14,134. *See id.*

11       36.     Harris has numerous publicly available published patents corresponding to its

12  portable/transportable wireless device locator technology.  These patents explain how to make

13  the devices used to track and locate cell phones, etc.:

> [T]he wireless device locator may include at least one antenna and a transceiver
> connected thereto, and a controller for cooperating with the transceiver for
> transmitting a plurality of location finding signals to a target wireless
> communications device from among the plurality thereof.  The target device
> may transmit a respective reply signal for each of the location finding signals.
>
> Billhartz, Thomas J., *et al.*, Harris Corp., *Wireless Communications System
> Including A Wireless Device Locator And Related Methods*, U.S. Patent No.
> 7,321,777 (Melbourne, FL: Jan. 22, 2008), *available at*
> http://www.freepatentsonline.com/7321777.html (last accessed: May 16, 2014),
> p. 2, ln. 47-55.
>
>
> The location determining system may also include a location determining
> processor coupled to the receiver to collect, during movement relative to the
> wireless transmitter, a series of range measurements [(using propagation
> delays)] and a corresponding series of received signal measurements, and to
> estimate a location of the wireless transmitter based upon the range
> measurements weighted using the received signal measurements.
>
> McPherson, Rodney and Lanza, David J., Harris Corp., *Wireless Transmitter
> Location Determining System And Related Methods*, U.S. Patent No. 7,592,956
> (Melbourne, FL: Sept. 22, 2009), *available at*
> http://www.freepatentsonline.com/7592956.html (last accessed: May 16, 2014),
> p. 2, ln. 16-22.

In certain embodiments, the antenna may comprise a directional antenna. In these embodiments, the location determining processor may cooperate with the directional antenna to collect, during movement relative to the wireless transmitter, a corresponding series of angle of arrival measurements. The location determining processor may also estimate the location of the wireless transmitter further based upon the angle of arrival measurements.

*Id.*, p. 2, ln. 40-47.

Moreover, the location determining processor may cooperate with the receiver to collect, during movement relative to the wireless transmitter, a corresponding series of received signal strength measurements. The location determining processor may further estimate the location of the wireless transmitter further based upon the received signal strength measurements weighted using the received signal measurements.

*Id.*, p. 2, ln. 52-58.

*See also, e.g.*, Otto, James C., Harris Corp., *System And Method For Determining The Geolocation Of A Transmitter*, U.S. Patent No. 5,719,584 (Indian Harbor Beach, FL: Feb. 17, 1998), available at http://www.freepatentsonline.com/5719584.html (last accessed: May 16, 2014); Proctor, James A, Jr. and Otto, James C., Harris Corp., *Range And Bearing Tracking System With Multipath Rejection*, U.S. Patent No. 5,687,196 (Indialantic, FL: Nov. 11, 1997), *available at* http://www.freepatentsonline.com/ 5687196.html (last accessed Feb. 16, 2011).

The above quoted/cited published patents are on the record at <u>ATTACHMENT 14</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

37.     By virtue of the patents being publicly available, it is evident that the government has made no effort to protect Harris' patents under the Invention Secrecy Act (ISA), 35 U.S.C. §§ 181-88: "If, in the opinion of the Atomic Energy Commission, the Secretary of a Defense Department, or the chief officer of another department or agency so designated, the publication or disclosure of the invention by the publication of an application or by the granting of a patent therefor would be detrimental to the national security, the Atomic Energy Commission, the Secretary of a Defense Department, or such other chief officer shall notify the Commissioner of Patents and the Commissioner of Patents shall order that the invention be kept secret and shall withhold the publication of the application or the grant of a patent for such period as the national interest requires[.]" *Id.*, § 181.

1      38.     In <u>United states v. Rigmaiden</u>, CR08-814-PHX-DGC, Plaintiff submitted an

2   expert report explaining the precise operations of portable/transportable wireless device

3   locators as used to locate cdma2000 1xEV-DO Rel. 0 wireless devices.  *See* <u>United States v.</u>

4   <u>Daniel Rigmaiden</u>, CR08-814-PHX-DGC, Doc. #1047-1 (Plaintiff's Expert Report) (D.Ariz.);

5   *see also id.*, Doc. #824-1.  Plaintiff's expert report is also on the record in the instant case at

6   <u>ATTACHMENT 15</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support*

