## ATTACHMENT 16

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 16:   **(1)** Miami, FL, USA, *Legislative Files, Harris Sole Source Vendor
Letter*, p. 1 (Nov. 29, 2006), **(2)** Miami, FL, USA, *Legislative Files,
Inter-Office Memo RE: Harris Sole Source Vendor*, p. 1 (Nov. 13, 2008),
**(3)** Miami, FL, USA, *Legislative Files, Harris Sole Source Letter
[Attachment B]*, p. 2 (Aug. 25, 2008), **(4)** Miami, FL, USA, *Legislative
Files, Harris* Product Datasheets, p. 1-2, **(5)** Miami, FL, USA,
*Legislative Files, Harris Product Datasheets*, p. 1, and **(6)** Miami, FL,
USA, *Legislative Files, Harris GCSD Price List* (Sep. 2008), p. 1-8.



**HARRIS CORPORATION**

Government Communications
Systems Division
Wireless Products Group
Post Office Box 9800
Melbourne, FL USA 32902-9800
phone 1-800-358-5297
fax 1-321-309-7437

www.harris.com

Date:    29 November 2006

To:      City of Miami PD – Manuel Diaz

From:    Harris Wireless Products Group

REF:     KingFish, KingFish GSM S/W, Pocket PC GSM S/W & Training Sole Source Justification

Harris Government Communications Systems Division, via its Wireless Products Group (WPG) in Melbourne, FL, offers a comprehensive line of cellular surveillance and tracking equipment for exclusive utilization by Government and Law Enforcement Agencies. Harris WPG developed and owns the design, but does sub-contract the electronic board assemblies, the functional testing of those assemblies, and the integration into the final equipment chassis. Harris WPG adds application specific S/W and conducts final testing on this chassis prior to shipping to the end-item customer.

The KingFish system is the only man-portable battery powered CDMA & GSM Interrogation, Active Location, and Signal Information Collection system currently available. KingFish is compatible with CDMA commercial standards IS-95A, IS-95-B, TSB74, and J-STD-008 in the U.S. 800 and 1900 MHz bands. A GSM S/W upgrade package (for the KingFish and its Pocket PC) is available for purchase that will allow operation against the GSM standard in the U.S. 800 and 1900 MHz bands (as well as the overseas 900 MHz E-GSM and DCS 1800 MHz bands). KingFish can also be powered via standard automotive +12V DC or standard 110VAC. The man-portability and battery power features of the Harris KingFish product are unique for tactical mission needs, allowing the user to perform passive collection, active interrogation and active location while on foot (i.e., inside a multi-story building, or outside in rough terrain).

The KingFish is delivered with all the accessories necessary to perform man-portable active location, interrogation and passive collection technical investigations on the CDMA & GSM cellular formats. Harris also sells training on the use of the KingFish. Training sessions are 2 days per class with a maximum class size of 4 students. One training class is required per product, and per cellular protocol.

Harris WPG is your only source for the KingFish, KingFish GSM S/W, KingFish Pocket PC GSM S/W and associated training.

One-year maintenance agreements are included with all Harris WPG Products. A Maintenance Agreement includes:
- Customer Telephone Support (8AM – 6PM EST) @ 1-800-358-5297
- Warranty on hardware
- Notification of and free access to S/W upgrades as they are released (applies to purchased protocols only)

Upon expiration of the first-year Maintenance Agreement, customers may extend their coverage another 12 months by purchasing an Extended Annual Maintenance Agreement at 15% of the original purchase price of their cellular product. These can then be renewed annually thereafter for the same 15% fee.

If you require any additional information, please feel free to contact our office at (800) 358-5297 or you can call my direct line at (321) 309-7430.

Sincerely,

Richard F. Roosa
Manager Advanced Programs
Harris Corporation
Wireless Products Group

**assured communications**

CITY OF MIAMI, FLORIDA

**INTER-OFFICE MEMORANDUM**

TO :   Pedro G. Hernandez
       Chief Administrator/City Manager

FROM : Glenn Marcos, Director
       Chief Procurement Officer

DATE :        November 13, 2008        FILE :

SUBJECT :     Purchase of Upgrades for the
              StingRay and KingFish Cellular
              Tracking Surveillance Equipment

REFERENCES :

ENCLOSURES:

An investigation was conducted by staff to determine whether Harris Government Communications Systems Division (GCSD) Wireless Products Groups, located at P.O. Box 9800, Melbourne, Florida 32902, is the sole source provider to upgrade the current cellular tracking surveillance equipment known as the StingRay 4-CH and KingFish 1-CH, for the Department of Police.

The Police Department will be purchasing a Dual Band High Powered 30W Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband Direction Finder to upgrade the StingRay 4-CH and KingFish 1-CH, from Harris GCSD, which was purchased utilizing GSA IT 70 Schedule Contract #GS-35F-0283J, authorized pursuant to Resolution No. 06-0238. The electronic software (including training and a one-year maintenance agreement) to operate the cellular tracking devices was purchased as a sole source from Harris GCSD, as authorized by Resolution No. 07-0287.

The upgrade is necessary to operate both the StingRay 4-CH and the KingFish 1-CH given the continuous change in technology. The amplifier will allow an increase in wattage that will greatly heighten the ability of tracking phones from an increased distance and reducing the time utilized; the converter is a high performance converter that enables the StingRay and the KingFish to operate in the 2100 MHz band, which is the new cellular phone technology being introduced to the Miami market and already being utilized around the country; the Amberjack Wideband will enable the StingRay to use its added capabilities with the current iDEN software to pinpoint push-to-talk cellular phones more effectively, a feature that the current equipment does not have This will enable the investigators to carry out their duties and responsibilities in a more effective and efficient manner.

Harris Government Communications Systems Division, via its Wireless Products Group (WPG) offers a comprehensive line of cellular surveillance and tracking equipment, plus training and maintenance, for exclusive utilization by government and law enforcement agencies. Harris WPG developed and owns the equipment designs, but does sub-contract the electronic board assemblies, functional testing of those assemblies, and chassis integration. Harris WPG adds application specific, proprietary software, and conducts final testing on the chassis prior to shipment to the customer. Harris WPG is the only source and distributor of the StingRay vehicular-based and KingFish man-portable systems plus compatible accessories training and maintenance.

Accordingly, I am recommending that the requirements for competitive bidding be waived, and these findings be approved: Harris Government Communications Systems Division (GCSD) Wireless Products Groups, located at P.O. Box 9800, Melbourne, Florida 32902, is the sole source provider of the Dual Band High Powered 30W Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband Direction Finder to upgrade StingRay 4-CH and KingFish 1-CH cellular surveillance equipment, for the Department of Police, in an amount not to exceed $51,500. Funding is to be provided from the Law Enforcement Trust Fund, Award No. 1171, Project No. 19-690003, and Account Code No. 12500.191602.896000.0000.00000.

APPROVED BY: _____        DATE: ___12/23/08___
             Pedro G. Hernandez
             Chief Administrator/City Manager



# Attachment B

# Law Enforcement Trust Fund
## *Sole Source Vendor Letter*



**HARRIS CORPORATION**

Government Communications
Systems Division
Wireless Products Group
P.O. Box 9800
Melbourne, FL USA 32902-9800
phone 1-321-309-7773

www.harris.com

**August 25, 2008**

**To: Raul Perez, City of Miami PD**

**RE: StingRay and KingFish Sole Source Justification**

Harris Government Communications Systems Division, via its Wireless Products Group (WPG) in Melbourne, FL, offers a comprehensive line of cellular surveillance and tracking equipment, plus training and maintenance, for exclusive utilization by Government and Law Enforcement Agencies. Harris WPG developed and owns the equipment designs, but does sub-contract the electronic board assemblies, functional testing of those assemblies, and chassis integration. Harris WPG adds application specific, proprietary software, and conducts final testing on the chassis prior to shipment to the customer. Harris WPG has also developed specialized training courses for the operation and use of the StingRay and KingFish equipment.

The Harris StingRay and KingFish systems are compatible with the CDMA standard in the 800 MHz and 1900 MHz frequency bands, the GSM standard in the 800 MHz, 900 MHz, 1800 MHz, and 1900MHz frequency bands, the iDEN (Nextel) standard in the 800 MHz and 850 MHz frequency bands, the UMTS standard in the 800 MHz and 1900 MHz frequency bands, and, with optional converter equipment, the UMTS standard in the 2100 MHz frequency band.

The Harris StingRay and KingFish vehicular-based systems are the only portable standard +12VDC powered CDMA, GSM, UMTS, and iDEN interrogation, tracking and location, and signal information collection system currently available. When interfaced with the optional Harris AmberJack direction-finding (DF) antenna(s) (or handheld DF antenna for iDEN and UMTS), Tarpon software, laptop PC controller, and Harpoon amplifier kits, the StingRay can perform vehicular-based DF operations on the CDMA, GSM, UMTS, and iDEN cellular formats. The transportability and standard +12VDC vehicular power features of the Harris StingRay and KingFish products are unique for tactical mission needs.

The StingRay and KingFish are quoted with software and accessories that are required in order to perform missions on the CDMA, GSM, UMTS, and iDEN cellular formats. These include the cable assemblies, power supplies, antennas, laptop PC controller, power amplifiers, handheld DF antenna, AmberJack DF antenna, and cellular format software (CDMA, GSM, UMTS, and iDEN).

Harris also sells training on the use of the StingRay, KingFish and its accessories. Standard training sessions are 2 days per class with a maximum class size of 4 students. One-year maintenance agreements are included with all Harris WPG Products. Maintenance agreements include the following:
- Customer telephone support (8AM – 6PM EST)
- Hardware warranty
- Notification and access to software upgrades as they are released

Harris WPG is your only source and distributor of the StingRay vehicular-based and KingFish man-portable systems plus compatible accessories, training and maintenance.

If you require any additional information, please feel free to my direct line at 321-309-7773 or my mobile at 321-258-2583.

Sincerely,

Lin Vinson                    8/25/08

Lin Vinson
Major Account Manager, Wireless Products Group
Harris Corporation

*assuredcommunications*™



| Quote | QTE6779-01751 |
|---|---|
| Date | 7/31/2008 |
| Page: | 1 |

## Quotation

**Bill To:**

City of Miami Police Department
Detective Raul Perez
raul.perez@miami-police.org
305-321-7655

**Ship To:**

Detective Raul Perez
raul.perez@miami-police.org
305-321-7655

| Purchase Order No. | Customer ID | Salesperson ID | Shipping Method | Payment Terms | Req Ship Date | Master No. |
|---|---|---|---|---|---|---|
| | MDPD-MIAFL-001 | | BEST WAY | Net 30 | 0/0/0000 | 2,211 |

| Quantity | Item Number | Description | UOM | Discount | Unit Price | Ext. Price |
|---|---|---|---|---|---|---|
| 1 | PA-KIT-30W DUAL-BAND | PA-KIT-30W Dual-Band CONUS 850/1900 | EA | | $17,500.00 | $17,500.00 |
| 1 | UMTS-B4-CONV | UMTS 2100 MHz Converter | EA | | $16,000.00 | $16,000.00 |
| 1 | AJ-W-UG | AmberJack-X or G to AmberJack-W Upgrade (WideB | EA | | $18,000.00 | $18,000.00 |
| | NOTE | | | | | $0.00 |
| | Delivery will be 120 days ARO unless otherwise | | | | | |
| | stated. Please see attached Terms and Conditions. | | | | | |

HARRIS CORP - WIRELESS PRODUCTS GROUP
P.O. BOX 9800, M/S R5-11A
MELBOURNE, FL 32902-9800
PH: 800-358-5297, FAX: 321-309-7437,wpg@harris.com

Approved By:

_____

| Subtotal | $51,500.00 |
|---|---|
| Misc | $0.00 |
| Tax | $0.00 |
| Freight | $0.00 |
| Trade Discount | $0.00 |
| Purchase Price | $51,500.00 |



**HARRIS**

*assuredcommunications*®

*Wireless Products Group*

# Harpoon™

## Software-Controlled, High-Power Filtered Amplifier

### Product Description

Harpoon™ is a software-controlled, high-power filtered amplifier that maximizes the multichannel transmit capability of the StingRay II® and significantly improves the performance of the single-channel StingRay® and KingFish® systems by providing high-gain, wide dynamic range, and excellent linearity along with 30 watts of filtered output power. System status indication alerts the user during fault conditions including problems with the RF connections.

