KAB

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Daniel David Rigmaiden,

Plaintiff,

vs.

Federal Bureau of Investigation, et al.,

Defendants.

No.  CV 12-1605-PHX-DLR (BSB)

**ORDER**

Plaintiff  Daniel David Rigmaiden, who was a federal prisoner at the time of filing his Complaint, brought this civil rights action pursuant to the Freedom of Information Act ("FOIA") against the Federal Bureau of Investigation ("FBI"), the Executive Office for United States Attorneys ("EOUSA"), the Office of Information Policy, and the United States Department of Justice ("DOJ").  (Doc. 1).  Plaintiff moves for partial summary judgment (Doc. 84) and Defendants cross-move for summary judgment on all claims (Doc. 91).[1]

**I.    Background**

    **A.    Plaintiff's Criminal Case**

Plaintiff pleaded guilty to conspiracy in violation of 18 U.S.C. § 371; wire fraud, in violation of Title 18, U.S.C. §1343; wire fraud in violation of 18 U.S.C. § 1341, wire

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 93).

fraud in violation of 18 U.S.C. § 1343, and mail fraud in violation of 18 U.S.C. §1341. *United States v. Rigmaiden*, CR 08-814-PHX-DGC (Doc. 1136).[2]  The charges against Plaintiff arose "from an alleged scheme to obtain fraudulent tax refunds by filing electronic tax returns in the names of numerous deceased persons and third parties." *United States v. Rigmaiden*, 844 F. Supp. 2d 982, 987 (D. Ariz. 2012).  "The government located and arrested [Plaintiff], in part, by tracking the location of an aircard connected to a laptop computer that allegedly was used to perpetrate the fraudulent scheme."  *Id.*  Specifically, the government used a portable/transportable wireless device locator[3] to locate Plaintiff's laptop.  In his criminal case, Plaintiff alleged that "the technology and methods used to locate the aircard violated his Fourth Amendment rights."  *Id.*

**B.    The Civil Complaint**

On July 26, 2012, Plaintiff filed a Complaint against the FBI, EOUSA, the Office of Information Policy, and the DOJ.  In his Complaint, Plaintiff alleged three counts for violations of the FOIA regarding three FOIA requests made by Plaintiff.

**1.    The FOIA Requests**

**a.    October 10, 2011 Request to the FBI[4] (the "Harris Request")**

Plaintiff alleged that on October 10, 2011, he mailed the FBI a FOIA request seeking: (1) all agency records concerning portable/transportable wireless device locators and related equipment manufactured, branded or sold by Harris Wireless Products Group ("Harris"); (2) all agency records detailing the FBI's policies, practices, and procedures to destroy real-time device location data obtained by the Harris portable/transportable wireless device locators and related equipment or by other portable transportable wireless

---

[2] Plaintiff was released from custody on April 7, 2014.  CR 08-814-PHX-DGC (Docs. 1134, 1136).

[3] Such locators are known as known as cell site emulators, cell site simulators, IMSI catchers, Loggerhead, TriggerFish, and StingRay.

[4] The full request can be located at Doc. 92-6 at 34-41.

device locators following an investigation or to facilitate an arrest; (3) all agency records detailing the FBI's polices, practices, and procedures to conceal from defendants and their attorneys in criminal cases the fact that the FBI used portable/transportable wireless device locators to gather evidence during related criminal investigations; and (4) all agency records constituting user manuals, operations manuals, and training manuals for the Harris portable/transportable wireless device locators and related equipment.

In his request, Plaintiff specified that all digital documents should be provided in their original native form with metadata preserved and not be printed to hard copy and rescanned to create an artificial digital form of the documents.

Plaintiff further requested a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Plaintiff also requested expedited processing of the request.

On February 15, 2012, Plaintiff sent a letter to the Office of Information Policy indicating that he had not yet received a response from the FBI as to his October 10, 2011 request and asserted that he was appealing the FBI's failure: to acknowledge the FOIA request, to provide a fee waiver, to grant reduced fees, to provide expedited processing and to provide all requested records.

On May 10, 2012, the Office of Information Policy acknowledged receipt of the appeal, but stated that the FBI had no record of the FOIA request, that the Office of Information Policy would forward the request to the FBI, and that the appeal was closed. (Doc. 1-2 at 3).[5]

**b.    The October 10, 2011 Request to the Executive Office for United States Attorneys (the EOUSA Request")[6]**

On October 10, 2011, Plaintiff mailed a FOIA request to the Executive Office for the United States Attorneys ("EOUSA") seeking: (1) records on portable/transportable wireless device locators and related equipment manufactured, branded, or sold by Harris;

---

[5] Throughout this Order, all citations to page numbers within the Court's docket refer to the page numbers generated by the Court's electronic filing system.

[6] The full request can be located at Doc. 92-9 at 9-17.

(2) records detailing the United States Attorneys' Office policies, practices, and procedures to seek court orders to destroy real-time wireless device location data obtained by Harris portable/transportable wireless device locators and related equipment or obtained by other portable/transportable wireless device locators; (3) records detailing the United States Attorneys' Office policies, practices, and procedures to have AUSAs and other attorneys seek one or more court orders authorizing the use of pen registers, trap and trace devices, stored records under the Stored Communications Act and/or mobile tracking devices while the "true intention" is to use Harris portable/transportable wireless device locators and related equipment or other portable/transportable wireless device locators; (4) all records detailing the United States Attorneys' Office policies, practices, and procedures to conceal from defendants and their attorneys in criminal cases the fact that the government used the Harris portable/transportable wireless device locators and related equipment, or other portable/transportable wireless device locators to gather evidence during criminal investigations.

In his request, Plaintiff specified that all digital documents should be provided in their original native form with metadata preserved and not be printed to hard copy and rescanned to create an artificial digital form of the documents.

Plaintiff further requested a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Plaintiff also requested expedited processing of the request.

On February 15, 2012, Plaintiff sent a letter to the Office of Information Policy indicating that he had not yet received a response from EOUSA as to his October 10, 2011 request and asserted that he was appealing EOUSA's failure: to acknowledge the FOIA request, to grant a fee waiver, to grant reduced fees, to provide expedited processing and to provide all requested records.

On May 10, 2012, the Office of Information Policy acknowledged receipt of the appeal, but stated that EOUSA was processing Plaintiff's request and, because an adverse determination had not yet been made, an appeal was improper. (Doc. 1-4 at 50).

. . . .

c. **The November 10, 2011 Request to the FBI (the "WSJ Request")**[7]

On November 10, 2011, Plaintiff mailed a FOIA request to the FBI seeking: (1) all agency records concerning comments made by FBI agents and employees to the WSJ reporting in or in relation to the September 22, 2011 WSJ article entitled "'Stingray' Phone Tracker Fuels Clash" and (2) all agency records concerning comments made by FBI agents and employees at a panel at the Brookings Institution in May 2011 regarding portable/transportable wireless device locators.  Plaintiff again specified that all digital documents should be provided in their original native form with metadata preserved and not be printed to hard copy and rescanned to create an artificial digital form of the documents.  Plaintiff again requested a waiver of all costs or reduced costs and expedited processing.

On January 23, 2012, Plaintiff received a letter from David Hardy, the Section Chief of the Record/Information Dissemination Section, Records Management Division of the FBI ("Hardy"), acknowledging the Receipt of the FOIA request, and stating that the request was being processed, the fee waiver was being considered, and that Plaintiff would receive a decision at a later date.

On January 31, 2012, Plaintiff received two more letters from Hardy.  The first letter denied Plaintiff's request for expedited processing and the second letter denied Plaintiff's request for a fee waiver.  (Doc. 1-2 at 23-25).

On February 15, 2012, Plaintiff appealed the denials of expedited processing and fee waiver to the Office of Information Policy.  (Doc. 1-2 at 28).

On April 17, 2012, the Office of Information Policy sent Plaintiff a letter informing him that the determinations as to fee waiver and expedited processing were being upheld.

. . . .

. . . .

---

[7] The full request can be located at Doc. 91-8 at 30-40.

1

## 2. Counts of the Complaint

2

### a. Count One

3      In Count One of his Complaint, Plaintiff alleged that (1) the FBI and DOJ's failure

4   to acknowledge Plaintiff's October 10, 2011 FOIA request violated 5 U.S.C.

5   § 552(a)(6)(A)(i) and "corresponding regulations"; (2) the FBI, Office of Information

6   Policy, and DOJ's failure to grant Plaintiff expedited processing for his October 10, 2011

7   FOIA request to the FBI violated 5 U.S.C. § 552(a)(6)(E); (3) the FBI, Office of

8   Information Policy, and DOJ's failure to grant Plaintiff fee waivers or a limitation of fees

9   for his October 10, 2011 FOIA requests violated 5 U.S.C. § 552(a)(4)(A)(iii); and (4) the

10   FBI, and DOJ's failure to grant Plaintiff expedited processing for his October 10, 2011

11   FOIA request violated 5 U.S.C. § 552 (a)(3)(A).

12

### b. Count Two

13      In Count Two of his Complaint, Plaintiff alleged that (1) the FBI and DOJ's

14   failure to acknowledge Plaintiff's November 10, 2011 FOIA request violated 5 U.S.C.

15   § 552(a)(6)(A)(i) and "corresponding regulations"; (2) the FBI, Office of Information

16   Policy, and DOJ's failure to grant Plaintiff expedited processing for his November 10,

17   2011 FOIA request to the FBI violated 5 U.S.C. § 552(a)(6)(E); (3) the FBI, Office of

18   Information Policy, and DOJ's failure to grant Plaintiff fee waivers or a limitation of fees

19   for his November 10, 2011 FOIA requests violated 5 U.S.C. § 552(a)(4)(A)(iii); and (4)

20   the FBI and DOJ's failure to grant Plaintiff expedited processing for his November 10,

21   2011 FOIA request violated 5 U.S.C. § 552 (a)(3)(A).

22

### c. Count Three

23      In Count Three of his Complaint, Plaintiff alleged that (1) the Executive Office of

24   United States Attorneys and DOJ's failure to acknowledge Plaintiff's October 10, 2011

25   FOIA request violated 5 U.S.C. § 552(a)(6)(A)(i) and "corresponding regulations"; (2)

26   the Executive Office of United States Attorneys, Office of Information Policy, and DOJ's

27   failure to grant Plaintiff expedited processing for his October 10, 2011 FOIA request to

28   the EOUSA violated 5 U.S.C. § 552(a)(6)(E); (3) EOUSA, the Office of Information

Policy, and DOJ's failure to grant Plaintiff fee waivers or a limitation of fees for his October 10, 2011 FOIA requests violated 5 U.S.C. § 552(a)(4)(A)(iii); and (4) the EOUSA and DOJ's failure to grant Plaintiff expedited processing for his October 10, 2011 FOIA request violated 5 U.S.C. § 552 (a)(3)(A).

## II.    Motions for Summary Judgment

### A.    Plaintiff's Motion

Plaintiff moves for summary judgment on ten issues: (1) whether he is entitled to fee waivers on his FOIA requests; (2) whether the FBI acted arbitrarily and capriciously in denying his fee waiver request; (3) whether Plaintiff is entitled to expedited processing of his FOIA requests; (4) whether the FBI acted arbitrarily and capriciously when it denied expedited processing of Plaintiff's requests; (5) whether EOUSA is required to conducted searches for the records requested by Plaintiff in his EOUSA Request; (6) whether the FBI should submit declarations explaining the sufficiency of its searches and justifying its redactions;[8] (7) whether the FBI and EOUSA are required to provide native form digital records (digitally redacted as needed) as opposed to rescanned paper print-outs; (8) whether the FBI and EOUSA are required to provide metadata corresponding to all located records; (9) whether Plaintiff exhausted his administrative remedies prior to filing suit; and (10) whether the FBI, EOUSA, and the Office of Information Policy are proper defendants in this case.[9]

. . . .

