1  Daniel David Rigmaiden
2  530 E McDowell Rd Ste 107-214
   Phoenix, AZ 85004
   Email: freedan@safe-mail.net
3

4  Daniel David Rigmaiden,
   Pro Se, Plaintiff
5

6            **UNITED STATES DISTRICT COURT**
             **DISTRICT OF ARIZONA**
7

8  Daniel David Rigmaiden,              Civil Action No.:

9        Plaintiff,                     CV12-01605-PHX-DLR

   v.                                   PLAINTIFF'S RESPONSE TO
10                                       DEFENDANTS' SECOND MOTION FOR
   Federal Bureau of Investigation, et al.  SUMMARY JUDGMENT
11       Defendant.

12        Plaintiff, Daniel David Rigmaiden, appearing *pro se*, respectfully submits *Plaintiff's*

13  *Response to Defendants' Second Motion for Summary Judgment*.  The facts in support of

14  Plaintiff's response are contained in *Plaintiff's Controverting Statement of Facts, Objection to*

15  *the Admission of Evidence, and Statement of Additional Undisputed Material Facts in*

16  *Support of Response to Defendant's Second Motion for Summary Judgment*.  Hereafter

17  "Controverting Facts," "Objections to Evidence," and "Additional Undisputed Facts," each of

18  which has its own section and numbered paragraph sets in the noted document.

19            ***MEMORANDUM OF POINTS AND AUTHORITIES***

20  **I.    ARGUMENT**

21        **A.  Plaintiff has paid the FBI's full $555.00 extortion fee in relation to
              the 37 CDs worth of data that should have been provided on 3 CDs
22            for $45.**

23        Defendant FBI argues that Plaintiff's case should be dismissed because "plaintiff has

24  failed to pay standard duplication fees to the FBI, and is now delinquent in the amount of

25  $450.  Accordingly, he has failed to exhaust his administrative remedies, depriving this Court

26  of jurisdiction over his claims relating to the Harris request." Dkt. #137, p. 5.  This argument

27  holds no merit considering Plaintiff has paid the FBI's full extortion amount under duress.

28  *See Controverting Facts*, ¶ 27 and *Additional Undisputed Facts*, ¶ 72 (citing declaration

                                    - 1 -

1 | ATTACHMENT 32 [copy of $450 money order sent to the FBI]) and ¶ 71.

2 |     Plaintiff never agreed to pay the FBI $555.00 ($545.00 actual due to a $10 credit) when he

3 | filed his notice of intent to pay the FBI's standard FOIA duplication fees on January 13, 2015.

4 | *See* Dkt. #128.  On January 12, 2015, the Court ordered that "within 90 days of Plaintiff's Notice

5 | [to pay standard duplication fees], Defendants shall provide Plaintiff with all documents

6 | responsive to the [FOIA] searches[.]"  *Id.*, Dkt. #127, pp. 5-6.  Therefore, the FBI had three

7 | months to provide Plaintiff with documents while he paid the standard duplication fees.  These

8 | documents were supposed to have been provided on one CD per month at $15.00 each, which is

9 | the standard manner in which the FBI fulfills FOIA requests according the FBI's counsel.  *See*

10 | *Controverting Facts*, ¶ 59-61.

11 |     Instead of sending Plaintiff one CD per month at $15.00 each over the 3-month period

12 | ordered by the Court, the FBI sent Plaintiff a first letter containing seven (7) CDs at $15.00 per

13 | CD for a total of $105.00; a second letter containing eleven (11) CDs at $15.00 per CD for a total

14 | of $165.00; and then a box containing nineteen (19) CDs for a total of $285.00.  *See id.*, ¶ 62.

15 | The grand total came to $555.00 for 37 CDs ($545 actual, due to a $10.00 credit).  *See id*.  A

16 | standard CD has a data capacity of 700 megabytes.  *See id.*, ¶ 63.  However, none of the 37 CDs

17 | billed to Plaintiff at $15.00 each were filled anywhere near the 700 megabyte capacity of a

18 | standard CD.  *See id.*, ¶ 64-69.  Each set of CDs contained data that **could have fit on a single**

19 | **CD**, for a total of three CDs mailed to Plaintiff over the three month period for $45.00.  *See id*.

