Daniel David Rigmaiden
530 E McDowell Rd Ste 107-214
Phoenix, AZ 85004
Email: freedan@safe-mail.net

Daniel David Rigmaiden,
Pro Se, Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel David Rigmaiden, | Civil Action No.: |
| Plaintiff, | CV12-01605-PHX-DLR |
| v. | |
| Federal Bureau of Investigation, et al. | PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS, OBJECTION TO THE ADMISSION OF EVIDENCE, AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS IN SUPPORT OF RESPONSE TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT |
| Defendant. | |

### I.      Controverting Statement of Facts

Plaintiff, Daniel David Rigmaiden, appearing *pro se*, respectfully submits the following controverting statement of facts Pursuant to Fed. R. Civ. P. 56 and LRCiv 56.1(b). The below numbered paragraphs correspond to Defendants' numbered paragraphs at Dkt. #138.

1.      Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

2.      Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

3.      Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

4.      Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

5.      Plaintiff lacks knowledge or information sufficient to form a belief about the

- 1 -

1 | truth of this assertion.

2 |       6.      Plaintiff lacks knowledge or information sufficient to form a belief about the
3 | truth of this assertion.

4 |       7.      Plaintiff lacks knowledge or information sufficient to form a belief about the
5 | truth of this assertion considering the use of the phrase, "that aspect," was left ambiguous.

6 |       8.      Plaintiff controverts this fact on the basis of (1) it is inaccurate and not
7 | supported by material evidence, and (2) it is not a material fact.

8 | **INACCURATE FACT EXPLAINED**:  Searching "email archives" is the most accurate and
9 | efficient way to turn up responsive emails.  The FBI's method of asking individual FBI
10 | personnel to search their own email in and out boxes lends to human error and improper
11 | concealment of records.  Additionally, emails could have been deleted from the work station
12 | computer in and out boxes used by FBI personnel that will still exits in archive systems.

13 | **IMMATERIAL FACT EXPLAINED**:  It makes no difference if the FBI wishes to assume
14 | that no responsive records will result from a search.  If a requester asks for records contained
15 | at a specific location, database, or repository, the agency must conduct the search.  FOIA
16 | provides for agencies to charge search fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)
17 | (A)(ii)(III) ("fees shall be limited to reasonable standard charges for document search...").

18 |       9.      Plaintiff controverts this fact on the basis of (1) it is inaccurate and not
19 | supported by material evidence, and (2) it is not a material fact.

20 | **INACCURATE FACT EXPLAINED**:  The FBI's assertion that "[t]here is no factual basis
21 | to conclude that any additional searches for records responsive to this FOIA request are
22 | necessary[]" is the FBI's own speculation.  An agency cannot know if records exist until a
23 | search is conducted.  Additionally, Plaintiff has submitted evidence showing that copies of
24 | FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal
25 | investigations.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 55-57, *infra*.  This alone
26 | undercuts all of the FBI's claims that searching in all the locations specified by Plaintiff will
27 | be a waste of time.

28 | **IMMATERIAL FACT EXPLAINED**:  It makes no difference if the FBI wishes to assume

that no responsive records will result from a search.  If a requester asks for records contained at a specific location, database, or repository, the agency must conduct the search.  FOIA provides for agencies to charge search fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III) ("fees shall be limited to reasonable standard charges for document search...").

10.   Plaintiff controverts this fact considering it is inaccurate and not supported by material evidence.  Plaintiff clearly told the FBI where to search: (1) workstation computers, (2) server computers, (3) backup systems, (4) legacy systems, (5) databases, (6) hard drives, (7) tape drives, (8) zip disks and other disks, (9) CDs, DVDs, Blu-ray discs, etc., (10) cartridges, (11) magneto-optical disks, (12) calendar systems, (13) voice mail systems, (14) text messaging systems, (15) intranet systems, (16) internet systems, (17) personal digital assistants, (18) cell phones and other cellular devices including Blackberry devices, (19) Blackberry Enterprise Servers maintained by the FBI at its Clarksburg, West Virginia, facility and other facilities, (20) FBI Enterprise Security Operations Center (ESOC) classified analytical network, (21) home computers belonging to agents/personnel (to the extent, if any, they are used for FBI business purposes).  *See* Dkt. #001-3, p. 9.

11.   Plaintiff controverts this fact considering it is not a material fact.  It makes no difference how many FOIA requests Defendant FBI receives each year.  If a requester asks for records contained at a specific location, database, or repository, the agency must conduct the search. FOIA provides for agencies to charge search fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III) ("fees shall be limited to reasonable standard charges for document search...").

12.   Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**<u>INACCURATE FACT EXPLAINED</u>**:  The FBI's assertion that comes with the assumption that Plaintiff's proposed searches are "speculative"—this is the FBI's own speculation.  An agency cannot know if records exist until a search is conducted.  Additionally, Plaintiff has submitted evidence showing that copies of FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal investigations.  *See* Section III, *Addition Undisputed*

*Facts*, ¶¶ 55-57, *infra*.  Searching the FBI Blackberry enterprise server and other "text messaging systems" for records of this nature are some of search locations and record types specified by Plaintiff in his original FOIA request letters that the FBI now refuses to search..  *See* Dkt. #001-3 and #001-2.

**IMMATERIAL FACT EXPLAINED**:  It makes no difference if the FBI wishes to assume that no responsive records will result from a search.  If a requester asks for records contained at a specific location, database, or repository, the agency must conduct the search.  FOIA provides for agencies to charge search fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III) ("fees shall be limited to reasonable standard charges for document search...").

13.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**:  The FBI's assertion that Plaintiff's proposed searches "would be cumulative, unnecessary, and not reasonably calculated to locate additional records" is the FBI's own speculation.  An agency cannot know if records exist until a search is conducted.  Additionally, Plaintiff has submitted evidence showing that copies of FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal investigations.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 55-57, *infra*.  Searching the FBI Blackberry enterprise server and other "text messaging systems" for records of this nature are some of the search locations and record types specified by Plaintiff in his original FOIA request letters that the FBI now refuses to search.  *See* Dkt. #001-3 and #001-2.

**IMMATERIAL FACT EXPLAINED**:  It makes no difference if the FBI wishes to assume that no responsive records will result from a search.  If a requester asks for records contained at a specific location, database, or repository, the agency must conduct the search.  FOIA provides for agencies to charge search fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III) ("fees shall be limited to reasonable standard charges for document search...").

14.    Plaintiff controverts this fact considering it is inaccurate and not supported by material evidence.  The FBI's assertion that it "has searched the divisions and offices most likely to possess records responsive to the FOIA request[]" is the FBI's own speculation.  An

agency cannot know if records exist until a search is conducted.  Additionally, Plaintiff has submitted evidence showing that copies of FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal investigations.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 55-57, *infra*.  is alone undercuts all of the FBI's claims that searching in all the locations specified by Plaintiff will be a waste of time.

15.    Plaintiff controverts this fact considering it is not a material fact.  It makes no difference whether the FBI commonly searches its email servers in response to FOIA requests.  If a specific requester asks for records contained at a specific location, database, or repository, the agency must conduct the search.  FOIA provides for agencies to charge search fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III) ("fees shall be limited to reasonable standard charges for document search...").

16.    **(a)** Plaintiff controverts the following part of this fact considering it is inaccurate and not supported by material evidence: "If the FBI had any information responsive to plaintiff's request, it is reasonably likely to be located in the FBI's CRS..." Plaintiff has submitted evidence showing that copies of FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal investigations.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 55-57, *infra*.  This alone undercuts all of the FBI's claims that searching in all the locations specified by Plaintiff will not turn up additional records. **(b)** Plaintiff confirms the following part of this fact:  "If the FBI had any information responsive to plaintiff's request, it is reasonably likely to be located... **by going directly to the actual source**[,]" but to the effect that the "actual source" is the 21 locations specified by Plaintiff in his original FOIA request letter, i.e., (1) workstation computers, (2) server computers, (3) backup systems, (4) legacy systems, (5) databases, (6) hard drives, (7) tape drives, (8) zip disks and other disks, (9) CDs, DVDs, Blu-ray discs, etc., (10) cartridges, (11) magneto-optical disks, (12) calendar systems, (13) voice mail systems, (14) text messaging systems, (15) intranet systems, (16) internet systems, (17) personal digital assistants, (18) cell phones and other cellular devices including Blackberry devices, (19) Blackberry Enterprise Servers maintained by the FBI at its Clarksburg, West Virginia, facility and other facilities, (20) FBI

Enterprise Security Operations Center (ESOC) classified analytical network, (21) home computers belonging to agents/personnel (to the extent, if any, they are used for FBI business purposes).  *See* Dkt. #001-3, p. 9.  **(c)** Plaintiff controverts this part of this fact considering it is inaccurate and not supported by material evidence: "there are no other record systems within the FBI reasonably containing the requested information."  Plaintiff has submitted evidence showing that copies of FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal investigations.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 55-57, *infra*.  This alone undercuts all of the FBI's claims that searching in all the locations specified by Plaintiff will not turn up additional records.

17.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**:  The FBI's assertion that "search of all of the categories of records in all of the locations that plaintiff has identified would be unreasonable, unnecessary, and burdensome[]" is the FBI's own speculation.  An agency cannot know if records exist until a search is conducted.  Additionally, Plaintiff has submitted evidence showing that copies of FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal investigations.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 55-57, *infra*.  This alone undercuts all of the FBI's claims that searching in all the locations specified by Plaintiff will be a waste of time.

**IMMATERIAL FACT EXPLAINED**:  It makes no difference if the FBI wishes to assume that no responsive records will result from a search.  If a requester asks for records contained at a specific location, database, or repository, the agency must conduct the search.  FOIA provides for agencies to charge search fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III) ("fees shall be limited to reasonable standard charges for document search...").

18.    Confirmed.

19.    Confirmed to the extent that the letters provided with the CDs are dated as specified.  Denied to the effect that evidence has been presented proving that the CDs were either sent or received on the dates specified.

