## ATTACHMENT 14

DANIEL RIGMAIDEN'S DECLARATION UNDER PENALTY OF PERJURY IN
SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT

Daniel David Rigmaiden
v.
Federal Bureau of Investigation, et al.

CV12-01605-PHX-DLR


ATTACHMENT 14:   Florida v. James L. Thomas, No. 2008-CF-3350A, Suppression Hearing
Transcript RE: Harris StingRay & KingFish [testimony of Investigator
Christopher Corbitt] (2nd Cir. Ct., Leon County, FL, Aug. 23, 2010).

1

IN THE CIRCUIT COURT OF THE
SECOND JUDICIAL CIRCUIT, IN
AND FOR LEON COUNTY, FLORIDA

CASE NO.:   2008-CF-3350A


STATE OF FLORIDA

vs.

JAMES L. THOMAS,

    Defendant.

_____/


DIGITAL PROCEEDINGS: MOTION TO SUPPRESS

BEFORE:              THE HONORABLE JAMES HANKINSON

DATE:                August 23, 2010

LOCATION:            Leon County Courthouse
                     Tallahassee, Florida

FOR THE STATE:       KATHRYN RAY, ASSISTANT STATE ATTORNEY
                     OFFICE OF THE STATE ATTORNEY
                     LEON COUNTY COURTHOUSE
                     TALLAHASSEE, FLORIDA   32301

FOR THE DEFENDANT:   DAREN SHIPPY, ESQUIRE
                     OFFICE OF REGIONAL CONFLICT COUNSEL
                     227 N. BRONOUGH STREET
                     TALLAHASSEE, FLORIDA 32301

TRANSCRIBED BY:      TERESA SELVA
                     Digital Court Reporter          ORIGINAL


TERESA SELVA
Official Digital Reporter
Leon County Courthouse, Room 341
Tallahassee, FL   32301

1                    INDEX TO WITNESSES

2

3    CHRISTOPHER CORBITT                              Page

4        Direct examination by Ms. Ray                  9
         Cross examination by Mr. Shippy               19
5        Redirect examination by Ms. Ray              27

6

7    TODD SULESKI

8        Direct examination by Ms. Ray                 29
         Cross examination by Mr. Shippy               48
9        Redirect examination by Ms. Ray               59

10

11   HERBERT WESTER

12       Direct examination by Ms. Ray                 62
         Cross examination by Mr. Shippy               78
13       Redirect examination by Ms. Ray               83

14

15   ROBERT TODD

16       Direct examination by Ms. Ray                 86
         Cross examination by Mr. Shippy               89
17

18

19   DIEDRE SIMMONS

20       Direct examination by Ms. Ray                 90
         Cross examination by Mr. Shippy              100
21       Redirect examination by Ms. Ray             103

22

23   CERTIFICATE OF REPORTER                         127

24

25

```
 1                   PROCEEDINGS
 2           THE COURT:  All right.  So that takes us to State
 3       vs. Thomas.
 4           MS. RAY:  Yes, sir.
 5           THE COURT:  We're going to have testimony?
 6           MS. RAY:  Yes, sir.
 7           MR. SHIPPY:  Your Honor, on behalf of the defense, I
 8       would ask the Court to invoke the rule.
 9           THE COURT:  Uh-huh.  Let's have all potential
10       witnesses stand, please.
11           All right.  The rule of sequestration has been
12       invoked.  That means you need to remain outside the
13       courtroom.  While you're waiting to testify you're not to
14       discuss the case among yourselves.
15           An important exception to that is you're free to
16       talk to the attorneys for either side, just not in the
17       presence of any other witness.
18           Let's go ahead and swear the witnesses.
19  (Whereupon, the witnesses were duly sworn to tell the truth).
20           THE COURT:  All right.  Did we discuss who is going
21       to lead off with the evidence?
22           MR. SHIPPY:  We have not, Your Honor.  I would
23       suspect that it's the State's burden in this instance in
24       light of the allegations that have been raised in the
25       motion.
```

1            THE COURT:  Let me see the file.  Is it a search
2       warrant case?
3            MR. SHIPPY:  No warrant, Your Honor.
4            THE COURT:  All right.  The State would have the
5       obligation to proceed forward.  We'll let you -- who
6       would be your first witness, Ms. Ray?
7            MS. RAY:  Well, Judge, I think maybe there's a -- if
8       we're going to be hearing today, this defense motion to
9       compel disclosure of evidence, I think that might impact
10      the way I present the testimony.  So --
11           THE COURT:  All right.  So you think that needs to
12      be resolved first?
13           MS. RAY:  I think we should resolve that one, first.
14           THE COURT:  All right.  All right.  You don't want
15      any of these witnesses for that presentation, Mr. Shippy?
16           MS. RAY:  Yes.  Mr. Corbitt would be the witness
17      that goes to this.
18           THE COURT:  All right.  The rest of you may step
19      out.
20  (Brief pause).
21           I'm not real sure the testimony is necessary.  I
22      guess what I would need to hear from Mr. Shippy is why he
23      feels this is material.
24           MR. SHIPPY:  Thank you, Your Honor.
25           Well, we believe it's material, Your Honor, because

1          in doing the probable cause affidavit (inaudible)

2     discovery matters, one will come to find that the reason

3     that the officers in this case went to the address that

4     they went to because -- was based, I'll respectfully

5     suggest 100 percent based -- upon the information and the

6     techniques utilized by Investigator Corbitt.  And without

7     knowing what those techniques are and whether or not

8     those techniques are legally permissible, whether they

9     may be -- and I have no idea what they are, except I

10    suspect they somehow or another relate to -- relate to

11    tracking cell phones.

12         It puts us -- and I say the defense when I say us,

13    Your Honor -- at a disadvantage in understanding the

14    legality of what was done and the reliability of what was

15    done.  The only analogy that I'm able to come up with in

16    my own mind is -- whether it's good or not the Court will

17    decide.

18         But if there was an anonymous tip provided to

19    somebody that a crime was being committed at a particular

20    place at a particular time and law enforcement went to

21    the location there would be some sort of follow up, if

22    you will, to determine the reliability of the anonymous

23    tip -- and in this instance I have no idea what the

24    techniques are -- I would suggest to the Court that the

25    rules of discovery, as provided for in the Florida Rules

1        of Criminal Procedure, provide for the disclosure of this

2        information.  The Florida, United States Constitutions,

3        the due process provisions would require the disclosure

4        of this information.

5             I have indicated in the motion itself that my goal

6        is not to make the information public.  And I would have

7        no objection to the disclosure being done in camera, or

8        in some form under seal, but in order to properly and

9        effectively defend Mr. Thomas against these allegations I

10       am asking that the techniques be disclosed.  Thank you.

11            THE COURT:  Is the State going to be relying upon

12       probable cause gathered prior to their arrival at the

13       residence -- in other words, based on what the

14       investigator determined is probable cause for the search

15       that's in question?

16            MS. RAY:  Yes, Your Honor.  I think to an extent,

17       yes.  We're also going to be making an argument about

18       consent.  But they were led to that residence by the

19       techniques that indicated to them that the victim of this

20       sexual assault's cellphone was inside this apartment.

21       So, yes.

22            THE COURT:  Well, I think that in some form of

23       fashion I have to hear what led them there, then.  How we

24       do that I think there is -- what were you proposing, Mr.

25       Shippy?

1          MR. SHIPPY:  The mechanics are always the question.

2     But, once again, my goal is not to make this public so

3     that the world knows what techniques Mr. Corbitt was

4     using.  But, if there is some form or fashion to it being

5     done in camera or under some form of seal that this

6     portion of the testimony or this portion of the record is

7     set aside protected from public disclosure, I have no

8     objection to that -- none, whatsoever.

9          And I'll be happy to follow any orders that the

10    Court imposes upon me or anybody else connected in

11    defending this case, to that effect no different than,

12    you know -- I think that gag orders are the correct

13    comparable animal that may be available.  I have no

14    objection to any of that stuff.

15         But anyway, that's my proposal.

16         THE COURT:  Ms. Ray?

17         MS. RAY:  I think that Investigator Corbitt would

18    tell you that there is a nondisclosure agreement that

19    they've signed with the company.  But if ordered by the

20    Court to answer questions, the witness is certainly going

21    to answer the questions.  And we certainly -- if he

22    doesn't mind doing it the way he has proposed, the State

23    would prefer that, as well.

24         THE COURT:  I mean, I don't think I have any choice

25    that if the State's going to be relying upon the

1     information that brought them there to the residence that

2     -- I don't think I have any choice but to hear how that

3     information was gleaned.  I'll put any limitations on it

4     that the State seeks.  If you're comfortable it's simply

5     a provision that this proceeding is a sealed proceeding,

6     I would direct that it not be disclosed by Mr. Thomas.  I

7     would disclose that it not be -- I would order that it

8     not be disclosed by the defense.

9         And I'm not sure who we have in the back.  I know

10    one of the parties, I'm not sure who the other person is

11    present.  I don't know whether you want them to remain or

12    not, Ms. Ray.

13         MS. RAY:  No, I don't think that would be necessary

14    for them to remain.  I don't mind if Ms. Potluck remains,

15    but --

16         THE COURT:  I think let's let them step out.

17         MS. RAY:  Yeah, thank you.

18         THE COURT:  All right.  And Investigator Corbitt, to

19    the extent that you're under some limitation as to

20    disclosure of this information, I do direct that you

21    answer the questions to the extent they are relevant to

22    what's being presented here today.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Do you need any further direction from

25    the Court?

```
1              THE WITNESS:  No, sir.  Thank you.

2              THE COURT:  All right.  It is warrantless seizure,

3         so therefore the State of Florida has the burden to

4         establish an exception to the warrant requirement, is my

5         understanding of the facts that we'll be involved in.  Is

6         that correct, Ms. Ray?

7              MS. RAY:  Yes -- I would just --

8              THE COURT:  So who would you call first?

9              MS. RAY:  I'll go ahead and leave Mr. Corbitt on the

10        stand.

11             THE COURT:  All right.  I guess I should have asked.

12        Either of you want to make any preliminary statement?

13             MR. SHIPPY:  The defense does not, Your Honor.

14        We've adequately covered our position in the amended

15        motion to suppress.

16             THE COURT:  Okay.  Ms. Ray?

17             MS. RAY:  No, Your Honor.

18             THE COURT:  All right.  You may proceed.

19                        DIRECT EXAMINATION

20   BY MS. RAY:

21        Q    Could you state your name for the record, please?

22        A    Sure.  It's Investigator Christopher Corbitt,

23   C-O-R-B-I-T-T.

24        Q    Okay.  And what is your position with the

25   Tallahassee Police Department?
```

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1      A      I'm an investigator with the technical operations

2   unit.

3      Q      Okay.  And did you become involved in that capacity

4   in the case of the State of Florida vs. James Thomas?

5      A      Yes, ma'am, I did.

6      Q      Tell the Court when you became involved in this

7   investigation, please.

8      A      It was sometime after the incident.  As a matter of

9   routine if, as in this case, cell phones are taken during the

10  commission of a crime then the technical operation unit is

11  consulted in an attempt to determine if there is any follow up

12  potential in locating that device, or tracking individuals who

13  may possess it.

14     Q      Okay.  So you were aware that there was a sexual

15  assault involving a young lady by the name of Kaitlyn Miller

16  on September 13th, of the year 2008?

17     A      I was familiar with the incident; I don't recall her

18  name, specifically.

19     Q      Were you made aware that Ms. Miller had indicated

20  that a cellphone that she had on her prior to the assault was

21  now missing, along with some other personal items of hers?

22     A      Yes, I was.

23     Q      Okay.  And based on that information did you make an

24  attempt to use -- utilize the equipment or skills that you

25  have in order to try to track this phone, if possible?

1        A    Yes, I did.

2        Q    All right.  And if you would, tell the Court how it

3    is you go about trying to track the location of the cellphone

4    in this case.

5        A    Okay.  It varies by case.  But specifically for this

6    incident we made contact with the provider, who was Verizon

7    Wireless.  They were able to provide us with the tower, the

8    cellphone tower or cell site for which that handset is

9    currently registered and communicating with.  In addition,

10   they are able to provide us with a distance from that tower,

11   an approximate distance.  But we're able to use that to define

12   a general area that that handset will be located.

13       From that point, we will take equipment that is meant to

14   intercept the radio signals emanating from that device and

15   provide us some direction finding capabilities and allow us to

16   basically walk to the device, to the handset.

17       Q    Okay.  So if I understand you correctly, you're

18   indicating that you find out, you knew who the provider was --

19   Verizon?

20       A    Yes.

21       Q    You contact Verizon.  And did they give you some

22   information as to whether or not that cellphone is using any

23   towers in the area?

24       A    Correct.

25       Q    All right.  And when you said an approximate

1    distance from the tower, is that information that you got from

2    Verizon that -- that would indicate how far away from the

3    tower the actual cellphone was being used?

4         A    That's correct.

5         Q    Okay.  And when we say used, does that mean somebody

6    is actually using it, or does it just need to be on?

7         A    It varies by provider.  But, for this case, the

8    handset merely needed to be on and registered and they were

9    able to determine that distance.

10        Q    Okay.  And then I think you've indicated that you

11   have some sort of device that you use that can intercept radio

12   signals?

13        A    That's correct.

14        Q    Okay.  How does that work?

15        A    In essence, we emulate a cellphone tower.  So just

16   as the phone was registered with the real Verizon tower, we

17   emulate a tower; we force that handset to register with us.

18   We identify that we have the correct handset and then we're

19   able to, by just merely direction finding on the signal

20   emanating from that handset -- we're able to determine a

21   location.

22        Q    Okay.  And what kind of training were you provided

23   in the use of this equipment?

24        A    The manufacturer of the equipment provides

25   approximately a six-day training program.  In addition to that

1    I attended numerous classes on the use of cell phones and
2    various communications, communication items for locating
3    persons.

4        Q    Okay. And are there any quality assurance things
5    that are in place? I mean how do you know the equipment is
6    working properly when you're using it?

7        A    Well, it's very difficult to say quality assurance.
8    The -- in hundreds of uses the equipment has proven completely
9    reliable. The equipment will basically decode information
10   from the handset and provide certain unique identifying
11   information about the handset, being a subscriber identity and
12   equipment identity.

13       The equipment provides that to us. We compare that with
14   the information provided from Verizon to insure that we are
15   looking at the correct handset. Once we know that that
16   information is correct, then the location of that becomes
17   simply a matter of detecting where the signal is the
18   strongest. And it's a matter of getting closer and closer.

19       Q    And when you say the handset you're referring to the
20   cellphone that you're attempting to locate through the use of
21   basically forcing that cellphone to come to your equipment
22   rather than going to a tower that it normally would?

23       A    That is correct.

24       Q    And is that -- what information do you put into your
25   equipment that will lead that signal to be transferred to your

14

1   equipment, versus going to the tower?

2       A    Well, the equipment -- or the information that we

3   would put in would be that unique subscriber identity and

4   unique equipment identity, a serial number and a subscriber

5   identity --

6       Q    -- of the cellphone you're looking for?

7       A    Of the cellphone we're looking for, which would be

8   the victim's cellphone.  We put that information into the

9   equipment.  And as the equipment is evaluating all the

10  handsets in the area, when it comes across that handset -- the

11  one that we're looking for, for the information that we put

12  into the box -- then it will hang onto that one and allow us

13  to direction find at that point.

14      Q    And is that subscriber information and that serial

15  number unique to the telephone that you're actually trying to

16  find or track?

17      A    In the case of a Verizon phone, the serial number is

18  unique to the physical handset.  The subscriber identity is

19  unique to that handset, so long as that handset is registered

20  to the account.  The subscriber identity can be changed;

21  that's how we're able to port our phone numbers.  You can go

22  from one carrier to the next.

23      So that number can change over time.  The serial number

24  is always unique to that specific handset.

25      Q    Okay.  And you had information that -- you had

1   information that linked the serial number that you diverted to

2   your equipment actually belonged to the victim in this case.

3   Is that correct?

4        A    That is correct.

5        Q    All right.  Okay so what were the results of your

6   attempts to track this phone?

7        A    We were, after some time based upon the environment

8   there -- we were able to locate the phone, or to actually

9   capture the phone to begin with and then a relatively lengthy

10  process of determining exactly where that signal was emanating

11  from.

12       Using portable equipment we were able to actually

13  basically stand at every door and every window in that complex

14  and determine, with relative certainty you know, the

15  particular area of the apartment that that handset was

16  emanating from.

17       Q    Okay.  Now you started off by saying based on the

18  environment.  What do you mean by that?

19       A    Just the apartment complex.

20       Q    Okay.

21       A    Being multi-story, with the way it's configured.

22       Q    Okay.  So and then you used the phrase you captured

23  the phone.  That means that after putting that information

24  into your equipment you were able to direct the signal from

25  the tower to your equipment?

1       A       That is correct.

2       Q       And that being the phone -- that was the serial

3   number that belonged to the handset of the victim in this

4   case.  Is that correct?

5       A       That is correct.

6       Q       All right.  And you said it was a lengthy process.

7   Did that mean finding the apartment complex in general, or

8   finding the actual location at the apartment complex?