7   *of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

8          **B.**  ·  **Information preserved in official <u>state government</u> public records**
                   **detailing the technical operations of Harris devices (rebutting**
9                  **Defendants' claims of Exemption (b)(7)(E), etc.).**

10             **1.   Publicly preserved state government records relating to all**
                     **Harris equipment used to locate wireless devices.**
11

12     39.     Publicly disclosed Miami, Florida, City Commission Legislative Files contain

13   numerous documents revealing information on how various Harris portable/transportable

14   wireless device locators operate:

15     <u>The KingFish system is the only man-portable battery powered CDMA & GSM</u>
       <u>Interrogation, Active Location, and Signal Information Collection system</u>
16     <u>currently available.</u>  KingFish is compatible with CDMA commercial standards
       IS-95A, IS-95-B, TSB74, and J-STD-008 in the U.S. 800 and 1900 MHz bands.
17     A GSM S/W upgrade package (for the KingFish and its Pocket PC) is available
       for purchase that will allow operation against the GSM standard in the U.S. 800
18     and 1900 MHz bands (as well as the overseas 900 MHz E-GSM and DCS 1800
       MHz bands).  KingFish can also be powered via standard automotive + 12V DC
19     or standard 110 VAC.  The man-portability and battery power features of the
       Harris KingFish product are unique for tactical mission needs, allowing the user
20     to perform passive collection, active interrogation and active location while on
       foot (i.e., inside a multi-story building, or outside in rough terrain).
21

22     Miami, FL, USA – Legislative Files, Harris Sole Source Vendor Letter, p. 1
       (Nov. 29, 2006), *available at*
23     http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf (last accessed:
       May 16, 2014).
24

25     The Police Department will be purchasing a Dual Band High Powered 30W
       Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband
26     Direction Finder to upgrade the StingRay 4-CH and KingFish 1-CH, from
       Harris GCSD...
27

28     The upgrade is necessary to operate both the StingRay 4-CH and the KingFish

1-CH given the continuous change in technology.  The amplifier will allow an increase in wattage that will greatly heighten the ability of tracking phones from an increased distance and reducing the time utilized; the converter is a high performance converter that enables the StingRay and the KingFish to operate in the 2100 MHz band, which is the new cellular phone technology being introduced to the Miami market and already being utilized around the country; the Amberjack Wideband will enable the StingRay to use its added capabilities with the current iDEN software to pinpoint push-to-talk cellular phones more effectively, a feature that the current equipment does not have.  This will enable the investigators to carry out their duties and responsibilities in a more effective and efficient manner.

Miami, FL, USA, *Legislative Files, Inter-Office Memo RE: Harris Sole Source Vendor,* p. 1 (Nov. 13, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/47993.pdf (last accessed: May 16, 2014).

The Harris StingRay and KingFish systems are compatible with the CDMA standard in the 800 MHz and 1900 MHz frequency bands, the GSM standard in the 800 MHz, 900 MHz, 1800 MHz, and 1900 MHz frequency bands, the iDEN (Nextel) standard in the 800 MHz and 850 MHz frequency bands, the UMTS standard in the 800 MHz and 1900 MHz frequency bands, and, with optional converter equipment, the UMTS standard in the 2100 MHz frequency band.

The Harris StingRay and KingFish vehicular-based systems are the only portable standard +12VDC powered CDMA, GSM, UMTS, and iDEN interrogation, tracking and location, and signal information collection system currently available.  When interfaced with the optional Harris AmberJack direction-finding (DF) antenna(s) (or handheld DF antenna for iDEN and UMTS), Tarpon software, laptop PC controller, and Harpoon amplifier kits, the StingRay can perform vehicular-based DF operations on the CDMA, GSM, UMTS, and iDEN cellular formats.  The transportability and standard +12VDC vehicular power features of the Harris StingRay and KingFish products are unique for tactical mission needs.

The StingRay and KingFish are quoted with software and accessories that are required in order to perform missions on the CDMA, GSM, UMTS, and iDEN cellular formats.  These include the cable assemblies, power supplies, antennas, laptop PC controller, power amplifiers, handheld DF antenna, AmberJack DF antenna, and cellular format software (CDMA, GSM, UMTS, and iDEN).

Harris also sells training on the use of the StingRay, KingFish and its accessories.  Standard training sessions are 2 days per class with a maximum class size of 4 students....

Miami, FL, USA, *Legislative Files, Harris Sole Source Letter [Attachment B],* p. 2 (Aug. 25, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48003.pdf (last accessed: May 16, 2014).