- Four Versions Available
  - Harpoon 850/1900 (Dual Band)
  - Harpoon 900/1800 (Dual Band)
  - Harpoon 2100 (Single Band)
  - Harpoon i800 (Single Band)

### Features

- Automatic Level Control
  - Maximizes total output power up to 30 W per band
  - Maintains constant output power
  - Improves power level accuracy
- Filtered Output
  - Improves transmit signal quality
  - Improves receiver sensitivity



### Operations Supported

- Maximizes the multichannel transmit capability of the StingRay II
- Significantly improves the performance of the single-channel StingRay and KingFish systems



# Harpoon™

## Software-Controlled, High-Power Filtered Amplifier



**WIRELESS products group**

### Standards Supported
- GSM
- CDMA2000®
- iDEN
- UMTS

### Frequency Coverage
- 850/1900: 869–894 MHz/1930–1990 MHz
- 900/1800: 925–960 MHz/1805–1880 MHz
- iDEN 800: 851–870 MHz
- 2100: 2110–2170 MHz

### Physical Characteristics
- Dual Band
  - Size: 10.5" x 14.75" x 5"
  - Weight: 24 lbs
- Single Band
  - Size: 10.5" x 10.5" x 5"
  - Weight: 15 lbs

### Power Specifications
- Input: 10–33 Vdc
- Power Consumption
  - Dual Band: 440 W max
  - Single Band: 280 W max

### Optional Accessories
- Diplexer for dual-band operation with StingRay and KingFish

### Catalog Part Number
- Harpoon 850/1900
- Harpoon 900/1800
- Harpoon i800
- Harpoon 2100



Improves Transmit Signal Quality and Receiver Sensitivity

Specifications are subject to change without notice. Harris is a registered trademark of Harris Corporation. KingFish, StingRay, and StingRay II are registered trademarks of Harris Corporation. Harpoon is a trademark of Harris Corporation. CDMA2000 is a registered trademark of the Telecommunications Industry Association in the United States (TIA-USA). iDEN is a trademark of Motorola, Inc.

This product is a restricted use item and can be sold only to authorized law enforcement and government agencies. Its use shall comply with all local, state, and federal laws and regulations. Harris Corporation assumes no liability for any misuse or improper use of the product and makes no warranty or representation whatsoever as to its suitability for any specific application.

**DISTRIBUTION WARNING**

This brochure may be provided only to persons eligible under 18 USC 2512 (Government law enforcement agencies or communications service providers).



**HARRIS®**

*assured communications®*

Government Communications Systems | P.O. Box 9800 | Melbourne, FL USA 32902-9800
1-800-358-5297 or wpg@harris.com | www.wpg.harris.com | **www.harris.com**

Copyright © 2008 Harris Corporation 07/08 514176m VPB d0341



# AmberJack®
## Direction-Finding System

### Product Description

AmberJack® is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations. The DF antenna array is designed to operate with Harris' Gossamer®, KingFish®, StingRay®, and StingRay II® products, enabling tracking and location of targeted mobile phones, as well as base stations. AmberJack-X operates in the U.S. cellular 850 and PCS 1900 bands, and AmberJack-G operates in the EGSM 900 and DCS 1800 bands. AmberJack-W operates in all the bands above as well as iDEN™ and UMTS bands I and IV.

AmberJack combines Harris' expertise in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction-finding system. Phased array technology offers a universal DF antenna for existing, as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation on the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows® operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a target is engaged, information on the direction to the target is dynamically updated for display on the PC.



### Operations Supported

- Locating mobile phones and base stations
- Tracking mobile phones



# *AmberJack®*
## *Direction-Finding System*



### Features

- Determines direction of arrival and received signal strength of a targeted mobile phone's transmission
- Determines direction of arrival and received signal strength of a targeted base station's transmission
- Provides real-time display of direction to the target
- Low power and portable
- User-friendly Graphical User Interface (GUI) for the PC

### Frequency Coverage

- AmberJack-X (U.S. Cellular/PCS 1900)
  - Cellular reverse: 824–849 MHz
  - Cellular forward: 869–894 MHz
  - PCS reverse: 1850–1910 MHz
  - PCS forward: 1930–1990 MHz
- AmberJack-G (EGSM 900/DCS 1800)
  - EGSM reverse: 880–915 MHz
  - EGSM forward: 925–960 MHz
  - DCS reverse: 1710–1785 MHz
  - DCS forward: 1805–1880 MHz

- AmberJack-W (Wideband)
  - iDEN reverse: 806–825 MHz
  - iDEN forward: 851–870 MHz
  - Cellular reverse: 824–849 MHz
  - Cellular forward: 869–894 MHz
  - PCS reverse: 1850–1910 MHz
  - PCS forward: 1930–1990 MHz
  - EGSM reverse: 880–915 MHz
  - EGSM forward: 925–960 MHz
  - DCS reverse: 1710–1785 MHz
  - DCS forward: 1805–1880 MHz
  - UMTS IV reverse: 1710–1755 MHz
  - UMTS IV forward: 2110–2155 MHz
  - UMTS I reverse: 1920–1980 MHz
  - UMTS I forward: 2110–2170 MHz

### External Control

- Laptop PC (Windows® XP Professional)

### Power source

- 12 Vdc at 0.5 A

### Physical Characteristics

- Size: D = 17″, H = 4.2″
- Weight: <14 lbs

### Required Accessories (sold separately)

Gossamer with PC Controller, StingRay system, StingRay II, or KingFish with PC Controller

### Optional Accessories

Harpoon™ for DF range extension

### Catalog Part Number

- AJ-X (AmberJack-X)
- AJ-G (AmberJack-G)
- AJ-W (AmberJack-W)

### Authorized Federal Supply Service Information Technology Schedule

- SIN: 132-8 Purchase of Equipment
- SIN: 132-12 Maintenance, Repair Services and Repair Parts/Spare Parts

GSA Contract Number: GS-35F-0293J

General Services Administration Federal Supply Service products and ordering information in this Authorized FSS Information Technology Schedule Pricelist are also available on the GSA *Advantage!* System. Agencies can browse GSA *Advantage!* by accessing the GSA's home page via the Internet at *www.gsa.gov.*



Specifications are subject to change without notice. Harris is a registered trademark of Harris Corporation. AmberJack, KingFish, Gossamer, StingRay, and StingRay II are registered trademarks of Harris Corporation. Harpoon is a trademark of Harris Corporation. Windows XP Professional is a registered trademark of Microsoft Corporation. iDEN is a trademark of Motorola, Inc.

This product is a restricted use item and can be sold only to authorized law enforcement and government agencies. Its use shall comply with all local, state, and federal laws and regulations. Harris Corporation assumes no liability for any misuse or improper use of the product and makes no warranty or representation whatsoever as to its suitability for any specific application.

### DISTRIBUTION WARNING
This brochure may be provided only to persons eligible under 18 USC 2512 (Government law enforcement agencies or communications service providers).



*assuredcommunications®*

Government Communications Systems | P.O. Box 9800 | Melbourne, FL USA 32902-9800
1-800-358-5297 or wpg@harris.com | www.wpg.harris.com | **www.harris.com**

Copyright © 2008 Harris Corporation 07/08 514176k VPB d0105





# UMTS IV Converter

## Overview

**UMTS IV Converter** is a high performance Frequency Converter that enables the StingRay® or KingFish® to operate in the CONUS UMTS IV (2100 MHz DL, 1700MHz UL) band. Its high stability and extremely low phase noise performance enables stand-alone-capability; which allows the StingRay/KingFish and Converter to operate with independent references. Its excellent channel-pair rejection enables operation with high-power PAs.

**UMTS IV Converter** enables the StingRay/KingFish to transmit on the UMTS IV downlink band and to receive on both the uplink and downlink bands. It automatically shuts down the downlink receive path during transmit mode, improving system isolation and reducing power consumption.

Active gain compensation guarantees constant gain over temperature, frequency, aging, and other environmental effects during transmit mode and guarantees constant gain over temperature during receive mode.

## Features

**Transmit**
- TX conversion from 1842.5 to 2140 MHz
- 60 MHz low ripple bandwidth
- Circuitry turns off during receive only mode
- Active gain compensation over temp and freq
- Active TX LED status indicator

**Receive**
- RX 1 conversion from 2140 to 1842.5 MHz
- RX 2 conversion bypass
- RX 1 circuitry turns off during transmit mode
- 11dB gain is temperature compensated
- Attenuators are activated from the front panel

**Local Oscillators**
- 0.5° Integrated Phase Noise (100Hz – 1MHz)
- 0.2ppb over temperature, ±25ppb/year aging
- LED status indicator

**Mechanical Housing**
- Rugged welded metal case
- Formed lid for convenient transceiver mounting
- Front panel connectors, controls, and indicators

**UMTS IV Converter**




**StingRay and UMTS IV Converter**



**Accessories included:**
- Transit Case
- AC/DC converter
- DC/DC converter for vehicular operation
- RF cables for StingRay/KingFish connections
- RF cable for PA connection
- Brackets for KingFish installation

*assuredcommunications®*

**HARRIS PROPRIETARY INFORMATION**

**Perez, Raul**

| | |
|---|---|
| **From:** | Vinson, Lin [wvinson@harris.com] |
| **Sent:** | Thursday, July 31, 2008 10:51 AM |
| **To:** | Perez, Raul |
| **Subject:** | t-mobile 2100 network rollout |

Raul,

Here is the info we received on T-Mobile's UMTS (2100 AWS) rollout plans. Also I have attached copies of our UMTS converter and AmberJack data sheets for your reference.

Thanks,
Lin

From: Engadget
URL: http://www.engadget.com/2008/07/30/t-mobile-3g-service-coming-october-1-to-27-markets/
Sent from: adam harder (aharder@harris.com)
Sent to: aharder@harris.com
Comments:

# T-Mobile 3G service coming October 1 to 27 markets

**07-30-2008**



We were already <u>pretty sure</u> this would be happening, but it's looking real now, if 8.5 x 11-inch pieces of paper taped to a window is any indication: T-Mobile is rolling out its 3G service on October 1 to 27 select cities. The above poster was spotted by TmoNews "outside a meeting" and, as you can see, it says,

T-Mobile 3G service coming October 1 to 27 markets                                    Page 2 of 2

"10.1.08 3G is Coming." As far as those launch cities, we have a handy little list for you after the break. By the way, it's entirely possible T-Mobile 3G is already live in your market, though, so don't let this confuse you too much. It could just mean you're next, or, at least by October 1.