. . . .

---

[8] Because Defendants have now submitted declarations explaining the sufficiency of the searches and justifying the redactions and Plaintiff has made no arguments as to this issue, Plaintiff's Motion for Summary Judgment as to this issue will be denied.

[9] Although Plaintiff moves for summary judgment as to whether he exhausted administrative remedies and whether the FBI and EOUSA are proper Defendants (Doc. 84 at 3), Defendants did not respond to these issues in their cross-motion, and thus the Court will assume that they are not issues in dispute and will deny Plaintiff's motion on these issues as moot.

1     **B.     Defendants' Motion**

2         In their Motion, Defendants move for summary judgment on the following issues:

3     (1) whether Plaintiff is entitled to a fee waiver; (2) whether Plaintiff is entitled to records

4     in native digital format with metadata; (3) whether the FBI conducted searches

5     reasonably calculated to uncover all relevant documents regarding Plaintiff's WSJ

6     Request; (4) whether the FBI properly withheld records in response to the WSJ Request;

7     (5) whether the FBI properly withheld records on the Harris Request; (6) whether the FBI

8     has produced all reasonably segregable portions of records; (7) whether EOUSA has

9     conducted a search reasonably calculated to uncover relevant records in response to

10    Plaintiff's EOUSA Request; and (8) whether the EOUSA has properly withheld records.

11    **III.    Summary Judgment Standard**

12        A court "shall grant summary judgment if the movant shows that there is no

13    genuine dispute as to any material fact and the movant is entitled to judgment as a matter

14    of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

15    (1986).   Under summary judgment practice, the moving party bears the initial

16    responsibility of presenting the basis for its motion and identifying those portions of the

17    record, together with affidavits, which it believes demonstrate the absence of a genuine

18    issue of material fact. *Id.* at 323. If the moving party meets its initial responsibility, the

19    burden then shifts to the opposing party who must demonstrate the existence of a factual

20    dispute and that the fact in contention is material, i.e., a fact that might affect the outcome

21    of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

22    (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

23    could return a verdict for the non-moving party. *Id.* at 250; *Matsushita Elec. Indus. Co.,*

24    *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The opposing party need not

25    establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed

26    factual dispute be shown to require a jury or judge to resolve the parties' differing

27    versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S.

28    253, 288-89 (1968).

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any.  *See* Fed. R. Civ. P. 56(c).  At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted.  *Id.* at 248-49. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment").

## IV.   Discussion

### A.   Fee Waiver

Plaintiff asserts that he is entitled to fee waivers under 5 U.S.C. §§ 552(a)(4)(A)(iii) and (viii) for all pending FOIA requests because the disclosure of the information sought is in the public interest and is not primarily in Plaintiff's commercial interest.  Plaintiff further asserts that the requested records concern identifiable operations or activities of the federal government, Plaintiff has the ability, expertise and intention to effectively convey the responsive information to the public, and the information sought will contribute significantly to the public understanding.

Defendants argue that Plaintiff has failed to show that the disclosure of the requested information is in the public interest.

### 1.   Legal Standard

"Generally, the FOIA requires those who make document requests to pay for the search and duplication costs for the disclosed documents." *Ctr. for Medicare Advocacy, Inc. v. U.S. Dep't of Health and Human Servs.*, 577 F. Supp. 2d 221, 239 (D.D.C. 2008);

*see Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 153 (1980); 5 U.S.C. § 552(a)(4)(A)(ii) (stating that the agency regulations shall provide a schedule of all fees, which "shall be limited to reasonable standard charges for document search and duplication" if the records requested are not for commercial use, or are provided to an educational or noncommercial scientific institution or a representative of the news media. But, under certain circumstances, costs may be reduced or waived completely. *See Ctr. for Medicare Advocacy, Inc*, 577 F. Supp. 2d at 239.

Indeed, 5 U.S.C. § 552(a)(4)(A)(iii) provides that:

> Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

5 U.S.C. § 552(a)(4)(A)(iii); 28 C.F.R. § 16.11(k)(1)(i)&(ii).

Where, as here, an agency denies a request for a fee waiver under FOIA, that determination is subject to a de novo standard of review, and "the court's review of the matter [is] limited to the record before the agency." 5 U.S.C. § 552(a)(4)(A)(vii); *see Ctr. for Biological Diversity v. Office of Mgmt. & Budget*, 546 F. Supp. 2d 722, 728 (N.D. Cal. 2008) (an agency's denial of a fee waiver under FOIA is limited "to the facts and arguments in the record before the agency."). "This limitation applies to both the reasons offered by the agency for the denial and to the evidence in the record supporting the waiver." *Id*.

Plaintiff bears "the initial burden of satisfying the statutory and regulatory standards for a fee waiver." *Friends of the Coast Fork v. U.S. Dep't of the Interior*, 110 F.3d 53, 55 (9th Cir. 1997).

. . . .

. . . .

. . . .

. . . .

## 2.    Discussion

### a.    The Administrative Record

#### i.    The October 10, 2011 Harris Request

In the Harris Request, Plaintiff stated that he was entitled to a fee waiver because "disclosure of the requested records will help members of the public understand the privacy risks of carrying cell phones and other wireless devices.  The requested records concern the direct operations and activities of the government with respect to surreptitiously locating cell phones and other wireless devices. . . ."  (Doc. 92-6 at 39).  Plaintiff refers to the WSJ article of September 22, 2011, and states that the reported government actions and the information Plaintiff placed in the record in CR 08-0814-PHX-DGC weigh in favor of granting him a fee waiver.  (*Id.* at 40).  He goes on to state that he has the ability and intention of conveying the responsive information to the public by placing the information in the criminal case record and forwarding it to a WSJ reporter.  (*Id).*.  He refers specifically to his efforts to prove that the government violates the Fourth Amendment.  (*Id).*.

The FBI's initial response of May 1, 2013, was to neither confirm nor deny the existence of the records.  (Doc. 92-6 at 43-45).  On September 25, 2013, the FBI confirmed that records responsive to part of the request exist and denied the fee waiver.  (Doc. 92-6 at 47, 52-53).  The FBI's response states:

> We have reviewed the information you provided in support of your request for fee waiver and have found that you do not satisfy either requirement [for a fee waiver].  Quoting or paraphrasing the statutes, without also providing factual detail or support specific to your request is not sufficient under the law.   Moreover, while disclosure contributes to your individual understanding and interest, it is not likely to contribute significantly to public understanding of government operations and activities.  Consequently, your request is denied.

(*Id.* at 52).  On December 13, 2013, the FBI agreed to a one-time waiver of costs for documents relating to Plaintiff's Harris Request that were previously disclosed in *Epic v.*

*FBI*, a separate FOIA lawsuit.  The FBI provided Plaintiff with a CD containing a 500-page sample of records and a *Vaughn* index.  (Doc. 92-6 at 59).  On January 14, 2014, the FBI waived copying fees for a CD containing 4,377 records relating to the *Epic v. FBI* lawsuit, which were responsive to the Harris Request.  (*Id.* at 61).

### ii.     October 10, 2011 EOUSA Request

In the EOUSA Request, Plaintiff again stated that he was entitled to a fee waiver because "disclosure of the requested records will help members of the public understand the privacy risks of carrying cell phones and other wireless devices.  The requested records concern the direct operations and activities of the government with respect to surreptitiously locating cell phones and other wireless devices. . . ."  (Doc. 92-9 at 14). Plaintiff further refers to the WSJ article of September 22, 2011, and states that the reported government actions and the information Plaintiff placed in the record in CR 08-0814-PHX-DGC weigh in favor of granting him a fee waiver.  (*Id.* at 14-15).  He goes on to state that he has the ability and intention of conveying the responsive information to the public by placing the information in the criminal case record and forwarding it to a WSJ reporter.  (*Id.* at 15).  He refers specifically to his efforts to prove that the government violates the Fourth Amendment.  (*Id.*).

The EOUSA initially responded on May 3, 2013 and stated that the request was denied because the agency does not keep records in a manner that would enable it to search for the information but that it had recently released records to the ACLU in response to a request that "generally overlaps [Plaintiff's] request" and that it would provide those records if Plaintiff wanted them.  (Doc. 92-9 at 18).  On March 13, 2014, the EOUSA provided 868 pages of documents to Plaintiff.  (Doc. 92-9 at 19-20).

### iii.     November 10, 2011 WSJ Request to FBI

In the WSJ Request, Plaintiff stated that he was entitled to a fee waiver because:

> [d]isclosure of the requested records will help members of the public understand (1) the privacy risks of carrying cell phones and wireless devices and (2) the FBI policy to destroy discoverable *Brady* material (*i.e.*, real-time geolocation data) so that defendants and their attorneys will be unable to use the

information in a defense.  The requested records concern the direct operations and activities of the government with respect to surreptitiously locating cell phones and other wireless devices and related equipment.

(Doc. 92-8 at 35-36).  As with the other requests, Plaintiff stated that he had the ability and intention of conveying the responsive information to the public by placing the information in the criminal case record and forwarding it to a WSJ reporter, and he referred specifically to his efforts to prove that the government violates the Fourth Amendment.  (*Id.* at 36).

On January 31, 2012, the FBI sent Plaintiff a letter denying the fee waiver.  (Doc. 92-8 at 47-48).  The FBI stated that Plaintiff had not adequately demonstrated that the information sought was not in his own commercial interest.  (Doc. 92-8 at 47-48).

### iv.    Plaintiff's Appeals

On February 15, 2012, Plaintiff appealed the denial of the fee waiver for all three requests to the Office of Information Policy.  (Doc. 86-11 at 2-46 (appeal of Harris Request); Doc. 86-12 at 12-44 (appeal of WSJ Request); Doc. 86-13 at 44-89 (appeal of EOUSA Request)).   With his appeals, he submitted declarations under penalty of perjury stating: "[m]y primary purpose for seeking the records requested in the [FOIA requests] is to obtain evidence for my defense in United States v. Rigmaiden, CR08-814-PHX-DGC, pending in the District of Arizona . . . in support of a motion to suppress evidence . . . ."  (Doc. 86-11 at 44; Doc. 86-12 at 37; Doc. 86-13 at 87).  He further stated that to advance public understanding, he would give the requested documents to his named contacts at the American Civil Liberties Unions in Northern California and Arizona and the Electronic Frontier Foundation and a reporter at the WSJ.  (Doc. 86-11 at 44-45; Doc. 86-12 at 37-38; Doc. 86-13 at 87-88).  He also stated that he did not have resources or means to profit from any records as he was in custody at the Corrections Corporation of America, Central Arizona Detention Center.  (Doc. 86-11 at 45; Doc. 86-12 at 38; Doc. 86-13 at 88).

On April 17, 2012, the Office of Information Policy sent Plaintiff a letter stating that they received the appeal on the WSJ Request and agreed with the denial of the fee

waiver, but on a different basis than that stated by the FBI.   (Doc. 86-12 at 48). Specifically, the Office of Information Policy found that Plaintiff had not met the public interest requirement of FOIA and that Plaintiff failed to demonstrate that (1) he was the primary beneficiary of the requested documents; (2) disclosure of the records to Plaintiff would be a significant contribution to the public's understanding; and (3) he had a capacity to disseminate the records to the public.  (*Id*)..

On May 10, 2012, the Office of Information Policy sent Plaintiff a letter stating that they had received the appeal on the Harris Request, but the FBI had no record of such a request and, thus, there was no adverse determination from which to appeal.  (Doc. 86-11 at 49).

On May 10, 2012, the Office of Information Policy sent Plaintiff a letter stating that they had received the appeal on the EOUSA request, but because Plaintiff had not received an adverse determination, there was no action for the office to consider on appeal.  (Doc. 86-13 at 92).