20 |     The FBI's duplication fee scheme targeted at Plaintiff, which involved needlessly

21 | spreading data across 37 CDs while it could have fit on one CD per month, is plainly

22 | unreasonable.  The FBI's own website contained, at that time, "*A Guide to Conducting Research*

23 | *in FBI* Records" stating that "[s]ome files—like the John Dillinger investigation or the Julius and

24 | Ethel Rosenberg case—may take up many discs, but **most releases fit on a single disc**."  *See id.*,

25 | ¶ 74.  This statement reflects the FBI's practice of providing documents on a single CD if they fit

26 | on a singe CD—as they did here.  Additionally, the FBI's counsel advised Plaintiff that the FBI

27 | provides one CD per month and Plaintiff advised the FBI's counsel that "[he] will pay for the

28 | DVDs/CDs one at time."  *See id.*, ¶ 59-60.

1    Had Plaintiff known the FBI's counsel was wrong about the FBI providing one CD per
2    month, and that the FBI was going to needlessly inflate the duplication fees to $555.00, Plaintiff
3    would have raised the issue with the Court before the FBI began processing the records.  Plaintiff
4    could not and cannot afford a $555.00 duplication fee.  Plaintiff used his rent money to pay the
5    FBI's unannounced and inflated $555.00 FOIA duplication fee and later used his monthly food
6    money to pay his rent.

7        Defendant FBI incorrectly claims that "when the parties subsequently filed a status report
8    in December, 2014, plaintiff attempted to challenge the amount of th[e] [$555.00] duplication
9    fees[]" and that the "Court rejected that gambit as 'inappropriate.'" Dkt. #137, pp. 5-6.  Contrary
10   to the FBI's misleading claim, Plaintiff asked the Court to require the FBI to charge the going
11   market rate CDs, *i.e.*, "$0.202 (twenty cents) per CD and $0.1998 (twenty cents) per DVD[,]"
12   Dkt. #126, p. 11, rather than the FBI's current price of $15.00.  In response, the Court ruled that
13   "Plaintiff's request for the Court to set different duplication fees and deviate from the regulatory
14   scheme in place for charging such fees is denied." Dkt. #127, p. 5.  Therefore, when Plaintiff
15   filed his notice to pay the standard duplication fees, *see* Dkt. #128, he was agreeing to the FBI
16   providing one CD per month at $15.00 each, as explained by the FBI's counsel via email.  *See*
17   *Additional Undisputed Facts*, ¶ 59-60.

18       Defendant FBI also claims that "the FBI's IRP has recently been upheld after a direct
19   challenge in another district court." Dkt. #137, p. 6 (citing Nat'l Security Counselors v. Dep't of
20   Justice, ___ F. Supp. 3d ___, 2015 WL 674289 (D.D.C. Feb. 18, 2015), appeal docketed, No. 15-
21   5117 (D.C. Cir. Apr. 28, 2015)).  But the case cited by the FBI only helps Plaintiff's position.  The
22   plaintiff in the cited case did not want to receive one CD per month billed at $15.00.  *See id*.  In
23   the instant case, Plaintiff expected one CD per month billed at $15.00—which the FBI clearly
24   admits is its policy—but the FBI decided to not follow this policy and instead extorted money
25   from Plaintiff by providing numerous CDs worth of data while the data could have fit on one CD
26   per month.

27       In any event, because Plaintiff has paid the full extortion amount, the FBI has no argument
28   in support of dismissal for lack of jurisdiction.  Plaintiff is challenging the FBI's failure to follow

1   its own public guide on FOIA requests, the fees explained to Plaintiff by the FBI's counsel, and

2   relevant FOIA law requiring that fees be reasonable in his own motion for summary judgment

3   currently pending before the Court.  *See* Dkt. #136.

**B.   The FBI failed to justify why it refuses to search for the record types and within the record system specified by Plaintiff in his Harris FOIA request letter.**

6   With regard to Defendant FBI's failure to conduct a proper search, the Court

7   previously found as follows:

> "With regard to Plaintiff's argument that the FBI did not search 'text messages and emails and the other records types' and record systems named by Plaintiff, **the FBI makes no argument that it would be difficult or overly burdensome to search its email or text archives** and provides no explanation for its failure to do so.  Although the FBI implies that a search for more than thirty types of records in more than 20 locations would be overly burdensome and argues that FOIA does not require a search in every conceivable area where responsive records might be found, **the FBI provides no information as to the difficulty of such searches, that such searches would be cumulative or unnecessary, why such searches are not commonly done,** or any other information that would allow the Court to conclude that its search was reasonably calculated to uncover all relevant documents."