20. Confirmed to the extent that 7 CDs were provided with a letter dated March 3, 2015.

21. Confirmed to the extent that 11 CDs were provided with a letter dated March 31, 2015.

22. Confirmed to the extent that 19 CDs were provided with a letter dated April 13, 2015.

23. Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

24. Confirmed.

25. Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

26. Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

27. Plaintiff controverts this fact considering it is inaccurate and not supported by material evidence.  Plaintiff has paid the FBI in full.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 58-72.  However, the FBI demanding these payments was an act of extortion and Plaintiff made the payments under duress.  Plaintiff is entitled to a $510.00 refund.

28. Plaintiff controverts this fact considering it is inaccurate and not supported by material evidence.  The FBI already admitted that it "did not search the 33 categories of records that plaintiff requested for any of his FOIA requests."  Dkt. #137-1, p. 7 ¶ 14.  Those categories are (1) electronically stored information, (2) emails, (3) email attachments, (4) letters, (5) correspondence, (6) memorandums, (7) documents, (8) reports, (9) statements, (10) audits, (11) purchase receipts, (12) invoices, (13) word processing documents, (14) spreadsheets, (15) graphics and presentation documents, (16) images, (17) text files, (18) instant messages, (19) audio files, (20) video files, (21) voice mail, (22) internet data, (23) log files, (24) blogs, (25) calendar files, (26) text messages, (27) records of radio transmissions, (28) FBI corporate policy directives, (29) data dictionary files, (30) metadata, (31) system metadata, (32) substantive metadata, and (33) embedded metadata.  *See* Dkt. #001-2, p. 4-5.

29.     Confirmed to the effect that copies of some emails were provided to Plaintiff.

30.     Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**:  The FBI's assertion that "any further searches would be cumulative, redundant, and unduly burdensome." is the FBI's own speculation.  An agency cannot know if records exist until a search is conducted.  Additionally, Plaintiff has submitted evidence showing that copies of FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal investigations.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 55-57, *infra*.  Searching the FBI Blackberry enterprise server and other "text messaging systems" for records of this nature are some of the search locations and record types specified by Plaintiff in his original FOIA request letter that the FBI now refuses to search.  *See* Dkt. #001-2, p. 5-6.

**IMMATERIAL FACT EXPLAINED**:  It makes no difference if the FBI wishes to assume that no responsive records will result from a search.  If a requester asks for records contained at a specific location, database, or repository, the agency must conduct the search.  FOIA provides for agencies to charge search fees for this very purpose.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III) ("fees shall be limited to reasonable standard charges for document search...").

31.     Plaintiff controverts this fact considering it is inaccurate and not supported by material evidence.  The FBI's assertion that "[t]here are no other record systems within the FBI reasonably containing the requested information[]" is the FBI's own speculation.  An agency cannot know if records exist until a search is conducted.  Additionally, Plaintiff has submitted evidence showing that copies of FBI SMS text messages exist at the FBI relating to use of Harris equipment during criminal investigations.  *See* Section III, *Addition Undisputed Facts*, ¶¶ 55-57, *infra*.  This alone undercuts all of the FBI's claims that searching in all the locations specified by Plaintiff will be a waste of time.

32.     Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

**IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

33.    Plaintiff controverts this fact considering it is not a material fact.  It makes no difference what "methodology" the FBI used to remove prior redactions from a past FOIA release.  The FBI's unredaction methodology is not an issue in this suit and hold no relevance to any actual issue.

34.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

**IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

35.    Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

36.    Confirmed to the effect that 20 pages were released and the accompanying letter claimed 184 pages were withheld in full.

37.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

**IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

38.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

**IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

39.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not supported by material evidence, and (2) it is not a material fact.

**INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

**IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

40.    Plaintiff lacks knowledge or information sufficient to form a belief about the truth of this assertion.

41.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

1  supported by material evidence, and (2) it is not a material fact.

2  **INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

3  **IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

4      42.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

5  supported by material evidence, and (2) it is not a material fact.

6  **INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

7  **IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

8      43.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

9  supported by material evidence, and (2) it is not a material fact.

10  **INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

11  **IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

12      44.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

13  supported by material evidence, and (2) it is not a material fact.

14  **INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

15  **IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

16      45.    Plaintiff lacks knowledge or information sufficient to form a belief about the

17  truth of this assertion.

18      46.    Plaintiff controverts this fact on the basis of (1) it is inaccurate and not

19  supported by material evidence, and (2) it is not a material fact.

20  **INACCURATE FACT EXPLAINED**:  This is a legal conclusion, not a fact.

21  **IMMATERIAL FACT EXPLAINED**:  This is a legal conclusion, not a fact.

22      **II.    Objections to the Admission of Evidence**

23      Plaintiff, Daniel David Rigmaiden, appearing *pro se*, respectfully submits the

24  following objections to the admission of evidence Pursuant to Fed. R. Civ. P. 56 and LRCiv

25  56.1(b), and LRCiv 7.2(m)(2) ("An objection to the admission of evidence offered in support

26  of... a motion must be presented in the objecting party's responsive or reply memorandum (or,

27  if the underlying motion is a motion for summary judgment, in the party's response to another

28  party's separate statement of material facts)[.]").

1.     Plaintiff objects to the portions of David Hardy's declaration that claims, "By identifying the technique that is being used or can be used in too much detail, the FBI would provide the very gateway to circumvention [of the StingRay] that Plaintiff seeks."  Dkt. #137-1, p. 16-17, ¶ 23, fn. 15.  Plaintiff is not seeking FOIA records for the purpose of circumventing the StingRay or other Harris equipment.  Based on Harris patents in government public records, Plaintiff already knows how to both detect and defeat Harris wireless device locators using the HagFish, a hardware device that can be attached to cell phones.  Harris Corporation patents provide detailed information on how the FBI's surveillance devices operate, which allows for anyone skilled in the arts (*e.g.*, Plaintiff) to make a HagFish that randomizes a cell phone's location.

## III.    Statement of Additional Undisputed Material Facts in Support of Response to Defendants' Second Motion for Summary Judgment.

Plaintiff respectfully submits the following statement of additional undisputed material facts (in support of Response to Defendants' Second Motion for Summary Judgment) Pursuant to Fed. R. Civ. P. 56 and LRCiv and 56.1(b) ("Any party opposing a motion for summary judgment must file a statement, separate from that party's memorandum of law, setting forth:... additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party.").

### A.    Information preserved in official <u>federal government</u> public records detailing the technical operations of Harris devices (rebutting Defendants' claims of Exemption (b)(7)(E), etc.).

#### 1.   The Harris Loggerhead.

1.     Via an August 11, 2006 request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, the Electronic Frontier Foundation ("EFF") asked the Federal Bureau of Investigation ("FBI") to produce documents concerning electronic surveillance systems known as DCS-3000 and Red Hook.  *See* Marcia Hofmann, *EFF FOIA request to FBI* (Aug. 11, 2006), *available at* https://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf (last accessed: Mar. 30, 2011);  *see also* <u>Electronic Frontier Foundation v. Dep't of Justice</u>, 517 F.Supp.2d 111 (D.D.C.

1    2007).

2        2.      Between June 4, 2007 and February 11, 2008, the FBI disclosed to the public

3    5,278 pages of documents in response to the EFF FOIA request.  All of these documents are

4    available for download at https://www.eff.org/issues/foia/061708CKK (last accessed: May

5    15, 2014).

6        3.      Via an FBI Response to EFF FOIA Request, Nos. 1056287-000 & 1056307-1

7    (Aug. 27, 2007), the FBI released an email indicating that FBI agents utilize the Harris

8    Wireless Product Group ("Harris") Loggerhead portable/transportable wireless device locator

9    to locate wireless devices:

10       I was working with some agency guys yesterday.  They are putting together a
         system with a flat panel ant and a **loggerhead** and doing locations based on
11       registrations.  It works.  They have a later software version on their
         **loggerheads** (I think).  It will really help when we can use your software for
12       real time display of the **loggerhead** activity.  As it is, you have to make a pass
         in the area, move somewhere else, look at the log, etc.  Any word on when
13       **Harris** can make the change to the loggerhead?

14

15   FBI, *Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1*, Aug. 27, 2007,

16   *available at* https://www.eff.org/files/filenode/061708CKK/082707_dcs06.pdf [EFF PDF Set

17   6 of 6] (last accessed: Oct. 25, 2010), p. 142 of 148 (emphasis added).  Relevant pages of the

18   FOIA response containing the above quoted email are on the record at ATTACHMENT 01 of

19   *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response*

20   *to Defendants' Second Motion for Summary Judgment*.

21       4.      According to the United States Patent and Trademark Office ("USPTO"), the

22   trademark name Loggerhead is registered to Harris Corporation out of Melbourne, FL, USA.

23   *See* United States Patent and Trademark Office, *Trademark Reg. No. 2,555,909 [Loggerhead]*

24   (registered Apr. 2, 2002), *all associated documents available via search at*

25   http://tsdr.uspto.gov/#caseNumber=2,555,909&caseType=US_REGISTRATION_NO&search

26   Type=documentSearch (last accessed: May 15, 2014).  The full USPTO document record for

27   Loggerhead is on the record at ATTACHMENT 02 of *Daniel Rigmaiden's Declaration Under*

28   *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for*

*Summary Judgment*.

5.     According to the USPTO, Harris Intellectual Property Dept. attorney, Michael S. Yatsko, signed a public declaration on July 9, 2001, stating that the Loggerhead mark is for "electronic surveillance transceivers for intercepting, monitoring and gathering information concerning cellular network communications" and that it "was first used in connection with the goods at least as early as August 25, 1999, was first used in interstate commerce at least as early as August 25, 1999, and is now in use in such commerce." *Id*.

## 2.   The Harris Triggerfish.

6.     Via a November 29, 2007, request for information under the FOIA, 5 U.S.C. § 552 *et seq.*, the American Civil Liberties Union and the American Civil Liberties Union Foundation ("ACLU") asked the Executive Office for United States Attorneys ("EOUSA") to produce documents pertaining to the use of cell phone tracking and locating in criminal investigations.  *See* Catherine Crump, *ACLU FOIA request to EOUSA* (Nov. 29, 2007), *available at* https://www.aclu.org/files/pdfs/freespeech/eousa_foia_20071129.pdf (last accessed: May 15, 2014);  *see also* American Civil Liberties Union v. Department of Justice, U.S. Dist. LEXIS 29040, No. 08-1157 (JR) (D.D.C., Mar. 26, 2010).