9       A       Really finding the complex was the difficult part,

10  just that signal, getting it to emanate outside of the

11  apartment complex.  We actually worked during the day and it

12  was actually later into the evening when there was less

13  interference around, less other traffic around that our

14  equipment was able to detect the handset.  Once we were able

15  to detect it and get close to it, then it became very simple

16  at that point.

17      Q       Okay.  And what, if any, time constraints are there?

18  When you're in this case you're talking about Verizon and as

19  long as the phone is on, you're able to utilize the technique.

20  Correct?

21      A       Correct.

22      Q       Are there time restraints on how effective this is

23  going to be or before you might lose your potential to find

24  this evidence?

25      A       Certainly.  In the case of a victim phone, victim

1    handset being taken, there is not an apparent ability to

2    charge the handset so the battery going dead for us is always

3    a concern.  Additionally, once the equipment comes into play

4    and we capture that handset, to make locating it easier, the

5    equipment forces that handset to transmit at full power.

6         Again, that's why I say once we capture it, it becomes

7    much easier to specifically locate.

8         So we're forcing that handset to transmit at full signal,

9    consuming battery faster, in an effort to help us locate that

10   handset.  So it going dead would -- that battery dying would

11   essentially end our ability to locate it.

12        Q    Okay.  And you mentioned earlier that you were able

13   to eventually locate or track the signal from this cellphone

14   to an apartment complex.  Is that correct?

15        A    That is correct.

16        Q    And what was the name of the apartment complex?

17        A    2060 Continental, Berkshire Manner, if I recall

18   correctly.

19        Q    All right.  And what exactly did you do to narrow it

20   down, once you got to the apartment complex?

21        A    Again, using portable equipment, quite literally

22   stood in front of every door and window measuring, determining

23   that direction of where that signal was emanating from and

24   contacting investigators, and advised them that we had an

25   apartment.

18

1        Q    Okay.  And what apartment was that?

2        A    I don't recall the specific number (inaudible)

3    recall the specific door number, Apartment number.

4        Q    Okay.  Once you located the apartment then, did you

5    let the other investigators take over?

6        A    Yes, I did.  I pointed out the specific apartment

7    that I identified to them as they arrived and remained close

8    by as they continued the investigation.

9        Q    Do you have a recollection or do you have anything

10   in your notes that would indicate what time it was when you

11   located the apartment that you believe the cellphone would be

12   in, based on your tracking of it?

13       A    When we first identified the apartment it was

14   probably approximately 1:00 to 2:00 a.m.  I'm not sure if I

15   have anything in my notes specifically, to that.  I know that

16   we returned to the area sometime around midnight and located

17   it shortly thereafter.

18       Q    Do you have any idea how much time elapsed between

19   the time of the sexual assault in this case and the time you

20   tracked the phone to the apartment complex?

21       A    If I recall, the sexual battery occurred early,

22   early Saturday morning -- you know, late, late Friday night

23   into Saturday morning.  And it was now early Sunday morning

24   when we had actually located a handset.

25       Q    Okay.  Was time becoming of the essence to you

1   all --

2        A    Yes.

3        Q    -- based on what you have already testified to about

4   not having the ability to necessarily recharge the phone or

5   know someone was recharging it --

6        A    Absolutely.

7        Q    -- and the drain of power that would be on the phone

8   based on your directing, I guess, it to your equipment?

9        A    That's correct.

10       Q    And you did not actually enter the residence; is

11  that correct?  I think you said the other investigators took

12  over at that point.  Is that correct?

13       A    That is correct.

14       Q    And was it your belief, based on your training and

15  experience as both an officer and that equipment, that you

16  believed the property of the victim of that sexual assault to

17  be at the residence where you tracked that cellphone to?

18       A    That is correct.

19            MS. RAY:  I have nothing further.

20            THE COURT:  Cross?

21            MR. SHIPPY:  Yes, Your Honor.  Thank you.

22                  CROSS-EXAMINATION

23  BY MR. SHIPPY:

24       Q    Good afternoon, sir.

25       A    Good afternoon.

1     Q    I may have missed it, but how long have you been
2   with the Tallahassee Police Department Technical Operations
3   Unit?

4     A    The Technical Operations Unit, a little over five
5   years.  I've been with the police department since '95.

6     Q    Is it a requirement in order for the equipment, that
7   apparently TPD has purchased, to track a cellphone that the
8   cellphone be turned on?

9     A    The cellphone does have to be powered on for us to
10  be able to actively locate the handset.  And it's not -- the
11  Tallahassee Police Department is not the owner of the
12  equipment.

13    Q    And it's a technical question, but bear with me.
14         When we say turned on, that means the battery still may
15  be full, but if I turn the phone off then the equipment that
16  you're utilizing doesn't work.  Is that correct?

17    A    That is correct.

18    Q    And as long as the cellphone is turned on and as
19  long as there is power where the battery has power, I guess
20  then you're able to track the cellphone?

21    A    Generally speaking, yes.  As long as the handset is
22  on, then you know we have the ability to attempt to track it.

23    Q    And for how long has the Tallahassee Police
24  Department been utilizing this equipment?

25    A    If I recall, it was March.  Spring of '07 is when we

1   first started utilizing the equipment, if I remember properly.

2        Q    Are you the person within the Department who

3   primarily utilizes the equipment?

4        A    Yes, I am.

5        Q    In your estimation, since the spring of 2007, how

6   many times have you utilized the equipment to locate a

7   particular cellphone?

8        A    Probably, I could answer specifically.  But off the

9   top of my head, probably in the 200 or more times.

10       Q    And in those 200 or more times, what have you found

11  to be the level of reliability as to the accuracy of the

12  equipment?

13       A    Truthfully at this point, 100 percent.

14       Q    Does the equipment undergo any sort of maintenance

15  or anything of that nature, similar to what we're -- similar

16  to what we experience in the DUI machines?

17       A    There is not maintenance, per se.  The equipment is

18  under a maintenance contract.  The software is periodically

19  updated.  The equipment performs self calibration, but there

20  is not a specific maintenance schedule for it.

21       Q    Would it be -- if this is a good way to phrase it --

22  similar to if my car is running okay, it's continuing to run

23  okay?

24       A    Yes, for the most it's -- you know, it works or it

25  doesn't.  And as long as everything is functioning properly

1    all the process that goes on insures the reliability.

2        Q    And the proprietary nature of the equipment is that

3    it allows you to stand in the place of the service provider.

4    Is that correct?

5        A    That's correct.

6        Q    In this instance you picked up the signal from the

7    cellphone.  That is correct?

8        A    Yes.

9        Q    When you initially do that, are you doing that from

10   the Tallahassee Police Department or some other location?

11       A    No.  We have to be within close proximity of the

12   handset to capture it.

13       Q    That's where Verizon then first comes in, that

14   they're providing you some information as to what tower it's

15   close to?

16       A    That is correct.

17       Q    Then you go to some general vicinity/location,

18   operate your equipment, and then that's when you then hone

19   your location?

20       A    That is correct.

21       Q    And in this instance, although you weren't able to

22   recall the apartment number, if I was to tell you that it was

23   Apartment 251 at Berkshire Manor Apartments, would you agree

24   with that?

25       A    I would.  I actually have it written down on a note.

1    Yes, 251.

2         Q    All right. And how much time in your memory elapses

3    from when you get to the general vicinity, to the point where

4    you have actually located a specific apartment? What's your

5    best case estimate in this case?

6         A    In this case, we actually -- I actually worked

7    several hours to attempt to capture the phone, initially. So

8    from the time that -- the time that we actually captured the

9    handset the first time, then I know that I'm relatively close

10   to it. That was from a vehicle-based system.

11        At that point, then we know that we're close. We use the

12   vehicle-based system to help give us an area of the apartment

13   complex. And at that point we switch over to a hand held

14   device. With a hand held device it took really approximately

15   -- I would say really no more than 20 to 25 minutes, maybe 30

16   minutes to confidently determine the apartment. And we

17   continue to, you know -- continually check that and measure

18   that and continue to confirm that. But from the initial

19   determination, probably 25 to 30 minutes.

20        Q    And if I understood your testimony on direct

21   examination, your best estimate is that may have been

22   somewhere in the neighborhood of 1:00 to 2:00 in the morning,

23   on that Sunday morning?

24        A    I as I recall, yes. I basis that again on having

25   gone home for a little bit and coming back out as I recall,

1    shortly after midnight and then working from that point.

2        Q    And at that point in time, do you pass it on to the

3    primary investigating officer in the case?

4        A    Yes.

5        Q    Would you pass that information on, to Investigator

6    Wester?

7        A    He was present; Investigator Suleski was present.

8    Several ended up responding to the scene at that point.   I

9    believe that Sergeant Adams was present as well, and that

10   information was provided to numerous people.

11       Q    Were you present when contact was made with the

12   occupants of Apartment 251 at Berkshire Manor Apartments?

13       A    I was present, close by.

14       Q    What is your memory with respect to how much time

15   elapsed from the point when you know you've got the apartment

16   where the cellphone is in, versus someone arriving at the door

17   and knocking on it.  How much time elapses between those two?

18       A    It's very hard for me to recall.  I know that there

19   was discussion as far as tactics and techniques that would be

20   employed.  But I was waiting for a supervisor to arrive on

21   scene, waiting for sufficient officers to arrive on scene.

22   But I don't recall that being more than you know, maybe an

23   hour or two at most.

24       Q    What were the techniques that were discussed while

25   you were deciding what it is you're going to do to do after

1    you found where you believe the phone is located?

2        A    Well, there are various things discussed as far as

3    whether a search warrant would be obtained, or whether a legal

4    method would be used to enter the apartment, discussion as far

5    as our time sensitive nature of my equipment and being able to

6    continually reliably say that the handset was inside.

7        You know all of those things are discussed from the

8    simplest number of people that we want present for safety to

9    all those things.

10       Q    Do you recall what was discussed with respect to

11   obtaining a search warrant?

12       A    I know that there was discussion about a search

13   warrant.  I had indicated to the investigators that I believed

14   probable cause existed to say that property belonging to the

15   victim was within that apartment and was willing to complete

16   an affidavit for a search warrant.  We began -- I began taking

17   notes.  That's what I referenced here when he asked me the

18   apartment number.  I began taking notes as to the legal

19   description for the apartment in anticipation of obtaining a

20   search warrant.  And that was eventually determined, that a

21   search warrant was not necessary based on other factors.

22       Q    What were those other factors, if you recall?

23       A    Consent to enter.

24       Q    Was there any discussion of doing a protective sweep

25   of the apartment?

1        A    I believe that there was.  Again, I was not present
2    at the door; I did not hear those specific conversations and I
3    don't -- I could not comment on that.

4        Q    What were the legal methods that were discussed when
5    you're having your group discussion or pow wow -- if you
6    will -- before you actually made contact with the apartment?

7        A    I could only comment to what I was providing.  And
8    that was that again, I believed probable cause existed and was
9    willing to articulate that, if necessary.

10        As always, we prefer that alternate legal methods be
11   used, so that we do not have to rely upon the equipment to
12   establish the probable cause, just for not wanting to reveal
13   the nature and methods.  And that was my input to the
14   conversation.

15        Q    Have you in the past obtained a search warrant, as a
16   result of you executing an affidavit in reliance upon this
17   equipment in a situation similar to what we're talking about
18   here?

19        A    We have not obtained a search warrant, based solely
20   on the equipment.

21        Q    And as I understood what you just said, in part
22   because you would like to maintain the proprietary nature of
23   what it is you're doing.  Is that correct?

24        A    That's correct.  It's not because I do not believe
25   the equipment cannot establish probable cause.  I believe that

1    it can very effectively and I believe that my training and

2    experience with the equipment allows me to do that.  We prefer

3    not to do that, simply for having to reveal that in a

4    document.

5             MR. SHIPPY:  May have just one moment, Your Honor,

6        to --

7             THE COURT:  You may.

8    BY MR. SHIPPY:

9        Q    What was your level of certainty that phone that you

10   were seeking to obtain or recover was within the apartment at

11   Apartment 251, there at Berkshire Manor Apartments.

12       A    My level of certainty was enough to swear in a

13   probable cause affidavit that I believe that property was in

14   there.

15       Q    Okay.  Thank you, very much.  I appreciate it.

16            MR. SHIPPY:  No further questions, Your Honor.

17            THE COURT:  Redirect?

18                     REDIRECT EXAMINATION

19   BY MS. RAY:

20       Q    To your knowledge, was everything functioning

21   properly with the equipment when you tracked that victim's

22   cellphone to Apartment 251 at Berkshire Apartments?

23       A    To my knowledge, yes.

24       Q    Okay.  And to your knowledge, did law enforcement

25   find the victim's cellphone inside Apartment 251?

1       A    Yes, they did.

2       Q    And you were in the process of getting information.

3    I think you have testified the -- documenting the legal

4    description of the scene because there was going to be a

5    search warrant obtained.  Is that correct?

6       A    Yes.

7       Q    And it's your testimony that at some point you were

8    told by other officers that the search warrant -- or that

9    somebody had consented to a search of the residence.  Is that

10   your testimony?

11      A    That is correct.

12      Q    Okay.  It's your testimony though, that you believe

13   you had probable cause at that -- at that point.  Correct?

14      A    Yes, it is.

15           MS. RAY:  Thank you, I have nothing further.

16           THE COURT:  To the court reporter, this testimony is

17      sealed and should be considered a sealed document.

18           Somebody that's joined you now, Mr. Shippy, we need

19      to -- could you identify who this is please?

20           MR. SHIPPY:  I will, Your Honor.  It's Andrew

21      Beasley, who is an attorney with our office.  And I just

22      told him that everything that's said at this point in

23      time is under seal and it's not to be discussed with

24      anybody, period.

25           THE COURT:  Okay, thank you.  Do you understand

1          that, Mr. Beasley?

2                  MR. BEASLEY:  Yes, Your Honor.

3                  THE COURT:  All right.  Thank you.

4                  All right, you can step down.  The rest of the

5          proceeding is not necessarily to be sealed.

6                  All right.  You can call your next witness, Ms. Ray.

7                  MS. RAY:  Investigator -- or Sargent Suleski.

8          Judge, if we're not finished by 5:00, if I could just

9          make a call to get someone to -- make arrangements real

10         quick for someone to pick up my child.

11                 THE COURT:  We'll be ready for a break by then.

12                 MS. RAY:  Thank you.

13                 THE COURT:  Didn't we swear all witnesses?

14                 THE WITNESS:  Yes, sir.  I'm sorry.

15                         DIRECT EXAMINATION

16    BY MS. RAY:

17         Q    If you would, please, go ahead and state your name

18    for the record.

19         A    My name is Michael Todd Suleski, S-U-L-E-S-K-I.

20         Q    And Sergeant Suleski, I'm going to ask you some

21    questions about an investigating that I believe you were

22    involved in, involving the defendant in this case, Mr. Thomas.

23         How did you become involved in the sexual assault that

24    occurred on September 13th, of the year 2008?

25         A    At the current time I was assigned as an

1    investigator to the Vice and Narcotics Unit.  And the criminal

2    investigation at the time was investigating a sexual battery

3    which happened to be this case, in which they were searching

4    for some evidence.

5        Q    Okay.  And when did you actually become involved in

6    this case?

7        A    It was on the 13th.  I was working an FSU football

8    game and all the on-call investigators got a page to go to the

9    Ocala Road area looking for a cellular phone.  Investigator

10   Corbitt was using investigative techniques to track that

11   phone.

12       Q    Okay.  And approximately what time was it when you

13   when out there.  Do you recall?

14       A    I received a page at 1:11 p.m. and at approximately

15   1:25 I arrived on scene.

16       Q    1:11 p.m.

17       A    It's when I got the page.  And then at 1:25 p.m. I

18   arrived on Ocala Road.  And I was already working the football

19   game, so it's just a drive from FSU stadium area, or wherever

20   I was assigned to the Ocala Road area.

21       Q    And what information did you -- or what evidence did

22   you believe that law enforcement officers were looking at or

23   looking for, in connection with a sexual assault?

24       A    I knew at the minimum they were looking for the

25   phone.  I got very limited details about what occurred and

1    that we were just going to search for a phone.

2        Q    All right.  So what happens when you arrived at the

3    Ocala Road area?

4        A    There is a bunch of investigators there,

5    Investigator Corbitt is out doing whatever he does.  And I

6    guess he's having a hard time -- this is me just surmising.  I

7    imagine he is having a hard time finding -- getting a good

8    reading of where the phone is at, maybe through towers or some

9    other techniques, or something.  And we just generically

10   searched the area, walking up and down Ocala Road because at

11   that point he can pinpoint where the phone is at.

12       Q    Okay.  Well, I'm asking what you were doing,

13   specifically.  It probably wasn't a good question, but --

14       A    Oh, oh.  We just -- I just searched up and down

15   Ocala Road, some side streets, the parking lots, just to see

16   if the phone might have been discarded on the side of the road

17   or in an area somewhere.

18       Q    Okay.  And that was for approximately for two hours.

19   Is that correct?

20       A    Approximately, I'm not exactly sure of the exact

21   time.