Relevant pages of the above quoted Miami, Florida, City Commission Legislative Files are

1    on the record at <u>ATTACHMENT 16</u> of *Daniel Rigmaiden's Declaration Under Penalty of*

2    *Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

3         40.    Publicly disclosed Miami, Florida, City Commission Legislative Files also

4    contain Harris product datasheets revealing information on the features of the Harris line of

5    wireless device locators (*i.e.*, StingRay, AmberJack, Geolocation software, and KingFish):

6    **StingRay** Transportable CDMA Interrogation, Tracking and Location, and

7    Signal Information Collection System

8    ***Product Description***

9    StingRay is Harris' latest offering in a long line of advanced wireless
     surveillance products.  StingRay is a multichannel software defined radio that

10   performs network base station surveys, Dialed Number and registration
     collection, mobile interrogation, and target tracking and location with Harris'

11   AmberJack  Direction-Finding Antenna.  This low-power transportable
     surveillance system is designed with the future in mind—its reconfigurable

12   architecture lends itself to upgrades of new capabilities and wireless standards,
     while preserving the initial investment in hardware.

13

14   ***Features***

15   •   Software Defined Radio (SDR) enables Simultaneous monitoring of up to eight
         CDMA Paging/Access channel pairs

16

17   •   Active interrogation capability emulates base station to collect MINs and ESNs
         through forced registration; external PA output available for higher power

18       requirements

19   •   Interfaces with AmberJack antenna to form a complete target tracking and location
         solution using active direction-finding and ranging techniques (active approach

20       does not require the target phone to be engaged in a call)

21   •   Optional geolocation software overlays target tracks and tracking vehicle location
         on a digital map

22

23   •   Wideband RF front-end provides simultaneous operation in the U.S. cellular 800
         and PCS 1900 MHz bands and is preconfigured to support iDEN (low band), GSM
         900, and DCS 1800 bands

24

25   •   PC-based controller running Windows XP provides an Intuitive Graphical User
         Interface (GUI)

26

27   •   Industry-standard USB interface enables plug-n-play networking of multiple
         StingRay surveillance systems if the user requires more channel capacity

28   •   Supports targeting and real-time searching of mobile identification numbers (MIN),

- 29 -

dialed numbers, and electronic serial numbers (ESN)

• Low-power system designed for vehicular operations

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: May 16, 2014).

**AmberJack** Dual-Band Direction Finding System

***Product Description***

AmberJack is a phased array direction finding (DF) antenna system capable of tracking and locating mobile phone users. The DF antenna array is designed to operate with Harris' LoggerHead and StingRay products enabling tracking and location of AMPS, TDMA and CDMA phones. AmberJack operates in both the cellular and PCS bands.

AmberJack combines Harris' expertise in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction finding system. Beam forming technology offers a universal DF antenna for existing as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a targeted phone is engaged, information on the direction to the target is dynamically updated for display on the PC.

***Features***

• Determines direction of arrival and received signal strength of phone's transmission

• Provides real-time display of direction to the target

• Low power, small size

• User-friendly graphical user interface for the PC or Pocket PC (optional)

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: Mar. 9, 2011).

**AmberJack** Direction-Finding System

***Product Description***

- 30 -

AmberJack is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations. The DF antenna array is designed to operate with Harris' Gossamer, KingFish, StingRay, and StingRay II products, enabling tracking and location of targeted mobile phones, as well as base stations. AmberJack-X operates in the U.S. cellular 850 and PCS 1900 bands, and AmberJack-G operates in the EGSM 900 and DCS 1800 bands. AmberJack-W operates in all the bands above as well as IDEN and UMTS bands I and IV.

AmberJack combines Harris' experience in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction-finding system. Phased array technology offers a universal DF antenna for existing, as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation on the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a target is engaged, information on the direction to the target is dynamically updated for display on the PC.

### *Operations Supported*

- Locating mobile phones and base stations

- Tracking mobile phones

### *Features*

- Determines direction of arrival and received signal strength of a targeted mobile phone's transmissions

- Determines direction of arrival and received signal strength of a targeted base station's transmission

- Provides real-time display of direction to the target

- Low power and portable

- User-friendly Graphical User Interface (GUI) for the PC

...