- New York City
- Austin
- NJ and Long Island
- Las Vagas
- Minneapolis
- Miami
- Dallas
- Chicago
- Houston
- Philadelphia
- Denver
- Detroit
- Orlando
- Kansas city
- Atlanta
- Los Angeles
- New England (whatever that means)
- Portland
- Sacramento
- San Diego
- Seattle
- Washington DC
- San Francisco
- Birmingham
- Memphis
- Tampa
- Phoenix

7/31/2008





# StingRay™

*Transportable CDMA
Interrogation, Tracking
and Location, and
Signal Information
Collection System*

## Product Description

StingRay™ is Harris' latest offering in a
long line of advanced wireless surveillance
products. StingRay is a multichannel software
defined radio that performs network base
station surveys, Dialed Number and registration
collection, mobile interrogation, and target
tracking and location with Harris' Amber-
Jack™ Direction-Finding Antenna. This
low-power transportable surveillance system
is designed with the future in mind—its
reconfigurable architecture lends itself to
upgrades of new capabilities and wireless
standards, while preserving the initial
investment in hardware.

## Features

- Software Defined Radio (SDR) enables
  simultaneous monitoring of up to eight
  CDMA Paging/Access channel pairs

- Active interrogation capability emulates
  base station to collect MINs and ESNs
  through forced registration; external
  PA output available for higher power
  requirements

- Interfaces with AmberJack antenna to
  form a complete target tracking and
  location solution using active direction-
  finding and ranging techniques
  (active approach does not require
  the target phone
  to be engaged
  in a call)

- Optional geolocation software overlays
  target tracks and tracking vehicle location
  on a digital map

- Wideband RF front-end provides
  simultaneous operation in the U.S. cellular
  800 and PCS 1900 MHz bands and is
  preconfigured to support iDEN (low band),
  GSM 900, and DCS 1800 bands

- PC-based controller running Windows®
  XP provides an intuitive Graphical User
  Interface (GUI)

- Industry-standard USB interface enables
  plug-n-play networking of multiple
  StingRay surveillance systems if the
  user requires more channel capacity

- Supports targeting and real-time
  searching of mobile identification
  numbers (MIN), dialed
  numbers, and electronic
  serial numbers (ESN)

- Low-power system
  designed for
  vehicular
  operations



*next level solutions*

**HARRIS**



# AmberJack™

### Dual-Band Direction
### Finding System

## Product Description

AmberJack™ is a phased array direction finding (DF) antenna system capable of tracking and locating mobile phone users. The DF antenna array is designed to operate with Harris' Loggerhead™ and StingRay™ products enabling tracking and location of AMPS, TDMA and CDMA phones. AmberJack operates in both the cellular and PCS bands.

AmberJack combines Harris' expertise in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction finding system. Beam forming technology offers a universal DF antenna for existing as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows® operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a targeted phone is engaged, information on the direction to the target is dynamically updated for display on the PC.

## Features

- Determines direction of arrival and received signal strength of phone's transmission

- Provides real-time display of direction to the target

- Low power, small size

- User-friendly graphical user interface for the PC or Pocket PC (optional)



*next level solutions*



# Geolocation (Preliminary)

## PC-Based Intelligent AMPS/TDMA and CDMA Tracking and Location

**WIRELESS**
**products group**

## Product Description

Geolocation is a PC-based software application that allows the user to intelligently track and locate targeted AMPS/TDMA or TDMA cellular phones in the 800 and 1900 bands. Geolocation consists of software and an external GPS receiver. Geolocation will be offered in two options: an AMPS/TDMA Option to be used in conjunction with the Harris LoggerHead™ Interrogator plus the PC Controller™ and the AmberJack™ DF Antenna; and a CDMA Option to be used in conjunction with the Harris StingRay™ system plus the Amber-Jack™ DF Antenna.

Geolocation provides a user-friendly, geospatially accurate mapping routine which shows on-screen the exact location of the tracking vehicle, plus Direction of Arrival (DOA) information and/or estimated range/location information on the targeted phone.

Providing a visual screen of an accurate local map, the exact location of the tracking vehicle, and the approximate location of the targeted phone, allows for a much more intelligent and expedient method for tracking and location.

## Features

■ User-friendly application running on Windows® 98/2000/XP provides an intuitive Graphical User Interface (GUI)

■ AMPS/TDMA: Interfaces with the LoggerHead™ Handheld Interrogator plus the PC Controller™ and the AmberJack™ Direction-Finding (DF) Antenna

■ CDMA: Interfaces with the StingRay™ plus the AmberJack™ Direction-Finding (DF) Antenna

■ Provided GPS receiver integrates with PC running the application

■ Real-time viewing of tracking vehicle location

■ Real-time viewing of approximate targeted cellular phone location

■ Tracking missions can be stored for post-mission analysis

■ Migration path to GSM and future cellular standards



*next level solutions*

# HARRIS

## WIRELESS products group

## KingFish™ (Preliminary)

### Portable CDMA Interrogation, Direction-Finding, and Collection System

### Product Description

KingFish™ provides investigators with a tool that extracts the telephone number (MIN) and Electronic Serial Number (ESN) from a CDMA mobile telephone. The Active Direction-Finding (DF) capability enables location of a powered-on phone without depending on the suspect to be involved on a call. Additionally, KingFish provides passive Dialed Number Recorder (DNR) and Registration Collection capabilities. Passive operations identify calling patterns and provide information on the suspect's area of operation.

KingFish is based on a Software Defined Radio (SDR) architecture, which enables upgrades to future cellular standards, while preserving the initial investment in hardware. As initially offered, KingFish provides CDMA operation in both the Cellular and PCS bands.

### Features

#### Covert Packaging

- Concealed radio, antennas, and battery power supply
- Wireless remote control from commercially available Pocket PC

#### Intuitive Application Software

- Windows® interface
- Identifies active CDMA channels and catalogs base station parameters
- Provides real-time display of Interrogation and Passive Collection results
- Dynamically updates received signal strength to enable precise location of a target phone



*next level solutions*



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE



**HARRIS GCSD**
**PRICE LIST**
*Effective September 2008*
*All price quotes are in USD ($)*

*\*\*\*This price list supersedes all previous price lists.  Prices and products are subject to change without notice.  Products are subject to discontinuation without notice.\*\*\**



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

## AmberJack®

| MODEL NUMBER | DESCRIPTION | PRICE | |
|---|---|---|---|
| | | 1 to 15 Units | 16+ Units |
| AJ-G | The AmberJack-G DF Antenna is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations Forward and Reverse in the GSM 900 and 1800 MHz Bands.* | $  24,300 | $  23,100 |
| AJ-X | The AmberJack-X DF Antenna is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations Forward and Reverse in the GSM 800 and 1900 MHz Bands.* | $  24,300 | $  23,100 |
| AJ-W | The AmberJack-W DF Antenna is a wideband phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations Forward and Reverse in the frequency bands from 800MHz to 2100 MHz* | $  38,400 | $  36,500 |
| AJ-GUP | AmberJack-G DF Antenna Upgrade.  Upgrades the legacy AJ-DF antenna to the AJ-G antenna. | $  13,000 | $  12,400 |
| AJ-XUP | AmberJack-X DF Antenna Upgrade. Upgrades the legacy AJ-DF antenna to the AJ-X antenna. | $  9,000 | $  8,600 |
| AJ-WUP | AmberJack-W DF Antenna Upgrade. Upgrades the legacy AJ-DF antenna, AJ-X or AJ-G antenna to the AJ-W antenna. | $  18,000 | $  17,100 |
| | *Requires PC Controller Software for Gossamer Operations. | | |

| AmberJack Accessories | | PRICE |
|---|---|---|
| 3088596-101 | Cable Assembly, DBDF Antenna, Loggerhead (12') | $  650 |
| 3120038-101 | Cable Assembly, DBDF Antenna, LH/Gossamer (12') (To be used in place of the 3088596-101 for both LH and Gossamer) | $  650 |
| KCII/1660 | Cable Assembly, DBDF Antenna, StingRay (12')- (old PN: 3099547-101) | $  800 |
| RE0512HA-2 | Carrying Case | $  890 |
| DC15A-3J1 | Cable Assembly, 3-Way Splitter | $  170 |
| 47621 | Eyebolt, Swivel | $  54 |
| 3087877-101 | Power Cable Internal | $  73 |
| 47641/94882 | Tool, Eyebolt | $  15 |
| 8834T561 | Webbing Assembly, 12ft. | $  35 |
| 3087882-101 | Radome Assembly | $  1,800 |
| KCII/1672 | Cable Assembly, DBDF Antenna, StingRay (25') | $  975 |
| KCII/1684 | Cable Assembly, DBDF Antenna, StingRay (5 meters or 16' 4") - (old PN: 3099547-103) | $  825 |
| KCII/1696 | Cable Assembly, DBDF Antenna, StingRay (50') - (old PN: 3099547-102) | $  1,000 |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

## StingRay®

| MODEL NUMBER | DESCRIPTION | PRICE 1 to 15 Units | 16+ Units |
|---|---|---|---|
| STINGRAY | StingRay (4 module) – 1-CH Xmit Interrogation and Direction Finding Transportable Unit. | $ 75,100 | $ 71,300 |
| SRAY-GSM-SW | StingRay – GSM Software Package | $ 22,000 | $ 20,900 |
| SRAY-CDMA-SW | StingRay – CDMA Software Package | $ 22,000 | $ 20,900 |
| SRAY-IDEN-SW | StingRay – iDEN Software Package | $ 22,000 | $ 20,900 |
| SRAY-UMTS-SW | StingRay – UMTS Software Package | N/C | N/C |
| SRAY-GSM-SW-INTCP | StingRay -- GSM Intercept Software Package without S/C | $ 27,400 | $ 26,000 |
| SRAY-GSM-SW-INTCP-SC | StingRay -- GSM Intercept Software Package with S/C (Restricted Sales only Federal Customer) | $ 50,000 | $ 25,000 |
| UMTS-B1-CONV | StingRay 2100/1900MHz Down Converter | $ 16,000 | $ 15,200 |
| UMTS-B4-CONV | StingRay 2100/1700MHz Down Converter | $ 16,000 | $ 15,200 |
| AIRBRN-KIT-CONUS | Airborne DF Kit CONUS | $ 9,000 | $ 8,550 |