### b.      Analysis

As noted, the Court's de novo review is limited to the record before the agency. Therefore, the Court does not consider subsequent developments, such as Plaintiff's release from custody.

Having reviewed the administrative record, the Court finds that Plaintiff did not demonstrate that his requests were in the public interest.  To determine whether the records sought are in the public interest, the Court considers four factors: (1) "whether the subject of the requested records concerns . . . identifiable operations or activities of the federal government, with a connection that is direct and clear, not remote or attenuated"; (2) whether "[t]he disclosable portions of the requested records [are] meaningfully informative about government operations or activities in order to be 'likely to contribute' to an increased public understanding of those operations or activities"; (3) whether disclosure would "contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding

of the requester";[10] and (4) whether disclosure "is likely to contribute 'significantly' to [the] public understanding of government operations or activities."   28 C.F.R. § 16.11(k)(2)(i)-(iv); *see Friends of the Coast Fork*, 110 F.3d at 55.

Assuming Plaintiff has satisfied the first two factors, Plaintiff has not met his burden as to the third and fourth factors.

Plaintiff's Requests seek records including purchase receipts, invoices, spreadsheets, graphics, and several types of metadata.  He specifically seeks records in native digital format with metadata.  Plaintiff made no showing in his Requests that this information would contribute to the understanding of a "reasonably broad audience" or would be likely to contribute significantly to the public's understanding.  Thus, although some items may be in the public interest, Plaintiff's Requests were too broad and sweeping to support his claim that the information would contribute to the public's understanding as opposed to his own.  Indeed, Plaintiff clearly states in his appeals that his primary purpose in obtaining the information sought was for use in his criminal case, which was ongoing at the relevant time.  While seeking records for a purpose that does not benefit the public is not fatal to his request for a fee waiver, *see Brunsilius v. U.S. Dep't of Energy*, 514 F. Supp. 2d 30, 35 (D.D.C. 2007) (finding that two of the asserted reasons for requesting a fee waiver were not appropriate but considering the remaining claim), an admittedly significant self-serving purpose nevertheless informs the Court's determination on this factor.  Plaintiff's stated primary purpose in seeking the records demonstrates that the request was mainly for his benefit and not to "contribute to the understanding of a reasonably broad audience of persons interested in the subject."  28 C.F.R. § 16.11(k)(iii); *see McQueen v. United States*, 264 F. Supp. 2d 502, 525 (S.D. Tex. 2003) (district court denied fee waiver where the plaintiff alleged a public purpose but primarily sought to "obtain[ ] information about [his] criminal case."); *Mells v. I.R.S.*,

---

[10] "A requester's expertise in the subject area and ability and intention to effectively convey information to the public shall be considered" in determining whether the requester has satisfied the third factor.  28 C.F.R. § 16.11(k)(2)(iii).

No. 99-2030, 2002 WL 31934274, at *5-7 (D.D.C. Nov. 21, 2002) (noting that requester's reasons for fee waiver were "overwhelmingly personal in nature" where he claimed that disclosure "would yield exculpatory evidence pertaining to his criminal conviction").

Even if the Court found that Plaintiff met his burden in showing that the items requested were in the public interest because disclosure would benefit the public at large, Plaintiff did not meet his burden to show that he could disseminate the information to the public. "A requester's expertise in the subject area and ability and intention to effectively convey information to the public shall be considered" in determining whether the requester has satisfied the third factor. 28 C.F.R. § 16.11(k)(2)(iii); *see McCain v. U.S. Dep't of Justice*, 13 F.3d 220, 221 (7th Cir. 1993) (fee waiver must be assessed in light of identity and objectives of requestor); *Larson v. C.I.A.*, 843 F. 2d 1481, 1483 (D.C. Cir. 1988) (reasoning that requests cannot become eligible for fee waivers simply upon intent to distribute information to journalists "because such a rule would enable requesters to avoid fees simply by asserting an intention to give the released documents to a newspaper" and finding that denial of fee waiver was justified where the requestor failed to specify the newspaper he would use to disseminate the requested information).

Here, Plaintiff was an inmate both at the time he made his requests and at the time he filed his appeals. "Plaintiff's status as an inmate [at the time of the requests and appeals] certainly inhibits his ability to disseminate information to the general public." *Brunsilius*, 514 F. Supp. 2d at 35. Although Plaintiff identified his contacts with the ACLU and the WSJ, he failed to demonstrate the ability to actually disseminate to those contacts the extensive amounts of information sought. Plaintiff suggests in his appeals that he had no resources; thus, there is nothing in the administrative record to show that, at the relevant time, he could pay for the copying and mailing costs associated with providing the records to his contacts. And there is no evidence that Plaintiff's contacts agreed to pay for copying and mailing costs.

. . . .

1    Likewise, the administrative record provides no evidence that Plaintiff could

2    reproduce responses received on CDs, even assuming Plaintiff could have received CDs

3    in prison.  In sum, Plaintiff failed to make a showing that he could actually disseminate

4    the records to the public.

5    Accordingly, the administrative record reflects that Plaintiff did not demonstrate

6    that his requests were in the public interest and, thus, Plaintiff was not entitled to a fee

7    waiver pursuant to 5 U.S.C. §§ 552(a)(4)(A)(iii).  Accordingly, the Court will deny

8    Plaintiff's Motion for Summary Judgment and grant Defendants' Motion for Summary

9    Judgment as to fee waiver pursuant to 5 U.S.C. §§ 552(a)(4)(A)(iii).[11]

10   **B.    Waiver of right to charge fees**

11   Plaintiff asserts that, even if he is not entitled to a public-interest fee waiver, the

12   FBI and EOUSA have waived their rights to charge fees under 5 U.S.C.

13   § 552(a)(4)(A)(viii) for the Harris Request and the EOUSA request because their

14   responses to those FOIA requests were untimely.  Defendants argue there has been no

15   waiver as to duplication fees and that the EOUSA did not waive search fees.

16   5 U.S.C. § 552(a)(4)(A)(viii) provides that:

17   An agency shall not assess **search** fees (or in the case of a

18   requester described **under clause (ii)(II), duplication fees**)
     under this subparagraph if the agency fails to comply with

19   any time limit under paragraph (6), if no unusual or
     exceptional circumstances (as those terms are defined for

20   purposes of paragraphs (6)(B) and (C), respectively) apply to

21   the processing of the request.

22   5 U.S.C. § 552(a)(4)(A)(viii) (emphasis added).  The referenced "clause (ii)(II)" states

23   "fees shall be limited to reasonable standard charges for document duplication when

24   records are not sought for commercial use and the request is made by an educational or

25

26   _____

27   [11] To the extent that Plaintiff separately moves for summary judgment on the issue

28   of "whether the FBI acted arbitrarily and capriciously in denying his fee waiver request,"
     Plaintiff's Motion for Summary Judgment will be denied.

noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media. . . ." 5 U.S.C. § 552 (a)(4)(A)(ii)(II).

There is no question that the responses to Plaintiff's FOIA requests were untimely under 5 U.S.C. § 552(a)(6)(A).  5 U.S.C. § 552(a)(6)(A) provides that each agency "upon any request for records . . .shall . . . determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination . . . . 5 U.S.C. § 552(a)(6)(A)(i).  "The 20-day period shall not be tolled by the agency except . . . that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or . . . if necessary to clarify with the requester issues regarding fee assessment." *Id.* § 552(a)(6)(A)(ii)(I)-(II).

Plaintiff sent the Harris Request to the FBI on October 10, 2011 via certified mail and received a certified mail receipt indicating that the request was received on November 7, 2011.  (Doc. 1-1 at 39).  Thereafter, on May 10, 2012, the Office of Information Policy sent Plaintiff a letter stating that the FBI had no record of the Harris Request and stated that the Office of Information Policy would forward that request to the FBI.  (Doc. 1-2 at 3).  On May 1, 2013, the FBI initially responded to the Harris Request and stated that it would neither confirm nor deny the existence of the records sought by Plaintiff.  (Doc. 92-6 at 43-45).  Although the FBI claims that it was unaware of the Harris Request until this lawsuit was instituted, it agrees that in light of the letter from the Office of Information Policy, "it will not press[] that particular point in this litigation." (Doc. 92 at 8-9 n.10).  Accordingly, there is no disputed issue of material fact that the FBI's May 1, 2013 response was untimely under either the November 7, 2011 receipt of Plaintiff's original request or the May 10, 2012 forwarded request from the Office of Information Policy.

Likewise, Plaintiff sent the EOUSA Request to EOUSA on October 10, 2011 via certified mail and the United States Postal Service's Track & Confirm service indicated that the mail was delivered on November 7, 2011.  (Doc. 1-3 at 42).  The EOUSA's initial response was sent to Plaintiff on May 3, 2013.  (Doc. 92-9 at 18).  Accordingly, there is no dispute that the EOUSA's response was untimely.

### 1.    Duplication Fees

As to duplication fees, waiver is not appropriate because Plaintiff is not an educational or noncommercial scientific institution and he is not a representative of the news media.   Although Plaintiff asserts that he will distribute the records to a representative of the news media, Plaintiff is not himself a "representative of the news media" within the meaning of the statute.  A representative of the news media "means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. . . .  Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entitles qualify as disseminators of 'news') who make their products available for purchase by or subscription by or free distribution to the general public."  5 U.S.C. § 552 (a)(4)(A)(ii).  Accordingly, Plaintiff is not entitled to a waiver of *duplication* fees as to either agency under this provision and summary judgment will be granted to Defendants and denied to Plaintiff on the issue of waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(viii).

### 2.    Search Fees

EOUSA argues that Plaintiff is not entitled to search fees due to the untimeliness of the response to the EOUSA request because there were unusual circumstances that prevented the timely processing of the EOUSA request.  Likewise, the FBI asserts that "the FBI would still be entitled to charge search fees—if appropriate—due to the broad scope of the plaintiff's Harris Request," which constituted unusual circumstances under 5 U.S.C. § 552(a)(6)(B)(iii)(II).  (Doc. 92 at 8-9 n.10).

To the extent that search fees are applicable, EOUSA and the FBI have waived the right to charge fees as to the EOUSA and Harris Requests, respectively, pursuant to 5 U.S.C. § 552(a)(4)(A)(viii) because their responses to Plaintiff's requests were untimely and they have not shown unusual or exceptional circumstances within the meaning of 5 U.S.C. § 552(a)(6)(B)-(C).

EOUSA argues that Plaintiff's EOUSA request involved unusual circumstances because it sought records from multiple U.S. Attorney's Offices scattered around the country. (Doc. 91 at 11).

> "[U]nusual circumstances" means, **but only to the extent reasonably necessary to the proper processing of the particular requests**--
> 
> (I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;
> 
> (II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or
> 
> (III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

5 U.S.C. § 552(a)(6)(B)(iii) (emphasis added).

Plaintiff argues that § 552(a)(6)(B) requires that, in unusual circumstances, time limits must "be extended by written notice to the person making [the] request setting forth the unusual circumstances for such an extension and the date on which a determination is expected. . . ." (Doc. 114 at 26). He argues that no such notice was provided. (*Id*). EOUSA relies on *Rosenberg v. U.S. Dep't of Immigration and Customs*, 954 F. Supp. 2d 1, 10 (D.D.C. July 23, 2013) in arguing that the procedures for "unusual circumstances" in §552(a)(6)(B) are not incorporated into the fee waiver of 5 U.S.C. § 552(a)(4)(A)(viii), but rather the definition of unusual circumstances is the only thing incorporated into 5 U.S.C. 552(a)(4)(A)(viii). Indeed, the *Rosenberg* court found that "[t]he plain text of section 552(a)(4)(A)(viii) requires only that unusual circumstances *as*

*defined by* paragraph (6)(B) or (C) [exist], not that unusual circumstances exist *and* that the agency properly seek additional time to respond to the request in light of unusual circumstances." *Rosenberg*, 954 F. Supp. 2d at 10.