15   Dkt. #122, pp. 45-46 (emphasis added).

16   In its attempts to alleviate the Court's concerns at Dkt. #137, the FBI merely repeats

17   the boilerplate "overly burdensome" and "cumulative or unnecessary," and even goes so far

18   as to claim that "[t]he FBI would not even know where else to search."  Dkt. #137-1, p. 6.

19   For starters, Plaintiff explained to the FBI exactly where to search via his original FOIA

20   request letters.  *See Controverting Facts*, ¶ 10.  In the FBI's new declaration at Dkt. #137-1, it

21   made no attempt to explain why the searches requested by Plaintiff in relation to the Harris

22   FOIA request would be difficult, overly burdensome, cumulative, unnecessary, or not

23   commonly done.

24   Rather than provide additional information to the Court regarding the FBI's failure to

25   search the 21 search locations and 33 record types, Defendant FBI's declaration instead points

26   back to the first FBI declaration the Court found to be insufficient.  *See* Dkt. #137-1, ¶ 15

27   ("As stated in ¶¶ 9-10 of the 'Hardy Declaration Regarding Adequacy of Search for the Harris

28   Corp. Request' [Dkt. #097-1]... [t]he three-pronged search methodology was a significant

1   search undertaking by the FBI.").  The Court already rejected Hardy's declaration at Dkt.

2   #097-1 as a basis to conclude that the FBI was justified in failing to search as Plaintiff

3   requested.  *See* Dkt. #122,  pp. 45-46.  The Court asked the FBI for new information.

4        The only new information provided in the FBI's recent declaration in relation to the

5   Harris FOIA request is a "*see also*" that points back to an earlier portion of the declaration

6   explaining why the FBI's email archives were not searched in relation to the WSJ FOIA

7   request:

8        "Although plaintiff requested more than 20 different storage devices/systems be
         searched, *See* ¶¶ 11-14, *supra*., for an explanation as to why further searches for
9        responsive records would be cumulative, redundant, and unduly burdensome."

10       Dkt. #137-1, ¶ 15.

11

12       However, "¶¶ 11-14, *supra*" merely details the FBI's attempt to explain why emails not

13  found in the FBI's Central Record System (CRS) in relation to the WSJ FOIA request would

14  also not be located in the FBI's "email archives."  *See id.*, ¶¶ 11-14.  With respect to emails in

15  general, the FBI claimed that the search of the CRS "fail[ing] to locate or point to any

16  additional emails; underscores the lack of necessity to conduct searches of 'archived email.'"

17  *Id.*, ¶ 11.  But this is a false conclusion.

18       In the FBI's prior declaration, Hardy explained that "[t]he index [(CRS)]... does not

19  typically contain terms that one would use in a more generalized search, such as a search for

20  'cell site simulator' devices or technologies."  Dkt. #097-1, ¶  6.  In other words, the FBI's

21  recent attempt to reference the WSJ FOIA request search (explained in ¶¶ 11-14 of Dkt. #137-

22  1) as a means to justify why it failed to search the 21 search locations for 33 record types in

23  relation to the Harris FOIA request does not stand up to close scrutiny.  The FBI has failed to

24  meet its burden and must conduct the searches as specified by Plaintiff.

25       The FBI also claimed that records responsive to the Harris FOIA request, "is

26  reasonably likely to be located within the FBI's CRS or by Electronic Communication ('EC')

27  sent directly to the FBI divisions and offices most likely to possess responsive records...

28  There are no other record systems within the FBI reasonably containing the requested

1  information." Dkt. #137-1, ¶ 16.  This is also untrue.  As noted above, the FBI's prior

2  declaration at Dkt. #097-1 makes clear that searching the CRS is insufficient for the Harris

3  FOIA request.  Additionally, merely making reference to the "Electronic Communications"

4  sent to FBI divisions is the same attempted justification rejected by the Court when the FBI

5  made its failed argument the first time.  *See* Dkt. #122, pp. 45-46.