7.     Via an August 12, 2008 EOUSA response to the ACLU FOIA request, the EOUSA made official public disclosures of various sections from its Electronic Surveillance Manual.  *See* EOUSA, *[M.D.La.] Response to ACLU FOIA Request No. 07-4130*, Aug. 12, 2008, *available at* https://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf (last accessed: May 15, 2014).

8.     In the Electronic Surveillance Manual, under a heading labeled "Collection of Cell Phone Location Information Directly by Law Enforcement," the EOUSA revealed information on the government's use of portable/transportable wireless device locators:

> Law enforcement possesses electronic devices that allow agents to determine the location of certain cellular phones by the electronic signals that they broadcast.  This equipment includes an antenna, an electronic device that processes the signals transmitted on cell phone frequencies, and a laptop computer that analyzes the signals and allows the agent to configure the

1
2
3

> collection of information.  Working together, these devices allow the agent to identify the direction (on a 360 degree display) and signal strength of a particular cellular phone while the user is making a call.  By shifting the location of the device, the operator can determine the phone's location more precisely using triangulation.

4  EOUSA, *[M.D.La.] Response to ACLU FOIA Request No. 07-4130*, Aug. 12, 2008, *available*

5  *at* https://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf (last

6  accessed: May 15, 2014), p. 9-10.  Relevant sections of the FOIA response containing the

7  above quoted manual are on the record at <u>ATTACHMENT 03</u> of *Daniel Rigmaiden's*

8  *Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants'*

9  *Second Motion for Summary Judgment*.

10      9.    In the Electronic Surveillance Manual, the EOUSA also specifically identified

11  the portable/transportable wireless device locator called the "triggerfish":

12
13
14

> A "triggerfish" can also be used to determine the cell site being used by a particular cellular telephone.  In addition, the cellular telephone company should be able to provide cell site information.  Once a cell site is determined, law enforcement agents can conduct surveillance in a more specific area in an effort to identify the user of the cellular telephone.

15
16

> *Id*.

17      10.    According to the USPTO, the trademark name Triggerfish is registered to Harris

18  Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office,

19  *Trademark Reg. No. 2,534,253 [Triggerfish]* (registered Jan. 29, 2002), *all associated*

20  *documents available via search at*

21  http://tsdr.uspto.gov/#caseNumber=2,534,253&caseType=US_REGISTRATION_NO&search

22  Type=documentSearch (last accessed: May 15, 2014).  The full USPTO document record for

23  Triggerfish is on the record at <u>ATTACHMENT 04</u> of *Daniel Rigmaiden's Declaration Under*

24  *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for*

25  *Summary Judgment*.

26      11.    According to the USPTO, Harris Intellectual Property Dept. attorney, Michael

27  S. Yatsko, signed a public declaration on July 9, 2001, stating that the Triggerfish mark is for

28  "electronic receivers for intercepting and monitoring cellular network communications" and

that it "was first used in connection with the goods at least as early as November 26, 1997, was first used in interstate commerce at least as early as November 26, 1997, and is now in use in such commerce." *Id*.

### 3.    The Harris StingRay and StingRay II.

12.    Agents in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, specifically noted in a report of investigation and in handwritten notes that the StingRay portable/transportable wireless device locator was used to locate the aircard relevant to that case.  *See* <u>United States v. Daniel Rigmaiden</u>, CR08-814-PHX-DGC, EXHIBIT 26 of *1st Consolidated Exhibits,* Doc. #587-2 (D.Ariz.); *id.*, EXHIBIT 109 of *2nd Consolidated Exhibits*, Doc. #821-6.

13.    The aircard in <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, was located by the FBI using the StingRay and a second handheld, portable wireless device locator with each operating in cell site emulation mode.  *See* <u>United States v. Daniel Rigmaiden</u>, CR08-814-PHX-DGC*,* Doc. #602, p. 3 (D.Ariz.) ("The equipment mimicked a Verizon Wireless cell tower and sent and received signals directly to and from the aircard.").

14.    In <u>United States v. Rigmaiden</u>, CR08-814-PHX-DGC, FBI supervisory agent Morrison stated that when agents use stingrays, "the electronic serial numbers (ESNs) (or their equivalent) from all wireless devices in the immediate area of the FBI device that subscribe to a particular provider may be incidentally recorded, including those of innocent, non-target devices." <u>United States v. Daniel Rigmaiden</u>, CR08-814-PHX-DGC*,* "Affidavit Of Supervisory Special Agent Bradley S. Morrison," Doc. #674-1, p. 3, ¶ 5 (D.Ariz.).

15.    At an open *Daubert* hearing in <u>United States v. Allums</u>, No. 2:08-CR-30 TS, Doc. #128 [transcript] (D.Utah), FBI agent William Shute testified that **(1)** he has "particular expertise in cell phone technology, plotting cell towers, tracking movements people are making when they are making phone calls[,]" *id.*, p. 8, ln. 1-3, **(2)** he has "had training from the Harris Corporation in Melbourne, Florida, which is a company that produces various products for analyzing cellular telephones, measuring radio frequency[,]" *id.*, p. 9, ln. 2-5, **(3)** "[o]ver the last nine years, but predominantly more so in the last three, [][he] personally [] used [][his training] over 300 times[,]" *id.*, p. 16, ln. 12-13, and **(4)** one type of

1  portable/transportable wireless device locator equipment FBI Agent Shute uses is "from the

2  Harris Corporation called the Sting Ray."  *Id.*, p. 32, ln. 6-7.

3       16.    According to the USPTO, the trademark name StingRay is registered to Harris

4  Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office,

5  *Trademark Reg. No. 2,762,468 [StingRay]* (registered Sept. 9, 2003), *all associated*

6  *documents available via search at*

7  http://tsdr.uspto.gov/#caseNumber=2,762,468&caseType=US_REGISTRATION_NO&search

8  Type=documentSearch (last accessed: May 15, 2014).  The full USPTO document record for

9  StingRay is on the record at <u>ATTACHMENT 05</u> of *Daniel Rigmaiden's Declaration Under*

10 *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for*

11 *Summary Judgment*.

12      17.    According to the USPTO, Harris Intellectual Property Dept. attorney, Michael

13 S. Yatsko, signed a public declaration on August 14, 2001 stating that the StingRay mark is

14 for "electronic surveillance transceivers for tracking, locating and gathering information from

15 cellular telephones," *see id.*, and in a later "Response To Official Action," attorney Donald S.

16 Showalter, on behalf of Harris, asked to amend the identification of goods to read "multi-

17 channel, software-defined, two-way electronic surveillance radios for interrogating, locating,

18 tracking and gathering information from cellular telephones."  *Id*.  In support of his request to

19 amend, Mr. Showalter included a Harris Corporation datasheet explaining the technical

20 features and operations of the StingRay.  *See id*.  The trademark documents indicate that the

21 mark was first used in connection with the goods on March 2, 2003, and was first used in

22 commerce on March 2, 2003.  *Id*.

23      18.    According to the USPTO, the trademark name StingRay II is registered to

24 Harris Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark

25 Office, *Trademark Reg. No. 3,499,993 [StingRay II]* (registered Sep. 9, 2008), *all associated*

26 *documents available via search at*

27 http://tsdr.uspto.gov/#caseNumber=3,499,993&caseType=US_REGISTRATION_NO&search

28 Type=documentSearch (last accessed: May 15, 2014).  The full USPTO document record for

1    StingRay II is on the record at <u>ATTACHMENT 06</u> of *Daniel Rigmaiden's Declaration Under*

2    *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for*

3    *Summary Judgment*.

4           19.     According to the USPTO, Harris Intellectual Property Dept. attorney, Ronald S.

5    Blum II, signed a public declaration on July 18, 2008, stating that the mark is for "[m]ulti-

6    channel, software-defined, two-way electronic surve[i]llance radios for authorized law

7    enforcement and government agencies for interrogating, locating, tracking and gathering

8    information from cellular phones" and that it "was first used... at least as early as 7/17/2008,

9    and first used in commerce at least as early as 7/17/2008, and is now in use in such

10    commerce." *Id*.

11           20.     Within the trademark documents is a picture of the StingRay II mark attached to

12    goods as used in interstate commerce. *See id*. In the picture, the StingRay II shows the

13    following labeled connection ports: (1) TX1 [(Transmission Antenna No. 1)]; (2) TX2

14    [(Transmission Antenna No. 2)]; (3) TX3 [(Transmission Antenna No. 3)]; (4) TX4

15    [(Transmission Antenna No. 4)]; (5) ANT 1 [(Direction Finding Antenna No. 1)]; (6) ANT 2

16    [(Direction Finding Antenna No. 2)]; (7) CNTRL 1; (8) CNTRL 2; (9) GPS ANTENNA; (10)

17    10 MHZ REF OUT; (11) PC INPUT; (12) AUX1; (13) AUX2; (14) RX1 [(Receive Antenna

18    No. 1)]; (15) RX2 [(Receive Antenna No. 2)]; (16) RX3 [(Receive Antenna No. 3)]; (17)

19    RS232; (18) 10/100 [(Ethernet)]; (19) USB [(x2)] ; and (20) DC INPUT 12VDC. *See id*.

20           21.     As indicated by a June 29, 2010, sole source purchase notice authored by the

21    United States Secret Service, Harris is the sole source vendor of a certain class of

22    portable/transportable wireless device locators sold under the trade names StingRay II,

23    StingRay, AmberJack, and SideWinder:

24         25 Watt PA Kit, Amberjack W (components of StingRay II), PA Kit 30W 2100
           (components of StingRay II), PA Kit 30W Dual Band 850/1900 (components of

25         StingRay II), PA Kit 30W iDEN 800 (components of StingRay II), SideWinder
           (CDMA, GSM, 2100) components of StingRay II), SR II Upgrade: SRII

26         CDMA, SRII GSM, SRII iDEN, StingRay II, Tactical Power Kit.

27

28    Department of Homeland Security, United States Secret Service (USSS). (Jun. 29, 2010).

1  Harris equipment (Solicitation Number: 225717), *available at* https://www.fbo.gov/?

2  s=opportunity&mode=form&id=52b671c48d68c6518b78939677952282&tab=core&_cview=

3  0 (last accessed: May 15, 2014).  The above quoted notice is on the record at ATTACHMENT

4  07 of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's*

5  *Response to Defendants' Second Motion for Summary Judgment*.  The fbo.gov website states

6  that it is a "U.S. Federal government computer system[.]"  *See* https://www.fbo.gov/?