22       Q    Okay.  Then after that time goes by and you don't

23   find the cellular phone, do you discontinue your involvement

24   for that day, or --

25       A    Yes, ma'am, I go back.  Eventually the decision is

TERESA SELVA, OFFICIAL DIGITAL REPORTER

```
 1    made to stop looking and I go back to work the FSU football
 2    game.
 3         Q    Okay.  And when you say stop looking, you don't mean
 4    Investigator Corbitt, you just mean the other investigators
 5    that are out there?
 6         A    Yes.  For me personally, I won't -- they said for me
 7    to go back and work the game.  I don't what the other
 8    investigators did.  But from my recollection, is all the
 9    investigators stopped looking in that area.
10         Q    And Chris Corbitt continued to do what he was doing?
11         A    Yes.
12         Q    All right.  And then did you get some information
13    the next day on September 14, of the year 2008 -- some further
14    information regarding the cellphone that had been taken from
15    the victim in the sexual assault?
16         A    Yes, ma'am.
17         Q    What information did you get?
18         A    Approximately 3:30 a.m. that morning Sergeant Adams
19    called me and stated that Investigator Corbitt and other
20    investigators were out.  And I believe they located where the
21    phone may be at.
22         Q    Okay.  And what was the address that you went to?
23         A    It was Berkshire Manor.
24         Q    Do you recall what apartment?
25         A    26 Continental Avenue, 251.
```

1      Q     Okay.  And what happened when you got to Apartment

2   251?

3      A     We discussed a couple of strategies and then

4   eventually we made contact at the door.

5      Q     All right.  And what -- you say strategies. I mean,

6   what strategies were you --

7      A     Well the idea was Investigator Corbitt was giving

8   indications that he believed that the phone was starting to go

9   dead, the battery was going dead.  And then if that was to

10  occur we would be unable to locate the phone anymore, or track

11  it.

12     So we looked at what would happen if they started

13  destroying the evidence or tampering with it if someone saw us

14  outside.  Do we need to make contact at the door, maybe try to

15  secure a search warrant? Then if someone saw us outside,

16  officer safety, because it was starting to get daylight.  Then

17  people are starting to come out to come to school and you have

18  college kids.  And so we round tabled all the different ideas

19  and possibilities and we thought for the safety of everyone

20  involved lets make contact at the door.

21     Q     Okay.  So it's your testimony that Officer Corbitt

22  had concerns about the phone going dead?

23     A     Yes, ma'am.

24     Q     And it's your understanding that if the phone were

25  to have gone dead, you would have lost the ability to -- or

1   the police department would have lost the ability to track the

2   location of the phone?

3       A    Yes.  From my understanding it's that every time the

4   phone is on it's powering to a signal to get power to a tower

5   and that's how he tracks that.  If a phone is either turned

6   off or has -- or the battery is dead you cannot track the

7   phone.

8       Q    How many law enforcement vehicles were in the area

9   of Apartment 251?

10      A    That apartment, none.  We parked unmarked vehicles

11  in the parking lots.  But I mean, the way the apartment is

12  situated it's kind of like -- I don't think you can see any

13  cars.

14      Q    Okay.  You mentioned a concern about evidence being

15  destroyed?

16      A    Yes, ma'am.

17      Q    What was -- what did you think you all were doing

18  there that might lead the occupants of 251 to destroy any

19  evidence that might be in there?

20      A    Well, first of all, when Investigator Corbitt comes

21  out and does his tracking techniques he actually has to be out

22  on foot.  He's walking around and you have to have officers

23  out there kind of covering him, whether they be marked or

24  unmarked officers because he actually has to use a hand held

25  device from his car, from my understanding.

1      Q     And this is 3:30 in the morning, or so?

2      A     No, this is probably 4:35 because I got the phone

3  call at 3:30, we got there at 4:00.  By the time more

4  investigators got there, we talked about some things and then

5  I got a little bit more details of the case.  Apparently some

6  clothing was missing from the victim, her purse, other

7  contents.  And that's all evidence that could be really easily

8  destroyed or taken out of the apartment.

9      Q     Okay.  You mentioned officer safety.  What were the

10  officer safety concerns?

11      A     The idea is not knowing what the suspects mindframe

12  is, his background or what goes through his thought processes.

13  If he saw an officer outside what if he decided -- if he had a

14  gun, if he came outside, you know, people in the area getting

15  ready to go to school.

16      Q     Approximately, how many officers were at the scene?

17      A     Six or seven maybe, I'm not 100 percent sure.

18      Q     Who made the decision to make contact at the

19  residence?

20      A     It was a cumulation decision of myself and

21  Investigator Wester.  I believe Sergeant Adams was on scene.

22      Q     And he is retired since then, is that right?

23      A     Yes, ma'am.

24      Q     Okay.  So what happened next, after you made that

25  decision?

1      A     Investigator Wester and myself go up to the

2   apartment door and make contact.  Investigator Todd is with

3   us.

4      Q     Okay.  How did you go about making contact with

5   Apartment 251?

6      A     We just walk up.  Investigator Wester and myself are

7   there.  I believe Investigator Todd is just standing a little

8   off to the side and just knock on the door.

9      Q     Okay.  So yourself and Burt Wester --

10     A     Yes, ma'am.

11     Q     -- are standing directly in front of the door?

12     A     Not open in front of the door.  We are kind of off,

13  trying to give us some type of protection using the building a

14  little bit, but basically by the door.

15     Q     Okay.  Can you describe the front of the -- are we

16  talking about a one-level apartment, multi levels?

17     A     It's two stories.  And basically, just imagine the

18  top story like this and this.  Then the doors all face out.

19  And then you have Investigator Todd is standing over here.

20  I'm kind of standing over here and Burt is kind of standing

21  over here at the door, and the door kind of opens in.

22     Q     What level were you on the first floor?

23     A     Second floor.

24     Q     Second floor, okay.  And are there any windows in

25  the door?

1       A    No windows in the door, but you believe there was a

2   windows in the door.  But there was a -- I believe there was

3   a -- I believe there was a window just to the right of the

4   door if you were facing the door -- I believe.

5       Q    Okay.  And how did you announce your presence?

6       A    At first we just knocked on the door.

7       Q    Okay.  Did you say anything when you knocked?

8       A    No, no, ma'am.  I don't think so.

9       Q    Okay.  Did anybody come to the door?

10      A    No.  Someone asked who was it, from a female's voice

11  inside, and then Investigator Wester told them it was the

12  police department.

13      Q    Okay.  After you -- well, how many times did you

14  knock on the door before you hear the female voice, as to who

15  it was?

16      A    I don't recall.

17      Q    Was it more than once or did somebody answer right

18  away?

19      A    I want to give an indication that it was more than

20  once, but I'm not 100 percent sure.

21      Q    Okay.  So after you hear the female voice say, who

22  is it, how -- what's next?

23      A    We say police department, Tallahassee Police

24  Department.  And then the female said, hold on.  And then we

25  could hear movement inside of the apartment.

```
 1        Q    Okay.  Anything unusual about that, at this point?
 2        A    Movement inside the apartment and then obviously we
 3   believe the phone is in there.  You knock on the door, it's a
 4   females voice.  You know, police Department, hold on.  And
 5   then we have about a minute or so then someone will come to
 6   the door.
 7        Q    Okay.  And does someone come to the door?
 8        A    Yes, ma'am.
 9        Q    Okay.  Is it a female that comes to the door?
10        A    Yes, ma'am.
11        Q    All right.  And what happens when she answers the
12   door?
13        A    It turns out to be Ms. Simmons and she stands in
14   front of the door, opens the door, and we identify ourselves.
15        Q    Okay.  And what did you tell her?
16        A    Basically, I asked her; I said if we could come in
17   and talk to her.  She asked basically -- and this is just
18   paraphrasing -- what do you want?  We're like, we're here to
19   conduct an investigation.  Did anyone bring anything to your
20   house?
21        Q    Did you tell her what kind of investigation you
22   were -- at that point, what type of investigation you were
23   conducting?
24        A    No, ma'am.  No, ma'am.  My original intent was just
25   to maybe go inside and talk to her away from neighbors or
```

1   anyone involved.  I usually try to do that so not everyone is

2   in everyone's business.

3       Q    Okay.

4       A    As it was getting daylight.  People are starting to

5   come out, getting ready to go to school, getting ready for

6   work.

7       Q    So what did she say to that?

8       A    She wouldn't.  She just kept her body, blocked the

9   door.  I told her that -- did anyone bring anything inside her

10  apartment?  She said, no.

11      I think we specifically asked her that we were looking --

12  we asked her if someone placed something inside of her

13  apartment.

14          THE COURT:  I didn't quite understand.  What?

15          THE WITNESS:  We asked her if someone placed

16      something inside her apartment, a cellular phone and then

17      if we can come inside her apartment and look.  She

18      said -- she asked if I had a search warrant.  I said no,

19      but I can go get one.  And then she says well, you can

20      come back, some detective can come back and get one.

21          She began to slam the door, at which point I placed

22      my foot inside the door preventing her from slamming the

23      door.

24  BY MS. RAY:

25      Q    And why did you do that?

1       A       Because we already discussed prior to that if --
2   that we didn't get permission to go in we would seek a search
3   warrant.

4       Q       Okay.  And why don't you just let her close the door
5   and then stand outside, and have somebody watch the door until
6   you all get a search warrant?

7       A       Well, because the idea is that she can -- someone
8   can go inside, take the phone, break it, flush it down the
9   toilet bowl.  They could -- I don't know the back side.  They
10  can take it, flip it on top of the roof.  They can have hidden
11  compartments inside the apartment, that we may not be able to
12  find.

13      Q       Is it fair to say at this point at least, the lady
14  who answered the door, Ms. Simmons, knows that there is a
15  police presence at her home?

16      A       Oh, yes, ma'am.  And she knows we're looking for
17  certain evidence to a crime.

18      Q       Okay.  And so you put your foot in the door.  What
19  happens next?

20      A       I asked her to step out.  She steps out, at which
21  point we give loud verbal commands because we heard, we
22  believe there was someone else inside the apartment by the
23  rustling.

24      Q       Okay.  Tell the Court a little bit more about that.
25  When you say the rustling, you mean the rustling you heard

1    before the door was opened or --

2        A    Yes, ma'am.  What happened when we knocked on the

3    door we can hear movement inside the apartment.  And my

4    indication it was right by the door area.  So it gave me

5    indication there was possibly another person in there.

6        Q    Okay.  So based on that, what did you do?

7        A    Loud verbal commands were given.  Police Department,

8    anyone inside the residence make your presence known,

9    Tallahassee Police Department.  After several verbal commands,

10   a gentlemen answered and came forward.

11       Q    Okay.  And what happened when he came forward?

12       A    Investigator -- I think Investigator Wester and Todd

13   made contact with him.  Eventually he was (inaudible) -- he

14   was brought outside or towards the front door area, I believe.

15   And then a protective sweep was done of the apartment.

16       Q    And why --

17       A    Just looking for strictly any bodies that said there

18   was another person inside the house, not looking for evidence

19   or anything.

20       Q    Okay.  And what was the result of the protective

21   sweep, if any?

22       A    No one else was inside the residence except for Mr.

23   Thomas and Ms. Simmons.

24       Q    So what did you do after you completed the

25   protective sweep of the apartment?

TERESA SELVA, OFFICIAL DIGITAL REPORTER

```
 1        A    I think Investigator Wester -- I spoke at some point
 2   to Ms. Thomas.
 3        Q    All right.  After you --
 4             THE COURT:  To Mr. Thomas, you say?
 5             THE WITNESS:  I'm sorry, Ms. Simmons.
 6   BY MS. RAY:
 7        Q    Ms. Simmons?
 8        A    I'm sorry.
 9        Q    Now when the protective sweep was being done, are
10   the occupants removed, Mr. Thomas and Mr. Simmons?
11        A    Yes. Ms --
12        Q    Are they outside?
13        A    Yes, Ms. Simmons is already outside because we
14   pulled her out and then Mr. Thomas comes out.  Then at some
15   point I made contact with Mr. Thomas outside the apartment.
16   And I asked if he lived with Ms. Simmons.  He stated that he
17   spends most of the night there.  I asked him if anybody
18   brought anything to the apartment.  He stated, no.
19        Then Mr. Thomas went inside with Mr. Wester --
20   Investigator Wester and Mr. Todd, Investigator Todd, while I
21   spoke with Ms. Simmons outside.
22        Q    Okay.  And tell the Court the discussion you had
23   with Ms. Simmons outside was.
24        A    Being that she is the occupant of the apartment, I
25   explained to her what was occurring.  I started telling her
```

1    that the police Department is investigating a sexual battery

2    in which a female was brutally raped and attacked, and that we

3    have evidence.  And then at some point during that thing she

4    stopped and said, you can search my apartment; I didn't know

5    it was this serious.

6         Q    Were was the defendant, or Mr. Thomas when she made

7    the statements to you?

8         A    He was -- I believe he was inside the apartment out

9    of earshot, because we separated them.

10        Q    Now, in the meantime is -- were there any

11   discussions or plans to get a search warrant prior to

12   Ms. Simmons giving you the consent that you're indicating that

13   she gave you after you gave her some information about

14   specifically what the crime was?

15        A    Yes.

16        Q    Okay.  What had already been discussed regarding a

17   search warrant?

18        A    Well, before we even -- back before we even made

19   contact at the door that was the plan.  The plan was that if

20   we did not get consent or something we would seek a search

21   warrant.

22        Q    Okay.  And after she gives you consent, what do you

23   do; do you go back into the apartment?

24        A    At some point I do step back in, but prior to that

25   the investigator is speaking with Mr. Thomas.  And he tells

1    them information that the victim's property is inside the

2    apartment.

3         Q    Okay.  Now, did you hear that conversation,

4    yourself?

5         A    No, ma'am, they just told me.

6         Q    Okay.  And what else, if anything, did you do inside

7    the apartment?

8         A    I believe that was it.

9         Q    At some point, did you have a conversation with Mr.

10   Thomas at the kitchen table in the house?

11        A    Briefly.  Briefly, just explaining what was kind of

12   going on.

13        Q    Okay.  And is that prior to -- well, let me strike

14   that.

15             Ultimately, is it your testimony that the defendant gives

16   somebody -- or tells one of the officers that the victim's

17   property is indeed in the apartment?

18        A    Yes.  He did not tell me that.

19        Q    Okay.  But prior to him telling whoever he told, you

20   had a discussion yourself with Mr. Thomas at the kitchen table

21   as to whether or not the phone was in the apartment?

22        A    Yes, what happened is when we do the protective

23   sweep, Mr. Thomas is inside the apartment.  Eventually, we

24   bring him to us, make sure he doesn't have nothing on him.  He

25   sits down, we sit him at the -- he comes outside, the

1    protective sweep is done.

2        So now you have Ms. Simmons and Mr. Thomas outside, so

3    you're not going to talk to both of them while they're right

4    next to each other.  So we ask Mr. Thomas would you like to go

5    back inside, so no one knows what's going on with his

6    business.

7        We have a brief conversation with him at the table.  Did

8    anyone give you anything -- like I said, previous.  And then

9    at which point I then leave and go outside and speak to

10   Ms. Simmons.

11       Q    And he told you at that point no?

12       A    Yes.

13       Q    He did not have -- the phone was not in the

14   apartment; is that correct?

15       A    Yes.  We asked him if anyone brought anything to the

16   apartment that didn't belong to him.  And he said, no.  Then I

17   step out and I speak to Ms. Simmons.

18       Q    Okay.  And based on Investigator Corbitt's tracking

19   of the phone, it was everyone's belief that the phone was

20   indeed inside that apartment.  Is that correct?

21       A    That's correct.

22       Q    Okay.  So does that cause you some concern in

23   exiting the apartment without -- and allowing Mr. Thomas or

24   Ms. Simmons to remain in the apartment?

25       A    Yeah.  We can't leave because we know -- we have

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1    reasonable belief to believe, based on what Corbitt is telling

2    us through his training, that the phone is inside the

3    apartment.

4         Q    Okay.  And then is it then that you step outside and

5    you have this conversation with Ms. Simmons --

6         A    Yes, ma'am.

7         Q    -- that you just testified to where you tell her

8    that isn't -- it is actually a sexual assault you're

9    investigating and --

10        A    Yes.  Yes, I'm going to give her the reasons why we

11   did what we did, so I can explain to her and answer any

12   question that she may have and understand why -- what we're

13   doing and why we're doing it.

14        Q    Okay.  And was it your testimony that you told her

15   you were indeed going to get a search warrant?

16        A    That is correct.

17        Q    Okay.  And it was at that point that she indicated

18   to you that would consent to a search.  Is that correct?

19        A    No.  I told her at the door.  When we were at the

20   door I asked her the question.  She said, do you have a search

21   warrant?  And I said no, I can get one.  And she said come

22   back when you want to get one.

23        So at that point the decision was made that we were going

24   to secure that apartment in anticipation of a search warrant.

25        Q    Okay.  So --

1        A     So then she was stepped out and then the protective

2    sweep was called to Mr. Thomas and that was done.

3        Q     Right.  But when you tell her about the sexual

4    battery and she tells you yeah, you can search my apartment --

5    that second conversation with her is there any -- did you tell

6    her you were going to get a search warrant or anything at that

7    point?