### *External Control*

- Laptop PC (Windows XP Professional)

### *Power Source*

- 12 Vdc at 0.5 A

*Physical Characteristics*

- Size: D = 17" H = 4.2"

- Weight: <14 lbs

*Required Accessories (sold separately)*

Gossamer with PC Controller, StingRay system, StingRay II, or KingFish with PC Controller

*Optional Accessories*

- Harpoon for DF range extension

...

Miami, FL, USA, *Legislative Files, Harris Sole Source Letter [Attachment B]*, p. 6-7 (Aug. 25, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48003.pdf (last accessed May 16, 2014).

**Geolocation (Preliminary)** PC-Based Intelligent AMPS/TDMA and CDMA Tracking and Location

*Product Description*

Geolocation is a PC-based software application that allows the user to intelligently track and locate targeted AMPS/TDMA or CDMA cellular phones... Geolocation consists of software and an external GPS receiver. Geolocation will be offered in two options: an AMPS/TDMA Option to be used in conjunction with the Harris LoggerHead Interrogator plus the PC Controller and the AmberJack DF Antenna; and a CDMA Option to be used in conjunction with the Harris StingRay system plus the AmberJack DF Antenna.

Geolocation provides a user-friendly, geospatially accurate mapping routine which shows on-screen the exact location of the tracking vehicle, plus Direction of Arrival (DOA) information and/or estimated range/location information on the targeted phone.

Providing a visual screen of an accurate local map, the exact location of the tracking vehicle, and the approximate location of the targeted phone, allows for a much more intelligent and expedient method for tracking and location.

*Features*

- User-friendly application running on Windows 98/2000/XP provides an intuitive Graphical User Interface (GUI)

- AMPS/TDMA: Interfaces with the LoggerHead Handheld Interrogator plus the PC

Controller and the AmberJack Direction-Finding (DF) Antenna

- CDMA: Interfaces with the StingRay plus the AmberJack Direction-Finding (DF) Antenna

- Provided GPS receiver integrates with PC running the application

- Real-time viewing of tracking vehicle location

- Real-time viewing of approximate targeted cellular phone location

- Tracking missions can be stored for post-mission analysis

- Migration path to GSM and future cellular standards

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed: Mar. 9, 2011).

**KingFish (Preliminary)** Portable CDMA Interrogation, Direction-Finding, and Collection System

### Product Description

KingFish provides investigators with a tool that extracts the telephone number (MIN) and Electronic Serial Number (ESN) from a CDMA mobile telephone. The Active Direction-Finding (DF) capability enables location of a powered-on phone without depending on the suspect to be involved on a call. Additionally, KingFish provides passive Dialed Number Recorder (DNR) and Registration Collection capabilities. Passive operations identify calling patterns and provide information on the suspect's area of operation.

KingFish is based on a Software Defined Radio (SDR) architecture, which enables upgrades to future cellular standards, while preserving the initial investment in hardware. As initially offered, KingFish provides CDMA operation in both the Cellular and PCS bands.

### Features

**Covert Packaging**

- Concealed radio, antennas, and battery power supply

- Wireless remote control from commercially available Pocket PC

**Intuitive Application Software**

- Windows interface

- 33 -

- Identifies active CDMA channels and catalogs base station parameters

- Provides real-time display of Interrogation and Passive Collection results

- Dynamically updates received signal strength to enable precise location of a target phone

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed: May 16, 2014).

Relevant pages of the above quoted Miami, Florida, City Commission Legislative Files are on the record at <u>ATTACHMENT 16</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

41.     Publicly disclosed Miami, Florida, City Commission Legislative Files also contain a Harris WPG GCSD Price List with numerous wireless device locators and accessories listed. *See* Miami, FL, USA, *Legislative Files, Harris GCSD Price List* (Sept. 2008), p. 1-8, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf [cached at: https://info.publicintelligence.net/Harris-SurveillancePriceList.pdf] (last accessed: May 16, 2014).  *See also* <u>ATTACHMENT 16</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

### C.     Evidence of public knowledge regarding (1) the technical operations of Harris devices, (2) how to make Harris-like devices, and (3) how to easily defeat Harris devices used by law enforcement.