## StingRay II®

| | | | |
|---|---|---|---|
| STINGRAY II | StingRay II – 4-CH Multi-Xmit Interrogattion and Direction Finding Transportable Unit. | $ 148,000 | $ 140,600 |
| STINGRAY II-UP | StingRay II – StingRay to StingRay II Upgrade | $ 65,000 | $ 61,800 |
| SRAY II-GSM-SW | StingRay – GSM Software Package | $ 22,000 | $ 20,900 |
| SRAY II-CDMA-SW | StingRay – CDMA Software Package | $ 22,000 | $ 20,900 |
| SRAY II-IDEN-SW | StingRay – iDEN Software Package | $ 22,000 | $ 20,900 |
| SRAY II-GSM-SW-INTCP | StingRay -- GSM Intercept Software Package | $ 27,400 | $ 26,000 |
| SRAY II-GSM-SW-INTCP-SC | StingRay -- GSM Intercept Software Package with S/C (Restricted Sales only Federal Customer) | $ 50,000 | $ 25,000 |
| SRAY II-UMTS-SW | StingRay – UMTS Software Package | N/C | N/C |

| *StingRay Accessories* | | PRICE |
|---|---|---|
| 3092524-102 | Cable Assembly PC/USB - 6' Cable | $ 196 |
| 3092524-103 | Cable Assembly PC/USB - 12' Cable | $ 220 |
| 3092525-101 | Cable DC Power | $ 171 |
| REI017HA | Carrying Case | $ 925 |
| 17250 | 115V Power Cord | $ 8 |
| 2009523-101 | Laptop PC Controller (Dell Latitude D630) | $ 3,500 |
| 2009525-101 | Panasonic Toughbook Computer | $ 6,500 |
| DE2035-803 | Adapter, DC (Laptop) (non- Charging) | $ 226 |
| 2009523-003 | Mouse, CMPTR (Micro Trac) | $ 50 |
| 2009523-002 | Auto Power Adapter (8500 & D600) | $ 128 |
| OSMM-SA-20 | Mobile Mast 20' | $ 2,990 |
| PE3665-144 | 12' Extension Cable (TNC to N) | $ 80 |
| PE3414-144 | 12' Extension Cable (TNC to TNC) | $ 85 |
| PE9131 | N-F to TNC-F Adapter | $ 48 |
| PE9099 | TNC-F to TNC-F Adapter | $ 28 |
| PE9090 | N-M to TNC-F Adapter | $ 30 |
| PE9089 | N-F to TNC-M Adapter | $ 28 |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

| StingRay Accessories continued... | | PRICE | |
|---|---|---|---|
| Y2287A-66 | Directional Antenna, Yagi (GSM) Pole Mount | $ | 100 |
| FPPA-400 | Field Portable Power Adapter (Military Vehicles) | $ | 2,900 |
| FPPS-375 | Field Portable Power Source (Battery Pack) | $ | 1,700 |
| FPACPS | Field Portable AC Power Source | $ | 900 |
| 3092527-201 | SDR Radio Slice | $ | 15,000 |
| 3092577-101 | DC-DC Power Supply Module (SR & KF) | $ | 1,400 |
| WSA-00045 | Duplex Filter (AMPS/PCS) Stand Alone | $ | 1,970 |
| WSA-00100 | Duplex Filter (EGSM/DCS) Stand Alone | $ | 2,310 |
| 3174173-101 | Quad Band Mag Mount Antenex Antenna (TNC) | $ | 125 |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

## KingFish®

| MODEL NUMBER | DESCRIPTION | PRICE | |
|---|---|---|---|
| | | 1 to 15 Units | 16+ Units |
| KINGFISH | **KingFish** – Man Portable Interrogation and Direction Finding Unit for the CDMA waveform | $ 27,800 | $ 26,400 |
| KF-GSM-SW | **KingFish** – GSM Software Package | $ 18,100 | $ 17,200 |
| KF-CDMA-SW | *KingFish* – CDMA Software Package | $ 18,100 | $ 17,200 |
| KF-IDEN-SW | **KingFish** – iDEN Software Package | $ 18,100 | $ 17,200 |
| KF-UMTS-SW | **KingFish** – UMTS Software Package | N/C | N/C |

### *KingFish Accessories*

| | | PRICE | |
|---|---|---|---|
| 3100242-101 | Tote Bag Assembly | $ 570 | |
| RE0513HA | Carrying Case, KingFish | $ 950 | |
| 3092524-102 | Cable Assembly, W102 (PC USB Type A) 6' cable | $ 196 | |
| 3092525-101 | Cable DC Power | $ 171 | |
| 2014068-101 | Battery Pack (11.1V) | $ 256 | |
| 2014068-102 | Lithium-Ion Battery Charger | $ 426 | |
| VA2524 | Battery, Adapter, Lighter (24V, 1.5A) | $ 140 | |
| ACHA-12501 | Power Supply (12V, 5A) | $ 190 | |
| 3118694-201 | Quad Band Yagi (Wedge) including 6ft cable (PE 3076-72) | $ 1,300 | |
| PE3076-72 | Cable Assembly, RF (SMA-M to RTANGM-M) 6' | $ 104 | |
| PE3076-144 | Cable Assembly, RF (SMA-M to RTANGM-M) 12' | $ 108 | |
| 2014620-001 | Antenna Device, Wave, PCS/Cell (Green) | $ 22 | |
| 2014628-001 | Antenna, ¼ Wave (2.4 GHZ) (Bluetooth) | $ 18 | |
| 2014629-002 | Antenna Device, Wave, GSM  (Orange) | $ 22 | |
| 3100242-103 | Backpack Carrying Case Custom (Blue) | $ 660 | |
| 3100242-104 | Backpack Carrying Case Custom (Army Digi-Camo) | $ 660 | |
| 3174173-102 | Quad Band Mag Mount Antenex Antenna (SMA) | $ 125 | |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

### PC Controllers

| MODEL NUMBER | DESCRIPTION | PRICE |
|---|---|---|
| 2009523-101 | Laptop PC Controller (Dell Latitude D630) | $ 3,500 |
| 2015651-101 | Mini PC Controller (OQO) | $ 3,200 |
| 2014069-101 | Rugged Mini PC Controller (GD Go Book) | $ 4,900 |
| 3084625-101 | Laptop Computer, Lightweight, Low Power, 12" Screen | $ 3,000 |
| 2009525-101 | Panasonic Toughbook Computer | $ 6,500 |

| PC Controller Accessories | | PRICE |
|---|---|---|
| 3058870-101 | Serial Cable | $ 40 |
| 2009523-003 | Mouse, CMPTR (Micro Trac) | $ 50 |
| 2009523-002 | Auto Power Adapter (8500 & D600) | $ 128 |

### Harpoon High Powered Amp 30 Watt Filtered

| MODEL NUMBER | DESCRIPTION | PRICE | |
|---|---|---|---|
| | | 1 to 15 Units | 16+ Units |
| PA-KIT-30W iDEN 800 | High Powered Filtered 30W PA Kit - Single Band iDEN 800 | $ 14,000 | $ 13,300 |
| PA-KIT-30W 2100 | High Powered Filtered 30W PA Kit - Single Band UMTS 2100 | $ 16,000 | $ 15,200 |
| PA-KIT-30W Dual-Band CONUS | High Powered Filtered 30W PA Kit - Dual Band 850/1900 | $ 17,500 | $ 16,600 |
| PA-KIT-30W Dual-Band OCONUS | High Powered Filtered 30W PA Kit - Dual Band 900/1800 | $ 17,500 | $ 16,600 |
| 3184472-101 | Harpoon Diplexer Kit (Use w/SR I) | $ 650 | $ 650 |
| | Need Mag Mount Antenna Specified | | |

### UMTS Band Converters

| MODEL NUMBER | DESCRIPTION | PRICE | |
|---|---|---|---|
| | | 1 to 15 Units | 16+ Units |
| CONV-2100/1700 | UMTS Band IV -AWS Converter | $ 16,000 | $ 15,200 |
| CONV-2100/1900 | UMTS Band I Converter | $ 16,000 | $ 15,200 |



EFFECTIVE: SEPTEMBER, 2008
HARRIS PROPRIETARY INFORMATION
DO NOT DISTRIBUTE

## ATTACHMENT 17

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 17:   Singel, Ryan (Wired Magazine), FBI E-Mail Shows Rift Over
Warrantless Phone Record Grabs (Dec. 20, 2007).

<< Back to Article

# FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs

By Ryan Singel    12.20.07

By now it's well known that FBI agents can't always be troubled to get a court order before going after a surveillance target's telephone and internet records. But newly released FBI documents show that aggressive surveillance tactics have even caused friction within the bureau.

"We deal mostly with the fugitive squad here, and, like in many other offices, these guys have a reputation for cutting corners," a surveillance specialist at the FBI's Minneapolis field office complained in an internal e-mail last year. "I'm not bashing them; it's the way they do business. Getting a court order is the absolute last step, if they have to.

"Before I had a blowup with a particular agent ... we were constantly asked to call our contacts at service providers to see if we could get various information without having to get a court order," the message continues. "This gets old, believe me. ... Doing this once or twice to help out turns into SOP (standard operating procedure) ... It's expected, and you're criticized as a tech agent if you refuse to do this later on."

The revelation is the second this year showing that FBI employees bypassed court order requirements for phone records. In July, the FBI and the Justice Department Inspector General revealed the existence of a joint investigation into an FBI counter-terrorism office, after an audit found that the Communications Analysis Unit sent more than 700 fake emergency letters to phone companies seeking call records. An Inspector General spokeswoman declined to provide the status of that investigation, citing agency policy.

The June 2006 e-mail (.pdf) was buried in more than 600-pages of FBI documents obtained by the Electronic Frontier Foundation, in a Freedom of Information Act lawsuit.

The message was sent to an employee in the FBI's Operational Technology Division by a technical surveillance specialist at the FBI's Minneapolis field office -- both names were redacted from the documents. The e-mail describes widespread attempts to bypass court order requirements for cellphone data in the Minneapolis office.

Remarkably, when the technical agent began refusing to cooperate, other agents began calling telephone carriers directly, posing as the technical agent to get customer cellphone records.

Federal law prohibits phone companies from revealing customer information unless given a court order, or in the case of an emergency involving physical danger.

The documents are the second batch released by the EFF after winning a Freedom of Information Act lawsuit last May. The first set of documents shed light on the breadth and sophistication of the FBI's national wiretapping system, which is wired into telecom switches around the United States under the terms of the 1994 Communications Assistance for Law Enforcement Act -- a law that was extended to broadband internet switches in May of this year.

The new documents detail how a little-known FBI telephone intercept unit has developed a powerful cellphone tracking technology that agents use to monitor the physical movements of surveillance targets, even on phones that are not GPS equipped.

Originally developed to capture and arrest computer hacker Kevin Mitnick in 1995, the system today relies on a mobile FBI van that has access to a wireless carrier's cell site tracking information in real time. A special surveillance unit called the Wireless Intercept and Tracking Team (WITT) operates the van, using the cell site

location to get to the approximate location of the cellphone customer, then uses direction-finding gear to zero in on the target.

The technical agent complained in the e-mail that FBI agents looking for a suspect tend to skip gumshoe investigative techniques in favor of the slick tracking van. "These guys always want to take the WITT vehicle out and drive around half of town (sic) to find the guy," the agent wrote.

The tracking system is part of the FBI's Digital Collection System, or DCS, a suite of software packages used for criminal and intelligence phone taps, which relies on a massive interlinked fiber-optic network that connects surveillance terminals around the country.

In brief, the mobile tracking system works as follows:

FBI agents investigating a case prepare a court order saying a cellphone number is likely relevant to an ongoing investigation, and a judge signs off on it.
The court order is faxed to a mobile carrier, which then turns on surveillance in its switches, and begins delivering call data and cell site information to the FBI's DCS 3000 software.
That software keeps track of which cellphone towers a phone uses or pings. A central FBI database translates a mobile carrier's cell tower code to latitude and longitude coordinates.
The software sends the coordinates to the agents and technical personnel in the mobile unit who then drive to the general area. But since cell tower information is not precise, agents in the van use antenna array connected to tracking software to zero in on the cellphone.
The FBI's technology office trumpeted the tracking function of the DCS 3000 software in a letter to the FBI director, boasting that it was used after a December 2005 North Carolina kidnapping to help find the victim unharmed.