While the Court agrees that the plain text of section 552(a)(4)(A)(viii) requires only that unusual circumstances exist and not that the agency follow the proper procedures when unusual circumstances exist, the Court finds the agencies' failure to follow the proper procedures under section § 552(a)(6)(B) to be strong evidence that unusual circumstances did not actually exist. Defendants provide no explanation for their failure to follow the statutorily required procedures in section § 552(a)(6)(B). Moreover, EOUSA does not even attempt to explain why is took over a year and half for EOUSA to simply inform Plaintiff that it does not "maintain records which would enable [it] to reasonably search for information." (Doc. 91-9 at 18). The simple fact that the request involved a search of multiple U.S. Attorney's Offices does not show unusual circumstances such that it would explain the untimeliness of the response to Plaintiff's request. In that respect, this case differs from *Rosenberg*, where the evidence showed that the request was not received until one month before the request for fees was transmitted to Plaintiff.

Likewise, the FBI has not shown how the "broad scope" of Plaintiff's Harris Request prevented it from responding to Plaintiff's request for at least a year, simply to inform Plaintiff that the FBI would neither confirm nor deny the existence of the records sought.

Accordingly, unusual circumstances did not exist and, thus, Defendants' untimely responses to Plaintiff's Harris and EOUSA requests did constitute waiver of *search* fees under 5 U.S.C. § 552(a)(4)(A)(viii). Accordingly, Plaintiff's Motion for Summary Judgment will be granted and Defendants' Motion for Summary Judgment will be denied as to the waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(viii).

. . . .

. . . .

## C.     Native Form Digital Records and Metadata

In all three of his FOIA requests, Plaintiff requested that all digital documents be provided in their original native form with metadata preserved.  (Doc. 92-6 at 38, 92-8 at 35, 92-9 at 13).   With regard to metadata, Plaintiff specifically requested system metadata, substantive metadata, and embedded metadata.  Plaintiff moves for summary judgment on his request for documents in native digital format and metadata.  Defendants argue that it is impossible for their processing units to provide FOIA documents in native digital form with metadata intact.

In Response, Plaintiff states that "EOUSA provided its records in the form **precisely requested by Plaintiff**." (Doc. 114 at 30 (emphasis in original)).  Accordingly, it appears that native digital format is not at issue with regard to the EOUSA request.

### 1.     Legal Standard

In 1996, Congress amended FOIA to address electronic information.   The Electronic Freedom of Information Amendments of 1996 provide in part:

> [i]n making any record available to a person under this paragraph, an agency shall provide the record *in any form or format* requested by the person *if the record is readily reproducible by the agency in that form or format.*   Each agency shall make *reasonable efforts to maintain its records in forms or formats that are reproducible* for purposes of this section.

5 U.S.C. § 552(a)(3)(B) (emphasis added).

An agency's determination as to reproducibility must be accorded substantial weight by the reviewing court.  5 U.S.C. § 552(a)(4)(B) ("In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to . . . reproducibility under paragraph (3)(B)."  5 U.S.C. § 552(a)(4)(B).

. . . .

. . . .

. . . .

- 22 -

## 2.    Native Digital Format

Defendant FBI has met its burden to show that the requested material cannot be produced in native digital format.[12]

In support of his argument that Defendants are required to provide records in native digital format, Plaintiff relies on *Sample v. Bureau of Prisons*, where the district court stated that "there is a clear statutory obligation to provide the records in electronic format when that format is requested."  466 F.3d 1086, 1088 (D.C. Cir. 2006).  In *Sample*, the BOP provided an inmate with paper copies of records, arguing that electronic records need not be produced because BOP security regulations prohibited the inmate from receiving such records and, thus, they were not "readily reproducible" in that format.  But the court reasoned that "readily reproducible" does not focus on the characteristics of the FOIA requester.  *Id.* at 1088.  In addition, in *Sample* there was no dispute as to the agency's ability to produce the records electronically because it offered to provide the records in electronic format to the requester's non-inmate designee.  *Id.*

Plaintiff argues that the volume of records involved in his requests necessitates that they be provided in native digital form.  (Doc. 85 at ¶ 129).  He asserts that the FBI plans to print 15,377 pages of native digital form records to hard copy paper, then scan the paper into PDF files, then provide non-native form records to him.  (*Id*. at ¶ 130).  He further argues that native form digital records are needed "so that the original, unaltered vector based text can be databased and searched using a computer without the need for Optical Character Recognition (OCR)—which is an unrefined process limiting accurate keyword searches."  (*Id*).

Plaintiff contends that it would be simple for the FBI to provide native form digital records or an equivalent that preserves vector-based, keyword-searchable text.  (Doc. 84 at 13; Doc. 85 at ¶¶ 134-139).  He asserts that for easily edited records like Microsoft Word or Excel documents, Defendants can provide the true native digital form after using

---

[12] As stated above, Plaintiff concedes that EOUSA has produced its information in a format acceptable to Plaintiff.

native viewing/editing software to redact (replacing sensitive text with a series of bold XXs) and preserving embedded data.  For other records, Plaintiff suggests that a digital PDF conversion process can be used and embedded data provided separately.  For example, he suggests that an email file in *.eml format or in a format displayed within a web-based email account can be digitally converted to a PDF file using the PrimoPDF or doPDF print driver.  By this process, a PDF file is not converted to paper and the vector-based, keyword-searchable text is preserved.  (Doc. 84 at 13).  Plaintiff also argues that even if the FBI cannot provide records as vector-based PDF files, it can scan its paper documents into its HighView system as 600 dpi flat TIFF images rather than 150 dpi.  (Doc. 114 at 30).

The FBI asserts that a "vast majority of the records responsive to FOIA/Privacy Act requests is still maintained by the FBI in original paper format as part of the FBI's official federal records system."  (Doc. 91-7 at ¶ 10).  It further asserts that as to electronic records, "the customized software product that the FBI uses to process FOIA requests, dubbed 'FDPS,' converts all electronic media into a flattened TIFF image."  (*Id.* at ¶ 12).  FDPS "is designed such that it is compatible only with TIFF images," and "[d]ocuments can be reviewed and redacted only if they are in TIFF format."  (*Id.* at ¶ 13).

Hardy avers that converting documents to flattened TIFFs "ensures protection of FBI and government agency equities, protection of national security information, and maintenance of classified information."  (*Id.* at ¶ 13; *see id.* at ¶ 9 (noting that "FDPS resides on the internal FBI network which is specifically designed to handle documents classified up to the 'SECRET' level")).

Hardy further avers that "[d]ocuments in their native electronic formats, . . . unlike TIFFs, are editable and could allow for the required redactions to be reverse engineered, exposing the critical information that must be protected."  (*Id.* ¶ 14).  As to PDF, Hardy attests that the Transportation Security Administration inadvertently released information of a standard operating procedures manual when it processed the manual by drawing

black boxes on top of sensitive security information in a native PDF version of the document. (*Id.*). It was later discovered that the blacked out redactions could be made readable by a particular PDF viewer. (*Id.*). Accordingly, Hardy avers that "[m]aintaining records in their native format and deleting information exempt under the FOIA is not a viable alternative when dealing with sensitive information that, under FOIA, must not be released." (*Id*).

The FBI has met its burden to show that electronic records are not readily reproducible in native format because they can be edited and redactions can be reverse engineered. Plaintiff does not dispute that embedded data is stripped in the process of converting files to TIFF. Plaintiff does not dispute that TIFF, unlike native format documents, cannot be reverse-engineered to restore redacted information. The legislative history reflects that this alone is fatal to Plaintiff's request for records in native digital format in this case. *See* S. Rep. 104-272 at 14-15 ("the 'reasonable efforts' qualification could relieve agencies of the obligation of releasing the original form of partially exempt records in circumstances where agencies need to handle the records in a certain form for purposes of redaction and, therefore, cannot readily disclose them, as redacted, in a previously existing form."). The Court will deny Plaintiff's Motion for Summary Judgment on the issue of records in native digital format and grant Defendants' Motion for Summary Judgment on the issue of records in native digital format.

### 3. Metadata

As noted above, Plaintiff requested system metadata, substantive metadata, and embedded metadata for each record responsive to his requests to Defendants.[13] Whether

---

[13] Metadata can be grouped into three broad categories: substantive metadata (also referred to as application metadata), system metadata, and embedded metadata. First, substantive, or application metadata, is created by the application specific to the ESI being addressed, embedded in the file, and moved with the file when copied. This data may reflect substantive changes to a document by the user and/or instruct the software program on how to display the document because substantive metadata "records and reflects any

and to what extent metadata is subject to FOIA is the subject of considerable debate. Such debate arises, in part, from an attempt to balance FOIA's principles of openness and public access to government and records, and the need to safeguard sensitive information. The debate is furthered by the confusion that arises about how metadata must be produced, how much of it must be produced, and what requirements exist for how to search for and produce metadata generally.

changes to a document made by the user or creator of a document." Examples include the track changes function in a Microsoft Word document and other internal data such as who created the document, any revisions that were made, and when the revisions occurred. . . . Substantive metadata is also prone to a large amount of contextual inaccuracy.

Second, embedded metadata is generally hidden but usually considered to be an integral part of ESI. This data is embedded in a file and is only available in the original, native file. It consists of text, numbers, hyperlinks, data, or any other information that is not observable by an individual "viewing the output display of the native file." An example of embedded metadata is that of an Excel spreadsheet that uses formulas that underlie the output of a cell—the formulas underlying the document would constitute metadata. Without the ability to view these formulas, the spreadsheet could be incomprehensible and may not provide any beneficial use to the requesting party.

Third, system metadata is created automatically by the operating system to track the demographics of ESI. This data includes logs and other logistical information generated by the operating system to track modifications of a record's name, size, location, and the date and time of creation. System metadata is generally useful in determining the authenticity of a document as it could reveal "information regarding the identity of the author and the date and time of creation . . . [and] is created automatically by the user's application or operating system."

Christopher R. Meltzer, *More Than Just Ones and Zeros: The Reproducibility of Metadata Under the Freedom of Information Act*, 9 J.L. & Pol'y Info. Soc'y 327, 332-334 (2013) (footnotes omitted).

Nothing in FOIA explicitly requires the production of metadata and Defendants have presented a credible argument that Congress did not intend for FOIA to encompass metadata.  (Doc. 92 at 12-16).  Moreover, considering the overall breadth and complexity of issues concerning the disclosure of metadata, Congress, and not the Court, is better equipped to create rules governing the production of metadata under FOIA.

But, even assuming that metadata is subject to FOIA, disclosure of metadata is not necessary in this case because despite reasonable efforts by Defendants, the metadata sought by Plaintiff is not readily reproducible within the meaning of FOIA.

Plaintiff does not seek discrete portions of identified metadata for certain documents, but rather requests every general type of metadata for every document produced in response to broad requests for information, which has amounted to results of thousands of documents.  The sheer volume of documents possibly responsive to Plaintiff's requests calls into question whether the metadata in those documents is readily reproducible.

Indeed, while not in the context of metadata specifically, when Congress amended FOIA to address electronic information, it specifically contemplated what would constitute reasonable efforts in the context of whether documents are readily reproducible.

> The bill's requirement to make records available in the form or format requested by any person where such records are not usually maintained in the requested form or format, is subject to a "reasonable efforts" qualification. In some cases, this could relieve the agency of the requirement if it would prove onerous. . . .
>
> This requirement applies to choices between conventional record forms (e.g., paper, microfiche, or electronic) as well as to choices between existing electronic formats. As a general rule, the decision whether to disclose requested records or information in a new requested form, whether electronic or other form, is a matter of administrative discretion. In exercising that discretion, agencies should consider administrative efficiency and the existence of identified public demands for the information. Consistent

with current practice, a FOIA requester generally should be entitled to obtain a paper printout of any nonexempt electronic records-or any readily retrievable nonexempt part of such records-if the requester prefers.