6        The FBI also claimed that "[t]here are no other record systems within the FBI

7  reasonably containing the requested information."  Dkt. #137-1, ¶ 16.  This is also untrue.

8  While Plaintiff defended himself in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC

9  (D.Ariz.), Defendant FBI provided Plaintiff with copies of text messages sent to/from FBI

10  agents while they used cell site simulator based portable/transportable wireless device

11  locators to locate Plaintiff's aircard in his Santa Clara, CA, apartment in 2008.  *See Additional*

12  *Undisputed Facts*, ¶¶ 54-57.  This is clear evidence that records of this type exist in "other

13  record systems within the FBI."  In his original FOIA request letters sent to Defendant FBI,

14  Plaintiff requested "text messages" stored in "text messaging systems."  *See* Dkt. #001-2, p.

15  4-6.  The FBI has failed to provide any SMS text message records in response to the Harris

16  FOIA request.  *See id.*, ¶ 57.

17        Finally, nowhere in the declaration at Dkt. #137-1 does the FBI state that all the

18  categories of data requested by Plaintiff, or even merely all FBI emails, are loaded into the

19  CRS.  *See* Dkt. #137-1.  The FBI only claims that some emails are added to the CRS with no

20  statistics on the percentage that are added and not added.  *See id*.  The FBI has failed to meet

21  its burden.

22        **C.    The FBI failed to justify why it refuses to search for the record types**
          **and within the record system specified by Plaintiff in his WSJ FOIA**
23        **request letter.**

24        In relation to the WSJ FOIA request, the FBI claims "[t]here is no rhyme or reason to

25  plaintiff's lists.  For example, it would be absurd to require the FBI to search for records

26  regarding communications with a newspaper reporter by sifting through purchase receipts

27  located on cartridges (to the extent such documents and systems even exist)."  Dkt. #137, p. 4.

28  If a particular system does not exist, the FBI should have stated it in its declaration at Dkt.

1  #137-1.  The FBI has provided inadequate information for one to determine whether the

2  searches specified by Plaintiff will be difficult, overly burdensome, cumulative, unnecessary,

3  or not commonly done.  Mere speculation by the FBI's counsel on one of the 21 search

4  locations is not sufficient for the FBI to meet its burden and it must conduct the searches as

5  specified by Plaintiff.

6         Furthermore, nowhere in the declaration at Dkt. #137-1 does the FBI state that all the

7  categories of data requested by Plaintiff, or even merely all FBI emails, are loaded into the

8  CRS.  *See* Dkt. #137-1.  The FBI only claims that some emails are added to the CRS with no

9  statistics on the percentage that are added and not added.  *See id*.  The FBI has failed to meet

10  its burden.

11                    **D.    The FBI is required to conduct the specific searches requested by**
                         **Plaintiff because FOIA law allows for agencies to bill FOIA**
12                         **requesters for the labor of conducting the search.**

13         If a FOIA requester asks for records contained at a specific location, database, or

14  repository, the agency must conduct the search.  FOIA provides for agencies to charge search

15  fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III) ("fees shall be limited to

16  reasonable standard charges for document search...").  The Court previously found that the

17  FBI violated FOIA law and therefore cannot charge Plaintiff search fees.  *See* Dkt. #122, p. 21

18  ("Accordingly, unusual circumstances did not exist and, thus, Defendants' untimely responses

19  to Plaintiff's Harris... requests did constitute waiver of search fees under 5 U.S.C. § 552(a)(4)

20  (A)(viii)").

21         If the FBI could still charge Plaintiff search fees, it would simply calculate the cost of

22  the searches and send Plaintiff an invoice.  Because the FBI can no longer bill Plaintiff for

23  searches, it now seeks alternative means to avoid having to comply with FOIA law.  Congress

24  allows for judges to waive search fees in instances of government agencies abusing the FOIA

25  process.  It is a form of punishment designed to deter agencies from engaging in future abuse.

26  The FBI is now attempting to get out of its punishment by falsely claiming that the searches

27  requested by Plaintiff will not turn up the records he seeks.