7  s=privacy&mode=list&tab=list (last accessed: May 15, 2014).

8  **4.   The Harris KingFish.**

9  22.     As indicated by a January 12, 2009 "NOTICE OF INTENT TO AWARD A

10  SOLE SOURCE CONTRACT" authored by the United States Army, Harris is the sole source

11  vendor of a certain class of portable/transportable wireless device locators sold under the

12  trade name KingFish:

13  *Harris KingFish, 1-Channel, Dual Mode Package systems that can be operated
   in two separate modes; Man-Portable and Vehicular Mounted. The Man-
14  Portable system mode is battery powered CDMA, GSM and iDEN Interrogation
   Tracking and Location, and Signal Information Collection System. The
15  Vehicular Mounted system mode is portable, 12VDC powered CDMA, GSM,
   iDEN Interrogation, Tracking and Location, and Signal Information Collection
16  System.

17

18  Department of the Army, Office: U.S. Army Intelligence and Security Command. (Jan. 12,

19  2009). NOTICE OF INTENT TO AWARD A SOLE SOURCE CONTRACT-HARRIS:

20  KINGFISH DUAL MODE SYSTEM (Solicitation Number: W911W4-09-T-0017), *available*

21  *at* https://www.fbo.gov/index?

22  s=opportunity&mode=form&id=fd03ebae781f3a3fdb7633699bc1e351&tab=core&tabmode=

23  list&= (last accessed: May 15, 2014).  The above quoted notice is on the record at

24  ATTACHMENT 08 of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support*

25  *of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.  The fbo.gov

26  website states that it is a "U.S. Federal government computer system[.]"  *See*

27  https://www.fbo.gov/?s=privacy&mode=list&tab=list (last accessed: May 15, 2014).

28  23.     According to the USPTO, the trademark name KingFish is registered to Harris

- 18 -

Corporation out of Melbourne, FL, USA. *See* United States Patent and Trademark Office, *Trademark Reg. No. 2,867,227 [KingFish]* (registered Jul. 27, 2004), *all associated documents available via search at* http://tsdr.uspto.gov/#caseNumber=2867227&caseType=US_REGISTRATION_NO&searchType=documentSearch (last accessed: May 15, 2014). The full USPTO document record for KingFish is on the record at ATTACHMENT 09 of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.

24. According to the USPTO, Harris Intellectual Property Dept. attorney, Michael S. Yatsko, signed a public declaration on August 16, 2001, stating that the KingFish mark is for "electronic surveillance transceivers for tracking, locating and gathering information from cellular telephones." *Id*. The trademark documents indicate that the mark was first used in connection with the goods on December 10, 2003, and was first used in commerce on December 10, 2003. *Id*.

25. Within the trademark documents is a picture of the KingFish mark attached to goods as used in interstate commerce. *See id*. In the picture, the KingFish shows the following labeled connection ports: (1) REMOTE ANTENNA, (2) USB, (3) DF [(Direction Finding)] ANTENNA, (4) EXT PA, (5) DC INPUT, and (6) MAIN ANTENNA. *See id*.

## 5. The Harris AmberJack.

26. As indicated by a June 10, 2004, "Sole Source Harris Corporation AmberJack G antennas and antenna accessory kits" notice authored by the United States Navy, Harris is the sole source vendor of phased array antennas used with portable/transportable wireless device locators sold by Harris, *i.e.*, "AmberJack G magnetic mount vehicular direction find antennas... direction find accessory kits." Space and Naval Warfare Systems Center (SPAWARSYSCEN). (Jun. 10, 2004). *Sole Source Harris Corporation AmberJack G antennas and antenna accessory kits* (Solicitation Number: N65236-04-R-0096), *available at* https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=f23e7d8968011a8d5fa7ccb38a0cb96c (last

accessed: May 16, 2014).  The above quoted notice is on the record at <u>ATTACHMENT 10</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.  The fbo.gov website states that it is a "U.S. Federal government computer system[.]"  *See* https://www.fbo.gov/?s=privacy&mode=list&tab=list (last accessed: May 15, 2014).

27.     According to the USPTO, the trademark name AmberJack is registered to Harris Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office, *Trademark Reg. No. 2,710,009 [AmberJack]* (registered Aug. 22, 2003), *all associated documents available via search at* http://tsdr.uspto.gov/#caseNumber=2710009&caseType=US_REGISTRATION_NO&searchType=statusSearch (last accessed: May 16, 2014).  The full USPTO document record for AmberJack is on the record at <u>ATTACHMENT 11</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.

28.     According to the USPTO, Harris Intellectual Property Dept. attorney, Michael S. Yatsko, signed a public declaration on August 14, 2001, stating that the AmberJack mark is for "direction finding antennas for use in locating and tracking mobile telephones."  *Id*.  The trademark documents indicate that the mark was first used in connection with the goods on October 28, 2002, and was first used in commerce on October 28, 2002.  *Id*.

29.     Within the trademark documents is a picture of the AmberJack mark attached to goods as used in interstate commerce.  *See id*.  In the picture, a label on the AmberJack indicates that the device is mounted to a road vehicle and used while driving: "Direction Finding System has been designed to mount magnetically... [and] to [be us]able at normal highway speeds[.]"  *Id*.

**6.  Publicly preserved federal government records relating to all Harris equipment used to locate wireless devices.**

30.     Public records at the United States General Services Administration reveal numerous portable/transportable wireless device locators and accessories being sold by Harris

1  to the federal government and the price for each product.  *See* United States General Services

2  Administration. (Mar. 11, 2014).  FEDERAL SUPPLY SERVICE, INFORMATION

3  TECHNOLOGY SCHEDULE PRICELIST, GENERAL PURPOSE COMMERCIAL

4  INFORMATION TECHNOLOGY EQUIPMENT, SOFTWARE AND SERVICES (Harris),

5  *available at* https://www.gsaadvantage.gov/ref_text/GS35F0283J/0ML8KB.2S6VTT_GS-

6  35F-0283J_HARRISMOD162.PDF (last accessed: May 16, 2014).  The full GSA record of

7  Harris products is on the record at <u>ATTACHMENT 12</u> of *Daniel Rigmaiden's Declaration*

8  *Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for*

9  *Summary Judgment*.

10         31.     According to the U.S. GSA record, the portable/transportable wireless device

11  locators and accessories being sold by Harris include, but are not limited to **(1)** Gossamer

12  5100, $19,696; **(2)** KingFish, $25,349; **(3)** StingRay, $68,479; **(4)** Converter Band 4 CONUS

13  w/ By Pass, $18,054; **(5)** StingRay II, $134,952; **(6)** StingRay I to StingRay II Upgrade,

14  $65,014; **(7)** AmberJack W, $35,015; **(8)** AmberJack Legacy to W Upgrade, $18,009; **(9)**

15  AmberJack W Upgrade, $19,741; **(10)** OCTOPUS, $14,589; **(11)** 25W PA (CONUS),

16  $10,486; **(12)** 25W PA Kit (OCONUS), $10,486; **(13)** 25W PA Kit W/AD – RayFish Only

17  (CONUS), $10,486; **(14)** 25W PA Kit W/AD – RayFish Only (OCONUS), $10,486; **(15)**

18  Harpoon 2100, $16,915; **(16)** Harpoon (CONUS), $18,419; **(17)** Harpoon (OCONUS),

19  $18,419; **(18)** Harpoon iDen, $14,954; **(19)** Moray II, $24,984; **(20)** KingFish X1 to

20  HailStorm Upgrade, $154,557; **(21)** KingFish X2 to HailStorm Upgrade, $139,511; **(22)**

21  KingFish X3 to HailStorm Upgrade, $124,466; **(23)** KingFish X1 to HailStorm Upgrade,

22  $119,907; **(24)** KingFish X2 to HailStorm Upgrade, $104,861; **(25)** KingFish X3 to

23  HailStorm Upgrade, $89,816; **(26)** KingFish X1 to HailStorm Upgrade, $74,771; **(27)**

24  HailStorm, $169,602; **(28)** StingRay I to HailStorm Upgrade, $109,421; **(29)** StingRay II to

25  HailStorm Upgrade, $65,652; **(30)** KingFish X4 to HailStorm Upgrade, $109,421; **(31)**

26  Harpoon PA Kit Dual Band 700/800, $18,419; and **(32)** Harpoon PA Kit Dual Band 700/800

27  Upgrade, $14,134.  *See id*.

28         32.     Harris has numerous publicly available published patents corresponding to its

portable/transportable wireless device locator technology.  These patents explain how to make the devices used to track and locate cell phones, etc.:

> [T]he wireless device locator may include at least one antenna and a transceiver connected thereto, and a controller for cooperating with the transceiver for transmitting a plurality of location finding signals to a target wireless communications device from among the plurality thereof.  The target device may transmit a respective reply signal for each of the location finding signals.

> Billhartz, Thomas J., *et al.*, Harris Corp., *Wireless Communications System Including A Wireless Device Locator And Related Methods*, U.S. Patent No. 7,321,777 (Melbourne, FL: Jan. 22, 2008), *available at* http://www.freepatentsonline.com/7321777.html (last accessed: May 16, 2014), p. 2, ln. 47-55.

> The location determining system may also include a location determining processor coupled to the receiver to collect, during movement relative to the wireless transmitter, a series of range measurements [(using propagation delays)] and a corresponding series of received signal measurements, and to estimate a location of the wireless transmitter based upon the range measurements weighted using the received signal measurements.