8        A     Yes, ma'am.  I explained to her what was occurring.

9    And I said the apartment is now secure, we're going to get a

10   search warrant.

11       Q     Okay.

12       A     And I started explaining the reasons of the crime

13   that had occurred and why we're doing what we we're doing.

14       Q     Okay.  And it was at that point that she consented?

15   Is that what you're saying; do I have that right?

16       A     Yes, ma'am.

17       Q     Okay.  Were you present in the area when the

18   victim's property was actually located in the -- in Apartment

19   251?

20       A     Yeah.  Yes, ma'am.

21       Q     Did you see where the items were in Apartment 251?

22       A     No, ma'am, I was standing outside.  I just heard

23   them make the comment.

24       Q     Okay.  So you didn't personally see where the

25   objects were retrieved from.  Is that correct?

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1       A    That's correct.

2       Q    Okay.

3            MS. RAY:  Nothing further, at this time.

4            THE COURT:  Cross?

5            MR. SHIPPY:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7   BY MR. SHIPPY:

8       Q    Good afternoon.

9       A    Good afternoon, sir.

10      Q    You arrived about 4:00 o'clock in the morning on

11  Sunday morning.  Is that correct, sir?

12      A    Yes, sir.

13      Q    And at the time that you arrived at the apartment,

14  the information that you had led you and everybody else to

15  believe that the cellphone that you were looking for was

16  inside that Apartment 251.  Is that correct?

17      A    That is correct.  Well, it's there but he is still

18  doing some more diagnostic checking.

19      Q    But in any event you were really comfortable that

20  you had the right apartment.  Weren't you?

21      A    Yes.

22      Q    And as I understand it, both you and Investigator

23  Wester knocked on the front door at that point in time.

24  Right?

25      A    It was well after 4:00, I can't tell you the exact

                TERESA SELVA, OFFICIAL DIGITAL REPORTER

1    time.  I got there at 4:00.  By the time other investigators

2    got there we spoke and talked about different things.

3    Investigator Corbitt was still walking the area there and then

4    eventually the decision was made.  But it was getting

5    daylight.  So daylight would have been roughly -- it was

6    starting to get daylight; that was one of our concerns.

7         Q    I asked the question in a bad way.  At some point in

8    time you and Investigator Wester knocked on the front door.

9    Right?

10        A    Yes, sir.

11        Q    And that was after the group of you had discussed

12   how you were going to approach the matter.  Is that correct?

13        A    That's correct.

14        Q    Had you discussed the possibility of getting a

15   search warrant?

16        A    Yes.

17        Q    And what was the nature of the discussion you had in

18   that regard?

19        A    And I can only speak from my half of my input -- was

20   we thought it was the best to go make contact at the door.

21        Q    Which is ultimately what you all decided to do,

22   right?

23        A    That's correct.

24        Q    And as I understood your testimony on direct

25   examination, if you did not gain entry to the apartment at

1    that point in time, you did intend to secure for the purpose

2    of later obtaining a search warrant.  Is that correct?

3         A    Yeah.  Yeah, immediately after.

4         Q    Well, you intended to secure the apartment?

5         A    Yeah.  And immediately after we would seek a search

6    warrant.

7         Q    That's what -- right, we would agree.  Now when we

8    talk about securing the apartment that means entering and

9    conducting the protective sweep that you talked about.  Right?

10        A    Correct.

11        Q    Which would have contributed to what you did, which

12   was when Ms. Simmons says, well come back when you get the

13   search warrant and she starts to close the door.  At that

14   point in time you actually insert your foot in the doorway.

15   Is that correct?

16        A    That is correct.

17        Q    And at that point in time, the door is prevented

18   from closing.  Correct?

19        A    Correct.

20        Q    At that point in time, is she asked to then come

21   outside?

22        A    Correct.

23        Q    And then you -- whoever it was, makes the loud

24   verbal commands about if anybody else is inside come on out.

25   Right?

1     A     Correct.

2     Q     And before you conducted the sweep where you went

3 inside, did Mr. Thomas then come outside?

4     A     He called out and then identified himself by voice.

5     Q     And then at that point in time, did you all direct

6 him to come outside?

7     A     Yes.

8     Q     Did he follow your directive?

9     A     Yes.

10     Q     So when the sweep is conducted of the residence,

11 both Ms. Simmons and Mr. Thomas are both outside of the

12 residence?

13     A     Well, Mr. Simmons is right at the -- well, I'm

14 sorry.  Mr. Thomas is somewhere right near the door.  I

15 can't -- it's a small hallway but there are -- he is more

16 towards the front of the apartment.  It's a small apartment.

17     Q     You don't recall whether he was outside, or not?

18     A     I want to say he's in the doorway, jammed closer

19 maybe a foot outside or two.  I'm not 100 percent sure, sir.

20     Q     And a part of what you asked Ms. Simmons was if you

21 could look inside the apartment.  And that was prior to when

22 she attempted to close the door.  Is that correct?

23     A     Well, she's asking a lot of questions to figure out

24 what is going on.  I'm trying to be a little bit vague, not to

25 tell her everything that's occurring without blowing the

1    jeopardy of the investigation.

2        Q    And one of the things, though, is you want to get

3    inside to look inside the apartment so you could find that

4    phone.  Right?

5        A    Absolutely.

6        Q    And just to confirm, although I think the record is

7    clear, no officer at the point in time that you made entry

8    into the apartment had a warrant, did they?

9        A    No, sir.

10   (Pause).

11       Q    Now the purpose for the protective sweep in this

12   instance was to secure the apartment in anticipation of

13   obtaining the warrant.  Is that correct?

14       A    Yes, to make sure that -- yes.

15       Q    Okay.  If you had something else to add, feel free

16   to do so.

17       A    No, I'm just -- yes, to make sure no one is inside.

18       Q    The information that you had received in follow up

19   to the sexual battery that occurred, had you received any

20   information that the person was armed and dangerous?

21       A    No, just violent.

22       Q    Did you have any information that anybody inside the

23   apartment that you conducted the protective sweep in was

24   armed?

25       A    No.

1      Q      That was a no?

2      A      No, sir.

3      Q      Did you have any specific information or evidence

4   that you could rely upon today that told you, or suggested to

5   you, that somebody within the apartment might effect officer

6   safety.

7      A      You never know.

8      Q      I don't disagree with you.  I guess my question

9   though is -- I have to ask the question the way that I did

10  which is, did you have information or evidence upon which that

11  you could rely upon today, specifically at that time, that

12  says somebody in that apartment you know, may jeopardize my

13  safety?

14     A      No.  And then let me reiterate; let me back up.  I

15  believe you asked me from (inaudible).  You asked me three or

16  four questions ago, because I want to make sure I'm clear is

17  that it's some -- you asked me something about someone,

18  violent history, about someone being violent inside the

19  apartment.  At the time, we didn't know who was inside the

20  apartment.  It turned out later that it was him and just based

21  on the crime that occurred is all I knew.

22     Q      As a matter of fact, the information that you had

23  received from Ms. Miller in this case -- you didn't have a

24  specific suspect in mind as a result of that, did you?

25     A      I never spoke to her, sir.

1        Q      Well, let me ask a question.

2        A      All we knew, all I could tell you is that she was

3   attacking (inaudible).

4        Q      Here's what I want to know.   As a result of what

5   information she provided to perhaps others in the Tallahassee

6   Police Department, you all did not have a specific suspect in

7   mind that you were going to talk to, right?

8        A      Right, correct.

9        Q      Did you have any evidence at the time that you went

10  in to conduct the protective sweep of the residence that

11  someone in the residence was in the process of destroying

12  evidence?

13       A      No, not that I'm aware of.

14       Q      Did you have any evidence that Mr. Thomas was aware

15  of your presence outside of the residence, prior to your

16  announcing your presence?

17       A      I have no way of knowing yes or no.

18       Q      Did you have any evidence that Mr. Thomas was

19  attempting to escape from within the residence?

20       A      I don't know; I can't tell what he was thinking.

21  The area was surrounded.

22       Q      I'm not asking you what he was thinking.   Did you

23  have any evidence that he was making an attempt to escape from

24  the residence?

25       A      Not, that I know of.

1       Q    Is there anything that precluded obtaining a search

2   warrant prior to making contact with the residence?

3       A    If someone was to walk out of the apartment and had

4   the phone on them we wouldn't have been able to stop them.  We

5   wouldn't have known, wouldn't have been able to search them.

6   They could have hidden the phone, they could have put it in a

7   child's backpack, they could have stuck it in a private part

8   and we could have missed it.

9       Q    Do you have any evidence of that occurring in this

10  particular instance?

11      A    No, that's one of the reasons why we decided to make

12  the actions that we did, one of the factors.

13           MR. SHIPPY:  Just one moment, Your Honor.

14  (Pause).

15  BY MR. SHIPPY:

16      Q    TPD in general's first contact with Mr. Thomas, as

17  it related to this investigation, was when you made contact

18  with him at the residence there at 251 Berkshire Manor

19  Apartments.  Is that correct?

20      A    As far as I know, yes.  But, I don't know.

21      Q    Well, as far as you know, I guess -- I'm only

22  interested in your personal knowledge, anyway.

23      A    Yes.  As far as my understanding, yes.

24      Q    What were the alternatives that you discussed

25  amongst yourselves, prior to making contact with Apartment

1    251?

2        A    It was either get a search warrant or not.  And we

3    discussed the reasons why that we thought it was exigent we

4    needed we need to at least make contact at the door because at

5    that particular moment in time we knew the phone was there,

6    based on the phone was going dead.  If it took us two to three

7    hours we would not know where that piece of evidence is.

8        Q    What strategies did you discuss, as far as gaining

9    entry into the apartment?

10       A    Doing what we did, eventually walking up and

11   knocking on the door.

12       Q    Were there strategies discussed beyond just knocking

13   on the door and if so, what were they?

14       A    I don't -- there is a couple people.  The one that I

15   remember (inaudible) the one we did.  That's the only one I --

16   one of the ones I recall.  It was either that or getting a

17   search warrant.

18       Q    And what it is you did -- I don't want to put words

19   in your mouth, but I want to clarify for purposes of making a

20   record.  That would have been make contact with them.  If they

21   don't give you admittance, we're going to secure the residence

22   by conducting a protective sweep and then we'll worry about

23   getting the search warrant after that, right?

24       A    Yes, and no.  We looked at this.  I don't know how

25   (inaudible).  What if people leave the apartment, do we talk

1    to them; do we have enough to detain them?  Those types of

2    strategies that's what I'm talking about that way.

3         And then ultimately, the decision -- ultimately, we came

4    down to two decisions.  It was do you go get a search warrant

5    right here, or do you go make contact at the door?  So

6    ultimately, those were eventually the two strategies.

7         But it was you talk about the pros and the cons of doing

8    either or which one and if the evidence did leave -- if the

9    phone did die, how do you track it?  If someone did leave the

10   apartment with the item on them, where would it be?  How do

11   you stop them; do you have legal authority, all that type of

12   stuff.  What if the items get lost or broken --

13        Q    -- which then led to the decision of going and

14   making contact at the door?

15        A    Yes.  And with the others just as I spoke about

16   previously, people in the courtyard, people getting ready to

17   come out for work, didn't know who was inside that apartment,

18   were they going to come out, see us, go back inside.

19        Q    At the time that you made contact with Apartment

20   251, did you know who was inside?  Did you know who might be

21   inside, might be a better way to ask it.

22        A    Yeah, we knew the phone was in there, so -- I'm

23   sorry.  Repeat your question.

24        Q    It wasn't a very good one; let me try again.

25        At the time that you made contact with Apartment 251, did

1   you know who the occupants might be inside, whether it's

2   someone who has a lease there, someone who is living there,

3   anything else to track somebody who might be inside that

4   apartment?

5        A    I knew for sure we knew -- you're asking the

6   possibility, is that what your question is?

7        Q    Did you have any idea who was inside the apartment?

8        A    Possibly, we knew someone possibly related to -- had

9   information possibly related or might have knew something

10  because obviously the phone was there and I'm not sure --

11       Q    Let me be a little more specific.

12       A    I'm not sure if someone told me or not, whether or

13  not Ms. Simmons was on the lease.  I can't recall that.

14       Q    That's what I'm trying to get at.  Did you have any

15  of that information at that point in time, as to who?

16       A    I would like to believe someone did do that check

17  and tell me, but I don't recall.

18  (Pause)

19       Q    At the time that you made contact with the

20  apartment, you did not have a specific suspect in mind,

21  whether by a specific description or by name.  Did you?

22       A    I think they had a suspect description.

23       Q    Did you have a name or anything else to connect it?

24       A    No, sir.

25            MR. SHIPPY:  That's all I have, Your Honor.  Thank

1       you.

2              THE COURT:  Redirect?

3                      REDIRECT EXAMINATION

4   BY MS. RAY:

5       Q    Is it correct that part of the protective sweep was

6   to make sure that there wasn't anyone in there that could

7   either tamper or destroy the phone, or any other evidence that

8   might be in there?

9       A    That's correct.

10      Q    Okay.  And is it also correct that law enforcement

11  was aware that the victim's purse was also missing?

12      A    Correct.

13      Q    And the victim was beaten severely in this case.  Is

14  that correct?

15      A    Correct.

16      Q    And when the defendant came to the door, did he

17  appear to have just woken up or have been asleep to you; or

18  are you able to tell us anything about that?  Or did he appear

19  to be awake and like he had been up?

20      A    I don't recall, I mean it's hard to say.

21      Q    Any recollection about whether Ms. Simmons appeared

22  to have just woken up from sleep?

23      A    No, ma'am.

24             MS. RAY:  Thank you, I have nothing.

25             THE COURT:  I think you said something I want to

1    just make sure I got it.  How many times did you talk to

2    Mr. Thomas?

3         THE WITNESS:  Once at the apartment and in an

4    interview back at the station.

5         THE COURT:  At the apartment though, was the only

6    conversation you had with him at the kitchen table that

7    you were taking about?

8         THE WITNESS:  Yes, sir.

9         THE COURT:  Did you have any conversation with him

10   about his status with the apartment?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  When was that?

13        THE WITNESS:  I don't know, let me double check my

14   notes.

15        No, sir, I'm sorry that was with Ms -- I got

16   confused.  That's Ms. Simmons, I asked her about Mr.

17   Thomas.

18        THE COURT:  And what did she tell you?

19        THE WITNESS:  That basically -- just paraphrasing --

20   that he spends some of the -- most of the nights or some

21   of the nights, that I can pinpoint, exactly.

22        MS. RAY:  I think it's on Page 2 of 4 of your

23   report, fourth paragraph up from the bottom.

24        THE WITNESS:  I'm sorry it is (inaudible.  Yes, Mr.

25   Thomas did say he spends most of the nights with Ms.

1          Simmons.

2                    THE COURT:  And she said what?

3                    THE WITNESS:  I got the impression that Mr -- and I

4          don't have a document in my notes, just -- I believe that

5          Ms. Simmons said that he does spend some nights there.

6          And then Mr. Thomas was that he spends most of the nights

7          there.

8                    THE COURT:  But it was her apartment?

9                    THE WITNESS:  Yes, sir.  And I don't know what

10         there --

11                   THE COURT:  But I mean, that's what she said?

12                   THE WITNESS:  Yes, sir, yes, sir.  She said it was

13         her apartment.

14                   THE COURT:  All right.  Any follow up on that from

15         anybody?

16                   MS. RAY:  No, sir.

17                   MR. SHIPPY:  No, Your Honor.

18                   THE COURT:  All right.  You can step down.

19                   THE WITNESS:  Thank you.

20                   THE COURT:  Why don't we take a five-minute break,

21         we've been sitting a long time.  You can make your calls,

22         Ms. Ray.

23                   MS. RAY:  Thank you.

24    (Short recess)

25                   THE COURT:  Call your next witness, Ms. Ray.

```
1              MS. RAY:  Burt Wester.

2              THE COURT:  You may proceed.

3         Have a seat.  Slide up to microphone, please.

4                   DIRECT EXAMINATION

5    BY MS. RAY:

6         Q    State your name for the record, please.

7         A    Herbert Wester.

8         Q    And did you become involved in an investigation of a

9    sexual battery that occurred on September 13, of the year

10   2008?

11        A    Yes, I did.

12        Q    And when did you first become involved, on the 13th

13   or 14th?

14        A    It was the 13th.

15        Q    Okay.  And did you actually have contact with the

16   victim in the case, Kaitlyn Miller?

17        A    Yes, I did.

18        Q    And did she indicate to you that she had -- well,

19   aside from reporting the crime of being sexually assaulted,

20   did she report to you that some of her belongings were

21   missing?

22        A    Yes.

23        Q    And what did she tell you; what belongings did she

24   indicate were missing?

25        A    Her phone and her purse primarily, were the main
```

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1    focus of what she said was missing.

2        Q    Okay.  After you were provided the information from

3    the victim that her cellphone was missing, along with some of

4    other personal items, are you the person who contacted

5    Investigator Corbitt to try to use the tools available to the

6    Tallahassee Police Department, to attempt to track the phone?

7        A    Yes, ma'am.

8        Q    Okay.  And when did you initiate that contact with

9    Chris Corbitt?

10       A    It would have been several hours later.  This was

11   early morning when I first became involved.  I want to say it

12   was maybe 9:00 o'clock the next -- the following -- the same

13   morning, many hours later.