#### 1.     Evidence of public knowledge regarding the technical operations of Harris devices.

42.     In 2007, the media reported that "a little-known FBI telephone intercept unit has developed a powerful cellphone tracking technology that agents use to monitor the physical movements of surveillance targets, even on phones that are not GPS equipped." Singel, Ryan (Wired Digital), *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs* (Dec. 20, 2007), http://archive.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell (last accessed: May 17, 2014); <u>ATTACHMENT 17</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for*

1  *Summary Judgment.*

2      43.     On November 14, 2008, Rachel Myers at the ACLU reported that "[t]he FBI

3  now has what is called 'triggerfish' technology — a cell site simulator that forces cell phones

4  in the area to register its phone number, serial number and location — allowing it to track cell

5  phones on its own." Myers, Rachel (ACLU), *With Technology Like This, Who Needs the*

6  *Law? | American Civil Liberties Union* (Nov. 14, 2008),

7  http://www.aclu.org/2008/11/14/with-technology-like-this-who-needs-the-law (last accessed

8  May 17, 2014).  The above quoted news article is on the record at <u>ATTACHMENT 18</u> of

9  *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response*

10  *to Defendants' Motion for Summary Judgment.*

11      44.     On September 22, 2011, *The Wall Street Journal* published a front page article

12  detailing the government's use of the Harris StingRay.  *See* Valentino-DeVries, Jennifer (The

13  Wall Street Journal), *'Stingray' Phone Tracker Fuels Constitutional Clash*, p. A1 (Sept. 22,

14  2011) (original article addressing CR08-814-PHX-DGC) *available at*

15  http://online.wsj.com/news/articles/SB10001424053111904194604576583112723197574#pri

16  ntMode (last accessed: May 17, 2014); <u>ATTACHMENT 19</u> of *Daniel Rigmaiden's*

17  *Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants'*

18  *Motion for Summary Judgment.*  The article goes into great detail about how the StingRay

19  operates and includes a diagram.  *See id.*

20      45.     On April 9, 2013, Kim Zetter, a reporter for *Wired*, published an article

21  explaining cell site emulator technology in great detail.  *See* Zetter, Kim (Wired), *Secrets of*

22  *FBI Smartphone Surveillance Tool Revealed in Court Fight* (Apr. 09, 2013), *available at*

23  http://www.wired.com/threatlevel/2013/04/verizon-rigmaiden-aircard/all/ (last accessed: May

24  17, 2014); <u>ATTACHMENT 20</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury*

25  *in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

26      46.     In his book, [Lapin, Lee. (2003).  *How To Get Anything On Anybody – Book 3.*

27  Mt. Shasta, CA: Intelligence Here. ISBN: 1880231131.] former government employee Lee

28  Lapin explains the functionality of various portable/transportable wireless device locators

manufactured by Harris WPG (*i.e.*, LoggerHead 4000, DF Antenna Array, SeaHorse, StarFish, and TriggerFish):

The LoggerHead 4000 is a handheld device that enables survey, intercept, and interrogation of analog and digital cellular networks.  This multipurpose tool provides investigators with a means of passively monitoring forward and reverse voice traffic, locating targeted cellular telephone users, actively intercepting calls, and interrogating cellular telephones for identifying information.  LoggerHead 4000 operates in the cellular and PCS bands.

**Base Station Survey**
- Identifies analog and digital control channels with related received signal strength
- Captures network information including System ID (SID) and service provider features
- Time tags and stores survey results

**Passive Mobile Survey**
- Intercepts forward and reverse audio using operator-defined mobile target parameters
- Captures call related information including Mobile Identification Number (MIN), Electronic Serial Number (ESN), Dialed Number, Caller ID. and Received Signal Strength
- Collects occurrences of mobile registrations with the network
- Scans voice traffic channels for call activity

**Active Mobile Survey**
- Emulates Base Station Control Channel to "capture" mobile phones in close proximity
- Collects MINs and ESNs through forced registration
- Actively intercepts or denies calls originating from captured mobile phones

**Direction Finding**
- Interfaces with available direction-finding equipment

Lapin, Lee. (2003).  *How To Get Anything On Anybody – Book 3* (p. 122). Mt. Shasta, CA: Intelligence Here. ISBN: 1880231131.

SeaHorse is an Interrogation and Direction Finding (DF) system, which is capable of identifying, tracking, and locating an IS-95 (CDMA) mobile phone.  SeaHorse may be deployed with a tracking vehicle or in a man-portable configuration.  The interrogation function is used to extract the identity (IMSI and ESN) of a suspect's mobile phone, if this information is not already known to the investigator.  The DF function is used to track and locate a targeted suspect.