Justice Department spokesman Dean Boyd says the department's policy allows the FBI to get cell tower information using under the low legal standard that applies to monitoring the digits a phone customer dials. Under that "pen register" standard, the FBI need only assert that the surveillance is relevant to an investigation -- the target need not be suspected of a crime.

When GPS-level data is wanted, law enforcement agents still need to show probable cause to a judge, said Boyd, who deferred questions about the Minneapolis agent's e-mail to the FBI.

FBI spokesman Paul Bresson cautioned against drawing conclusions from redacted government documents, and claimed that the FBI follows the law.

"FBI agents are trained to enforce the law using all available legal tools," Bresson said. "Absent an emergency circumstance involving danger or death or serious physical injury, the FBI does not request, nor do service providers give, any records without a court order."

The FBI tech agent's critical e-mail is best understood in light of the bureau's ongoing courtroom attempts to get cellphone location information without having to show probable cause, according to EFF lawyer Marcia Hofmann.

"For years the government has made dubious legal claims to justify tracking people's locations with minimal oversight," Hofmann said. "These docs show that the government hasn't satisfied its own weak standards in some cases."

Other revelations in the document include:

National security wiretaps in a Florida investigation captured more than 1,800 phone conversations, and led to 50 international terrorism advisories. Though details are redacted from the document, that case appears to be the so-called Liberty City Seven. Prosecutors initially trumpeted that the seven men were plotting to blow up the Sears Tower, though a government official later admitted the group was "more aspirational than operational." Last week a Florida jury acquitted one man and failed to reach a verdict on the other six.
In 2006, DCS 5000, the FBI's national security wiretapping software, captured 27,728,675 communication sessions. The document does not define what a "session" consists of. That year the FBI reported winning 2,176 FISA, or Foreign Intelligence Surveillance Act, warrants from a secret court.

By 2003 one cellphone carrier, Richmond, Virginia-based Triton PCS, was handling some 1,800 subpoenas and court orders a year. With 800,000 customers, that represented one records demand for every 444 customers. The FBI uses a Raytheon-developed tool known as the Digital Multimedia Watchdog to record and store phone calls and internet communications between informants and targets of an investigation. That tool can "collect, process and store large amounts of multimedia data, including voice, fax, data and video."

DCS 3000 -- the FBI's tool for recording the phone numbers a target calls, or is called from -- was set loose on 5,300 phones in 2005, at a cost of $320 per targeted number. Those costs did not include payments to telecoms for the intercepts. The software is maintained by Booz Allen Hamilton and contained more than 490,000 lines of code as of 2005.

The three software components of the FBI's phone surveillance system cost $38.7 million in 2003 and $39 million in 2004. Computers running these software packages at FBI offices and surveillance locations are connected through a Sprint-run closed fiber-optic network that allows surveillance to continue even when offices are destroyed, as happened during Sept. 11 and Hurricane Katrina.

## ATTACHMENT 18

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

<u>ATTACHMENT 18</u>:   Myers, Rachel (ACLU), *With Technology Like This, Who Needs the
Law? >> Blog of Rights: Official Blog of the American Civil Liberties
Union*  (Nov. 14, 2008).



# With Technology Like This, Who Needs the Law?

**November 14, 2008**
By Rachel Myers, ACLU at

*(Originally posted on Daily Kos.)*

The ACLU and Electronic Frontier Foundation have received several batches of Justice Department documents in response to our Freedom of Information Act (FOIA) request (and subsequent lawsuit) for records relating to the government's use of cell phones as tracking devices. What they tell us is that the government doesn't even need the help of a cell phone service provider to track us with our phones. The FBI now has what is called "triggerfish" technology — a cell site simulator that forces cell phones in the area to register its phone number, serial number and location — allowing it to track cell phones on its own. This raises the risk that they will do so without bothering to go to a court for permission first, since they no longer need to compel the provider to cooperate.

The documents do indicate that at least currently, the FBI's standard procedure is to seek a court order before using "triggerfish" to track cell phones. However, when obtaining those court orders — for "pen register and trap and trace" surveillance — the government doesn't show probable cause that a crime has been or is being committed, or even demonstrate to the court that the person being spied on is relevant to an ongoing investigation. The government simply tells the court that it thinks the target is relevant and then the court issues the order, a process offering little protection against the abuse of this powerful surveillance technology. In fact, the Department of Justice documents themselves suggest some government folks might be apprehensive: "The use of a triggerfish to locate cellular telephones is an issue of some controversy." People with questions or concerns are instructed to contact Mark Eckenwiler, Senior Counsel at the DOJ Computer Crime and Intellectual Property Section.

An earlier EFF FOIA lawsuit turned up documents detailing how a little-known FBI telephone intercept unit had developed triggerfish technology that agents use to monitor the physical movements of surveillance targets. Back then it seemed the process required assistance from the provider. But the new documents plainly say that triggerfish surveillance can be done without provider assistance, as at the top of page 18 in this document (PDF): "This can be done without the user knowing about it, and without involving the cell phone provider."

The *Washington Post*'s Ellen Nakashima writes about the renewed call from magistrate judges for Congress to set a consistent legal standard for seeking cell phone tracking information today. All our related documents are here.

**CORRECTION:** An earlier version of this post mentioned the process of obtaining a pen-trap order from the FISA court. The documents uncovered by the ACLU/EFF FOIA are actually about pen-trap orders in the criminal context, and the second paragraph has been amended to reflect that.

Published on *American Civil Liberties Union* (https://www.aclu.org)
**Source URL:** https://www.aclu.org/blog/free-speech-national-security/technology-who-needs-law

## ATTACHMENT 19

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 19:   Valentino-DeVries, Jennifer (The Wall Street Journal), *'Stingray' Phone Tracker Fuels Constitutional Clash*, p. A1 (Sept. 22, 2011).

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com.

• See a sample reprint in PDF format.   • Order a reprint of this article now

WHAT THEY KNOW

# 'Stingray' Phone Tracker Fuels Constitutional Clash

By JENNIFER VALENTINO-DEVRIES

September 22, 2011

For more than a year, federal authorities pursued a man they called simply "the Hacker." Only after using a little known cellphone-tracking device—a stingray—were they able to zero in on a California home and make the arrest.



A Harris StingRay II, one of several devices dubbed 'stingrays.' *U.S. Patent and Trademark Office*

Stingrays are designed to locate a mobile phone even when it's not being used to make a call. The Federal Bureau of Investigation considers the devices to be so critical that it has a policy of deleting the data gathered in their use, mainly to keep suspects in the dark about their capabilities, an FBI official told The Wall Street Journal in response to inquiries.

A stingray's role in nabbing the alleged "Hacker"— Daniel David Rigmaiden —is shaping up as a possible test of the legal standards for using these devices in investigations. The FBI says it obtains appropriate court approval to use the device.

Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a search warrant. These techniques are driving a constitutional debate about whether the Fourth Amendment, which prohibits unreasonable searches and seizures, but which was written before the digital age, is keeping pace with the times.

On Nov. 8, the Supreme Court will hear arguments over whether or not police need a warrant before secretly installing a GPS device on a suspect's car and tracking him for an extended period. In both the Senate and House, new bills would require a warrant before tracking a cellphone's location.

**More**

Key Documents in 'Stingray' Case
Digits: How 'Stingray' Devices Work
Digits: How Technology Is Testing the Fourth Amendment

And on Thursday in U.S. District Court of Arizona, Judge David G. Campbell is set to hear a request by Mr. Rigmaiden, who is facing fraud charges, to have information about the government's secret techniques disclosed to him so he can use it in his defense. Mr. Rigmaiden maintains his innocence and says that using stingrays to locate devices in homes without a valid warrant "disregards the United States Constitution"

and is illegal.

His argument has caught the judge's attention. In a February hearing, according to a transcript, Judge Campbell asked the prosecutor, "Were there warrants obtained in connection with the use of this device?"

The prosecutor, Frederick A. Battista, said the government obtained a "court order that satisfied [the] language" in the federal law on warrants. The judge then asked how an order or warrant could have been obtained without telling the judge what technology was being used. Mr. Battista said: "It was a standard practice, your honor."

Judge Campbell responded that it "can be litigated whether those orders were appropriate."

On Thursday the government will argue it should be able to withhold details about the tool used to locate Mr. Rigmaiden, according to documents filed by the prosecution. In a statement to the Journal, Sherry Sabol, Chief of the Science & Technology Office for the FBI's Office of General Counsel, says that information about stingrays and related technology is "considered Law Enforcement Sensitive, since its public release could harm law enforcement efforts by compromising future use of the equipment."



The prosecutor, Mr. Battista, told the judge that the government worries that disclosure would make the gear "subject to being defeated or avoided or detected."

A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It lets the stingray operator "ping," or send a signal to, a phone and locate it as long as it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.

The government says "stingray" is a generic term. In Mr. Rigmaiden's case it remains unclear which device or devices were actually used.

The best known stingray maker is Florida-based defense contractor Harris Corp. A spokesman for Harris declined to comment.

Harris holds trademarks registered between 2002 and 2008 on several devices, including the StingRay, StingRay II, AmberJack, KingFish, TriggerFish and LoggerHead. Similar devices are available from other manufacturers. According to a Harris document, its devices are sold only to law-enforcement and government agencies.

Some of the gadgets look surprisingly old-fashioned, with a smattering of switches and lights scattered across a panel roughly the size of a shoebox, according to photos of a Harris-made StingRay reviewed by the Journal. The devices can be carried by hand or mounted in cars, allowing investigators to move around quickly.

A rare public reference to this type of technology appeared this summer in the television crime drama "The Closer." In the episode, law-enforcement officers use a gadget they called a "catfish" to track cellphones without a court order.

The U.S. armed forces also use stingrays or similar devices, according to public contract notices. Local

law enforcement in Minnesota, Arizona, Miami and Durham, N.C., also either possess the devices or have considered buying them, according to interviews and published requests for funding.

The sheriff's department in Maricopa County, Ariz., uses the equipment "about on a monthly basis," says Sgt. Jesse Spurgin. "This is for location only. We can't listen in on conversations," he says.

Sgt. Spurgin says officers often obtain court orders, but not necessarily search warrants, when using the device. To obtain a search warrant from a court, officers as a rule need to show "probable cause," which is generally defined as a reasonable belief, based on factual evidence, that a crime was committed. Lesser standards apply to other court orders.

A spokeswoman with the Bureau of Criminal Apprehension in Minnesota says officers don't need to seek search warrants in that state to use a mobile tracking device because it "does not intercept communication, so no wiretap laws would apply."

FBI and Department of Justice officials have also said that investigators don't need search warrants. Associate Deputy Attorney General James A. Baker and FBI General Counsel Valerie E. Caproni both said at a panel at the Brookings Institution in May that devices like these fall into a category of tools called "pen registers," which require a lesser order than a warrant. Pen registers gather signals from phones, such as phone numbers dialed, but don't receive the content of the communications.