. . . . [T]he "reasonable efforts" qualification could relieve agencies of the obligation of releasing the original form of partially exempt records in circumstances where agencies need to handle the records in a certain form for purposes of redaction and, therefore, cannot readily disclose them, as redacted, in a previously existing form.

This section also directs agencies to make "reasonable efforts to search for records in electronic form or format." What constitutes a "reasonable effort" shall vary with the circumstances under which the records are held. We recognize that both agency computer program development resources and agency computer system operation resources are highly valuable and finite. Both of these categories of agency resources shall be impinged upon by the level of new search activity required under the amendments. Agencies should search for and retrieve data according to new specifications where such retrieval activity does not disrupt agency functions.

S. Rep. 104-272 at 14-15.

As such, the legislative history reflects that Congress contemplated withholding documents both where the agency needs to handle records in a certain form for the purposes of redaction and cannot readily disclose them in a previously existing form and where agency resources would be impinged by search activity for overly broad, voluminous requests. In this case, Defendants have shown that they do not keep metadata in records to be produced under FOIA, *see* Doc. 92-7 at ¶ 13 ("the conversion of electronic documents to TIFF images is specifically designed to *affirmatively* strip metadata in order to ensure that no classified and/or law enforcement sensitive information is inadvertently released to the public."); Doc. 92-9 at ¶ 24 (FOIA/Privacy Staff do not use a document processing system that preserves records in their native form and instead uses an electronic FOIA processing system into which it transfers documents,

which are maintained in a TIFF format, the staff also converts documents into PDF files through Adobe Acrobat), and Plaintiff's requests themselves reflect the extensive breadth of the metadata that he seeks.   Accordingly, even assuming that FOIA applies to metadata, due to the breadth of Plaintiff's requests and the fact that Defendants do not keep records for production under FOIA in a form that would allow for production of metadata, Defendants are not required to produce metadata in response to Plaintiff's FOIA requests at issue in this case.  Accordingly, the Court will deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment on the issue of metadata.

**D.    Adequacy of the Responses and Claimed Exemptions to Plaintiff's Requests**

FOIA requires that an agency responding to a request "demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents."   *Lahr v. Nat'l Transp. Safety Bd*., 569 F. 3d 964, 986 (9th Cir. 2009) (quoting *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)).   Such a showing can be made by "reasonably detailed, nonconclusory affidavits submitted in good faith."  *Zemansky*, 767 F.2d at 571. Such affidavits or declarations are entitled to "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."   *Lawyers' Comm. For Civil Rights of S.F. Bay Area v. U.S. Dep't of Treasury*, 534 F. Supp. 2d 1126, 1131 (N.D. Cal. 2008).   An agency "need not set forth with meticulous documentation the details of an epic search for the requested records." *Id.* (quotation omitted).   "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*."   *Citizens Comm'n on Human Rights v. FDA.*, 45 F.3d 1325, 1328 (9th Cir. 1995) (quotation omitted) (emphasis in original).   In general, the sufficiency of a search is determined by the "appropriateness of the methods" used to carry it out, "not by the fruits of the search."  *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).   The failure of an agency "to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not

undermine the determination that the agency conducted an adequate search for the requested records."  *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004).

Once a search has been conducted, FOIA requires disclosure of all agency records at the request of the public unless the records fall within one of nine narrow exemptions. *See* 5 U.S.C. § 552(b); *see also Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996).  These "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (internal citation omitted).  The exemptions "have been consistently given a narrow compass," and agency records that "do not fall within one of the exemptions are improperly withheld."  *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quotation omitted).

Ultimately, the threshold issue on a motion for summary judgment is whether the agency's explanations are full and sufficiently specific to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding.  *See Wiener v. FBI*, 943 F.2d 972, 977-79 (9th Cir. 1991) (noting that specificity is the defining requirement of the *Vaughn* index).

"To carry their summary judgment burden, agencies are typically required to submit an index and 'detailed public affidavits' that, together, 'identify [ ] the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption.'"  *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012).  These submissions—commonly referred to as a *Vaughn* index—"must be from affiants who are knowledgeable about the information sought and detailed enough to allow the court to make an independent assessment of the government's claim of exemption."  *Id.* (internal quotation omitted).  Whether by *Vaughn* index or by affidavit or some combination of the two, the government must "provide enough information, presented with sufficient detail, clarity, and verification, so that the requester can fairly determine what has not been produced and why, and the court can decide whether the exemptions claimed justify the nondisclosure."  *Fiduccia v. U.S.*

1    *Dep't. of Justice*, 185 F.3d 1035, 1043 (9th Cir. 1999).  "To justify withholding, the

2    government must provide tailored reasons in response to a FOIA request.  It may not

3    respond with boilerplate or conclusory statements." *Shannahan v. I.R.S.*, 672 F.3d 1142,

4    1148 (9th Cir. 2012).

5        Courts "accord substantial weight to an agency's declarations regarding the

6    application of a FOIA exemption." *Id.* at 1148.  However, before giving the agency's

7    expert opinion on national security matters the substantial weight to which it is entitled, a

8    district court must ensure that it has an adequate foundation to review the agency's

9    withholding claims.  *King v. U.S. Dep't of Justice*, 830 F.2d 210, 225-226 (D.C. Cir.

10   1987).  Deference is not equivalent to acquiescence and, thus, an agency's declaration

11   may justify summary judgment only if it is sufficient "to afford the FOIA requester a

12   meaningful opportunity to contest, and the district court an adequate foundation to

13   review, the soundness of the withholding." *Campbell v. U.S. Dep't of Justice*, 164 F.3d

14   20, 30 (D.C. Cir. 1998) (quotation omitted).

### 1.    WSJ Request

16       Defendants move for summary judgment on the adequacy of the search and the

17   exemptions claimed as to the WSJ Request.  (Doc. 91 at 16-17).

#### a.    Adequacy of the Search

19       Hardy avers that that the FBI typically conducts searches in response to FOIA

20   requests in its Central Records System (CRS).  (Doc. 92-8 at ¶¶ 15-20).  He further attests

21   that, due to the nature of Plaintiff's WSJ Request, as well as the purpose, design, and

22   organization of information in the CRS as a law-enforcement tool, the FBI conducted a

23   search query outside of the CRS, instead contacting those divisions and offices most

24   likely to maintain potentially responsive records.  (*Id.* at ¶ 21).  Specifically, the FBI

25   issued a search e-mail for responsive records relating to the WSJ article and comments

26   made by FBI employees at the Brookings Institution panel at issue.  (*Id.* at ¶ 22).  The

27   FBI identified 94 responsive records relating to the WSJ portion of the request, all of

28

1   which were processed.  (*Id.* at ¶22).  The FBI released those 94 pages to Plaintiff, on July

2   12, 2013; 14 pages were released in full and 80 pages were released in part.  (*Id.* at ¶ 22).

3          In addition to the search inquiry described above, the FBI also conducted a search

4   of the CRS regarding Plaintiff's request relating to the Brookings Institute.  (*Id.* at ¶ 23).

5   Hardy avers that neither the search inquiry nor the search of the CRS yielded any records

6   responsive to the Plaintiff's Brookings Institute request.  (*Id.* at ¶ 23).

7          Plaintiff responds that the FBI should have directly contacted its prior general

8   counsel, Valerie Caproni, for records responsive to his request, since the request

9   concerned comments she made.  Plaintiff further asserts that the FBI should have

10  searched its "'Blackberry enterprise servers maintained by the FBI at its Clarksburg,

11  West Va., facility and other facilities' for text messages regarding the issues" and it

12  should have searched its archives of saved incoming and outgoing e-mail sent and

13  received by FBI employees.  (Doc. 114 at 16).  Plaintiff argues that a targeted search of

14  these documents could be easily accomplished.

15         In Reply, the FBI argues that it is not required to employ the same standards of

16  discovery in litigation in responding to a FOIA request, and that Plaintiff received emails

17  in response to his request.  The FBI further asserts that FOIA does not impose an

18  obligation on it to contact former employees in order to obtain documents responsive to

19  Plaintiff's request.

20         As to Plaintiff's assertion that the FBI needed to contact its former general counsel

21  to adequately search for documents in response to Plaintiff's request, FOIA "does not

22  impose an obligation on defendant to contact former employees to determine whether

23  they know of the whereabouts of records that might be responsive to a FOIA request."

24  *Blanton v. U.S. Dep't of Justice*, 182 F. Supp. 2d 81, 85 (D.D.C. 2002); *see Jackson v.*

25  *U.S. Dep't of Labor*, No. 2:06 CV 02157 RRB KJM PS, 2008 WL 539925, at *5 n.2

26  (E.D. Cal. Feb. 25, 2008) ("The [agency] is not required to pursue any records that may

27  exist and be in possession of a retired employee.").  Accordingly, the FBI did not need to

28  contact Valerie Caproni for the search to be adequate within the meaning of FOIA.

As to the remainder of Plaintiff's arguments, the Court agrees that the FBI has not met its burden to show that its search was reasonably calculated to uncover all relevant documents.  Although the FBI states that Plaintiff received some emails in response to Plaintiff's request, the FBI does not explain whether those emails constituted all relevant documents responsive to Plaintiff's request.  The FBI makes no argument that it would be difficult or overly burdensome to search its email archives and provides no explanation for its failure to do so.  Although the FBI implies that a search for more than thirty types of records in more than 20 locations would be overly burdensome and argues that FOIA does not require a search in every conceivable area where responsive records might be found, the FBI provides no information as to the difficulty of such searches, that such searches would be cumulative or unnecessary, why such searches are not commonly done, or any other information that would allow the Court to conclude that its search was reasonably calculated to uncover all relevant documents.  The FBI likewise does not explain why it did not search the CRS for documents responsive to the portion of Plaintiff's request regarding the WSJ.  Accordingly, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment on the adequacy of the WSJ search as set forth herein.

**b.     Exemptions Claimed for WSJ Request**

To explain the claimed exemptions for redactions relating to the WSJ Request, Defendants have submitted a Declaration from Hardy and have included each document produced in response to the request with the exemption claimed in each portion of the document for which that particular exemption was claimed.  (Doc. 92-8).

**i.     Exemption 5**

The FBI asserts that it properly withheld documents relating to the WSJ Request reflecting "an internal, on-going dialogue among and between FBI personnel with regard to developing FBI policy on the legal status of [cell phone tracking] technology,' which fall within the deliberative process privilege protected under 5 U.S.C. § 552(b)(5)

("Exemption 5").[14]   Plaintiff responds that the FBI improperly applied this exemption to records that "contain the FBI's final decision on how to deal with *The Wall Street Journal* and what comments will be made to the reporter [because] it failed to disclose the FBI's **internal emails** that contain the FBI's final decision on what would be said, etc."   (Doc. 114 at 14) (emphasis in original).   The FBI replies that all information withheld under Exemption 5 is pre-decisional.   (Doc. 120 at 12; Doc. 91-8; Doc. 92-8 at ¶¶ 56-60)).   Plaintiff has failed to rebut Defendant's showing that any document withheld under Exemption 5 was a final decision.   Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Exemption 5 on the WSJ Request.

### ii.      Exemptions 6 & 7(C)

The FBI asserts that it properly withheld information under 5 U.S.C. § 552(b)(6) ("Exemption 6")[15] and 5 U.S.C. § 552(b)(7)(C) ("Exemption 7(C)")[16] relating to the WSJ Request containing: (1) names and/or identifying information of FBI Special Agents and support employees who were responsible for investigative activities reported in the responsive documents; (2) the names of FBI support employees who were assigned to handle task related to stingray technology; and (3) names and/or identifying information of third parties who were merely mentioned in records responsive to plaintiffs' request.