28

1

**E.    The FBI failed to meet its burden under exemption (b)(7)(E) on the Harris FOIA request.**

2      In the first round of summary judgment, the Court addressed Defendant FBI's

3  Exemption (b)(7)(E) claim and found that it "does not have adequate information from the

4  Declaration of Hardy about the documents withheld and the information withheld in

5  particular documents.  Because the FBI has not provided the Court with a **particularized**

6  **explanation of why each document falls within the claimed exemption**, the FBI has failed

7  to establish a rational nexus between its law enforcement function and the information being

8  withheld."  Dkt. #122, p. 52 (emphasis added).

9      In its new declaration at Dkt. #137-1, the FBI still fails to provide a particularized

10  explanation of why each document falls within exemption (b)(7)(E).  Rather than explain the

11  information withheld, the FBI created a chart and tagged each document under a generic

12  description.  *See* Dkt. #137-1, ¶ 22.  For example, numerous documents are labeled as

13  "Operator Manual/User Guide."  *Id*.  However, this provides no additional useful information.

14  It was already known to both Plaintiff and the Court that the FBI was withholding user

15  manuals when the Court denied Defendant FBI summary judgment the first time:

16
17
> "In Response, Plaintiff asserts that the FBI improperly relies on Exemption 7(E) to withhold user manuals and other technical information relating to 'cell phone spying equipment manufactured by Harris[.]'"

18
> Dkt. #122, p. 52.

19

20      The FBI claims it cannot comply with the Court's request for additional information

21  because "the FBI has determined it cannot provide more specific detail about the withheld

22  documents themselves without divulging exempt information pertaining to the FBI's use of

23  cell-site simulator technology." Dkt. #137-1, ¶ 22.  As explained below, the FBI has no valid

24  exemption (b)(7)(E) claim considering there are already cell phone Apps and hardware

25  devices that can defeat the FBI's Harris surveillance equipment.  However, if the Court

26  disagrees, then Plaintiff requests that the Court conduct an *in camera* review of the

27  unredacted versions of the records so they can be compared against the public sources of

28  information Plaintiff attached to his declaration titled *Daniel Rigmaiden's Declaration Under*

1  *Penalty Of Perjury In Support Of Plaintiff's Response To Defendants' Second Motion For*
2  *Summary Judgment*, filed with this response motion.  By conducting the in camera review
3  and doing the comparison, the Court will be able to easily determine what information the
4  FBI is improperly withholding under exemption (b)(7)(E).

5                **1.   The FBI's exemption (b)(7)(E) claim fails because use of Harris**
                       **cell site simulators is routine and generally known.**
6

7         First, the FBI admits that "the existence of cell-site technology as a general law
8  enforcement technique is publically [sic] known..."  Dkt. #091-6, ¶ 73, p. 29.  Widely
9  available news articles and a book by a former government surveillance contractor document
10  the precise technical details of how Harris devices function and how they are used by law
11  enforcement.  *See Additional Undisputed Facts*, ¶¶ 39-44.  Government entities including the
12  FBI (*id.*, ¶¶ 3, 12-15), EOUSA (*id.*, ¶ 9), United States Secret Service (*id.*, ¶ 21), United
13  States Army (*id.*, ¶ 22), United States Navy (*id.*, ¶ 26), and others have also released technical
14  details regarding the use and operations of Harris devices.

15         In *Rosenfeld*, the Ninth Circuit found that "[i]t would not serve the purposes of FOIA
16  to allow the government to withhold information to keep secret a[n] investigative technique
17  that is routine and generally known."  <u>Rosenfeld v. United States Dep't of justice</u>, 57 F.3d
18  803, 815 (9th Cir. 1995).[1]  Because there is no dispute that the investigative technique is
19  routine and generally known, the FBI has no valid (b)(7)(E) claim.  *See also* <u>ACLU v. DOJ</u>,
20  12-cv-04008-MEJ, Dkt. #61 (N.D.Cal., Sept. 30, 2014) ("To the extent that potential law
21  violators can evade detection by the government's location tracking technologies, that risk
22  already exists." (denying EOUSA summary judgment on exemption 7(E))).