> McPherson, Rodney and Lanza, David J., Harris Corp., *Wireless Transmitter Location Determining System And Related Methods*, U.S. Patent No. 7,592,956 (Melbourne, FL: Sept. 22, 2009), *available at* http://www.freepatentsonline.com/7592956.html (last accessed: May 16, 2014), p. 2, ln. 16-22.

> In certain embodiments, the antenna may comprise a directional antenna.  In these embodiments, the location determining processor may cooperate with the directional antenna to collect, during movement relative to the wireless transmitter, a corresponding series of angle of arrival measurements.  The location determining processor may also estimate the location of the wireless transmitter further based upon the angle of arrival measurements.

> *Id.*, p. 2, ln. 40-47.

> Moreover, the location determining processor may cooperate with the receiver to collect, during movement relative to the wireless transmitter, a corresponding series of received signal strength measurements.  The location determining processor may further estimate the location of the wireless transmitter further based upon the received signal strength measurements weighted using the received signal measurements.

> *Id.*, p. 2, ln. 52-58.

1   *See also*, *e.g.*, Otto, James C., Harris Corp., S*ystem And Method For*
    *Determining The Geolocation Of A Transmitter*, U.S. Patent No. 5,719,584
2   (Indian Harbor Beach, FL: Feb. 17, 1998), available at
    http://www.freepatentsonline.com/5719584.html (last accessed: May 16, 2014);
3   Proctor, James A, Jr. and Otto, James C., Harris Corp., *Range And Bearing*
    *Tracking System With Multipath Rejection*, U.S. Patent No. 5,687,196
4   (Indialantic, FL: Nov. 11, 1997), *available at*
    http://www.freepatentsonline.com/5687196.html (last accessed Feb. 16, 2011).

5

6   The above quoted/cited published patents are on the record at <u>ATTACHMENT 13</u> of *Daniel*

7   *Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to*

8   *Defendants' Second Motion for Summary Judgment*.

9          33.     By virtue of the patents being publicly available, it is evident that the

10  government has made no effort to protect Harris' patents under the Invention Secrecy Act

11  (ISA), 35 U.S.C. §§ 181-88: "If, in the opinion of the Atomic Energy Commission, the

12  Secretary of a Defense Department, or the chief officer of another department or agency so

13  designated, the publication or disclosure of the invention by the publication of an application

14  or by the granting of a patent therefor would be detrimental to the national security, the

15  Atomic Energy Commission, the Secretary of a Defense Department, or such other chief

16  officer shall notify the Commissioner of Patents and the Commissioner of Patents shall order

17  that the invention be kept secret and shall withhold the publication of the application or the

18  grant of a patent for such period as the national interest requires[.]" *Id.*, § 181.

19              **B.    Information preserved in official <u>state government</u> public records
                        detailing the technical operations of Harris devices (rebutting
20                      Defendants' claims of Exemption (b)(7)(E), etc.).**

21                  **1.   Publicly preserved state government records relating to all
                          Harris equipment used to locate wireless devices.**
22

23         34.     On August 23, 2010, Investigator Christopher Corbitt of Leon County, FL,

24  testified in a Florida court about how cell site simulators operate.  *See* <u>Florida v. James L.</u>

25  <u>Thomas</u>, No. 2008-CF-3350A, Suppression Hearing Transcript RE: Harris StingRay &

26  KingFish [testimony of Investigator Christopher Corbitt] (2nd Cir. Ct., Leon County, FL,

27  Aug. 23, 2010); <u>ATTACHMENT 14</u> of *Daniel Rigmaiden's Declaration Under Penalty of*

28  *Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary*

1    *Judgment*.

2       35.      Among other detailed technical information, Corbitt explained how a cell site

3   simulator used to locate a cell phone "forces the handset to transmit at full power." *Id.*, p. 17.

4       36.      Publicly disclosed Miami, Florida, City Commission Legislative Files contain

5   numerous documents revealing information on how various Harris portable/transportable

6   wireless device locators operate:

7

8      <u>The KingFish system is the only man-portable battery powered CDMA & GSM Interrogation, Active Location, and Signal Information Collection system currently available.</u>  KingFish is compatible with CDMA commercial standards IS-95A, IS-95-B, TSB74, and J-STD-008 in the U.S. 800 and 1900 MHz bands. A GSM S/W upgrade package (for the KingFish and its Pocket PC) is available for purchase that will allow operation against the GSM standard in the U.S. 800 and 1900 MHz bands (as well as the overseas 900 MHz E-GSM and DCS 1800 MHz bands).  KingFish can also be powered via standard automotive + 12V DC or standard 110 VAC.  The man-portability and battery power features of the Harris KingFish product are unique for tactical mission needs, allowing the user to perform passive collection, active interrogation and active location while on foot (i.e., inside a multi-story building, or outside in rough terrain).

9

10

11

12

13

14      Miami, FL, USA – Legislative Files, Harris Sole Source Vendor Letter, p. 1 (Nov. 29, 2006), *available at*

15      http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf (last accessed: May 16, 2014).

16

17      The Police Department will be purchasing a Dual Band High Powered 30W Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband Direction Finder to upgrade the StingRay 4-CH and KingFish 1-CH, from Harris GCSD...

18

19

20      The upgrade is necessary to operate both the StingRay 4-CH and the KingFish 1-CH given the continuous change in technology.  The amplifier will allow an increase in wattage that will greatly heighten the ability of tracking phones from an increased distance and reducing the time utilized; the converter is a high performance converter that enables the StingRay and the KingFish to operate in the 2100 MHz band, which is the new cellular phone technology being introduced to the Miami market and already being utilized around the country; the Amberjack Wideband will enable the StingRay to use its added capabilities with the current iDEN software to pinpoint push-to-talk cellular phones more effectively, a feature that the current equipment does not have.  This will enable the investigators to carry out their duties and responsibilities in a more effective and efficient manner.

21

22

23

24

25

26

27      Miami, FL, USA, *Legislative Files, Inter-Office Memo RE: Harris Sole Source Vendor*, p. 1 (Nov. 13, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/47993.pdf (last accessed: May 16, 2014).

28

The Harris StingRay and KingFish systems are compatible with the CDMA standard in the 800 MHz and 1900 MHz frequency bands, the GSM standard in the 800 MHz, 900 MHz, 1800 MHz, and 1900 MHz frequency bands, the iDEN (Nextel) standard in the 800 MHz and 850 MHz frequency bands, the UMTS standard in the 800 MHz and 1900 MHz frequency bands, and, with optional converter equipment, the UMTS standard in the 2100 MHz frequency band.

<u>The Harris StingRay and KingFish vehicular-based systems are the only portable standard +12VDC powered CDMA, GSM, UMTS, and iDEN interrogation, tracking and location, and signal information collection system currently available.</u>  When interfaced with the optional Harris AmberJack direction-finding (DF) antenna(s) (or handheld DF antenna for iDEN and UMTS), Tarpon software, laptop PC controller, and Harpoon amplifier kits, the StingRay can perform vehicular-based DF operations on the CDMA, GSM, UMTS, and iDEN cellular formats.  The transportability and standard +12VDC vehicular power features of the Harris StingRay and KingFish products are unique for tactical mission needs.

The StingRay and KingFish are quoted with software and accessories that are required in order to perform missions on the CDMA, GSM, UMTS, and iDEN cellular formats.  These include the cable assemblies, power supplies, antennas, laptop PC controller, power amplifiers, handheld DF antenna, AmberJack DF antenna, and cellular format software (CDMA, GSM, UMTS, and iDEN).

Harris also sells training on the use of the StingRay, KingFish and its accessories.  Standard training sessions are 2 days per class with a maximum class size of 4 students....

Miami, FL, USA, *Legislative Files, Harris Sole Source Letter [Attachment B]*, p. 2 (Aug. 25, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48003.pdf (last accessed: May 16, 2014).

Relevant pages of the above quoted Miami, Florida, City Commission Legislative Files are on the record at <u>ATTACHMENT 15</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.

37.     Publicly disclosed Miami, Florida, City Commission Legislative Files also contain Harris product datasheets revealing information on the features of the Harris line of wireless device locators (*i.e.*, StingRay, AmberJack, Geolocation software, and KingFish):

**StingRay** Transportable CDMA Interrogation, Tracking and Location, and Signal Information Collection System

***Product Description***

StingRay is Harris' latest offering in a long line of advanced wireless surveillance products.  StingRay is a multichannel software defined radio that performs network base station surveys, Dialed Number and registration collection, mobile interrogation, and target tracking and location with Harris' AmberJack  Direction-Finding Antenna.  This low-power transportable surveillance system is designed with the future in mind—its reconfigurable architecture lends itself to upgrades of new capabilities and wireless standards, while preserving the initial investment in hardware.

### Features

- Software Defined Radio (SDR) enables Simultaneous monitoring of up to eight CDMA Paging/Access channel pairs

- Active interrogation capability emulates base station to collect MINs and ESNs through forced registration; external PA output available for higher power requirements

- Interfaces with AmberJack antenna to form a complete target tracking and location solution using active direction-finding and ranging techniques (active approach does not require the target phone to be engaged in a call)

- Optional geolocation software overlays target tracks and tracking vehicle location on a digital map

- Wideband RF front-end provides simultaneous operation in the U.S. cellular 800 and PCS 1900 MHz bands and is preconfigured to support iDEN (low band), GSM 900, and DCS 1800 bands

- PC-based controller running Windows XP provides an Intuitive Graphical User Interface (GUI)

- Industry-standard USB interface enables plug-n-play networking of multiple StingRay surveillance systems if the user requires more channel capacity

- Supports targeting and real-time searching of mobile identification numbers (MIN), dialed numbers, and electronic serial numbers (ESN)

- Low-power system designed for vehicular operations

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: May 16, 2014).

**AmberJack** Dual-Band Direction Finding System

### Product Description

AmberJack is a phased array direction finding (DF) antenna system capable of

tracking and locating mobile phone users.  The DF antenna array is designed to operate with Harris' LoggerHead and StingRay products enabling tracking and location of AMPS, TDMA and CDMA phones.  AmberJack operates in both the cellular and PCS bands.