14       Q    Okay.  And at some point, did you get information

15   from either other officers or Investigator Corbitt that they

16   were getting strong indications or indicators that the

17   cellphone was at Berkshire Manor Apartments?

18       A    Yes, ma'am.

19       Q    Did you then have contact at that address?

20       A    Yes, ma'am, we did.

21       Q    Okay.  And what happened when you got to that

22   address?

23       A    We were informed which apartment we believed the

24   phone was in, so we knocked on the door and tried to contact

25   the residents.

1    Q    Okay.  Now, prior to you doing that, did you and

2    other investigators have a discussion as to how you were going

3    to proceed once you got the information, that there were

4    strong indications that the cellphone was actually at that

5    apartment complex in Apartment 251?

6    A    Yes.  We had done some very basic background as to

7    who we believed was there didn't match the suspects.

8    (inaudible) was to contact that individual, try to explain why

9    we were there, what we were trying to locate and --

10    Q    Now, let me ask you that again.  You said -- did you

11   have any specific information about who was in Apartment 251?

12        I didn't understand what you said.

13    A    Just some very generic and basic routine checks as

14   to past calls there, but nothing verified.

15    Q    Okay.  So did you have any idea who lived at

16   Apartment 251?

17    A    Yes, a female.

18    Q    All right.  And, once you all figure out that the

19   cellphone is in Apartment 251 did you have some discussions

20   amongst yourself and the other investigators as to what the

21   best next step is going to be, as far as whether you get a

22   search warrant or whether you make contact at the residence?

23    A    Yes.

24    Q    Tell us about that.

25    A    We discussed it and our primary goal was to contact

1    the individual inside the apartment and get consent to recover

2    these items that we believed were in there.

3        Q    What was -- was time a factor in your consideration

4    of how you were going to proceed?

5        A    Yes.

6        Q    Why is that?

7        A    There were several factors, obviously.  The

8    particular nature of this particular case and the victim

9    saying at one point that she believed there may have been

10   one -- more than one individual involved.  They were all --

11       Q    Let me stop you there.  What information did the

12   victim give you that led you to believe that maybe more than

13   one individual was involved?

14       A    During my initial contact with her she said she had

15   a feeling, was the best way she could describe it, that there

16   may have been more than one person involved, or one person

17   there.

18       Q    Okay.  Did she tell you any statements that she

19   recalled anyone making during the sexual assault or right

20   after it?

21       A    One thing that stood out to her was -- I believe the

22   statement was see, this is how easy it is, or something of

23   that nature --

24       Q    Okay.

25       A    -- as if he -- well, I'm sorry, go ahead.

1          Q     No, go ahead.

2          A     -- as if he may have been telling someone that.

3          Q     And what about -- do you recall a statement that she

4    made to you with respect to if she told anybody what would

5    happen?

6          A     Yes.  If she told anybody what happened, the subject

7    threatened to kill her.

8          Q     Okay.  So you had that information prior to going

9    into the Apartment 251.  Is that correct?

10         A     Yes, ma'am.

11         Q     And you actually met with the victim in this case.

12   Is that correct?

13         A     Yes, ma'am.

14         Q     Was she severely beaten?

15         A     Yes, ma'am.  She had swollen blackened eyes, blood

16   in one eye, various other abrasions and scratches, and those

17   types of things.  Yes, ma'am.

18         Q     So was that a factor at all, the fact that she

19   indicated that there may have been more than one person

20   involved?  Did that factor into your decisions at all, with

21   regard to whether or not the urgency of getting into the

22   apartment once you decided that -- or figured out that the

23   phone is at that location?

24         A     Yes, ma'am.  Like I say, the fear that that force

25   was used maybe more than one subject.  And frankly the phone

1    being the reason we were there, concerned that that resource

2    may not be available as it was explained to me.

3        Q    Okay.  That resource being the phone --

4        A    The phone.

5        Q    -- and the ability to track it?

6        A    Right.  Yes, ma'am.

7        Q    Okay.  And would it be fair to say that you knew

8    more about the case and had more involvement with the case up

9    to this point than, for example, Investigator Suleski did?

10       A    Yes, ma'am.

11       Q    Okay.  Were you the lead investigator?

12       A    Yes, ma'am.

13       Q    So you were on-call investigator when the call came

14   in.  Is that correct?

15       A    That is correct.

16       Q    And you actually had already interviewed the victim?

17       A    Yes.

18       Q    Okay.  And were you one of the officers who actually

19   went and attempted to make contact at Apartment 251, once you

20   all made that decision?

21       A    Yes, ma'am.

22       Q    Okay.  And who actually knocked on the door?  Was

23   that you or someone else?

24       A    I believe Investigator Suleski knocked on the door.

25   I don't recall exactly who (inaudible).  Suli and I --

1    Investigator Suleski and I were both there.

2        Q    So you two were right at the door, or in the area of

3    the front door?

4        A    Yes, ma'am.  Yes, ma'am.

5        Q    Okay.  And do you recall how many times the door had

6    to be knocked on before you heard any response from inside?

7        A    No, ma'am, I don't.

8        Q    Okay.  Do you recall whether or not there was a

9    response from anyone inside after you all were knocking on the

10   door?

11       A    Yes, ma'am.  A female answered the door.

12       Q    Okay.  Had you all announced your presence as being

13   police officers with the Tallahassee Police Department when

14   you were knocking on the door?

15       A    Yes, ma'am.

16       Q    Okay.  Do you have any recollection as to how long

17   it took someone -- the female to the open door?

18       A    It was an unusual -- was not an unusual amount of

19   time given the hour you know, a minute or two.

20       Q    Are you able to tell the Court whether or not the

21   female when she came to the door appeared to have just been

22   awoken from a sleep or whether she had been up or --

23       A    Yes, ma'am.  She appeared to have been asleep.

24       Q    Okay.  And what, if any conversation -- who talks to

25   her at the door, you or Suleski?

```
1        A    I talked to her.  We were both kind of -- at various

2   times in the first few seconds, explain to her why we're there

3   and again, trying to explain the reason we're there and why we

4   want to go in and try to obtain this phone.

5        Q    And what did she say to you?

6        A    She does not allow us to do that.

7        Q    Okay.  Did she want you to get a search warrant?

8        A    Yes, ma'am.

9        Q    Okay.  And then did she attempt to close the door?

10       A    Yes, ma'am.

11       Q    And what happened when she attempted to close the

12  door?

13       A    She was not allowed to shut the door.  And in fact,

14  you know, the door is kept open.  We observed or we were

15  asking if anybody else was there, just for various officer

16  safety -- officer safety reasons.

17       Q    Uh-huh.

18       A    And we saw another individual in the rear of the

19  apartment coming from a hallway.

20       Q    Okay.  Did you have to call out to that individual

21  before they came out?

22       A    Yes, ma'am.  Yes, ma'am.

23       Q    Okay.  Are you able to tell the Court whether or not

24  that individual appeared to have just awoken from a sleep or

25  whether they had been already been up?
```

1      A      Yes, ma'am.  Both parties appeared to have been

2  asleep or in sleeping attire, that type of thing, yes.

3      Q      Okay.  And this is about --

4      A      -- probably about 5:00 in the morning, I'm thinking

5  it was.  Yes, ma'am.

6      Q      Prior to the door opening, did you hear any movement

7  inside the apartment?

8      A      I can't say that it was definitely from inside or

9  what part of the apartment it was coming from.  But yes,

10  ma'am.

11      Q      What did you hear?

12      A      Like maybe a rumble or a walking-type thing.

13      Q      And is it correct then, that Ms. Simmons attempted

14  to close the door and Investigator Suleski put his foot in the

15  door and prevented her from doing that?

16      A      Yes, ma'am.

17      Q      Okay.  And why was it that you all were not going to

18  allow her to close that door?

19      A      Well, we had that belief that the evidence of this

20  crime was inside and didn't know who else was in there.  There

21  was already one other person that we weren't expecting to be

22  in there.  And we were in fear that if we simply walked away

23  that that property inside may be destroyed or rendered of non

24  value for us to locate him.

25      Q      So had the occupants not been removed from the

1    apartment and a sweep done, would you have been able to insure

2    that any evidence -- well, the phone that you knew was in

3    there, was there any way to make sure that that didn't get

4    destroyed, broken, flushed down a toilet, something of that

5    nature?

6        A    No, no, ma'am.  There's no way.

7        Q    Okay.  What happened after Investigator Suleski

8    stuck his foot in the door?

9        A    Well, Ms. Simmons was you know asked to step

10   outside, so was the other gentlemen in the back apartment was

11   asked to come to the front.

12       Q    And what -- do you recall what you all told

13   Ms. Simmons, how much detail you gave her when you first ask

14   her about coming into the apartment?

15       A    We gave a very basic -- this is -- we're looking for

16   a phone.  It's involved in a serious crime-type of thing.

17   But, no, ma'am, we weren't able to give much of a true

18   explanation before she decided she didn't want us there.

19       Q    Okay.  Then is she removed from the apartment?

20       A    Yes, ma'am.

21       Q    All right.  What happened after that?

22       A    Both parties were removed from the apartment or

23   moved to the front of the apartment.  We do the protective

24   sweep.

25       Q    What is the purpose of the protective sweep?

1       A     To make sure there is no other live bodies in there

2    that may harm us or evidence, or that type of thing.

3       Q     Okay.  And did the fact that the victim had

4    mentioned potentially more than one person involved in this

5    rape, did that factor into it at all?

6       A     Yes, ma'am.

7       Q     Those were your concerns?

8       A     Yes, ma'am.

9       Q     Okay.  Would it be sure to say that you want to make

10   sure that no one else is in the apartment that could alter or

11   destroy any evidence that's in the apartment?

12      A     Yes, ma'am.

13      Q     What happened after the protective sweep?  Did you

14   find anyone else in the apartment?

15      A     We did not.

16      Q     Was there any conversation by you with Mr. Thomas,

17   prior to the protective sweep?

18      A     No, ma'am, I don't recall prior to the -- the

19   protective sweep was done right then.  I mean, it was within

20   seconds of finding people in the apartment.

21      Q     Okay.  Were you present when Investigator Suleski

22   had a conversation with Ms. Simmons outside?

23      A     No, ma'am.

24      Q     Okay.  What did you do after the protective sweep?

25      A     I sat down with Mr. Thomas, I again explained --

1       Q      Where?

2       A      At the kitchen table, in the apartment -- or I guess

3   dining room table.

4       Q      Okay.  What did you explain to him?

5       A      I explained why we were there, what we were looking

6   for and that we were trying to get in property as evidence of

7   this crime.

8       Q      Okay.  While you were sitting there at the table,

9   did Mr. Thomas ever tell you he wanted you to leave the

10  apartment?

11      A      No, ma'am.

12      Q      When he came to the door, after you initially spoke

13  to Ms. Simmons and then realized there was someone else in the

14  apartment, did he tell you to get out of the apartment?

15      A      No, ma'am.

16      Q      Did anybody prevent you from going to the apartment,

17  other than Ms. Simmons putting her foot in the door?

18      A      No, ma'am.

19      Q      Okay.  And while you were talking to Mr. Thomas at

20  the table what, if anything, did he tell you about any of the

21  victim's belongings that were in the apartment, or that might

22  be in the apartment?

23      A      Well, the cellphone that he had obtained it from a

24  next door neighbor or acquaintance.

25      Q      Well, let me --

1       A      Okay.  I'm sorry.

2       Q      Let me ask another question.  What I'm asking you is

3   you're having a conversation with him at the table and you're

4   asking him about a phone.  Is that correct?

5       A      Yes, ma'am.

6       Q      What is he saying to you in response to you

7   questioning him about a cellphone?

8       A      He says that the phone is in there.

9       Q      Okay.  Does he tell you where it is?

10      A      In the bedroom, in a pillowcase.

11      Q      And what happens after he tells you that this

12   cellphone is in a pillow case in the bedroom?

13      A      He offers to go and get this phone, as he stands up

14   and starts to walk back to the bedroom area.

15      Q      Okay.  And when he told you it was in the bedroom

16   did he say to you it was in his bedroom?

17      A      He did not.

18      Q      Do you recall putting in your report, on Page 4 of

19   5, while talking to Thomas, he stated the victim's items were

20   inside a pillowcase, which was inside his bedroom?

21             MS. RAY:  Can I approach the witness, Your Honor?

22             THE COURT:  You may.

23   BY MS. RAY:

24      Q      You want to take a look at the second paragraph?

25             And Mr. Shippy it would be on Page 4 of 5 of your report,

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1      if you want to look at that second paragraph.

2           A    Okay.  Yes, ma'am, in his bedroom.

3           Q    So he did say?

4           A    Yes, ma'am, I'm sorry.  Yes, ma'am.

5           Q    Okay.  And after he tells you that the cellphone is

6      in his bedroom, what does he do?

7           A    Then he stood up to go get these items.

8           Q    Okay.  So was it your understanding, based on what

9      he said and his actions, that he was going to get the

10     cellphone and hand it to you?

11          A    Yes, ma'am.

12          Q    Okay.  And up to this point has he told you to get

13     out of his apartment or the apartment?

14          A    No, ma'am.

15          Q    Okay.  And what happens when he tells you he's going

16     to go get the cellphone?

17          A    I ask him if he would mind not doing that.

18          Q    Okay.  And why did you do that?

19          A    Well, we were in the process of getting a search

20     warrant and at that point I didn't know the other -- the

21     occupant, Ms. Simmons, whether or not she had agreed to that

22     or not.

23          Q    Agreed to what?

24          A    To letting us obtain property or evidence from her

25     residence.

1        Q     Okay.  So I'm sorry, I lost my train of thought.  So

2   he's going to go into the bedroom to get the cellphone.  So do

3   you stop him; what happens next?

4        A     I can't make him, not.  I asked him if he wouldn't

5   mind not going to do that until we you know until we determine

6   if Ms. Simmons is okay with that as she was a resident, also.

7        Q     Okay.  And what happens next?

8        A     He agrees and sits back down at the table.

9        Q     Okay.  And then at that point do you have a

10  conversation with Investigator Suleski where he indicates to

11  you that Ms. Simmons has given permission to search the

12  residence -- or okay.  When does that happen?

13       A     Shortly after that.  You know after he offers to get

14  the items I'm like well, let me go talk to Investigator

15  Suleski and see if anything has changed on his end while we're

16  waiting.

17       Q     Okay.  And what information do you get?

18       A     That she has agreed to let us obtain this property.

19       Q     Okay.  And what happens after that?

20       A     We called the forensic unit to come out and document

21  where we found it and collect these items.

22       Q     And where did you locate the items?

23       A     In a pillowcase in the bedroom.  I believe it was

24  on -- on the bed.

25       Q     Okay.  And what items were in the pillowcase?

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1       A     Cellphone, purse, undergarments, ID, that type

2    thing.

3       Q     Okay.  Okay.  And did Mr. Thomas say anything about

4    the items at that point?

5       A     No, ma'am.  He had obtained -- as I said earlier, he

6    had obtained a phone from a friend, earlier.

7       Q     Okay.  Now, I think you've testified you were even

8    though you had gotten consent at this point from Ms. Simmons

9    to search the apartment, you all were still in the process of

10   getting a search warrant.  I'm sorry, is that what you just

11   mentioned?

12      A     No, ma'am.  We were in the process of getting a

13   search warrant while I was talking to Mr. Thomas and

14   Investigator Suleski was talking to Ms. Simmons.

15      Q     Okay.  So your intent was to maintain the evidence

16   by not allowing anyone in the apartment or touch the evidence,

17   prior to you all getting a search warrant to search?

18      A     Right, correct.

19      Q     And as it happened she gave consent and you all

20   searched from the items.  Is that correct?

21      A     Yes, ma'am.

22      Q     Okay.  I think that's all the questions I have,

23   right now.

24            THE COURT:  Cross?

25            MR. SHIPPY:  Thank you.

```
1                    CROSS-EXAMINATION
2    BY MR. SHIPPY:
3        Q    Good afternoon.
4        A    Good afternoon.
5        Q    Did I understand your testimony to be that when you
6    first knocked on the door it was about five o'clock in the
7    morning, thereabouts?
8        A    Yes, sir.
9        Q    And present at the door were you, Investigator
10   Suleski and Investigator Todd?
11       A    Yes, sir.
12       Q    Did you have on uniforms or anything else that
13   identified yourself as TPD officers?
14       A    No, sir, no uniforms.  We had our badge (inaudible)
15   our gun and ID, similar to this.
16            THE COURT:  I couldn't hear what you said.
17            THE WITNESS:  Our badge, our gun and I had that
18       would be similar to this.
19   BY MR. SHIPPY:
20       Q    Would your badge have been visible on your belt?
21       A    Yes.
22       Q    And your gun would have been visible as well, in a
23   holster?
24       A    Yes, sir.
25       Q    And at some point, did you identify yourself as
```

1    being from the Tallahassee Police Department?

2         A    Yes, sir.

3         Q    Initially, Ms. Simmons did not give consent to enter

4    the apartment.  Is that correct?