SeaHorse is capable of operating in both the Cellular and PCS bands. User friendly software, developed for Windows operating systems, enables control of the SeaHorse system from a laptop or pocket PC.

The DF Antenna Array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle.  Once a targeted phone is engaged, information on the directions to the target is dynamically updated for display on the PC.  The DF Antenna Array is designed to operate with Harris' entire line of interrogators and intercept receivers, enabling tracking and location of AMPS, TDMA, GSM, as well as CDMA phones.

When detached from the laptop PC and Antenna Array, the interrogator unit can be easily concealed for tactical interrogation and location operations.

**Features**
    Base Station Survey Capability
- Identifies active CDMA channels
- Measures and records pilot signal strengths
- Captures network information required for interrogation operation
- Time tags and stores survey results

**Interrogation**
- Emulates Base Station to "capture" IS-95 phones in close proximity
- Collects and stores phone identities (IMSI and ESN)

**Direction Finding**
- Engages targeted mobile phone
- Determines direction of arrival and received signal strength of phone's transmissions
- Provides real-time display of direction to the target

*Id.*, p. 123.

StarFish integrates the Harris TriggerFish and LoggerHead surveillance products into a single pinpoint cellular location product.  StarFish combines the multichannel monitoring capability of the TriggerFish with the mobility of the handheld LoggerHead to track a cellular user to an area the size of a hotel room.  The StarFish system is comprised of a LoggerHead segment and a TriggerFish segment.  The LoggerHead segment consists of a LoggerHead, directional antenna, a pocket PC (PPC) and communications equipment that is man-portable and concealed within a common backpack or shoulder bag.  The TriggerFish segment consists of a TriggerFish and wireless communications equipment.

In StarFish mode, the LoggerHead receives its channel assignment remotely from the TriggerFish segment and graphically represents signal strength indications from the directional antenna to the PPC enabling the operator to locate the cellular target.  The TriggerFish segment serves as the command and control element for StarFish.  It monitors for a selected cellular target and sends channel assignments and short text messages to a maximum of six LoggerHead segments in the field.

- 37 -

1
2          Feedback to the TriggerFish operator of LoggerHead receiver signal strength and channel information allows an operator to direct and coordinate the search while somewhat removed from the hostile environment.

3      **Features**
4      ●    Ability to intercept and locate an AMPS/TDMA phone operating in the U.S. cellular or PCS bands
5      ●    Ability of the TriggerFish to remotely control and status up to six LoggerHeads at a range of up to 2,000 feet
6      ●    Remote control and status of LoggerHead mobile tracking functions via the PPC
7      ●    Concealment of the LoggerHead segment in an ordinary backpack or shoulder bag
8

9      *Id.*, pp. 123-24.

10     47.    "Lee [Lapin] has worked with several agencies, both public and private, helping

11     to develop surveillance and tracking equipment and techniques. His works ('letters on file')

12     are employed as textbooks by many of the world's major intelligence agencies including the

13     CIA, KGB and MOSSAD, the Justice Department, IRS, ATF, even the FBI. In addition, Lee

14     has appeared on several national talk shows and has been featured on the front page of the

15     NY Times, in People Magazine, Associated Press, and in many other magazines and

16     newspapers." Coast to Coast AM, *Lee Lapin - Guests - Coast to Coast AM*, Lee Lapin

17     Biography, http://www.coasttocoastam.com/guest/lapin-lee/6469 (last accessed: May 17,

18     2014). The above quoted news article is on the record at <u>ATTACHMENT 21</u> of *Daniel*

19     *Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to*

20     *Defendants' Motion for Summary Judgment.*

21                    **2.    Evidence of public knowledge regarding how to make Harris devices.**
22

23     48.    Through the OpenBTS project, information is publicly available allowing for

24     anyone to build his/her own 2G GSM cell site emulator for approximately $1500 USD. *See*

25     *OpenBTS Public Release*, http://wush.net/trac/rangepublic/wiki/WikiStart (last accessed: May

26     18, 2014) ("OpenBTS is a Unix application that uses a software radio to present a GSM air

27     interface to standard 2G GSM handset and uses a SIP softswitch or PBX to connect calls.");

28     <u>ATTACHMENT 22</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support*

1 | *of Plaintiff's Response to Defendants' Motion for Summary Judgment* (web resource

2 | attached).