To get a pen-register order, investigators don't have to show probable cause. The Supreme Court has ruled that use of a pen register doesn't require a search warrant because it doesn't involve interception of conversations.

But with cellphones, data sent includes location information, making the situation more complicated because some judges have found that location information is more intrusive than details about phone numbers dialed. Some courts have required a slightly higher standard for location information, but not a warrant, while others have held that a search warrant is necessary.

The prosecution in the Rigmaiden case says in court documents that the "decisions are made on a case-by-case basis" by magistrate and district judges. Court records in other cases indicate that decisions are mixed, and cases are only now moving through appellate courts.

The FBI advises agents to work with federal prosecutors locally to meet the requirements of their particular district or judge, the FBI's Ms. Sabol says. She also says it is FBI policy to obtain a search warrant if the FBI believes the technology "may provide information on an individual while that person is in a location where he or she would have a reasonable expectation of privacy."

Experts say lawmakers and the courts haven't yet settled under what circumstances locating a person or device constitutes a search requiring a warrant. Tracking people when they are home is particularly sensitive because the Fourth Amendment specifies that people have a right to be secure against unreasonable searches in their "houses."

"The law is uncertain," says Orin Kerr, a professor at George Washington University Law School and former computer-crime attorney at the Department of Justice. Mr. Kerr, who has argued that warrants should be required for some, but not all, types of location data, says that the legality "should depend on the technology."

In the case of Mr. Rigmaiden, the government alleges that as early as 2005, he began filing fraudulent

tax returns online. Overall, investigators say, Mr. Rigmaiden electronically filed more than 1,900 fraudulent tax returns as part of a $4 million plot.

Federal investigators say they pursued Mr. Rigmaiden "through a virtual labyrinth of twists and turns." Eventually, they say they linked Mr. Rigmaiden to use of a mobile-broadband card, a device that lets a computer connect to the Internet through a cellphone network.

Investigators obtained court orders to track the broadband card. Both orders remain sealed, but portions of them have been quoted by the defense and the prosecution.

These two documents are central to the clash in the Arizona courtroom. One authorizes a "pen register" and clearly isn't a search warrant. The other document is more complex. The prosecution says it is a type of search warrant and that a finding of probable cause was made.

But the defense argues that it can't be a proper search warrant, because among other things it allowed investigators to delete all the tracking data collected, rather than reporting back to the judge.

Legal experts who spoke with the Journal say it is difficult to evaluate the order, since it remains sealed. In general, for purposes of the Fourth Amendment, the finding of probable cause is most important in determining whether a search is reasonable because that requirement is specified in the Constitution itself, rather than in legal statutes, says Mr. Kerr.

But it is "odd" for a search warrant to allow deletion of evidence before a case goes to trial, says Paul Ohm, a professor at the University of Colorado Law School and a former computer-crime attorney at the Department of Justice. The law governing search warrants specifies how the warrants are to be executed and generally requires information to be returned to the judge.

Even if the court finds the government's actions acceptable under the Fourth Amendment, deleting the data is "still something we might not want the FBI doing," Mr. Ohm says.

The government says the data from the use of the stingray has been deleted and isn't available to the defendant. In a statement, the FBI told the Journal that "our policy since the 1990s has been to purge or 'expunge' all information obtained during a location operation" when using stingray-type gear.

As a general matter, Ms. Sabol says, court orders related to stingray technology "will include a directive to expunge information at the end of the location operation."

Ms. Sabol says the FBI follows this policy because its intent isn't to use the data as evidence in court, but rather to simply find the "general location of their subject" in order to start collecting other information that can be used to justify a physical search of the premises.

In the Rigmaiden example, investigators used the stingray to narrow down the location of the broadband card. Then they went to the apartment complex's office and learned that one resident had used a false ID and a fake tax return on the renter's application, according to court documents.

Based on that evidence, they obtained a search warrant for the apartment. They found the broadband card connected to a computer.

Mr. Rigmaiden, who doesn't confirm or deny ownership of the broadband card, is arguing he should be given information about the device and about other aspects of the mission that located him.

In the February hearing, Judge Campbell said he might need to weigh the government's claim of privilege against the defendant's Fourth Amendment rights, and asked the prosecution, "How can we litigate in this case whether this technology that was used in this case violates the Fourth Amendment without knowing precisely what it can do?"

**Write to** Jennifer Valentino-DeVries at <u>Jennifer.Valentino-DeVries@wsj.com</u>

Copyright 2013 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com

5/17/2014 10:52 PM



How a 'Stingray' Cellphone Tracking Device Works

Law-enforcement officials are quietly using gadgets referred to generically as 'stingrays' to locate cellphones as part of investigative work.

**1.** Often the device is used in a vehicle along with a computer with mapping software.

**2.** The stingray system, which mimics a cellphone tower, gets the target phone to connect to it.

**3.** Once the cellphone is detected by the stingray, the phone's signal strength is measured.

**4.** The vehicle can then move to another location and again measure the phone's signal strength.

**5.** By collecting signal strength in several locations, the system can triangulate and map a phone's location.

Source: WSJ research and government documents

## ATTACHMENT 20

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 20:   Zetter, Kim (Wired), *Secrets of FBI Smartphone Surveillance Tool
Revealed in Court Fight* (Apr. 09, 2013).

- RSS

## Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight

- By Kim Zetter
- 04.09.13 |
- 6:30 am |
- Permalink

- Share on Facebook
  8
- Tweet   0
- g+1   711
- Share
- Pin it



*Image: rmuser/Flickr*

A legal fight over the government's use of a secret surveillance tool has provided new insight into how the controversial tool works and the extent to which Verizon Wireless aided federal agents in using it to track a suspect.

Court documents in a case involving accused identity thief Daniel David Rigmaiden describe how the wireless provider reached out remotely to reprogram an air card the suspect was using in order to make it communicate

with the government's surveillance tool so that he could be located.

Rigmaiden, who is accused of being the ringleader of a $4 million tax fraud operation, asserts in court documents that in July 2008 Verizon surreptitiously reprogrammed his air card to make it respond to incoming voice calls from the FBI and also reconfigured it so that it would connect to a fake cell site, or stingray, that the FBI was using to track his location.

Air cards are devices that plug into a computer and use the wireless cellular networks of phone providers to connect the computer to the internet. The devices are not phones and therefore don't have the ability to receive incoming calls, but in this case Rigmaiden asserts that Verizon reconfigured his air card to respond to surreptitious voice calls from a landline controlled by the FBI.

The FBI calls, which contacted the air card silently in the background, operated as pings to force the air card into revealing its location.

In order to do this, Verizon reprogrammed the device so that when an incoming voice call arrived, the card would disconnect from any legitimate cell tower to which it was already connected, and send real-time cell-site location data to Verizon, which forwarded the data to the FBI. This allowed the FBI to position its stingray in the neighborhood where Rigmaiden resided. The stingray then "broadcast a very strong signal" to force the air card into connecting to it, instead of reconnecting to a legitimate cell tower, so that agents could then triangulate signals coming from the air card and zoom-in on Rigmaiden's location.

To make sure the air card connected to the FBI's simulator, Rigmaiden says that Verizon altered his air card's Preferred Roaming List so that it would accept the FBI's stingray as a legitimate cell site and not a rogue site, and also changed a data table on the air card designating the priority of cell sites so that the FBI's fake site was at the top of the list.

Rigmaiden makes the assertions in a 369-page document he filed in support of a motion to suppress evidence gathered through the stingray. Rigmaiden collected information about how the stingray worked from documents obtained from the government, as well as from records obtained through FOIA requests filed by civil liberties groups and from open-source literature.

During a hearing in a U.S. District Court in Arizona on March 28 to discuss the motion, the government did not dispute Rigmaiden's assertions about Verizon's activities.

The actions described by Rigmaiden are much more intrusive than previously known information about how the government uses stingrays, which are generally employed for tracking cell phones and are widely used in drug and other criminal investigations.

The government has long asserted that it doesn't need to obtain a probable-cause warrant to use the devices because they don't collect the content of phone calls and text messages and operate like pen-registers and trap-and-traces, collecting the equivalent of header information.

The government has conceded, however, that it needed a warrant in his case alone — because the stingray reached into his apartment remotely to locate the air card — and that the activities performed by Verizon and the FBI to locate Rigmaiden were all authorized by a court order signed by a magistrate.

The Electronic Frontier Foundation and the American Civil Liberties Union of Northern California, who have filed an amicus brief in support of Rigmaiden's motion, maintain that the order does not qualify as a warrant and that the government withheld crucial information from the magistrate — such as identifying that the tracking device they planned to use was a stingray and that its use involved intrusive measures — thus preventing the court from properly fulfilling its oversight function.

"It shows you just how crazy the technology is, and [supports] all the more the need to explain to the court what

they are doing," says EFF Staff Attorney Hanni Fakhoury. "This is more than just [saying to Verizon] give us some records that you have sitting on your server. This is reconfiguring and changing the characteristics of the [suspect's] property, without informing the judge what's going on."

The secretive technology, generically known as a stingray or IMSI catcher, allows law enforcement agents to spoof a legitimate cell tower in order to trick nearby mobile phones and other wireless communication devices like air cards into connecting to the stingray instead of a phone carrier's legitimate tower.

When devices connect, stingrays can see and record their unique ID numbers and traffic data, as well as information that points to the device's location.

By moving the stingray around and gathering the wireless device's signal strength from various locations in a neighborhood, authorities can pinpoint where the device is being used with much more precision than they can get through data obtained from a mobile network provider's fixed tower location.

Use of the spy technology goes back at least 20 years. In a 2009 Utah case, an FBI agent described using a cell site emulator more than 300 times over a decade and indicated that they were used on a daily basis by U.S, Marshals, the Secret Service and other federal agencies.

The FBI used a similar device to track former hacker Kevin Mitnick in 1994, though the version used in that case was much more primitive and passive.

A 1996 *Wired* story about the Mitnick case called the device a Triggerfish and described it as "a technician's device normally used for testing cell phones." According to the story, the Triggerfish was "a rectangular box of electronics about a half a meter high controlled by a PowerBook" that was essentially "a five-channel receiver, able to monitor both sides of a conversation simultaneously." The crude technology was hauled around in a station wagon and van. A black coaxial cable was strung out of the vehicle's window to connect the Triggerfish to a direction-finding antenna on the vehicle's roof, which had four antenna prongs that reached 30 centimeters into the sky.

The technology has become much sleeker and less obtrusive since then, but still operates under the same principles.

In Rigmaiden's case, agents apparently used two devices made by a Florida-based company called Harris. One was the company's StingRay system, which is designed to work from a vehicle driven around a neighborhood to narrow a suspect's location to a building. Once agents tracked the signals from Rigmaiden's air card to the Domicilio Apartments complex in Santa Clara, California, they apparently used another device made by Harris called the KingFish — a handheld system that allowed them to walk through the complex and zero-in on Rigmaiden's air card in apartment 1122.

Although a number of companies make stingrays, including Verint, View Systems, Altron, NeoSoft, MMI, Ability, and Meganet, the Harris line of cell site emulators are the only ones that are compatible with CDMA2000-based devices. Others can track GSM/UMTS-based communications, but the Harris emulators can track CDMA2000, GSM and iDEN devices, as well as UMTS. The Harris StingRay and KingFish devices can also support three different communication standards simultaneously, without having to be reconfigured.