The FBI asserts that the exemptions are necessary in protecting identifying information of FBI Special Agents and support employees who were responsible for investigative activities because publicity regarding any particular investigation "may

---

[14] Exemption 5 exempts "inter-agency or intro-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

[15] Exemption 6 exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

[16] Exemption 7(C) exempts "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

seriously prejudice their effectiveness in conducting other investigations" and subject them to "unnecessary, unofficial questioning as to the course of an investigation" because these individuals conduct searches and make arrests, which result in "serious disturbances to people and their lives," which can result in "an individual targeted by law enforcement to carry a grudge lasting years," and such a person "may seek revenge on agents and other federal employees involved in a particular investigation." (Doc. 92-8 at ¶ 66).

The FBI further asserts that the exemptions are necessary in protecting the names of FBI support employees who were assigned to handle tasks related to stingray technology because they could become the targets of harassing inquiries for unauthorized access to investigations if their identities were released." (*Id.* at ¶ 67). The FBI notes that it does disclose the names of the section chief "and above" and "certain supervisory positions," but withholds the names of other employees including agents and support personnel. (*Id.*).

Finally, the FBI asserts that the exemptions are necessary in protecting the "names and/or identifying information of third parties who were merely mentioned in records responsive to plaintiffs' request" because releasing information about private citizens "without notarized authorizations permitting such a release violates individuals['] legitimate privacy interests" and could subject those individuals to "possible harassment or criticism and focus derogatory inferences and suspicion on them." (*Id.* at ¶ 68).

Plaintiff does not mention or otherwise oppose the application of Exemptions 6 and 7(C). Although, Plaintiff states that he "contests all other FOIA exemptions claimed by Defendants which are not otherwise specifically addressed in this brief" (Doc. 114 at 16), this statement does not demonstrate a disputed issue of material fact necessary to prevent summary judgment in favor of Defendants. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Exemption 6 and 7(C) on the WSJ Request.

### iii.    Exemption 7(E)

The FBI asserts that it properly withheld information under 5 U.S.C. §

552(b)(7)(E) ("Exemption 7(E)")[17] relating to the WSJ Request containing (1) "the FBI's application and use of emerging cell phone location technology as a law enforcement technique and the procedures associated with employment of this technique" and (2) information "involving the identity of FBI sections that were involved in the investigation(s) at issue in this case [which] are found in the signature block of internal FBI emails."

The FBI asserts that withholding information regarding "the FBI's application and use of emerging cell phone location technology as a law enforcement technique and the procedures associated with employment of this technique" is necessary because the specific internal application, functioning, and procedural details of the technology are not commonly known and to "release this type of information could enable criminals to educate themselves about the techniques employed for the location and apprehension of individuals and, therefore, allow these individuals to avoid detection or develop countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law." (Doc. 92-8 at ¶ 72).

The FBI asserts that withholding information "involving the identity of FBI sections that were involved in the investigation(s) at issue in this case [which] are found in the signature block of internal FBI emails" is necessary to "protect methods and techniques involving the location and identity of FBI sections that were involved in the investigation(s) at issue in this case." (*Id.* at ¶ 73). The FBI further asserts that disclosure of this information would "reveal the targets, the physical areas of interest of investigation, and when taken together the other locations if identified, could establish a pattern or 'mosaic' that identification of a single location would not," which would

---

[17] Exemption 7(E) exempts "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

1    "allow hostile analysts to avoid or circumvent those locations especially if one or more

2    location[s] appeared with frequency or in a pattern."  (*Id.*).  The FBI asserts that this

3    would disrupt the investigative process and deprive the FBI of valuable information

4    because a subject could adjust behaviors and activities to avoid detection.  (*Id.*).

5         In response, Plaintiff argues that Exemption 7(E) should not be applied because

6    much of the information withheld by the FBI is already preserved in permanent public

7    records.[18]  Plaintiff argues that, even if some information is not routine and publicly

8    known, he is nonetheless entitled to some records containing information, which is the

9    same as the information contained in publicly preserved documents under the "public

10   domain exception."

11        With regard to the FBI's argument that it is necessary to protect the location and

12   identity of FBI sections, Plaintiff argues that the FBI already publicly advised potential

13   violent offenders that the FBI Criminal Investigative Division, Violent Crimes Unit, is in

14   possession of a number of StingRays.  Plaintiff argues that this shows that the FBI's

15   concern about tipping off criminals is frivolous.

16        Because the FBI has a "clear law enforcement mandate," it "need only establish a

17   'rational nexus' between enforcement of a federal law and the document for which [a law

18   enforcement] exemption is claimed."  *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803,

19   807 (9th Cir. 1995) (quoting *Church of Scientology v. Dep't of the Army*, 611 F.2d 738,

20   748 (9th Cir. 1979)).  "Exemption 7(E) only exempts investigative techniques not

21   generally known to the public."  *Id.* at 815.

22        The FBI has established a rational nexus between the enforcement of federal law

23   and withholding information on investigative techniques relating to the devices that are

24   not commonly known and its need to protect the sections involved in such investigations.

25        Accordingly, the Court will grant Defendants' Motion for Summary Judgment as

26   _____

27        [18] Plaintiff "incorporates by reference" arguments made with regard to Exemption
     7(E) as claimed in response to the Harris Request.  Because the Harris Request is
28   substantially different in content than the WSJ Request, it is unclear how exactly
     Plaintiff's arguments regarding the Harris Request apply to the WSJ Request.

to Exemption 7(E) on the WSJ Request.

### 2.      EOUSA Request

Defendants move for summary judgment on the adequacy of the search and the exemptions claimed as to the EOUSA Request.

### a.      Adequacy of the Search

Initially in responding to Plaintiff's EOUSA request, EOUSA stated that "it did not maintain records in a manner that would enable it to reasonably search for the records [Plaintiff] sought" and denied Plaintiff's request.  (Doc. 92-9 at ¶ 5).  EOUSA informed Plaintiff that it could provide him with records released to the ACLU in response to a request that "generally overlapped" with Plaintiff's request.  (*Id.*)  Plaintiff responded to EOUSA, through counsel, that he did not mean to seek all Department of Justice records, but just those of EOUSA and the specific offices identified in his request.  (*Id.* at 3, ¶ 6).  He also clarified that "other devices" meant those not manufactured by Harris and "related equipment" referred to related Harris equipment.  (*Id.*).

EOUSA then determined that it could search offices 1-5, but could not search 6 and 7 because they are not part of EOUSA.  (*Id.* at ¶ 9).  EOUSA further determined that it could only search for records in one category of the request, "as the other three categories are subjective, offering no basis for an objective search."  (*Id.*).

Because EOUSA's records are kept in a manner that manage cases and do not track the use of particular equipment, EOUSA asked representatives of offices 1-5 if they had responsive records and where such records would be stored.  (*Id.* at ¶ 10).  After receiving responses, EOUSA searched the emails of individuals that might contain responsive information using the terms provided by Plaintiff in his request.  (*Id.* at ¶¶ 11-13).  EOUSA also searched the agendas and minutes of meetings for the Attorney General's Advisory Committee.  (*Id.* at ¶ 14).  On March 13, 2014, EOUSA responded to Plaintiff and released 868 pages in part and withheld 50 pages.  (*Id.* at ¶ 25).

Plaintiff argues that the search was inadequate because: (1) the EOUSA failed to search the types of records in the places specified in the FOIA request; (2) the EOUSA

did not actually conduct a search for the records as it claims it did, but rather, sent Plaintiff records responsive to another FOIA request regarding GPS tracking devices; (3) the EOUSA ignored three of the four categories in the FOIA request letter and its' reasoning for doing so is frivolous because the EOUSA has previously responded to similarly-worded FOIA requests; and (4) the EOUSA ignored Plaintiff's request to search all United States Attorneys' Offices within California, Arizona, and New York.

In Reply, Defendants assert that EOUSA did search for the records responsive to Plaintiff's request as it claims it did. Defendants further assert that "[b]ecause plaintiff has exhausted his search time and received his free documents, his arguments that EOUSA must also search U.S. Attorney's Offices . . . fails." (Doc. 120 at 8).

With regard to Plaintiff's argument that EOUSA failed to search the types of records in the places specified in the FOIA request, EOUSA explained that "because its record keeping systems are generally set up to manage cases, and not track the use of particular equipment," it decided the best way to obtain a reasonable response to Plaintiff's requests was to ask representatives of offices whether such information might be stored and then searched those places. Defendant EOUSA conducted an adequate search for the types of documents requested by Plaintiff given the nature of its system and the nature of Plaintiff's request.

Moreover, Plaintiff's argument that EOUSA did not actually conduct a search for the records as it claims it did, but rather, sent Plaintiff records responsive to another FOIA request regarding GPS tracking devices is speculative and is contradicted by John Kornmeier's declaration.[19]

Plaintiff's argument that the EOUSA should have searched each category of requested documents also fails. The records Plaintiff sought in three of the four categories of his request were inherently subjective. For instance, Plaintiff sought all department records detailing "USAO polices . . . to have AUSAs and other attorneys seek

---

[19] John Kornmeier ("Kornmeier") is the attorney advisor for the Executive Officer for United States Attorneys, United States Department of Justice. (Doc. 92-9 at ¶ 1).

one or more court orders authorizing the use of pen registers . . . <u>while the true intention</u> <u>is to use Harris/portable/transportable wireless device locators.</u>"   (Doc. 92-9 at 10 (emphasis in original)).  In his Declaration, Kornmeier states "[t]hese requests with their subject notions of destroying evidence used to further an investigation; of the 'true intention' of an AUSA as opposed to what she may be representing to a court; and of concealing evidence from defendants and their attorneys imply malfeasance and as such are merely argumentative with no objective standard on which to base a search."  Doc. 92-9 at ¶ 18.  In light of the subjective nature of Plaintiff's requests, it is reasonable that EOUSA could not formulate a search that would be responsive to the requests.  Though EOUSA could perhaps have re-worded the requests to make them searchable, Plaintiff chose to word his requests in a certain way, and the agency receiving a FOIA request should not have to guess at the true meaning of such requests.  Indeed, a requester may object to such an undertaking by the agency.  Accordingly, it was reasonable for EOUSA to respond to that part of Plaintiff's EOUSA request to which it could form a responsive search.

With regard to Plaintiff's argument that EOUSA ignored Plaintiff's request to search all United States Attorneys' Offices within California, Arizona, and New York, Kornmeier explains that it did not attempt to search those offices because the case management system used by those USAOs, the Legal Information Office Network System ("LIONS"), tracks case-related information and would not yield information responsive to Plaintiff's requests.  However, the EOUSA does not explain why it did not follow the procedure that it followed with the offices from which it did seeks responsive records in attempting to determine whether the USAOs would have documents responsive to Plaintiff's requests.

EOUSA further argues that it did not search those offices because Plaintiff already received more than the two hours of search time and 100 pages of documents to which he is entitled.  This, in itself, does not justify the failure to fully respond to Plaintiff's request.  To the extent that EOUSA sought fees over $250 to complete the search,

EOUSA should have requested such fees from Plaintiff.  *See, e.g.*, *Lion Raisins*, 636 F. Supp. 2d at 1100 (in response to request requiring over $6,000 in fees, agency requested fees be paid prior to searching); *see also* 5 U.S.C. § 552(a)(4)(A)(v) ("No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.").

While the Court understands the Parties have disputed whether fee waiver is appropriate, there is no record at all of EOUSA even requesting additional fees to fulfill the remainder of Plaintiff's request.  Accordingly, EOUSA should have attempted to fulfill or seek fees from Plaintiff to fulfill Plaintiff's requests with respect to the USAOs.