23

24

25

26  _____
1.    This reasoning "is supported by holdings from district courts of the District of
27  Columbia Circuit, that Exemption 7(E) only exempts investigative techniques not generally
known to the public."  *Id.*  *See, e.g.*, <u>National Sec. Archive v. FBI</u>, 759 F.Supp. 872, 885
28  (D.D.C. 1991) ("Exemption 7(E) is properly invoked only for techniques not generally
known to the public.").

### 2. The FBI's exemption (b)(7)(E) claim fails because detailed technical information on Harris cell site simulators, and methods of circumvention, are generally known to the public.

While the FBI admits that use of Harris cell site simulators is routine and generally known, it contends that "detailed information about its application... is not publically [sic] known." Dkt. #137-1, ¶ 23. Contrary to the FBI's claim, precise details of the operations of Harris cell site simulators is so well known that there are free software tools available on the Internet allowing any member of the public to defeat law enforcement's use of the devices via his/her cell phone. *See id.*, ¶¶ 47-51. There is also a commercially developed hardware tool that detects Harris cell site simulators. *See id.*, ¶¶ 52-53.

The *SRLabs Open Source Projects*, website provides the "SnoopSnitch" downloadable app for many cell phone models. *See id.*, ¶¶ 50-51. "SnoopSnitch is an Android app that collects and analyzes mobile radio data to make you aware of your mobile network security and to warn you about threats like fake base stations (IMSI catchers), user tracking and over-the-air updates. With SnoopSnitch you can use the data collected in the GSM Security Map at gsmmap.org and contribute your own data to GSM Map." *Id*. SnoopSnitch detects Harris cell phone surveillance equipment and is available for download on the most popular website in the world: https://play.google.com/store/apps/details?id=de.srlabs.snoopsnitch&hl=en (last accessed: Jun. 22, 2015). *Id*. According to the *Google Play Store* profile, the app has been installed "100,000 – 500,000" times. *Id*.

The *SRLabs Open Source Projects* website provides the "Catcher Catcher" cell phone software that employs StingRay / cell site simulator detection methods including: (1) "No encryption after using encryption with the same operator before," (2) "IMEI not requested in Cipher Mode Complete message," (3) "The LAC of a base station changes," (4) "The LAC changes more than once," (5) "The network queries the phones IMEI during location update," (6) "Receive a silent text message," (7) "You are paged, but do not enter any transaction," (8) "You do not receive a call setup message while already being on a traffic channel for 2 seconds," (9) "You do not receive a call setup message while already being on a traffic channel for [10 seconds]," and (10) "Your phone sends at the highest possible power." *Id.*, ¶¶

1   47-49.

2         The circumvention scenario the FBI seeks to prevent has already occurred.

3   Investigator Christopher Corbitt of Leon County, FL, testified in a Florida court about how

4   Harris cell phone surveillance devices operate.  *See* <u>Florida v. James L. Thomas</u>, No. 2008-

5   CF-3350A, Suppression Hearing Transcript RE: Harris StingRay & KingFish [testimony of

6   Investigator Christopher Corbitt] (2nd Cir. Ct., Leon County, FL, Aug. 23, 2010);

7   <u>ATTACHMENT 14</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support*

8   *of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.  Corbitt

9   explained under oath that the equipment "forces the handset to transmit at full power."  *Id.*, p.

10  17.  Defeating this technique, the "Catcher Catcher" software detects Harris equipment when

11  it forces "Your phone sends at the highest possible power."  *Additional Undisputed Facts*, ¶

12  48.

13        As reported by Ars Technica, on April 20, 2015, Pwnie Express demonstrated its new

14  product "that detects rogue cellular network transceivers, including 'Stingray' devices and

15  other hardware used by law enforcement to surreptitiously monitor and track cell phones and

16  users."  *Id.*, ¶ 52.  Among other detection methods used to defeat the StingRay and other cell

17  site simulators, the Pwnie Express device detects when "a base station has moved or changed

18  its transmitting power."  *Id.*, ¶ 53.