AmberJack combines Harris' expertise in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction finding system.  Beam forming technology offers a universal DF antenna for existing as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle and offers a low profile for reduced visibility.  User-friendly software, developed for the Windows operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface.  Once a targeted phone is engaged, information on the direction to the target is dynamically updated for display on the PC.

### Features

- Determines direction of arrival and received signal strength of phone's transmission

- Provides real-time display of direction to the target

- Low power, small size

- User-friendly graphical user interface for the PC or Pocket PC (optional)

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed: Mar. 9, 2011).

**AmberJack** Direction-Finding System

### Product Description

AmberJack is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations. The DF antenna array is designed to operate with Harris' Gossamer, KingFish, StingRay, and StingRay II products, enabling tracking and location of targeted mobile phones, as well as base stations. AmberJack-X operates in the U.S. cellular 850 and PCS 1900 bands, and AmberJack-G operates in the EGSM 900 and DCS 1800 bands.  AmberJack-W operates in all the bands above as well as IDEN and UMTS bands I and IV.

AmberJack combines Harris' experience in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction-finding system.  Phased array technology offers a universal DF antenna for existing, as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation on

the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a target is engaged, information on the direction to the target is dynamically updated for display on the PC.

### Operations Supported

• Locating mobile phones and base stations

• Tracking mobile phones

### Features

• Determines direction of arrival and received signal strength of a targeted mobile phone's transmissions

• Determines direction of arrival and received signal strength of a targeted base station's transmission

• Provides real-time display of direction to the target

• Low power and portable

• User-friendly Graphical User Interface (GUI) for the PC
...

### External Control

• Laptop PC (Windows XP Professional)

### Power Source

• 12 Vdc at 0.5 A

### Physical Characteristics

• Size: D = 17" H = 4.2"

• Weight: <14 lbs

### Required Accessories (sold separately)

Gossamer with PC Controller, StingRay system, StingRay II, or KingFish with PC Controller

### Optional Accessories

• Harpoon for DF range extension

...

Miami, FL, USA, *Legislative Files, Harris Sole Source Letter [Attachment B]*, p. 6-7 (Aug. 25, 2008), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48003.pdf (last accessed May 16, 2014).

**Geolocation (Preliminary)** PC-Based Intelligent AMPS/TDMA and CDMA Tracking and Location

### Product Description

Geolocation is a PC-based software application that allows the user to intelligently track and locate targeted AMPS/TDMA or CDMA cellular phones...  Geolocation consists of software and an external GPS receiver. Geolocation will be offered in two options: an AMPS/TDMA Option to be used in conjunction with the Harris LoggerHead Interrogator plus the PC Controller and the AmberJack DF Antenna; and a CDMA Option to be used in conjunction with the Harris StingRay system plus the AmberJack DF Antenna.

Geolocation provides a user-friendly, geospatially accurate mapping routine which shows on-screen the exact location of the tracking vehicle, plus Direction of Arrival (DOA) information and/or estimated range/location information on the targeted phone.

Providing a visual screen of an accurate local map, the exact location of the tracking vehicle, and the approximate location of the targeted phone, allows for a much more intelligent and expedient method for tracking and location.

### Features

• User-friendly application running on Windows 98/2000/XP provides an intuitive Graphical User Interface (GUI)

• AMPS/TDMA: Interfaces with the LoggerHead Handheld Interrogator plus the PC Controller and the AmberJack Direction-Finding (DF) Antenna

• CDMA: Interfaces with the StrngRay plus the AmberJack Direction-Finding (DF) Antenna

• Provided GPS receiver integrates with PC running the application

• Real-time viewing of tracking vehicle location

• Real-time viewing of approximate targeted cellular phone location

• Tracking missions can be stored for post-mission analysis

• Migration path to GSM and future cellular standards

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed: Mar. 9, 2011).

**KingFish (Preliminary)** Portable CDMA Interrogation, Direction-Finding, and Collection System

### *Product Description*

KingFish provides investigators with a tool that extracts the telephone number (MIN) and Electronic Serial Number (ESN) from a CDMA mobile telephone. The Active Direction-Finding (DF) capability enables location of a powered-on phone without depending on the suspect to be involved on a call. Additionally, KingFish provides passive Dialed Number Recorder (DNR) and Registration Collection capabilities. Passive operations identify calling patterns and provide information on the suspect's area of operation.

KingFish is based on a Software Defined Radio (SDR) architecture, which enables upgrades to future cellular standards, while preserving the initial investment in hardware. As initially offered, KingFish provides CDMA operation in both the Cellular and PCS bands.

### *Features*

**Covert Packaging**

- Concealed radio, antennas, and battery power supply

- Wireless remote control from commercially available Pocket PC

**Intuitive Application Software**

- Windows interface

- Identifies active CDMA channels and catalogs base station parameters

- Provides real-time display of Interrogation and Passive Collection results

- Dynamically updates received signal strength to enable precise location of a target phone

Miami, FL, USA, *Legislative Files, Harris Product Datasheets*, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed: May 16, 2014).

Relevant pages of the above quoted Miami, Florida, City Commission Legislative Files are on the record at <u>ATTACHMENT 15</u> of *Daniel Rigmaiden's Declaration Under Penalty of*

1 │ *Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary*

2 │ *Judgment*.

3 │       38.    Publicly disclosed Miami, Florida, City Commission Legislative Files also

4 │ contain a Harris WPG GCSD Price List with numerous wireless device locators and

5 │ accessories listed. *See* Miami, FL, USA, *Legislative Files, Harris GCSD Price List* (Sept.

6 │ 2008), p. 1-8, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf

7 │ [cached at: https://info.publicintelligence.net/Harris-SurveillancePriceList.pdf] (last accessed:

8 │ May 16, 2014). *See also* <u>ATTACHMENT 15</u> of *Daniel Rigmaiden's Declaration Under*

9 │ *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for*

10 │ *Summary Judgment*.

11 │          **C.**    **Evidence of public knowledge regarding (1) the technical operations**

12 │                   **of Harris devices, (2) how to make Harris-like devices, and (3) how**
                  **to easily defeat Harris devices used by law enforcement.**

13 │                 **1.**    **Evidence of public knowledge regarding the technical operations**

14 │                     **of Harris devices.**

15 │       39.    In 2007, the media reported that "a little-known FBI telephone intercept unit

16 │ has developed a powerful cellphone tracking technology that agents use to monitor the

17 │ physical movements of surveillance targets, even on phones that are not GPS equipped."

18 │ Singel, Ryan (Wired Digital), *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs*

19 │ (Dec. 20, 2007), http://archive.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell

20 │ (last accessed: May 17, 2014); <u>ATTACHMENT 16</u> of *Daniel Rigmaiden's Declaration*

21 │ *Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for*

22 │ *Summary Judgment*.

23 │       40.    On November 14, 2008, Rachel Myers at the ACLU reported that "[t]he FBI

24 │ now has what is called 'triggerfish' technology — a cell site simulator that forces cell phones

25 │ in the area to register its phone number, serial number and location — allowing it to track cell

26 │ phones on its own." Myers, Rachel (ACLU), *With Technology Like This, Who Needs the*

27 │ *Law? | American Civil Liberties Union* (Nov. 14, 2008),

28 │ http://www.aclu.org/2008/11/14/with-technology-like-this-who-needs-the-law (last accessed

May 17, 2014).  The above quoted news article is on the record at <u>ATTACHMENT 17</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.

41.     On September 22, 2011, *The Wall Street Journal* published a front page article detailing the government's use of the Harris StingRay.  *See* Valentino-DeVries, Jennifer (The Wall Street Journal), *'Stingray' Phone Tracker Fuels Constitutional Clash*, p. A1 (Sept. 22, 2011) (original article addressing CR08-814-PHX-DGC) *available at* http://online.wsj.com/news/articles/SB10001424053111904194604576583112723197574#printMode (last accessed: May 17, 2014); <u>ATTACHMENT 18</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.  The article goes into great detail about how the StingRay operates and includes a diagram.  *See id*.

42.     On April 9, 2013, Kim Zetter, a reporter for *Wired*, published an article explaining cell site simulator technology in great detail.  *See* Zetter, Kim (Wired), *Secrets of FBI Smartphone Surveillance Tool Revealed in Court Fight* (Apr. 09, 2013), *available at* http://www.wired.com/threatlevel/2013/04/verizon-rigmaiden-aircard/all/ (last accessed: May 17, 2014); <u>ATTACHMENT 19</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.

43.     In his book, [Lapin, Lee. (2003).  *How To Get Anything On Anybody – Book 3*. Mt. Shasta, CA: Intelligence Here. ISBN: 1880231131.] former government employee Lee Lapin explains the functionality of various portable/transportable wireless device locators manufactured by Harris WPG (*i.e.*, LoggerHead 4000, DF Antenna Array, SeaHorse, StarFish, and TriggerFish):

> The LoggerHead 4000 is a handheld device that enables survey, intercept, and interrogation of analog and digital cellular networks.  This multipurpose tool provides investigators with a means of passively monitoring forward and reverse voice traffic, locating targeted cellular telephone users, actively intercepting calls, and interrogating cellular telephones for identifying information.  LoggerHead 4000 operates in the cellular and PCS bands.

> **Base Station Survey**

●     Identifies analog and digital control channels with related received signal strength

●     Captures network information including System ID (SID) and service provider features

●     Time tags and stores survey results

**Passive Mobile Survey**

●     Intercepts forward and reverse audio using operator-defined mobile target parameters

●     Captures call related information including Mobile Identification Number (MIN), Electronic Serial Number (ESN), Dialed Number, Caller ID. and Received Signal Strength

●     Collects occurrences of mobile registrations with the network

●     Scans voice traffic channels for call activity

**Active Mobile Survey**

●     Emulates Base Station Control Channel to "capture" mobile phones in close proximity

●     Collects MINs and ESNs through forced registration

●     Actively intercepts or denies calls originating from captured mobile phones

**Direction Finding**

●     Interfaces with available direction-finding equipment

Lapin, Lee. (2003). *How To Get Anything On Anybody – Book 3* (p. 122). Mt. Shasta, CA: Intelligence Here. ISBN: 1880231131.