5         A    That is correct.

6         Q    Did she attempt to close the door, as well?

7         A    Yes.

8         Q    And Investigator Suleski placed his foot inside the

9    door to prevent it from closing?

10        A    Yes.

11        Q    Prior to the time that you made contact with the

12   apartment, had you discussed with Investigator Suleski and

13   perhaps others, how it is you were going to handle contact

14   with the occupants in the apartment?

15        A    Yes, sir.

16        Q    What did you discuss?

17        A    Again, we were going to try to make contact and make

18   this a consensual encounter.

19        Q    And if consent was not granted to you, what was the

20   plan at that point?

21        A    That we would secure the apartment and obtain a

22   search warrant.

23        Q    And how is it that you secure the apartment?

24        A    With a protective sweep.

25        Q    And that's what was done in this instance?

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1       A       Yes, sir.

2       Q       Did you have any evidence or information that

3  anybody within the residence was armed?

4       A       No, sir.

5       Q       Did you have any evidence that anybody within the

6  residence posed a specific danger to you or might undermine

7  your safety?

8       A       It was unknown at the time.

9       Q       Did you have any evidence that anyone within the

10  residence was in the process of destroying evidence?

11      A       No, sir.

12      Q       Did you have any evidence -- did you have any

13  information that anyone within the apartment would, in fact

14  destroy evidence?

15      A       No, sir.  We didn't know who was in there or what

16  their motives may be.

17      Q       Did you have any evidence that anyone within the

18  apartment was attempting to escape?

19      A       No, sir.

20      Q       Was there anything that prevented you from obtaining

21  a search warrant?

22      A       At that particular moment?

23      Q       Yes.

24      A       No, sir -- other than if I may --

25      Q       Certainly, absolutely.

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1        A    No, sir. We just felt given the totality of the

2    circumstances if we could go ahead and get the phone and be

3    done with it, the more the better, that type of thing.

4        Q    And is it my understanding that both Ms. Simmons and

5    Mr. Thomas were taken out of the residence in order for you to

6    conduct your protective sweep?

7        A    Yes, sir.

8        Q    After the protective sweep is conducted, how many

9    officers remain on site?

10       A    After the protective sweep I know -- I believe

11   I'm -- myself and maybe Investigator Todd are inside with Mr.

12   Thomas.  Investigator Suleski is outside with Ms. Simmons.

13   And honestly, I don't recall how many officers -- other

14   officers may have been outside.

15       Q    Were there in fact other officers, in any event?

16       A    Yes.

17       Q    Would any of those officers have been dressed in

18   uniforms?

19       A    Yes, sir.  Generally, if I recall, we give the

20   nature of things, the time of the morning.  We did have a

21   uniformed officer there kind of off in the distance, just to

22   reassure that we are the police.

23       Q    And when you -- did you ask Mr. Thomas to come

24   inside and speak with you after the protective sweep?

25       A    Yes, sir.

1     Q     Would he have been free to leave if he had chosen to

2   do so?

3     A     We never discussed that, it was never an issue.  I

4   don't know if I can give you an answer on that, definitively.

5     Q     And at some point did you ask Mr. Thomas if he would

6   come down to the Tallahassee Police Department in order to

7   provide a statement regarding the recovered property?

8     A     Yes, sir.

9     Q     And did he agree to do that?

10    A     Yes, sir he did.

11    Q     And how did you all get to the Department?

12    A     In my unmarked police vehicle.  I believe

13  Investigator Todd was in with me at the time.

14    Q     You would have had the two officers, then Mr.

15  Thomas?

16    A     Yes, sir.

17    Q     And where would Mr. Thomas have been?

18    A     On the front seat -- front passenger seat.

19    Q     And when you then spoke with him was that in the TPD

20  investigation room?

21    A     Interview room.  Yes, sir.

22    Q     Interview room.  Where is the interview room located

23  within the police department?

24    A     On the second floor in the Criminal Investigative

25  division area of that floor.

1      Q     So you have to go inside, take an elevator or steps

2  up to the second floor, in order to get to the interview room?

3      A     Yes, sir.

4      Q     Is there immediate access outside of the department

5  building from the interview room?

6      A     No, sir.

7      Q     Excuse me.

8            MR. SHIPPY:  I need just a moment, Your Honor.

9            THE COURT:  Sure.

10  BY MR. SHIPPY:

11     Q     Any contact or statements that would have been made

12  by Mr. Thomas to someone connected with Tallahassee Police

13  Department, whether yourself or somebody else, would have been

14  made after the protective sweep.  Is that correct?

15     A     Yes, sir; I believe so.

16     Q     At the time that you made contact with the occupants

17  of Apartment 251 at Berkshire Manor Apartments, you did not

18  have a specific suspect in mind, did you?

19     A     No, sir.

20            MR. SHIPPY:  That's all the questions I have, Your

21      Honor.  Thank you.

22            THE COURT:  Redirect?

23                    REDIRECT EXAMINATION

24  BY MS. RAY:

25     Q     Your report indicates that both Mr. Thomas and

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1    Ms. Simmons consented to the search for the phone in the

2    bedroom.  Is that correct?

3         A    Yes, ma'am.

4         Q    Okay.  And had you not been able to -- had

5    Investigator Suleski not put his foot in the door and the door

6    would have closed, would you have any -- would law enforcement

7    have had any way of insuring that the cellphone wasn't

8    destroyed, damaged, flushed down the toilet, anything of that

9    nature?

10        A    No, ma'am, there would have been no way.

11        Q    Would there have been any way to insure that the

12   victim's underwear, for example, weren't set on fire and

13   destroyed?

14        A    No, ma'am.

15             MS. RAY:  I don't have anything further, thank you.

16             THE COURT:  You indicated you had some basic

17        information on who was in the apartment.  What basic

18        information did you have?

19             THE WITNESS:  Something like, we have access to the

20        City of Tallahassee utilities as to who might be on

21        utilities there, or either prior incidents and our

22        dispatch notes for a certain location.

23             THE COURT:  So you said you knew a female lived

24        there and I was trying to decide what the basis of that

25        was.

1                    THE WITNESS:  No, sir.  Most likely we thought there

2          was a female lived there, based on what little

3          information we had received from those resources, but we

4          had no way of knowing that.

5                    THE COURT:  I'm trying to get you to be a little

6          more specific other than very generic.

7                    THE WITNESS:  No, ma'am -- no, sir, I don't know who

8          was living there.  We had --

9                    THE COURT:  What was the source of your information?

10                   THE WITNESS:  The City of Tallahassee utilities.

11                   THE COURT:  Okay.  So utilities were listed to a

12         female.  Is that what you're trying to tell me?

13                   THE WITNESS:  Yes, sir.  I'm sorry.

14                   THE COURT:  Did you have any other information?

15                   THE WITNESS:  Previous calls to that location was to

16         a Ms. Simmons.

17                   THE COURT:  What do you mean?

18                   THE WITNESS:  Whenever someone is dispatched to a

19         call there is --

20                   THE COURT:  Oh, police calls.  Okay.  We've been

21         talking about a telephone and then -- all right.  So

22         police calls previously came back to Ms. Simmons living

23         there?

24                   THE WITNESS:  Yes, Your Honor.

25                   THE COURT:  Okay.  Thank you.  Anything else, either

1          side?

2                   MR. SHIPPY:  No, sir.

3                   MS. RAY:  No, sir.  No, Your Honor.

4                   THE COURT:  All right.  And I may have been hurrying

5          them so they didn't do this.  I take it you're an

6          investigator with the Tallahassee Police Department?

7                   THE WITNESS:  Yes, Your Honor.

8                   THE COURT:  And how long?

9                   THE WITNESS:  Fifteen years.

10                  THE COURT:  All right.  You can step down.

11                  THE WITNESS:  Thank you, sir.

12                  THE COURT:  All right.  Call your next witness,

13         please.

14                  MS. RAY:  Investigator Robert Todd.

15                  (Brief pause).

16                           DIRECT EXAMINATION

17    BY MS. RAY:

18         Q    If you would, please state your name for the record.

19         A    Investigator Robert Todd.

20         Q    How are you employed?

21         A    Investigator with the Tallahassee Police Department.

22         Q    What unit are you assigned to?

23         A    Currently in the violent Crimes Robbery Unit.

24         Q    How long have you been in that unit?

25         A    I've been in that unit since March, of this year.

1      Q     Okay.  Where were you assigned before that?

2      A     The Special Victims Unit.

3      Q     And how long were you in that unit?

4      A     A little over two years.

5      Q     How long have you worked for the Tallahassee Police

6  Department?

7      A     Over ten years.

8      Q     Okay.  Did you become involved in an investigation

9  involving the defendant in this case, James Thomas and the

10  victim of a sexual assault that occurred on September 13th, of

11  the year 2008?

12     A     Yes, ma'am.

13           THE COURT:  And Ms. Ray, I don't need to hear the

14      same thing a third time, okay?

15           MS. RAY:  Yes, sir.

16           THE COURT:  So stick to what he specifically

17      knows about.

18           MS. RAY:  I am, absolutely.

19  BY MS. RAY:

20     Q     Were you present?  Did you actually hear the

21  defendant in this case give consent to search the bedroom for

22  the phone and the other items that were in the bedroom?

23     A     Did I hear him give consent?

24     Q     Yeah.  Your report indicates that Thomas and Simmons

25  wound up giving consent.  Was that based on --

1      A      Yes.

2      Q      -- you actually hearing it yourself?

3      A      I don't recall.  I didn't actually talk to them

4   much.  It was Investigator Suleski and Wester who talked to

5   him.

6      Q      So if that's in your report it would have been

7   information that was relayed to you by other investigators.

8   Is that correct?

9      A      Yes, ma'am.

10      Q      All right.  And you were part of the protective

11   sweep.  Is that correct?

12      A      Yes, ma'am.

13      Q      Okay.  Did you ask Mr. Thomas if there were any

14   weapons in the residence, prior to doing the protective sweep?

15      A      Yes.

16      Q      And what did he tell you?

17      A      That there was a firearm located in his bedroom.

18      Q      And was there indeed a firearm located in the

19   bedroom?

20      A      Yes, ma'am.

21      Q      And where was it located?

22      A      It was on the floor of the bedroom I believe, next

23   to a dresser.

24          MS. RAY:  Okay.  That's all the questions I have.

25      Thank you.

1           THE COURT:  Cross?

2           MR. SHIPPY:  No questions, Your Honor.

3           THE COURT:  Let me be certain that -- this question

4       and answer was before the sweep?

5           THE WITNESS:  Of the firearm?

6           THE COURT:  Right.

7           THE WITNESS:  I believe so.  Yes, sir.

8           THE COURT:  And when did you locate the firearm?

9           THE WITNESS:  When I went into the bedroom.

10          THE COURT:  At what point?

11          THE WITNESS:  When we were doing the protective

12      sweep.

13          THE COURT:  Okay.  So that's when you saw the

14      firearm?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  All right.  Either side, anything

17      further?

18          MS. RAY:  No, sir.

19          THE COURT:  All right, you can step down.

20          MR. SHIPPY:  I have one question, Your Honor, if I

21      may.

22          THE COURT:  Okay, you may.

23                  CROSS-EXAMINATION

24  BY MR. SHIPPY:

25      Q    As a part of conducting the protective sweep, did

                TERESA SELVA, OFFICIAL DIGITAL REPORTER

1    you ask Mr. Thomas, are there were any firearms in the

2    residence?

3         A    I believe we asked if there were any weapons.

4         Q    Pardon me?

5         A    Yeah, something to that effect -- weapons or

6    firearms.

7         Q    It's a part of a component of doing the protective

8    sweep, though, right?

9         A    Yes, sir.

10             MR. SHIPPY:  Thank you.

11             THE COURT:  All right.  You can step down.  Call

12        your next witness.

13             MS. RAY:  Ms. Simmons, Deidre Simmons.

14             THE COURT:  Come on up here, please ma'am.  You can

15        have a seat there and slide up to the microphone, please.

16                       DIRECT EXAMINATION

17   BYMS. RAY:

18        Q    If you would, please state your name for the record.

19        A    Deidre Simmons.

20        Q    And Ms. Simmons, do you know the defendant in this

21   case?

22        A    Yes.

23        Q    How do you know him?

24        A    He is my ex-boyfriend.

25        Q    Okay.  Where were you living back on September 13,

1    of the year 2008; do you remember?

2         A    Berkshire Manor Apartments.

3         Q    Apartment 251?

4         A    Yes.

5         Q    All right.  And you knew -- you were dating the

6    defendant, at that point?

7         A    Yes.

8         Q    Okay.  And was he living in Apartment 251 with you?

9         A    Yes.

10        Q    Okay.  And how long had you been living in the

11   apartment?

12        A    How long -- could you repeat the question?

13        Q    How long had he been living with you in that

14   apartment, if you recall?

15        A    A couple months.

16        Q    Did there come a point on the early morning hours, I

17   guess of September 14th, the year 2008, that there was

18   something going on at your front door?

19        A    Yes.

20        Q    What was it that brought your attention to something

21   going on at your front door?

22        A    There was knocking at the door.

23        Q    Okay.  Do you recall how many times you heard

24   knocking at the door before you responded to it?

25        A    No, I don't remember how many time they knocked.

1      Q     Where were you in the apartment when you heard the

2    knocking?

3      A     I was asleep in my bed.

4      Q     Where -- was the defendant there?

5      A     Yes.

6      Q     Where was he?

7      A     He was asleep on the floor in the living room.

8      Q     Okay.  And so is that where he was when you came out

9    of the bedroom to answer the door?

10     A     Yes.

11     Q     Did you hear anyone say anything before you opened

12   the front door?

13     A     From the outside?

14     Q     Yes.

15     A     No.

16     Q     Was there just knocking at the door and no

17   announcement that it was the police?

18     A     No it wasn't an announcement.

19     Q     Okay.  Just knocking at the door.  What did you do

20   when you got to the front door?

21     A     There was a banging.  They were kind of banging at

22   the door.  So I asked James who was at my door, you know, it's

23   five in the morning.  Who's knocking at the door?

24     Q     What did he say?

25     A     I don't know, tell him I'm not here.

1       Q    Okay.  Were you able to look out any windows or out
2    the door to see who was outside?

3       A    I could have, but I didn't.

4       Q    Okay.  And it's your testimony that there wasn't any
5    announcement that it was the police, or anything at the door?

6       A    No.

7       Q    Okay.  So what did you do?

8       A    I just opened the door.

9       Q    And what did you see when you opened the door?

10      A    Several police outside.

11      Q    Okay.  Were they in uniform or out of uniform?  Do
12   you recall?

13      A    I think they were out of uniform, but I'm not sure.

14      Q    Okay.  And what do you recall happening, after you
15   opened the front door?

16      A    One of the officers put his foot in the threshold of
17   my door and --

18      Q    Okay.  Prior to him doing that, did he say anything
19   to you?

20      A    Prior to him doing that, he asked me was there
21   anybody in the house with me.

22      Q    What did you tell him?

23      A    I told him, no.

24      Q    Why did you tell him, no?

25      A    Because James told me to say no, that he wasn't

1    there.

2         Q    Okay.  And you knew that they were police officers

3    at that point?

4         A    Yes.

5         Q    Okay.  And what do you remember happening next?

6         A    After he asked me was there anyone in the house -- I

7    guess he could probably look at my face and tell that I was

8    not telling the truth, so he asked me again.  And he stated

9    that he thinks someone has got me involved in something that I

10   don't know anything about.  So he put his foot in the

11   threshold of the door and he asked again.  You know -- he

12   asked you know, are you sure there is not anybody in the

13   house?  And that's when I told the truth and I said, yes.

14        Q    Okay.  Now before we move on, is it correct that as

15   the police were knocking on the door the defendant, or Mr.

16   Thomas, was picking up his pillow and blankets and whatever,

17   and moving it?

18        A    Yes.

19        Q    Okay.  And you indicated -- do you remember -- I

20   know it's been a while, but you were here for a hearing

21   previously.  But do you remember looking at your written

22   statement that you wrote in this case?

23        I know it's been a while.

24        A    Yes.  Yeah, I don't really remember what it says.

25             MS. RAY:  May I approach the witness, Your Honor?

```
 1              THE COURT:  You may.

 2              MS. RAY:  I just want to --

 3              MR. SHIPPY:  Your Honor, there has not been a

 4       question that she has said that she didn't know the

 5       answer to.  So I respectfully suggest it's improper to do

 6       so, at this time.

 7              THE COURT:  Ask her your question, Ms. Ray.

 8              MS. RAY:  Okay.

 9   BY MS. RAY:

10       Q    Okay.  You have indicated that you didn't know it

11   was the police at the door.  Is that correct?

12       A    Could you repeat that?

13       Q    Is that correct that you're testifying that you

14   didn't realize it was the police knocking at the door because

15   there is just banging on the door, and they are not announcing

16   like who they are?

17       A    Right.

18       Q    Okay.  Now, do you remember writing in your

19   statement that --

20              THE COURT:  You can let her read it.

21              MS. RAY:  May I approach the witness, Your Honor?

22              THE COURT:  You may.

23   BY MS. RAY:

24       Q    Just read it and then -- and it's actually just this

25   bottom paragraph there.  If you just want to review that, I
```

1    was going to ask you a question about that.