3 |     49.     At the 2010 Defcon security conference, researcher Chris Paget used the

4 | OpenBTS software to publicly demonstrate her own cell site emulator similar to the

5 | technology built into Harris portable/transportable wireless device locators. *See* Greenberg,

6 | Andy (Forbes Magazine), *Despite FCC Scare Tactics, Researcher Demos AT&T*

7 | *Eavesdropping - Forbes* (Jul. 31, 2010), *available at*

8 | http://www.forbes.com/sites/firewall/2010/07/31/despite-fcc-scare-tactics-researcher-demos-

9 | att-eavesdropping/print/ (last accessed: May 18, 2014) ("With about $1,500 worth of

10 | hardware and open source software, Paget turned two on-stage antennas into a setup capable

11 | of spoofing the base stations that connect the GSM cell phone signals used by AT&T and T-

12 | Mobile. Paget set h[er] hardware to impersonate an AT&T signal, and dozens of phones in the

13 | room connected to h[er] fake base station."). The above quoted news article is on the record

14 | at <u>ATTACHMENT 23</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in*

15 | *Support of Plaintiff's Response to Defendants' Motion for Summary Judgment.*

16 |               **3.  Evidence of public knowledge regarding how to easily defeat**
17 |                        **Harris devices.**

18 |     50.     Through the "Catcher Catcher" project, an open source software tool is publicly

19 | available that can detect and defeat portable/transportable wireless device locators operating

20 | in cell site emulator mode:

21 |     **IMSI catcher detection**

22 |
23 |     For IMSI catchers [(aka "stingrays")] to achieve their goals they will need to
       show behavior different from normal base stations. We distinguish between
       yellow, red, and black flags. Yellow flag are an indication that you might have
24 |     been caught; red flags are a very strong indication; and black flags tell you:
       "You are being tracked down; throw away your phone and run."

25 |

26 | *See CatcherCatcher - Mobile Network Assessment Tools - SRLabs Open Source Projects,*

27 | https://opensource.srlabs.de/projects/mobile-network-assessment-tools/wiki/CatcherCatcher

28 | (last accessed: May 18, 2014); <u>ATTACHMENT 24</u> of *Daniel Rigmaiden's Declaration Under*

1  *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

2  *Judgment.*

3       51.    Some of the detection methods used by the "Catcher Catcher" software include:

4  (1) "No encryption after using encryption with the same operator before," (2) "IMEI not

5  requested in Cipher Mode Complete message," (3) "The LAC of a base station changes," (4)

6  "The LAC changes more than once," (5) "The network queries the phones IMEI during

7  location update," (6) "Receive a silent text message," (7) "You are paged, but do not enter

8  any transaction," (8) "You do not receive a call setup message while already being on a traffic

9  channel for 2 seconds," and (9) "You do not receive a call setup message while already being

10  on a traffic channel for [10 seconds]."  *Id.*

11       52.    Using the "Catcher Catcher" software, anyone can detect and defeat law

12  enforcement use of Harris portable/transportable wireless device locators.  The software is

13  available as a free download from https://opensource.srlabs.de/projects/mobile-network-

14  assessment-tools/wiki/GSMmap-live (last accessed: May 23, 2014).  The outcome the FBI

15  fears is already a reality.

     **D.    Defendant FBI failed to comply with the agreement that Plaintiff would be provided with a 500-page sample of processed FOIA records and a *Vaughn* index in order to litigate all future, yet-to-be-made redactions/withholdings.**

19       53.    Plaintiff and counsel for Defendant FBI verbally agreed to use a 500-page

20  sample of records responsive to Plaintiff's Harris FOIA request and an accompanying *Vaughn*

21  index as a means to argue the applicability of the FOIA exemptions the FBI *plans* to apply to

22  all responsive records in the future.[2]  This agreement was never formally placed on the

23  record pursuant to LRCiv 83.7. Plaintiff is exercising his right to dispute the verbal agreement

24  for the following reasons: (1) Defendant FBI violated the most basic term of the verbal

25  agreement, *i.e.*, a 500-page sample of responsive records **was never provided**; instead, a 321-

26

27  _____

28  2.    See *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment*, ¶ No. 1.