Rigmaiden was arrested in 2008 on charges that he was the mastermind behind an operation that involved stealing more than $4 million in refunds from the IRS by filing fraudulent tax returns. He and others are accused of using numerous fake IDs to open internet and phone accounts and using more than 175 different IP addresses around the United States to file the fake returns, which were often filed in bulk as if through an automated process. Rigmaiden has been charged with 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized computer access and two counts of mail fraud.



A PC5740 Air Card.

The surveillance of Rigmaiden began in June 2008 when agents served Verizon with a grand jury subpoena asking for data on three IP addresses that were allegedly used to electronically file some of the fraudulent tax returns. Verizon reported back that the three IP addresses were linked to an air card account registered in the name of Travis Rupard — an identity that Rigmaiden allegedly stole. The air card was identified as a UTStarcom PC5740 device that was assigned a San Francisco Bay Area phone number.

A court order was then submitted to Verizon Wireless requiring the company to provide historical cell site data on the account for the previous 30 days to determine what cell towers the air card had contacted and determine its general location. Verizon responded by supplying the government with information that included the latitude and longitude coordinates for five cell sites in San Jose and Santa Clara cities, in the heart of Silicon Valley.

In July, the government served Verizon Wireless with another court order directing the company to assist the FBI in the use and monitoring of a mobile tracking device to locate an unidentified suspect. The order directed Verizon Wireless to provide the FBI with any "technical assistance needed to ascertain the physical location of the [air card]...."

The government has fought hard to suppress information about how it uses stingrays, but in his motion to suppress, Rigmaiden lays out in great detail how the surveillance occurred and the nature of the technical assistance Verizon provided the FBI.

> On the morning of July 14, 2008, FBI Agent Killigrew created a cell tower range chart/map consisting of a street map, plotted Verizon Wireless cell site sectors belonging to cell site Nos. 268, 139, and 279, and a triangulated aircard location signature estimate represented by a shaded area. On the chart/map, the total land area collectively covered by cell site Nos. 268, 139, and 279 is approximately 105,789,264 ft$^2$. FBI Agent Killigrew used triangulation techniques and location signature techniques to eliminate 93.9% of that 105,789,264 ft$^2$ area resulting in the location estimate being reduced to 6,412,224 ft$^2$ represented by the shaded area. The shaded area on the cell tower range chart covers the location of apartment No. 1122 at the Domicilio apartment complex.

On July 15, agents with the FBI, IRS and US Postal Service flew to San Jose to triangulate Rigmaiden's location using the stingray. They worked with technical agents from the San Francisco FBI's Wireless Intercept and

Tracking Team to conduct the real-time tracking.

According to Rigmaiden, the agents drove around the cell site areas gathering information about signal range and radio frequencies for each cell site sector. "The radio frequency information was needed so that the FBI technical agents could properly configure their StingRay and KingFish for use in cell site emulator mode," Rigmaiden writes. "By referencing a list of all the radio frequencies already in use, the FBI was able to choose an unused frequency for use by its emulated cellular network that would not interfere with the various FCC licensed cellular networks already operating in the noted area."

The next day, Verizon Wireless surreptitiously reprogrammed Rigmaiden's air card so that it would recognize the FBI's stingray as a legitimate cell site and connect to it "prior to attempting connections with actual Verizon Wireless cell sites." The FBI needed Verizon to reprogram the device because it otherwise was configured to reject rogue, unauthorized cell sites, Rigmaiden notes.

On July 16, the FBI placed 32 voice calls to the air card between 11am and 5pm. Each time the air card was notified that a call was coming in, it dropped its data connection and went into idle mode. At the same time, it sent real-time cell site location information to Verizon, which forwarded the information to the FBI's DCS-3000 servers, part of the elaborate digital collection system the FBI operates for wiretapping and pen-registers and trap-and-traces. From the FBI's servers, the location data was transmitted wirelessly through a VPN to the FBI's technical agents "lurking in the streets of Santa Clara" with the StingRay.



A stingray, made by Harris Corp. *Image: U.S. Patent and Trademark Office*

At this point, the StingRay took over and began to broadcast its signal to force the air card — and any other wireless devices in the area — to connect to it, so that agents could zoom-in on Rigmaiden's location.

"Because the defendant attempted to keep his aircard continuously connected to the Internet, the FBI only had a very short window of time to force the aircard to handoff its signal to the StingRay after each surreptitious voice call [and] the FBI needed to repeatedly call the aircard in order to repeatedly boot it offline over the six hours of surreptitious phone calls," Rigmaiden writes. "Each few minute window of time that followed each denial-of-service attack (i.e., surreptitious phone call) was used by the FBI to move its StingRay, while in cell site emulator mode, to various positions until it was close enough to the aircard to force an Idle State Route Update (i.e., handoff)."

Rigmaiden maintains that once the connection was made, the StingRay wrote data to the air card to extend the connection and also began to "interrogate" the air card to get it to broadcast its location. The FBI used the Harris AmberJack antenna to deliver highly-directional precision signals to the device, and moved the StingRay around to various locations in order to triangulate the precise location of the air card inside the Domicilio Apartments complex.

According to Rigmaiden, agents also transmitted Reverse Power Control bits to his air card to get it to transmit its signals at "a higher power than it would have normally transmitted if it were accessing cellular service through an actual Verizon Wireless cell site."

Once agents had tracked the device to the Domicilio Apartments complex, they switched out the StingRay for the handheld KingFish device to locate Rigmaiden's apartment within the complex.

Around 1am on July 17, an FBI agent sent a text message to another FBI agent stating, "[w]e are down to an apt complex…." By 2:42 am, one of the FBI technical agents sent a text message to someone stating that they had "[f]ound the card" and that agents were "working on a plan for arrest."

Agents still didn't know who was in the apartment — since Rigmaiden had used an assumed identity to lease the unit — but they were able to stake out the apartment complex and engage in more traditional investigative techniques to gather more intelligence about who lived in unit 1122. On August 3, while the apartment was still under surveillance, Rigmaiden left the unit. Agents followed him a short distance until Rigmaiden caught on that he was being followed. After a brief foot chase, he was arrested.

Rigmaiden and the American Civil Liberties Union and Electronic Frontier Foundation have argued that the government did not obtain a legitimate warrant to conduct the intrusive surveillance through the stingray. They say it's indicative of how the government has used stingrays in other cases without proper disclosure to judges about how they work, and have asked the court to suppress evidence gathered through the use of the device.

U.S. District Court Judge David Campbell is expected to rule on the motion to suppress within a few weeks.

Pages: 1 2 View All

- Share on Facebook
  8
- Tweet  0
- 8+1  711
- Share

- Reddit
- Digg
- Stumble Upon
- Email

Tags: surveillance

- 0 Comments |
- Permalink

## ATTACHMENT 21

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

ATTACHMENT 21:   Coast to Coast AM, *Lee Lapin - Guests - Coast to Coast AM, Lee Lapin
Biography.*



## ATTACHMENT 22

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 22:   *OpenBTS Public Release*,
                 http://wush.net/trac/rangepublic/wiki/WikiStart.

# Welcome to the  OpenBTS Public Release

This Trac is the home of the OpenBTS public release, a  FOSS version of  Range Network's self-contained SDR/GSM/VoIP stack.

*To edit this wiki, you can login as user "guest" with the password "guestpass". If you are a regular editor of this wiki, please request a personal account from Kurtis (log in to see info) so that your changes can be tracked. Contributions to this wiki are licensed under CC-BY-SA 3.0.*

**Table of Contents**
What is OpenBTS?
How do I get started?
Where can I get the latest code?
How do I build and install and run the code?
Is there documentation?
How do I get support?
Who else is using OpenBTS?
Decoding UMTS
SMQ2
Programming SIM Cards using PC/SC devices

Quick Links:

- OpenBTS developer community news

## What is OpenBTS?

OpenBTS is a Unix application that uses a software radio to present a GSM air interface to standard 2G GSM handset and uses a SIP softswitch or PBX to connect calls. (You might even say that OpenBTS is a simplified form of  IMS that works with 2G feature-phone handsets.) The combination of the global-standard GSM air interface with low-cost VoIP backhaul forms the basis of a new type of cellular network that can be deployed and operated at substantially lower cost than existing technologies in many applications, including rural cellular deployments and private cellular networks in remote areas.

OpenBTS is distributed in two forms:

1. **The public ("P") release.** The public release is distributed under  AGPLv3 with copyrights assigned to the  Free Software Foundation. The public release is a subset of the commercial release intended for experimentation, education, evaluation and proof-of-concept projects.
2. **The commercial ("C") release.** The commercial release is installed in Range Networks products under a mix of GPL and non-GPL licenses. Range Networks also offers a customer portal for commercial customers where source code is available for the GPL components of the OpenBTS installation. The "C" release is intended for users
   - who need to provide cellular service in industrial, government or commercial applications,
   - whose intellectual property policies or business models are incompatible with A/GPLv3 or
   - who require commercial support, network monitoring or other professional services.

## How do I get started?

There are two ways to get started with the public release of OpenBTS:

1. **Get a development kit.** You can buy one online  here. This is probably the best choice for users who want to experiment with the public ("P") release of OpenBTS in a desktop setting, without a lot of additional up-front effort. The current development kit consists of
   - a Range Networks RAD-1 multi-band digital radio, including a software-trimmable 52 MHz TCXO clock generator and
   - a mini-ITX PC with the latest public release of OpenBTS pre-installed in both source code and binary form.
2. **Get a full-scale basestation.** Range Networks produces several GSM basestation models based on the RAD-1 radio hardware and the commercial ("C") release of OpenBTS. These units are available in single- and multi-ARFCN configurations, at power levels ranging from 100 mW to 50 W. Any of these units can also be used to run the public release. This is probably the best choice for users who want to use OpenBTS for normal communications, who want to experiment with OpenBTS in full-range configurations or who require commercial support or other professional services. For more information on these products, contact Range sales.
3. **Roll your own.** The public release of OpenBTS is compatible with several digital radio products from  Ettus Research.

## Where can I get the latest code?

The best way to get OpenBTS is by pulling the code directly from our source code repository as an anonymous read-only user.

```
svn co http://wush.net/svn/range/software/public
```

If you're planning on **developing** for OpenBTS, we recommend using git instead of svn. This allows you to commit and test your code locally, before uploading it to the main repository.

```
git svn init http://wush.net/svn/range/software/public openbts
cd openbts
git svn fetch
./git-svn-clone-externals
```

Using git-svn is described in numerous places, here being an example.

## How do I build and install and run the code?

See BuildInstallRun for instructions on how to build and install a simple, one-PC, one-BTS system. This is the appropriate starting point for new users.

For advanced users, see multiBTS for instructions on operating a more complicated setup.

For debugging techniques, please see DebuggingCode for tips and tricks.

## Is there documentation?

This wiki is the primary documentation for the OpenBTS public release.

We also maintain an OpenBTS manual, though it is not as up to date as the wiki. If you can't find some important information on the wiki, look there (and then put it on the wiki).

Lastly, a contributor has provided a Spanish manual as well. This is almost certainly not going to be updated very often.

## How do I get support?

Commercial support for OpenBTS is available from Range Networks and Fairwaves. Contact respective companies for more information.