Based on the foregoing, Defendants' Motion for Summary Judgment as to the adequacy of the search in response to the EOUSA request is granted in part and denied in part.

### b.   Exemptions Claimed

To explain the claimed exemptions for redactions relating to the EOUSA Request, Defendants submitted a Declaration of Kornmeier and two *Vaughn* indexes.  (Doc. 92-9).

### i.   Exemption 5

The EOUSA asserts that it properly withheld documents based on application of the deliberative process privilege and the work-product doctrine under Exemption 5. EOUSA asserts that it withheld materials, which largely consist of emails, draft memoranda, and comments on draft memoranda, which reflect internal, pre-decisional deliberations or were prepared in anticipation of litigation or both.

Plaintiff responds that "EOUSA's [reasoning behind its] claim of exemption (b)(5) . . . is entirely conclusory as shown by its *Vaughn* index."  Plaintiff does not explain how EOUSA's reasoning is conclusory and does not include any specific examples of such conclusory reasoning.

EOUSA has explained its reasoning for withholding certain documents and has provided detailed *Vaughn* indexes describing the particular exemption claimed for each redaction.   Plaintiff has failed to rebut Defendant's showing that any information

1   withheld under Exemption 5 was improper.   Accordingly, the Court will grant

2   Defendant's Motion for Summary Judgment as to Exemption 5 on the EOUSA Request.

3                                   **ii.       Exemption 6 and 7(C)**

4         EOUSA asserts that it properly withheld information under Exemptions 6 and

5   7(C) to protect the names and other personal information of individuals identified in

6   EOUSA's records.   Plaintiff does not mention or otherwise oppose the application of

7   Exemptions 6 and 7(C).   Although Plaintiff states that he "contests all other FOIA

8   exemptions claimed by Defendants which are not otherwise specifically addressed in this

9   brief" (Doc. 114 at 16), this statement does not demonstrate a disputed issue of material

10  fact necessary to prevent summary judgment in favor of Defendants.   Accordingly, the

11  Court will grant Defendants' Motion for Summary Judgment as to Exemption 6 and 7(C)

12  on the EOUSA Request.

13                                  **iii.      Exemption 7(E)**

14        The FBI asserts that it properly withheld information under Exemption 7(E) to

15  protect techniques and procedures for law enforcement investigations or procedures of

16  which disclosure could reasonably be expected to risk circumvention of the law.

17        In response, Plaintiff argues that while the "FBI at least attempted to justify an

18  application of exemption (b)(7)(E), EOUSA provides no basis whatsoever to support its

19  application."

20        Each time Exemption 7(E) was applied, the *Vaughn* index describes the

21  information withheld and states "[t]he guidance contains sensitive law enforcement

22  information about the use of technology and techniques for investigations and

23  prosecutions which Exemption (7)(E) of the FOIA protects to prevent circumvention of

24  the law."   EOUSA offers no reason as to how the disclosure "could reasonably be

25  expected to risk circumvention of the law."   5 U.S.C. § 552(b)(7)(E).   Accordingly,

26  EOUSA has not given the Court or Plaintiff enough information to determine whether it

27  properly withheld information pursuant to Exemption 7(E).   *See Lion Raisins v. U.S.*

28  *Dep't. of Agric.*, 354 F.3d 1072, 1082 (9th Cir. 2004) ("Ordinarily, the government must

submit detailed public affidavits identifying the documents withheld, the FOIA exemptions claimed, and a **particularized explanation** of why each document falls within the claimed exemption. . . . Because the court and the plaintiff do not have the opportunity to view the documents themselves, the submission must be 'detailed enough for the district court to make a *de novo* assessment of the government's claim of exemption.'" (emphasis added) (quotation omitted); *Wiener*, 943 F.2d at 978-79.

Accordingly, the Court will deny Defendants' Motion for Summary Judgment as to Exemption 7(E) on the EOUSA Request.

### 3.    Harris Request

#### a.    Adequacy of the Search

The FBI asserts that it was unaware of Plaintiff's Harris Request until this lawsuit was filed.  (Doc. 92-6 at ¶ 6).  The FBI opened the Harris Request on April 12, 2013.  *Id.* On May 1, 2013, the FBI sent Plaintiff a letter neither confirming nor denying the existence of records responsive to the Harris Request.  *Id.* at ¶ 7.  On September 25, 2013, the FBI sent Plaintiff a letter modifying its earlier response and stating that it had located 23,000 pages of responsive material subject to exemptions.  *Id.* at ¶ 8.  The 23,000 pages were identified in response to searches as follows: (1) a search in response to a FOIA request that sought documents including memoranda, training manuals, and e-mails regarding cell-site simulator devices (including those manufactured by Harris) from January 1, 2000 to November 8, 2011; in response, in May 2012, the FBI circulated an Electronic Communication to five FBI HQ divisions most likely to possess responsive records to perform a focused search and searched the CRS using an Automated Case Support application.  (Doc. 104-1 at ¶ 8); (2) a search in response to the EPIC request; in response, an Electronic Communication was sent to seven FBI HQ divisions or offices determined to possess potentially responsive material to the broad request.  (*Id.* at ¶ 9); and (3) in early June 2012, the FBI tasked an additional office to search for documents responsive to the EPIC request.  (*Id.* at ¶ 10).

The FBI advised Plaintiff that it had 4,377 pages of material responsive to his

request that was preprocessed for a similar FOIA request and if Plaintiff wanted those materials, he must submit $427.70 to receive a paper copy or $20 to receive the records on CD.  *Id.* The FBI further advised that "additional material consisting of approximately 11,000 pages [of the identified 23,000 pages] could be reviewed for responsive information but [Plaintiff] must first submit his commitment to pay the estimated fees." (*Id.* at ¶ 11; Doc. 92-6 at 47-48).

The similar FOIA request referred to in the FBI's September 25 letter was a request submitted by EPIC, which the FBI considered to be substantially similar to Plaintiff's request.  *Id.* at ¶ 9.  EPIC's request sought "agency records concerning cell site simulator and other cell phone tracking technologies deployed by the FBI to covertly locate, target, and track targets of interest."  *Id.*  For the EPIC request, the FBI reviewed a total of 22,982 pages, producing a total of 4,377 pages in whole or in part and withholding 18,605 in full.  *Id.*  The FBI prepared a draft *Vaughn* index for a sample of 500 pages selected by EPIC.  *Id.*  On October 21, 2013, Plaintiff responded to the FBI's letter stating that the terms were unacceptable and claimed that he was entitled to a fee waiver.  *Id.* at ¶ 12.

On December 10, 2013, Counsel for the FBI spoke with Plaintiff and agreed to provide him with a copy of the 500 pages that had been reviewed as a sample set in the EPIC litigation with a copy of the draft *Vaughn* index.  *Id.* at ¶ 13.  Those documents were provided to Plaintiff on December 13, 2013.  *Id.*  Plaintiff requested a new, revised *Vaughn* index that would include the FBI's withholdings under Exemptions 1, 3, 4, 5, 6, 7(C), and 7(E).  *Id.* at ¶ 13.  On January 14, 2014, the FBI provided Plaintiff with a copy of the 4,377 pages that the FBI previously provided to EPIC in response to the similar FOIA request.  *Id.* at ¶ 14.

Plaintiff argues that the search was inadequate because the FBI failed to search for text messages within its Blackberry Enterprise Servers and failed to search for emails within its email servers.  Accordingly, Plaintiff argues that the FBI should have to perform keywords searches of its text message and email archive servers.  Plaintiff

further argues that the FBI did not search for the "other records types" named by Plaintiff or in the record systems specifically named by Plaintiff.  Plaintiff additionally argues that the FBI failed to search for two specified categories of documents, namely: "all agency records detailing the FBI's policies, practices, and procedures to destroy real-time wireless device location data obtained by the Harris portable/transportable wireless device locators . . . ." and "all agency records detailing the FBI's policies practices, and procedures to conceal from defendants and their attorneys in criminal cases the fact that the FBI use the Harris portable/transportable wireless device locators."  Plaintiff argues that the other FOIA searches that the FBI used to fulfill his FOIA request did not request these categories of information and were thus insufficient to satisfy his search.

With regard to Plaintiff's argument that two categories of his request were not searched, the FBI argues that the request for records detailing policies to conceal the use of portable/transportable wireless device locators in criminal cases is a subjective request and, thus, is not appropriate under FOIA.  As noted above in the discussion of the EOUSA request, the Court agrees that in light of the subjective nature of Plaintiff's requests, it is reasonable that FBI could not formulate a search that would be responsive to the requests.

The FBI further argues that the searches Plaintiff requested would have been subsumed within the broad searches the FBI conducted.  The Court agrees.  The FBI conducted searches for "copies of all documents and communication-including legal opinions, memoranda, briefs, training manuals, emails-related to 'cell site simulators,' 'IMSI catchers,' 'digital analyzers, 'TriggerFish,' 'StingRay'" and "all documents concerning procedural requirements or guidelines for the use of the StingRay device or other cell site simulator technologies (e.g. configuration, data retention, data deletion." Based on the breadth of these prior searches, it was reasonable for the FBI to use those searches to satisfy Plaintiff's requests.

With regard to Plaintiff's argument that the FBI did not search "text messages and emails and the other records types" and record systems named by Plaintiff, the FBI

1  makes no argument that it would be difficult or overly burdensome to search its email or

2  text archives and provides no explanation for its failure to do so.  Although the FBI

3  implies that a search for more than thirty types of records in more than 20 locations

4  would be overly burdensome and argues that FOIA does not require a search in every

5  conceivable area where responsive records might be found, the FBI provides no

6  information as to the difficulty of such searches, that such searches would be cumulative

7  or unnecessary, why such searches are not commonly done, or any other information that

8  would allow the Court to conclude that its search was reasonably calculated to uncover

9  all relevant documents.

10      Accordingly, the Court will grant in part and deny in part Defendants' Motion for

11  Summary Judgment on the adequacy of the Harris/EPIC search as set forth herein.

12                      **b.      Exemptions Claimed**

13      The Parties initially agreed to a disclosure of sample documents with a *Vaughn*

14  index for 500 pages of documents responsive to that request and that the Court's

15  determination on the exemptions claimed within that sample would guide them in

16  determining whether further disclosures are necessary.  Plaintiff now disputes the

17  agreement on the grounds that the FBI only provided him a 321 page sample, which is

18  inadequate for him to properly dispute the claimed exemptions.  In Reply, the FBI argues

19  that it provided Plaintiff with a *Vaughn* index for the 500 page sample and the reason

20  Plaintiff only received 321 pages is that the remainder of the sample described in the

21  *Vaughn* index reflects documents that were withheld in full.  Defendant FBI asserts that

22  the sample is representative and the Court should use it as a sample of all of the

23  exemptions the FBI is claiming, even though Plaintiff no longer agrees.  Despite

24  Plaintiff's argument to the contrary, there is no reason that the Court's rulings on the

25  sample exemptions provided cannot be used to guide the Parties in determining whether

26  further disclosures are necessary.

27      To explain the claimed exemptions for redactions relating to the sample response

28  to the Harris Request, Defendants have submitted a Declaration from Hardy.  (Doc. 92-

6).[20]

### i.        Exemptions 6 and 7(C)

Plaintiff has agreed not to challenge Exemptions 6 and 7(C) unless there were sections of a personnel file discussing an agent's training and experience in using portable/transportable wireless device locators and related equipment.  Doc. 92-6. at 6 n.5.  The FBI avers that there are no files discussing an agent's training and experience.  *Id.*  Accordingly, there is no dispute as to Exemptions 6 and 7(C) and the Court will grant Defendants' Motion for Summary Judgment as to Exemptions 6 and 7(C).