19        Again, the circumvention scenario the FBI seeks to prevent has already occurred.  A

20  publicly available Harris patent explains that its "location determining system [][will] be

21  carried by a platform movable relative to the wireless transmitter."  McPherson, Rodney and

22  Lanza, David J., Harris Corp., *Wireless Transmitter Location Determining System And*

23  *Related Methods*, U.S. Patent No. 7,592,956 (Melbourne, FL: Sept. 22, 2009);

24  <u>ATTACHMENT 13</u> [PDF p. 20] of *Daniel Rigmaiden's Declaration Under Penalty of*

25  *Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary*

26  *Judgment*.  The Pwnie Express device detects Harris cell site simulators because they move,

27  as described in the patent.  This movement causes fluctuations in signal transmission power

28  that do not typically occur with legitimate service provider cell towers that are stationary.

1    The FBI made no effort to conceal this technology from the public using the *Invention*
2 *Secrecy Act*, 35 U.S.C. §§ 181-88.  If the FBI was so concerned, it could have issued a
3 secrecy order on the relevant Harris patents under the Act.  Harris' patents explain the
4 technology in precise enough detail to allow for someone to duplicate the devices or, in the
5 case of Pwnie Express, defeat them.  *See* <u>United States v. Telectronics, Inc.</u>, 857 F.2d 778,
6 758 (Fed. Cir. 1988) (A patent application must pass the test of enablement, which "is
7 whether one reasonably skilled in the art could make or use the invention from the disclosures
8 in the patent coupled with information known in the art without undue experimentation.").

9    In any event, the FBI cannot claim that (b)(7)(E) and (b)(1) apply simply because there
10 are specific technical details or techniques within the requested records that are yet to be
11 generally known.  "If we were to follow such reasoning, the government could withhold
12 information under Exemption 7(E) under any circumstances, no matter how obvious the
13 investigative practice at issue, simply by saying that the 'investigative technique' at issue is
14 not the practice but the application of the practice to the particular facts underlying the FOIA
15 request."  <u>Rosenfeld</u>, 57 F.3d at 815.

16          **3.    Exemption (b)(7)(E) do not apply to any information requested
                    by Plaintiff that is already preserved in permanent public
17                  records.**

18    If the Court rejects full disclosure under the requirements of *Rosenfeld*, or wishes to
19 debate precisely what details can be considered "routine and generally known," Plaintiff is
20 still entitled to at least some records or portions thereof under the public domain exception.
21 As further argued below, Plaintiff is entitled to records containing information that mirrors
22 other information currently preserved in public records.  As noted in Section I(E), *supra*, an
23 *in camera* review and comparison to the public documents placed on the record by Plaintiff is
24 requested if full disclosure is denied.

25    "Under the public domain doctrine, FOIA-exempt information may not be withheld if
26 it was previously disclosed and preserved in a permanent public record."  <u>Chesapeake Bay</u>
27 <u>Found., Inc. v. U.S. Army Corps of Eng'rs</u>, 722 F.Supp.2d 66, 72 (D.D.C. 2010) (citation and
28 internal quotation marks omitted).  "[I]f identical information is truly public, then

1  enforcement of an exemption cannot fulfill its purpose." <u>Niagara Mohawk Power Corp. v.</u>

2  <u>United States DOE</u>, 169 F.3d 16, 19 (D.C. Cir. 1999).  However, the identified publicly

3  preserved document or record need not be the same document or record in the agency's

4  possession.  Rather, the doctrine covers the same *information*—even if the document or

5  record produced via a FOIA search is different from the publicly preserved document or

6  record:

7  > While the excerpts of [public] trial testimony produced by North do not
   > establish that the documents [][sought in his FOIA request] became part of the

8  > public record, they are sufficient to demonstrate that **some information** within
   > the requested documents may have been publicly disclosed....  Accordingly,

9  > DEA has an obligation to search for and produce any responsive records that
   > contain **information** identical that which has been publicly disclosed.

10

11  <u>North v. United States</u>, 810 F. Supp. 2d 205, 208 (D.D.C. 2011) (emphasis added).

12  Therefore, Defendant FBI is required to produce all records, or portions thereof, containing

13  *information* which is the same as the *information* contained in publicly preserved documents.