SeaHorse is an Interrogation and Direction Finding (DF) system, which is capable of identifying, tracking, and locating an IS-95 (CDMA) mobile phone.  SeaHorse may be deployed with a tracking vehicle or in a man-portable configuration.  The interrogation function is used to extract the identity (IMSI and ESN) of a suspect's mobile phone, if this information is not already known to the investigator.  The DF function is used to track and locate a targeted suspect.

SeaHorse is capable of operating in both the Cellular and PCS bands.

User friendly software, developed for Windows operating systems, enables control of the SeaHorse system from a laptop or pocket PC.

The DF Antenna Array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle. Once a targeted phone is engaged, information on the directions to the target is dynamically updated for display on the PC. The DF Antenna Array is designed to operate with Harris' entire line of interrogators and intercept receivers, enabling tracking and location of AMPS, TDMA, GSM, as well as CDMA phones.

When detached from the laptop PC and Antenna Array, the interrogator unit can be easily concealed for tactical interrogation and location operations.

**Features**

Base Station Survey Capability

● Identifies active CDMA channels

● Measures and records pilot signal strengths

● Captures network information required for interrogation operation

● Time tags and stores survey results

**Interrogation**

● Emulates Base Station to "capture" IS-95 phones in close proximity

● Collects and stores phone identities (IMSI and ESN)

**Direction Finding**

● Engages targeted mobile phone

● Determines direction of arrival and received signal strength of phone's transmissions

● Provides real-time display of direction to the target

*Id.*, p. 123.

StarFish integrates the Harris TriggerFish and LoggerHead surveillance products into a single pinpoint cellular location product. StarFish combines the multichannel monitoring capability of the TriggerFish with the mobility of the handheld LoggerHead to track a cellular user to an area the size of a hotel room. The StarFish system is comprised of a LoggerHead segment and a TriggerFish segment. The LoggerHead segment consists of a LoggerHead, directional

antenna, a pocket PC (PPC) and communications equipment that is man-portable and concealed within a common backpack or shoulder bag.  The TriggerFish segment consists of a TriggerFish and wireless communications equipment.

In StarFish mode, the LoggerHead receives its channel assignment remotely from the TriggerFish segment and graphically represents signal strength indications from the directional antenna to the PPC enabling the operator to locate the cellular target.  The TriggerFish segment serves as the command and control element for StarFish.  It monitors for a selected cellular target and sends channel assignments and short text messages to a maximum of six LoggerHead segments in the field.

Feedback to the TriggerFish operator of LoggerHead receiver signal strength and channel information allows an operator to direct and coordinate the search while somewhat removed from the hostile environment.

**Features**

● Ability to intercept and locate an AMPS/TDMA phone operating in the U.S. cellular or PCS bands

● Ability of the TriggerFish to remotely control and status up to six LoggerHeads at a range of up to 2,000 feet

● Remote control and status of LoggerHead mobile tracking functions via the PPC

● Concealment of the LoggerHead segment in an ordinary backpack or shoulder bag

*Id.*, pp. 123-24.

44.    "Lee [Lapin] has worked with several agencies, both public and private, helping to develop surveillance and tracking equipment and techniques.  His works ('letters on file') are employed as textbooks by many of the world's major intelligence agencies including the CIA, KGB and MOSSAD, the Justice Department, IRS, ATF, even the FBI.  In addition, Lee has appeared on several national talk shows and has been featured on the front page of the NY Times, in People Magazine, Associated Press, and in many other magazines and newspapers."  Coast to Coast AM, *Lee Lapin - Guests - Coast to Coast AM*, Lee Lapin Biography, http://www.coasttocoastam.com/guest/lapin-lee/6469 (last accessed: May 17, 2014).  The above quoted news article is on the record at <u>ATTACHMENT 20</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to*

1  *Defendants' Second Motion for Summary Judgment*.

2            **2.**    **Evidence of public knowledge regarding how to make Harris**
3                  **devices.**

4         45.      Through the OpenBTS project, information is publicly available allowing for

5  anyone to build his/her own 2G GSM cell site simulator for approximately $1500 USD.  *See*

6  *OpenBTS Public Release*, http://wush.net/trac/rangepublic/wiki/WikiStart (last accessed: May

7  18, 2014) ("OpenBTS is a Unix application that uses a software radio to present a GSM air

8  interface to standard 2G GSM handset and uses a SIP softswitch or PBX to connect calls.");

9  ATTACHMENT 21 of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support*

10  *of Plaintiff's Response to Defendants' Second Motion for Summary Judgment* (web resource

11  attached).

12         46.      At the 2010 Defcon security conference, researcher Chris Paget used the

13  OpenBTS software to publicly demonstrate her own cell site simulator similar to the

14  technology built into Harris portable/transportable wireless device locators.  *See* Greenberg,

15  Andy (Forbes Magazine), *Despite FCC Scare Tactics, Researcher Demos AT&T*

16  *Eavesdropping - Forbes* (Jul. 31, 2010), *available at*

17  http://www.forbes.com/sites/firewall/2010/07/31/despite-fcc-scare-tactics-researcher-demos-

18  att-eavesdropping/print/ (last accessed: May 18, 2014) ("With about $1,500 worth of

19  hardware and open source software, Paget turned two on-stage antennas into a setup capable

20  of spoofing the base stations that connect the GSM cell phone signals used by AT&T and T-

21  Mobile. Paget set h[er] hardware to impersonate an AT&T signal, and dozens of phones in the

22  room connected to h[er] fake base station.").  The above quoted news article is on the record

23  at ATTACHMENT 22 of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in*

24  *Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.

25            **3.**    **Evidence of public knowledge regarding how to easily defeat**
26                  **Harris devices.**

27         47.      Through the "Catcher Catcher" project, an open source software tool is publicly

28  available that can detect and defeat portable/transportable wireless device locators operating

in cell site simulator mode:

**IMSI catcher detection**

For IMSI catchers [(aka "stingrays")] to achieve their goals they will need to show behavior different from normal base stations. We distinguish between yellow, red, and black flags. Yellow flag are an indication that you might have been caught; red flags are a very strong indication; and black flags tell you: "You are being tracked down; throw away your phone and run."

*See CatcherCatcher - Mobile Network Assessment Tools - SRLabs Open Source Projects*, https://opensource.srlabs.de/projects/mobile-network-assessment-tools/wiki/CatcherCatcher (last accessed: May 18, 2014); <u>ATTACHMENT 23</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.

48.     Some of the detection methods used by the "Catcher Catcher" software include: (1) "No encryption after using encryption with the same operator before," (2) "IMEI not requested in Cipher Mode Complete message," (3) "The LAC of a base station changes," (4) "The LAC changes more than once," (5) "The network queries the phones IMEI during location update," (6) "Receive a silent text message," (7) "You are paged, but do not enter any transaction," (8) "You do not receive a call setup message while already being on a traffic channel for 2 seconds," (9) "You do not receive a call setup message while already being on a traffic channel for [10 seconds]," and (10) "Your phone sends at the highest possible power." *Id*.

49.     Using the "Catcher Catcher" software, anyone can detect and defeat law enforcement use of Harris portable/transportable wireless device locators.  The software is available as a free download from https://opensource.srlabs.de/projects/mobile-network-assessment-tools/wiki/GSMmap-live (last accessed: May 23, 2014).  The outcome the FBI fears is already a reality.

50.     Through the "SnoopSnitch" project, an open source software tool is publicly available that can detect and defeat portable/transportable wireless device locators operating in cell site simulator mode:

1
2
3

> SnoopSnitch is an Android app that collects and analyzes mobile radio data to make you aware of your mobile network security and to warn you about threats like fake base stations (IMSI catchers), user tracking and over-the-air updates. With SnoopSnitch you can use the data collected in the GSM Security Map at gsmmap.org and contribute your own data to GSM Map.

4

5   *See Wiki - SnoopSnitch - SRLabs Open Source Projects*,

6   https://opensource.srlabs.de/projects/snoopsnitch (last accessed: Jun. 22, 2015); <u>ATTACHMENT</u>

7   <u>24</u> of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's*

8   *Response to Defendants' Second Motion for Summary Judgment*.

9        51.    The SnoopSnitch App is available for download on the Google Play Store,

10  https://play.google.com/store/apps/details?id=de.srlabs.snoopsnitch&hl=en (last accessed:

11  Jun. 22, 2015).  *See id*.  Anyone with a compatible cell phone can download and install the

12  App to detect and defeat cell site simulators.  *See id*.

13       52.    On April 20, 2015, Pwnie Express demonstrated its new product "that detects

14  rogue cellular network transceivers, including 'Stingray' devices and other hardware used by

15  law enforcement to surreptitiously monitor and track cell phones and users."  *See* Gallagher,

16  Sean. (Apr. 20, 2015). *This machine catches stingrays: Pwnie Express demos cellular threat*

17  *detector*. Ars Technica; <u>ATTACHMENT 25</u> of *Daniel Rigmaiden's Declaration Under*

18  *Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for*

19  *Summary Judgment*.

20       53.    Among other detection methods used to defeat the StingRay and other cell site

21  simulators, the Pwnie Express device detects when "a base station has moved or changed its

22  transmitting power."  *Id*.

23         **D.**    **Evidence that Defendant FBI has additional responsive records in the unsearched records systems.**

24

25       54.    While Plaintiff defended himself in <u>United States v. Rigmaiden</u>, CR08-814-

26  PHX-DGC (D.Ariz.), Defendant FBI provided Plaintiff with copies of text messages sent

27  to/from FBI agents while they used cell site simulator based portable/transportable wireless

28  device locators to locate Plaintiff's aircard in his Santa Clara, CA, apartment in 2008.  *See*

1  United States v. Rigmaiden, CR08-814-PHX-DGC, Dkt. #821-3, pp. 86-93 (D.Ariz., May 25,

2  2012); ATTACHMENT 26 of *Daniel Rigmaiden's Declaration Under Penalty of Perjury in*

3  *Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*.

4       55.     These text messages were sent on July 16, 2008, but were pulled from an FBI

5  "text messaging system" more than 3 years later in late 2011. *See id*.