2         It reads, as the police are knocking, he is gathering up

3    his stuff.  Now is that something that your writing after the

4    fact and now you know that the police are there.

5         A    Yes.

6         Q    Okay.  So you do tell them there is someone else

7    there and then what do you remember happening?

8         A    He asked me to step outside and they went into my

9    house.  Half of the officers stayed outside with me and a

10   couple of them went inside.  From that point I was asking the

11   officers outside with me, you know what's going on?  You know

12   you all are in my house.  I said like I should have a right to

13   know what's going on and what's this about?

14        Q    Okay.  Now, when the officer first stuck his foot in

15   the door, did the officer tell you at that point anything at

16   all?

17        A    No, he said he could not tell me anything.

18        Q    Okay.  Other than asking if anyone else was in the

19   apartment and then I think you said first you said no, but

20   then he asked you again because you thought he could tell from

21   your face that you weren't being truthful with him.  Did he

22   tell you anything else about why they were there at that

23   point?

24        A    No.

25        Q    Okay.  He didn't tell you whether or not they were

1    looking for any phone or anything of that nature at that

2    point?

3         A    No.

4         Q    Just has his foot stuck in the door?

5         A    Right.

6         Q    Okay.  Did you tell the officer at that point to go

7    get a search warrant if he wanted to come in?

8         A    No.

9         Q    Okay.  Did they ask you at that point if they could

10   come into the apartment, before --

11        A    No.

12        Q    Okay.  So they stick their foot in the door and then

13   they ask you to come outside.  Is that correct?

14        A    Yes.

15        Q    Okay.  And then is it your testimony some of the

16   officers go inside?

17        A    Yes.

18        Q    Some stay outside with you?

19        A    Yes.

20        Q    Do you get any further explanation outside as to

21   what's going on?

22        A    Yes.

23        Q    What are you told?

24        A    I was told that this was -- there was a girl that

25   was brutally beaten and raped and that they had a device

1    outside, and they pointed to the device and said that the

2    reason why they are at my door is that they were trying to

3    track a cellphone, and that this device led them to my house.

4    And they asked me you know, do I remember seeing a cellphone

5    in the house.

6        Q    And did you at that point tell the officer that you

7    didn't realize how serious it was and then give them

8    permission to go into your apartment?

9        A    They were already inside.

10       Q    Did you ever have any conversation like that with an

11   investigator outside where he told you about a woman had been

12   raped?  And was there any conversation that took place like

13   that and then at that point you consented?

14       A    Actually, what I stated I believe that was the only

15   conversation that I had outside.  I was being cooperative; I

16   didn't know what was going on.  So I wasn't trying to give

17   anybody any slack.

18       Q    I'm sorry?

19            THE COURT:  You weren't what?

20            THE WITNESS:  I wasn't trying to give anybody any --

21       you know, I wasn't -- I was just trying to be

22       cooperative.

23            MS. RAY:  Okay.

24   BYMS. RAY:

25       Q    But it is your testimony that you did not give

1    consent for the officers to go into your apartment?

2        A    No.

3        Q    Okay.  And is it your testimony that you never at

4    any point while they were there gave them consent to go into

5    your apartment?

6        A    No.

7        Q    Did the officers tell you that they were -- they

8    could get a search warrant or were in the process of getting a

9    search warrant?

10       A    Yes.

11           THE COURT:  That's two different things; which did

12       they tell you?  What did they tell you about a search

13       warrant?

14           THE WITNESS:  They said they could go get a warrant.

15       But this is after they had already obtained what they

16       needed because I had asked about it and we sat there for

17       hours and we waited -- waited for them, I guess for the

18       judge to get up get up or whatever, to issue the warrant.

19   BY MS. RAY:

20       Q    Were you present when Mr. Thomas told the

21   investigators where the phone was?

22       A    I was walking back into the door, at that time.  So

23   as I was walking in, I think he and another officer were

24   coming out of the room with the evidence.

25       Q    Okay.  So did you at any point hear Mr. Thomas

1   consent to allowing the officers to go in the bedroom and get

2   the phone?

3        A    I don't really remember.  I mean, I remember them

4   coming out of the room with it, but I don't remember if I

5   heard words.

6        Q    And you shared this bedroom with Mr. Thomas.  Is

7   that correct?

8        A    Yes.

9        Q    And you shared the apartment with him?

10       A    Yes.

11       Q    Is that your testimony?  Did you ever hear Mr.

12   Thomas say -- tell the officers to get out of the bedroom or

13   to get out of the house?

14       A    No.

15            MS. RAY:  I don't think I have anything further,

16       thank you.

17            THE COURT:  Cross?

18            MR. SHIPPY:  Your Honor, yes.

19                 CROSS-EXAMINATION

20   BY MR. SHIPPY:

21       Q    Good afternoon.

22       A    Hi.

23       Q    Did you give consent to the officers to search your

24   apartment?

25       A    When?

1    Q    At any time?

2    A    Yes.

3    Q    When was that?

4    A    I give them consent to search when they were asking

5    what he wore, what he had on the previous night.

6    Q    Help me understand the timing of these things.   The

7    officers come to your front door, and knock on the door.   Is

8    that correct?

9    A    Right.

10    Q    You open the door, is that right?

11    A    Yes.

12    Q    You have a conversation with them at that point.   Is

13    that right?

14    A    Yes.

15    Q    And the one officer places his foot inside -- you

16    said the threshold of the door.   Is that correct?

17    A    Right.

18    Q    And also asked you to step outside.   Is that

19    correct?

20    A    Yes.

21    Q    Up to that point in time had you given consent to

22    anybody to go inside your apartment?

23    A    No.

24    Q    Did you then step outside at the request of the

25    officer?

1      A    Yes.

2      Q    Where are you standing after that point in time?

3      A    On the -- I guess balcony or whatever you call it --

4   sidewalk.

5      Q    How many officers do you recall seeing at that

6   location, at that time?

7      A    While I was outside?

8      Q    Yes.

9      A    Five or six.

10     Q    Did you then at that point in time give them consent

11  to go inside your apartment?

12     A    No.

13     Q    In terms of what you would call minutes, hours,

14  whatever the time may be -- from the time when you stepped

15  outside and you're on what you call the balcony or ledge, when

16  is it that you give somebody consent to go inside your

17  apartment?

18     A    I never gave anybody consent to go inside.  I gave

19  them consent to search when they were asking me the different

20  things that they were still looking for.  They said there was

21  a camera that was missing.  I told them they could look for

22  it.  He asked what he had he on; I showed them the clothes.  I

23  told them they could take it.  That's the type of consent that

24  I was giving.

25     Q    Was that after -- well --

1        A     That was after they had already taken James down to

2     the station.

3        Q     All right.  Now you've helped me to understand.  So

4     the consent that you're talking about to search for items was

5     after Mr. Thomas had already been transported by other

6     officers to the Tallahassee Police Department?

7        A     Yes.

8        Q     There was no consent prior to that time?

9        A     No.

10             THE COURT:  Redirect?

11                       REDIRECT EXAMINATION

12     BYMS. RAY:

13        Q     You also consented to do a search of your vehicle on

14     September 16, of 2008.  Is that correct?

15        A     Correct.

16        Q     All right.  Thank you.

17             MS. RAY:  I have nothing else.

18             THE COURT:  who's apartment was this lease to?

19             THE WITNESS:  Mine.

20             THE COURT:  How long had you been living there?

21             THE WITNESS:  I don't know for sure, but it was just

22     a couple months.

23             THE COURT:  And you had secured the lease?

24             THE WITNESS:  Let's see, this was in August.  I

25     moved in August.  well, this happened in September?

TERESA SELVA, OFFICIAL DIGITAL REPORTER

```
 1              THE COURT:  Yes, September 13th.  Had Mr. Thomas
 2    gotten the lease with you, or had you gotten it yourself?
 3              THE WITNESS:  He is not on the lease with me.
 4              THE COURT:  And you were paying the rent on the
 5    apartment?
 6              THE WITNESS:  Yes.
 7              THE COURT:  Was Mr. Thomas paying any rent on this
 8    apartment?
 9              THE WITNESS:  No.
10              THE COURT:  So he was living there because you said
11    it was okay?
12              THE WITNESS:  Yes.
13              THE COURT:  Okay.  All right.  Anything further from
14    either side?
15              MS. RAY:  No, Your Honor.
16              MR. SHIPPY:  No, Your Honor.
17              THE COURT:  All right.  You can step down.  Do we
18    need to keep her any further?
19              MS. RAY:  No.  Thank you, ma'am.
20              THE COURT:  You're excused, you're free to go about
21    your business.  Call your next witness.
22              MS. RAY:  I just need one second; I may not be
23    calling anyone else, Your Honor.  If I could just have
24    one second.
25              No, Your Honor, I think -- I don't have any further
```

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1      witnesses.

2              THE COURT:  Say what?

3              MS. RAY:  No further witnesses.

4              THE COURT:  Mr. Shippy?

5              MR. SHIPPY:  We have no witnesses, Your Honor.

6              THE COURT:  Uh-huh.  Do you want to excuse the

7      witnesses before we start into discussion?

8              Either they can leave or come in, as they see fit.

9      You don't need to do it, let the deputy do it.  Ms. Ray?

10             MS. RAY:  Oh, I'm sorry.  You're going to do it?

11     I'm sorry.  I thought you wanted me to.

12             THE COURT:  Mr. Shippy, do you want to be heard?

13             MR. SHIPPY:  Yes, Your Honor, thank you.

14             Your Honor, I have cited case authority within the

15     amended --

16             THE COURT:  Go ahead and make your argument because

17     I haven't really studied your motion and I'm going to

18     make a ruling here.

19             MR. SHIPPY:  All right.  In the meantime, before we

20     do that, Your Honor, let me give you an additional case

21     that I've located since filing the motion.

22             I'm going cite it for the Court and give the Court a

23     copy and Ms. Ray a copy.

24             It's BIAZ, B-I-A-Z vs. State 34 So.3d 797 Fouth

25     District Court of Appeals, opinion date of May 19 of

1    2010.  Here is a copy for the State, if I may approach.

2         THE COURT:  You may.

3         MR. SHIPPY:  First of all, Your Honor, so we're

4    clear about the evidence that we're seeking to suppress,

5    as reflected in the amended motions:  all items seized by

6    any law enforcement officers at 2060 Continental Avenue

7    which is the Berkshire Manor Apartments, Apartment 251,

8    which would include specifically, the cellphone, purse,

9    underwear and identification card that were taken into

10   evidence as described in the probable cause affidavit and

11   any statements made by Mr. Thomas to law enforcement at

12   that address and thereafter, including those statements

13   that I have referenced in the amended motion to

14   dismiss -- which are that Mr. Thomas had the phone and it

15   was given to him by a friend and was willing to go get it

16   for law enforcement -- that he did not have sex with

17   Kaitlyn Miller.

18        He observed other males calling a girl, presumably

19   her, a bitch and then pushing her to the ground.  That

20   was at Baha's or close to Vinyl Fever, that Mr. Thomas

21   could not give an explanation for having possession of

22   Kaitlyn Miller's property and putting himself at a time

23   and place near Kaitlyn Miller when she alleged -- was

24   alleged to have been attacked and that Mr. Thomas in fact

25   did have sex with Kaitlyn Miller, but it was consensual

1    whether a construction site near Vinyl Fever or elsewhere

2    and whether inside or outside of the vehicle.

3        Basically, anything that occurred after the point in

4    time that the officer stepped inside the apartment,

5    conducted the protective sweep we're saying is tainted

6    fruit of the poisonous tree and should be suppressed --

7    whether that is the physical evidence, taken into

8    custody, or the statements made by Mr. Thomas.

9        The reason for suppressing the evidence, Your Honor,

10   is that the protective sweep was improperly conducted and

11   everything thereafter falls as a result, Your Honor.

12       The best case to deal with this issue, Your Honor,

13   is the one that I've given to the Court, which is Diaz

14   vs. State.  And that case does a good job of discussing

15   the relevant law in this case, Your Honor.

16       In that case, the defendant argued that the officers

17   had no right to enter his home and conduct a protective

18   sweep.  In that case it was because someone else had been

19   taken into custody outside and that the officer had no

20   reasonable belief based on specific and articulable facts

21   that the home harbored individuals that posed a danger to

22   them and therefore, any consents that were given after

23   the illegal entry were in valid.

24       The reasons for asking the officers questions, Your

25   Honor, to the effect as to whether -- and that's in this

1       case, your Honor.  I'm speaking of our case, Your Honor,

2       Mr. Thomas' case -- as to whether they had any evidence

3       of somebody being armed.  It is because the Diaz case

4       that that's one of the elements that they need to

5       consider, as to whether or not they can conduct the

6       protective sweep.

7            Identifying a protective sweep is a quick and

8       limited search of the premises to the (inaudible) to

9       arrest, conducted to the protect the safety of the police

10      officers or others.  The evidence in this case, Mr.

11      Thomas' case, does not show any specific articulable

12      evidence upon which this Court can rely in authorizing

13      the protective sweep in this instance, Your Honor, which

14      then led to the discovery of the evidence as well as the

15      statements that are attributed to Mr. Thomas.

16           Also, ask the question -- the evidence -- in the

17      response -- the answer is in response to the questions,

18      Your Honor, as to whether or not they had any evidence

19      upon which they could point or rely upon, to show that

20      somebody in the apartment was in the process of

21      destroying the evidence, or would destroy the evidence.

22      The answer is no, they didn't have that.  That was an

23      obvious concern but concern isn't constitutionally

24      permissible -- is not a constitutionally permissible

25      reason for going in and doing the protective sweep.

1        The case that I'm relying upon, Diaz vs. State says

2        you need to be able to point to some specific evidence

3        that is, in fact, occurring -- probably no different than

4        if we want to do an analogy, Your Honor, that in order to

5        conduct a Terry stop of an individual you have to have a

6        specific and articulable reason that the person is

7        committing, is about to commit, or has committed some

8        sort of a criminal offense.  Just the general notion that

9        you know, I think he is, or analogy in this case that I

10       think something may be going on or there is a possibly

11       that the phone is going to go dead or there is the

12       possibility -- or the evidence is going to get destroyed,

13       or if there is a possibly because we don't know if

14       somebody is armed in there.

15        All the things are not specific articulable reasons

16       linked to any specific evidence that gives anybody the

17       authority to go inside.  And we can add to that, Your

18       Honor.  And I extremely appreciate the candor of the

19       officers.  There was nothing that prevented them from

20       getting a search warrant in this instance.

21        The exigencies you don't know whether they exist

22       because there is no evidence upon which this Court can

23       rely in saying, that yes these were exigent circumstances

24       which allowed the officers to go inside.  A decision was

25       made that we were going to make contact with them, but

1        also the decision was made in advance that if we don't

2        get entry we are going to secure this residence because

3        we don't want anything to happen to that evidence.

4            That, Your Honor, is not a constitutionally

5        permissible basis for conducting a protective sweep.

6        They knew where the evidence was, they were able to

7        connect it to a specific residence.  There is nothing

8        that prevented them from having the affidavit signed.  As

9        matter of fact, Investigator Corbitt was basically

10       100 percent certain that that phone that they were

11       looking for was in that residence.

12           So they had a basis and he was extremely highly

13       competent that he had probable cause as would have to be

14       required for a search warrant in order to go inside that

15       residence.  So they knew they had what they needed, what

16       they didn't have was a search warrant.  And what they

17       tried to do is avoid getting a search warrant.  That's

18       constitutionally wrong and that's the reason the evidence

19       should be suppressed in this case, Your Honor.

20           As the Diaz court announces, the threshold to the

21       entrance of a house may not be reasonably crossed without

22       a warrant absent exigent circumstances.

23           But in order to have the right to conduct a quick

24       and cursory check of the residence, when they believe

25       somebody else may be inside who might present a security

1      risk, they secure -- security risk, excuse me -- they

2      must have a reasonable, articulable, suspicion that the

3      protective sweep is necessary, due to a safety threat or

4      the destruction of evidence.

5           The Court simply does not have any evidence in this

6      case of either of those, that there was a safety risk to

7      officers themselves.  If that was the case, then every

8      time they conduct any -- have any contact with anybody on

9      the street, or on the -- or in an apartment they are

10     always going to have that safety risk.  And I don't want

11     to diminimize the fact that there is that risk involved,

12     but it applies in every instance, Your Honor.  They have

13     to be able to articulate specific evidence to this Court

14     why it applied in this case, though, Your Honor.

15          And the same applies to the destruction of the

16     evidence.  Sure, it could and the fact that there were

17     officers there they've kind of blown their cover, so to

18     speak.  They wouldn't have had that issue if had they

19     gone and gotten the search warrant.  There wouldn't have

20     been any question about cover because they would have

21     been able to be in.  There wouldn't be anything anybody

22     could do about it.

23          But the only reason that they went in was to secure

24     the residence and protect it for the destruction of

25     evidence without any articulable suspicion, evidence upon

1     which this Court can rely making a decision that the

2     evidence was in fact in the process of being destroyed or

3     could be destroyed.