1  page sample was provided,[3] (2) out of the 23,000 "pages" located thus far, Defendant FBI

2  failed to provide an adequate number of sample records corresponding to each claimed FOIA

3  exemption, *e.g.*, only one sample "page" was provided corresponding to FOIA exemption (b)(1)

4  [4] and only nine sample "pages" were provided corresponding to FOIA exemption (b)(4).[5]  In

5  other words, Plaintiff does not have a sufficient sample to address the FBI's planned future

6  withholdings to be applied across at least 23,000 *yet-to-be-processed* "pages" of records.[6]

7        54.    Considering the FBI sent a 321-page sample, as opposed to the 500-page sample as

8  agreed upon, the agreement is null and void.  Considering the FBI failed to provide sufficient

9  sample pages for each claimed exemption, the agreement is null and void.  The only records of

10  which the FBI's claimed exemptions are ripe for review are the actual 321 "pages" provided to

11  Plaintiff thus far.  All future disclosures are not ripe for review.[7]

12        **E.    Relevant facts RE: the EOUSA failed to conduct an adequate search**
        **for records responsive to Plaintiff's Harris FOIA request.**
13

14        55.    The EOUSA mailed Plaintiff a set of records it claims is responsive to Plaintiff's

15  Harris FOIA request.  *See* ATTACHMENT 28 of *Daniel Rigmaiden's Declaration Under*

16  *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for Summary*

17  *Judgment*.  These records are largely unresponsive to Plaintiff's request and are instead

18  responsive to someone else's FOIA request (dated in 2012) that relates to GPS tracking

19  devices, **not** portable/transportable wireless device locators used to locate cell phones and

20  other wireless devices.  As indicated by the attached records, and by EOUSA's Vaughn index,

21  all of the records relate to the GPS device case, United States v. Jones, 132 S. Ct. 945 (2012),

22  other than for (1) "Information about cellular provider retention periods" (20 pages), Dkt.

23  #091-6, p. 34, (2) "guidance for prosecutors for obtaining and using cell phone evidence" (25

24  _____

25  3.    *See id.*, ¶ No. 2.

26  4.    *See id.*, ¶ No. 3.

    5.    *See id.*

27  6.    *See id.*

28  7.    *See id.*, ¶ No. 4.

1 | pages), Dkt. #091-6, p. 37, and (3) "Using Cellular Call Detail Records and Location

2 | Analysis Evidence in Criminal Trials" (23 pages), Dkt. #091-6, p. 38. The remainder of the

3 | 918 processed "pages" of records are not at all responsive to Plaintiff's Harris FOIA request.

4 |      56.    EOUSA is attempting to push off these unresponsive records as being

5 | responsive to Plaintiff's FOIA request as a means to avoid searching for records relating to

6 | portable/transportable wireless device locators used to locate cell phones and other wireless

7 | devices. As shown by the metadata for the PDF files sent to Plaintiff, the records were

8 | assembled in October of 2012, while EOUSA did not decide to begin processing Plaintiff's

9 | request until the year 2014. *See* ATTACHMENT 29 of *Daniel Rigmaiden's Declaration*

10 | *Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Motion for*

11 | *Summary Judgment.* (screenshot of PDF metadata showing that the redaction software

12 | "Redax" was used to build the PDF documents on October 11, 2012). Furthermore, all of the

13 | documents are dated in 2012, while EOUSA claims to have searched in the year 2014. *See*

14 | *id.*, ATTACHMENT 28; *see also* Dkt. #091-9 (EOUSA conducted its search in 2014).

15 | ///

16 | ///

17 | ///

18 | ///

19 | ///

20 | ///

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

1  Respectfully Submitted: May 27, 2014

2

3                                              DANIEL DAVID RIGMAIDEN,
                                               Pro Se Plaintiff:
4

5

6                                              Daniel D. Rigmaiden

7

8                          **CERTIFICATE OF SERVICE**

9         I, Daniel David Rigmaiden, certify under penalty of perjury under the laws of the

10  United States of America that on May 27, 2014                I caused the following

11  to be hand delivered as follows:

12

13  Original attached document and one copy addressed to:

14  Clerk of the Court
    Attn: Civil Docketing Section
15  Sandra Day O'Connor U.S. Courthouse
    401 West Washington Street, Suite 130, SPC 1
16  Phoenix, AZ 85003-2118

17

18  Per Court order at Dkt. #056, the ECF system will effectuate service by providing copies to:

19  Brad P. Rosenberg, Trial Attorney
    Kimberly L. Herb, Trial Attorney
20  U.S. Department of Justice
    Civil Division, Federal Programs Branch
21  PO Box 883
    Washington, D.C. 20044
22

23

24

25

26

27

28  By: Daniel Rigmaiden

                              - 43 -