Free support for the public release is available from the OpenBTS public mailing list, openbts-discuss (at) lists.sourceforge.net.

- list archive
- subscription page

## Who else is using OpenBTS?

If your organization is using OpenBTS, please let us know by putting a link here.

- UC Berkeley
- Carnegie Mellon Silicon Valley

---

# Current Feature Efforts in the Public Release

- GPRS support
- A3-A8-A5/1 authentication and encryption

- Handover support
- Roaming
- L3Rewrite
- Other news from community
- Using OpenBTS' transceiver to run OsmoBTS/OpenBSC Network In The Box

## Other Technical Notes

- Why we no longer support 64 MHz clocks.
- Useful debug techniques.
- MultiBTS network configuration.
- LUR Reject causes and their effects.
- How to put some phone models into Field Test/Engineering Mode.

## Other Open Projects Related to OpenBTS

### Decoding UMTS

This is a sub-wiki dedicated to a clearer, more complete explanation of UMTS/UTRAN 3G than what is found in the official specifications. Hopefully, it will become an alternative presentation of the specs for people who actually want to understand how UMTS works.

### SMQ2

SMQ2 is a proposed replacement for our current smqueue text messaging store-and-forward server. Smqueue has served us well for over two years now, but we are hitting its limitations and it might be time for a better-informed fresh start.

### Programming SIM Cards using PC/SC devices

OpenBTS is a registered trademark of Range Networks, Inc.

### Attachments

- Manual de instalación de OpenBTS Versión 0.2.pdf (1.0 MB) - added by *kurtis.heimerl* 2 years ago.
- Prototipo De Una Estación Celular Portátil Para Atención De Emergencias.pdf (1.8 MB) - added by *guest* 18 months ago. "Prototipo De Una Estación Celular Portátil Para Atención De Emergencias"
- Anexo A.pdf (1.1 MB) - added by *guest* 18 months ago. "Anexo A Del Prototipo De Una Estación Celular Portátil Para Atención De Emergencias"
- Anexo B.pdf (136.6 KB) - added by *guest* 18 months ago. "Anexo B del Prototipo De Una Estación Celular Portátil Para Atención De Emergencias"
- PublicReleaseLogo.png (12.7 KB) - added by *dburgess* 14 months ago. "logo for public release"
- OpenBTS-4.0-Manual.pdf (0.9 MB) - added by *olga.bobrova* 5 weeks ago. "User Manual: OpenBTS Application Suite, Release 4.0"

## **ATTACHMENT 23**

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)

<u>ATTACHMENT 23</u>:   Greenberg, Andy (Forbes Magazine), *Despite FCC Scare Tactics,*
*Researcher Demos AT&T Eavesdropping - Forbes* (Jul. 31, 2010).



# Forbes

http://blogs.forbes.com/firewall/?p=2066

**The Firewall**
*the world of security*
Opinions expressed by Forbes Contributors are their own.

7/31/2010 @ 5:35PM | 2,274 views

# Despite FCC "Scare Tactics," Researcher Demos AT&T Eavesdropping

 Andy Greenberg , Forbes Staff
**Comment Now**

**Updated with a response from the GSM Association below.**

Researcher Chris Paget pulled off a stunt at the Defcon security conference Saturday that required as much legal maneuvering as technical wizardry: eavesdropping on the cell phone calls of AT&T subscribers in front of thousands of admiring hackers.

With about $1,500 worth of hardware and open source software, Paget turned two on-stage antennas into a setup capable of spoofing the base stations that connect the GSM cell phone signals used by AT&T and T-Mobile. Paget set his hardware to impersonate an AT&T signal, and dozens of phones in the room connected to his fake base station. "As far as your cell phones are concerned, I'm now indistinguishable from AT&T," he told the crowd.

Paget invited anyone with an AT&T phone to make a call, and using his GSM hijacking trick, routed their calls through a voice-over-Internet system that connected their calls even while recording the audio to a USB stick—which he promptly destroyed with a pair of scissors to make sure he hadn't violated any privacy laws. The hack, after all, was intended to show the fundamental insecurity of GSM cell signals—not spy on callers.

Even minutes before his demonstration, it wasn't clear whether Paget would go through with his cell-snooping act. He says he received a call from the Federal Communication Commission (FCC) on Friday morning, warning him about a long list of potential federal regulations that he might be violating with the demo.

"It wasn't a particularly productive conversation," he said in a meeting with reporters before his talk. "It seemed more like scare tactics to me."

Requests for comment from the FCC and the GSM Association, which represents companies that use the GSM protocol, weren't immediately returned, though we'll update this post when we hear from them.

Paget's demo sidestepped the FCC's legal hurdles with a clever loophole. Creating your own GSM cell tower isn't generally legal. But Paget used a GSM radio spectrum that's reserved for HAM radio in the United States but GSM phones in Europe; Since Paget is licensed as a HAM radio operator, he's ostensibly protected from charges of running an unlicensed base station. "I'm operating as a licensed HAM radio transmitter, but your handset thinks I'm a European cell tower," he said.

Paget's fake base station trick is one that law enforcement and intelligence agencies have been using for years. But Paget says his $1,500 method is the least expensive and most accessible version of the hack ever performed. "This is a thousand times cheaper than anything that's done this before," he says.

Though Paget's hack can only intercept the 2G GSM protocol, his equipment first sends out a "jamming" signal of radio noise to block 3G connections, forcing phones to automatically search for a 2G signal and connecting with his hardware instead.

For now, his method can only intercept outgoing calls, and displays the wrong caller ID on the phone of the call's recipient. But neither of those problems applies to the more expensive versions of the interception technology, and could be fixed in his cheaper attack with more time, he says.

The highly-public hack is intended to show that GSM is a fundamentally insecure system, and should be dumped altogether in favor of 3G protocols. "GSM is broken," says Paget. "The primary solution is to turn it off altogether."

In practical terms, that would T-Mobile and AT&T phones shouldn't be set to search for 2G signals when a 3G connection isn't available. While BlackBerry phones have an option to only use 3G signals, iPhones and Android handsets don't, Paget says.

Paget says he's warned the GSM Association—the industry organization that oversees the standard—about his hack, but his concerns have been dismissed. "The GSMA says GSM is secure," he says. "The only defense I can put forth is

to demonstrate that it isn't."

***Update:*** *The GSM Association responded in a statement that lists the limitations to Paget's method: the eavesdropper would have difficulties identifying or targeting any specific user, the interception only works within a certain range, in some cases, the call's encryption could prevent eavesdropping, and GSM phones are designed to alert users when encryption is removed by a base station. (Paget said in his talk that no device he's tested—including iPhone and Android phones—has had this option enabled.)*

*In summary, the GSM Association spokeswoman writes, "The overall advice for GSM calls and fixed line calls is the same. Neither has ever offered a guarantee of secure communications. The great majority of users will make calls with no reason to fear that anyone might be listening. However users with especially high security requirements should consider adding extra, end to end security features over the top of both their fixed line calls and their mobile calls."*

This article is available online at: http://blogs.forbes.com/firewall/?p=2066          2014 Forbes.com LLC™   All Rights Reserved

## ATTACHMENT 24

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR  SUMMARY
JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV 12-1605-PHX-SRB (BSB)


ATTACHMENT 24:    *CatcherCatcher - Mobile Network Assessment Tools - SRLabs Open
Source Projects*, https://opensource.srlabs.de/projects/mobile-network-
assessment-tools/wiki/CatcherCatcher.

Mobile Network Assessment Tools »

# CatcherCatcher

The CatcherCatcher tool detects mobile network irregularities hinting at fake base station activity.

### Requirements

- Osmocom phone
- Osmocom cable
- Linux computer

### Download:

- We recoomend using our ⬚ Live System
- Source Code is available in the OSMOCOM repository. See Tutorial for manual installation instructions.

```
git clone git://git.osmocom.org/osmocom-bb.git
git checkout luca/catcher
```

### Instructions

1. Download ⬚ GSM Map Live System
2. ⬚ Install Image to Stick
3. run: From the main menu, choose "Run a test -> FakeBTS"

### Mailing list

A public mailing list discussion is ⬚ here

## Background & Development information

### OsmocomBB software

Currently, the IMSI Catcher detector is available only for the OsmocomBB platform. If you'd like to test it, you can find all the needed information in our Tutorial Please upload improvements as patches to this site or post to the ⬚ mailing list .

### Implementation on other platforms

While Osmocom provides access to most detailed GSM data, other platforms could, too, provide useful information for detecting IMSI catcher attacks.

Folks with insights into phone programming APIs, please help fill out this list:

| Evidence | Available on | | | |
| | Blackberry | Android | iOS | Symbian |
| --- | --- | --- | --- | --- |
| Cipher indication | | [1] *#32489# // OEM_SM_TYPE_SUB_CIPHERING_PROTECTION_ENTER | | |
| LAC | | [1a] getLac() | | |
| Cell ID | | [1a] getCid() | | |
| Retransmission counters | | | | |
| TMSI | | | | |
| Send power | | [1] LISTEN_SIGNAL_STRENGTHS ? | | |
| Silent call | | [1] | | |
| Silent SMS | | [1] | [2] | |

| Remote install | | [1c] // INSTALL_ASSET | | |
| Network Roaming | | [1b] getRoaming() | | |

[1] TODO: Reference / API call needed
[1a]: android.telephony.gsm.GsmCellLocation
[1b]: android.telephony.ServiceState
[1c]: GTalkService

[2] TODO: Reference / API call needed

Preliminary information for developing an Android based Catcher can be found on the Android page.

**IMSI catcher detection**

For IMSI catchers to achieve their goals they will need to show behavior different from normal base stations. We distinguish between yellow, red, and black flags. Yellow flag are an indication that you might have been caught; red flags are a very strong indication; and black flags tell you: "You are being tracked down; throw away your phone and run."

| # | Flag | Evidence | Implementable in Osmocom |
|---|------|----------|--------------------------|
| Setup: | | | |
| S1 | R | No encryption after using encryption with the same operator before | done |
| S2 | Y | Cipher mode complete message is sent more than twice | wip |
| S3 | R | ... more than four times | wip |
| S4 | Y | IMEI not requested in Cipher Mode Complete message | done |
| S5 | Y | Cell is not advertising any neighbor cells | todo |
| S6 | Y | Cell reselection offset > 80db | todo |
| Location updating (for information gathering, MITM): | | | |
| L1 | Y | The LAC of a base station changes | done |
| L2 | R | The LAC changes more than once | done |
| L3 | Y | The LAC differs from all neighboring cells | wip |
| L4 | Y | The network queries the phones IMEI during location update | done |
| L5 | Y | The registration timer is set to a value < 10 minutes | wip |
| L6 | Y | The "IMSI attach procedure" flag is set | wip |
| (when locating a victim): | | | |
| L7 | Y | Receive a silent text message | done |
| L8 | R | You are paged, but do not enter any transaction | done |
| L9 | R | Being assigned a traffic channel but not entering call control state/receiving a text message for 2 seconds | wip |

| L10 | B | ... 10 seconds | wip |
| L11 | Y | You do not receive a call setup message while already being on a traffic channel for 2 seconds | done |
| L12 | R | ... 10 seconds | done |
| L13 | Y | Your phone sends at the highest possible power | wip |

📎 mobile.cfg (984 Bytes) Linus, 12/23/2013 05:57 PM