### ii.        Exemption 1

The FBI asserts that it properly withheld information relating to the Harris Request relating to intelligence activities, sources, and methods; foreign relations or foreign activities; and vulnerabilities or capabilities of systems relating to national security protected under 5 U.S.C. §552(b)(1) ("Exemption 1").

Exemption 1 exempts information "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C.A. § 552(b)(1).  Executive Order 13,526 applies to Exemption 1 and provides, in relevant part,

> (a) Information may be originally classified under the terms of this order only if all of the following conditions are met:
>
> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

---

[20] The Court is unable to locate a copy of the *Vaughn* index in the Record. Accordingly, the Court has based its decisions solely on the Declaration of David Hardy (Doc. 92-6).

1
2
3
4
5

> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

6   Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).   Information may be

7   classified "Top Secret," "Secret," or "Confidential." *Id.* "'Secret' shall be applied to

8   information, the unauthorized disclosure of which reasonably could be expected to cause

9   serious damage to the national security that the original classification authority is able to

10  identify or describe." *Id.* at 707-708.

11       Hardy avers that he is an original classification authority and he has withheld

12  information under Exemption 1 that is marked at the "Secret" level. Hardy avers that he

13  determined that the withheld information involves: intelligence activities; intelligence

14  sources, or methods, or cryptology; foreign relations or foreign activities of the United

15  States, including confidential sources; and vulnerabilities or capabilities of systems,

16  installations, infrastructures, projects, plans or protection service relating to national

17  security including defense against transnational terrorism, as the unauthorized disclosure

18  of the information could reasonably be expected to cause serious damage to national

19  security. Doc. 92-6 at ¶¶ 2, 23. Hardy describes in detail the reasons for withholding

20  such information. *Id.* at ¶¶ 24-34.

21       Plaintiff argues that the information was improperly withheld under Exemption 1

22  because the FBI is attempting to hide violations of international law and Hardy failed to

23  establish that he received the proper training to continue to exercise his duties as an

24  original classification officer.[21]

25  _____

26       [21] Executive Order 13,526 provides (d):

27
28       All original classification authorities must receive training in proper classification (including the avoidance of over-classification) and declassification as provided in this order

- 48 -

Plaintiff's speculation that the FBI is asserting Exemption 1 in an attempt to hide violations of international law is speculative and conclusory.   Likewise, Plaintiff's speculation that Hardy has not received the proper classification training is speculative and contradicts Hardy's averments that he has original classification authority. Accordingly, Plaintiff has failed to establish a disputed issue of material fact with respect to Exemption 1 and the Court will grant Defendants' Motion for Summary Judgment as to Exemption 1 on the Harris Request.

### iii.   Exemption 3

The FBI asserts that it properly withheld information relating to the Harris Request relating to intelligence sources and methods the National Security Act of 1947, which is protected under 5 U.S.C. §552(b)(3) ("Exemption 3").[22]   The National Security Act of 1947 provides, in relevant part, that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."   50 U.S.C. § 3024(i)(1). Hardy avers that the Director of National Intelligence reviewed the information exempted

---

and its implementing directives at least once a calendar year. . . .Original classification authorities who do not receive such mandatory training at least once within a calendar year shall have their classification authority suspended by the agency head or the senior agency official designated under section 5.4(d) of this order until such training has taken place.

Exec. Order No. 13,526, 75 Fed.Reg. at 709.

[22] Exemption 3 exempts information:

specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

**(A)(i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

**(ii)** establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

**(B)** if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C.A. § 552(b)(3).

1   under Exemption 3 and approved the FBI's assertion of this statutory authority to

2   withhold intelligence sources and method information.  (Doc. 92-6 at ¶ 37).

3       Plaintiff argues that Exemption 3 was improperly applied because the FBI fails to

4   explain how any given document contains intelligence sources and method information.

5   The FBI has adequately explained its application of Exemption 3.   Accordingly, the

6   Court will grant Defendants' Motion for Summary Judgment as to Exemption 3 on the

7   Harris Request.

8                              **iv.    Exemption 4**

9       The FBI asserts that it properly withheld information relating to the Harris Request

10  reflecting the identifies of telecommunications companies, wireless products group, cell

11  phone tracking devices, and satellite systems that had provided information to the FBI as

12  part of its national security and criminal investigations, which is protected under 5 U.S.C.

13  §552(b)(4) ("Exemption 4").[23]   Hardy avers that the disclosure of this commercial

14  information would impair the government's ability to obtain necessary information in the

15  future and could cause substantial harm to the competitive position of the person from

16  whom the information was obtained.  (Doc. 92-6 at ¶ 40).

17      Plaintiff argues that the FBI is relying on Exemption 4 to hide violations of the

18  law and FBI policy.  Again, Plaintiff's speculation that the FBI is asserting Exemption 4

19  in an attempt to hide violations of the law and FBI policy is speculative and conclusory.

20  Accordingly, Plaintiff has failed to establish a disputed issue of material fact with respect

21  to Exemption 4 and the Court will grant Defendants' Motion for Summary Judgment as

22  to Exemption 4 on the Harris Request.

23                              **v.    Exemption 5**

24      The FBI asserts that it properly withheld information relating to the Harris Request

25  subject to the attorney-client privilege and the deliberative process privilege, which is

26

27      [23] Exemption 4 exempts information regarding "trade secrets and commercial or
financial information obtained from a person and privileged or confidential."  5 U.S.C. §
28  552(b)(4).

protected under Exemption 5.  Hardy explains the information withheld and the privilege applied in his Declaration.  (Doc. 92-6 at ¶¶ 43-66).

Plaintiff does not mention or otherwise opposed the application of Exemption 5. Although Plaintiff states that he "contests all other FOIA exemptions claimed by Defendants which are not otherwise specifically addressed in this brief," (Doc. 114 at 15), this statement does not demonstrate a disputed issue of material fact necessary to prevent summary judgment in favor of Defendants.  Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Exemption 5 on the Harris Request.

### vi.     Exemption 7(E)

The FBI asserts that it properly withheld information under Exemption 7(E) relating to the Harris Request containing (1) information related to the application of cell-site simulator technology as a law enforcement technique and its associated procedures; and (2) secure FBI e-mail addresses, faxes, telephone numbers and building/office locations where the devices are developed and tested.

As to the first category, the FBI asserts that it withheld information including: (1) the development of the technology as a law enforcement tool; (2) the facts and circumstances relating to the employment or contemplated use of this technique; (3) procedural matters associated with the use of this technique; (4) technical specifications; (5) specific types of products that are utilized or may be utilized in the future; (5) sensitive terms and definitions specific to the FBI relating to the application of these devices in collecting data in current and/or potential future investigations; and (6) information that would expose the scope, direction, level of cooperation, and expertise related to the cell-site technology techniques and procedures.  (Doc. 92-6 at ¶ 73).  Hardy asserts that "disclosure would provide a virtual playbook for criminal elements and terrorists on how to identify, avoid, or evade detection efforts related to the use of this technology." *Id.*

As to the second category, the FBI asserts that its internal e-mail addresses, faxes, phone numbers, and sensitive building/office locations relate to the internal practices of

the FBI as they are utilized by FBI personnel during the performance of their jobs and disclosure of the information could subject the individuals to hackers and unauthorized users, who could disrupt official business and compromise the effectiveness of the computer system. *Id.* at ¶ 74.

In Response, Plaintiff asserts that the FBI improperly relies on Exemption 7(E) to withhold user manuals and other technical information relating to "cell phone spying equipment manufactured by Harris" because detailed technical information about the Harris devices is generally known the public and much of the information is already preserved in the public records.

The FBI properly withheld information relating to its internal e-mail addresses, faxes, phone numbers, and sensitive building/office locations because it has established a rational nexus between its enforcement function and the information being withheld.

With regard to the remainder of the information being withheld under Exemption 7(E), the Court does not have adequate information from the Declaration of Hardy about the documents withheld and the information withheld in particular documents.  Because the FBI has not provided the Court with a particularized explanation of why each document falls within the claimed exemption, the FBI has failed to establish a rational nexus between its law enforcement function and the information being withheld.

Accordingly, the Court will deny in part and grant in part Defendants' Motion for Summary Judgment as to Exemption 7(E) on the Harris Request.

## E.    Expedited Processing

Plaintiff moves for summary judgment on his claim that he was and still is entitled to expedited processing of his FOIA requests and that the FBI acted arbitrarily and capriciously in denying him expediting processing.  Plaintiff asserts that he was entitled to expedited processing under 5 U.S.C. §552(a)(6)(E)(i) because he demonstrated a compelling need for the documents.

The term "compelling need" means--

**(I)** that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

**(II)** with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

5 U.S.C.A. § 552 (a)(6)(E)(iv).  In his FOIA requests, Plaintiff failed to demonstrate a compelling need within the meaning of the statute and has failed to demonstrate that the FBI acted arbitrarily and capriciously in denying him expediting processing. Accordingly, Plaintiff's Motion for Summary Judgment on the issue of expedited processing is denied.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to the Parties' motions for summary judgment (Doc. 84, 91).

(2)    Plaintiff's Motion for Partial Summary Judgment (Doc. 84) **is granted in part and denied in part** as follows:  Plaintiff's Motion for Partial Summary Judgment is **granted** as to the issue of waiver of search fees for the Harris and EOUSA requests and is **denied** in all other respects.

(3)    Defendants' Cross-Motion for Summary Judgment (Doc. 91) **is granted in part and denied in part** as follows:  Defendants' Motion for Summary Judgment is **granted** as to fee waiver pursuant to 5 U.S.C. §§ 552(a)(4)(A)(iii); Defendants' Motion for Summary Judgment is **granted** on the issue of waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(viii); Defendants' Motion for Summary Judgment is **granted** on the issue of records in native digital format; Defendants' Motion for Summary Judgment is **granted** on the issue of metadata; Defendants' Motion for Summary Judgment is **granted in part and denied in part** as set forth herein on the issue of the adequacy of the WSJ search; Defendants' Motion for Summary Judgment is **granted** as to Exemptions 5, 6, 7(C), and 7(E) on the WSJ Request; Defendants' Motion for Summary

Judgment is **granted in part and denied in part** as set forth herein as to the adequacy of the search in response to the EOUSA Request; Defendants' Motion for Summary Judgment is **granted** as to Exemptions 5, 6, and 7(C) on the EOUSA Request; Defendants' Motion for Summary Judgment is **denied** as to Exemption 7(E) on the EOUSA Request; Defendants' Motion for Summary Judgment **is granted in part and denied in part** as set forth herein as to the adequacy of the search in response to the Harris Request; Defendants' Motion for Summary Judgment is **granted** as to Exemptions 1, 3, 4, 5, 6, and 7(C) on the Harris Request; Defendants' Motion for Summary Judgment is **granted** in part and **denied** in part as to Exemption 7(E) of the Harris Request; Defendants' Motion for Summary Judgment is **denied in all other respects.**

(4)     Because this Order does not resolve all of the issues in this FOIA action, **the parties shall**:

(a)     confer and attempt to resolve the outstanding issues in this case in light of the Court's rulings;

(b)     if the Parties cannot resolve all issues, the Parties shall determine what issues remain outstanding;

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

1            (c)    **on or before December 15, 2014, t**he Parties shall file a joint status

2    report numerically listing each issue that remains outstanding (if either party argues that a

3    particular issue listed by the other party is not outstanding, the objecting party shall note

4    his position on that issue in the status report).  After listing the issues, the parties shall

5    advise the Court how they propose to proceed to the resolution of this case.  If the parties

6    propose another round of summary judgment motions, they must include a proposed

7    deadline for filing such motions in the status report.  Such status report **shall not** be used

8    to re-argue or ask the Court to reconsider any of the issues decided in this Order.

9            Dated this 14th day of November, 2014.

Douglas L. Rayes
United States District Judge