14  Plaintiff's requests that the Court require the FBI to use the documents attached to *Daniel*

15  *Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to*

16  *Defendants' Second Motion for Summary Judgment* as a **road map** to the specific information

17  that is preserved in public records.  The relevant attachments are Nos. 1-26.  Any information

18  referenced in those attachments must not be redacted or withheld in the records provided to

19  Plaintiff.

20      The FBI claimed that "[r]eleasing **further details** pertaining to [][Harris cell site

21  simulators] would thwart law enforcement responsibilities."  Dkt. #091-6, ¶ 73, p. 29

22  (emphasis added).  With its use of the phrase "further details," the FBI admits that some

23  information is already publicly preserved.  Portions of documents in the FBI's possession

24  (*i.e.*, user manuals, training manuals, technical literature, *etc.*) containing the noted publicly

25  preserved information cannot be withheld under exemption (b)(7)(E).  The FBI simply

26  revealing the terms "Harris," "StingRay," "LoggerHead," "TriggerFish" and "WITT" is a

27  good start, *see id.*,  ¶ 16, p. 7, fn. 7, but falls short of the broad category of publicly preserved

28  information relating to Harris devices.  Even the official Harris price list provided to the

1  public by the United States General Services Administration lists 32 different Harris products

2  by name.  *See* <u>ATTACHMENT 12</u> of *Daniel Rigmaiden's Declaration Under Penalty of*

3  *Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary*

4  *Judgment* (including names such as KingFish, AmberJack, HailStorm, Harpoon, and

5  RayFish).

6       Because Defendant FBI failed to meet its burden under the public domain doctrine,

7  Plaintiff requests that the Court order the FBI to reprocess all records accordingly.

8            **4.   The FBI failed to justify redactions and withholdings within the**
             **newly provided 4,571 redacted pages of Harris FOIA documents.**
9

10      In its second motion for summary judgment, the FBI only attempted to justify (b)(7)

11  (E) redactions and withholdings with the previous 321-page sample.  *See* Dkt. #137.

12  Defendant FBI justifies this failure by arguing that it "applied the same post-Glomar

13  processing methodology to the sample as it did to the re-processing of plaintiff's request."

14  *Id.*, p. 10, fn 6.  However, the "post-Glomar processing methodology" is not the issue.  The

15  issue is, among others, the significant variations in subject matter within the newly provided

16  4,571 pages and sample's failure to cover it.  There are also addition problems with using the

17  sample, which is explained in Plaintiff's motion for partial summary judgment pending before

18  the Court.  *See* Dkt. #136.

19      In the context of Defendant FBI's request for summary judgment, Defendant FBI failed

20  to address the (b)(7)(E) exemptions within the newly provided 4,571 pages.  Therefore,

21  Plaintiff requests that Defendant FBI's request for summary judgment on those documents be

22  denied.

23        **F.   Defendant EOUSA failed to meet its burden under all claimed**
             **exemptions and all claimed searches.**
24

25      Defendant EOUSA submitted conclusory boilerplate in its attempt to justify all

26  claimed FOIA exemptions and the sufficiency of its searches.  Because Defendant EOUSA

27  failed to meet its burden under FOIA, Plaintiff requests that summary judgment be denied and

28  that the EOUSA be ordered to conduct adequate searches and provide all previously redacted

1    and withheld information.

2    **II.    <u>CONCLUSION</u>**

3    For the foregoing reasons, Plaintiff respectfully requests that the Court deny

4    Defendants' second motion for summary judgment.  In the alternative, Plaintiff requests that

5    the Court conduct an *in camera* review of unredacted versions of the Harris FOIA response

6    documents, compare them to the public sources of information Plaintiff put on the record

7    contemporaneous with this response motion, and determine what information the FBI is

8    improperly withholding under exemption (b)(7)(E).

9    ///

10    ///

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

1    Respectfully Submitted: June 22, 2015.

2

3                                    DANIEL DAVID RIGMAIDEN,
                                     Pro Se Plaintiff:
4

5

6                                    s/ Daniel Rigmaiden
                                     Daniel D. Rigmaiden
7

8                          **CERTIFICATE OF SERVICE**

9         I, Daniel David Rigmaiden, hereby certify that on June 22, 2015, I caused the attached
10
     document to be electronically transmitted to the Clerk's Office using the ECF system for
11
     filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:
12

13
     Brad P. Rosenberg, Attorney for Defendants
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   By: s/ Daniel Rigmaiden

                                          - 16 -