6       56.     In his original FOIA request letters sent to Defendant FBI, Plaintiff requested

7  "text messages" stored in "text messaging systems." *See* Dkt. #001-2, p. 4-6.

8       57.     Defendant FBI refuses to search for "text messages" stored in "text messaging

9  systems" despite clear evidence of the records existing in relation to investigations involving

10 portable/transportable wireless device locators. *See* Dkt. #137-1, p. 7 ¶ 14. Within the Harris

11 FOIA request documents provided so far, there are no copies of SMS text messages sent

12 to/from agents as during investigations to locate cellular devices with Harris equipment. *See*

13 *Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response*

14 *to Defendants' Second Motion for Summary Judgment*, ¶ 42.

15              **E.     Plaintiff paid the FBI all of its $555 extortion fee in relation to the 37**
                         **CDs worth of data that should have been provided on 3 CDs for $45.**
16

17      58.     Pursuant to the Court's scheduling order, Plaintiff filed his notice of intent to

18 pay the FBI's standard FOIA duplication fees on January 13, 2015. *See* Rigmaiden v. FBI,

19 CV12-01605-PHX-DLR, Dkt. #128 (D.Ariz.). On January 12, 2015, the Court ordered that

20 "within 90 days of Plaintiff's Notice [to pay standard duplication fees], Defendants shall

21 provide Plaintiff with all documents responsive to the [FOIA] searches[.]" *Id.*, Dkt. #127, pp.

22 5-6. In other words, the FBI had three months to provide Plaintiff with documents while he

23 paid the standard duplication fees.

24      59.     According to an email sent to Plaintiff by Mr. Rosenberg on December 19,

25 2014, the FBI's standard method of fulfilling FOIA requests and charging duplication fees is

26 to provide one CD per month at $15.00 per CD:

27          "I assume that you would opt for one CD per month, rather than two CDs every
            other month. (I believe that CDs are $15 each.) This is the standard method by
28          which the FBI processes FOIA requests."

*Daniel Rigmaiden's Declaration Under Penalty of Perjury in Support of Plaintiff's Response to Defendants' Second Motion for Summary Judgment*, ¶ No. 2 (quoting declaration <u>ATTACHMENT 27</u> [email chain including above quoted email dated December 19, 2014]).

60.     On December 17, 2014, prior to the above email, Plaintiff advised Mr. Rosenberg that "[he] will pay for the DVDs/CDs one at time." *Id.*, ¶ No. 3 (quoting declaration <u>ATTACHMENT 27</u> [email chain including above quoted email dated December 17, 2014]).

61.     Based on Plaintiff's email discussions with Mr. Rosenberg wherein Plaintiff was advised that the FBI sends out one CD per month at $15.00 each, and based on the Court's order requiring the FBI to produce all documents within three months, it was clear that Plaintiff would be paying for one CD per month, at $15.00 each, over three months for a total of $45.00. *See id.*, ¶ No. 4.  When Plaintiff filed his notice at Dkt. #128 to pay the standard fees, he was agreeing to pay these standard fees as they were presented to Plaintiff by Mr. Rosenberg in the email chain. *See id*.

62.     Instead of sending Plaintiff one CD per month at $15.00 each over the 3-month period ordered by the Court, the FBI sent Plaintiff a first letter containing seven (7) CDs at $15.00 per CD for a total of $105.00; a second letter containing eleven (11) CDs at $15.00 per CD for a total of $165.00; and then a box containing nineteen (19) CDs for a total of $285.00. The grand total came to $555.00 for 37 CDs ($545 actual, due to a $10.00 credit). *See id.*, ¶ No. 5.

63.     A standard CD has a data capacity of **700 megabytes**. *See Compact disc*. Wikipedia [website], https://en.wikipedia.org/wiki/Compact_disc (last accessed: May 20, 2015). However, none of the 37 CDs billed to Plaintiff at $15.00 each (for a total of $555.00) were filled anywhere near capacity. *See id.*, ¶ No. 6.  In fact, the total amount of PDF files making up the FBI Harris FOIA document disclosure came to a mere **510 megabytes**, which is only **72.8%** of the capacity of a **single $15.00 FBI CD**. *See id*.  This is further explained below.

64.     The FBI's first set of PDF files sent to Plaintiff on March 4, 2015, consisted of a total of **49.7 megabytes** (for 482 PDF pages) spread across seven (7) CDs. *See id.*, ¶ No. 7

(citing declaration <u>ATTACHMENT 28</u> [screenshot of the total amount of data contained on the seven (7) CDs]).

65.    The data making up the first set of PDF files could have fit on a single CD, which has a standard capacity of 700 megabytes, but the FBI instead spread the PDF files across seven (7) CDs, which have a combined capacity of 4,900 megabytes, and billed Plaintiff $105.00 for the seven (7) CDs.  *See id.*, ¶ No. 8 (citing Dkt. #137-1, p. 22 (FBI's cover letter, dated March 3, 2015, billing Plaintiff $105.00 for the seven (7) CDs)).

66.    The FBI's second set of PDF files sent to Plaintiff on April 1, 2015, consisted of a total of **75.3 megabytes** (for 672 PDF pages) spread across eleven (11) CDs.  *See id.*, ¶ No. 9 (citing declaration <u>ATTACHMENT 29</u> [screenshot of the total amount of data contained on the eleven (11) CDs]).

67.    The data making up the second set of PDF files could have fit on a single CD, which has a standard capacity of 700 megabytes, but the FBI instead spread the PDF files across eleven (11) CDs, which have a combined capacity of 7,700 megabytes, and billed Plaintiff $165.00 for the eleven (11) CDs.  *See id.*, ¶ No. 10 (citing Dkt. #137-1, p. 26 (FBI's cover letter, dated March 31, 2015, billing Plaintiff $165.00 for the eleven (11) CDs)).

68.    The FBI's third set of PDF files sent to Plaintiff on April 13, 2015, consisted of a total of **385 megabytes** (for 3,417 PDF pages) spread across nineteen (19) CDs.  *See id.*, ¶ No. 11 (citing declaration <u>ATTACHMENT 30</u> [screenshot of the total amount of data contained on the nineteen (19) CDs]).

69.    The data making up the third set of PDF files could have fit on a single CD, which has a standard capacity of 700 megabytes, but the FBI instead spread the PDF files across nineteen (19) CDs, which have a combined capacity of 13,300 megabytes, and billed Plaintiff $285.00 for the nineteen (19) CDs.  *See id.*, ¶ No. 12 (citing Dkt. #137-1, p. 30 (FBI's cover letter, dated April 13, 2015, billing Plaintiff $285.00 for the nineteen (19) CDs)).

70.    Each of the FBI letters billing Plaintiff the combined $555.00 state that "[f]ailure to pay for this release within thirty (30) days from the date of this letter will close any pending FBI FOIPA requests from you.  Nonpayment will also cause an automatic denial of any future FOIPA

1 | requests." *See id.*, ¶ No. 13 (citing citing Dkt. #137-1, p. 22-32).

2 |      71.    After receiving the FBI's first set of CDs billed at $105.00 ($95.00 actual, after

3 | applying a $10.00 credit), Plaintiff paid the FBI $95.00 under duress due to the warning noted in

4 | ¶ No. 26 above and also because he sought to avoid the consequences noted in 28 CFR 16.11(g),

5 | stating that "[c]omponents will follow the provisions of the Debt Collection Act of 1982 (Pub. L.

6 | 97-365, 96 Stat. 1749), as amended, and its administrative procedures, including the use of

7 | consumer reporting agencies, collection agencies, and offset[.]" *See id.*, ¶ No. 14.  Plaintiff paid

8 | this bill under duress, as reflected by his March 26, 2015, email sent to Mr. Rosenberg: "I am

9 | filing for summary judgment and asking that the court order the FBI to refund the fee minus the

10 | cost of one CD / DVD." *See id.* (quoting declaration <u>ATTACHMENT 31</u> [email Plaintiff sent to

11 | Mr. Rosenberg]).

12 |      72.    Plaintiff paid the FBI the remainder of its $555.00 extortion ($450.00).  *See id.*, ¶

13 | No. 15 (citing declaration <u>ATTACHMENT 32</u> [copy of $450 money order sent to the FBI]).

14 | Because Plaintiff lives right on the federal poverty line, he was unable to complete the extortion

15 | payments until May 22, 2015.

16 |      73.    The FBI failed to advise Plaintiff ahead of time that he would have to pay $555.00,

17 | or that he would be sent seven (7) CDs in a single month at $105.00 to be paid within 30 days,

18 | and then thirty (30) more CDs the next month at $350.00 to be paid within 30 days.  *See id.*, ¶

19 | No. 16.  The FBI also failed to give Plaintiff notice that he could discuss the matter with

20 | Department personnel in order to reformulate the request to meet his needs at a lower cost.  *See*

21 | *id*.

22 |      74.    The FBI provided the public with "A Guide to Conducting Research in FBI

23 | Records." *See id.*, ¶ No. 16 (guide is declaration <u>ATTACHMENT 33</u>).  The guide states that

24 | when the FBI provides FOIA records, "most releases fit on a single disc."  *Id*. (<u>ATTACHMENT</u>

25 | <u>33</u>, PDF p. 9).  This guide was originally linked from the FBI's "Freedom of Information/Privacy

26 | Act" web page located at http://www.fbi.gov/foia/ as recent as March 27, 2015.  *See*

27 | https://web.archive.org/web/20150327065938/http://www.fbi.gov/foia/a-guide-to-conducting-

28 | research-in-fbi-records (last accessed: May 20, 2015).

1   Respectfully Submitted: June 22, 2015.

2

3                                              DANIEL DAVID RIGMAIDEN,
                                               Pro Se Plaintiff:
4

5

6                                              s/ Daniel Rigmaiden
                                               Daniel D. Rigmaiden
7

8                                 **CERTIFICATE OF SERVICE**

9           I, Daniel David Rigmaiden, hereby certify that on June 22, 2015, I caused the attached

10   document to be electronically transmitted to the Clerk's Office using the ECF system for

11   filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

12

13   Brad P. Rosenberg, Attorney for Defendants

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   By: s/ Daniel Rigmaiden