4          The Court goes on to say that the protective sweep

5     is proper if the arresting officer has, one:  A

6     reasonable belief that third persons are inside and a

7     reasonable belief that third persons were aware of the

8     arrest outside the premises, so long -- so that they

9     might destroy evidence, escape, or jeopardize the safety

10    of the officers, or public.

11         I also ask the question about whether there was any

12    evidence upon which the officers had that would have

13    permitted them to believe that Mr. Thomas or anybody else

14    was attempting to escape.  In candor they said no, that

15    was not the case.

16         Highlighted, Your Honor, on Page 6 of the opinion

17    over on the right hand side in italics, the Court says

18    and is quoting the case of Klosieski -- C, excuse me --

19    K-L-O-S-I-E-S-K-I vs. State of Florida 82 So.2d 448,

20    which is a fifth DCA case from 1986.  It says that the

21    fact that the police did not know as an absolute

22    certainty whether more people were in the house cannot

23    justify entry into the house.

24         So the suspicion -- and anybody would have that

25    suspicion, but that's not enough constitutionally, Your

1        Honor.  The suspicion that somebody might be in the
2        house, somebody else might be armed because that's the
3        reality of a society that we life in, or that the
4        evidence might get destroyed.  That suspicion, that
5        uncertainty, that question mark does not permit them to
6        go inside.  Everything that happens in this case falls
7        after that, Your Honor.
8             As matter of fact, in this particular case, the
9        Court noted that their testimony suggested -- the
10       testimony of the officers, that is.  They entered the
11       residence as part of a routine practice, rather than on
12       the basis of any articulable facts which would warrant a
13       reasonable belief that the occupants posed a threat to
14       officer sight.  Which, if I may digress for one moment,
15       Your Honor, the Court will find in the court file a
16       request for the Court to take judicial notice, limited
17       specifically to this amended motion to suppress, that in
18       at least two other cases -- in which I represent the
19       clients is the reason I know of it.  And those would be
20       State vs. Yawn, Y-A-W-N, which is 08-CF-2981, State vs.
21       Scott, 09-CF-052.  Protective sweeps were also done in
22       those cases, Your Honor.  So I'm suggesting --
23            THE COURT:  I deny your request to take judicial
24       notice of the facts of some other case.  That's not an
25       appropriate subject of judicial notice.

1              MR. SHIPPY:  Okay.  The State bares the burden in

2      this case, Your Honor, to demonstrate that the

3      procurement of a warrant was not feasible because the

4      exigencies of the situation made that course impaired.

5              And let me respectfully suggest to the Court that

6      the evidence was completely to the contrary, that

7      everybody believed that they had the basis for getting

8      the warrant and that certainly was an option.  It was an

9      option that they specifically chose not to do.

10             The Diaz court quotes or cites to -- actually cites

11     and quotes the first DCA case, Lee vs. State, L-E-E, at

12     856 So.2d 1133, 2003 case.  It says that the Lee court

13     explains that in order to justify a warrantless entry

14     into a residence to prevent the imminent destruction of

15     evidence, the police must have an objectively reasonable

16     fear that the evidence will be destroyed before a warrant

17     can be obtained.

18             The Diaz court goes on to say that in Benefield vs.

19     State, which is a Florida Supreme Court opinion from 1964

20     at 167 2nd 706 has held that exigent circumstances exist

21     where the occupants of the house are aware of the

22     presence of someone outside and are engaged in activities

23     that justify the officers in belief that the occupants

24     are actually trying to escape or destroy evidence fears

25     on generalizations.  And in that instance they were

1    talking about guns and drugs are not enough to create in
2    exigent circumstances.

3         We have a generalized concern in this case, Your
4    Honor, we don't have specific or articulable concerns of
5    anybody trying to escape, any destruction of evidence, or
6    anybody having been armed at the time. And actually, as
7    I recall, I think I asked question. There was no
8    evidence that the sexual battery that's alleged to have
9    occurred in this instance, that the person who committed
10   it, in fact was armed at that time.

11        The Court in Diaz went on to know that the consent
12   to search given by -- in that case, the defendant, and
13   another individual were (inaudible) because it's well
14   settled law that where a consent to search is obtained
15   after illegal police activity, such an illegal search or
16   arrest -- such as an illegal search or arrest -- the
17   unlawful police action presumptively taints and renders
18   involuntary any consent to search. And the State bears
19   the burden to prove that the taint of the illegal entry
20   was dissipated by subsequent events. I would
21   respectfully suggest to the Court that in this instance
22   the State has not met that burden.

23        If the Court would give me one moment, Your Honor,
24   just to collect my thoughts and look at my notes, I would
25   really appreciate it.

1   (Brief pause)

2          Just one thing that I would add, Your Honor, that's

3      perhaps unique to this particular case, is -- and it goes

4      back to Investigator Corbitt, in his particular testimony

5      and I won't go into his particular details so we can keep

6      the matter under seal.

7          But it's quite clear that the Tallahassee Police

8      Department wants to maintain the confidentiality of those

9      techniques in order to preserve them for future use in

10     solving criminal offenses, Your Honor.  As a matter of

11     fact, there has been no case upon which they've gone to

12     attempt to obtain a search warrant using this as a basis,

13     although they are relatively comfortable that you know,

14     it certainly would be an accepted process and procedure

15     for doing so.

16         And I think that's really what this all gets down

17     to, Your Honor, is they really wanted to preserve the

18     confidentiality of the techniques that were used.  They

19     made the conscious choice to make contact with the

20     residents, the occupants in the apartment.  The plan was

21     specific that if they did not gain entry through consent

22     that they were going to secure the residence and then go

23     obtain the search warrant.  But unfortunately, or

24     fortunately, depending on how you view the matter, there

25     is no legal authority for securing a residence under

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1     those circumstances without specific articulable evidence

2     upon which the State can rely to show that there was a

3     basis for doing so.  It simply does not exist in this

4     case; the evidence doesn't support it.  We are asking the

5     Court to suppress all the evidence that's reflected in

6     the motion to suppress.

7          Thank you, for your time.

8          THE COURT:  Ms. Ray?

9          MS. RAY:  Had the phone lost it's signal in this

10    case the law enforcement would not have been able to

11    track it.  They made a conscious decision that in order

12    to preserve that evidence which was the phone that was

13    taken off the young lady that was brutally raped on Ocala

14    Street.  They made a decision that they needed to make

15    contact with the residents of that apartment where they

16    knew the phone was in order to preserve that evidence.

17         In making contact at the door the female who --

18    although she says there was never any announcement that

19    it was the Tallahassee Police Department, Officer Suleski

20    testified that she asked -- a female voice asked -- who's

21    there and that the law enforcement officers indicated

22    that they were with the police.  They hear movements

23    behind the door, which I would suggest is the testimony

24    of Ms. Simmons, the defendant, gathering the pillow and

25    the pillowcase and the sheets, and/or whatever else and

1    going into the bedroom.

2         When she answers the door, they -- I would submit

3    the testimony is that they know it's the police outside

4    by the time the door gets opened.

5         And at that point, I think it's significant that she

6    testifies that Mr. Thomas told her to tell police there

7    was no one else in the apartment, knowing that he was

8    there.  And the police she says can tell she's lying,

9    asks again if someone else is in the apartment.

10        And with the police, even as she acknowledges,

11   knowing that she is not being forthcoming about who all

12   is in that apartment, Officer Suleski -- Investigator

13   Suleski -- puts his foot in the door and is not going to

14   allow the door to close, based on the reasonable

15   suspicion that there are multiple people in that

16   apartment, that the cellphone that was taken from the

17   victim of this crime is in the apartment and that they

18   are -- the signal is becoming weak and if they allow that

19   door to close, yes.  Mr. Shippy says there's nothing they

20   can articulate about you know, what would have happened

21   to the phone.

22        But I can assure the Court that what would have

23   happened if the door had been closed is that the

24   defendant and Ms. Simmons possibly would have had the

25   opportunity to destroy, alter, or get rid of evidence

1        inside that apartment, if they had the opportunity.

2             And for the officers in this case to believe that
3        that was a possibility and that they already know there
4        is one other person in the apartment, that Ms. Simmons is
5        already -- at first at least lied about -- they had an
6        obligation to go in there and search that apartment, or
7        do a protective sweep to make sure that there wasn't
8        anyone else in that apartment that could destroy any
9        evidence.  They didn't look for any evidence when they
10       were in there, they didn't find the phone when they did
11       the protective sweep.  They went in there, they found
12       that there was no one else in that residence and then
13       they removed Ms. Simmons from the residence.

14            It's at that point that Investigator Suleski has
15       testified that Ms. Simmons consented to a search of the
16       apartment, although I realize she testified that she did
17       not give consent.  There was also testimony that Mr.
18       Thomas consented to a search of the apartment.

19            And I would also point out that corroborates the
20       fact that -- of what the officer testified today, that
21       she did give consent, that she was very cooperative even
22       through her own words.  She allowed them to come back
23       with a search warrant for his clothes, she allowed them
24       to come back for a search warrant to search her vehicle.
25       I would suggest to you that she indeed gave consent to

TERESA SELVA, OFFICIAL DIGITAL REPORTER

```
 1      search the residence as well, but that the officers when
 2      they attempted to secure that scene and they were in
 3      process of getting a search warrant, they had exigent
 4      circumstances.  It was necessary for them to make sure
 5      that that phone and any other potential evidence in that
 6      apartment did not have the opportunity to be destroyed or
 7      altered.
 8           A phone -- a cellphone is a small thing, it could
 9      have been crushed, broken up, flushed down a toilet.  As
10      I said, they ended up finding the victim's underwear in
11      his -- and her purse in his pillowcase.  The underwear
12      could have been destroyed, set on fire.  A multitude of
13      things could have happened to the evidence.  And I would
14      ask that the Court deny the motion.
15 (Pause).
16           THE COURT:  All right.  In analyzing a -- I'm sorry,
17      Mr. Shippy.  Did you have something further you wanted to
18      say?
19           MR. SHIPPY:  No, Your Honor.  No.
20           THE COURT:  It was getting late and I was -- in
21      analyzing a motion to suppress, the Court always goes
22      back to the basic constitutional tenant that was the
23      officer's actions unreasonable -- which ultimately is
24      what we're trying to determine here.  We cubby-hole it
25      into a lot of different areas with our extensive case law
```

TERESA SELVA, OFFICIAL DIGITAL REPORTER

1       in a motion to suppress.  But ultimately, that's the

2       question that has to be determined, was it unreasonable

3       search and seizure?

4           I find that the actions -- that the officer's

5       actions were reasonable under the circumstances.  I'm

6       going to deny the motion to suppress.

7           The first issue relates to the legality, or

8       illegality of the sweep.  I do find that the officers had

9       a reasonable basis to believe that there were other

10      people in the apartment.  The testimony from the victim

11      or the statement from the victim was that there was

12      potentially multiple assailants.

13          Initially, Ms. Simmons lied to the officer about

14      whether others were there and they could see that that

15      was not true.  They observed and heard that there were

16      others in the apartment.  I think they had a reasonable

17      basis to be concerned about other people being in the

18      apartment and doing the sweep was not illegal.

19          But ultimately, I don't think the legality of the

20      search and seizure is dependant upon that.  I think the

21      clearer finding in my clearer determination was that the

22      search was a result of a free and voluntary consent by

23      Ms. Simmons.  It was Ms. Simmon's apartment, not the

24      defendant's apartment.  She was the one that leased it;

25      she was the one that paid rent.  She had every right to

1      consent to the search; he was a guest there.  And I think

2      ultimately, the search and seizure is based upon her

3      consent.

4          I've read the provision in Diaz.  It says that the

5      State must prove that there was a clear -- with clear and

6      convincing evidence that there was a break in the chain

7      of events sufficient to dissolve the taint.  That would

8      be assuming that the sweep is illegal.

9          I would find that even assuming for sake of argument

10     that the sweep was illegal, that there was a break in the

11     chain of that taint and that Ms. Simmons freely and

12     voluntarily consented to the search.

13         The testimony is that as soon as Ms. Simmons

14     understood the gravity of the circumstances she began to

15     cooperate.  I understand there was a little difference in

16     terminology between her and the officers.  But even her

17     testimony, although she says I didn't specifically

18     consent, was I was cooperative as soon as I understood

19     what was going on.  Just initially, they didn't tell me

20     anything.

21         I accept the officer's testimony that she did

22     specifically consent.  The officers certainly were more

23     cognizant of the significance of that consent.  I'm sure

24     it didn't mean too much to Ms. Simmons at the time.  But

25     even taken at her testimony she says I began to consent,

1        cooperate with them as soon as I realized how serious
2        this was.  Basically, I wanted to know what was going on.

3            I think that's supported by her testimony that later
4        she did, in fact, even give specific consent after the
5        defendant had left the premises and later consented to a
6        search of her car, to further buttress the fact that she
7        was trying to be cooperative.  I don't think her
8        cooperation had anything to do with whether the sweep was
9        legal or illegal.  It wasn't a situation where the
10       officers discovered something and exploited that
11       discovery in getting her to consent.

12           As I understand the facts, she doesn't even know
13       what happened in the sweep at the point that she consents
14       to the search of the apartment.  She has remained outside
15       the whole time.

16           It's a little closer question to me, as to the
17       defendant's statement in the apartment.  I do find that
18       the defendant was not under arrest at that point in time,
19       so his statements were not as a result of an illegal
20       detention.  It appears the statements were very limited
21       and basically were his attempt to show that he was
22       cooperating with the officers.

23           Under all those circumstances, I do not find that
24       the defendant's statement should be suppressed as being
25       the result of an illegal detention.  I don't really feel

1    like I have enough information to make a ruling on the

2    statement later made at the police department.  I'll

3    reserve that ruling to trial.

4        I will deny to the extent that the argument is that

5    there was an illegal arrest.  I deny the motion to

6    suppress statements at the apartment on that basis, but

7    whether there is -- exactly what happened at the station

8    I really have not been presented with that testimony.

9    And I'll reserve ruling on that portion of the

10   defendant's statement.

11       Does that leave anything unresolved?

12       MR. SHIPPY:  That's the all of it, Your Honor.

13       THE COURT:  All right.  We will be in recess.

14       MS. RAY:  Thank you, Your Honor.

15       MR. SHIPPY:  Do we want to set this for trial?

16       MS. RAY:  Oh, yeah, we need to set a trial date.

17       THE COURT:  When do you all propose?  This case has

18   gotten really old.  When do you all want to set it?

19       MS. RAY:  I think everyone's been deposed by

20   Mr. Higgins, so I'm not sure what Mr. Shippy's posture

21   is.  But I'm pretty sure, other than these motions, we

22   were pretty much ready to go to trial.

23       MR. SHIPPY:  I think that's a fair statement, Your

24   Honor.  I don't know how you want to handle it from a

25   what's-already-out-there standpoint.  But there has been

1       a lot of discovery conducted by Mr. Higgins beforehand,

2       so I have had a chance to review the file.  So I'm

3       certainly --

4              THE COURT:  So, when would you propose?

5              MR. SHIPPY:  I'm still proposing later than sooner,

6       only because of everything else I've got going on.

7              THE COURT:  Well, I understand.  But in terms of

8       prioritizing this case ought to take priority over some

9       perhaps that we have already set, frankly.  It's about

10      two years old it's a serious offense.  Mr. Thomas is in

11      custody, so I would give it a higher priority than much

12      of what we've already set.  But, I'm not trying to rush

13      you either, but at the same time -- I was looking at

14      November 1st, is what I was looking at.

15             MR. SHIPPY:  I do have a first degree murder case

16      set before Your Honor that week.  If this one gets higher

17      priority than that, then I'm okay with doing this one

18      over that.

19             THE COURT:  Well, what I find that we with start

20      setting one somewhere different because we have this one

21      set, what we end up doing is leap frogging them over them

22      because next, something will happen.  If that date

23      doesn't suit you, give me another proposal.  The only day

24      when I would say that we really have too many already set

25      is the October 18th trial week.  That would be the only

1        week that I would say we have too many set.  But beyond

2        that, I would set it whenever you all propose.

3            MR. SHIPPY:  The State has suggested November 15th

4        and that would be acceptable.

5            THE COURT:  All right.  Set it for trial week of

6        November 15, pretrial will be October 28th, final plea,

7        November 10th.

8            MR. SHIPPY:  Thank you, Your Honor.

9            MS. RAY:  Thank you.

10           THE COURT:  All right.

11           THE DEFENDANT:  Can I now speak please, sir?

12           THE COURT:  We'll be in recess.

13   (End of proceedings).

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2    STATE OF FLORIDA:

3    COUNTY OF LEON:

4              I, Teresa Selva, Digital Court Reporter,

5    do hereby certify that I transcribed the digital

6    recording of said proceedings that was provided to me

7    and that the foregoing pages are an accurate transcript

8    to the best of my ability.

9              I FURTHER CERTIFY that I am not a relative,

10   employee, attorney or counsel of any of the parties, nor

11   relative or employee of such attorney or counsel, or

12   financially interested in the foregoing action.

13
               DATED this    day of _____, 2011.
14

15

                    _____
16                  TERESA A. SELVA
                    DIGITAL COURT REPORTER
17                  LEON COUNTY COURTHOUSE
                    TALLAHASSEE, FLORIDA  32301
18

19

20

21

22

23

24

25